1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT FOR THE

7                 EASTERN DISTRICT OF CALIFORNIA

8

9  PAUL C. BOLIN                          )  Case No. 1:99-cv-5279-LJO
                                          )
10                  Petitioner,           )  <u>DEATH</u> <u>PENALTY</u> <u>CASE</u>
                                          )
11      vs.                               )  ORDER RE: PETITIONER'S REQUEST
                                          )  FOR EVIDENTIARY HEARING,
12  MICHAEL MARTEL, as Acting Warden of San )  RECORD EXPANSION AND MERITS
   Quentin State Prison,*                 )  REVIEW
13                                         )
                    Respondent.           )
14  _____ )

15

16

17

18

19

20

21

22

23

24

25

26

27

28  *Michael Martel is substituted for his predecessor as Acting Warden of San Quentin State Prison

99dp5279.OReReq4EvHrg.Bol.wpd

Table of Contents

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.     Overview of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.     Procedural History of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    The Standard for Reviewing State Court Conclusions. . . . . . . . . . . . . . . . . . . . . . . 4

III.   The Standard for Reviewing State Court Factual Determinations. . . . . . . . . . . . . . . . . 6

IV.    The Standard for Granting Further Evidentiary Development. . . . . . . . . . . . . . . . . . . . 6

       A.     Evidentiary Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.     Record Expansion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.     Essential Elements of Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . 8

VI.    Claim C: Trial Error and Ineffective Assistance of Counsel in Connection with Bolin's Failed
       Change of Venue Motion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.     Statement of the Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              1.     Pretrial Publicity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                     a.     Newspaper Articles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                     b.     *America's Most Wanted* Segment About Bolin. . . . . . . . . . . . . . 13

                     c.     Television News Reviewing the Crime and Bolin's Apprehension
                            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                     d.     Follow-up *America's Most Wanted* Segment About the Crime and
                            Bolin's Apprehension. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              2.     Violent and Criminal Conduct Mentioned in Pretrial Publicity. . . . . . . . 18

                     a.     Bolin's Arrest for Possession of a Gun, June 22, 1980. . . . . . . . . 18

                     b.     Bolin's Prior Conviction for Attempted Voluntary Manslaughter
                            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                     c.     Bolin's Acquittal of for the January 6, 1986 Oklahoma Assault and
                            Battery with a Deadly Weapon. . . . . . . . . . . . . . . . . . . . . . . . . 20

                     d.     Proceedings Regarding the Pipe Bomb Evidence. . . . . . . . . . . . 21

              3.     Publicity After Bolin's Arrest through Trial. . . . . . . . . . . . . . . . . . . . . 22

              4.     Summary of the Kern County Community Attitude Venue Change Survey
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              5.     Hearing on the Change of Venue Motion. . . . . . . . . . . . . . . . . . . . . . 25

6.      Summary of the Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

7.      Offers of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.      Bolin's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C.      The Warden's Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.      Claimed Trial Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.      Claimed Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . 41

a.      Relevant Facts Outside of the Record on Appeal. . . . . . . . . . . . 41

b.      Unsupported State Court Factual Findings in Light of Evidentiary
        Submissions on Habeas Corpus and Record Review. . . . . . . . . . 43

c.      Controlling Legal Authority for Change of Venue. . . . . . . . . . . 46

d.      Application of Ineffective Assistance of Counsel Standards. . . . . 49

VII.    Scope of the Evidentiary Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

VIII.   Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

APPENDIX I
        Summary of Newspaper Articles from the *Bakersfield Californian*. . . . . . . . . . . . . . . 56

APPENDIX II
        Summary of *America's Most Wanted* Program Regarding Bolin's Case, Sunday, January 7,
        1990,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

APPENDIX III
        Summary of Kern County Channel 29 Television Broadcast Bolin's Case on *America's Most
        Wanted*, Monday, January 8, 1990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

APPENDIX IV
        Summary of *America's Most Wanted* Program Regarding Bolin's Capture,
        Sunday,  January 14, 1990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

APPENDIX V
        Summary of Voir Dire of Jurors and Potential Jurors Exposed to Pretrial Publicity. . . . 72

APPENDIX VI
        Bolin Juror Publicity Chart. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

**I.      Introduction**

This matter is before the Court on the motion of Petitioner Paul C. Bolin ("Bolin") for an evidentiary hearing and expansion of the record with respect to Claims A, B2, C, D, F, G, I, J, K, W, Y, BB, DD, and EE.[1] Respondent Michael Martel, as Acting Warden of San Quentin State Prison (the "Warden"), opposes the motion.  In addition to briefs submitted regarding the evidentiary hearing and record expansion request, the Court has before it the previously submitted merits briefs in support of and opposition to Bolin's claims.  Bolin requests the Court to defer ruling on record based claims which may be relevant in assessing cumulative prejudice until after further evidentiary development has been completed.

**A.      Overview of the Case**

Bolin was convicted of two counts of first degree murder, with the multiple murder special circumstance, one count of attempted first degree murder, and one count of marijuana cultivation. The murder and attempted murder convictions resulted from an argument and shooting in the Kern County mountain community of Walker Basin on September 2, 1989.  In the summer months preceding the homicides, Bolin was living in a small cabin in a remote area of Walker Basin, at which he began occupying to cultivate marijuana.  Vance Huffstuttler ("Huffstuttler"), one of the deceased victims, also lived on the property with Bolin[2] to assist in the marijuana cultivation endeavor.  Prior to meeting Bolin, Huffstuttler was a local of Walker Basin.

In years prior to 1989, the Labor Day weekend in Walker Basin was celebrated with an annual team penning (rodeo-type) competition.  For the Labor Day weekend in 1989, the family of Steve Mincy ("Mincy"), the other deceased victim, planned to spend the long week-end enjoying the festivities and relaxing at a campsite on nearby family-owned property in Twin Oaks.  Mincy and friend Jim Wilson ("Wilson"), the surviving victim, drove from Garden Grove to the Mincy family campsite on Friday night, September 1, 1989. Mincy and Huffstuttler had been friends for a number

---

[1] Originally, Claim CC also was included in the request.  Bolin withdrew Claim CC (Doc. 236).

[2] Huffstuttler lived variously in the cabin with Bolin or in a trailer located nearby, or both, sometimes with his girlfriend Rebecca Ward.

of years, since Mincy often had spent entire summers in the Walker Basin area as a teenager. Mincy had introduced Wilson to Huffstuttler on a prior trip to Walker Basin. During this (the 1989) trip to the Walker Basin area, Wilson intended to spend part of his time bicycling through the mountains.

On Saturday, September 2, 1989, Wilson rode his bicycle to a bar in Twin Oaks to meet up with Mincy. At Twin Oaks, Mincy and Wilson also met up with Huffstuttler, Bolin, and Juan Eloy Ramirez ("Ramirez"), the latter two who were unknown to Wilson. Wilson left the others at the bar (and team penning) area and returned to the Mincy campsite later that afternoon after a long bicycle ride. Huffstuttler was there with Mincy and asked to be driven home to the cabin in Walker Basin. Wilson drove his pickup truck because he was sober and Mincy had consumed a few beers. Huffstuttler rode in the cab of the pick-up truck and Mincy rode in the truck bed.

After a 45 minute, rough, dirt-road trip, the trio arrived at the cabin and were greeted by Bolin. Ramirez also was present. Huffstuttler beckoned Mincy and Wilson across a creek bed to show them numerous marijuana plants under cultivation, all in planter containers. Bolin followed shortly thereafter and confronted Huffstuttler about bringing strangers to the property. Bolin and Huffstuttler argued and walked toward the cabin, still arguing. Wilson and Mincy heard a gunshot from the direction of the cabin. Bolin then returned to Wilson and Mincy, stated he had "nothing against" them, and opened fire. Wilson turned to run as soon as Bolin raised his pistol and was hit in his shoulder, but kept running up the mountain-side. He heard Mincy pleading for his life and more gunshots. Wilson kept running as long as he was able and finally rested until morning when he found his way to a neighboring ranch and the authorities were summoned.

At the cabin property, both Huffstuttler and Mincy were found dead. Huffstuttler was found outside the cabin near Wilson's pickup truck; Mincy was found lying near the creek bed. The cabin was in disarray with broken glass, a turned over chair, and hot sauce on the cabin floor. Outside, marijuana paraphernalia and loose marijuana were scattered about, a knife was near Huffstuttler's body, and hot sauce was observed on Huffstuttler's socks. A revolver also was found in the vicinity of Huffstuttler's body and the pickup truck. Neither weapon bore Bolin's fingerprints.

After the shooting, Bolin and Ramirez left the area and drove to Covina to spend the night at the home of Patricia Islas. The next morning, Bolin left his four-wheel drive van with a friend and

1  then traveled to Chicago where he had family members.  He eventually was arrested in a Chicago

2  suburb after the airing of the *America's Most Wanted* program on January 7, 1990, featuring him as

3  "the most wanted."  He waived extradition and was returned to Kern County for trial.

4      The airing of the *America's Most Wanted* program together with the pretrial publicity about

5  Bolin's arrest and crime is a major theme in Bolin's Petition and the subject of this memorandum

6  order.  The character of the first homicide (of Huffstuttler), whether murder or manslaughter, also

7  plays a major role in Bolin's claims.  Similarly, the possibility of a second shooter at the crime scene

8  is raised.  Based on the Court's thorough review of the record and Bolin's offers of proof, neither

9  of these claims can be sustained; while the claims state viable causes of action, no evidence is

10  offered which would entitle Bolin to relief.

11      On the other hand, constitutional incompetence of his attorneys, Charles Soria and William

12  Cater, an over-arching theme in the case, is worthy of consideration.  This is particularly true with

13  respect to the manner in which trial counsel conducted the change of venue motion, handled voir

14  dire, and failed to renew the change of venue motion post-voir dire.

15      **B.    Procedural History of the Case**

16      On December 12, 1990, Bolin's jury found him guilty of two counts of first degree murder,

17  with the multiple murder special circumstance, one count of attempted first degree murder, and one

18  count of marijuana cultivation.  After two continuances, the penalty phase trial commenced on

19  January 22, 1991, culminating on January 24, 1991 with deliberations and a verdict of death.  Bolin's

20  motion to set aside the death verdict was denied on February 25, 1991 and his death sentence was

21  imposed.  His conviction and sentence were affirmed by the California Supreme court on June 18,

22  1998. *People v. Bolin*, 18 Cal. 4th 297 (1998).  Bolin's petition for rehearing was denied on August

23  12, 1998, and his petition for certiorari to the United States Supreme Court was denied on March 8,

24  1999.  Bolin commenced this action on March 3, 1999 with a request for appointment of counsel,

25  in pauperis status, and for a stay of execution.  He filed his federal petition for habeas corpus relief

26  on August 8, 2000.  On the same day, with the assistance of federally appointed counsel, he filed his

27  first state petition for habeas corpus relief with the California Supreme Court.  With his August 11,

28  2000 state petition, Bolin presented Exhibits 1 through 51 to the California Supreme Court.  On

January 19, 2005, the California Supreme Court summarily denied Bolin's state petition on the merits, and additionally found several claims procedurally barred for Bolin's failure to raise them in the first instance on direct appeal. That procedural default was excepted by the California court to the extent the petition alleged ineffective assistance of appellate counsel.[3]   Bolin's amended federal petition filed on the same day is the operative petition in this action (hereafter the "Petition"). In addition to referencing Exhibits 1 through 51, Bolin presents Exhibits 52 through 94 with the Petition. At the direction of the Court, Bolin submitted Exhibit 95, a transcription of the September 5, 1989 interview with surviving witness Jim Wilson.

The Warden also has lodged his own exhibits. On December 19, 2007, the Warden lodged his Exhibits 1 through 15 in support of his merits brief opposing the Petition (hereafter the "Warden's Exhibits"). On June 30, 2010, the Warden lodged certified copies of the trial exhibits.

## II.     The Standard for Reviewing State Court Conclusions

Because Bolin's original federal petition was filed after the effective date of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), this case is governed by the provisions of that law. *Woodford v. Garceau*, 538 U.S. 202, 207 (2003). The United States Supreme Court recently addressed and re-articulated the standard of review for a post-AEDPA petition arising from a California conviction where the California Supreme Court did not provide a reasoned decision for its merits denial:

> Under [28 U.S.C.] § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). The Court emphasized, "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (Citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] state prisoner must show that the state

---

[3] The order reads in pertinent part: "Except to the extent the petition claims ineffective assistance of appellate counsel, the following claims are each procedurally barred, separately and independently, because they could have been, but were not raised on appeal." Citing *In re Harris*, 5 Cal. 4th 813, 825, fn. 3 (1993) and *In re Dixon*, 41 Cal. 2d 756, 759 (1953) (Recitation of defaulted claim omitted.)

1   court's ruling on the claim being presented in federal court was so lacking in justification that there

2   was an error well understood and comprehended in existing law beyond any possibility for

3   fairminded disagreement." *Id*. at 786-87.

4       Claim C was summarily denied by the California Supreme Court on state habeas (state claim

5   B4). Under California law, this signifies the petition would not entitle the petitioner to relief, even

6   if all the allegations were assumed to be true. *People v. Duvall*, 9 Cal. 4th 464, 474 (1995). Similar

7   to the phrasing of federal requirements in Rule 2 of the Rules Governing § 2254 Cases, California

8   habeas petitions "state fully and with particularity the facts on which relief is sought," and in

9   addition, "include copies of reasonably available documentary evidence supporting the claim,

10  including pertinent portions of the trial transcripts and affidavits or declarations." *Id*. (citing *In re*

11  *Harris*, 5 Cal. 4th 813, 827 (1993)). "If no prima face case for relief is stated, the court will

12  summarily deny the petition." *Id*. at 475. Should a state petitioner *"plead* sufficient grounds for

13  relief," the California courts then provide an opportunity for him or her "later to *prove* them." *Id.*

14  at 474 (Emphasis in original.) If the state court "finds the factual allegations, taken as true, establish

15  a prima facie case for relief, the court will issue an OSC." *Id*. at 475. The issuance of an order to

16  show cause directs the respondent State to address only the claims and factual bases for the claims

17  in the petition. *Id*.

18      In addition, Claim C was addressed by the California Supreme Court on direct appeal, but

19  only with the trial record before it. Additional facts and evidence were presented to the state court

20  during state habeas corpus proceedings. The ruling of the California Supreme Court is addressed

21  in the analysis of the claims, *infra*.

22      In those cases where a petitioner is able to meet the threshold under § 2254(d) for

23  establishing the state court decision was unreasonable, the issue of prejudice must be decided. For

24  ineffective assistance of counsel claims, the prejudice analysis is a component of the claim and is

25  described below. *See* Part V., *infra*. Where the constitutional claim is not comprised of a specific

26  prejudice element, prejudice must be established under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

27  Specifically, the prejudicial impact of any constitutional error must have had "a substantial and

28  injurious effect or influence in determining the jury's verdict." *Id*. at 623.

**III.     The Standard for Reviewing State Court Factual Determinations**

Where a petitioner challenges the state court's findings based entirely on the state record (i.e., an intrinsic review), the reviewing court must be particularly deferential and grant relief only if "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record" and "any appellate court to whom the defect is pointed would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Miller-El v. Cockerell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceedings . . .") Construing the "statutory language so as to avoid contradiction or redundancy," the Ninth Circuit concludes that "unreasonable determination" in (d)(2) may be based on a contention "that the [state court] finding is unsupported by sufficient evidence, [citations], that the process employed by the state court is defective [citations], or that no finding was made by the state court at all, [citations]." *Taylor*, 366 F.3d at 999.

Although the Supreme Court in *Richter*, 131 S. Ct. 770, did not have occasion to apply the "fairminded jurist" to an inquiry under (d)(2), the identity of the legal term of art, "unreasonable" used in both (d)(2) and (d)(1) convinces the Court to apply that standard to (d)(2) analyses.

**IV.     The Standard for Granting Further Evidentiary Development**

When a petitioner presents one or more colorable claims that have survived all procedural impediments and that, despite the petitioner's diligence in state court, were not adequately developed in state proceedings, further evidentiary development in federal court may be required, including an evidentiary hearing and record expansion.

**A.     Evidentiary Hearing**

An evidentiary hearing is authorized under Rule 8 of the Rules Governing § 2254 Cases for the development of a colorable claim when the state court has not reliably found the relevant facts and the claim, if proved, would entitle the petitioner to relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegation, which

if true, would entitle the applicant to federal habeas relief."). "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.*; *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). A federal court is without authority to consider evidence which was not available to the state court when undertaking analysis under § 2254(d)(1) as to the reasonablenss of the state court decision. The rationale for this holding is, simply, that "review under § 2254(d)(1) focuses on what a state knew and did." *Id.* at 1399. Similarly, a federal court also may not grant an evidentiary hearing without first determining whether a state court's factual determination was unreasonable under § 2254(d)(2). *Earp v. Ornoski*, 431 F.3d 1158-1166-76 (9th Cir. 2005). This determination may be informed by the six factors identified in *Townsend v. Sain*, 372 U.S. 293 (1963). *See Earp*, 431 F.3d at 1167. Those factors are:

1.    The merits of the factual dispute were not resolved in the state hearing;

2.    The state factual determination is not fairly supported by the record as a whole;

3.    The fact finding procedure employed by the state court was not adequate to afford a full and fair hearing;

4.    There is a substantial allegation of newly discovered evidence;

5.    The material facts were not adequately developed at the state court hearing;[4]

6.    For any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313.

Entitlement to and evidentiary hearing is limited further under 28 U.S.C. § 2254(e)(2). A federal court may not hold a hearing unless it first determines that the petitioner exercised diligence in trying to develop the factual basis of the claim in state court. *Williams (Michael) v. Taylor*, 529 U.S. 420, 435 (2000) (holding that subsection (e)(2) precludes an evidentiary hearing when the

---

[4] This factor is informed by the diligence requirement under § 2254(e)(2), discussed in the text, *infra.*

1  failure to develop the factual basis of a claim is due to a "lack of diligence or some greater fault

2  attributable to the prisoner or the prisoner's counsel").

> The question is not whether the facts could have been discovered but instead whether
> the prisoner was diligent in his efforts. The purpose of the fault component of
> "failed" is to ensure the prisoner undertakes his own diligent search for evidence.
> Diligence for purposes of the opening clause depends upon whether the prisoner
> made a reasonable attempt, in light of the information available at the time, to
> investigate and pursue claims in state court; it does not depend, as the
> Commonwealth would have it, upon whether those efforts could have been
> successful.

8  *Id.*

9  **B.     Record Expansion**

10     The record expansion procedure under Rule 7 of the Rules Governing § 2254 Cases

11  facilitates the consideration of evidence developed through investigation and discovery.  Under Rule

12  7(a), a court may require authentication of the materials presented.  Record expansion follows and

13  works in tandem with §§ 2246 and 2247 to allow admissibility of proceedings and records conducted

14  or filed in state court, or developed on federal habeas corpus.

15     If the petitioner seeks to expand the record to introduce new evidence never presented in state

16  court for the purpose of establishing the factual predicate of a claim, he or she must satisfy §

17  2254(e)(2) and show that he or she exercised diligence in state court to develop the evidence now

18  proffered in federal proceedings.  *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (per curiam)

19  (holding that § 2254(e)(2) restrictions apply to evidence presented without an evidentiary hearing).

20  The deference due state court decisions under § 2254(d) also will be applied in the context of Bolin's

21  record expansion requests.  *See Pinholster*, 131 S. Ct. at 1398; *Landrigan*, 550 U.S. at 574.

22  **V.     Essential Elements of Ineffective Assistance of Counsel**

23     To establish that trial counsel was constitutionally defective, the petitioner must demonstrate

24  (1) that counsel made errors so serious, counsel was not functioning as the counsel guaranteed the

25  defendant by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense.

26  *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995 ) *citing Strickland v. Washington*, 466 U.S. 668,

27  687 (1984).  The reviewing court need not address both prongs if the petitioner cannot satisfy one

28  or the other.  *Hein v. Sullivan*, 601 F.3d 897, 918 (9th Cir. 2010) ("The court may dispose of an IAC

claim where the petitioner "fails to satisfy either prong of the two-part test."); *Strickland*, 466 U.S. at 697.

"The first prong – constitutional deficiency – necessarily is linked to the practice and expectations of the legal community." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010).  Although the Court has long recognized that American Bar Association ("ABA") standards are guides to determining what is reasonable, they are only guides.  *Id.*  They are not "inexorable commands." *Bobby v. Van Hook*,  558 U.S. ___, ___, 130 S. Ct. 13, 17 (2009), *quoted by Padilla*, 130 S. Ct. at 1482.

> To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. [ ] A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. [ ] The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.

*Richter*, 131 S. Ct. at 787; *Premo v. Moore*, 131 S. Ct. 733, 739 (2011) (citations to *Strickland* omitted).

Many cases involving alleged deficient performance of trial counsel arise from decisions counsel make in the course of their representation.  Generally, strategic choices are accorded deference.  *See Strickland*, 466 U.S. at 691; *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). In order to pass constitutional muster, however, the decisions must be reasonable and informed. *Sanders*, 21 F.3d at 1456.  In the absence of evidence to establish lack of investigation, an improper strategy (as in *Sanders* where counsel advised his client to lie on the stand), or explained omission, the deference accorded trial attorneys' conduct at the time of trial forecloses a finding of deficient performance.

> Surmounting *Strickland*'s high bar is never an easy task. [ ] An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or pretrial proceedings], and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. [ ] Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  . . . The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

1  *Richter*, 131 S. Ct. at 788; *Moore*, 131 S. Ct. at 739-40 (citations to *Padilla* and *Strickland* omitted.

2  Bracketed clause added in *Moore* decision).

3      "With respect to prejudice, a challenger must demonstrate a reasonable probability that, but

4  for counsel's unprofessional errors, the result of the proceeding would have been different.  A

5  reasonable probability is a probability sufficient to undermine confidence in the outcome." *Richter*,

6  131 S. Ct. at 787.

> In assessing prejudice, under *Strickland*, the question is not whether a court can be
> certain counsel's performance had no effect on the outcome or whether it is possible
> a reasonable doubt might have been established if counsel acted differently.  *See*
> *Wong v. Belmontes*, 558 U.S. ___, ___, 130 S. Ct. 383, 390 [ ] (2009); *Strickland*,
> 466 U.S. at 693 [ ].  Instead, *Strickland* asks whether it is 'reasonably likely' the
> result would have been different. *Id*. at 696 [ ].  This does not require a showing that
> counsel's actions 'more likely than not altered the outcome,' but the difference
> between *Strickland*'s prejudice standard and a more-probable-than-not standard is
> slight and matters 'only in the rarest case.' *Id*. at 693 [ ].  The likelihood of a
> different result must be substantial, not just conceivable." *Id*. at 693.  130 S. Ct. at
> 792 (citing *Strickland*, 466 U.S. at 693).

13  *Richter*, 131 S. Ct. at 791-92.

14      In post-AEDPA cases, the analysis under *Strickland* additionally is subject to the

15  "unreasonable application" standard of 28 U.S.C. § 2254(d)(1).  *Knowles v. Mirzayance*, 562 U.S.

16  111,123 (2009).  The high Court refers to the review standard under § 2254(d)(1) as "doubly

17  deferential."  *Id*.  Under AEDPA, "[t]he pivotal question is whether the state court's application of

18  the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel

19  performance fell below *Strickland*'s standard." *Richter*, 131 S. Ct. at 785.  Although the state

20  decision under review need not explain the state court's reasoning, the habeas petitioner still bears

21  the burden to show there was no reasonable basis for the state court to deny relief. *Id*. at 784.  "A

22  state court's determination that a claim lacks merit precludes federal habeas relief so long as

23  'fairminded jurists could disagree' on the correctness of the state court's decision.  *Id*. at 786

24  (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "When § 2254(d) applies, the

25  question is not whether counsel's actions were reasonable.  The question is whether there is any

26  reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.  Moreover, because

27  "the *Strickland* standard is a general standard, a state court has even more latitude to reasonably

28

1    determine that a defendant has not satisfied that standard." *Stanley v. Cullen*, 633 F.3d 852, 682 (9th

2    Cir. 2011) (quoting *Yarborough*, 541 U.S. at 664)).

3    **VI.    Claim C: Trial Error and Ineffective Assistance of Counsel in Connection with Bolin's**

4    **Failed Change of Venue Motion.**

5          Claim C is presented as a two-part argument of trial error and constitutionally ineffective

6    counsel, the components of which Bolin claims are inextricable.  The underlying complaint is that

7    the venue change motion presented by Messrs. Soria and Cater before voir dire was not granted.  The

8    trial error relates to the fact that Judge Davis did not immediately grant the requested change of

9    venue, and instead reserved the ruling upon renewal, pending the results of voir dire.  The ineffective

10   counsel claim is predicated on the failure of the attorneys to renew the motion.

11        **A.    Statement of the Relevant Facts**

12         The facts relevant to Claim C are numerous.  They consist of pretrial publicity, violent and

13   criminal conduct mentioned in the publicity, the presence of publicity during and after Bolin's arrest

14   and through trial, a summary of the Kern County Community Attitude Survey, the hearing on the

15   change of venue motion, and a summary of the voir dire.

16        **1.    Pretrial Publicity**

17         There are four categories of publicity in this case: local newspaper accounts of the crime,

18   local broadcast media publicizing details about the crime, including trailers for the *America's Most*

19   *Wanted* episode about Bolin's case, the *America's Most Wanted* program itself, and a follow-up

20   *America's Most Wanted* segment about Bolin recapping the original program plus proclaiming the

21   fact of Bolin's arrest within an hour of the airing of the original program.   There also were several

22   references to continued media interest following Bolin's arrest and trial.  No reproductions of these

23   newspaper articles or media broadcasts have been presented to the Court (or, evidently preserved in

24   the record).  All references to the continued interest are anecdotal from the actual record of the

25   proceedings.  The pretrial newspaper articles and audio-video presentations have been submitted as

26   exhibits: Exhibit 53 for the newspaper articles and Exhibit 54 for the DVD containing the three

27   audio-video presentations.  These exhibits are included as offers of proof in Bolin's evidentiary

28   hearing motion.

### a.   Newspaper Articles

Eleven news articles dated between September 4, 1989, and March 3, 1990, have been submitted. In addition to reporting the "grisly" facts of the crime scene as described by deputies, the first five articles, from September 4 through 9, 1989, relay the following information: Jim Wilson's harrowing overnight trek through the rugged Kern County mountains to a place of safety after being shot in the shoulder, multiple "booby traps" at the cabin site, the discovery four pipe bombs in the cabin and the concomitant need for explosives experts to disarm them, the reason Bolin shot the three young men was that he was furious Huffstuttler brought Wilson and Mincy to see the marijuana operation, Bolin was a convicted killer as well as a former member of the Navy SEALS commando and explosives unit, patrols in the Walker Basin area had been increased as a protective measure, and the SWAT team discovery of a second "marijuana plantation" nearby Bolin's Walker Basin location. Readers were cautioned that Bolin and another suspect (Ramirez) "may be in possession of pipe bombs and numerous other unknown type weapons." Regarding the reported prior homicide, namely manslaughter, Bolin was said to have shot the victim during an altercation involving Bolin's god-daughter, for which he served almost two years in prison and that this information came from the State Department of Corrections.  The four pipe bombs said to have been discovered by authorities were described has having the fire power equivalent to a hand grenade.  An explosives expert did state that the pipe bombs were not set up as booby traps "per se," but had potential to do so, and that it was not uncommon for marijuana farmers to set up such booby traps to protect their unattended fields.  A description of the marijuana plantation discovered in the secluded terrain nearby Bolin's marijuana crop was interspersed with information about Kern County's pursuit of Bolin, a separate discovery of a vehicle registered to Bolin's wife in another area, and the recovery of a automobile stolen from Los Angeles near the second marijuana operation, intimating a possible connection.

There was a break in the articles submitted between September 9, 1989 and January 6, 1990, when the newspaper article advertised the showing of *America's Most Wanted* featuring Bolin's crime the following evening, and specifically to describe Jim Wilson's "brush with death."  The involvement of *America's Most Wanted* was reported to have been solicited by Kern County authorities, who after four months of trying to locate Bolin turned to the producers of the show for

assistance.  A reporter for the *America's Most Wanted* program was quoted as saying that selection of subjects for the show "are the biggest threats to society."   One of the investigating deputy corrected earlier accounts that Bolin was a former member of the Navy SEALS, noting that Bolin portrayed himself as involved with the SEALS to impress others.   The article reasserted the information about Bolin's prior conviction for manslaughter, and, in addition that Bolin suffered prior arrests for weapons charges.  Similarly, the article repeated the description of four pipe bombs, "each with the explosive power of a hand grenade" officials believed were to be used a "booby traps."  The next article, on January 8, 1990, recounted that because of the airing of the *America's Most Wanted* episode about Bolin, he was apprehended, and repeated the description of Wilson's 14-hour, eight-mile trek during which he crawled to safety.  The next article, from January 17, 1990, provided factual information about Bolin's representation, the fact that he was captured in Illinois, Wilson's 14-hour, eight-mile trek during which he crawled to safety, that authorities turned to the syndicated crime re-enactment show for help in finding Bolin, and that authorities discovered four pipe bombs, each with an explosive power of a hand grenade, to be used as booby traps at the marijuana farm site.  In between there was a letter to the editor from one of the *America's Most Wanted* actors praising the work of the Kern County authorities and the efficacy of the program in securing Bolin's arrest.  The last January article, from January 27, 1990, reported the delay of Bolin's preliminary examination hearing (to March 2, 1990) and that Wilson crawled eight miles over 14 hours to safety after having been shot in the shoulder.

The final article submitted was from March 3, 1990.  This article factually summarized the preliminary examination testimony from Jim Wilson and Eloy Ramirez.

**b.**   ***America's Most Wanted* Segment About Bolin**

The *America's Most Wanted* program about Bolin aired on Sunday night, January 7, 1990. It  is a dramatization of the crime, and events leading up to it, from the perspective of surviving victim Jim Wilson, with additional details added from Ramirez's perspective and based on law enforcement information.  The producers hired actors to portray Bolin, Ramirez, Mincy, Huffstuttler, Wilson, and members of Mincy's family, in particular, Mincy's father and Mincy's young daughter. The real Wilson provides narration over the action of the dramatization to give context and to

describe his fear, sorrow, and disbelief that Bolin killed Mincy and Huffstuttler and tried to kill him (Wilson).

The program begins with the narrator attributing the following information to Drug Enforcement Agents: "marijuana growers will stop at nothing to protect their illegal marijuana crops. Booby traps, land mines, bungie sticks, it could be deadly for anyone who wanders too close." Following this introduction "what happened to a young man from California," is uncovered.

The real Wilson first describes how he came to be in the Kern County mountains on September 2, 1989, that is to enjoy the company of Mincy and Mincy family members at their annual Labor Day camping trip and to spend time riding his mountain bike through the mountainside trails. The first indication that the joy of weekend might be compromised occurs when Wilson meets Bolin for the first time at Twin Oaks, the site of the local bar and annual team penning competition.  The Bolin character tells the Wilson character that he (Bolin) was a Navy SEAL and killed his first man when Wilson was in diapers.  The Wilson character is visibly upset by this comment. After some reassurances from the others, the Wilson character rides off on his bike and later meets back at the campsite where the family is gathered. Huffstuttler is there as well, and asks Wilson to drive him "home," that is, back to the cabin at which he lived with Bolin.  Wilson agrees to drive Huffstuttler home and Mincy goes along.

The *America's Most Wanted* narrator explains that Huffstuttler and Mincy previously shared a drug problem and Mincy's father did not believe Huffstuttler had changed his ways, whereas his son, Mincy, had done so.  The Mincy father character remains aloof from and clearly shows his disapproval of Huffstuttler.  Before departing, a child portraying Mincy's ten-year old daughter approaches the Mincy character to ask if she could accompany him on the journey.  Saying no, he kisses her reminding her about the dance in town that night.

The narrator refers to the trip from the Mincy campsite to the cabin as "an hour's drive up steep mountain trails." Aerial footage is shown of the rugged mountain terrain.  The length of the journey and the aerial views show that the cabin was difficult to locate and access.  Once at the cabin, the greeting of the Wilson, Huffstuttler, and Mincy characters by the Bolin and Ramirez characters seems amicable enough, with the exception of Bolin's German Shepherd dog which he

(the Bolin character) told the Wilson character was mean and might bite. The dog was tied to a stake near the entrance to the cabin. Huffstuttler immediately leads his friends down a hill behind the cabin to the site of the marijuana plants. This is where the trouble begins, with the Bolin character then confronting the Huffstuttler character about bringing his friends to see the marijuana operation. The narrator refers to the cultivation as "a secret" law enforcement officials said "Paul Bolin was determined to keep."

Once the Bolin character confronts the Huffstuttler character expressing his displeasure, the two proceed away from the marijuana plants back toward the cabin, with Bolin silently perturbed and Huffstuttler continuing his plaintive monologue about why he should be able to show his friends the operation. At this point the perspective shifts to Rameriz's, as Wilson and Mincy remains down by the creek bed. The Huffstuttler character is depicted grabbing the Bolin character by the shoulder and turning him around, causing the German Shepherd dog to bark menacingly. The Bolin character responds to this action by warning: "Don't fight me Vance. You're going to lose." The Bolin character then walks into the cabin as the Huffstuttler character continues challenging Bolin to fight and shoot him. After a long pause, the Bolin character emerges from the cabin glaring at Huffstuttler and holding a pistol. The camera is focused on the pistol, as the safety is pulled back. The Huffstuttler character pleads with Bolin not shoot and the Bolin character does so, without saying a word.

The camera pans back to the Wilson and Mincy characters who hear the gun shot and appear very worried. A fast drum beat is heard as the Bolin character returns to the creek bed, pistol in hand. The Mincy character asks Bolin if he is bluffing to which the Bolin responds simply, "No." As the Bolin character tells the others he has nothing against them he raises his pistol. The Mincy and Wilson characters run in opposite directions, Wilson up the hillside and Mincy down the creek bed past the marijuana plants. The Wilson character is hit in the shoulder and falls down. The Bolin character then pursues Mincy who trips and falls down on some large stones. His head emerges and he pleads with Bolin not to shoot him. The camera pans back to show the Bolin character standing on a boulder adjacent to the cowering Mincy character, pointing the pistol in Mincy's direction. The Bolin character smirks while Mincy pleads and then fires the pistol.

There are a number of scenes where the Wilson character stumbles, falls, and tumbles as he continues to run for his life.  The real Wilson's voice speaks over this action explaining he felt like an animal.  At one point there is footage of the Bolin character from the waist down running after Wilson.  The camera pans back and forth between Bolin's actions at the cabin site and Wilson's frantic escape to safety.

Back at the cabin site, the Bolin character is seen taking a rifle and shooting the lifeless bodies of Mincy and Huffstuttler, turning over furniture in the cabin, pouring hot sauce in the cabin interior, breaking the bottle, spreading handfuls of harvested marijuana over Huffstuttler's body, wiping finger prints off the pistol and wrapping Huffstuttler's hand around it, tossing a buck knife near Huffstuttler's body, loading the dog and Ramirez into the van, and driving away.  The narrator explains that Bolin tried to make the crime scene look like a drug deal shoot out.  While the Bolin and Ramirez characters are getting in the van, the real Wilson speaks over stating his impression about Bolin: "It was like it was business.  It didn't matter that he was going to kill somebody, take human lives.  It didn't matter."  The last image of the crime scene footage is of the Wilson character still running, tripping, and falling through the brush on mountainside.

The camera then returns to the *American's Most Wanted* newsroom.  The narrator reports that authorities found four pipe bombs in the cabin, notes that Bolin was a survivalist, but his claims of being a Navy SEAL were false.  Then the narrator reports about Bolin's past violent history, including that he killed a man in 1981 with a shot gun blast during an argument, and that in 1986 he stabbed a man 15 times but was acquitted of charges.  During narration of these facts, mug shot photographs of Bolin are displayed including one with Bolin's California State Prison "C-number" on a plaque below his face.  Viewers are urged to call the number on the screen, which is 1-800-CRIME-90, if Bolin is sighted.

**c.      Television News Reviewing the Crime and Bolin's Apprehension**

This news story, which aired on Monday January 8, 1990, credits the *America's Most Wanted* program with precipitating Bolin's capture, a feat Kern County Sheriff deputies had not been able to accomplish in four months.  The segment includes excerpts from the program, notably the shooting of Huffstuttler, and Wilson fleeing – running, stumbling, and falling.  Also included are

1    excerpts from an interview with the Kern County Sheriff Smith in which he details Bolin's arrest

2    following a call from a relative who had seen the *Most Wanted* program and the fact the residents

3    of the Walker Basin area remained concerned Bolin was still in the area because he was a survivalist.

4    The story ends with the statement, "with Paul Bolin in jail tonight, people here [in Kern County]

5    seem to be breathing a lot easier."

6            **d.**      **Follow-up *America's Most Wanted* Segment About the Crime and**

7                    **Bolin's Apprehension**

8          The follow-up segment aired on Sunday night, January 14, 1990, excerpting previously seen

9    footage of the Bolin episode and adding some additional interviews. The introduction to the

10    program line up summarizes two main stories about random, violent murderers, and three follow-up

11    reports about how three fugitives featured the previous Sunday had been captured. Bolin's is among

12    the follow-up stories.

13          When Bolin's name is mentioned, the footage is shown of the Bolin character, silently

14    emerging from the cabin, just before shooting the Huffstuttler character and then the real Bolin

15    walking through an airport terminal flanked by law enforcement and in belly chains with the word

16    "CAPTURED" printed diagonally over the footage. Before giving any further description of Bolin's

17    crime, the narrator credits an Illinois viewer for Bolin's capture "in near record time." The narrator

18    states "Bolin was hiding a secret marijuana crop on a mountain top in California's Sierra Nevadas,

19    and when three men stumbled on to the plants, Bolin murdered two of them."

20          The footage, just shown, of the Bolin character emerging from the cabin and shooting

21    Huffstuttler is repeated, followed by the Mincy character saying goodbye to his little girl at the

22    Mincy family camp site, and then Mincy cowering behind a small boulder pleading for his life as

23    Bolin, wordlessly smirking, shoots him dead. Footage not previously seen of Donna Mincy, Mincy's

24    mother, is aired as she explains, "hearing the news [about her son's death] wasn't as bad as having

25    to tell a little ten-year old child that her daddy was gone, and he wouldn't be back."

26          This sequence is followed by replayed footage of Wilson running, stumbling, falling and

27    struggling as the real Wilson narrates how he felt like an animal as he was trying to escape.

28    Previously unaired footage is shown of Wilson speaking to the narrator about essentially falling

down the mountain until he received help at a farm.  After showing the location on a map and the actual house at which Bolin was arrested, Mrs. Mincy is then shown with an interviewer explaining how happy she was when she found out Bolin had been caught.  The final scene is the repeated new footage of Bolin in leg and belly chains at an airport accompanied by authorities.

### 2.     Violent and Criminal Conduct Mentioned in Pretrial Publicity

The newspaper accounts and the narrator in the *America's Most Wanted* dramatization mentioned four categories of violent and criminal conduct attributable to Bolin.  In order of prominence, first, there was the possession of four pipe bombs, each having the fire power of a hand grenade.  Second, there was his prior manslaughter conviction for shooting Kenneth Ross with a shotgun during an argument.  Third, was his stabbing a man 15 times, but being acquitted because the jury thought he acted in self-defense.  Fourth, was the report that Bolin had been arrested previously on weapons charges.  The incidents that match these reports are, in order:

First, regarding the pipe bombs, the discovery of three pipes in the kitchen in the Thompson Canyon cabin, apparently capable of being converted into actual pipe bombs – September 3, 1989.

Second, regarding the manslaughter conviction, Bolin's prior conviction for *attempted* voluntary manslaughter of Kenneth Ross on September 8, 1981 (conviction May 24, 1983).

Third, regarding the January 6, 1986 stabbing of another man 15 times, Bolin's acquittal of assault with a deadly weapon in Oklahoma.

Fourth, regarding prior arrest for weapons there is his arrest for possession of a gun on June 22, 1980.

The prior incidents are described in chronological order.

### a.     Bolin's Arrest for Possession of a Gun, June 22, 1980

There is only one incident that Bolin suffered a prior arrest for "weapons charges" as published in the *Bakersfield Californian* on January 6, 1990, and stated by the *America's Most Wanted* narrator.  That was for a 1980 arrest in Los Angeles County for possession of a gun found in a leather briefcase, for which no charges were ever filed, and which Bolin's defense counsel successfully moved to suppress in advance of the penalty trial.  The proceedings related to this prior gun possession arrest took place on January 17, 1991 when Mr. Cater moved to strike the

prosecution's factor #3 in aggravation, that is Bolin's possession of a sub-machine gun on June 22, 1980. After an evidentiary hearing on the matter, at which the arresting officer testified, the trial court found, first, that the weapon was a semi-automatic handgun rather than a sub-machine gun, and second, that there had not been probable cause for the officer to seize and open the briefcase. RT-10: 2330-60; 2367; CT-2: 583. Although the court did not strike the factor, itself, CT-2: 579, the evidence the prosecution would have presented to support it was suppressed and the prosecutor told the court she would not go forward with that factor in aggravation. RT-10: 2390.

### b. Bolin's Prior Conviction for Attempted Voluntary Manslaughter

Bolin was convicted of attempted voluntary manslaughter of Kenneth Ross in the Los Angeles County Superior Court on May 24, 1983. He was sentenced to prison for five years and received by the California Department of Corrections on June 6, 1983. Exhibit 42: 197. In an early September 1989 article about Bolin, however, the information reported was that Bolin's conviction was for *actual* manslaughter, and that this information had been confirmed with the California Department of Corrections ("CDC"). The information prepared by the District Attorney's Office filed on March 12, 1990, also alleged Bolin previously had been convicted of voluntary manslaughter. CT-1: 125-29. This error was not corrected until December 13, 1990, when the court read the information to the jury before Ms. Ryals was called upon to prove the prior conviction. RT-9: 2248. She did that by introducing and authenticating three official documents, Bolin's booking sheet for this arrest, the "California Penal Code 969(b) package from the California Facility in Vacaville," and "a certified copy of minute orders and docket sheets from the trial in Los Angeles of this particular felony." *Id*.: 2252. [5]

//

//

_____

[5] During penalty proceedings, Ms. Ryals also provided the jury with the circumstances of the crime by eliciting testimony from the victim and witnesses to this September 8, 1981 attempted manslaughter incident. Bolin has submitted further evidence in support of his petition undermining Ms. Ryals' presentation. A complete summary of the testimony elicited at the penalty phase, plus additional evidence Bolin has offered in response to the penalty phase testimony is relevant to Bolin's Claim W5 of the Petition, and not recounted here.

1

       **c.**  **Bolin's Acquittal of for the January 6, 1986 Oklahoma Assault**

2

          **and Battery with a Deadly Weapon**

3    On August 7, 1985, while Bolin was on parole for the attempted voluntary manslaughter

4 charge, he was granted permission to move to Oklahoma so he could work with a friend who offered

5 him a job. Bolin's CDC records reflect that he had "been accepted by the State of Oklahoma for

6 parole supervision." Exhibit 42: 188. According to a later CDC report, Bolin was arrested in

7 Oklahoma on January 7, 1986 for assault and battery with a deadly weapon when he stabbed Jack

8 Baxter, a former CDC cell mate, following an argument. Baxter apparently struck Bolin with a

9 board and Bolin stabbed Baxter 15 times with a knife. Exhibit 42: 191. This same report notes:

10 "The Oklahoma Parole Agent advises that Baxter is under investigation for a number of crimes and

11 there is a possibility that charges against Subject [Bolin] may be dropped because of self-defense;"

12 and "The supervising Oklahoma Parole Agent indicates he would recommend continuance on parole

13 in the event the charges are dismissed. He describes Subject's adjustment as very good." *Id*.: 192.

14 After Bolin's acquittal, the California authorities nonetheless recommended that Bolin be returned

15 to California Prison. *Id*.

16    On December 27, 1990, Bolin's (second) investigator, Roger Ruby, interviewed Oklahoma

17 parole officer David Alexander in Durant, Oklahoma about the altercation between Bolin and Jack

18 Baxter. Alexander reported that Baxter was much larger than Bolin and that Bolin probably would

19 "need a weapon to keep Baxter off of him," although he doubted in was necessary for Bolin to have

20 stabbed Baxter 15 times. Alexander reportedly told Ruby "he could never understand why California

21 wanted to put Bolin back in prison especially after he was acquitted in his trial," that Bolin fully

22 cooperated with authorities, and "was an excellent parolee and tried to do everything required of him

23 as he was living in Durant." According to Ruby's report, Alexander stated he would testify for Bolin

24 in Kern County but needed a subpoena to cover him at work. Exhibit 24: 1.

25    On January 23, 1991, Mr. Cater presented to the court certified copy of the acquittal verdict

26 from this Oklahoma incident and asked that the matter not be brought to the jury's attention. The

27 court granted Mr. Cater's request. RT-10: 2458-59; CT-2: 588.

28

d.      Proceedings Regarding the Pipe Bomb Evidence

On September 28, 1990, Ms. Ryals gave notice of the People's intention to use evidence of the pipe bombs as a factor in aggravation of Bolin's sentence at the penalty phase proceedings. CT-1: 229-30.   During the pretrial motions on November 1, 1990, Mr. Soria orally moved to strike prosecution aggravating factors #3 and #7.   RT-II: 32.   Factor #3, as indicated in above in Part VI.A.2.a., *supra*, was the prosecution contention that Bolin had been in possession of a sub-machine gun on June 22, 1980.   Factor #7 was evidence that Bolin had pipe bombs in the cabin.   When Judge Davis asked about this pretrial motion, Mr. Soria abandoned it saying the matter could be reserved until after the guilt phase proceedings, when the issue of penalty aggravating factors was relevant. *Id.*: 32-35.

Notwithstanding the pending defense opposition to evidence of pipe bombs, on December 4, 1990, during the guilt phase people's case in chief, Ms. Ryals called senior Deputy Martin Williamson to the stand for his testimony regarding the investigation of the crime scene.   Laying the foundation for subsequent testimony of a Sheriff's investigator regarding the marijuana cultivation charge, Ms. Ryals asked him he found something in the cabin that appeared to Deputy Williamson "to be bombs." RT-8: 1862.   Deputy Williamson responded that the investigating officers found "what appeared" to them "to be [three] pipe bombs."   The investigators then contacted the bomb squad, because they "did not know if there were any other bombs on the property booby-trapped areas." No defense objection to the introduction of the pipe evidence was interposed.[6]   Further, on cross examination, Mr. Soria elicited that in addition to the pipes, there was a can of gun powder. *Id.*: 1865.   The next witness to testify about the "pipe bombs" was Sergeant Glen Johnson, who was in charge of the bomb squad for the Kern County Sheriff's Department.   Sergeant Johnson testified that bombs, explosive devices, and trip wires often are used in areas were narcotics are manufactured or cultivated.   *Id.*: 1884-85.   He then described three pipes found in the drawer of a small dresser with caps screwed on both ends and wires coming out of one end of each pipe and taped to that hole.

---

[6] Trial counsel could have objected to this evidence under California Evidence Code section 352 on the grounds that the probative value of this evidence was not sufficient to overcome its prejudicial impact.

Photographs of the small dresser, the pipes, and the can of gun powder were introduced into evidence during his testimony.  In the same dresser where the three pipes were found, there was a canister of gunpowder.[7]   The pipes were not loaded with gun powder, although one appeared to have had gun powder residue inside.  *Id*.: 1886-87.  During Mr. Cater's cross examination, he elicited from Sergeant Johnson that it would only take a "matter of seconds" to put powder into one of those pipes and another "matter of seconds" to wire them through the end caps.  *Id*.: 1890.

When Mr. Cater renewed the motion to strike prosecution aggravating factors #3 and #7 in advance of the January 17, 1991 pre-penalty phase hearing, Ms. Ryals responded in her papers, "The People will not offer factor #7 as a factor in aggravation under Penal Code § 190.3(b) and therefore will not respond to this motion as it concerns factor #7."  CT-2: 552.

### 3.    Publicity After Bolin's Arrest through Trial

Prior to the March 2, 1990, preliminary examination hearing, four motions for media coverage of proceedings were filed, one from the *Bakersfield Californian*, to include a still camera and tape recorder, one from radio station KUZZ, for audio, and one each from television station Channels 17 and 23.  CT-1: 8.  Due to the publicity focused on Bolin's case,  then co-counsel, George Peterson, presented a motion to exclude the public from the preliminary examination hearing and seal the preliminary examination hearing transcript.  *Id*.: 9.  In addition, he requested that the motion be heard *in camera*.  The court denied the *in camera* hearing, taking into account "the rights of the public and the news media to be represented by counsel to oppose such a motion."  *Id*.: 11.  Mr. Peterson argued under Penal Code § 868 that if the preliminary examination hearing were open to the public, there was a reasonable likelihood of substantial prejudice to Bolin's fair trial rights. *Id*.: 12-13.  Acknowledging the cited case and statutory law, the court noted, "In this particular case, we have the additional situation of nation wide TV because of a show that purports to have led to the capture of the defendant in this case. [¶] However, all of that has already occurred and there's

---

[7]   At trial, these photographs were marked People's 63, 64, and 65.  Those exhibits were admitted into evidence on December 6, 1990.  RT-9: 2086.  Mr. Cater stated he had no objection to the admission of Exhibits 47 through 67.  These photographic exhibits are before the Court in the present matter, since, as noted previously, the Warden provided all the trial exhibits to assist the Court in evaluating Bolin's claims.

[sic] already been numerous stories in the local media about not only the crime, itself, but the apprehension of the defendant." The court determined that even if the hearing were ordered closed to the public, the news media would have file photographs and reports of Bolin which could be publicized on television, radio, and newspaper. *Id.*: 13-14. In closing the court noted, "There has been publicity, there will continue to be publicity whether this hearing is closed or not. [¶] Court also has to consider, as the case law indicates, the public's right to know and the public's right to access a public court room. And in weighing those different factors it's this court's opinion that in this case the matter should remain open; transcript, when it is prepared, should not be sealed." The court added, "The four media representatives who have requested coverage will be permitted that and, again that's the newspapers [sic], one radio station and two television stations." *Id.*: 15. Mr. Peterson asked that his sealing motion be filed under seal and that was granted. *Id.*: 16.

Bolin alleges all of the media exposure led to a trial which apparently was "a real show" for the community. Petition, ¶ 104. In support of this allegation, he points to a statement made by Ms. Ryals, at the beginning of voir dire: "I think probably these people know what this case is and they think it will be fun." RT-1: 7.

Pretrial publicity was not the end of the media interest in the proceedings. Just after the jurors were sworn in, on the first day of the trial, December 3, 1990, Judge Davis noted that television cameras were permanently set up in the courtroom ready to film witness testimony.[8] On Tuesday, December 4, 1990, Judge Davis set out the schedule for the upcoming crime scene visit the following Monday, December 10, 1990. He described the trip as follows:

> We are going to leave between 9:30 and ten o'clock Monday and we will arrange to have lunch at the Twin Oaks Store between 11:00 and 11:30. That will be the restroom break. [¶] After a sumptuous repast, we will continue the journey up the mountain to a place called Five Points where we will off load you from your vans and on load you to a series of four-wheel drive vehicles, and you will be ferried the rest of the way in those four-wheel drive vehicles, and then we will reverse the situation as we come down the mountain, and should be home, 3:30 ish or 4:00, I would think on that day. [¶] If you have comfortable walking boots, I would suggest you use those. And as I said to you earlier, the temperatures are in the fifties, unless it's raining, which will make our trip even more exciting, perhaps *better than Disneyland.*

---

[8] The cameramen were admonished not to photograph or film the jurors. RT-7: 1643; RT-8: 1782.

1  RT-8: 1892 (emphasis added).

2      After giving the jurors the end of day admonitions, Judge Davis added, "Oh that reminds me.

3  We will be tailed by a television crew who will be filming again, and they are ordered not to talk,

4  and you are ordered not to talk to them." *Id*.: 1892-93.

5      Referencing the upcoming December 10 jury view during a break in the proceedings on

6  December 5, 1990, Judge Davis stated that the Monday trip had "gotten a little more complicated

7  and publicized" than he "might wish" and that he did not have the authority to close down the

8  highways to the crime scene. *Id*.: 1976. He informed the jurors there were "going to be television

9  stations following us up and down and all around" and admonished the jurors to avoid contact with

10  any of the television personnel, noting there would be more than one television crew "tailing" them.

11  *Id*.: 1977.

12          **4.    Summary of the Kern County Community Attitude Venue Change**

13          **Survey**

14      In advance of the November 1, 1990, motion to change venue, Bolin's trial attorneys, Messrs.

15  Soria and Cater, commissioned a community survey.[9]  Exhibit 52.   Three hundred seventeen Kern

16  County residents, registered to vote and holding California driver's licenses were interviewed to

17  assess the degree of public awareness of the case as well as predisposition for or against Bolin.

18  Forty-five percent of the respondents were aware of the case, and 52 percent of that number stated

19  they saw the *America's Most Wanted* program concerning the crime. That works out to be 23.4

20  percent of all respondents.  Sixty-six percent of the respondents aware of the case were exposed to

21  pretrial publicity other than the *America's Most Wanted* program.  That works out to be 29. 7 percent

22  of all respondents.  There is an obvious overlap between the 52 percent who saw the *America's Most*

23  *Wanted* program and the 66 percent of those exposed to other publicity.  Some respondents were

24  

25      [9] The Kern County Survey was lodged as part of Supplemental Clerk's Transcript on June

26  24, 2005.  It is unknown whether the California Supreme Court was presented with this document
on state habeas.  The Warden's June 23, 2005 notice of lodging states that the survey, along with

27  other documents, came from his (attorneys') files and were being lodged "with this Court for
consideration in connection with these [federal habeas] proceedings" (Doc. 124).  For ease in

28  reference, the Court will cite to Bolin's Exhibit 52 when referencing this document.

exposed to both.[10]  Of the 45 percent who were aware of the case, 60 percent believed Bolin to be guilty.  That works out to be 27 percent of all respondents.  The percentage of respondents who believed Bolin to be guilty was slightly higher in the category who saw the *America's Most Wanted* program, that is, 66 percent.[11]  *Id*.: 3.

The survey concludes there existed a "very strong statistical association" between "respondent predisposition toward guilt" and the viewing of the *America's Most Wanted* program. The survey reports that "respondents who did not view the program are more inclined to say that they need more information to form an opinion about the case than those who viewed the program."  The survey compared 58 percent with 23 percent of the respondents.  *Id*.: 4.

With respect to penalty, respondents aware of the case were asked whether they would favor life without parole or the death penalty if Bolin were convicted of the charges.  Sixty-nine percent favored the death penalty, 14 percent favored life without parole, and 17 percent stated they would need more information to form an opinion.  *Id*.: 4-5.  Comparing respondents who saw the *America's Most Wanted* program against those who did not see it, the percentage favoring the death penalty was 76 percent for those who saw it versus 61 percent who did not see it.  *Id*.: 5.

Asked whether the *America's Most Wanted* program featuring this case led respondents to favor the death penalty as a general proposition, 79 percent stated it did.  Seventeen percent stated the program led them to favor life without parole and 4 percent indicated they did not form an opinion.  *Id*.

### 5.    Hearing on the Change of Venue Motion

The venue change motion was heard on November 1, 1990, along with other *in limine* motions.  RT-II: 3-50.  The first part of the hearing was devoted to marking exhibits.  Exhibit A

---

[10] The survey later indicates that 77 percent of respondents who had seen the *America's Most Wanted* program thought Bolin was guilty, compared to 41.5 percent of respondents who had not seen the program and thought Bolin was guilty.

[11] The survey also states: "Those who viewed the television program are much more likely to say that the defendant is guilty of the charges than those who did not [view the program] (77 percent versus 41.5 percent guilty)."  This statement is puzzling because it overstates the 66 percent figure quoted in the text.

included local newspaper articles and the Community Attitude Survey. Exhibit B was comprised of the January 7, 1990, *America's Most Wanted* episode about the case. Exhibit C was the January 14, 1990, follow-up *America's Most Wanted* excerpt about Bolin's capture. Exhibit D was a Channel 29 extended news report about the case. The first order of business was for the court to view Exhibits, B, C, and D. The narration and dialogue of all the exhibits were transcribed into the record. The initial *America's Most Wanted* program is at RT-II: 7-16; the follow-up excerpt is at *id.*: 16-18; and the local news program is at *id.*: 18-20.

After the audio-video tape of the *America's Most Wanted* episode about Bolin, the follow-up story, and the Channel 29 news account were shown, Mr. Soria stated:

> The Court has just viewed our problem, your Honor. Anybody that has particularly viewed that program has basically seen the prosecution's side without any cross-examination. That certainly – first – the first tape is certainly Wilson's statement made into a movie. If the Court has reviewed the change of venue [motion], anybody who has seen that program has already convicted our client and believes the appropriate sentence is death or, at least, 75 percent according to the survey that we have done in this county.

RT-II: 21

Pointing to page 5 of the survey, Mr. Soria then conceded the percentage was only 61 percent.[12] *Id.* Continuing he noted that 45 percent of the people polled had knowledge of the case by some way of media exposure. *Id.*: 21-22. He explained:

> Our main problem, your Honor, if the Court is not inclined to grant the change of venue [motion], the defense cannot tolerate jurors who have seen the program sitting in judgment of our client. We would ask that anybody who has seen the program be excused for cause without even bothering to question.

*Id.*: 22. Judge Davis then noted that the *America's Most Wanted* program was broadcast nationally, so everyone might have seen it, and then acknowledged the defense argument "that when they [the *America's Most Wanted* producers] said Kern County, everybody in Kern County perked their ears up." *Id.* Mr. Soria then conceded that exposure to pretrial publicity by only 45 percent of those surveyed was "quite a low percentage to get a change of venue." *Id.*: 23. Mr. Soria then pointed

---

[12] Mr. Soria's concession misrepresented the survey results. He was correct the first time when he said at least 75 percent of the respondents who watched the program believed Bolin should suffer the death penalty. The survey reported 76 percent favored the death penalty of the respondents who has seen the program, and 61 percent in favor of the respondents who had not seen it.

out the claim of the *Most Wanted* program that Bolin killed a man in 1981 was not true. Rather, Bolin had been convicted of attempted manslaughter. The court commented that because neither Bolin nor the victims were national figures, "but for this re-enactment [the *America's Most Wanted* program], it would not be appropriate to change the venue." *Id.*: 23.[13]

Following this colloquy, Mr. Soria erroneously informed the court that according to the survey, only 20 percent of the people who knew about the case had seen the *America's Most Wanted* program about it. The correct percentage reported in the survey was that 52 percent of the people who knew about the case specifically had seen the *America's Most Wanted* episode and a total of 66 percent were aware of the case from publicity *other* than from the *America's Most Wanted* program.[14]

Ms. Ryals' primary opposition to the venue change motion was that Bolin had not established he couldn't get a fair trial. She specifically mentioned the figure 9 percent, which would be 20 percent of 45 percent, as being insufficient. RT-II: 24. But, as noted above, and demonstrated by the summary of the survey, far more than 9 percent of the Kern County community population had seen the *America's Most Wanted* program and were familiar with the case through other media exposure. Next, Ms. Ryals argued there was no way to know if even one person on voir dire would have seen the *Most Wanted* program. She did concede that the show probably was inflammatory, but that the defense failed to show Kern County was so prejudiced Bolin could not get a fair trial. She suggested that this case may be like others in the past where a large portion of people exposed to publicity didn't even remember when called for jury duty. She also criticized the survey because it didn't inquire whether people who had seen the program could put it aside if selected as jurors. *Id.*: 25. She urged the court that the case shouldn't be moved somewhere else because a small percentage of people in Kern County saw the program. *Id.*: 26.

---

[13] In later proceedings, namely on November 8, 1990, after voir dire examination of juror Michael Vaughn, Judge Davis stated he had not read any of the *Bakersfield Californian* newspaper articles offered by the defense. RT-2: 385-86. *See* Part VI.A.6., *infra*.

[14] Of the total survey population, 23.4 percent (45 x 52) had seen the *America's Most Wanted* program and 29.7 percent (45 x 66) had seen other the *America's Most Wanted* segment or news accounts of the case.

1    In response, Judge Davis commented:

2    I recognize that and what you say is true, Ms Ryals, but I must say that we, in the
     business, pride ourselves that we can rise above publicity. I don't know whether the
3    average person viewing this particular program, Exhibit B, psychologically will be
     able to do that. It's quite dramatic.
4

5    *Id*. This observation was tempered when Mr. Soria confirmed the judge's question, "Am I to

6    understand what percentage of the people in this country saw the program, 19 percent?" Mr. Soria

7    confirmed the percentage was "a little over 15 percent." It is entirely unclear from whence this

8    information is derived. As set out above, Question 4 of the survey asked if the respondent had seen

9    the *America's Most Wanted* program about the present case. Of the 317 people in the survey, 23.4

10   percent said they had.

11   Ultimately, instead of ruling on the motion, the court reserved its ruling to see how many

12   prospective jurors actually had seen the *America's Most Wanted* program and then to see how those

13   people responded to questions advanced by the defense lawyers.

14   As to this motion to change venue, Mr. Soria, what I think I'm going to do with that
     is to reserve ruling on it. I want to see first of all how many prospective run-ins we
15   get who actually have seen this video and then I would like to take a few of those and
     I realize you and Mr. Cater would have a great many questions that may not be
16   necessary and see what their general reaction is. [¶] Frankly, if I think there are
     general reactions, if – if there are general reactions, what I think there is, I think I
17   might be inclined to give a blanket for cause. [¶] So your motion is reserved, Mr.
     Soria, I guess is what I'm saying.
18

19   *Id*. at 50. Judge Davis then reiterated his earlier comment, "but for this re-enactment on *America's*

20   *Most Wanted*, I do not think there are grounds to change the venue on any of the criteria that we have

21   before us concerning that." *Id*.

22              **6.      Summary of the Voir Dire**

23   Publicity about Bolin's crimes was prevalent among the venire from which Bolin's jury was

24   selected. Out of 171 jurors who survived initial hardship excusals and were individually questioned

25   about their exposure to publicity and views about the death penalty, 66 reported varying degrees of

26   knowledge about the case and exposure to one or more sources of pretrial publicity.[15]  Appendix V

27   _____

28   [15] Bolin's papers state 147 and the Warden claims 152  prospective jurors survived the
     hardship process.  The Court cannot account the differences, but relies on its own careful review.

recounts the voir dire testimony of 59 prospective and 7 actual jurors who had been exposed to pretrial publicity, including newspaper articles, television news reports, trailers for the *America's Most Wanted* program, the actual *America's Most Wanted* segment featuring Bolin, and the follow-up segment on *America's Most Wanted* after Bolin was apprehended. Appendix VI is a table summarizing voir dire responses of these 66 individuals as to the source of publicity to which they were exposed, whether their testimony indicated their response on the questionnaire about Bolin's guilt, their level of recollection about the crime, whether they could put the publicity to which they had been exposed out of their minds, whether they were subject to a cause challenge, and whether they were excused on other grounds.

With one exception, where a prospective juror reported having been exposed to the *America's Most Wanted* episode or follow-up programing about Bolin, Messrs. Soria and Cater advanced a cause challenge.[16]  Where a cause challenge was predicated solely on exposure to an *America's Most Wanted* broadcast *and* the juror reported that she or he could put publicity out of her or his mind, the challenge was denied.  This process occurred 19 times during the course of voir dire, including for six of the seven actual jurors who sat on Bolin's petit jury.  About a third of the way through voir dire, after Mr. Cater moved to challenge prospective juror Dawn Albitre for cause because she had watched the *America's Most Wanted* episode about Bolin, he asked Judge Davis for "some advisement."  In frustration, he asked (rhetorically), "What do I have to do to get someone who has seen this off this jury?"  *See* Appendix V, Part One, 11.  In several cases, prospective jurors who had been exposed to the *America's Most Wanted* program were challenged by defense counsel after reporting they could *not* be impartial based on publicity, they would automatically vote for the death penalty if Bolin were convicted of the pending charges, or would be inclined to find Bolin guilty if he failed to testify.

The voir dire responses also show that 45 individuals, whether or not exposed to the *America's Most Wanted* program had a good to excellent recollection of the crime, while only 12 had no or a limited recollection and three had a limited to good recollection.  Four of the 45

---

[16] The exception was Meri Hatfield, who stated she may have watched the *Most Wanted* episode about Bolin, but remembered nothing about it.  Defense counsel did not challenge her.

individuals with a good to excellent recollection of the crime were selected to serve on the petit jury. Nine individuals in the good to excellent recollection category had not seen any production or production portion of the *America's Most Wanted* program, including one of Bolin's actual jurors.[17]

The issue of whether the *America's Most Wanted* program was the primary source of juror knowledge about the crimes is illustrated by voir dire examination of one prospective juror ultimately selected to sit on the petit jury, which generated considerable argument between counsel. That juror, Michael Vaughn, explained on voir dire that he acquired his knowledge about the crime based on his reading of articles in the *Bakersfield Californian* and that he also saw the follow-up *America's Most Wanted* segment describing Bolin's arrest. *See* Appendix V, Part Two, 3. Mr. Cater vehemently argued (out of Mr. Vaughn's presence) that he was unqualified to sit on the jury because his knowledge about the crime obviously came from viewing the main Bolin *America's Most Wanted* episode. Judge Davis, however, stated that he believed Mr. Vaughn had not seen the *America's Most Wanted* program, but rather that his knowledge about the case from the *Bakersfield Californian*. Ms. Ryals argued in support of the judge's view, noting that the key facts Mr. Vaughn recollected had been published in the newspaper as well as re-enacted on the *Most Wanted* program, concluding "what was in the news and what was on that television show were basically the same things." *See* Appendix V, Part Two, 3.

A great many prospective jurors, including those actually selected, also wrote on their questionnaires they believed Bolin to be guilty of the pending charges (either probably or definitely). The number of individuals in this category is 24 for prospective jurors (40.6 percent) and three for actual jurors (42.8 percent). The tally on this fact is incomplete, however, since the only information available to the Court is voir dire inquiries about the questionnaire responses. If a prospective juror wasn't asked about what she or he marked on her or his questionnaire and the issue wasn't explored on voir dire, the information is unknown. Twenty-nine individuals, including three actual jurors fall into the "not asked" category. In some of these cases the prospective juror's statement of partiality about the death penalty or feelings about Bolin's guilt if he did not testify led to a granted cause

---

[17] That juror was Gilbert Barnes.

challenge before in depth questioning.  This occurred in 15 of the 29 instances where individuals were not asked about their questionnaire responses.

Neither party spends much effort describing the peremptory challenges, but because Bolin's attorneys failed to exhaust the 20 challenges to which Bolin was entitled, the peremptory challenge process was relevant.  The following table illustrates the peremptory challenges of 30 jurors seated for the petit jury.

| Prospective Juror Seated | Prosecution Challenge | Defense Challenge |
|---|---|---|
| ~~Thomas Hale~~ | | 1634 2nd |
| ~~Nancy Burciaga~~ | 1632 1st | |
| ~~Dawn Albitre~~ | | 1632 1st |
| ~~Meri Hatfield~~ | 1637 12th | |
| ~~Janice Lucas~~ | 1636 11th | |
| ~~Shirley Sabo~~ | 1637 13th | |
| ~~Mary Badgley~~ | 1633 2nd | |
| ~~William Goff~~ | 1633 3rd | |
| Patricia Hinson | | |
| Ralph Lopes | | |
| ~~Anthony Zaninovich~~ | 1638 14th | |
| ~~Gwendolyn Holder~~ | 1634 4th | |
| Robert Bowles | | |
| ~~Bobby O'Neal~~ | 1635 6th | |
| ~~Ginger Lewis~~ | 1635 5th | |
| ~~Pamela Fuson~~ | 1636 9th | |
| Julie Hanson | | |
| Connie Pauley | | |
| ~~Dina Romero~~ | 1635 7th | |
| ~~Ronald Sprague~~ | 1636 8th | |
| John Medina | | |
| Gilbert Barnes | | |

| | | |
|---|---|---|
| ~~Arthur Cordova~~ | 1636 10th | |
| Beverly Lauer | | |
| ~~Randall Griffin~~ | | 1637 3rd |
| ~~Douglas Zimmerman~~ | | 1637 4th |
| Dale Campbell | | |
| Jeannine Lee | | |
| Steven Parkison | | |
| Michael Vaughn | | |

RT-7: 1632-38

This next table shows peremptory challenges exercised with respect to the alternate jurors.

| Prospective Alternate | Prosecution Challenge | Defense Challenge |
|---|---|---|
| ~~Clifton Journey~~ | 1639 3th | |
| Donald Newberry | | |
| ~~Gloria Hawkins~~ | 1639 1st | |
| ~~Robert Oglesby~~ | 1639 2nd | |
| ~~Jody Pedrin~~ | | 1639 1st |
| Sherry Hickman | | |
| James Iseminger | | |
| ~~Kirscy Newton~~ | 1640 4th | |
| ~~Linda Crawford~~ | | 1640 2nd |
| Cynthia Underwood | | |

*Id.*: 1638-40.

### 7.    Offers of Proof

Bolin offers three exhibits regarding the background of case-related publicity, including the Kern County Community Attitudes Venue Change Survey, the newspaper reports, and DVD recordings. Exhibits 52, 53, and 54.  The content of the evidence presented in these exhibits is described in Part VI.A.1., *supra*. For prevailing professional norms, Bolin offers the 1989 ABA

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the 1987 National Legal Aid and Defender Association (NLADA) Standards for the Appointment of Counsel in Death Penalty Cases, excerpts from the California Death Penalty Defense Manual (1986 through 1989) regarding jury selection as well as pretrial motions for change of venuye, and the declaration of *Strickland* expert, James S. Thomson.  Exhibits 57, 58, 59, 60, and 72, respectively.  For evidence regarding the performance of counsel, he offers the declarations of Mr. Soria, Mr. Cater, and Mr. Thomson (Exhibits 65, 66, and 72, respectively).

The relevant portion of Mr. Soria's declaration as to Claim C is summed up in one paragraph:

> We knew it was important to keep off the jury the people who had seen the segment about the case on "America's Most Wanted." I do not recall any strategic reason why we would not have renewed the change of venue motion after voir dire, unless we felt we had been successful in selecting a jury of people who had not seen "America's Most Wanted."

Exhibit 65, ¶ 8.  Mr. Cater's declaration on the subject also discloses a lack of strategy for failure to renew the change of venue motion:

> The change of venue motion was particularly important, because the Bolin case had received a lot of publicity.  I am not aware of any strategic decision not to renew that motion following voir dire, and I do not know why Mr. Soria failed to do so.  I cannot explain why I did not prompt him to do so.  If we failed to get a final ruling, it was a mistake.

Exhibit. 66, ¶ 20.  With respect to failure to exercise more of Bolin's peremptory challenges, Mr. Cater's declaration avers: "I do not recall any strategic decision not to peremptorily excuse jurors we had previously challenged for cause."  *Id*., ¶ 23.

Mr. Thomson's declaration relative to Claim C stresses the importance of defense counsel obtaining a final, definitive ruling on a change of venue motion, which Messrs. Soria and Cater did not do.  Mr. Thomson avers, "The defense bar knows that counsel must obtain a final ruling on a motion in order to preserve an issue for appeal."  Exhibit 72, ¶ 47.  Noting Mr. Soria's averment of not recalling any strategic reason for failing to renew the change of venue motion unless he and Mr. Cater had been successful in selecting a jury of people who had not seen the *America's Most Wanted* program, Mr. Thomson declares:

> Unfortunately, counsel had not been successful in that regard: four seated jurors (Lee, Vaughn, Hanson, and Bowles) disclosed that they had seen the *America's Most Wanted* episode regarding Mr. Bolin [Record citation.] Another seated juror (Barnes)

admitted to being influenced by newspaper reports about the case. [Record citation.] Failure to renew the venue motion under these circumstances is inconsistent with prevailing professional norms at the time of Mr. Bolin's trial.[18]

Exhibit 72, ¶ 48.  Mr. Thomson also is highly critical of Bolin's trial attorneys for their failure to exercise only four of the 20 available peremptory challenges, especially for the individuals who had watched the *America's Most Wanted* program (or follow-up) and Mr. Barnes, who had been persuaded of Bolin's guilt from reading the newspaper.  *Id*., ¶ 51.

**B.    Bolin's Argument**

Bolin first argues the trial court erred by not granting his motion to change venue because the record demonstrated presumed as well as actual prejudice.  Citing *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) and *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966), he claims prejudice should have been presumed because the Kern County community was saturated with prejudicial and inflammatory publicity about the crime.  Acknowledging that claims of presumed bias have been rejected where media reports have been primarily factual, citing *Harris v. Pulley*, 885 F.2d 1354, 1362 (9th Cir. 1988), he maintains the publicity in Bolin's case could not be characterized as primarily factual.  Rather, the articles in the *Bakersfield Californian* contained what Bolin characterizes as "a broad array of misinformation," including that his marijuana "plantation" was rigged with pipe bombs and other booby traps, that Bolin was a former Navy SEALS explosives expert, that he and a second fugitive were likely armed with pipe bombs and "numerous other unknown type weapons," that Bolin was a "convicted killer," and a connection between Bolin's marijuana cultivation efforts with other marijuana operations in Walker Basin.  Moreover, he argues, the *America's Most Wanted* program and subsequent follow-up broadcasts conflated fact and fiction, deliberately stirring up public sentiment against Bolin.  He points to three examples of evoking viewer sentiment: 1) the fact that Wilson was portrayed as a clean-cut young man with a bright future; 2) family ties in the Mincy family, especially the touching interaction between Mincy and his

---

[18]  The Court's review of the voir dire, Appendix V, indicates that six of Bolin's jurors, Jeannine Lee, Michael Vaughn, Dale Campbell, Julie Hanson, Patricia Hinson, and Robert Bowles saw the initial *America's Most Wanted* episode or the follow-up episode (which repeated salient excerpts from the initial broadcast).

1  young daughter; and 3) the fact that Mincy had put his past drug use behind him.  These were factors

2  with which viewers could identify, in contrast to *America's Most Wanted*'s portrayal of Bolin as a

3  "grizzled mountain man without community or families ties."    The effect of this publicity, Bolin

4  argues, is reflected in the results of the Community Attitude Survey as well as the fact that numerous

5  prospective jurors and actual jurors exposed to publicity had drawn conclusions about Bolin's guilt

6  prior to trial.  He also notes that the trial judge repeatedly noted that the *America's Most Wanted*

7  program was graphic in its depiction of violence and dramatic in style.  This occurred in the voir of

8  Nancy Porter, Daniel Webb, Hal Hannah, Linda Jackson, and Shirley Sabo.[19]

9      He argues the publicity in his case was comparable to prejudicial news accounts publicized

10  in *Daniels v. Woodford*, 428 F. 1181 (9th Cir. 2005), where the denial of habeas relief was reversed

11  because of presumed prejudice affecting the jurors.  He claims the coverage of his case meets the

12  three factors described in *Daniels*, that is, 1) a barrage of inflammatory publicity immediately prior

13  to trial amounting to a huge wave of public passion, 2) the absence of primarily factual news

14  accounts, and 3) inclusion in those reports of prejudicial material not admissible at trial.  *Id*. at 1211.

15  He also points out that publicity attending the case immediately after the crime was discovered and

16  Bolin's apprehension continued into the trial, where the media maintained a continued presence in

17  the courtroom.  He offers the statement of prosecutor Ms. Ryals that the people reporting for jury

18  service would know about the case and think the experience would be "fun" as further support for

19  the pervasive influence of media attention and publicity.

20      Bolin also argues actual prejudice among the prospective and actual jurors should have

21  impelled the trial judge to grant the venue change motion sua sponte following voir dire.  Quoting

22  *Patton v. Yount*, 467 U.S. 1025, 1035 (1984), he sets forth the standard: "The relevant question is

23  not whether the community remembered the case, but whether the jurors [ ] had such fixed opinions

24  that they could not judge impartially the guilt of the defendant."  Because Bolin maintains so many

25  prospective jurors and actual jurors believed in his guilt before voir dire, he argues the reliability of

26

27  [19] *See* Appendix V, Part One, 27 (Nancy Porter), 30 (Daniel Webb), 39, (Hal Hannah), 41
    (Linda Jackson), 48 (Shirley Sabo).  Bolin also notes that in the voir dire of two other prospective

28  jurors, Donald Pearson and George Atkisson, the jurors mentioned that the *America's Most Wanted*
    program about Bolin was "graphic."  *See* Appendix V, Part One, 4 and 13.

later assurances of impartiality cannot be credited, citing *Murphy v. Florida*, 421 U.S. 794, 803 (1975). Pointing to the results of voir dire questioning, Bolin claims the high level of prejudice seen in the questioned prospective jurors as a whole casts doubt on the ability of the seven sitting jurors, who also had been exposed to pretrial publicity, to have remained impartial.[20]  Relying on *Irvin v. Dowd*, 366 U.S. 717 (1961), he denigrates the subsequent "rehabilitation" of these jurors:

> With such an opinions permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations.  The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man.

*Id*. at 727.

In his reply brief, Bolin acknowledges the ruling of the California Supreme Court on direct appeal that he abandoned the trial error claim for not renewing his venue motion after voir dire, as his attorneys were invited to do by the trial court.  18 Cal. 4th at 312-13.  He argues, however, that because the cause for this procedural default was ineffective assistance of trial counsel, and ineffective assistance of counsel is part of the same claim, both the trial error and attorney error components must be considered together.

Based on the record and the fact Judge Davis did invite Messrs. Soria and Cater to renew their venue motion after voir dire, Bolin has a significant arsenal of claimed constitutional professional incompetence.  Not only did counsel fail to renew the venue motion, they also failed to request a blanket excusal of all prospective jurors who and seen the *America's Most Wanted* program after Judge Davis gave an indicated ruling that he would grant a blanket cause challenge excluding prospective jurors who had seen the *America's Most Wanted* program if their "general reaction" demonstrated lack of impartiality.

Bolin argues that the failure of his attorneys to act was not part of any litigation strategy, since they never conceded propriety of venue in Kern County, and never abandoned the position that prejudicial media coverage tainted the jury.  He points to the rhetorical question Mr. Cater made of the trial court after the voir dire of prospective juror Dawn Albitre (who had seen a re-recorded video

---

[20] As identified in Appendices V and VI, *infra*, those jurors were Gilbert Barnes, Jeannine Lee, Michael Vaughn, Dale Campbell, Julie Hanson, Patricia Hinson, and Robert Bowles.

*America's Most Wanted* program, had been in Walker Basin the weekend of the crime, and demonstrated an excellent recollection of the crime): "What do I have to do to get someone who has seen this off of this jury?"   Bolin maintains that rather than attempt to vindicate his Sixth Amendment right to an impartial jury, counsel abdicated their professional responsibility.

Recounting the factors to be considered in ruling on a venue change motion, Bolin maintain Messrs. Soria and Cater would have been successful had they renewed it.  Those factors include: 1) the extent and kind of publicity; 2) the size of the community in which the crime occurred; 3) the nature and gravity of the crime; and 4) the standing of the victim and accused in the community, citing *Martinez v. Superior*, 29 Cal. 3d 574, 578 (1981).  He argues the Community Attitude Survey and voir dire responses both demonstrated widespread publicity which generated a belief in Bolin's guilt, the nature of the crime could not have been more serious, and although neither the victims nor Bolin were public figures, their respective social standing was highlighted in the print and broadcast reports as well as in *America's Most Wanted*.[21]   To bring home the ineffective performance of Messrs. Soria and Cater, Bolin refers to several of the defense manual texts and ABA guidelines offered to support his contentions, noting that many resources available to defense counsel at the time Bolin's trial was conducted definitely advised to push for a change of venue in the face of prejudicial publicity and to preserve the client's arguments for appeal.

## C.    The Warden's Argument

Citing the California Supreme Court opinion on direct appeal, the Warden argues procedural default on the trial error claim.  *Bolin*, 18 Cal. 4th at 312-13.  Similarly, he cites the Supreme Court opinions for rejection of the ineffective assistance of counsel claim on the merits.  *Id.* at 313-14.  The Warden's reliance on the state court's opinion is the cornerstone of his argument:

> Counsel's failure to renew the change of venue motion did not result from ignorance or inadvertence and reflected a reasonable trial strategy. [Citation.] The impact of the pretrial publicity generally and the *America's Most Wanted* episodes in particular was a critical focus of the voir dire.  Although many prospective jurors had been exposed to some pretrial publicity, including the segment re-enacting the killings, for the most part few recalled the specifics or had formed a resolute impression of defendant's

---

[21] The Court takes Bolin's omission of discussion about the size of the community factor as a concession that his element did not militate in favor of the requested venue change.

guilt. In particular, those who eventually sat on the jury all gave assurances they would decide the case based solely on the courtroom evidence. [Citation.]

In light of these responses, counsel could well have recognized the effect of the publicity had not been as substantial as feared, especially after an 11-month interim. Thus, renewed effort to seek a change of venue would be futile since the trial court had conditioned any change in its tentative ruling on a determination the television coverage had impaired the ability to assemble an impartial jury. In addition, the re-enactment was relevant only to the guilt phase portion of the trial. With guilt virtually a foregone conclusion, counsel's concern may at that point have turned to the penalty phase, which was substantially insulated from the effect of pretrial publicity. [Citation.] Given the possibility of a valid trial tactic, we reject this claim of ineffective assistance. [Citation.]

*Id*. at 314.

Focusing solely on the ineffective assistance of counsel claim, the Warden argues Bolin has presented no evidence to undermine the reasonableness of the California Supreme Court decision that the failure of Messrs. Soria and Cater to renew the venue motion was tactical. Further, he maintains, Bolin cannot demonstrate prejudice because he has not shown the motion had any reasonable probability of success, or even if granted, that the outcome of the trial or sentence would have been different. For this proposition he cites *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000), *Heath v. Jones*, 941 F.2d 1126, 1136 (11th Cir. 1991), *Braun v. Ward*, 190 F.3d 1181, 1189 (10th Cir. 1999), and *Williams v. Vasquez*, 817 F. Supp 1443, 1477 (E.D. Cal. 1993).

The Warden's bottom line is that Bolin has not and cannot establish either presumed or actual prejudice. Citing *Murphy*, 421 U.S. 794, the Warden states that a finding of presumed prejudice requires consideration of whether the atmosphere surrounding the trial was inherently prejudicial. *Id*. at 798. Continuing, he maintains, presumed prejudice is invoked only in extreme situations, citing *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998), such as where there has been a "deluge of publicity" and media attention creates a "carnival atmosphere," citing *Sheppard*, 384 U.S. at 358, or where there has been a "barrage of inflammatory publicity immediately prior to trial," citing *Murphy*, 421 U.S. at 798, or a "huge wave of public passion," *Irvin*, 366 U.S. at 728, or where the majority of the populace has been "exposed repeatedly and in depth to the spectacle of [the defendant] personally confessing in detail to the crimes," citing *Rideau*, 373 U.S. at 726. The Warden argues no comparably extreme situations existed in Bolin's case.

1    Relying on Mr. Soria's oral argument at the November 1, 1990, change of venue motion, the

2    Warden notes Bolin (through counsel) conceded that according to the Community Attitude Survey,

3    the number of Kern County residents who had heard of his case was small compared to other cases

4    where venue motions had been granted.  The Warden correctly recounts that Mr. Soria represented

5    to the trial court that only about 15 percent of Kern County residents interviewed for the survey had

6    viewed the *America's Most Wanted* program.[22]  The Warden then (incorrectly) attributes to Mr. Soria

7    the observation of Judge Davis that but for the *America's Most Wanted* program, the nature and

8    extent of the other news coverage did not warrant a change of venue.  Next he argues that since

9    *America's Most Wanted* was broadcast nationally, if that was the criteria for cause challenges, Bolin

10   might have faced exposure to the program where ever venue was transferred had the motion been

11   successful.

12   Next, the Warden claims the evidence Bolin presents does not undermine the California

13   Supreme Court's finding that publicity in the case did not warrant a change of venue (or concomitant

14   ineffective counsel for failure to renew the motion).  He notes that only a total of ten articles were

15   published,[23] six in the first six days after the murders and another four near the time of the airing of

16   the *America's Most Wanted* episodes featuring Bolin.  He claims the high court's finding that most

17   news articles appeared almost a year before Bolin's actual trial is fully supported.

18   On the issue of actual prejudice, the Warden's argument again is premised on the finding by

19   the California Supreme Court that the voir dire proceedings established Bolin could receive a fair

20   trial in Kern County.  In support of this finding, the Warden recounts the number of jurors remaining

21   after hardship excusals (which he sets at 152) and the bases for various cause challenges as well as

22   peremptory challenges advanced by the prosecution and defense.  His only remark about exposure

23   to publicity is the conclusion that many of the jurors who had been exposed to publicity "either did

24   ───────────────

25   [22] As pointed out in both Part VII.A.4. and 5., this figure was incorrect and not based on the
     survey results at all.  The survey indicated that of those people interviewed, 45 percent were familiar
26   with the case and 52 percent of that group had seen the *Most Wanted* program.  That works out to
     slightly over 23 percent.
27

28   [23] Eleven articles were presented to the trial court on the venue change motion and eleven
     are part of the record here.

not sit on the jury because they were not ultimately called to do so or were excused for other reasons, such as their views on the death penalty, their medical conditions, or their predisposition about certain facts of the case."  Based on the direct appeal opinion, the Warden concludes that of the 12 jurors selected for the jury, not one was familiar with the facts of Bolin's crimes, none appeared to remember any significant details of the crimes, all assured the court they could decide the case on the evidence presented at trial, and all assured the court and counsel they could be fair and impartial jurors.  Since this is a reiteration of a state court finding, he continues, it is subject to AEDPA deference under § 2254(d)(2).

**D.**   **Analysis**

The evaluation of Claim C has several components.  First there are the two theories – trial error and ineffective assistance of counsel.  Second, the ineffective assistance of counsel claim must be evaluated for satisfaction of the deficient performance and prejudice elements.   Third, there is the overarching authority regarding a defendant's right to a change of venue to vindicate his right to trial by an impartial jury.  Finally, in the course of addressing these legal theories, the Court must determine whether the state court's factual findings on direct appeal and decisions on direct appeal as well as state habeas are or are not unreasonable under the deferential review of § 2254(d)(1) and (2).

**1.**   **Claimed Trial Error**

The Court agrees with the Warden's argument with respect to the trial error portion of Claim C.  The ruling by the California Supreme Court on direct appeal is dispositive and clearly not unreasonable.  Accordingly, it is not necessary to address the Warden's argument that the trial error component is procedurally barred.

In the opinion, the state court notes "it is not error for the trial court to postpone the consideration of an application for a change of venue until an attempt is made to impanel the jury, where leave is granted to counsel to renew his application if the facts disclosed . . . warrant it."  18 Cal. 4th at 312.  Habeas review under § 2254(d)(1) cannot disturb this ruling unless it meets the "no fairminded jurist" standard under *Richter*, 131 S. Ct. at 786-87.  It does not.  The trial error component of Claim C is denied.

### 2.   Claimed Ineffective Assistance of Counsel

The Warden's reliance on the direct appeal opinion for Bolin's ineffective assistance of counsel, however, is not compelling. As habeas corpus necessarily explores matters outside of the trial record, a party's reliance on an appellate decision for a ruling on a claim traditionally raised for the first time on habeas corpus is not always well taken. First and foremost, the factual record on appeal is limited to the trial record. The Court's review of the parties' respective arguments is informed by this fact. The California Supreme Court also acknowledges the limitations of the appellate record:

> To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . ."

18 Cal. 4th at 333 (citing *People v. Pope*, 23 Cal. 3d 412, 426 (1979)). As a consequence, and based on properly presented evidentiary submissions to the state court on habeas corpus, significant factual findings relied upon by the Warden in the direct appeal opinion are unsupported. From this determination, it follows that the state court's legal decisions about the merits of Bolin's venue challenge also overstep the bounds of reasonableness under § 2254(d)(1). Finally, addressing the elements of Bolin's ineffective counsel claim, in light of the record and properly presented evidence, the Court determines Bolin has satisfied the stringent AEDPA requirements to proceed with an evidentiary hearing.

### a.   Relevant Facts Outside of the Record on Appeal

There are three categories of evidence that were not before the state court on direct appeal, which the Court is persuaded would have (or should have) influenced the state court's findings, starting with the Community Attitude Survey. Bolin's counsel failed to make this document part of the appellate record. In its direct appeal opinion, the state court found as follows:

> Initially, we address defendant's claim counsel was ineffective for failing to make a sufficient record in support of the motion because he failed to have the public opinion survey entered into evidence. We find no deficiency. [Citation.] The trial court had a copy of the survey of its consideration. Counsel orally represented the statistical information he deemed most vital to the motion. Since the prosecutor offered no contradiction, we have concluded those representations were accurate and accepted them as part of the record.

18 Cal. 4th at 312.  As is turns out, Mr. Soria's representations of the statistical information in the survey were not accurate, a fact the Supreme Court could not have known without reviewing it.[24] He under-represented the percentage of survey respondents who had watched the *America's Most Wanted* program as well as the percentage of respondents from that group who favored the death penalty for Bolin.  From the colloquy at the change of venue motion, it is clear that the trial judge also relied on Mr. Soria's under-representations in his lack of enthusiasm for Bolin's argument about the detriment occasioned by the pretrial publicity.  In light of Mr. Soria's inaccurate representations, the state court's complacence in not requesting the document for independent review is unfortunate.

The second gap is that the Supreme Court did not have the newspaper clippings repeatedly recounting Jim Wilson's harrowing escape over a 14-hour, eight-mile trek, sometimes crawling to safety, and the increased law enforcement patrol of the Walker Basin area until Bolin was apprehended.  These articles also misrepresented as facts that Bolin's marijuana operation had been rigged with multiple "booby traps," that authorities discovered four pipe bombs in the cabin, each with the fire power equivalent to a hand grenade, that Bolin was a convicted "killer," and a connection between Bolin's marijuana operation and other marijuana farms in the Walker Basin area discovered by the Kern County SWAT team.  The newspaper also reported that Bolin had a prior arrest for weapons charges, a fact determined to be not admissible at Bolin's trial (because the trial court found that the arresting officer lacked probable cause to search Bolin).  Although these clippings certainly were mentioned in the appellate proceedings, the state court expressed no interest in reviewing them.

Third, the California Supreme Court did not have the before it the audio-video evidence of the television broadcasts, including the *America's Most Wanted* episode, the follow-up episode reprising the crime and describing Bolin's apprehension, as well as the news broadcast discussing the *America's Most Wanted* program and the interview with Kern County Sheriff Smith.  While the programs were transcribed into the reporter's transcript, the visual impact of the broadcasts cannot

---

[24] As noted in Part VI.A.4., *supra*, although the Warden's attorneys were in possession of the survey document, it was not lodged with this Court until after state habeas proceedings terminated. Whether the California Supreme Court *ever* received a copy of the survey, from either party is simply unknown.  What is clear is that the state court knew about it, but never requested to review it.

be understood.[25]  As Bolin argues, the *Most Wanted* episode included many dramatic features to make an emotional appeal to the audience, including the tender moment shared by the Mincy character and his young daughter, the emotionless demeanor of the Bolin character as he shot the Huffstuttler character, the smirk on the Bolin character's face as he callously shot the cowering, pleading Mincy character in cold blood, the many times the Wilson character stumbled, fell, tumbled, and kept persevering, running and crawling for his life after being shot in the shoulder, and even the untrue braggadocios representations of the Bolin character that he had been part of the elite Navy SEALS.  In addition, the fact of Steve Mincy's struggle and triumph over a past drug addiction and the  the clean-cut presentation of Jim Wilson provided a dramatic contrast to the heartless, survivalist Bolin.  The Court notes that no contrary description of the *America's Most Wanted* program is offered by the Warden.  The Court finds his silence on the characterization of the *America's Most Wanted* program is telling.  The program was inflammatory and created to excite public passion against Bolin.

Further, the broadcasts repeated the misinformation about "booby traps," pipe bombs, and Bolin's convicted "killer" status.  Like the newspaper articles, the program also repeated that Bolin had been arrested on weapons charges and added that he had stabbed a man 15 times but had been acquitted.  This latter incident, like the weapons charges incident, was the subject of an in limine motion, which the trial court granted.

> **b.    Unsupported State Court Factual Findings in Light of Evidentiary Submissions on Habeas Corpus and Record Review**

In light of this additional evidence combined with a thorough review of the trial record, this Court finds that four of the state court's factual conclusions, relied on by the Warden, are unsubstantiated and erroneous.  All four support the state court's conclusion that "Counsel's failure to renew the change of venue motion did not result from ignorance or inadvertence and reflected a reasonable trial strategy."  18 Cal. 4th at 314.

---

[25] Even though the state court had the transcript including these television broadcasts, no summary is of the programs is referenced in the direct appeal opinion.

1    The first is strictly record based.  The state court observed that "for the most part few [of the

2    prospective jurors] recalled the specifics or had formed a resolute impression of the defendant's

3    guilt."  *Id.*  To the contrary, of the 38.6 percent of the jurors individually questioned who had been

4    exposed to pretrial publicity (66 out of 171), only eight (of the 38 jurors and prospective jurors who

5    actually were questioned about their questionnaire responses as to preconceived guilt[26] had no

6    opinion when they entered the courtroom.  Sixteen thought Bolin was probably guilty, and fourteen

7    thought he was guilty or definitely guilty.  The voir dire responses also show that 45 of those 66

8    individuals, whether or not exposed to the *America's Most Wanted* program, had a good to excellent

9    recollection of the crime, while only 12 had no or a limited recollection and three had a limited to

10   good recollection.  Four of the 45 individuals with a good to excellent recollection of the crime were

11   selected to serve on the petit jury.[27]

12   The second unsubstantiated finding is that there had been "an 11-month" interval between

13   the last media report about the case and the commencement of trial, *id.*, indicating the public interest

14   had subsided.  This notion is contradicted by anecdotal references to continued media interest in the

15   trial record, as stated by the state trial judges.  Publicity was prevalent during the preliminary

16   examination hearing as a result of the judge granting the request for media presence in the

17   courtroom, namely, the *Bakersfield Californian*, radio station KUZZ, and two television stations.

18   Ms. Ryals mentioned that jury service would be "fun" because "probably these people know what

19   this case is."  Just after the jurors were sworn in, Judge Davis noted that television cameras were set

20   up, permanently, in the courtroom to film witness testimony.  When Judge Davis described the

21   manner in which the jury view of the crime scene would be handled, he told the jurors they would

22   "be tailed by a television crew" filming the proceedings.  The next day he gave more information

23   about being followed by television station personnel, noting that the jury view had "gotten a little

24   more complicated and publicized" and that he did not have authority to close down highways to the

25

26   [26] The Court's only information about how prospective jurors completed the questionnaires
comes from voir dire testimony.

27

28   [27] Again, reference to 45 prospective jurors and actual jurors is limited because the remaining
19 individuals exposed to publicity were not asked about their level of recollection.

99dp5279.OReReq4EvHrg.Bol.wpd                    44

crime scene.  He admonished jurors to avoid contact with the television personnel, as there were "going to be television stations following us up and down and all around."  The Court has no way of knowing whether these anecdotal references to publicity are exhaustive of continued public interest.  No side bar or chambers conferences about continued publicity have been preserved.  Nonetheless, they do demonstrate that media and public interest in the case continued well into the trial.

The next questionable finding by the California Supreme Court is that "counsel could well have recognized the effect of the publicity had not been as substantial as feared."  *Id.*   There are two components to the erroneousness of this finding.  The first is the failure to acknowledge the number of persons influenced by the publicity, as demonstrated by the Community Attitude Survey and voir dire.  The second is the contradiction between the *supposed* mental state of Messrs. Soria and Cater and their actual conduct during voir dire.  To the state court's credit, the fact that Messrs. Soria and Cater exercised only four of Bolin's 20 peremptory challenges provides support for this finding.  However, the attorneys' failure to exercise more of Bolin's peremptory challenges contradicts their continued and persistent efforts during voir dire to have the trial court excuse prospective jurors exposed to the *America's Most Wanted* program.  Bolin's offer of the declarations of both Mr. Soria and Mr. Cater also flatly contradict the state court's finding and demonstrates the absence of a strategic decision about not advancing more of Bolin's 20 peremptory challenges.[28]  Notwithstanding the attorneys' failure to exercise more peremptory challenges, as Bolin argues, they never conceded the propriety of the venue in Kern County, and never abandoned the position that prejudicial media coverage tainted the jury.

The final troublesome finding is the state court's statement that the *America's Most Wanted* program "was relevant only to the guilt phase portion of the trial," noting that guilt was "virtually a foregone conclusion."  *Id.*  This finding cannot be sustained under any construction of the record.  Courts nationwide reviewing death penalty cases are aware that the "circumstances of the crime" are

---

[28] Under *Pinholster*, 131 S. Ct. at 1398, the relevance of these declarations goes to evidence to be adduced at the evidentiary hearing, not the reasonableness of the state court's factual finding.

1   relevant to a jury's consideration of whether to impose the ultimate punishment.  Bolin's case is no

2   different.  During penalty phase instructions, the trial judge stated the following:

3         In determining which penalty is to be imposed on this defendant, you shall consider
          all of the evidence which has been received during any part of the trial in this case.
4         [¶] You shall consider, take into account and be guided by the following factors, if
          applicable: [¶] A, the circumstances of the crime of which the defendant was
5         convicted in the present proceeding and the existence of any special circumstance
          found to be true. . . .

6

7   RT-11: 2605.  Moreover, after asserting that *America's Most Wanted* was not relevant to the penalty

8   phase, the state high court then referred back to the circumstances of the crime presented during the

9   guilt phase, in commenting on the strength of the penalty phase evidence: "In particular, the guilt

10  phase testimony revealed defendant as a calculating and callous individual, willing to kill defenseless

11  victims, including his friend and partner Huffstuttler, in cold blood to protect his drug enterprise."

12  18 Cal. 4th at 341.  By the state court's own analysis of penalty phase issues, the dramatization of

13  Bolin's crime on *America's Most Wanted*, was relevant to both phases of the trial.

14                    **c.    Controlling Legal Authority for Change of Venue**

15        Turning to the law, the basic and enduring standard for evaluating a change of venue claim

16  in the face of pretrial publicity is whether there is a "reasonable likelihood that prejudicial news prior

17  to trial will prevent a fair trial."  *Sheppard*, 384 U.S. at 362 (1966).   Under California law, as the

18  Warden points out, the relevant factors for determining whether a venue motion should be granted

19  are: 1) the extent and kind of publicity; 2) the size of the community in which the crime occurred;

20  3) the nature and gravity of the crime; and 4) the standing of the victim and accused in the

21  community.  *People v. Martinez*, 29 Cal. 3d 575,  578.

22        The first of these factors, that is, the extent and kind of publicity, determines whether the

23  prejudice is actual or presumed.  To establish actual prejudice, the defendant must demonstrate that

24  the jurors exhibited actual partiality or hostility that could not be laid aside.  *Ainsworth v. Calderon*,

25  138 F.3d 787, 795 (9th Cir. 1998); *Daniels*, 428 F.3d at 1211.  In Bolin's case all of the seated jurors

26  represented on voir dire that they could set aside whatever preconceived notions they had about his

27  guilt as well as recollection of the crime, and consider only evidence presented by the parties at the

28  trial itself in rendering a verdict.  The California Supreme Court was impressed by this fact in

rejecting Bolin's trial error and ineffective counsel claims on direct appeal. *Bolin*, 18 Cal. 4th at 314 (noting "those who eventually sat on the jury all gave assurances they would decide the case based solely on the courtroom evidence").   In light of the assurances of impartiality given by Bolin's sitting jurors, the state court's determination that actual prejudice was not established is not unreasonable under § 2254(d). *See Richter*, 131 S. Ct. at 786-87.  Bolin's reliance on *Patton v. Yount*, 467 U.S. at 1035 and *Irvin*, 366 U.S. at 727, for the proposition that the jurors demonstrated actual prejudice is unpersuasive.  Both of those cases involved claims of presumed prejudice such that the jurors claims they could be impartial was not believable.

Nonetheless, prejudice may be presumed when the record demonstrates that the community in which the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. *Ainsworth*, 138 F.3d at 795; *Daniels*, 428 F.3d at 1211.  As noted by the Warden, and relying on *Ainsworth*, 138 F.3d at 795, the factors considered in a presumed prejudice inquiry include the existence of a "barrage of inflammatory publicity immediately prior to trial amounting to a huge [ ] wave of public passion" *id*. (citing *Patton v. Yount*, 467 U.S. at 1033), an assessment of whether media accounts consisted primarily factual material as opposed to inflammatory editorials, *id*. (citing *Harris*, 885 F.2d at 1362), and an evaluation of whether the media account contained inflammatory, prejudicial information that was not admissible at trial, *id*. (citing *Sheppard*, 384 U.S. 360-61).  Even in circumstances where assurances of impartiality are given, the prejudice inquiry examines jury voir dire to determine if, notwithstanding jurors' assurances of impartiality, the record compels an inference that the jurors were not impartial. *Murphy*, 421 U.S. at 799-803. Looking at each of the factors informing the presumed prejudice inquiry, the Court concludes Bolin has made a prima facie case that presumed prejudice existed and that juror assurances of impartiality should not have been credited.

<u>Whether there was a barrage of inflammatory publicity immediately prior to the trial</u>

The media attention surrounding Bolin's case commenced the day after authorities discovered the bodies of Steve Mincy and Vance Huffstuttler, with several successive articles in the *Bakersfield Californian*, and continued at least through the guilt phase trial, with cameras permanently set up in the courtroom.  The peak of the potentially inflammatory publicity occurred in January 1990, just

before and after the *America's Most Wanted* episode and follow-up segment about Bolin's case were broadcast. Because the record has been poorly preserved on the issue of continuing media interest, however, the Court cannot say that passion against Bolin reflected in the specific publicity reviewed in Part VI.A.1., *supra*, was perpetuated after the preliminary examination. Anecdotal evidence about media interest in the actual trial proceedings mentioned by Judge Davis in connection with the jury view, however, does indicate that considerable interest in Bolin's case was sustained in Kern County. Notably, the presence of television cameras permanently set up in the courtroom, Ms. Ryals comment that people would think serving on Bolin's jury would be "fun" because they knew about the case, that television personnel would be "tailing" jurors up and down the mountain during the jury view, and that two public school teachers brought their classes to observe the trial proceedings.

Whether the media accounts were primarily factual

While the publicity about Bolin's case did factually report the two homicides, the attempted homicide,[29] and the marijuana cultivation, there were numerous references to non-facts. Included in this category are:

1) That Bolin previously had been convicted of voluntary manslaughter (or that Bolin already was a convicted "killer"), when in fact his prior conviction was for attempted manslaughter;

2) That Bolin and his companion (referencing Ramirez) likely were armed with unspecified weapons, including pipe bombs;

3) That the property was rigged with multiple booby traps;

4) That four pipe bombs were discovered in the cabin, each with the fire power equivalent to a hand grenade; and

5) That Bolin's marijuana operation was connected with other marijuana cultivation projects located in the Walker Basin area.

//

//

---

[29] The homicides consistently were characterized as "murder."

1    <u>Whether prejudicial material was published that was not admissible at trial</u>

2    This category is comprised of repeated references to Bolin's prior arrest for possession of a

3    sub-machine gun (which turned out to be a semi-automatic gun) suppressed following a defense in

4    limine motion, his acquittal for stabbing of a man 15 times on the grounds of self-defense (which

5    didn't result in a death), also suppressed following a defense in limine motion, and the discovery of

6    other marijuana cultivation projects located in the Walker Basin area suggested to have been

7    connected to Bolin.  The Court also is mindful of the introduction of evidence about the discovery

8    of three pipes and a cannister of gun powder in the cabin during guilt phase proceedings, which

9    could been suppressed on a defense limine motion if Bolin's attorneys had made the motion.

10   Defense counsel could have argued that under the required analysis of California Evidence Code

11   section 352, this evidence was irrelevant to the murder and attempt murder charges while only

12   marginally relevant to the marijuana cultivation charge, and highly prejudicial.

13                    **d.    Application of Ineffective Assistance of Counsel Standards**

14   The foregoing analysis reveals the Court's impression of the trial attorneys' deficient

15   representation.  After conducting voir dire over a period of nearly four weeks (from November 5,

16   1990, through December 3, 1990, with Fridays and Thanksgiving off), the prospective jurors

17   examined demonstrated familiarity with the case and definite opinions about Bolin's guilt.  While

18   many prospective jurors were excused because they admitted they could not set aside the pre-existing

19   opinions, many others who had (respective) accurate recollections of the facts and voiced definite

20   opinions about Bolin's guilt remained, and Bolin's attorneys persisted in their unsuccessful efforts

21   to have individuals who had watched the *America's Most Wanted* program excused.  In light of the

22   continuing public and media interest in the case up to jury selection and through guilt phase

23   proceedings, the inflammatory nature of both the broadcast and printed media information published

24   in Kern County, together with the attorneys' continued cause challenges, their failure to renew the

25   venue motion when clearly offered that opportunity by the trial judge was deficient.

26   In light of the unsupported factual conclusions recited in the appellate decision, the California

27   Supreme Court's contrary conclusion cannot withstand scrutiny under § 2254(d)(1) applying the

28   fairminded jurist standard set out in *Richter*, 131 S. Ct. at 786-87.  Nor is the determination of the

state court that Bolin's corresponding state habeas claim failed to state a prima facie case reasonable under the applicable federal standards.  As explained in Part II, *supra*, the pleading requirements for state habeas petitions are similar to those for federal habeas.  Under *Duvall*, 9 Cal. 4th at 474, state habeas petitioners are expected to "state fully and with particularity the facts on which relief is sought," and in addition, "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of the trial transcripts and affidavits or declarations."  The California Supreme Court's summary denial of state claim B4 (the state petition version of federal Claim C), signals the state court finding that even if the Bolin's allegations had been accepted as true, he failed to state a prima facie case.  To the contrary Bolin did state fully and with particularity the facts supporting his contentions of deficient performance by Messrs. Soria and Cater in both his state and federal petitions.

Addressing the prejudice component, the Warden offers three out of circuit cases and one pre-AEDPA case from this district, for the proposition that even if Bolin's trial attorneys had renewed the venue motion, it would not have been granted.  *See Meeks,* 216 F.3d at 961 (from the Eleventh Circuit); *Heath*, 941 F.2d at 1136 (also from the Eleventh Circuit); *Braun*, 190 F.3d at 1189 (from the Tenth Circuit); *Williams*, 817 F. Supp at 1477 (from the Eastern District of California). The last two of these cases additionally state that the respective petitioners failed to show there was a reasonable probability of a different outcome in the trial proceedings, even if a motion for change of venue had been granted.  *Braun*, 190 F.3d at 1189 and *Williams*, 817 F. Supp. at 477.  Under current controlling authority, however, this later requirement is not properly part of the prejudice showing.  Rather, Bolin is required only to demonstrate that had his attorneys renewed the venue motion it would have  (or should have) been granted.  *See Styers v. Schriro*, 547 F.3d 1026, 1030 (9th Cir. 2008) (involving a claim for ineffective assistance counsel for the trial attorney's failure to move to strike the entire jury panel because of exposure to prejudicial publicity).  The court explained in a footnote that because Styers' motion to strike the panel "directly implicate[d] the impartiality of the jury itself [ ], no such additional or separate showing of prejudice would appear necessary."  *Id*. at 1030, n. 5 (citing *Dyer v. Calderon*, 151 F.3d 970, 973, n. 2 (9th Cir. 1998) (holding conviction obtained from a jury comprised of even one biased member requires automatic

1    reversal).  This principle also is followed in the Fifth and Sixth Circuits.  *See Virgil v. Dretke*, 446

2    F.3d 598, 607 (5th Cir. 2006); *Quintero v. Bell*, 368 F.3d 892 (6th Cir. 2004) *reinstating after*

3    *remand, Quintero v. Bell*, 256 F.3d 409, 413-15 (6th Cir. 2001).  Since Bolin's ineffective counsel

4    claim for his attorneys' failure to renew the venue motion also implicates the impartiality of the jury,

5    the Court applies the same principle stated by the Ninth Circuit in *Styers*, 547 F.3d at 1030.

6         In the direct appeal opinion, the California Supreme Court concluded that a "renewed effort

7    to seek a change of venue would [have been] futile since the trial court had conditioned any change

8    in its tentative ruling on a determination the television coverage had impaired the ability to assemble

9    an impartial jury." 18 Cal. 4th at 314.  In drawing this conclusion, the state court relied on its finding

10   that few prospective jurors recalled specifics of the *America's Most Wanted* program or had formed

11   "a resolute impression" of Bolin's guilt, that all seated jurors gave assurances of impartiality, and

12   that exposure to the publicity "was relevant only to the guilt phase portion of the trial," which was

13   "virtually a foregone conclusion."  *Id*.  Given the state court's mistaken view about the number of

14   prospective and actual jurors who accurately recalled the specifics of the publicity accounts and had

15   formed opinions about Bolin's guilt in advance of voir dire, as well as the court's erroneous

16   statement that the publicity was relevant only to guilt phase proceedings, this Court finds the

17   conclusion unreasonable under § 2254(d)(1), applying the fairminded jurist standard under *Richter*,

18   131 S. Ct. at 786-87.  Contrary to the state court's conclusion and the Warden's argument, the

19   atmosphere surrounding Bolin's trial was not benign.  As noted above, the Warden does not describe

20   the character of the *America's Most Wanted* program or any of the publicity, but  rather minimizes

21   the impact of the publicity, emphasizing how few actual jurors remembered details of the crime and

22   that all jurors promised to be impartial.  His argument is unsupported by the record. While the Court

23   does not conclude that the continued presence of media equipment in the courtroom during trial

24   created a "carnival atmosphere," *Sheppard*, 384 U.S. at 358, with  so many jurors familiar with the

25   details of the case and having pre-voir dire opinions about his guilt, together with continued media

26   and public interest in the case, the Court is persuaded that Bolin has demonstrated a colorable claim

27   that the atmosphere was inherently prejudicial and that the wave of public passion had not subsided.

28

1   Turning to the state habeas summary denial, the Court again addresses whether the state

2   petition allegations reached the threshold of a prima facie case so as to warrant the state's

3   issuing an order to show cause and conducting an evidentiary hearing. *See Duvall*, 9 Cal. 4th at 474-

4   75.  In assessing the three factors identified in *Ainsworth*, 138 F.3d at 795, and *Daniels*, 428 F.3d

5   at 1211, for determining the whether lack of impartiality may be presumed, the Court is informed

6   by the *Styers* case[30] where the Ninth Circuit upheld denial of Styers' claim.  547 F.3d at 1032-33.

7   In *Styers*, the Ninth Circuit primarily relied on *Patton v. Yount*, 467 U.S. 1025, and *Mu'Min*,

8   500 U.S. 415.  Contrasting the facts of Styers' case with those of the Yount and Mu'Min, the court

9   noted none of the prior articles reported Styers had confessed or mentioned his prior criminal history.

10  Next, although the articles did publish statements made by a co-defendant about Styers, and those

11  statements were not admitted at Styers' trial, evidence that was admitted at trial was similar and even

12  more damaging than the published statements of the co-defendant.  *Id*. at 1032.  Finally, there was

13  a break in the articles.  In the month after the young victim was discovered there were 25 articles

14  published about the crime.  In the ensuing eight months, there were only seven articles, followed by

15  26 articles the month one of the co-defendants was tried.  The court pointed out, however, that the

16  articles published during the co-defendant's trial "were virtually all factual accounts of her trial

17  proceedings, rather than opinion pieces containing inflammatory rhetoric."  *Id*. at 1029, 1032.

18  The facts in the *Styers* case are distinguishable.  In Bolin's case, from the time of the

19  *America's Most Wanted* episode was broadcast on January 7, 1990, there was no break in the

20  publicity in Bolin's case all the way through, at least, the guilt phase proceedings.  Nor was the

21  publicity primarily factual and confined solely to information admissible at trial.  As pointed out in

22  Part VI.D.2.c., *supra*, Bolin was identified as a convicted killer throughout the pre-arrest and pretrial

23  periods who had prior weapons charges and had stabbed a man 15 times.  Moreover, his status as

24  a "convicted killer" remained a *fact* in the trial proceedings until just before the penalty phase, when

25  the trial judge was preparing to read the information (including the prior convictions) to the jury.

26

27   [30] The facts of this case are disturbing, involving the murder of the four-year old son of James

28  Styers' co-defendant, Debra Milke, because the child allegedly was "too much trouble."  547 F.3d
    at 1029.

*See* Part VI.A.2.b., *supra*. The other two incidents were excluded prior to the penalty phase following defense in limine motions. Early articles published by the *Bakersfield Californian* also reported that Bolin and Ramirez likely were armed with unspecified weapons, including pipe bombs, that the property was rigged with multiple booby traps, and that Bolin's marijuana operation was connected with other marijuana cultivation projects in the Walker Basin area. None of these reports were in any way substantiated. Continued and repeated reports that four *actual* pipe bombs, each with the fire power of a hand grenade, were discovered at the property also were unsubstantiated.

The most distinctive departure in publicity between Bolin's case and all the other cases, including *Styers*, 547 F.3d 1026, *Daniels*, 428 F.3d 1181, *Ainsworth*, 138 F.3d 787, as well as the Supreme Court cases, *Mu'Min*, 500 U.S. 415, *Patton v. Yount*, 467 U.S. 1025, and *Murphy*, 421 U.S. 794, is that Bolin's crime was featured on an dramatization of *America's Most Wanted*. Having reviewed the broadcast of this program, as well as the follow-up episode and the local news report, the Court is persuaded that Bolin's has presented a colorable claim his jury was not impartial, notwithstanding assurances to the contrary. As Judge Davis stated, it is far from clear that "the average person viewing this particular program . . . psychologically would] be able to [put it out of his or her mind if selected as a juror]. It's quite dramatic." *See* Part VI.A.5., *supra*. This sentiment also was echoed by a prospective juror[31] before being excused for lack of impartiality about the publicity in general. He told the judge and parties that Bolin would have to live with the fact that people in Kern County would be familiar with the crime,

> unless you go out of town because I can't imagine very many people here in Kern County that didn't follow that closely because it was kind of pushed in the news programs prior to it being aired, and more than once, so people were kind of watching for it just because it dealt with Bakersfield and Kern County.

RT-5: 1062.

The only remaining issue relevant to Bolin's request for an evidentiary hearing is satisfaction of the diligence requirements under § 2254(e)(2). The Court finds that given the procedural history

---

[31] This prospective juror was Hal Hannah. He was excused on a defense cause challenge because he had misgivings about whether he could remain neutral about Bolin's guilt after being exposed to publicity. *See* Appendix V, Part One, 38.

of the case, including abandonment of Bolin's case by original state-appointed attorney Richard Gilman, the entry of two orders of equitable tolling of the limitations period while federal counsel developed federal claims to be presented in the state *and* federal petitions (Doc. 71 and Doc. 85), and the approval of a case management plan and budget to fund the investigation, it would be anomalous for the Court now to find Bolin's attorneys were not diligent.  Prior federal counsel Jolie Lipsig and Gary Wells exercised great persistence and diligence investigating Bolin's federal claims and presenting them before the limitations period expired.  The controlling Supreme Court case on the issue of diligence, *(Michael) Williams*, 529 U.S. 423, unquestionably supports this finding. Diligence under § 2254(e)(2) is satisfied when the petitioner seeks an evidentiary hearing in state court, as Bolin did, and the state denies the request, as the California Supreme Court did here.  *Id*. at 437.

Bolin's request for an evidentiary hearing as to Claim C is granted with respect to his trial attorneys' failure to renew their request for a change of venue on the basis of presumed prejudice occasioned by pretrial publicity.  The trial error component of Claim C as well as the argument that juror impartiality followed from *actual* prejudice, however, are denied on the merits.

## VII.    Scope of the Evidentiary Hearing

The Court anticipates Bolin will present evidence consistent with his offers of proof, namely the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the 1987 National Legal Aid and Defender Association (NLADA) Standards for the Appointment of Counsel in Death Penalty Cases, excerpts from the California Death Penalty Defense Manual (1986 through 1989) regarding jury selection as well as pretrial motions for change of venue, the declaration of *Strickland* expert, James S. Thomson, the declaration of Mr. Soria, and the declaration of Mr. Cater.  Exhibits 57, 58, 59, 60, 72, 65,[32] and 66, respectively.  The Court cautions Bolin that ABA standards are only guides which inform reasonable attorney conduct, not "inexorable commands."  *Van Hook*, 558 U.S. at ___, 130 S. Ct. at 17; *Padilla*, 130 S. Ct. at 1482.  The Court further reminds Bolin that in the March 9, 2012 order, the proffered declarations of his trial counsel

---

[32] As redacted in the March 9, 2012 order.

and Mr. Thomson were found not to relay privileged attorney work product or attorney-client communications, except as determined in the order, and will not be eligible for a protective order under *Bittaker v. Woodford*, 331 F.3d 715, 718-26 (9th Cir. 2003) in any ensuing state proceedings. Except for juror questionnaire responses, the Court does not anticipate that Bolin will present any additional evidence beyond that proffered. The Court also anticipates that the Warden may wish to present his own evidence on the issue of whether trial counsel were constitutionally ineffective.

The Court will consider evidence presented by way of stipulation, record expansion, and testimony to determine whether the allegations presented are, in fact, established. The parties are directed to meet and confer and thereafter file a joint statement on or before May 30, 2012, setting forth their respective preparations for the hearing, including witnesses to be called, documentary evidence to be introduced, pre-hearing discovery to be conducted, several proposed dates for the evidentiary hearing, and a realisitic, efficient time estimate. If the estimate is not reasonable the Court will set it for counsel.

**VIII.   Order**

Having considered Claim C of Bolin's Petition, the Court orders an evidentiary hearing to be conducted as to the ineffective assistance of counsel portion of the claim, consistent with the foregoing analysis. That portion of Claim C addressing trial error is denied on the merits.

DATE:      April 26, 2012

                                          /s/ Lawrence J. O'Neill
                                          Lawrence J. O'Neill
                                          United States District Judge

APPENDIX I

Summary of Newspaper Articles from the *Bakersfield Californian*

Exhibit 53 (which was Exhibit A to Bolin's October 22, 1990, motion to change venue)[33]

September 4, 1989

Entitled, "Armed pair sought in deaths," this article states that "sheriff's deputies are looking for two 'armed and extremely dangerous' suspects . . . after a grisly discovery in a remote marijuana plantation in the mountains east of Bakersfield."   The article incorrectly reports that the suspects "had multiple bobby traps set up there" and that authorities had to have "explosive experts come up and disarm them."   The article reports that the two suspects "may be in possession of pipe bombs and numerous other unknown type weapons."   One of the suspects, identified as "Paul" (i.e., Bolin) "was described as a former member of the Navy's elite SEALS explosives and commando unit."[34] The surviving victim, Jim Wilson, was reported has having been wounded, but escaped after hiking all night in the hills above Walker Basin and then getting help.

September 6, 1989

Entitled, "Man arrested in slaying of 2," this article reports that Juan Eloy Ramirez has been arrested but that Bolin, "a convicted killer and reported former member of the Navy SEALS commando and explosives unit" is still being hunted.   The article repeats that Bolin had been convicted of a homicide, namely manslaughter, for which he served almost two years in prison.   This information reportedly came from the State Department of Corrections.[35]   While acknowledging that

---

[33] The exhibits to Bolin's trial venue motion were not made part of the appellate record, though the venue motion was prominently argued before the California Supreme Court.

[34] Investigating Deputy Martin Williamson reported that on September 6, 1989, he telephoned the SEAL training school and spoke with the commanding master chief, who advised Deputy Williamson that Bolin had never been through SEAL training either on the east coast or west coast. Exhibit 6: 32

[35] In fact, the information was incorrect.   Bolin previously had been convicted of attempted manslaughter.   There had been no death.

Pentagon officials had not confirmed it, the article reiterates that law enforcement broadcasts described Bolin as a former member of the Navy's elite SEALS and an explosives expert." The article then assures: "Until Bolin is found, [ ] an additional deputy and the sheriff's helicopter have been assigned to patrol the Walker Basin and Thompson Canyon areas where the pot farm was located."  Surviving victim Jim Wilson's 12 hour hike to safety after being shot in the shoulder is again recounted.  Bolin is said to have shot the three young men after becoming furious that the one victim with whom he was associated had invited the other two to see the marijuana operation.  Next, a sheriff's department explosives specialist is quoted reporting that four pipe bombs had been confiscated from the cabin, the largest of which was two inches in diameter and measured a foot long, with equivalent "fire power" to a hand grenade.  Although the specialist stated these pipe bombs, which had not been activated, "were not set up as booby traps per se [ ] they had the potential to do so."  The specialist further is quoted as saying that it is not uncommon for marijuana farmers to set up "booby traps" to protect unattended fields.

Finally the article mentions another marijuana farm uncovered over four years earlier nearby at which a Kern County sheriff deputy was shot.

September 7, 1989

Entitled, "Murder suspect once convicted in shooting," this report identifies the victims of the homicides, refers to Bolin as a fugitive, and describes an earlier shooting of Kenneth Ross, with a shotgun, during an altercation involving Bolin's God-daughter.  The article then stated Bolin was convicted of manslaughter for this shooting.[36]  The motive for shooting the victims is attributed to Bolin's having become furious that the victim with whom he was acquainted brought the other two to see the marijuana.  The article states that a .45 caliber handgun believed have been used in the homicides was recovered from the scene as well as shotguns, four pipe bombs, and 300 marijuana

---

[36] The conviction was for attempted manslaughter, not manslaughter.  The weapon used was a rifle, not a shotgun.

plants.[37]  With respect to Bolin's stated connection with the Navy SEALs, this article reports that

authorities had not been able to confirm Bolin's military record.[38]


September 8, 1989

        Entitled, "Deputies discover 2nd pot farm," this article oscillates from a description of a

second marijuana farm operation in the hills near the crime scene, to the continued pursuit of Bolin,

to the mission of a SWAT team at a trailer found in a remote canyon off a nearby road because a

vehicle registered to Bolin's wife was found near the trailer.  The article draws a vague connection

between recovery of an automobile stolen from the Los Angeles area near the second marijuana farm

and Bolin, since Bolin was thought to be in Los Angeles.


September 9, 1989

        Entitled, "Murder suspect's empty van found," this article first mentions the recovery of

Bolin's Ford van in Covina, then reiterates the identities of the victims and the fact that the

homicides took place on Bolin's "marijuana plantation."  The article then mentions the two pieces

of information unrelated to the homicides, namely the discovery of a second marijuana farm and

separate discovery of a car registered to Bolin's wife in another area of the Kern County mountains.

The article closes with the assurance that "patrols in the Walker Basin area have been increased after

a resident reported seeing a man he believed could be Bolin hiking in the hills," since "possible

sightings of the fugitive" had been reported.


January 6, 1990

        Entitled, "Show to open national hunt for killer of 2," this article advertises the showing of

*America's Most Wanted* the following evening at 9 p.m. about Jim Wilson's "brush with death when

"America's Most Wanted" airs its story on the shootings and encourages viewers to call in with leads

---

        [37] In fact, only one shotgun was found and there were no ready-to-use pipe bombs.

        [38] By this time, however, Kern County authorities *had* confirmed that Bolin had never been
a Navy SEAL.

to Bolin's whereabouts." The article opens with information that Kern County homicide detectives turned to "the syndicated crime re-enactment show" for help finding Bolin after four months of dead-end leads. Wilson is reported to have "crawled eight miles to reach the closest house" after having been shot in the shoulder and that his journey to safety took him 14 hours. A reporter for the program is quoted as saying "We give national exposure to a fugitive story. . . . We try to pick the ones who are the biggest threats to society." Detective Williamson is credited with stating that Bolin "likes to describe himself as a survivalist and a former member of the Navy SEALS specialized team," when he in fact was "neither." Williamson referred to Bolin's "macho image" as a ploy to impress those he encountered. The article recounts:

> Bolin does have a violent criminal history [ ]. Five years ago, he was released from prison after serving a Los Angeles county sentence for manslaughter, and had been arrested on other weapons charges before that. [¶] When deputies arrived at the ranch after Wilson's escape, they discovered four pipe bombs, each with the explosive power of a hand grenade, inside the 20-by-20 foot cabin, which officials think were to be used as booby traps.[39]

January 8, 1990

Entitled, "Fugitive reportedly nabbed," this brief article recounts that Bolin was arrested 33 minutes after the airing of the *America's Most Wanted* program on Sunday, January 7, 1990. The article repeats that after Wilson had been shot in the shoulder, he "crawled eight miles to reach the closest house," and that his journey took 14 hours.

Undated, post-January 7, 1990 Arrest

This letter to the editor, entitled "Actor appreciates deputies [sic] assistance," is authored by the *America's Most Wanted* actor who played the role of Eloy Ramirez. The actor gives praise and validation to the work of the Kern County authorities working on the case and expresses gratitude that Bolin was apprehended so expeditiously after the airing of the program.

---

[39] As noted above, Bolin was convicted of attempted manslaughter rather than actual manslaughter, there were only three, rather than four pipes, none of them were loaded with gun powder, and they had not been used as booby traps.

January 17, 1990

Entitled, "Double-murder suspect logs 4 innocent pleas," this article reports the four charges filed against Bolin, that is, two counts of murder, one count of attempted murder, and one count of cultivating marijuana, and the fact that Bolin pleaded "innocent" to these charges.  The article also identifies Bolin's appointed attorneys, Charles J. Soria and George Peterson.  The article reiterates previously reported information, namely that "the fugitive was nabbed by officials in Illinois on Jan. 7 less than an hour after the television broadcast of 'America's Most Wanted,'" that Kern County authorities had been "tracking Bolin" since learning of the crime from "badly wounded Los Angeles-area man" (Jim Wilson), that Wilson crawled eight miles over 14 hours to safety after having been shot in the shoulder, that authorities turned to the syndicated crime re-enactment show for help in finding Bolin, that Bolin and Huffstuttler had been growing 300 marijuana plants at the crime scene, and that authorities discovered at the cabin "four pipe bombs, each with the explosive power of a hand grenade . . . officials think were to be used as booby traps."


January 27, 1990

Entitled, "Defendant's hearing delayed," this article reports that Bolin's preliminary examination hearing was delayed until March 2, 1990, reiterating that he was charged in the killing of two men at "the site of a marijuana plantation he allegedly operated," and that Wilson crawled eight miles over 14 hours to safety after having been shot in the shoulder.


March 3, 1990

Entitled, "Bail denied, Bolin to stand trial in marijuana fields killings," this article gives an account of Bolin's preliminary examination hearing, namely that Jim Wilson testified the last time he saw Bolin was when he (Bolin) shot him (Wilson), Bolin was held to answer for all charges and remanded into custody without bail, and that Bolin's counsel had asked for the preliminary examination hearing to be closed to the public and the transcript sealed, but that this request was

1   denied, except that the defense motion would be maintained under seal.[40]  The article reported the

2   testimony of both Wilson and Eloy Ramirez that Bolin was very agitated with and shot Huffstuttler

3   after an argument over Huffstuttler's act of showing Mincy and Wilson the marijuana plants he and

4   Bolin were cultivating.  Wilson reportedly testified that after being shot, he continued running, but

5   heard six more gunshots and Mincy begging for his life.  His trek to safety the next day took 14

6   hours.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[40]

1

APPENDIX II

2

Summary of *America's Most Wanted* Program Regarding Bolin's Case, Sunday, January 7, 1990,

3

Segment 1 of Exhibit 54 (which was presented as Exhibit B

4

to Bolin's October 22, 1990, motion to change venue)[41]

5

     The program begins with the narrator, standing in what appears to be a newsroom,

6

introducing the subject of what happened referring to statements attributable to Drug Enforcement

7

Agents: "Drug Enforcement Agents say marijuana growers will stop at nothing to protect their illegal

8

marijuana crops.  Booby traps, land mines, bungie sticks, it could be deadly for anyone who wanders

9

too close.  That's what happened to a young man from California."[42]

10

     The first scene shows the Wilson character, a clean cut, healthy looking, athletic young man,

11

riding his mountain bike, enjoying the fresh air.  Over this scene, the real Wilson explains to an

12

interviewer that his purpose in going to the Kern County mountains that weekend was to enjoy

13

mountain bike riding in the fresh air.   The Wilson character is then seen riding into Twin Oaks and

14

meets up with Steve Mincy.  Over this scene, the real Wilson relays that Mincy was his best friend

15

since they were five years old, and that the Mincy family was his second family.  The Wilson and

16

Mincy characters then meet with Vance Huffstuttler who was an old friend of Mincy's.[43]  *Huffstuttler*

17

appears drinking beer near a van along with *Paul Bolin* and *Eloy Ramirez*.  The narrator informs the

18

audience that while Wilson had met Huffstuttler previously, neither Bolin nor Ramirez were familiar

19

to him.

20

     Upon being introduced to *Mincy* and *Wilson*, *Bolin* asks *Wilson* if he (*Wilson*) was in the

21

service; *Wilson* replies he had been in the Navy.  *Bolin* then tells *Wilson* that he (*Bolin*) is an ex-Navy

22

SEAL and killed his "first man" when *Wilson* was still in diapers.  *Wilson* grimaces at this.  The

23

24

[41] The exhibits to Bolin's trial venue motion were not made part of the appellate record,
though the venue motion was prominently argued before the California Supreme Court.

25

26

[42] The audio DVD of the program presented (Exhibit 54) is somewhat garbled at the very
beginning.  The entire program was transcribed by the trial court reporter at the change of venue
motion hearing.  RT-II: 9-16.  This opening quote is taken from the transcript.

27

28

[43] *Italics* will be used to refer to the actors who are portraying *Wilson, Huffstuttler, Mincy,
Ramirez,* and *Bolin.*

others present, *Huffstuttler*, *Ramirez*, *Bolin*, and *Mincy* all reassure *Wilson* that *Bolin* was just being funny and "pulling [*Wilson's*] chain." *Ramirez* is shown to be friendly and conversing with the others.[44]

The program then cuts back to the real Wilson talking to an interviewer. He states his observation that Bolin wanted to project himself as a "tough guy." Back to the dramatization, *Wilson* then takes off from *Bolin*, *Ramirez*, *Mincy*, *Huffstuttler* group to do some more mountain bike riding. *Mincy* reminds *Wilson* about the dance that night.

*Wilson* is next seen at the Mincy family campsite in Walker Basin, which, according to the narrator, is at 4:30 in the afternoon. As soon as *Wilson* arrives, *Huffstuttler* asks *Wilson* to give him (*Huffstuttler*) a ride. *Mincy* comments that he was supposed to have given *Huffstuttler* a ride to the "Bolin cabin," but had a "couple too many" beers. *Wilson* asks to rest a bit, being tired out from his mountain bike riding.

The narrator then reports that both Mincy and Huffstuttler had a history of drug abuse. While Mincy had worked hard to put his drug use behind him, Mincy's father reportedly was not convinced that Huffstuttler had done so. The Mincy father character stares disapprovingly at *Huffstuttler*. *Mincy* then tells his father that he (*Mincy*) and *Wilson* will take *Huffstuttler* home and then be "right back." The father character agrees and admonishes *Mincy* "Don't be long, son," and then looks disapprovingly, again, at *Huffstuttler*.

Still at the campsite, a little blonde girl approaches *Mincy* and asks, "Daddy, can I go?" *Mincy* responds she cannot go with them, but that he'll be "right back." He tells the child that they will go to the dance that night where she will would wear her new shoes and "dance [her] feet off." *Mincy* then tenderly kisses the little girl.

The scene switches to the pickup truck on a dirt road. The narrator explains that it was "an hour's drive up steep mountain trails to reach Thompson Canyon where Vance Huffstuttler and Paul Bolin were living in a ramshackle cabin." Aerial footage of the rugged Kern County mountains is shown. The real Wilson's voice then reports that he wasn't that surprised or concerned about the

---

[44] In his trial testimony, Ramirez explained that during this conversation, he was off to the side by himself. He was not engaged in or eavesdropping on the conversation. RT-8: 1943-44.

remoteness of the cabin location.  This statement is juxtaposed with Wilson next statement that he "couldn't even imagine what was going to happen."

The pickup truck is seen parking right in front of the small cabin.  *Bolin* is standing in the doorway; *Ramirez* is sitting in a chair right next to the front door.  As the doors to the pickup truck swing open, *Ramirez* stands up and *Bolin* walks out of the cabin to greet the three young men. *Wilson* is seen bending over to pet a German Shepherd dog, which barks at him.  The dog is tied to a stake near the front entrance to the cabin.  *Bolin* cautions Wilson that the dog is mean and might bite *Wilson*.  In the meantime, *Huffstuttler* is beckoning *Mincy* and *Wilson* up an incline just behind the cabin and then down a hill behind the cabin to show them the marijuana plants growing there. The plants are full, healthy-looking, taller than the young men.  *Huffstuttler* is heard telling *Mincy* and *Wilson* that this crop of marijuana is going to make him "some money."

The program cuts back to the real Wilson telling the interviewer that this was the most pot he had ever seen in his life and even though it "wasn't a hefty plantation, it was quite a bit of pot." As the scene switches back to the dramatization, the real Wilson's voice continues that Huffstuttler explained the various kind of marijuana plants he and Bolin were growing.  *Wilson* is seen seriously regarding the plants.   It is apparent that the marijuana plants are contained in large planting containers. At this point, he narrator states that this marijuana crop was worth more than $300,000, according to Kern County deputies , which was "a secret, they say Paul Bolin was determined to keep."  As the narrator completes this sentence, the scene cuts to *Bolin's* legs walking quickly down the hill.  *Bolin* then confronts *Huffstuttler* and his companions.

*Bolin* announces that he isn't "too happy" with *Huffstuttler*.  Yelling, *Bolin* complains that *Huffstuttler* brought *Mincy* and *Wilson* ("these guys") to the cabin and that *Bolin* didn't know them "from diddly."   *Bolin* then turns and walks away, telling *Huffstuttler*, "This is a bunch of bull, Vance."  *Huffstuttler* follows *Bolin* back up the hill toward the cabin.  The camera stays on *Mincy* and *Wilson*  while *Huffstuttler* can be heard complaining that his friends will not tell anyone and that *Bolin* also brought people to the operation.  As *Bolin* and *Huffstuttler* walk toward the cabin, *Wilson* asks *Mincy* whether they should  go.

The camera then switches to the front of the cabin, where *Huffstuttler* continues his plaintive monologue to the silent, obviously perturbed *Bolin*. *Huffstuttler* then grabs *Bolin* by the shoulder and turns him around. The German Shepherd dog, which apparently is tied up barks. *Ramirez* remains seated next to the front door watching *Bolin* and *Huffstuttler*. When *Huffstuttler* turns *Bolin* around, *Bolin* warns him: "Don't fight me Vance. You're going to lose." *Bolin* then walks into the cabin, while *Huffstuttler* continues to holler at him from outside, challenging *Bolin* to fight. With no response from *Bolin*, *Huffstuttler* then challenges *Bolin*, "Are you going to shoot me?" This questions is followed by a long pause, while *Huffstuttler* nervously looks toward the front door of the cabin where *Bolin* entered. *Huffstuttler* continues to peer into the cabin, until finally, *Bolin* emerges holding a pistol in his right hand. With the camera focused on the gun, *Bolin* pulls back the safety. *Huffstuttler* pleads with *Bolin* not to shoot him and Bolin raises the pistol and fires off one round, without saying a word. *Huffstuttler* falls to the ground.

At this point the camera switches back to *Mincy* and *Wilson*, who appear dumbfounded and very worried as they are looking uphill toward the cabin. At this point in the program a very fast drum beats creating a feeling of anticipation. *Bolin* returns to *Wilson* and *Mincy* with the pistol in his hand. *Mincy* asks *Bolin* if he (*Bolin*) is bluffing. *Bolin* shakes his head and says, simply, "No." Continuing he tells the friends he has nothing against them. At that moment *Wilson* runs one way and *Mincy* the other. The camera shows *Bolin* with is arm raised and shooting at *Wilson*, who is not in view. *Mincy* is running the opposite direction from *Bolin* toward the brush. The camera cuts to *Wilson* running, being hit by the one round fired, and falling down. The camera immediately switches back to *Mincy* running through the creek bed past the marijuana plants. He trips and falls over the large stones and small boulders. His head emerges from behind some small boulders and addressing *Bolin* he repeatedly pleads, "Please don't shoot me. Please don't shoot me." The camera pans back to show *Bolin* standing on boulder adjacent to the cowering *Mincy*, pointing the pistol in *Mincy's* direction. As *Mincy* continues to plead, *Bolin* stares at him, smirks, raises his pistol, and fires off one round. *Mincy's* body goes limp.

Switching back to *Wilson*, it is apparent that he has been hit in the shoulder. He winces in pain and gets up, continuing to run, falter, trip, tumble, and run. The real Wilson's voice speaks over

1   this action, explaining that he felt like an animal, obviously running for his life, certain that Bolin

2   was pursuing him.  While Wilson's voice is speaking, in fact the camera does pan to *Bolin*, from the

3   waist down, running after *Wilson*.

4           The action then returns to the cabin.  At this point, *Bolin* has given up the search, satisfied

5   that *Wilson* probably will bleed to death.  This sentiment, however, is unknown to the fleeing *Wilson*

6   as he continues to struggle to escape, still stumbling, falling, and running.

7           The next scene shows *Bolin* with a rifle pointed at *Mincy's* lifeless body.  *Bolin* shoots off

8   three rounds.  Quickly changing scenes, and to the background of *Bolin* turning over a table and then

9   shooting *Huffstuttler's* lifeless body with the same rifle he used on Mincy's body, the narrator reports

10  that Kern County deputies said Bolin tried to make the cabin location look like a drug shoot out had

11  taken place.  While this is being shown, *Wilson's* frantic, struggling escape continues to be depicted

12  through the rugged terrain of the Kern County mountains.   Back at the cabin, *Bolin* drops a buck

13  knife in the dirt near *Huffstuttler's* body, drops handfuls of marijuana over *Huffstuttler's* legs from

14  a bucket, wipes off the handle of the pistol, wraps *Huffstuttler's* hand around the handle, drops that

15  weapon near *Huffstuttler's* body as well, and then disables *Wilson's* pickup truck by pulling spark

16  plug wires from the engine.

17          The next scene shows *Bolin* loading into his van, first the dog, then *Ramirez*.  The van then

18  drives away from the cabin.  The real Wilson then states to the interviewer, "It was like it was

19  business.  It didn't matter that he was going to kill somebody, take human lives.  It didn't matter."

20  The camera then cuts back to the *Wilson* character, still running, tripping, and falling through the

21  brush on the mountain side.  It's clear from the reflection of the sun, that it will be dark soon.

22          Back in the *America's Most Wanted* newsroom, which is decorated with a large round plaque

23  bearing the word's "America's Most Wanted" over the image of an eagle  the narrator explains that

24  police found four pipe bombs in the cabin where Bolin was living, that his van was discovered five

25  days later, but that Bolin had disappeared.  The narrator then displays a green camouflage hat, which

26  he states belonged to Bolin.  He explains the police said Bolin is a "survivalist," but that his (Bolin's)

27  claims he was a Navy SEAL are false.  With a photograph of Bolin displayed, which appears to be

28  a mug shot, the narrator continues that Bolin killed a man in 1981 with a shotgun blast during an

argument, was convicted, and paroled after two years.  Another mug shot of Bolin is shown, this one with a plaque in front of him showing the words "California State Prison," a 'C' number (which would be Bolin's inmate number), and the name, "Bolin" at the bottom of the plaque.  Next, the narrator reports that in 1986, Bolin stabbed a man 15 times, but he was acquitted, because the jury found he had acted in self-defense.  Now displaying a civilian photograph of Bolin, the narrator relates that he has been described as a "jack of all trades" who has made a living as a mechanic, but also may be working as a longshoreman.

With the display of another mug shot in the background, the narrator urges the audience to call the number shown on the screen (1-800-CRIME-90) if Bolin is sighted.  The narrator assures the audience that any callers can remain anonymous.

APPENDIX III

Summary of Kern County Channel 29 Television Broadcast Bolin's Case on *America's Most*

*Wanted*, Monday, January 8, 1990

Segment 2 of Exhibit 54 (which was presented as Exhibit D

to Bolin's October 22, 1990, motion to change venue).

The story opens with a view of the cabin with Wilson's Toyota pickup parked next to the cabin, and one uniformed officer talking to three other men in white shirts.  The narrator begins, "What Kern County deputies could not do in four months, a t.v. show did in a few minutes last night."  The narrator continues, over a mug shot photograph of Bolin, that Bolin's case had been featured on the program the previous evening and "90 minutes later he was arrested by police near Chicago."

Kern County Sheriff Smith is then seen talking to an interviewer about Bolin's capture.  Sheriff Smith states his understanding that Bolin's arrest resulted from a call from a relative.  The narrator explains that the relative notified police in Elmwood Park, Illinois, telling them where "the suspected killer" could be found. When Bolin was arrested, he also was watching t.v.  He was unarmed and surrendered without a struggle.  The camera pans back to Sheriff Smith who states that while Kern County authorities felt sure Bolin had left the area, some of the local residents in the Kern County mountains were concerned Bolin was still at large in California, a possibility authorities did not discount because Bolin is a survivalist.  Even if he had left, there was a concern that he could return.

The narrator then summarizes portions of the *America's Most Wanted* program, beginning with the shooting of Huffstuttler, showing program excerpts to dramatize the remarks.  The narrator recounts that Bolin shot the three victims in order to keep them quiet about his marijuana operation. Footage of the *America's Most Wanted* program depicting Jim Wilson fleeing – running, stumbling, falling – is shown.  He is described as "badly wounded."   Panning to a Bolin mug shot, the narrator reports Bolin was being held without bail in Illinois and late that afternoon agreed to be returned to Kern County for trial.   The segment ends with a reporter standing in front of the Sheriff's

Department and explaining that although the Department has arrest warrants on 40,000 suspects,

"but with Paul Bolin in jail tonight, people here seem to be breathing a lot easier."

1        APPENDIX IV

2        Summary of *America's Most Wanted* Program Regarding Bolin's Capture,

3                            Sunday,  January 14, 1990

4    Segment 3 of Exhibit 54 (which was presented as Exhibit C to Bolin's October 22, 1990, motion to

5    change venue).

6        This segment plays the introduction to the program previewing the newest "most wanted"

7    in America as well as numerous very brief snapshots of staged crime, rescue, and capture.  The first

8    story for January 14, 1990, concerns a Vietnamese gang of young men who are portrayed as violent

9    killers.  The second segment of the program concerns a 64-year old Sunday school teacher murdered

10   by a "drifter" who staked out her home and shot her in the back while she was running from him.

11       The narrator then refers to the Bolin segment, as footage from the program is shown of the

12   Bolin character emerging from the cabin just before shooting the Huffstuttler character.  While the

13   narrator is still speaking, the real Bolin shown walking through an airport terminal flanked by law

14   enforcement, in belly chains, with the word "CAPTURED" printed diagonally across the screen.

15   The scene changes to footage another individual who had been featured on the *America's Most*

16   *Wanted* program the previous week and who also was been captured thanks to the audience.

17       The program narrator then recounts how all three fugitives from the previously Sunday's

18   program were captured.  Bolin's case was the second case reviewed (in more detail than the prior

19   reference).  The narrator credits an Illinois viewer for Bolin's capture "in near record time."

20       The scene then shifts to footage showing the rugged terrain of the Kern County mountains

21   featured the previous week just before Wilson, Mincy, and Huffstuttler arrived at the cabin.

22   Supposedly reporting what the Kern County authorities said, the narrator states that "Bolin was

23   hiding a secret marijuana crop on a mountain top in California's Sierra Nevadas, and when three men

24   stumbled on to the plants, Bolin murdered two of them."  The scene replays the Bolin character

25   emerging from the cabin and shooting Huffstuttler.  The next scene shows Steve Mincy saying

26   goodbye to his little girl at the Mincy family campsite.  This is followed by the program excerpt of

27   the Mincy character cowering behind a small boulder pleading for his life and Bolin wordlessly

28   smirking, shooting him dead.

1    At this point new footage not previously shown in the original program is played.  It is of

2   Donna Mincy, the "victim's mother," who explains that "hearing the news [about her son's death]

3   wasn't as bad has having to tell a little ten year old child that her daddy was gone, and he wouldn't

4   be back."

5    Wilson's frantic escape is replayed next, with the narrator stating that Bolin "meant to kill

6   Jim Wilson too, according to police, but Wilson survived, shot and severely injured by his ordeal."

7   Again, the Wilson character running, stumbling, falling, and struggling is depicted as the real Wilson

8   narrates over this footage about how he felt like an animal when he was trying to escape.  New

9   footage of Wilson is played also.  Speaking to an interviewer, he reports how he essentially fell down

10   the mountain until he came upon a farm at which he obtained help.

11    Next, a map of Illinois is shown, with the location of Elmwood Park, where Bolin was

12   arrested.  Footage is shown of the actual house Bolin was in when he was arrested, reportedly

13   watching a football game on television.  Mrs. Mincy is then shown with an interviewer explaining

14   how happy she was when she found out Bolin had been caught.  The next scene repeats the footage

15   of Bolin in leg and belly chains at an airport, accompanied by authorities.  The narrator reports that

16   as of that night, Sunday, January 14, 1990, Bolin is in custody in Kern County, California, where he

17   faces two counts of murder.

18

19

20

21

22

23

24

25

26

27

28

APPENDIX V

Summary of Voir Dire of Jurors and Potential Jurors Exposed to Pretrial Publicity

During voir dire, jurors and potential jurors revealed they were exposed to pretrial publicity about Bolin's case.  Although the juror questionnaire responses each juror and potential juror completed were before Judge Davis, those responses are not part of the record on habeas corpus and they have not been offered.  The content of the questionnaire responses is gleaned only from references during the voir dire process.

**Part One – Potential Jurors:**

1.  Ann Chernabaeff stated in her questionnaire that she had seen the *America's Most Wanted* episode featuring Bolin and that the program "showed how it was done," that "they came to find the farm," "there was some shooting," that the program "show[ed] the parties involved," and that "[o]ne was getting shot at and another one [was] running." RT-1: 118.[45]  The colloquy between the Judge Davis and  Ms. Chernabaeff indicates she was excused for medical reasons. *Id*.: 116-19.

2.  Arthur Cordova, a correctional officer at the California Correctional Institution in Tehachapi was familiar with the case from both the newspaper and television.  He was not asked if he watched the *America's Most Wanted* episode about Bolin.[46]   From the publicity to which he was exposed, he recalled the crime occurred in Walker Basin, that two people came up to visit, and they were shot and killed.  Generally news about crimes interested Mr. Cordova because he liked to "keep up with the statistics of all crimes that occur[red] here in Kern County."  *Id*.: 143, 146, 162.  Maintaining those statistics, however, was not part of his job for the prison.  *Id*.: 162-63.  Mr.

---

[45] There is no indication from the voir dire how Ms. Chernabaeff had rated Bolin's guilt on her juror questionnaire.

[46] Because Mr. Cater passed him for cause, however, the Court surmises he had not seen the program.

Cordova also thought he recognized Bolin's face from either the newspaper or the television news. *Id.*: 163.[47] He responded to all questions that he would maintain an open mind about Bolin's guilt, and if the jury returned guilty verdicts on two murders, an open mind about whether to impose the death penalty or life without parole. *Id.*: 163-75. Mr. Cater passed him for cause after individual questioning and Ms. Ryals did likewise. *Id.*: 173, 175. He was excused on Ms. Ryals' tenth peremptory challenge. RT-7: 1636.

3.    David Everett Kessler's exposure to pretrial publicity, not including the *American's Most Wanted* episode, led him to believe he "would have a difficult time in being very objective" based on what he remembered and heard together with his feelings about drugs. RT-2: 267-68. What he remembered was that Bolin "[w]as growing marijuana, had marijuana, whatever up there and that these three people happened onto the area and that he shot and killed two of them, and one of them was wounded and escaped and that was the witness." He believed he obtained this information from the newspaper and television news broadcasts. *Id.*: 268. Prior to this revelation, Mr. Kessler expressed his unhappiness with the criminal justice system. He felt defense attorneys were "underhanded," prosecutors were less competent than lawyers in private practice, and that trial judges allowed criminals to go free. *Id.*: 263-64, 266-67. All counsel stipulated to excuse him for cause.[48]

4.    Donald Roger Pearson, a fire fighter, explained that he saw the *America's Most Wanted* episode; that "[b]asically, it was a re-enactment of this supposed crime." *Id.*: 280. His understanding of the circumstances of the crime was derived from a combination of the *Most Wanted* program,

---

[47] Voir dire questioning did not elicit how Mr. Cordova had rated Bolin's guilt on his juror questionnaire.

[48] He was not asked about how he had rated Bolin's guilt on his juror questionnaire.

newspaper accounts, and television news broadcasts. *Id*.: 280-81. Mr. Pearson actually had worked in the Walker Basin area and was familiar with Thompson Canyon on fire patrols. *Id*.: 281. Seeing the *Most Wanted* episode made Mr. Pearson feel that Bolin was "probably guilty." The show was "pretty graphic." *Id*.: 282. Mr. Pearson recognized that television programs tend to exaggerate, and he believed he could put what he saw and read about Bolin's case out of his mind so that he could decide the case on evidence presented in the courtroom. *Id*.: 283. On questioning by Mr. Cater, Mr. Pearson agreed that there was nothing presented in the show which was *not* focused on convincing the audience that Bolin was guilty of the crimes alleged. *Id*.: 288. He also agreed there was nothing in the show purporting to show Bolin's side of the story. *Id*.: 288-89. Mr. Pearson was aware that Bolin had been arrested within a few hours of the broadcast of the *Most Wanted* episode. *Id*.: 289. He admitted that since watching the show made him think Bolin was "probably guilty," the defense would, in his mind, be tasked with having to show a reason Bolin was not guilty. *Id*.: 289-90. At this, the court asked for a cause challenge; when it was interposed it was granted. *Id*.: 290.

5.    Jose Reynaldo Reyna, recalled seeing the "national show," describing it as a re-enactment in the mountain area that involved a killing, or maybe two. What he remembered was the "staging" of the show, meaning the geography of the setting. *Id*.: 295. Mr. Reyna represented he had no opinion about Bolin's guilt. *Id*.: 296. Mr. Reyna was excused for cause because he could never vote for the death penalty. *Id*.: 297.

6.    After Judge Davis explained to the six prospective jurors about the burden of proof and presumption of innocence, Velma Elizabeth Schroder, stated that if she had to decide whether Bolin was guilty or not guilty without having heard any evidence, she would vote "guilty" based on what she had read and

seen. *Id*.: 338-39. After Judge Davis explained that a verdict could only be predicated on evidence received in court, Ms. Schroder retracted her earlier statement. *Id*.: 339. On individual voir dire, Ms. Schroder confirmed she had not seen the *America's Most Wanted* episode about Bolin, although she did watch the program occasionally. *Id*.: 347. Based on the publicity to which she had been exposed, Ms. Schroder knew the case "had to do with the growing of marijuana" and that two men went in investigating or stumbled upon it. She did not recall any names. *Id*.: 349. In her questionnaire she wrote that based on what she had heard, Bolin was "definitely guilty." *Id*.: 351. The judge then asked her if she was "the kind of person" who could put out of her mind what she had seen on television and read in the newspaper and make a decision based on evidence presented in the courtroom. She responded that she would make herself do that. *Id*.: 352, 353. She was challenged by the prosecutor because although she was in favor of the death penalty, she couldn't vote for it herself. *Id*.: 360.

7.   James W. Cook, watched the *America's Most Wanted* episode about Bolin, after having seen a television news program explaining that the show would be broadcast about Bolin's case. *Id*.: 421. About the program he recalled a house in the woods, two people leaving, one of whom was shot and the other who fell down but got away. *Id*.: 422. It wasn't clear to Mr. Cook exactly what happened. *Id*.: 423. On the questionnaire, Mr. Cook marked "no opinion" as to Bolin's guilt and he told the judge the same thing on individual voir dire. *Id*.: 424. He didn't think the show necessarily presented all the facts about the crime, just "their opinion of what happened." *Id*.: 425. After extensively questioning Mr. Cook if, as a juror, he would put the program out of is mind and decide the case only on evidence presented, and receiving affirmations to all of his leading questions, Mr. Soria challenged Mr. Cook for cause and the challenge was denied. *Id*.: 436.

8.   Kirk William Thompson, saw the *America's Most Wanted* episode about Bolin. He remembered that an argument started when "these gentlemen" had come upon an area in Walker Basin and shots were fired. "One guy was shot, another guy ran off, and Mr. Bolin then ran after this gentleman and then shot him." *Id*.: 440. One got away and "crawled off to a roadside house or something." He vaguely recalled seeing the re-enactment of the shooting and the pointing of the gun at the victims. *Id*.: 441. On the questionnaire, Mr. Thompson checked he thought that Bolin was "probably guilty." He answered affirmatively, however, when the judge asked him, "Are you going to be able to put that out of your mind and listen to this case?" His "probably guilty" impression was based on the *America's Most Wanted* program. *Id*.: 442. Showing further rehabilitation from his earlier opinion of Bolin's probable guilt, Mr. Thompson stated that he could label Bolin "as being not guilty because he is innocent until he is proven guilty." Mr. Thompson accepted the concept of the presumption of innocence. *Id*.: 443. Mr. Thompson then revealed he had been called as a character witness in a murder case for the defense. As for his treatment by the District Attorney's Office, he was treated in the manner he would have expected to have been treated. *Id*.: 444. The cross examination he experienced started out "pretty nice, then it got a little rougher and rougher." He assured the judge he would not hold that experience against Ms. Ryals. *Id*.: 446. Mr. Thompson stated on his questionnaire that drug dealers should be hanged. During voir dire, he explained this was related to the fact he had a 15-year old daughter and was worried about whether she would become involved in drugs. *Id*.: 447-49. On the topic of a defendant's privilege *not* to testify, Mr. Thompson was a little bothered and thought he would have negative thoughts in the back of his head, despite jury instructions to the contrary. *Id*.: 450. Mr. Soria challenged him for cause, and the court granted the challenge when Mr. Thompson

1  admitted that he would vote for the death penalty automatically in the event

2  the jury convicted Bolin of at least one count of first degree murder and one

3  count of first or second degree murder.  *Id*.: 452.

4  9.  Raymond Dale Rumsey sometimes watched *America's Most Wanted* and

5  indicated on the questionnaire he might have seen the segment about Bolin.

6  *Id*.: 453-54.  He hadn't heard about the case from the newspaper or television

7  and he had no recollection of the circumstances of the crime.  He had no

8  opinion about whether Bolin was guilty.  *Id*.: 454.  Although when he filled

9  out the questionnaire, he thought a defendant's failure testify would mean the

10  defendant was hiding something, he no longer felt that way after Judge Davis

11  explained the rules about presumption of innocence and the Fifth

12  Amendment.  *Id*.: 454-55.  Mr. Soria challenged Mr. Rumsey for cause when

13  Judge Davis elicited that he would impose the death penalty automatically for

14  murder.  The challenge was granted.  *Id*.:  456.

15  10.  Richard Eugene Williford saw the *America's Most Wanted* program about

16  Bolin.  *Id*.: 459.  He recalled accurately that the storyteller of the episode was

17  one of the shooting victims and a friend of one of the deceased victims.  He

18  recalled that Bolin was mad that strangers were brought to the cabin to see

19  the marijuana plants and he shot the man who brought the others up to the

20  site "at the cabin door."  *Id*.: 460.  Mr. Williford recollected the depiction of

21  the actual shootings.  He was aware that the authorities captured Bolin

22  because of the *Most Wanted* program.  Mr. Williford didn't think the actor

23  who portrayed Bolin looked like Bolin, so he wouldn't "relate the program

24  totally to him [Bolin]."  He couldn't say that the events depicted on the

25  program were true.  *Id*.: 461.  Mr. Williford confirmed to Mr. Soria that he

26  (Mr. Williford) marked on the questionnaire he thought Bolin was "probably

27  guilty."  Mr. Soria further elicited that if Mr. Williford were Bolin, he would

28  be concerned if someone like Mr. Williford, who had seen the program and

thought Bolin was "probably guilty." *Id*.: 463-64.   Nonetheless, Mr. Williford stated he did not have his "mind made up" about the case. *Id*.: 464. He answered affirmatively to three leading questions posed by Mr. Soria: 1) "And you would base your decision strictly on the evidence you hear in this courtroom?"  2) "And you could promise us that whatever you saw on America's Most Wanted would not come into play at all?" and 3) "And you could make that promise to us?"  After securing those assurances, Mr. Soria challenged Mr. Williford for cause "based on *that*." (Emphasis added.)  The challenge was denied. *Id*.: 465.  The court then visited the issue of the death penalty and elicited from Mr. Williford he could not vote for it under any circumstances.  Ms. Ryals' cause challenge was granted. *Id*.: 466.

11.   Dawn Alicia Albitre, saw a recorded version of the *America's Most Wanted* program about Bolin, provided by close friends who lived in Caliente, near the area of the crime. RT-3: 551-52.  She watched the follow-up program as well where Bolin's arrest was announced.  After watching the Fox programs, she was able to presume Bolin's innocence; she would want to hear both sides before rendering a verdict. *Id*.: 552.  Although Ms. Albitre marked on the questionnaire that she believed Bolin was probably guilty,  she "would want to hear all of the facts" before making a decision as a juror. *Id*.: 552-53. Mr. Cater elicited from Ms. Albitre that she was at the Labor Day 1989 team penning Steve Mincy and his family had come to Kern County to see.  Before watching the tape recording of the *Most Wanted* program, Ms. Albitre's friend told her about the crime, that is that two men were shot and killed, another was shot but escaped, and the fact that marijuana involved. *Id*.: 554. She reported that her husband had heard of Bolin, but she didn't believe her husband knew Bolin. *Id*.: 554-55.  Ms. Albitre confirmed there was nothing in the program that supported Bolin's presumption of innocence and that the show was designed to make people believe Bolin was guilty.  She also

confirmed to Mr. Cater that she would be able to "divorce" her recollection of the video from what would be presented in court, by "completely block[ing]" out the program. She felt she could do that because she used to be an E.M.T. *Id.*: 556. Her recollection about the crime and the program were jogged when she was filling out the questionnaire. *Id.*: 557. If she were a relative of Bolin's, she would feel very uneasy about having a juror on his trial that had her (Ms. Albitre's) knowledge and background about the case. *Id.*: 558. Mr. Cater challenged her for cause. *Id.*: 560. Ms. Ryals elicited from Ms. Albitre that she would be fair. Ms. Ryals also confirmed that Ms. Albitre thought she might know (Deputy) Marty Williamson, but that this wouldn't make any difference in deciding the case. Then, Ms. Ryals passed her for cause. *Id.*: 561. After Ms. Albitre exited the courtroom, argument on the defense cause challenge resumed with Mr. Cater pointing out that her viewing of the *Most Wanted* program about Bolin was more than watching on the network broadcast; it was a special showing by the friend she stayed with when she attended the same team penning competition Steve Mincy and family attended. *Id.*: 562-63. Ms. Ryals countered that there was no indication Ms. Albitre was lying when she attested that she could be fair. The court then denied the challenge. *Id.*: 563. Mr. Cater then sought "some advisement" from Judge Davis, asking "What do we have to do to get someone who has seen this [*America's Most Wanted* program] off of this jury?" Ms. Albitre was excused on the first defense peremptory challenge. RT-7: 1623.

12. Michael G. Ansolabehere, Jr. watched the *America's Most Wanted* episode about Bolin as promoted by preshow publicity. He agreed the program "was a pretty graphic representation." The news account alerted the public to the anticipated airing of the program mentioned the location as Walker Basin, an area with which Mr. Ansolabehere was familiar. As far as the program itself,

he was most impressed with the depiction of "the young man running down away from whatever it was he was running away from and being shot at." RT-3: 565.  On his questionnaire, Mr. Ansolabehere wrote the prosecutors were "good guys," and defense attorneys were "bad guys."  *Id*.: 565. Nonetheless he thought he could set those feelings aside if selected for jury service in this case. *Id*.: 567.[49]  Mr. Ansolabehere worked as the Kern County Highway Maintenance Engineer for the Department of Public Works, so he had been a witness in lawsuits many times in the past (when the County was sued). *Id*.: 569. Mr. Ansolabehere admitted that if the jury were to find Bolin guilty of two premeditated murders then he "probably would vote for death." The court then solicited a cause challenge for the defense, the challenge was interposed, Ms. Ryals stipulated to it, and the challenge was granted.  *Id*.: 569.

13.    George Atkisson, stated he checked that Bolin was "probably guilty" on the questionnaire based on the *America's Most Wanted* program.  He responded affirmatively to the court's question about whether the show was "pretty graphic."  He believed he could be a fair juror and put the show out of his mind. *Id*.: 574. He didn't believe anything in the program pointed to Bolin's innocence.  He did not regularly watch the *Most Wanted* program.  He also gained familiarity with Bolin's case from reading the newspaper.  *Id*.: 575. If he were in Bolin's place he would be satisfied with him (Mr. Atkisson) as a juror. *Id*.: 576.  When Mr. Atkisson explained his business obligations for his small software business, counsel stipulated he could be excused for hardship.  *Id*.: 579.

---

[49] Voir questioning of Mr. Ansolabehere did not elicit how he had rated Bolin's guilt on his juror questionnaire.

14. Michael Bishop sometimes watched the *America's Most Wanted* program, but did not see the episode about Bolin. *Id*.: 584. He was familiar with the case from reading the newspaper and watching television news. *Id*.: 585. Mr. Bishop was not asked what he recalled about the crime by Judge Davis or any of the trial attorneys.[50] During Mr. Cater's individual question, Mr. Bishop revealed he had worked at California Correction Institution, Tehachapi, repairing kitchen equipment. He didn't think being in prison was any worse than being in the Army. *Id*.: 588. Mr. Cater challenged Mr. Bishop because he believed the death penalty should be automatic if the defendant was found guilt of two murders, whereas life without parol *may* be appropriate for guilt of a single murder. The challenge was granted. *Id*.: 591.

15. Celeste Faye Brown, reported she regularly watched *America's Most Wanted* and in fact watched the episode about Bolin. She recalled that Bolin was cultivating marijuana and he didn't want one of the boys to bring his friends up. *Id*.: 602. She recalled guns being used and chase scenes. After seeing that program, she thought Bolin was "probably guilty." It was a "he did it" kind of story. When asked if she would be able to put the re-enactment out of her mind if chosen as a juror, she responded, "I would try to come here without preconceived notions, because I don't know the man. I know nothing about him." She also confirmed she would not compare the re-enactment with evidence presented at the trial. *Id*.: 603. In addition to the original show, Ms. Brown also saw the second one, the update. All of her knowledge about the case came from the *America's Most Wanted* episodes. She neither watched the news on television, nor read the newspaper. *Id*.: 604. She was challenged when she said that she would automatically vote for the death

---

[50] Nor did any of the questioners elicit how Mr. Bishop had rated Bolin's guilt on his juror questionnaire.

penalty if Bolin were convicted of one count of first degree murder and one count of either first or second degree murder.  The challenge was granted. *Id*.: 606.

16.     Kenneth William Carpenter was a member of the National Rifle Association and in favor of the death penalty.  *Id*.: 607.  Judge Davis revealed that Mr. Carpenter's mother and his (Judge Davis's) wife were good friends, although Judge Davis did not know Mr. Carpenter or even the names of Mr. Carpenter's siblings.  *Id*.: 608.  If Bolin were convicted of murder and the special circumstances were found true, Mr. Carpenter would vote in favor of the death penalty "[d]epending on the circumstances."  *Id*.: 609-10.  He denied seeing the *America's Most Wanted* segment about Bolin.  *Id*.: 610-11. The thought he learned about the case on television and also from talking to co-workers.  He felt he was the kind of person who would be able to set aside what he learned about the case prior to trial and listen to testimony given in court.  *Id*.: 611.  He confirmed that he wrote in his questionnaire he thought criminal defense lawyers were shysters and that prosecutors were civil servants, but admitted he may have been a little facetious when he filled out the questionnaire.  *Id*. 613.  Based on his understanding of the case, that is, "[a]ccused of shooting three people at defendant's crop," Mr. Carpenter thought Bolin was "probably guilty."  Nonetheless, if chosen as a juror, he could decide the case from what was presented in the courtroom.  *Id*.: 614. Both sides passed Mr. Carpenter for cause.  *Id*.: 616, 618.  Mr. Carpenter was not subject to further questioning.

17.     William Henry Crawford, saw the *America's Most Wanted* program about Bolin.  He reported, "The re-enactment was quite vivid in the fact that it represented the two young men and the shooting and the chase.  Not all of the details are clear anymore, but some of the more dramatic things are."  He was "personally affected by it [the program] because of the trauma involved, the

tragedy." It would be a problem if he were selected as a juror.[51] The defense cause challenge was stipulated to by the prosecution and granted. *Id.*: 619.

18.    Dorothy Duncan occasionally watched the *America's Most Wanted* program, but did not see the segment about Bolin's case. *Id.*: 621-22. She did hear about the crime on television. She remembered only that drugs were involved and Bolin's name. *Id.*: 622.[52] Mr. Soria challenged her for cause after she stated she would vote for the death penalty automatically if Bolin were convicted of two counts of first-degree murder, and the challenge was granted. *Id.*: 624.

19.    Jo Ann Durrett remembered from pretrial publicity on the television news that the case involved marijuana and someone killed in Tehachapi or in the mountains. *Id.*: 626. If she were to remember any more about the case, she would be able to put that information out of her mind and decide the case on the evidence presented in court. *Id.*: 627.[53] Mr. Soria challenged her for cause because she stated would vote for the death penalty every time if a defendant were convicted of first-degree premeditated murder and the challenge was granted. *Id.*: 631.

20.    Meri Hatfield would occasionally watch the *America's Most Wanted* program and believes she might have seen something about this case on that program. She also checked on the questionnaire that she hadn't heard of this case before. She was unable to describe anything about the crime. She remembered nothing. *Id.*: 655. If, however, she were to remember

---

[51] Mr. Crawford was not asked about how he had rated Bolin's guilt on his juror questionnaire.

[52] Ms. Duncan also was not asked about how she had rated Bolin's guilt on her juror questionnaire.

[53] Likewise, Ms Durrett was not asked about how she had rated Bolin's guilt on her juror questionnaire.

something about the crime while sitting as a juror, she would put that information out of her mind and decide the case based on what she were to hear in the courtroom. *Id.*: 656.[54] After inquiring about Ms. Hatfield's views on the death penalty, Mr. Soria and Ms. Ryals passed her for cause without questioning her. *Id.* 663. She was excused on Ms. Ryals' twelfth peremptory challenge. RT-7: 1637.

21.     Carl Kroll, saw the *America's Most Wanted* episode about Bolin. RT-3: 674. The show made "rather much of an impression" on him. He felt Bolin was "pretty definitely guilty." If chosen as a juror, he would be able to put that aside. *Id.*: 675. If Bolin were convicted of two counts of first degree premeditated murder, Mr. Kroll would impose the death penalty. The defense cause challenge thereafter was granted. *Id.*: 676.

22.     Jacqueline Walker occasionally watched the *America's Most Wanted* program, but after questioning by Judge Davis, it was clear she knew nothing about Bolin's case. *Id.*: 677-78. Under questioning by Mr. Cater, Ms. Walker confirmed that although she indicated she had not seen the *America's Most Wanted* episode about Bolin, she marked that Bolin was "definitely guilty" on her questionnaire response. *Id.*: 681.[55] She explained this was because she thought Bolin was the *Most Wanted* individual featured on different episode – one who was "the murderer of babies in that preschool." *Id.*: 682. Ms. Walker was excused based on her request to "be dismissed"

---

[54] Whether or not Ms. Hatfield remembered or knew anything about the crime, voir dire questioning did not elicit how, or if, she had rated Bolin's guilt on her juror questionnaire.

[55] It is not clear from the voir dire exchanges whether Ms. Walker maintained Bolin's guilt even after learning that he was not the *America's Most Wanted* subject she thought he was.

because she wouldn't want to vote for the death penalty even if she thought it was appropriate.[56] *Id*.: 685.

23.    William Ward Miller, a school teacher with a desire to bring something to the court's attention, stated he saw the *America's Most Wanted* program about Bolin. *Id*,: 698. None of the scenes in the program stood out for him. He did not pay close attention to the *America's Most Wanted* program. He only occasionally watched it. He did mark on his questionnaire that Bolin was "probably guilty" and this was based on what he read about the case in the newspaper. *Id*.: 699. He couldn't say how many people had been shot. He connected Bolin's name to newspaper articles when he was completing the questionnaire. *Id*.: 701. He would be able to vote for either death or life without parole depending "on the situation." *Id*.: 703. If Bolin were found guilt of two premeditated murders, Mr. Miller always would vote for the death penalty. *Id*.: 704. Based on the court's solicitation of a challenge from the defense, the challenge was interposed and granted. *Id*.: 705.

24.    Don Newberry wrote in his questionnaire that he had seen the *America's Most Wanted* episode about Bolin. RT-4: 721. He saw only one episode of the program,  – the "re-enactment." He also had read about the case in the newspaper, but recalled no other television coverage besides the *America's Most Wanted* program. *Id*.: 722. He didn't remember "too much. . . . It was in regard to a case where . . there was marijuana grown on a piece of property and a case where a couple of people ended up dead." He recalled that the decedents were shot and had been associated with Bolin. *Id*.: 723. He recalled there were three victims, one of who got away who was wounded. He answered affirmatively to the question about whether he would be able to

---

[56] She also complained to Judge Davis that a man in a "brown coat" was laughing at her as she was requesting dismissal.   Judge Davis excused her directly after she lodged this complaint.

put the re-enactment out of his mind and listen to the evidence if he were selected as a juror. Mr. Newberry marked in the questionnaire that he thought Bolin was "probably guilty" after seeing the program, but on voir dire stated he felt he could be impartial. *Id*.: 724. Mr. Soria elicited Mr. Newberry's confirmation that he would be open-minded about sentence selection should the case proceed to the penalty phase. With respect to the *America's Most Wanted* program, Mr. Newberry answered affirmative to Mr. Cater's question that even though he saw the program about Bolin, the defense and prosecution were "basically starting off even." He further confirmed he would put everything out of his mind he had seen or heard previously about the case and base his decision on the evidence presented in the courtroom. *Id*.: 728-29. Mr. Soria then challenged Mr. Newberry for cause because of the *Most Wanted* program and the court denied the motion. *Id*.: 729. Ms. Ryals further elicited that if he remembered more about the program during the trial proceedings, he wouldn't compare what he remembered with the presentation because he would follow the court's instructions and also because he realized that the *America's Most Wanted* program was meant to entertain. *Id*.: 729-30.

25. Michael O'Donnell, saw the *America's Most Wanted* program about Bolin but indicated on his questionnaire response that he had no opinion as to Bolin's guilt based on this program. RT-4: 737-38. He clarified that his wife was watching the show, and when the Bolin segment came on, she called him in. What he saw was "the part where the guys went to his house and he supposedly came unglued and shot them." *Id*.: 738. His wife called him in to watch the segment because Kern County was mentioned. *Id*.: 738-39. Mr. O'Donnell reported that he neither read the newspaper nor watched the news on television. He could put out of him mind what he saw on the program if chosen as a juror. *Id*.: 739. He admitted that he smoked marijuana, most

recently, "not too long" ago from when the judge asked him the question.  He

was familiar with dealers, both good and bad, and didn't think he would feel

any affinity toward Bolin because Bolin was cultivating marijuana.  *Id*.: 740-

41. He didn't think he could vote for the death penalty.  Ms. Ryals interposed

a challenge and the challenge was granted.  *Id*.: 742.

26.     Robert Ogelsby occasionally watched the *America's Most Wanted* program,

but he didn't see the episode about Bolin.  *Id*.: 743.  He did hear about the

case, but his recollection was limited to remembering the area where the

crime occurred because he used to go out to that area for horseback riding and

rounding up cattle. *Id*.: 743-44.[57]  After telling the court that he would be

more inclined to vote for life with parole at the penalty phase, but that under

certain circumstances he could still vote for the death penalty, Mr. Soria

passed him for cause. *Id*.: 747.  Ms. Ryals challenged him for cause after she

elicited from him that he didn't know if he could vote for the death penalty

in a case that didn't involve child murder victims or the death of one his

family members. *Id*.: 750.  The court denied her challenge after Mr. Ogelsby

clarified that he could vote for the death penalty.  *Id*.: 751.  Ms. Ryals

exercised her third peremptory challenge to Mr. Ogelsby as an alternate juror.

RT-7: 1639.

27.     Nancy La Jean Porter saw the *America's Most Wanted* program about the

crime and although it was "a pretty graphic dramatization," she answered that

she would be able to put it out of her mind by "[j]ust pay[ing] attention to the

facts and block[ing] that [the show] out of her mind."   Judge Davis

characterized the program as a "dramatization" broadcast so the network can

sell products.  She conceded there was nothing in the dramatization about

---

[57] Voir dire questioning did not elicit from Mr. Ogelsby how he had rated Bolin's guilt on his  juror questionnaire.

Bolin's innocence.   RT-4: 761.   She wrote down in her questionnaire response and confirmed on voir dire that she had no opinion about Bolin's guilt.   She felt the program was a dramatization and might not be a true reflection.   *Id*.: 762.   The fact that her father spent eight months in the County Jail for a drug charge would not influence in the present matter.   *Id*.: 763. Mr. Soria elicited that Ms. Porter was pregnant.   Judge Davis elicited that the baby was due during the first week of February.   *Id*.: 765.   She did not feel her pregnancy would prevent her from serving as a juror as long as the proceedings did not extend to February.[58]   She didn't mind serving while pregnant.   Mr. Soria challenged Ms. Porter solely on the basis of her having seen the *America's Most Wanted* program.   The court denied the challenge. *Id*.: 766.   After Ms. Porter stepped down, Ms. Ryals told Judge Davis that she would stipulate to the challenge.[59]   *Id*.: 767.

28.   Nanette Smith did not watch the *America's Most Wanted* program, but she had heard of the case from television news about the time the crime occurred. *Id*.: 804.   She also might have been aware of Bolin's apprehension and return to Bakersfield from reading the newspaper.[60]   She responded, "Certainly" when asked whether she could decide this case based on what would be presented in court.   She felt she was "fair and impartial."   If she were in Bolin's place, she would be satisfied to have someone like her on the jury. *Id*.: 805.   Mr. Cater passed her for cause.   Then Ms. Ryals elicited from her what she remembered about the news coverage.   She remembered "the news

---

[58] In fact the penalty proceedings were continued to the first week in February.

[59] In the Petition, Bolin contends Ms. Ryals' proposed stipulation was based on Ms. Porter's exposure to the *America's Most Wanted* program.   Petition, ¶ 125.   The Warden contends that the proposed stipulation was more likely based on Ms. Porter's pregnancy.   Answer, ¶ 125.

[60] The questioning did not elicit how Ms. Smith had rated Bolin's guilt on her juror questionnaire.

team being up in the area, in Walker Basin when it happened." She also recalled that authorities apprehended Bolin "later on." *Id*.: 808. In the event she were to remember something about the pretrial publicity, she would not compare what she remembered with the evidence Ms. Ryals presented at trial. She could keep that information out of her mind. Ms. Ryals passed Ms. Smith for cause. *Id*.: 809.

29.   David Vejarano stated that he was a regular viewer of the *America's Most Wanted* program and watched it whenever he could. *Id*.: 836-37. He thought he saw the episode about Bolin four weeks before his voir dire, but he couldn't recall any of it. *Id*.: 837. He also thought he might have read about the case "or seen it on TV." He remembered that somebody allegedly killed two men. *Id*.: 838. If he were to remember more about the case from pretrial publicity as a sitting juror, he would put it out of his mind and decide the case based on what was presented in the courtroom. *Id*.: 839.[61] Mr. Soria challenged him for cause, and the challenge was granted when Mr. Vejarano stated he would always impose the death penalty where the defendant had been convicted of two counts of premeditated murder. *Id*.: 841.

30.   Dan Webb, believed he had seen the *America's Most Wanted* episode about Bolin six or eight months previous. He recalled that marijuana was being cultivated and that "two people walked in on this one guy. The guy shot one of them. One of the guys ran down a hill or something like that, tripped, fell, or something and then he shot the other guy." *Id*.: 844. He assumed the evidence presented on the program was "honest" and that the person exposed on the show "is probably guilty." He admitted there was nothing on the show about Bolin's innocence. Although he didn't necessarily believe everything

---

[61] Mr. Verjarano was not asked about how he had rated Bolin's guilt on his juror questionnaire.

he saw on television, the program was still in the back of his mind. Judge Davis observed that the show included "some very dramatic moments." He thought that killing two people would qualify as being "pretty graphic." He remembered that a gun was used. *Id.*: 845. Judge Davis referred to the program as having "dramatized and sensationalized the case." Mr. Webb felt like the program story would stay in the back of his mind if he were a juror on the case. Mr. Soria challenged him for cause and the challenge was granted. *Id.*: 846-47.

31.    Kimberly Wilson watched the *America's Most Wanted* program about Bolin, remembered it fairly well, thought he was definitely guilty based on what she had seen because of "the way the program was presented." *Id.*: 857. She stated she would be inclined to impose the death penalty if Bolin were convicted of two counts of murder, even though the death penalty is not automatic. *Id.*: 858. Mr. Soria challenged her for cause and the challenge was granted. *Id.*: 860.

32.    Douglas Zimmerman stated he watched *America's Most Wanted* on only one occasion and he believed it was about Bolin. He watched it because it was publicized beforehand. Judge Davis had to draw out Mr. Zimmerman's recollection about the program. First, Mr. Zimmerman thought the crime occurred up at Lake Isabella.[62] *Id.*: 860. He recalled that two people were killed, that the instrumentality was a gun. While he was watching the program, he received a telephone call. He did not recall a chase scene. *Id.*: 861. He checked on his questionnaire that he had no opinion about Bolin's guilt after watching the program. He explained that was because the program had very little impact on him. *Id.*: 861-62. He also read some information

---

[62] Lake Isabella also is in the Kern County mountains as are Walker Basin and Thompson Canyon.

about the case in the newspaper. He thought he could put all the pretrial publicity information he saw and heard out of his mind if selected as a juror. *Id*.: 862. He could vote for death or life without parole at the penalty phase. *Id*.: 863-84. He answered the same to Mr. Soria's questioning. He also stated he didn't expect Bolin to testify. *Id*.: 865. He clarified, however, and said that he thought it was the obligation of the defense to come forward. Then he said that it wouldn't be a problem if the defense remained mute. *Id*.: 866. Back to the program, Mr. Zimmerman promised to keep everything he saw and heard out of his mind if selected as a juror. *Id*. 867. Mr. Soria challenged him for cause based on his viewing (or partial viewing) of the program and the challenge was denied. *Id*.: 868. He did tell Ms. Ryals that if he remembered something about the program that she didn't present in evidence, he would wonder about that, but he wouldn't let it inform his decision making as a juror. *Id*.: 868-69. Mr. Zimmerman was excused on the defense team's fourth peremptory challenge. RT-7: 1637.

33.    During introductory remarks to the six jurors up for individual voir dire in which Daniel Bender was sitting, Judge Davis explained about the presumption of innocence and the prosecutor's burden of proof. He then solicited input from the prospective jurors about whether they understood and agreed with these precepts. Despite the explanation given by Judge Davis, Mr. Bender responded that if he and the other five prospective jurors were asked to reach a verdict right then, his verdict would be "guilty" based on what he had seen and heard on television. RT-5: 944. He did "not necessarily" believe everything on television or in the newspaper, but with respect to the newspaper, his initial response was "pretty much" to believe what he read. *Id*.: 945. Before asking Mr. Bender any questions about his exposure to pretrial publicity, Judge Davis elicited from him that he had a moral conviction that would prevent him from ever voting for the death

penalty.  Ms. Ryals challenged him for cause, Mr. Soria submitted the issue to the court.  *Id.*: 955.  Before sustaining the challenge, Judge Davis elicited from Mr. Bender that he did watch the *America's Most Wanted* episode about Bolin and was independently familiar with the case based on information he read in the newspaper.  As a result of that exposure he marked that he thought Bolin was "definitely guilty" in his questionnaire response.  Mr. Bender confirmed that he still felt that way, whereupon Mr. Soria challenged him as well.  Challenges from both the defense and prosecution were granted.  *Id.*: 956.

34.   Sandra Burgess revealed that she would lean toward imposing the death penalty if Bolin were convicted of two counts of first degree murder, but would listen to the evidence and be open to both death and life without parole.  *Id.*: 978-79.  Asked about *America's Most Wanted*, she stated that she did see the episode featuring Bolin.  On her questionnaire response she indicated that the program was presented to make Bolin appear guilty.  Then she said she saw parts of the program, while her husband was watching it, and heard the soundtrack.  She recalled hearing comments from one or two of the parents of the victims.  *Id.*: 980.  Then she said she left the room when the program first came on because she didn't want to watch it due to the subject matter.  She promised to try to put her recollection of what she heard in the program out of her mind if selected as juror.  *Id.*: 981.  She also read about the case in the newspaper shortly after the crime occurred.  *Id.*: 982.  She could put that information out of her mind as well.  *Id.*: 983.  Mr. Soria challenged on the grounds that she heard the *Most Wanted* segment about Bolin and the challenge was denied.  *Id.*: 987.[63]

---

[63] No reference was made to how Ms. Burgess marked her questionnaire as to Bolin's guilt based on exposure to pretrial publicity.

35.    Glen Hamilton gave his opinion during introductory remarks by Judge Davis to him and his five companion prospective jurors before individual voir dire. After hearing Judge Davis's explanation about how a defendant need not testify and that the jurors must not draw an inference that he is guilty for not testifying, Mr. Hamilton stated, "I think if they didn't want to stand up and defend themselves, they would like be admitting guilt." *Id.*: 1001. Even though he said he could follow the law as instructed by Judge Davis, he would still be influenced by this view. *Id.*: 1001-02. On individual voir dire Mr. Hamilton stated he read about the case in the newspaper and saw it on television.[64] He wouldn't decide the case as a juror based on the pretrial publicity. *Id.*: 1051. With respect to whether Bolin were to testify, Mr. Hamilton stated that Judge Davis has "swayed" him, in that his thinking was a little different than when he first considered the issue. *Id.*: 1052. Ms. Ryals challenged Mr. Hamilton because of his reluctance to impose the death penalty except in very limited circumstances. *Id.*: 1053-55. Mr. Cater objected to the challenge and the challenge was denied. *Id.*: 1055.

36.    Pete C. Castro explained that his wife saw the *America's Most Wanted* program about Bolin. *Id.*: 1024. She then told Mr. Castro about it, that is, that "it was bad." *Id.*: 1025. Both Mr. and Mrs. Castro had read about the case in the newspaper when the crime was first discovered. At the same time, he also heard about the case on television. *Id.*: 1026.[65] He did not believe in a penal system where a person is able to live in prison for the rest of his life at the expense of the taxpayers. *Id.*: 1028. If Bolin were convicted of two

---

[64] Mr. Hamilton was not asked if he watched *America's Most Wanted* generally, or specifically the episode about Bolin. He was not asked to describe what he knew about the case from his exposure to pretrial publicity. Finally, he was not asked how he had rated Bolin's guilt on his juror questionnaire.

[65] Voir dire questioning did not elicit from Mr. Castro how he had rated Bolin's guilt on his juror questionnaire.

99dp5279.OReReq4EvHrg.Bol.wpd

counts of first degree murder, Mr. Castro always would vote for the death

penalty. The defense challenge thereafter interposed was granted. *Id.*: 1029.

37.     Rachael Dominguez had not seen the *America's Most Wanted* episode about

the present case, but had heard about the case in the newspaper and on

television. *Id.*: 1032. She remembered a house in "the boonies" shown by

aerial video where marijuana was being grown. She was not asked any

further questions about her recollection of the crime, just to give an assurance

that if she were to remember more, she would keep those thoughts out of her

mind if selected as a juror. *Id.*: 1033-34.[66] After Judge Davis elicited from

her that she would not be able to bring herself to vote for the death penalty,

Ms. Ryals challenged her for cause and the challenge was granted.

38.     Hal Hannah saw the *America's Most Wanted* episode about Bolin. He had

a good recollection:

> [I]t was a man and a partner, I believe, who were cultivating
> marijuana and a local wanted to visit this partner. I guess he had
> known him since childhood or something like that, wandered up there
> and, I guess the defendant fired on him and another man that was with
> him and shot them

He could remember there was shooting and "the defendant firing on two men

who were approaching. One was crawling around in the weeds trying to hide

under rocks and so on." *Id.*: 1058. There was a "semi" chase scene. Mr.

Hannah wasn't sure he could "totally wipe" the dramatization out of his mind

if selected as a juror. *Id.*: 1059. Judge Davis expressed his concern that

because the program was "so graphic," Mr. Hannah might not be able to get

it out of his mind and he "would be comparing what [he] heard in the

courtroom under oath with the dramatization." *Id.*: 1060. Under questioning

---

[66] Nor was Ms. Dominguez questioned about how she had rated Bolin's guilt on her juror
questionnaire.

by Mr. Cater, Mr. Hannah stated that Bolin would have to live with the fact that people in Kern County would be familiar with the crime,

> unless you go out of town because I can't imagine very many people here in Kern County that didn't follow that closely because it was kind of pushed in the news programs prior to it being aired, and more than once, so people were kind of watching for it just because it dealt with Bakersfield and Kern County.

*Id*.: 1061.  If he were Bolin he would have "some misgivings" if a person with his amount of knowledge about the crime were seated on the jury.  With that statement, Mr. Cater challenged Mr. Hannah for cause. *Id*.: 1062.  After Ms. Ryals attempted to rehabilitate him, Mr. Hannah still stated he couldn't honestly say he was neutral about Bolin's guilt.[67]  The court then granted the defense challenge.  Prior to excusing Mr. Hannah, the judge told him that only 19 percent of the people surveyed in Kern County actually saw the *America's Most Wanted* program about Bolin. *Id*.: 1063.[68]

39.  Lyla Schultz confirmed she probably saw the *America's Most Wanted* program about Bolin, as well as being aware of other news accounts.  *Id*.: 1065.  She thought she probably could put out of her mind what she heard about this case and decide it only based on facts heard in the courtroom.  Because of her religious convictions, she wouldn't be comfortable returning a verdict for the death penalty. *Id*.: 1067.  On further questioning by the judge, she allowed as how she could vote for either the death penalty or life without parole if she thought it was appropriate. *Id*.: 1069.  In responding to Mr. Cater, she remembered something about growing marijuana and something about a chase.  When asked again about the program, she thought

---

[67] Although Mr. Hannah was not asked about how he had rated Bolin's guilt on his juror questionnaire, the colloquy indicates he believed Bolin was guilty.

[68] The 19 percent figure given by Judge Davis was incorrect.  The public opinion survey showed that 23.4 percent of the surveyed people who were aware of Bolin's case saw the *America's Most Wanted* episode about the crime.

that "maybe" she had seen it. *Id.*: 1070. She also checked "probably guilty" in the questionnaire about Bolin's guilt based on the program. On voir dire, however, she didn't feel Bolin was "probably guilty." *Id.*: 1072. She thought it possible that if Bolin didn't testify she would feel he was hiding something, but then said she wasn't sure. Mr. Cater passed Ms. Schultz for cause. *Id.*: 1072-73. During Ms. Ryals' questioning, Ms. Schultz stated that she was very much against cultivating marijuana and that she wasn't sure she could be fair to Bolin, whereupon Mr. Cater interposed a challenge and the court granted it. *Id.*: 1073-74.

40.    Linda Elaine Jackson watched *America's Most Wanted* on a weekly basis and saw the episode about Bolin. Judge Davis characterized the program about Bolin as "a pretty graphic re-enactment." She thought her viewing of that program might give her a problem. She also knew a witness named Doria Huffstuttler. *Id.*: 1133.[69] When she confirmed that she would never vote for the death penalty, Ms. Ryals interposed a challenge and it was granted. *Id.*: 1134.

41.    Michael Kelly was a regular viewer of *America's Most Wanted. Id.*: 1134-35. He saw the Bolin episode. Mr. Kelly first became aware of the crime from reading the newspapers. He thought the dramatization of the crime in the *America's Most Wanted* episode about Bolin was "fairly close to the basic presentation that was in the newspaper." His recollection of the crime is:

> [T]he only general thing I remember was something in the nature of a crop that was being cultivated, the fact that there had been a murder or murders involved, that the person had fled the area. It seems to me vaguely that there was something involved about a pickup truck.

---

[69] Although voir dire questioning did not elicit from Ms. Jackson how she had rated Bolin's guilt on her jury questionnaire, her response that her having viewed "the program" might give her a problem suggests she believed Bolin was guilty based on pretrial publicity.

He did not recall a chase scene. *Id*.: 1135. When Mr. Kelly marked on the questionnaire that Bolin was "probably guilty," that was based on the fact that the show producers had Bolin's name, authorities were trying to capture him, and that this must have meant that they were "pretty sure that this was the person [Bolin] they were looking for." *Id*.: 1136. He did not have a problem with the presumption of innocence. *Id*.: 1137. Mr. Kelly felt that "in most cases" if he and the other jurors returned guilt verdicts of two counts of first degree murder, he would impose the death penalty. *Id*.: 1140. After discussing the fact that he couldn't picture himself serving as a criminal defense attorney, representing someone he knew was guilty, Mr. Kelly could only say that he "probably" would be a fair and impartial juror to both sides. *Id*.: 1140-41. Mr. Soria challenged him and the challenge was granted. *Id*.: 1141.

42.   Vicki Lyn Luter had extensive exposure to publicity. During the Judge Davis's introductory remarks to her seven-person group before individual voir dire, he explained the presumption of innocence and the burden of proof. He then randomly asked Ms. Luter how she would vote, guilty or not guilty, before any evidence were presented. She responded "Guilty" on two separate occasions based on what she knew about the case. *Id*.: 1152. She believed a great deal of what she read in the newspaper. *Id*.: 1153. On individual voir dire she reported that she often watched *America's Most Wanted* and specifically saw the episode about Bolin the "first of the year." *Id*.: 1158. She recalled that "the defendant had murdered two people and attempted another one over a drug deal," the drug being marijuana. She knew the crime took place in Walker Basin and she remembered a chase scene. *Id*.: 1159. She knew that the Bolin character fired a gun. She recalled the pre-show publicity encouraging viewers to watch the program. She read about the crime in the newspaper and hearing about it on the television news. *Id*.:

1160.  She did not think she would be able to keep the program out of her mind if chosen as a juror.  *Id*.: 1161.  Mr. Soria challenged her and the challenge was granted.  *Id*.: 1162.

43.   Leland Rickey McGehee saw the *America's Most Wanted* program featuring Bolin.  *Id*.: 1163.  He did not see the follow-up episode about Bolin's arrest. He marked on the questionnaire "no opinion" about Bolin's guilt.  He didn't consider the *Most Wanted* episode when completing the questionnaire because he had no idea whether Bolin was guilty or not guilty.  He viewed the program as "all acting."  *Id*.: 1164.  He would not compare what happened in the program with the presentation in court by either the prosecution or the defense.  *Id*.: 1165-66.  He was in favor of the death penalty and could vote for it if warranted, but it would be difficult.  He also would vote for life without parole if that sentence were warranted.   *Id*.: 1168-71.  Mr. Soria questioned Mr. McGehee on Bolin's right not to testify and whether Mr. McGehee would draw any inferences about that; Mr. Soria then challenged him only on the basis of his exposure to the *America's Most Wanted* program. *Id*.: 1171-72.  The challenge was denied.  Ms. Ryals questioned him about his hesitancy to impose the death penalty and then passed him for cause.  *Id*.: 1172-74.

44.   Lyle Talmadge Mills saw the *America's Most Wanted* episode about Bolin. He described it as a re-enactment of the incident," including victims approaching the crime scene and the perpetrator "taking action to shoot the individuals," then "the person departing the premises."    On the questionnaire, he marked that Bolin was "definitely guilty" and still believed that on voir dire [g]iven the evidence that was presented in that scenario." *Id*.: 1176.  Mr. Mills also heard news broadcasts on the radio and articles in the newspaper.  The television program just reinforced his view.  He felt he would be influenced by the publicity and that it would "take something rather

1    dramatic to change that position." The defense cause challenge was granted.

2    *Id*.: 1177.

3    45.    Georgia Irene Morgan stated on individual voir dire that she saw the majority

4    of the *America's Most Wanted* episode about Bolin.   She missed the

5    beginning.   She watched the program because of the pre-show publicity

6    advertising it. Ordinarily she did not watch that program. *Id*.: 1178.  She did

7    not believe that she would compare the dramatization with what she would

8    hear in the courtroom.  She was employed as a Municipal Court clerk and

9    reported that she "clerked the preliminary hearing on it." She could not

10    differentiate what she heard at the preliminary examination hearing from the

11    television program. *Id*.: 1179.  Having clerked the preliminary examination

12    hearing and understanding that it was "just a probable cause hearing," she did

13    not think her experience would influence her judgment in as a trial juror.  She

14    remembered more about the television program than the preliminary hearing.

15    She didn't remember reading anything in the paper about the case.  If she did

16    "it was probably just the little standard paragraph that was in there." *Id*.:

17    1180.[70]  Mr. Soria's challenge on the basis of the exposure to the television

18    program was denied. *Id*.: 1185.  Questioning by Ms. Ryals brought out that

19    Ms. Morgan did not have a very high opinion of attorneys.  Ms. Morgan

20    explained that as a Municipal Court clerk, she dealt with a lot of new,

21    inexperienced attorneys; that view would not affect her view of the

22    presentation of this case. Her main complaint was that attorneys would come

23    into court ill-prepared. *Id*.: 1186.  Ms. Ryals also passed Ms. Morgan for

24    cause. *Id*.: 1188.

25

26

27    [70] Voir dire questioning did not elicit from Ms. Morgan how she had rated Bolin's guilt on
her juror questionnaire.  Her response to Judge Davis's questions, however, indicate she would not
28    have harbored pre-conceived notions of his guilt based on her exposure to pretrial publicity.

46.     Jody Pedrin saw trailers for the *America's Most Wanted* episode about Bolin
before it aired, but she did not watch the program. *Id*.: 1190. She recalled
that marijuana was involved. She stated her exposure to the pre-broadcast
"hype," as Judge Davis described it, would have no influence on her if
selected as a juror. *Id*.: 1191.[71] Mr. Soria passed her for cause without
questioning her. *Id*.: 1196. The defense team exercised its first peremptory
challenge to Ms. Pedrin as an alternate juror. RT-7: 1629.

47.     Shirley A. Sabo regularly watched the *America's Most Wanted* program
almost every week. She didn't have a good memory for the Bolin episode.
It didn't stand out for her. RT-6: 1225. At the time the show was aired, in
January, Ms. Sabo was preoccupied with personal business matters. Judge
Davis referred to the show about Bolin as a "rather graphic, I would think you
could call it, dramatization." *Id*.: 1227. She did read about the crime in the
newspaper. *Id*.: 1228. From the television news, she remembered there was
a raid in the mountains, someone got away, but then the authorities caught
him. She believed the deaths that she remembered occurred during a
shootout. *Id*.: 1229.[72] Mr. Cater interposed a challenge on the grounds she
may have seen the *America's Most Wanted* episode about Bolin and the
challenge was denied. *Id*.: 1235. Ms. Sabo was the prosecutor's thirteenth
peremptory challenge. RT-7: 1632

48.     Errol Stoddard watched the *America's Most Wanted* episode about Bolin.
When he was completing the questionnaire, that particular episode came back
to his mind. He customarily watched the program every week. He recalled
two men coming up a road to a small cabin in an area with heavy underbrush

---

[71] Ms. Pedrin was not asked about how she had rated Bolin's guilt on the juror questionnaire.

[72] Ms. Sabo also was not asked about how she had rated Bolin's guilt on the juror questionnaire.

and woods.  There were shots fired and one of the individuals fell down and the other ran off back down the road.  He did not recall a chase.  He believed that only one person "fell down."  RT-6: 1297.  He was aware of newspaper and television news accounts of the crime when it originally happened in 1989.  Based on what he knew of the crime, he marked on his questionnaire that Bolin was "definitely guilty."  He confirmed this belief to Judge Davis during individual questioning.  *Id*.: 1298.  He was most influenced by the local television news coverage.  Although he heard Judge Davis tell him that Bolin is presumed innocent under the law, Mr. Stoddard still felt he was definitely guilty.  Mr. Cater's cause challenge was granted.  *Id*.: 1299.

49.  Carolyn Pomerene saw television news broadcasts when Bolin was arrested.  She also read about the crime in the newspaper.  *Id*.: 1305.  She recalled that "somebody was shot and another guy was shot."  Her memory was vague.  As to Bolin's arrest, she recalled that he was arrested out of state.  *Id*. : 1306.  If her memory were clarified during the trial, she would be able to put information gleaned from pretrial publicity out of her mind.  *Id*.: 1307.  Mr. Cater passed Ms. Pomerene for cause without asking any questions.  *Id*.: 1313.[73]

50.  Cindy L. Kiser remembered seeing the trailers and advertisements for the Bolin episode of the *America's Most Wanted* program, but she did not recall actually seeing it.  She remembered there being publicity about the crime because it involved someone from Kern County.  She recalled "bits and pieces" about the case.  *Id*.: 1323.  On the questionnaire she wrote that she believed Bolin was "probably guilty."  *Id*.: 1324.  This was based on the following thinking: "if he was doing drugs or selling drugs or cultivating or

---

[73] The voir dire questioning of Ms. Pomerene did not elicit how she rated Bolin's guilt on her juror questionnaire.

whatever, he was breaking the law, he knew it, he was guilty." *Id.*: 1324-25. This impression was based entirely on the questionnaire. It applied to the marijuana charge. The court explained that Bolin also was charged with two counts of murder, *id.*: 1325, but she didn't give her opinions about those charges. She did tell Mr. Cater that even though the law cannot compel Bolin to testify, she would think he had something to hide if he did not testify. Mr. Cater interposed a cause challenge. *Id.*: 1329. The court inquired further and she clarified that although she wrote on the questionnaire she would think Bolin had something to hide if he did not testify, she no longer held that belief after the law was explained to her. *Id.*: 1330. The court then denied the challenge. *Id.*: 1331.

51. Lois Thurman[74] never watched *America's Most Wanted*. *Id.*: 1339. She read about the case in the newspaper when it first happened. *Id.*: 1339-40. She also saw a television news story about the crime on Channel 17.[75] *Id.*: 1340. Mr. Cater did not ask Ms. Thurman any questions about pretrial publicity and passed her for cause. *Id.*: 1343-45.

52. Isabel Caudillo saw the *America's Most Wanted* episode concerning Bolin and agreed with Judge Davis that "it was pretty graphic." *Id.*: 1368. Based on that show, she wrote on the questionnaire she thought Bolin was guilty, "the way they dramatize everything on TV." She remembered the show as follows:

> Well, it started up where, well, suppose, I guess he was talking to some guy or something and then they drove off to like some country or whatever out there in Kern County and he was talking to one of the guys and got mad because one of his friends or something brought another of the guys in there and he didn't want them, and I just saw

[74] The Clerk's Transcript spells this last name "Thurman" and the Reporter's Transcript spells it "Therman" and "Thurman." The "Thurman" version will be utilized in this memorandum order.

[75] She was not asked to state what she remembered about the crime. Nor did any questioner elicit how she had rated Bolin's guilt on her juror questionnaire.

one, like he came out and started shooting at one and that other guy heard it and came around and started chasing him, something like that.

She remembered some people being shot and somebody running. She didn't think this would affect her as a juror because she would have to hear both sides. *Id*.: 1369. She was challenged by Ms. Ryals because she would never vote for the death penalty. Mr. Cater also challenged on the grounds of the *America's Most Wanted* program. Ms. Ryals' challenge was granted and Mr. Cater's challenge was denied. *Id*.: 1372.

53.   William Goff began individual voir by talking about his opposition to the death penalty, which he expressed on the questionnaire. *Id*.: 1427. Nonetheless if he were a juror he felt he would follow the jury instructions. *Id*.: 1428. He felt that he would not invariably vote for life without parole or invariably for the death penalty. He would vote for the death penalty if he felt it was appropriate. *Id*.: 1430. Under Mr. Soria's questioning, Mr. Goff stated he saw the Bolin episode of *America's Most Wanted.* Based on what he knew of the case, he marked twice on the questionnaire that Bolin was "probably guilty." After receiving the preliminary instructions the court gave in advance of individual voir dire, however, he changed his mind; he did not still feel the way the questionnaire response indicated. He thought he saw the *America's Most Wanted* program about Bolin a month and a half prior to the date of his voir dire. He reported his understanding:

> What I recall in the story was something along the lines of there was some marijuana being cultivated in the desert area and someone was out in the field or out in the desert area, I think doing some target shooting or something like that, and someone came along and was a friend to him and brought him back, and the person at the house was upset because this person brought somebody back and that is when the shooting started.

*Id*.: 1431. Mr. Goff clarified that the desert area was the "foothill type." *Id*.: 1431-32. He recalled four people in the story. The people who came to the area came on an off-road vehicle. He recalled that two people came to visit

and the others were already there.  Mr. Goff only recalled guns being used and that one of the visitors took off and was pursued.  Mr. Soria commented, "Sounds like you might have or might not have seen it, it's not clear.  Some of the details you say may be right and some may be wrong."  *Id*.: 1432. While Mr. Goff couldn't verify that he wouldn't have images from the show in his mind, he believed that as a juror he would be able to decide the case based on the evidence presented in the courtroom.  He did not believe he could "block" out entirely the information he recalled from his mind if selected as a juror.  *Id*.:  1433.  He confirmed that he could follow the instructions not to consider any information in determining a verdict that was not presented in court.  *Id*.: 1434.  Mr. Soria challenged Mr. Goff based on the television program and the court denied the challenge.  *Id*.: 1435.  On further questioning by the judge, Mr. Goff clarified that he had no idea when he saw the show about Bolin.  It was not necessarily a month and a half ago. He remembered it because the setting was Kern County.  *Id*.: 1436.  Ms. Ryals questioned him extensively about his opposition to the death penalty and eventually passed him for cause because he said he could vote for it.  *Id*.: 1436-40.  Mr. Goff was the eighth potential juror to be seated for service. Ms. Ryals excused him on her third peremptory challenge.  RT-7: 1633.

54.    During general questioning of the group in which Ginger Lewis, Mary Clifford, and Angelica Gonzalez were assembled, Judge Davis explained to the prospective jurors about reasonable doubt, the prosecutor's burden, and the fact that the defendant does not have to testify.  Ms. Clifford then commented: "Yes, but I think after I read that questionnaire that I filled out yesterday, I don't think I could say, not guilty.  I mean I don't think I could say not guilty."  RT-7: 1482.  Explaining further, she said: "I assume from that [the questionnaire] that this gentleman was on a program on television. I didn't see it. . . . I assume that if he was among the most wanted, that he had

disappeared or run away or done something." *Id*.: 1483. Judge Davis then explained to her that television is mainly a medium to entertain people and not always believable. *Id*. Ms. Clifford did not speak again until individual voir dire; she was challenged for cause after confirming she would have difficulty setting aside her belief that if Bolin did not testify he had something to hide. *Id*.: 1510.

55.   During individual voir dire, Angelica Gonzalez revealed that she sometimes watched the *America's Most Wanted* program, but did not see the episode about Bolin. She marked "maybe" she had seen it on the questionnaire, but confirmed during voir dire that she had not. From other television viewing, however, she was aware that Bolin's case had been featured on the program. RT-7: 1488. Although she didn't see the program, she marked that she believed Bolin was "definitely guilty." *Id*.: 1489. Her explanation was vague; she said she felt Bolin was probably guilty by "the way the questionnaire was set up" and the assumption that he would not testify. *Id*. Judge Davis then pondered: "You gained – gee, we are going to have to redo the questionnaire – you gained the impression he was guilty by reading the questionnaire?" She affirmed this notion coupled with the fact that Bolin would not testify. *Id*. Mr. Cater challenged her for cause when she confirmed that she believed the death penalty was appropriate for marijuana cultivators and the challenge was granted. *Id*.: 1497.

56.   During individual voir dire, Ginger Lewis reported that the *America's Most Wanted* show was a favorite of her's and her husband's. She remembered:

> That it was a deal that was supposed to have happened in Walker Basin and they had on it where two young men come up there and ran across a marijuana field, and one man was killed, the other was not. Then the man, well, the boy had got to some place. The boy that was shot had crawled someplace and got help. And by the time they got there, the guy was gone and his belongings were gone, and then they showed a picture on TV.

*Id*.: 1499.  She stated that having seen the show would not influence her at all because the viewed TV as "a joke."  *Id*.: 1500.  Mr. Cater challenged Ms. Lewis on the grounds that she saw the *America's Most Wanted* segment about Bolin and the challenged was denied.  *Id*.: 1507.  Ms. Lewis was Ms. Ryals' fifth peremptory challenge.  *Id*.: 1635.[76]

57.   Lorri Craig was not sure whether she saw the *America's Most Wanted* program about Bolin.  She explained that she saw several programs on the local news and was not sure if she saw the actual program or local news previews of the program.  *Id*.: 1603.  From the local news she learned there had been a shooting and that one of the victims had gotten away; there has been three victims.  She personally knew the area because she had been up there. She responded, "I don't know," to the question, "Do you think what you have heard about this case will cause you to find it difficult to serve as a juror?"  She knew a lot about the case because people she knew lived up there.  After hearing this statement, Ms. Ryals challenged her for cause; Mr. Cater submitted; the court granted the challenge.  *Id*.: 1604.[77]

58.   Todd Wilson had learned about this case from the newspaper and television quite a while prior to this voir dire.  *Id*.: 1612-13.  Without asking him any questions about what he might recall about the crime, Judge Davis elicited an assurance from Mr. Wilson that he would be able to put out of his mind what he previously learned about the case.  *Id*.: 1613.[78]  Mr. Cater challenged him after he stated that he would impose the death penalty "every time" if a

---

[76] Voir dire questioning did not elicit from Ms. Lewis how she had rated Bolin's guilt on her juror questionnaire.

[77] The matter of how Ms. Craig had rated Bolin's guilt on her juror questionnaire did not come up during voir dire.

[78] In addition to not asking him to describe his recollection of the facts of the crime, Mr. Wilson was not asked about how he had rated Bolin's guilt on his juror questionnaire.

1   defendant had been convicted of two counts of premeditated murder.  *Id*.:

2   1614-15.  The challenge was granted.  *Id*.: 1615.

3   59.   During individual voir dire of Barbara Unruh, Judge Davis remarked that she

4   "certainly" had heard about the case on television and the newspaper.[79]  *Id*.:

5   1617.  She stated that she would be able to base any decision as a juror on

6   what was presented in court and not what she learned from the media.  *Id*.:

7   1617-18.  After Ms. Unruh explained that it would be difficult for her to

8   impose the death penalty, but she believed she could do it, Mr. Cater asked

9   no questions.  *Id*.: 1620.

10  **Part Two – Actual Jurors:**

11  1.   Gilbert Barnes read about this case in the newspaper (which he generally read

12  thoroughly) and watched television news about it.   He both read the

13  newspaper thoroughly and daily watched two segments of the evening news

14  on Channel 6.  RT-1: 91.  He  did not watch the *America's Most Wanted*

15  program and did not see the program about Bolin.  *Id*.: 92.  He marked that

16  Bolin was "definitely guilty" in his questionnaire response, because of the

17  "write up in the paper" and because he (Bolin) pulled the trigger of a gun as

18  an eyewitness so stated.  *Id*.: 92-93.  After further questioning by Judge

19  Davis, Mr. Barnes, upon reflection, stated that he would honor the

20  presumption of innocence and base whatever decision he would make about

21  the case on evidence presented in court.  *Id*.: 93-98.  Mr. Soria passed him for

22  cause after further questioning.  *Id*.: 100-03.  Ms. Ryals did as well.  *Id*.: 104-

23  05.

---

[79]  The Court deduces that this statement was predicated on Judge Davis's reading of Ms. Unruh's questionnaire response.  No other inquiries about her feelings of Bolin's guilt, as may or may not have been reflected in the questionnaire response, or her recollection of the crime were made.

2.  Jeannine Marie Lee recalled that the crime in this case occurred in Walker Basin and she thought she had seen the *America's Most Wanted* segment about Bolin. RT-2: 238-39. She thought three people were involved and that someone was wearing red.[80] Two victims were killed and one lived. She offered that she didn't read anything about the case and really didn't know whether someone told her about it or she saw it on television. *Id.*: 239. She did not recognize Bolin. *Id.*: 239-40. She stated that she "absolutely" could put aside what she knew about the case prior to that day if she were selected as a juror. *Id.*: 240.[81] Under Mr. Soria's questioning, she again confirmed that she thought she might have seen the *America's Most Wanted* episode about Bolin. *Id.*: 243. She remembered someone wearing a red, long-sleeved button-up shirt. Mr. Soria cautioned her that this particular program presents "one version of what may have happened out there, with no cross examination by the defense." She understood that. *Id.*: 244. She also understood that as a juror, she would have to base her decision on evidence presented in court. *Id.*: 244-45. Mr. Soria challenged Ms. Lee because she might have seen the program and the challenge was denied. *Id.*: 245.

3.  Michael Vaughn believed he saw the *America's Most Wanted* program about Bolin. He recalled that the setting was Kern County and that is why he had any interest in the program at all. He didn't normally watch it. *Id.*: 362. He recalled that just hours after the broadcast of the program, in Indiana or Idaho

---

[80] In fact the Steve Mincy character was wearing a long-sleeved red plaid button up shirt. The Vance Huffstutler character was wearing a red or reddish orange tee-shirt under an unbuttoned chambray work-type shirt.

[81] Voir dire questioning did not elicit from Ms. Lee how she had had rated Bolin's guilt on her juror questionnaire or whether her statement to Judge Davis that she could put aside her pretrial knowledge indicated she had not prejudged Bolin's guilt.

or somewhere Bolin was arrested.[82]   He believed he actually saw the broadcast where Bolin's arrest was described.   He did see the crime recreated.[83] He also subscribed to the newspaper and read it nearly every day. *Id*.: 364.   He did not see any television news broadcasts about this case. When he filled out the questionnaire he marked "no opinion," and then changed that to "probably guilty."   This answer was based on the fact that authorities arrested Bolin and that Bolin's case was featured on the *America's Most Wanted* program.  *Id*.: 364-65.  Mr. Vaughn did not believe, however, that everyone arrested was always guilty.  He also understood that the fact of Bolin's arrest was not evidence of his guilt.  *Id*.: 365.  If he were Bolin, he supposed he would be satisfied with having a juror with his (Mr. Vaughn's) frame of mind.  *Id*.: 366. With respect to penalty, Mr. Vaughn didn't lean one way or the other.  *Id*.: 370.  Mr. Cater elicited that Mr. Vaughn wrote on the questionnaire Bolin "got upset with a friend who brought another friend to the pot farm and shot them."  He believed he obtained that information from the newspaper close in time to the actual crime.  *Id*.: 373.  He didn't remember a chase scene or someone (i.e., Bolin) standing on a boulder shooting another person (i.e., Steve Mincy).  *Id*.: 374.  He confirmed that he marked twice on the questionnaire that he though Bolin was "probably guilty."  As a juror he would be able to divorce himself from that impression. *Id*.: 375.  He realized that the *America's Most Wanted* program depicts a version of events the producers want to convey.  He referred to it as sensationalism.  *Id*.: 376.  Mr. Vaughn denied that if Ms. Ryals were to put on a case he felt justified the charges, that the defense would have "to prove

---

[82] Bolin was arrested in a suburb of Chicago, Illinois.

[83] Highlights of the first program were, in fact, replayed during the second broadcast, in addition to clips of Steve Mincy's mother and the Kern County Sheriff.

something" to put him out of that frame of mind.  The following colloquy ensued:

Q.      Why not?

A.      Like I say, I don't know if he is guilty or not.

Q.      Why did you say he is "probably guilty," then?

A.      Basically from what I said before.  The next person that's on that T.V. show, he is probably guilty, too, but it is not necessarily so.

*Id*.: 378.  At this point, Mr. Cater challenged Mr. Vaughn for cause and the challenge was denied.  *Id*.: 378-79.  On her individual voir dire of Mr. Vaughn, Ms. Ryals stressed that her case would not necessarily follow the factual development depicted in the *America's Most Wanted* program.  Mr. Vaughn stated he understood that.  He also offered that he didn't pay that much attention to the program.  *Id*.: 380.  Mr. Vaughn revealed that in the past when he used marijuana, he actually suffered an arrest.  Authorities were going to charge him for a felony, but the charged ended up being a misdemeanor.  He was satisfied with the fairness of his treatment.  *Id*.: 381-82.  Ms. Ryals passed him for cause.  *Id*.: 382.  Judge Davis elicited further information about the prior arrest.  It took place in 1971 or 1972 in Tulare County.  *Id*.: 383.  After Mr. Vaughn was excused for the day, Mr. Cater made a record for his cause challenge.  First, he believed Mr. Vaughn lied during voir dire.  He said he didn't see the dramatization, but his questionnaire response read "like a script, a capsulization of the script of that show.  *Id*.: 384.  Mr. Cater specifically was referring to Mr. Vaughn's statement that Bolin got upset when a friend brought another friend to see the pot farm.  *Id*.: 384-85.  Second, Mr. Vaughn wrote in his jury questionnaire twice that he thought Bolin was "probably guilty."  Third, he neglected to disclose on the questionnaire that he had been arrested for the marijuana incident.  Mr. Cater described Mr. Vaughn as having "weaseled through

questions."   Judge Davis stated his view that he believed Mr. Vaughn had not seen the *America's Most Wanted* program, but rather his knowledge about the case from the *Bakersfield Californian*.  Judge Davis then stated that he hadn't read those articles.  RT-2: 385-86.  Ms. Ryals argued in support of the judge's view that Mr. Vaughn obtained his information about the crime from the newspaper rather than from the main *America's Most Wanted* episode about Bolin:

> every bit of the information [Mr. Vaughn] gave us was liberally in the press on one or more occasions, this "got upset" with "bring[ing] a friend to a pot farm" was pushed [by the newspaper] throughout the whole thing. Anything that was that television show was accurate, as far as I saw it, with what was in the [*Bakersfield*] *Californian* and with what is in the police reports with the exception of his background [about being a Navy SEAL].  I mean generally.  I am not talking about the colors that people had on and that type of thing, but what was in the news and what was on that television show were basically the same things.

*Id*.: 386.  With respect to the marijuana issue, Ms. Ryals stated that despite the fact he neglected to mention his arrest on his questionnaire, he had no qualms about talking about it in court.  In fact, had he lied, no one ever would have known.  *Id*.

4.      Dale Eyraud Campbell believed when she completed the questionnaire that she had not seen the *America's Most Wanted* program about Bolin, but overnight, she remembered she had seen it because of "the name and something clicked."  She did not, however, remember any details, except for the area.  RT-5: 1005.  She reiterated she didn't remember any of the details, only with respect to the "name" and the "area" she remembered "seeing something about that."  *Id*.: 1005-06.  She knew a little about the case through the newspaper or people talking, or television.  Since her baby was born the year before, she didn't have much time to pay attention to the news.

*Id.*: 1006.[84]  Even if she did remember something about the pretrial publicity as a sitting juror, she would not consider that information in rendering a verdict.  She had been a crime victim.  During a burglary of her house, the perpetrators tried to take her with them, but failed.  She was not hurt.  *Id.*: 1007.  She struggled, and that's why the perpetrators left empty handed.  Her parents were home at the time, and her father was yelling at her mother to "get the gun."  She didn't think that experience would influence her judgment in this case.  *Id.*: 1008.  Mr. Cater elicited that she watched the *America's Most Wanted* program occasionally.  *Id.*: 1011.  She confirmed that if she should recall details of the show that she would divorce them from her mind if selected to serve on the jury.  Mr. Cater challenged her for cause and the challenge was denied.  *Id.*: 1012.

> 5.   Julie Hanson saw the *America's Most Wanted* segment about Bolin.  She could not remember "that many details" about the program.  She stated:

>> I just recall that someone came to this man's house.  I don't know many details.  I don't know how he even came to the house.  I know he came to the house and was looking for help for somebody else I think that was injured or something, and I really don't know any details.  It is just one of those things. . . . I know this happened around, up in the desert, somewhere up in the mountains.  I know that.

*Id.*: 1092-93.  When asked whether she remembered any scenes involving shootings or knifings, she replied, "I only remember something about the man who went to the house getting in a car to go get the other guy or something.  No, I really can't – I don't know that much detail."  She believed she had seen news stories about this case on the local television news.  She also believed she had read about it in the newspaper.  She could remember no details from either source.  *Id.*: 1093.  If her recollection of pretrial publicity were refreshed by evidence presented during the trial, she could put that out

---

[84] She was not asked how she had rated Bolin's guilt on her juror questionnaire.

of her mind and decide the case based on what she heard in the courtroom. *Id*.: 1094.  She could keep an open mind about penalty.  *Id*.: 1096.  During Mr. Soria's individual voir dire, she confirmed the location of the crime in the desert or mountains, that a man came to a house, that the man was young, and that there was a shooting.  She did not recall how many people were in the house, if more than one man came to the house, or how many people were shot.  *Id*.: 1097-98.  She answered affirmatively to the question, "Okay, so there is very little you remember about the story?"  *Id*.: 1098.  Based on watching the *America's Most Wanted* program, she marked on her questionnaire, twice, that she thought Bolin was "probably guilty."  But that "feeling" would not stay with her.  It's the way the crime was "recreated on TV" that made her feel he was guilty.  There was nothing in the program that led her to believe that Bolin was innocent.  *Id*.: 1099.  She promised she could put those feelings aside if selected as a juror and decide the case on the evidence presented in court.  *Id*.: 1099-1100.  After securing these assurances, Mr. Soria challenged Ms. Hanson for cause and the challenge was denied.  *Id*.: 1100.

6.     Patricia Hinson believed she saw the *America's Most Wanted* program featuring Bolin.  *Id*.: 1111.  "What I remember about it was that they had given their dramatization of what supposedly happened in Walker Basin." She noted there had been a homicide plus another shooting and the incident involved marijuana.  She was not familiar with Walker Basin.  She didn't recall the type of weapon used or whether there were multiple houses involved.  *Id*.: 1112.[85]  She confirmed that she would not expect "Mrs. Ryals to come here with a script of that television program and entertain" her.  She also stated she would not compare what she remembered from the program

---

[85] She was not asked how she had rated Bolin's guilt on her juror questionnaire.

1     with what she hearing in court. *Id*.: 1113. She confirmed that she would not

2     retain the information in her mind or have "bias against" defense counsel

3     because she "saw this Hollywood dramatization." *Id*.: 1113-14. She didn't

4     even recognize Bolin's name until she read the synopsis at the end of the

5     questionnaire. If she were to remember something about the program or a

6     news story during the trial, she would be able to put it out of her mind and

7     decide the case on what was presented in the courtroom. Mr. Soria elicited

8     that from the newspaper she gleaned this case involved a shooting "under

9     suspicious circumstances." She didn't get that from the *America's Most*

10     *Wanted* program – because she was preparing, serving, eating, and cleaning

11     up dinner when the program came on. The television was in the living room

12     and she was working in the kitchen. Mr. Soria challenged her because of her

13     exposure to the program and the challenge was denied. *Id*.: 1120.

14     7.     Robert Bowles, had been a prosecution witness in a case in which Ms. Ryals

15     was the prosecutor. They talked before he testified. RT-6: 1393. There was

16     nothing about his pre-testimony interview with Ms. Ryals that would cause

17     him to favor her in the present case. He could vote "not guilty" in this case.

18     *Id*.: 1394. Mr. Bowles had a nephew who had a drug problem in high school.

19     Mr. Bowles would not convict Bolin of marijuana cultivation if he didn't feel

20     Ms. Ryals hadn't proved it. *Id*.: 1395. When asked if he could keep an open

21     mind about Bolin's guilt, despite his dislike of drugs, he responded: "I have

22     numerous friends who have had different lifestyes and my father taught me

23     to treat each individual as an individual and not to put some label on them."

24     *Id*.: 1396. He did see the *America's Most Wanted* dramatization about this

25     case. His children were watching the show. He didn't pay much attention to

26     it. *Id*. Mr. Bowles didn't see enough of the show to make comparisons

27     between what was presented during the show and what Mr. Ryals might

28     present in court. He also understood Mr. Soria's concern that the show "was

so darn graphic that it just burned into your mind that you can't get it out of your mind," but he confirmed that he would not hold that opinion. *Id*.: 1397. In his questionnaire response he indicated he had "no opinion" one way or the other about Bolin's guilt. He didn't agree with the program because he felt everyone charged with a crime should have a trial and not be convicted on television, which is generally what that show did. *Id*. Mr. Bowles also read about the case in the local newspaper and saw news programs about it. *Id*.: 1397-98. Specifically, on the news, he saw Bolin being escorted off the airplane. *Id*.: 1398. He believed he could fair and impartial. *Id*. On the questionnaire, he responded that he felt the death penalty would be "appropriate in cases where there is no doubt the guy meant to take someone else's life with no regard to the other person's rights," but he had no quarrel with the fact that under the law the death penalty was not automatic under those circumstances. *Id*.: 1400-10. Under questioning by Mr. Soria, Mr. Bowles confirmed that if Bolin were found guilty on all counts, he would still be open to imposing LWOP rather than the death penalty. He would also give Ms. Ryals the same consideration. Mr. Soria challenged Mr. Bowles because of his exposure to the *America's Most Wanted* show and the challenge was denied. *Id*.: 1402. Ms. Ryals elicited that Mr. Bowles did not see enough of the program to form an opinion about Bolin's guilt. *Id*.: 1402-03. Further, the fact that Bolin's case was featured on the program would not affect Mr. Bowles' consideration of the evidence in the case. He would not view Ms. Ryals' job has having to go a step or two beyond what she'd normally have to prove. *Id*.: 1403.

# APPENDIX VI

## Bolin Juror Publicity Chart

Part I – Potential Jurors

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 1.  Ann Chernabaeff | AM | not asked | limited | | | medical hardship |
| 2.  Arthur Cordova | newspaper & tv news | not asked | good | yes | none 10th DA peremptory | |
| 3.  David Kessler | newspaper & tv news | not asked | good | not objective | stip to excuse | |
| 4.  Donald Pearson | AM plus newspaper & tv news | probably | graphic | open minded except Bolin bore burden | defense b/c of def burden – granted | |
| 5.  Jose Reyna | AM | no opinion | good | not asked | DA b/c no DP – granted | |
| 6.  Velma Schroeder | other (watched AM sometimes) | definitely | good | yes | DA b/c no DP – granted | |
| 7.  James Cook | AM & trailers plus tv news | no opinion | limited | yes | def b/c of AM – denied | |
| 8.  Kirk Williams | AM | probably | good | yes | def b/c deft might not testify – granted | |
| 9.  Raymond Rumsey | none for this case, but occ. watched AM | no opinion | none | n/a | def  b/c of automatic DP – granted | |
| 10.  Richard Williford | AM | probably | good | yes | def b/c of AM – denied DA b/c no DP – granted | |

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 11. Dawn Albitre | AM – recorded & replayed; talking to friends | probably | excellent – was in town crime occurred | yes | def b/c of publicity – denied 1st def peremptory | |
| 12. Michael Ansolabehere | AM & trailers | not asked | excellent | yes | def b/c of automatic DP – granted | |
| 13. George Atkisson | AM & newspaper | probably | not asked, but revealed on voir dire as good | yes | | business hardship |
| 14. Michael Bishop | newspaper & tv; did not see AM, but occ watched | not asked | not asked | not asked | def b/c of automatic DP – granted | |
| 15. Celeste Brown | AM (regular viewer) | probably | good | yes | def b/c of automatic DP – granted | |
| 16. Kenneth Carpenter | tv & coworkers | probably | good | yes | none | |
| 17. William Crawford | AM | not asked | excellent | no | def b/c of lack of impartiality – granted | |
| 18. Dorothy Duncan | tv; did not see AM, but occ watched | not asked | limited | not asked | def b/c of automatic DP – granted | |
| 19. Jo Ann Durrett | tv news | not asked | limited | yes | def b/c of automatic DP – granted | |
| 20. Meri Hatfield | AM possibly; occ watched show | not asked | none | yes | none; 12th DA peremptory | |
| 21. Carol Kroll | AM | definitely | excellent | yes | def b/c of automatic DP – granted | |

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 22.  Jacqueline Walker | occ watched AM | definitely (but confused with another *Most Wanted* feature) | none | not asked | none – court excused her; would not vote for DP | |
| 23.  William Miller | AM; newspaper | probably | limited | not asked | def b/c of automatic DP – granted | |
| 24.  Don Newberry | follow-up AM plus newspaper | probably | good | yes | def b/c of AM – denied | |
| 25.  Michael O'Donnell | AM | no opinion | good | yes | DA b/c no DP – granted | |
| 26.  Robert Ogelsby | other; occ watched AM, but not this time | not asked | good | not asked | DA b/c favored LWOP – denied 3rd DA alt peremptory | |
| 27.  Nancy Porter | AM | no opinion | excellent | yes | def b/c of AM – denied DA stip to excusal (juror was 7 mos pregnant) | |
| 28.  Nanette Smith | tv news & newspaper, but not AM | not asked | good | yes | none | |
| 29.  David Verjarano | tv news & newspaper; AM regular, but not this time | not asked | limited | yes | def b/c of automatic DP – granted | |
| 30.  Dan Webb | AM | probably | good | no | def b/c of lack of impartiality – granted | |

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 31.   Kimberly Wilson | AM | definitely (b/c of how the program was presented) | good | not asked | def b/c of automatic DP – granted | |
| 32.   Douglas Zimmerman | AM plus newspaper | no opinion | good | yes | def b/c of AM – denied 4th def peremptory | |
| 33.   Daniel Bender | AM plus newspaper | definitely | good | no | def b/c of lack of impartiality – granted; DA b/c of no DP – granted | |
| 34.   Sandra Burgess | follow-up AM plus newspaper | yes | good | yes | def b/c of AM – denied | |
| 35.   Glen Hamilton | newspaper & tv news | not asked | not asked | yes | DA b/c of reticence to impose DP – denied | |
| 36.   Pete Castro | wife's rendition of AM plus tv news & newspaper | not asked | good | not asked | def b/c of automatic DP – granted | |
| 37.   Rachael Dominguez | newspaper & tv news but not AM | not asked | good | yes | DA b/c of no DP – granted | |
| 38.   Hal Hannah | AM | not asked | excellent | no | def b/c of lack of impartiality – granted | |
| 39.   Lyla Schultz | AM (probably) plus other news accounts | probably | good | probably | def b/c of lack of impartiality – granted | |

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 40. Linda Jackson | AM (regular viewer) | not asked | not asked | no | DA b/c of no DP – granted | |
| 41. Michael Kelly | AM (regular viewer) plus newspaper | probably | good | probably | def b/c of lack of impartiality – granted | |
| 42. Vicki Luter | AM plus trailers, newspaper & tv news | not asked but stated guilty on voir dire | good | no | def b/c of lack of impartiality – granted | |
| 43. Leland McGehee | AM, not follow-up | no opinion | not asked, but revealed on voir dire as good | yes | def b/c of AM – denied | |
| 44. Lyle Mills | AM plus radio news and newspaper | definitely & still believed that on voir dire | not asked, but revealed on voir dire as good | no | def b/c of lack of impartiality – granted | |
| 45. Georgia Morgan | AM (except for beg) plus trailers & newspaper | not asked (was the court clerk at the prelim) | limited to good | yes | def b/c of AM – denied | |
| 46. Jody Pedrin | AM trailers, but not AM | not asked | limited | yes | none (& no def questions) | |
| 47. Shirley Sabo | AM (regular viewer) plus newspaper & tv news | not asked | good | not asked | def b/c of AM – denied 13th DA peremptory | |
| 48. Errol Stoddard | AM (regular viewer) plus tv news & newspaper | definitely & maintained that belief on voir dire | very good | not asked | def b/c of lack of impartiality – granted | |
| 49. Carolyn Pomerene | tv news & newspaper | not asked | good | yes | none (& no def questions) | |

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 50. Cindy Kiser | AM trailers & ads | probably | good | not asked | def b/c deft might not testify, but after ct rehabilitated her – denied | |
| 51. Lois Thurman | newspaper & tv news – *never* watched AM | not asked | not asked | not asked | none (& no def questions) | |
| 52. Isabella Caudillo | AM | guilty | excellent | not asked | def b/c of AM – denied; DA b/c not DP – granted | |
| 53. William Goff | AM | probably (but changed his mind during voir dire) | good (not completely accurate) | yes | def b/c of AM – denied | |
| 54. Mary Clifford | questionnaire – did not see AM; not asked about other pretrial publicity | not asked – but stated during intro to voir dire Bolin must be guilty b/c of the questionnaire | none | n/a | def b/c deft might not testify – granted | |
| 55. Angelica Gonzalez | AM trailers, but not AM, plus Mary Clifford's remarks during into to voir dire; a sometime watcher of AM | definitely (by the way the questionnaire was "set up") | not asked | not asked; but indicated lack of impartiality | def b/c of belief the DP was appropriate for marijuana growers – granted | |
| 56. Ginger Lewis | AM (regular AM viewer) Mary Clifford's remarks during into to voir dire | not asked | excellent | not asked | def b/c of AM – denied 5th DA peremptory | |

| potential juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 57.  Lorri Craig | AM trailers, tv news | not asked | excellent | not asked | DA b/c of lack of impartiality – granted | |
| 58.  Todd Wilson | newspaper & tv news | not asked | not asked | yes | def b/c of automatic DP – granted | |
| 59.  Barbara Unruh | newspaper & tv news | not asked | not asked | yes | none (& no def questions) | |

Part II Actual Jurors

| actual juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
| 1.  Gilbert Barnes | newspaper & tv news, not AM | definitely (b/c of write up in the paper) | not asked, but revealed on voir dire as good | yes | none | |
| 2.  Jeannine Lee | AM – possibly | not asked | very good | yes | def b/c of AM – denied | |
| 3.  Michael Vaughn | follow-up AM plus newspaper | probably (based the fact Bolin was featured on AM); but he waffled about whether he currently thought Bolin was guilty | excellent | yes | def b/c of lack of impartiality & AM – denied | |
| 4.  Dale Campbell | AM (1st she thought not, then thought so) plus newspaper and tv news; occ watched | not asked | limited (knew the area) | yes | def b/c of AM – denied | |

| actual juror | source of publicity | Bolin's guilt on questionnaire | level of recollection | put publicity out of mind | cause challenge | other excusal |
|---|---|---|---|---|---|---|
|  | AM |  |  |  |  |  |
| 5. Julie Hanson | AM | probably | limited to good (incorrect in parts) | yes | def b/c of AM – denied |  |
| 6. Patricia Hinson | AM | not asked | limited to good | yes | def b/c of AM – denied |  |
| 7. Robert Bowles | AM plus tv news & newspaper | no opinion | graphic | yes | def b/c of AM – denied |  |