1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8
9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  PAUL C. BOLIN, | Case No. 1:99-cv-05279-LJO-SAB |
| 12  Petitioner, | **<u>DEATH PENALTY CASE</u>** |
| 13  v. | MEMORANDUM AND ORDER (1) DISMISSING WITHOUT PREJUDICE |
| 14  KEVIN CHAPPELL, Warden of San Quentin State Prison, | UNEXHAUSTED ALLEGATIONS, (2) DENYING CLAIM "C2" FOLLOWING |
| 15  Respondent. | LIMITED EVIDENTIARY HEARING, (3) DENYING FURTHER RECORD EXPANSION |
| 16 | AND EVIDENTIARY HEARING, (4) DENYING RECORD BASED CLAIMS A, B, |
| 17 | and D THROUGH FF, (5) DENYING AMENDED PETITION FOR WRIT OF |
| 18 | HABEAS CORPUS, and (6) ISSUING CERTIFICATE OF APPEALABILITY FOR |
| 19 | CLAIMS C2, I13, L (L1-L4) & W2 |
| 20 | CLERK TO VACATE ANY AND ALL SCHEDULED DATES AND SUBSTITUTE |
| 21 | RON DAVIS AS RESPONDENT WARDEN AND ENTER JUDGMENT |

22

23    Petitioner is a state prisoner, sentenced to death, proceeding with a petition for writ of habeas

24  corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action by appointed counsel Robert

25  Bacon, Esq. and Brian Abbington, Esq. of the Office of the Federal Defender.

26    Respondent Kevin Chappell[1] is named as Warden of San Quentin State Prison.   He is

27

28

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, warden of San Quentin State Prison, is substituted as Respondent in place of his predecessor wardens.

represented in this action by Rachelle Newcomb, Esq., and Ryan McCarroll, Esq. of the Office of the California Attorney General.

John Lee Holt, a state prisoner, sentenced to death, is a limited purpose intervener at the evidentiary hearing.  He is represented by Jennifer Mann, Esq., of the Office of the Federal Defender.

Before the Court for a decision are (1) claim C2, taken under submission following May 14, 2013 limited evidentiary hearing (ECF No. 339), (2) matters reserved for ruling raised in Petitioner's motion for evidentiary hearing and expansion of the record (ECF No. 214), and (3) the amended petition (ECF No. 113), record based claims A, B, and D through FF.[2]

## I. BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to judgment of the Superior Court of California, County of Kern imposing the death sentence, following his conviction by jury trial of two counts of first degree murder for which the multiple murder special-circumstance allegation as to the murders of Vance Huffstuttler and Steve Mincy was found true.  The jury also found Petitioner guilty of one count of attempted first degree murder of Mr. Jim Wilson, and one count of marijuana cultivation.  (CT at 399-400.)[3]

On September 19, 1989, Petitioner was charged with the following offenses: the murder of Steve Mincy, pursuant to California Penal Code § 187 (Count I), the murder of Vance Huffstuttler, pursuant to California Penal Code § 187 (Count II), the attempted murder of James Wilson, pursuant to California Penal Code § 664/187 (Count III), and the cultivation of marijuana, in violation of Health and Safety Code § 11358 (Count IV).  (CT at 125-29.)  Counts I-III included alleged use of a firearm. Counts I and II included alleged multiple murder, a special circumstance pursuant to California Penal Code § 190.2(a)(3).  All counts alleged that Petitioner had suffered a prior conviction for a serious felony.

---

[2] The Court previously denied claim C1.  (ECF No. 276, at 40:27-28.)

[3] Unless otherwise indicated, throughout this order, "CT" refers to the Clerk's Transcript on Appeal, "RT" to the Reporter's Transcript on Appeal, "EH" refers to evidentiary hearing held May 14, 2013, "EH Ex" refers to joint final exhibit at the evidentiary hearing, "Supp. RT" refers to the Supplemental Reporter's Transcript on Appeal, "CSC" refers to the California Supreme Court, and "SHCP" refers to state habeas corpus petition.  Other transcripts are referenced by date.  Reference to page numbering is to the page numbering in the original document except Bates numbering is used for the CT.  Any reference to state law is to California law unless otherwise noted.

At Petitioner's arraignment on January 16, 1990, defense counsel Charles Soria and George Peterson were appointed to represent him.  (CT at 4.)

On March 16, 1990, Petitioner pled not guilty to the charges.  (CT at 130.)  Trial was set to begin on October 22, 1990.  (CT at 131.)

Several months later, Mr. Peterson suffered health issues and became unavailable to work on the case.  (CT at 133-134.)

Defense counsel Soria moved to withdraw shortly thereafter (CT at 137-39), citing Mr. Peterson's departure and Soria's desire for new and different employment.  (7/18/90 RT at 3-4.)  Mr. Soria agreed to stay on the case with the appointment of William Cater as second counsel on July 30, 1990.  (CT at 203; 7/30/90 RT at 9-10.)

Petitioner, on October 12, 1990, moved to change venue because of the airing of two segments of the television program *America's Most Wanted* re-enacting Petitioner's alleged involvement in the crime and profiling his subsequent arrest, as well as local broadcast and print media reporting of the case.[4]  (CT at 238-46.)  The Court heard argument on November 1, 1990 and reserved the motion until the conclusion of voir dire.  (11/1/90 RT at 2-50.)  There was no subsequent ruling on the change of venue motion.  (RT at 1640:28-45:13.)

The jury was sworn on December 3, 1990.  (CT at 372.)

On December 12, 1990, the jury found Petitioner guilty on all counts and enhancements and found the special circumstance to be true.  (CT at 400-09.)

On December 13, 1990, prior to a bifurcated trial on Petitioner's prior conviction for attempted voluntary manslaughter, the Court granted the prosecutor's motion to strike the prior-prison-term allegation in count IV.  (CT at 519-21, 524.)  After the bifurcated trial, the jury found true the allegation of a prior conviction.  (Id.)

On December 14, 1990, following the guilt phase verdict, the Court granted Petitioner's request for substitute defense counsel pursuant to People v. Marsden, 2 Cal. 3d 118 (1970), finding a complete breakdown in the relationship between Mr. Soria and Petitioner (RT at 2297-98), and appointed co-

---

[4] There were two *America's Most Wanted* broadcasts aired on the FOX television network: one on January 7, 1990, and the other on January 14, 1990.  (See ECF No. 194 at 5 n.5.)

counsel Cater to represent Petitioner at the penalty phase.  (RT at 2297-2301.)

The penalty phase began in January 22, 1991.  (CT at 584-89.)  The jury returned a verdict of death on January 24, 1991.  (CT at 626.)

On February 25, 1991, defense counsel Cater's motion for appointment of independent counsel to prepare a motion for new trial was denied.  (CT at 668; Supp. RT 2/25/91 at 1-8, 15-17; RT 2/25/91 at 9-14.)  Mr. Cater did not then move for a new trial.  (Supp. RT 2/25/91 at 18-27.)  Later that day, the trial court heard and denied Petitioner's motion to modify the verdict pursuant to Pen. Code § 190.4 and sentenced Petitioner to death on the capital charges.  (RT 2/25/91 at 18-27.)  The trial court also sentenced Petitioner to the upper term of nine years for attempted premeditated murder (Count III), three years with a stayed one-year enhancement for marijuana cultivation (Count IV), two years for the firearm enhancement pursuant to Pen. Code § 12022.5 and five years for the serious felony enhancement pursuant to Pen. Code § 667(a).  (CT at 668-70; RT 2/25/91 at 24-27.)

On June 18, 1998, the California Supreme Court affirmed the judgment and sentence on direct appeal, as modified on August 12, 1998 upon denial of rehearing.  People v. Bolin, 18 Cal. 4th 297 (1998), as modified on denial of reh'g (Aug. 12, 1998).

Petition for writ of certiorari was denied by the United States Supreme Court on March 8, 1999.  Bolin v. California, 526 U.S. 1006 (1999).

On August 8, 2000, Petitioner filed his federal petition for writ of habeas corpus.  On that same day, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.

The state petition was summarily denied on January 19, 2005, each claim was denied on the merits, claims E1, E2, I3 (with respect to defense-requested penalty phase instruction No. 9) and L were denied on procedural grounds as raised and rejected on appeal, see In re Harris, 5 Cal. 4th 813, 824-29 (1993), and (except to the extent of claimed ineffective assistance of appellate counsel) claims A, B1 (to the extent of alleged trial court error), C, E3, E4, F, H, I1, I2, I3 (except as to defense requested penalty phase instruction No. 9), and J were also denied on procedural grounds because these claims could have been but were not raised on appeal, see In re Dixon, 41 Cal. 2d 756, 759 (1953).  In re Bolin, S090684.  On that same day, Petitioner filed an amended federal petition alleging violations of the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, (ECF No. 113),

which is the operative pleading.[5]

Respondent filed an answer to the amended petition on June 17, 2005, admitting certain jurisdictional and procedural allegations, asserting procedural defenses, and denying all claims A through FF.  (ECF No. 120.)

On September 30, 2005, the Court found all claims in the amended petition to be fully exhausted.  (ECF No. 142 at 4:2-4.)

On September 7, 2006, the Court granted Petitioner limited pre-briefing discovery as to prosecution files including background materials regarding potential jurors; witness Eloy Ramirez; victim/witness Jim Wilson; and notes of prosecution expert, criminologist Greg Laskowski.  (ECF No. 174.)

On March 1, 2007, Petitioner filed a memorandum of points and authorities in support of the petition.  (ECF No. 178.)

On December 17, 2007, Respondent filed a memorandum of points and authorities in support of his answer to the amended petition.  (ECF No. 194.)

On April 15, 2008, Petitioner filed a reply to Respondent's memorandum.  (ECF No. 205.)

On December 22, 2008, Petitioner requested an evidentiary hearing with respect to claims A, B2, C, D, F, G, I, J, K, W, Y, BB, CC, DD, and EE.  (ECF No. 214.)  Therein Petitioner also sought expansion of the record to include exhibits 52 through 94 not previously submitted, which supplement the exhibits that were before the state court.

On March 19, 2009, Respondent filed his opposition to the request for evidentiary development and hearing.  (ECF No. 232.)

On August 7, 2009, Petitioner filed a reply to Respondent's opposition, (ECF No. 235); therein withdrawing claim CC and the request for evidentiary hearing on claim CC, alleging that lethal injection is cruel and unusual punishment.  (ECF No. 235 at 39:15-16; ECF No. 236.)

On April 27, 2012, the Court granted an evidentiary hearing as to claim C2, ineffective assistance of defense counsel regarding "his trial attorneys' failure to renew their request for a change of venue on the basis of presumed prejudice occasioned by pretrial publicity."  (ECF No. 261 at 54:12-

---

[5] The Court takes judicial notice of the certified state record on appeal.

15; ECF No. 276, at 53:4-7.)  The Court denied on the merits the request for evidentiary hearing for "[t]he trial error component of [c]laim C as well as the argument that juror impartiality (*sic*) followed from *actual* prejudice . . . ."  (Id.)  The Court reserved ruling on the balance of claims requested for evidentiary hearing.  (ECF No. 271 at 2:18-19.)

On November 29, 2012, the Court granted Respondent pre-hearing discovery of claim C2 by authorizing deposition subpoenas duces tecum for attorneys Soria and Cater.  (ECF No. 303.)

On February 27, 2013, the Court granted the motion to intervene by third party intervenor John Lee Holt, for the limited purpose of asserting his attorney-client privilege and work product protection during the testimony of Soria, Howard Varinsky and Bruce Binns at the evidentiary hearing and in any other proceeding in this case in which such assertion may be necessary.  (ECF No. 325.)  Mr. Holt was represented by Messrs. Soria and Peterson when they were appointed to represent Petitioner.  (EH RT at 30:14-31:14, 91:16-17.)

The evidentiary hearing took place on May 14, 2013.  Claim C2 was taken under submission following the evidentiary hearing.  (ECF No. 339.)  Petitioner, at the hearing, requested an evidentiary hearing on other claims of ineffective assistance.  (ECF No. 343 at 16, n.10.)

On July 8, 2013, Petitioner filed a post-hearing brief.  (ECF No. 343.)

On September 3, 2013, Respondent filed a post-hearing brief.  (ECF No. 344.)

## II. STATEMENT OF FACTS

This factual summary is taken from the California Supreme Court's summary of the facts in its June 18, 1998 opinion.  Pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1), the state supreme court's summary of facts is presumed correct.  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state supreme court.  Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

### A. Guilt Phase

The crimes occurred Labor Day weekend of 1989, when defendant was living in a small cabin located in a secluded mountainous area of Walker Basin in rural Kern County. Vance Huffstuttler also lived on the property in a trailer. Together they cultivated marijuana defendant had planted nearby. Defendant had taken on Huffstuttler as an assistant in the marijuana venture and intended to give him a portion of the profits when

they sold the crop.

On Friday, September 1, Steve Mincy and Jim Wilson drove from Garden Grove to a campsite owned by Mincy's father, Robert, near Twin Oaks, also in Kern County. Robert and several other family members and friends had already arrived and were planning to spend the weekend. The next day, Wilson went for a bicycle ride and then met Steve Mincy at a bar in Twin Oaks. Mincy was there drinking with several others, including Vance Huffstuttler; defendant was also among the group. Later, Wilson returned to the campsite, where he agreed to drive Huffstuttler back to his trailer; Mincy accompanied them.

According to Wilson's trial testimony, the trip to Walker Basin took about 45 minutes in his truck, including 30 minutes on rough dirt roads leading into defendant's property. Defendant had already returned to his cabin. Upon arriving, Mincy, Wilson, and Huffstuttler saw him there with Eloy Ramirez, a friend of defendant's who was blind in one eye. When they got out of the truck, Huffstuttler took Mincy and Wilson across a creek bed and showed them numerous marijuana plants under cultivation. Defendant followed shortly thereafter and confronted Huffstuttler about bringing strangers to the location. Wilson testified defendant became "pretty agitated" and began arguing with Huffstuttler. The two returned to the other side of the creek bed toward the cabin, out of Wilson's view, still arguing. Wilson then heard a gunshot from that direction. A moment later, he and Mincy saw defendant appear from behind a line of trees holding a revolver and saying he had "nothing against" them. As Wilson turned and ran, defendant fired a shot that hit him in the shoulder. He heard several more shots as Mincy begged for his life.

According to Ramirez's testimony, when defendant and Huffstuttler returned across the creek bed arguing, defendant went into the cabin and came out with a revolver. Huffstuttler asked, "What are you going to do, shoot me?" Defendant did not respond, but instead fired one shot at close range. Huffstuttler fell to the ground and did not move. Defendant then approached Mincy and Wilson and fired several more rounds. Back at the cabin, he took a rifle and shot at Huffstuttler's inert body. He also took other steps to make the scene appear like the result of a drug deal gone bad. Ramirez refused to assist him. When defendant finished, they both left for Southern California.

Meanwhile, after traveling all night over the mountainous terrain, Wilson found his way to a neighboring ranch, where the owner called the sheriff's office. When sheriff's deputies went to defendant's cabin, they found Huffstuttler's body lying near Wilson's truck; Mincy's body was in the creek bed in a fetal position. Both had several fatal gunshot wounds; Huffstuttler had been shot with both a revolver and a rifle. The area inside and outside the cabin was in disarray with broken bottles and marijuana paraphernalia as well as some loose marijuana scattered about. The revolver, wiped clean of fingerprints, was found near Huffstuttler. A knife was found nearby as well. Spent shell casings and bullets were retrieved from near each body. At trial, Criminalist Gregory Laskowski determined that grooves in the bullets were consistent with having been fired from the .45-caliber weapon found at the scene. He also testified that blood spatters around Mincy's body indicated some gunshot wounds had been inflicted while he was running and at least one other while he was in a fetal position.

Despite an extensive search, law enforcement was unable to locate defendant for several months. Authorities eventually arrested him in Chicago, where he had been living with friends and family members. Sheriff's deputies also traced the whereabouts of Eloy Ramirez to the house of his girlfriend, Patricia Islas, in Covina, where he had gone after the killings. At trial, Ramirez corroborated the description of events recounted by Wilson.

The defense presented no evidence at the guilt phase.

B. Penalty Phase

1. Prosecution Evidence

At the penalty phase, the prosecution presented evidence of two instances of violent criminal conduct—an unadjudicated assault with great bodily injury of Matthew Spencer and the attempted manslaughter of Kenneth Ross, for which defendant was convicted and sentenced to prison. The prosecution also submitted a threatening letter defendant wrote to Jerry Halfacre while incarcerated awaiting trial. Halfacre had previously had a relationship with defendant's daughter, Paula, and was the father of her child. Among other things, the letter warned Halfacre not to see Paula again or defendant would have him "permanently removed from the face of this Earth." Halfacre had given the letter to his probation officer, who transferred it to a Kern County District Attorney investigator.

2. Defense Evidence

In addition to testimony that defendant had acted under provocation in the incidents involving Spencer and Ross, the defense presented evidence of his upbringing. Defendant's parents divorced when he was eight years old, and within a few years neither wanted to care for him. He lived on the street until he was 16 years old when he joined the Navy and went to Vietnam. Defendant's two daughters testified he had raised them from young ages when their mother abandoned them. Defendant also raised his stepdaughter, Pamela Castillo, after he and her mother were divorced. Other family members and friends recounted how defendant had helped them in various ways.

Bolin, 18 Cal. 4th at 309-11 (1998).

## III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. §§ 2241(c)(3), 2254(a); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County Superior Court, which is located within the

1  jurisdiction of this Court.  28 U.S.C. §§ 2241(d), 2254(a).

2      This action was initiated on March 11, 1999.  Because this action was initiated after April 24,

3  1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death

4  Penalty Act (AEDPA) apply.  Lindh v. Murphy, 521 U.S. 320, 336 (1997); Van Tran v. Lindsey, 212

5  F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63, 71

6  (2003).

7                          IV. STANDARDS OF REVIEW

8  A.      Legal Standard - Habeas Corpus

9      Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless

10  a petitioner can show that the state court's adjudication of his claim:

11      (1) resulted in a decision that was contrary to, or involved an unreasonable application
     of, clearly established Federal law, as determined by the Supreme Court of the United
12     States; or

13      (2) resulted in a decision that was based on an unreasonable determination of the facts in
     light of the evidence presented in the State court proceeding.
14

15  28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 98 (2011); Lockyer, 538 U.S. at 70-71;

16  Williams, 529 U.S. at 413.

17      "[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of §

18  2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of substance of

19  the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other

20  rule precluding state court review of the merits."  Brown v. Walker, No. C 09-04663 JSW, 2014 WL

21  4757804, at *5 (N.D. Cal. Sept. 24, 2014) (citing Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir.

22  2004)).

23      As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal

24  law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71 (quoting 28

25  U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to

26  the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant

27  state-court decision."  Williams, 529 U.S. at 412.  "In other words, 'clearly established Federal law'

28  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the

1   time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely

2   address [] the issue in th[e] case'; otherwise, there is no clearly established Federal law for purposes of

3   review under AEDPA." Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van

4   Patten, 552 U.S. 120, 125 (2008)); see also Panetti v. Quarterman, 551 U.S. 930, 949 (2007); Carey v.

5   Musladin, 549 U.S. 70, 74 (2006).

6         If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to

7   the state court's decision.  See Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

8   In addition, the Supreme Court has recently clarified that habeas relief is unavailable in instances where

9   a state court arguably refuses to extend a governing legal principle to a context in which the principle

10  should have controlled.  White v. Woodall, __ U.S. __, 134 S. Ct. 1697, 1706 (2014).  The Supreme

11  Court stated: "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then

12  by definition the rationale was not 'clearly established at the time of the state-court decision.'" Id.

13  (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

14        If the Court determines there is governing clearly established Federal law, the Court must then

15  consider whether the state court's decision was "contrary to, or involved an unreasonable application

16  of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)).

17  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a

18  conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

19  decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams,

20  529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72.  "The word 'contrary' is commonly understood to

21  mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529

22  U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)).  "A state-court

23  decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court

24  applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id.

25        "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

26  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

27  applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.  "[A] federal court

28  may not issue the writ simply because the court concludes in its independent judgment that the relevant

10

state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." Richter, 562 U.S. at 101, (citing Yarborough, 541 U.S. at 664). The Supreme Court stated:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

Id. at 101-05. In other words, so long as fair-minded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id. at 98-99. In applying this standard, "a habeas court must determine what arguments or theories supported . . . or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Id. at 101-03. This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). Hibbler v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012). If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1322 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th Cir. 2000); see also Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

The AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, 563 U.S. 170, 180-85 (2011)). "Factual determinations by state courts are presumed correct absent clear

1   and convincing evidence to the contrary." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) (citing 28

2   U.S.C. § 2254(e)(1)).  However, a state court's factual finding is not entitled to deference if the relevant

3   state court record is unavailable for the federal court to review.  <u>See</u> <u>Townsend v. Sain</u>, 372 U.S. 293,

4   319 (1963), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> by <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992).

5       If a petitioner satisfies either subsection (1) or (2) of § 2254 for a claim, then the federal court

6   considers that claim de novo.  <u>Panetti</u>, 551 U.S. at 953 (when § 2254(d) is satisfied, "[a] federal court

7   must then resolve the claim without the deference AEDPA otherwise requires"); <u>Frantz v. Hazey</u>, 533

8   F.3d 724, 737 (9th Cir. 2008).

9       In this case, many of Petitioner's claims were raised and rejected by the California Supreme

10  Court on direct appeal.  However, many of his claims were raised in his state habeas petition to the

11  California Supreme Court, and summarily denied on the merits.  In such a case where the state court

12  decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by

13  showing there was no reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.  The

14  Supreme Court stated that "a habeas court must determine what arguments or theories supported or . . .

15  *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded

16  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

17  decision of [the Supreme] Court."  <u>Id.</u> at 101-03 (emphasis added).  Petitioner bears "the burden to

18  demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  <u>Walker v. Martel</u>,

19  709 F.3d 925, 939 (9th Cir. 2013) (<u>quoting</u> <u>Richter</u>, 562 U.S. at 98).  "Crucially, this is not a de novo

20  review of the constitutional question," <u>id.</u>, as "even a strong case for relief does not mean the state

21  court's contrary conclusion was unreasonable." <u>Id.</u> (<u>quoting</u> Richter, 562 U.S. at 102); <u>see</u> <u>also</u> <u>Murray</u>

22  <u>v. Schriro</u>, 745 F.3d 984, 998 (9th Cir. 2014).  When reviewing the California Supreme Court's

23  summary denial of a petition, this Court must consider that the California Supreme Court's summary

24  denial of a habeas petition on the merits reflects that court's determination that:

25          [T]he claims made in th[e] petition do not state a prima facie case entitling the petitioner to
            relief. It appears that the court generally assumes the allegations in the petition to be true, but
26          does not accept wholly conclusory allegations, and will also review the record of the trial ... to
            assess the merits of the petitioner's claims.
27

28  <u>Pinholster</u>, 563 U.S. at 188; <u>see</u> <u>also</u> <u>Johnson v. Williams</u>, 133 S. Ct. 1088, 1094-96 (2013) (holding

that even where the state court does not separately discuss a federal claim there is a presumption that that state court adjudicated the federal claim on the merits).  Accordingly, if this Court finds Petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable.  See e.g., Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim de novo without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1).  Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir. 2005); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. Pinholster, 563 U.S. at 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); Pirtle, 313 F.3d at 1167–68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is de novo).

## V. PROCEDURAL BARS

Some of Petitioner's claims were alternatively denied by the California Supreme Court as procedurally barred.  As to those claims, Respondent has invoked the independent state ground doctrine, pursuant to which a federal court will not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Vang v. Nevada, 329 F.3d 1069, 1072 (9th Cir. 2003) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).

Since "cause and prejudice" can excuse a procedurally defaulted claim, Smith v. Baldwin, 510 F.3d 1127, 1139 (9th Cir. 2007), (quoting Coleman, 501 U.S. at 750), and "prejudice" essentially requires a merits analysis, the Court will proceed to the merits of claims found to be procedurally defaulted without determining whether the state procedural default is adequate and independent to bar relief in federal court.  Id., (quoting Coleman, 501 U.S. 732-35).  A district court may exercise discretion to proceed to the merits in advance of litigation of procedural default.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach the merits if on their face clearly not meritorious despite asserted procedural bar); Bell v. Cone, 543 U.S. 447, 451 n.3 (2005) (an application for habeas corpus may be denied on the merits even if unexhausted in state court); Loggins

13

v. Thomas, 654 F.3d 1204, 1215 (11th Cir. 2011) (relief may be denied on the merits where petition is clearly not meritorious despite asserted procedural bar).

## VI. LIMITED EVIDENTIARY HEARING

Petitioner alleges in claim C2 that defense counsel was ineffective for failing to renew the October 12, 1990 change of venue motion (CT at 238-46) following voir dire of the jury and in spite of alleged inflammatory pretrial publicity and alleged lack of impartiality among the prospective jurors. (ECF No. 113 at 16-38; ECF No. 178 at 43-63.)

Petitioner raised this same claim on direct appeal.  (Appellant's Opening Brief, "AOB", at 11-25.)  The California Supreme Court denied the claim as procedurally barred because defense counsel did not renew the motion to change venue or seek a definitive ruling.  Bolin, 18 Cal. 4th at 312.  That court also rejected the claim on the merits.  See Id. at 312-14.

Petitioner raised the claim again in his state habeas corpus petition (SHCP at 53-89), which the California Supreme Court again rejected.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner supported the venue motion with: the *America's Most Wanted* program, both the original re-enactment of the crime and the follow-up segment on Petitioner's arrest (ECF No. 214, EH Ex. 54); a defense-commissioned Community Attitude Survey (ECF No. 214, EH Ex. 52; see also 11/1/90 RT at 3-28; a folder of newspaper clippings and videotapes (ECF No. 214, EH Ex. 53; CT at 332); and a local News 29 broadcast about the role of *America's Most Wanted* in Petitioner's arrest. (CT 332; 11/1/90 RT at 28.)

Petitioner offered, for prevailing professional norms, the 1989 *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("*ABA Guidelines*"); the 1987 National Legal Aid and Defender Association (NLADA) *Standards for the Appointment of Counsel in Death Penalty Cases*; excerpts from the *California Death Penalty Defense Manual* (1986 through 1989) regarding jury selection as well as pretrial motions for change of venue; and the declaration of Strickland expert James S. Thomson.  (ECF No. 214, EH Ex.'s 57, 58, 59, 60, and 72.)  For evidence regarding the performance of defense counsel, he offers the declarations of counsel Soria and Cater, and expert Thomson.  (Id., EH Ex.'s  65, 66, and 72.)

Petitioner argued that his survey showed that 45 percent of Kern County residents surveyed

were familiar with the case.  (11/1/90 RT at 21:27-22:2.)  Petitioner requested that, if the change of

venue motion was not granted, those potential jurors who had seen the *America's Most Wanted*

reenactment be excused for cause without even participating in voir dire.  (11/1/90 RT at 22:25-26.)

Respondent countered that only approximately 15 percent of the Kern County residents

surveyed had seen the *America's Most Wanted* reenactment (11/1/90 RT at 24:26-25:2) and that only a

small portion of those felt swayed by seeing it (id.), such that Petitioner had not shown he could not get

a fair trial in Kern County.  (11/1/90 RT at 25:10-12.)

The trial judge took the motion under consideration (RT 11/1/90, at 28:16-19, 50:6-24),

informing defense counsel that he was not inclined to grant the motion to change venue but that he was

"very, very concerned about that program. . . ."  (11/1/90 RT at 28.)  The court "reserve[d] ruling" on

the venue motion (11/1/90 RT at 50:6-18) because it wanted:

> [T]o see first of all how many prospective run-ins we get who actually have seen this
> video and then I would like to take a few of those and I realize you and Mr. Cater
> [defense counsel] would have a great many question that may not be necessary and see
> what their general reaction is . . . [¶] [I]f there are general reactions, what I think there is,
> I think I might be inclined to give a blanket for cause."  (11/1/90 RT at 50:8-16.)

The trial court then stated that:

> "Let me just make a finding, I think I did this morning, but to make it perfectly clear, but
> for this re-enactment on *America's Most Wanted*, I do not think there are grounds to
> change the venue on any of the criteria that we have before us concerning that. That's
> the big issue. Fair enough?

(11/1/90 RT at 50:19-24.)

Defense counsel never raised the venue issue again, and the trial court made no further ruling on

it.  (RT at 1640:28-45:13.)  Respondent argues the motion was impliedly denied when the jury was

sworn and the prosecution's opening statement began.  (Id.)

**A.    Clearly Established Law**

      **1.    Ineffective Assistance of Counsel**

The Sixth Amendment right to effective assistance of counsel, applicable to the states through

the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial.

U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; Gideon v. Wainwright, 372 U.S. 335, 343-45 (1963); Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002); Murray, 745 F.3d at 1010-11.

The source of clearly established federal law for ineffective assistance of counsel claims is Strickland v. Washington. 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Richter, 562 U.S. at 104; Strickland, 466 U.S. at 687; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. More specifically, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 104, (citing Strickland, 466 U.S. at 688); accord United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, which Strickland defines as "one whose result is reliable." 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." Id. at 689. Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.; see also Richter, 562 U.S. at 106-08. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687); accord Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only does the court "give the attorneys the benefit of the doubt," but the court must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Pinholster, 563 U.S. at 196.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. 510, 521

(2003) (quoting Strickland, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." Summerlin v. Schriro, 427 F.3d 623, 629 (2005). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. However,

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Wiggins, 539 U.S. at 521-22, (quoting Strickland, 466 U.S. at 690–91); see also Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); Reynoso v. Giurbino, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." Strickland, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Richter, 562 U.S. at 104, (quoting Strickland, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687). Under this standard, the court asks "whether it is 'reasonably likely' the result would have been different." Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 696). That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," id., has the defendant met Strickland's demand that defense

errors were "so serious as to deprive the defendant of a fair trial." Id. at 103-05 (quoting Strickland, 466 U.S. at 687). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Under AEDPA, the court does not apply Strickland de novo. Rather, the court must determine whether the state court's application of Strickland was unreasonable. Richter, 562 U.S. at 100-101. Establishing that a state court's application of Strickland was unreasonable under 28 U.S.C. § 2254(d) is very difficult. Richter, 562 U.S. at 102 (on deferential § 2254(d) review, relief is granted only for "extreme malfunctions" in the state criminal justice system, not for ordinary errors that can be corrected on appeal).

Since the standards created by Strickland and § 2254(d) are both "highly deferential", Richter, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 689),"when the two apply in tandem, review is 'doubly' so." Id. (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). Further, because the Strickland rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" such that the range of reasonable applications is substantial. Id. at 123; see also Premo v. Moore, 562 U.S. 115, 122 (2011) (citing Strickland, 466 U.S. at 689-90) ("[T]he Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.").

Notwithstanding the foregoing, in issuing it decision following the limited evidentiary hearing, the Court "reviews de novo the evidence elicited through discovery and at the evidentiary hearing in these proceedings and is no longer constrained by the limitations imposed by § 2254(d)." Williams v. Davis, No. CV 00-10637 DOC, 2016 WL 1254149, at *8 (C.D. Cal. Mar. 29, 2016) (citing Frantz, 533 F.3d at 737) ("In sum, where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo."); accord Williams v. Woodford, 859 F. Supp. 2d 1154, 1161 (E.D. Cal. 2012) (Kozinski, J., sitting by designation).

**2.      Change of Venue**

The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. Skilling v. United States, 561 U.S. 358, 377-78 (2010); Irvin v. Dowd, 366 U.S. 717, 722 (1961).  The Constitution further provides that the trial shall occur "in the State where the . . . Crimes . . . have been committed."  Art. III, § 2, cl. 3; see also U.S. Const., Amend. 6 (right to trial by "jury of the State and district wherein the crime shall have been committed").  "The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'"  Skilling, 561 U.S. at 378.

Nevertheless, "juror impartiality, we have reiterated, does not require ignorance."  Skilling, 561 U.S. at 381 (citing Irvin, 366 U.S. at 722) (jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); Reynolds v. United States, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.").

To merit relief for violation of his due process rights due to pretrial publicity, petitioner must demonstrate that the case is one in which prejudice is presumed, or he must demonstrate actual prejudice.  Skilling, 561 U.S. at 379, 385.

Under California law, "[a] motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had."  Maine v. Superior Court, 68 Cal. 2d 375, 383 (1968); (see CT at 257).  The factors to be considered in granting or denying a motion for change of venue are: "1) the nature and gravity of the offense, 2) the size and nature of the community, 3) the status of the victim, 4) the status of the defendant, 5) the nature and extent of the publicity."  Martinez v. Superior Court, 29 Cal. 3d 574, 578 (1981); (see CT at 242, 257).

a.    **Presumed Prejudice**

A presumption of prejudice is "rarely invoked and only in extreme situations."  United States v.

1  McVeigh, 153 F.3d 1166, 1181 (10th Cir. 1998), partially overruled on other grounds by Hooks v.

2  Ward, 184 F.3d 1206, 1227 (10th Cir. 1999).  The Supreme Court has determined that pretrial publicity

3  so manifestly tainted a criminal prosecution that prejudice must be presumed in only three cases:

4  Rideau v. Louisiana, 373 U.S. 723 (1963); Estes v. Texas, 381 U.S. 532 (1965); and Sheppard v.

5  Maxwell, 384 U.S. 333 (1966).

6  "The foundation precedent is Rideau."  Skilling, 561 U.S. at 379.  In Rideau, the case turned on

7  an actual filmed confession broadcast to the entire community.  373 U.S. at 724.  "What the people [in

8  the community] saw on their television sets," the Supreme Court observed, "was Rideau, in jail,

9  flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery,

10  kidnapping, and murder."  Id. at 725.  "[T]o the tens of thousands of people who saw and heard it," the

11  Supreme Court explained, the interrogation "in a very real sense was Rideau's trial—at which he

12  pleaded guilty."  Id. at 726.  The Supreme Court therefore "d[id] not hesitate to hold, without pausing

13  to examine a particularized transcript of the voir dire," that "[t]he kangaroo court proceedings" trailing

14  the televised confession violated due process.  Id. at 726–727.

15  In the two cases to follow Rideau, the analyses and holdings turned on the massive media

16  interference with court proceedings and the constant and pervasive media coverage during trial.  See

17  Skilling, 561 U.S. at 379-80.  In Estes, "extensive publicity before trial swelled into excessive exposure

18  during preliminary court proceedings as reporters and television crews overran the courtroom and

19  'bombard[ed] . . . the community with the sights and sounds of the pretrial hearing.  The media's

20  overzealous reporting efforts, we observed, 'led to considerable disruption' and denied the 'judicial

21  serenity and calm to which petitioner was entitled.'"  Id. (quoting Estes, 381 U.S. at 536).  In Sheppard,

22  the Supreme Court noted that "bedlam reigned at the courthouse during the trial and newsmen took

23  over practically the entire courtroom," thrusting jurors "into the role of celebrities."  384 U.S. at 353,

24  355.  Pretrial publicity consisted of "months [of] virulent publicity about [the defendant] and the

25  murder."  Id. at 354.  Ultimately, the Supreme Court "upset the murder conviction because a 'carnival

26  atmosphere' pervaded the trial."  Skilling, 561 U.S. at 380 (quoting Sheppard, 384 U.S. at 358).

27  When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes

28  [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its

1    effect" and may base her evaluation on her "own perception of the depth and extent of news stories that

2    might influence a juror." Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).

3    **B.**    **Analysis of Claim C2**

4          Petitioner alleges that defense counsel was ineffective for failing to investigate and renew his

5    change of venue motion following (1) voir dire, which he claims demonstrated inflammatory pretrial

6    publicity and partiality among the prospective jurors; and (2) the trial court's denial of certain of

7    defense counsel's "for cause" challenges of potential jurors who had seen the *America's Most Wanted*

8    re-enactment.

9          As noted, the trial court reserved ruling on the change of venue motion until it could question

10   potential jurors regarding their exposure to pretrial publicity (11/1/90 RT at 50:6-18; RT at 1640:28-

11   45:13) and see "first of all how many prospective run-ins we get who actually have seen this video and

12   . . . what their general reaction is."  (11/1/90 RT at 50:8-12.)  However, that court voiced its concern

13   that the average person might be unable to rise above the publicity relating to the show's "quite

14   dramatic" re-enactment of the alleged incident (11/1/90 RT at 26:20)), and noting that:

15          Let me just make a finding, I think I did this morning, but to make it perfectly clear, but
             for this re-enactment on *America's Most Wanted*, I do not think there are grounds to
16          change the venue on any of the criteria that we have before us concerning that. That's
             the big issue. Fair enough?

17

18   (11/1/90 RT at 50:19-24.)

19          The California Supreme Court, in rejecting this claim, stated:

20          Prior to trial, defendant moved for a change of venue due to pretrial publicity about the
             case. Not only had the local television and print media given the killings substantial
21          coverage, the program, *America's Most Wanted*, featured a television reenactment of the
             crimes during a segment aired just prior to defendant's arrest. The broadcast apparently
22          led to his identification in Chicago as the alleged perpetrator, and a second airing shortly
             thereafter described his apprehension. In support of the motion, defendant submitted
23          videotaped copies of the television episodes as well as local news clippings reporting the
             crimes.  At the hearing on the change of venue motion, defense counsel also referred to
24          the results of a public opinion survey the defense had undertaken in Kern County. Based
             on the survey, counsel represented that 45 percent of the people responding indicated
25          they had some knowledge of the case due to the media attention. Of this number, 20
             percent had seen the *America's Most Wanted* reenactment.
26

27

28   Bolin, 18 Cal. 4th at 311-12. That court went on to observe that:

21

> Counsel's failure to renew the change of venue motion did not result from ignorance or inadvertence and reflected a reasonable trial strategy. [Citation] The impact of the pretrial publicity generally and the *America's Most Wanted* episodes in particular was a critical focus of the voir dire. Although many prospective jurors had been exposed to some pretrial publicity, including the segment reenacting the killings, for the most part few recalled the specifics or had formed a resolute impression of [Petitioner's] guilt. In particular, those who eventually sat on the jury all gave assurances they would decide the case based solely on the courtroom evidence. [Citation]

> In light of these responses, counsel could well have recognized the effect of the publicity had not been as substantial as feared, especially after an 11-month interim. Thus, renewed effort to seek a change of venue would be futile since the trial court had conditioned any change in its tentative ruling on a determination the television coverage had impaired the ability to assemble an impartial jury. In addition, the reenactment was relevant only to the guilt phase portion of the trial. With guilt virtually a foregone conclusion, counsel's concern may at that point have turned to the penalty phase, which was substantially insulated from the effect of pretrial publicity. [Citation] Given the possibility of a valid trial tactic, we reject this claim of ineffective assistance. [Citation]

Id. at 314.

Upon consideration of the record and the following findings of fact after limited evidentiary hearing the Court concludes that voir dire of the jury did not demonstrate exposure to pretrial publicity rising to the level of presumptive prejudice, and that defense counsel was not deficient by failing to renew the change of venue motion.

### 1.   Presumed Prejudice

Petitioner argues that the nature and extent and material falsity of the pretrial publicity, and the lack of impartiality among the venire pool, support a presumption of prejudice.

As noted, the Court previously denied Petitioner claim of actual prejudice (i.e., "actual partiality or hostility that could not be laid aside"), see Harris v. Pulley, 885 F.2d 1354, 1363 (9th Cir. 1988). (ECF No. 261 at 54:12-15; ECF No. 276, at 53:4-7.)

Furthermore, the Court previously stated that the Strickland prejudice prong must be established for claim C2 and that its Strickland analysis will be informed by whether it is reasonably likely that venue would have been changed from Kern County because of presumed prejudice had Bolin's attorneys renewed the motion.  (ECF No. 330 at 2:2-3); see Styers v. Schriro, 547 F.3d 1026, 1030 (9th Cir. 2008) (citing Strickland, 466 U.S. at 695) ("[T]he governing legal standard plays a critical role in

defining the question to be asked in assessing prejudice for counsel's errors."). Thus Respondent's argument that the Court has substituted a presumed prejudice standard in place of the Strickland standard of prejudice is rejected. Respondent's re-argument and citation to Thomas v. Borg, 159 F.3d 1147, 1149-52 (9th Cir. 1998), a case rejecting an ineffective assistance claim relating to jury composition by applying the Strickland prejudice standard, does not persuade the Court otherwise.

### a. Nature and Extent of Pretrial Publicity

#### 1) America's Most Wanted Program

Petitioner contends that the program, which initially aired on January 7, 1990, was an inflammatory re-enactment of events according to the Kern County Sheriff's Department (ECF No. 113 at 21:1-3) and that the prosecution admitted as much. (11/1/90 RT at 25:6-9.) He also contends the program presented inaccurate background information on Petitioner. (ECF No. 113 at 21:2-4.)

The trial court, after viewing the program, found it "quite dramatic" (11/1/90 RT at 26:20) attended by considerable "media hoopla" (RT at 1226:21-25) and a "pretty graphic dramatization of this alleged incident." (RT at 761:8-9.) The trial court was "very, very concerned about that program." (Id. at 28:18-19.)

Shortly thereafter, local television news aired a story on Petitioner's capture, including excerpts from the America's Most Wanted program. (ECF No. 214, EH Ex. 54.)

On January 14, 1990, America's Most Wanted aired a follow-up program, advising viewers of Petitioner's arrest (Id.; 11/1/90 RT at 17:6-13; 113 at 21:17-19), including an interview with Jim Wilson and a rebroadcast of the alleged last words of Steve Mincy pleading for his life, comments from Mr. Mincy's mother that his daughter was missing her deceased dad (ECF No. 113 at 21:17-23), and information about the fear of residents near the crime scene that Petitioner might return. (ECF No. 113 at 21:23-27; 1/1/90 Supp. RT at 16:24-20:25.) This second broadcast revisited the false booby trap allegations (11/1/90 RT at 7), discussed below, included victim impact statements from Jim Wilson and from Steve Mincy's daughter, (11/1/90 RT at 7:9-20:25), and falsely stated that: "[I]n 1981 [Petitioner] killed a man with a shotgun blast in an argument. He was paroled after serving 2 years. In 1986, [Petitioner] stabbed a man 15 times, but he was acquitted." (11/1/90 RT at 16:7-12; cf., RT at 2246-48; CT at 125-28; SHCP Ex. 42:191.)

### 2)    *Local Media Coverage*

Prior to the March 2, 1990 preliminary examination hearing, four motions for media coverage of proceedings were filed, one from a newspaper, the *Bakersfield Californian*, to include a still camera and tape recorder; one from radio station KUZZ, for audio; and one each from television stations Channel 17 and Channel 23.  (CT at 8:3-12.)  These motions were granted by the trial court.  (CT at 15:25-28.)  The trial court denied Petitioner's request to close the preliminary hearing and seal the transcript.  (CT at 14-15.)  Local media interest during the trial included television cameras permanently in the courtroom to record witness testimony (RT at 1643:7-12; RT-8 at 1780:15-82:11), and requests to accompany the jurors on their crime scene visit.  (RT at 1892:26-1893:4.)

Petitioner cites the following articles published in the *Bakersfield Californian* during the period September 1989 to March 1990:

- A September 4, 1989 article, which falsely attributed booby traps and pipe bombs to Petitioner, who was falsely described as a former Navy SEAL with explosives expertise. (ECF No. 113 at 17:1-20.)  This article also erroneously stated that Jim Wilson had to find a road where he flagged down a passing motorist.  (EH Ex. 53.)

- A September 6, 1989 article, which repeated the false pipe bomb statement and falsely described Petitioner as a "convicted killer."  (Id.; 11/1/90 RT at 23.)  In fact, Petitioner asserts, no pipe bomb had been assembled from the components found at the crime scene.  (ECF No. 113 at 18:8-13; RT at 1887-88.)  Petitioner claims this article also left the false impression that Petitioner may have been involved in a 1985 shooting of a law enforcement officer who was investigating a marijuana farm in the same general area. (ECF No. 113, at 18-25.)

- A September 7, 1989 article which falsely reported that Petitioner had shot Kenneth Ross with a shotgun, when in fact Ross had been shot with a rifle.  (Id.; EH Ex. 53; RT at 2565.)

- A September 8, 1989 article, which related to the search for Petitioner and included irrelevant and prejudicial information relating to other pot farms in the area, implying Petitioner was connected to the other pot farms.  (EH Ex. 53; ECF No. 113 at 19:7-24.)

- A September 9, 1989 article which reported that Petitioner's van had been found abandoned in Covina, California; that the search for him continued; and that police patrols in the Walker Basin area had increased following possible sightings of Petitioner in the area. (EH Ex. 53.) The article also included information about other pot farms in that area. (Id.)

- A January 6, 1990 article, which falsely report details of Wilson's escape, that he crawled to safety over 14 hours (id.; ECF No. 113 at 20-22); reported on Petitioner's alleged violent history; and falsely reported that 4 pipe bombs were found at the crime scene when in fact only 3 unloaded alleged pipe bombs were found. (ECF No. 113 at 20:20-28; RT at 1863, 1888.)

- A January 8, 1990 article which reported on Petitioner's arrest and repeated the erroneous information that Jim Wilson had "crawled eight miles over 14 hours to reach safety." (ECF No. 113 at 22:25-28.)

- A January 17, 1990 article, which repeated the erroneous information above and reported Petitioner's return to California following his capture in Illinois, his pleading not guilty to the two murder counts, the attempted murder count, and the marijuana cultivation count, discovery of four pipe bombs in the cabin which officials thought were used as booby traps, (EH Ex. 53; ECF No. 113 at 22:24-23:1), and stated that during arraignment, the courtroom "was fortified by seven Kern County sheriff's deputies." (ECF No. 113 at 23: 2-3.)

- A January 27, 1990 article, which repeated the erroneous information above and reported a delay in Petitioner's preliminary hearing until March 2, 1990. (EH Ex. 53; ECF No. 113 at 22:24-23:1.)

- A March 3, 1990 article summarizing the March 2, 1990 preliminary examination testimony of Jim Wilson and Eloy Ramirez. (EH Ex. 53; ECF No. 276 at 13:27-28.)

Respondent counters that the print publicity was not persistent and pervasive because only one newspaper, the *Bakersfield Californian*, covered the trial, with six articles published in the week following the crime (through September 9, 1989), and another four articles published near the

televising of the *America's Most Wanted* segments (through January 27, 1990.)  (ECF No. 194 at 40:27-41:7.)  Respondent argues these facts support the state court finding that most of the news articles appeared almost a year before trial, Bolin, 18 Cal. 4th 314, and that the articles were insufficient to show presumed prejudice.  See Hamilton v. Ayers, 458 F. Supp. 2d 1075, 1093 (E.D. Cal. October 30, 2006), reversed in part on other grounds, 583 F.3d 1100, 1135-36 (9th Cir. 2009) (citing United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996) (presumed prejudice standard requires the community be "saturated with prejudicial and inflammatory media publicity about the crime.").

The record suggests that there was no local media coverage (print, radio or television) following the preliminary hearing (CT at 8-12) until jury selection began in late November 1990.  (EH RT 41-43, 181.)  Moreover, the potential jurors were admonished numerous times by the trial court to avoid any contact with the media coverage of the case.  (RT at 25, 228, 235, 249, 326, 1642-43, 1892-93, 1976-77, 2090.)

### 3)    *Community Attitude Survey*

Petitioner argued at the hearing that the defense-commissioned Kern County community attitude venue change survey (EH Ex. 52), which involved 317 Kern County residents registered to vote and holding California driver's licenses, showed that 45% of the Kern County residents surveyed were familiar with the case from various sources, (id. at 3-5; 11/1/90 RT at 21:27-24:11); 52% of those familiar with the case, or 23% of all respondents, had seen the *America's Most Wanted* program, (id.; see also ECF No. 178 at 45:12-14); and 66% of those familiar with the case, or 29.7% of all respondents, had been exposed to other pretrial publicity, (EH Ex. 52 at 3-5).

Of the 45% who were aware of the case, 60% of those, or 27% of all respondents, believed Bolin to be guilty.  (Id.)  The percentage of respondents who believed Bolin to be guilty was higher in the category of individuals who saw the *America's Most Wanted* program (77%, versus 45% for those who had not seen the program).  Furthermore, of those who watched the program, 66% responded they were led to their belief in Bolin's guilt because of the program, while 34% did not form an opinion.  (Id.)

Additionally, of the 45% who were aware of the case, 69% favored death, 14% favored life, and

17% needed more information to form an opinion.  (Id.)  Comparing respondents who saw the *America's Most Wanted* program against those who did not see it, the percentage favoring the death penalty was 76% for those who saw it versus 61% for those who did not see it.  (Id.)

Petitioner argues that defense counsel Soria misstated the results of the survey at the venue change hearing by telling the trial judge that "of the 45% of residents who were aware of the case through the media, 20% had seen the *America's Most Wanted* program."  (ECF No. 178 at 45 n.40.)  He claims that according to his community survey, 75% of those who saw the *American's Most Wanted* program were convinced of Petitioner's guilt of the charged crimes, (ECF No. 113 at 22:21-24; 11/1/90 RT at 21) and that over half the final jury pool (56 of 110) admitted seeing and remembering portions of the *America's Most Wanted* program.  (ECF No. 113 at 23:21-24.)

Mr. Soria argued at the time of the motion that over half the potential jury pool would have seen portions of the *America's Most Wanted* reenactment; and that about three-quarters of those who saw the show believed Petitioner was guilty.  (RT, 11/1/90 at 21.)  He suggested at that time about 15 percent of Kern County residents had actually viewed the reenactment of the crime on *America's Most Wanted*. (11/1/90 RT at 24:1-5, 28:11.)

The prosecution admitted the show was "probably inflammatory" (11/1/90 RT at 25:7-9) and that the show included inaccurate information regarding Petitioner's background (RT at 386:12-19), but argued that only 15% of the Kern County residents surveyed had actually seen the *America's Most Wanted* reenactment (11/1/90 RT at 24:24-26:14) and that only a small percentage of those felt they were prejudiced by seeing it (Id.).  The prosecution asserted that such small percentages did not support a change of venue, (id.; ECF No. 194 at 34:22-35:8), *i.e.,* that prior to voir dire, the pretrial publicity did not establish that Petitioner could not get a fair trial in Kern County.  (ECF No. 194 at 40:20-24.)

Respondent contends the motion to change venue was impliedly denied by the trial court when the jury was sworn.  (RT at 1641:28-41:5.)

### *4)      Voir Dire*

Petitioner argues that the initial venire pool reflected a "high degree of prejudicial media exposure," noting that, of the 158 prospective jurors initially questioned on voir dire: 37 prospective jurors had seen the *America's Most Wanted* program, (ECF No. 178 at 46:2-5), of whom 16 were

excused for cause "because of attitudes hostile to the defense" (Id. at 46:4-5); 18 prospective jurors had learned about the case primarily from television other than *America's Most Wanted* (ECF No. 178 at 49:26-50:1); and 31 prospective jurors read about Petitioner's case in the newspaper.  (ECF No. 178 at 53:2-4.)

Petitioner's Strickland expert, Mr. Thomson, noting Mr. Soria's averment of not recalling any strategic reason for failing to renew the change of venue motion unless he and Mr. Cater had been successful in selecting a jury of people who had not seen the *America's Most Wanted* program, stated that:

> Unfortunately, counsel had not been successful in that regard: four seated jurors (Lee, Vaughn, Hanson, and Bowles) disclosed that they had seen the *America's Most Wanted* episode regarding Mr. Bolin [Record citation] Another seated juror (Barnes) admitted to being influenced by newspaper reports about the case. [Record citation] Failure to renew the venue motion under these circumstances is inconsistent with prevailing professional norms at the time of Mr. Bolin's trial.

(EH  Ex. 72, ¶ 48.)

Respondent counters that Petitioner, at the time of the motion, did not carry his burden of showing that he could not get a fair trial in Kern County, (RT 11/1/90 at 24), given that only 15% of surveyed county residents had seen the *America's Most Wanted* reenactment (id. at 28), and that only a small portion of those expressed possible prejudice from seeing the program (id. at 24-26).  Respondent contends the survey supports a tactical decision by defense counsel not to pursue the change of venue motion where counsel reasonably could have been satisfied with the jury as constituted following voir dire.  (See ECF No. 194 at 39:3-7.)  Respondent goes on to argue that, for the same reasons, the change of venue motion, even if it had been re-asserted, had no reasonable probability of success.  (Id. at 39:8-11.)

### b.    No Presumed Prejudice

Petitioner claims that prejudicial pretrial publicity saturated the community.  He argues this included the dramatic and graphic *America's Most Wanted* re-enactment of the crime.  (See RT at 282, 565, 574, 602-603, 675, 1060, and 1133-35.)  He argues the broadcast's dramatized re-enactment was akin to the televised confession in Rideau.  (ECF No. 178 at 44:16-25.)  He emphasizes what he views as non-factual and factually incorrect and conflated content, citing to Daniels v. Woodford, 428 F.3d

1181, 1210-12 (9th Cir. 2005), as an analogous case where prejudice was presumed from pretrial publicity.  He points out even the prosecution admitted that the information provided in *America's Most Wanted* was "inaccurate with regard to [Petitioner's] background."  (RT at 386:12-19.)

Petitioner contends that voir dire demonstrated media coverage at preliminary hearing (CT at 8-12) and thereafter was so extensive and extreme that a fair trial could not be had in Kern County and counsel's failure to renew the venue change motion following voir dire was presumptively prejudicial given his evidentiary proffer at the hearing.  (ECF No. 214 at 18:16-20:16.)

This Court finds that the noted facts developed during the evidentiary hearing do not stray significantly from those in the state record, as discussed below.

Mr. Soria testified that he believed less than 50% of the venire pool was aware of the *American's Most Wanted* program.  (EH RT at 32:25-33:4.)

The record at evidentiary hearing suggests that, of the jurors who passed the initial hardship process and who filled out the juror questionnaires, approximately 51% were aware of the case; about 24% of those stated they were aware of the case from *America's Most Wanted* (this percentage increases to approximately 40% if jurors who were expressed uncertainty of their awareness and/or its source are considered).  (EH Ex.'s. 1-7, 9.)  Moreover, of the jurors aware of the case, approximately 29% believed Petitioner was probably guilty, and approximately 23% believed Petitioner was probably guilty because of pretrial publicity.  (Id.)

These percentages were similar to the community survey, which showed 45% of those surveyed were aware of the case; 23% were aware of the case from *America's Most Wanted* with 66% of those led to believe Petitioner was guilty of the charges; and 29% had seen or heard media stories about the case other than *America's Most Wanted*.  (ECF No. 214, EH Ex. 52.)  Those jurors responding to the survey who had seen *America's Most Wanted* were more likely to view Petitioner as guilty of the charges than those responding to the survey who had not seen *America's Most Wanted*.  (Id.)  Those jurors responding to the survey who had seen *America's Most Wanted* also were more likely to favor a death sentence upon conviction.  (Id.)

The foregoing reasonably suggest that no more than 40% of the venire pool had seen the *America's Most Wanted* program and no more than a one-third of those were predisposed to guilt.

29

The Court finds that the media coverage in this case falls short of the type of massive media attention that manifestly tainted proceedings in Rideau, Estes, and Sheppard.  In those cases, "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings.  Crater v. Galaza, 491 F.3d 1119, 1135 (9th Cir. 2007), (citing Murphy v. Florida, 421 U.S. 794, 799 (1975)).  Those cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." Id.

Moreover, the size and characteristics of the community from which the instant venire was drawn suggest as much.  For example, in Rideau, defendant's jailhouse interrogation and confession was broadcast three times to a total of some 97,000 (i.e., 65%) people living in the parish of 150,000 from which the venire was drawn.  373 U.S. at 724.  Kern County, on the other hand, was double that size with a population of 300,000, (EH RT at 44:13-14), of which the Community Survey suggested 23% had seen the *America's Most Wanted* broadcast.

Moreover, the taped interrogation and confession in Rideau had been created **"**with the active cooperation and participation of the local law enforcement officers, [citation] **a**nd two local deputy sheriffs later were seated on Rideau's trial jury for what the Supreme Court denounced as "kangaroo court proceedings." Rideau, 373 U.S. at 726. Here, Kern County deputies took phone calls generated by *America's Most Wanted*, but Petitioner has not demonstrated the deputies participated in production of the *America's Most Wanted* reenactment as seen in Rideau.

The publicity in this case was not pervasive and constant.  There were news articles, local television and the *America's Most Wanted* broadcasts concerning the case around the time of the murders, Petitioner's capture, and preliminary hearing.  However, the coverage subsided over the nearly 1-year period prior to jury selection and trial, and was not persistent and pervasive.  Bolin, 18 Cal. 4th at 314.

Coverage in the *Bakersfield Californian* was sporadic: ten articles spanning September 1989 to March 1990, all substantially prior to the December 3, 1990 empaneling of the jury.  There were no further articles or media coverage in the local news prior to jury selection in late November 1990.  (EH RT at 41-42.)  Once jury selection began, jurors were repeatedly admonished to avoid any radio,

television, or newspaper coverage of the case.  (EH Ex. 26.)

The trial court made clear that neither the press coverage in the *Bakersfield Californian* nor the local January 1990 local news broadcasts warranted a change of venue.  (EH Ex. 24 at 50.)  Mr. Soria, at the evidentiary hearing, acknowledged his view that there was no media saturation between the preliminary hearing and the opening statement.  (EH RT at 43:5-9.)  Mr. Cater agreed that the publicity had attenuated over time.  (EH RT at 181:4-9.)

The false allegations relating to the voluntary manslaughter, the stabbing assault and battery, Petitioner allegedly being an ex-Navy SEAL explosives expert, and his alleged connection to other marijuana operations in the area, were clarified by the argument and evidence presented to the jury.  (RT at 1652:4-14, 1666:14-1667:6, 2588-89, 2598; CT at 125-30, 588.)  The supposed pipe bombs found in the cabin, (RT at 1862-65, 1887:10-1891:18), were not charged as a criminal offense or argued as aggravating circumstance evidence during the penalty phase.  (CT at 229, 552.)

The Court concludes that, for the reasons stated, prejudice cannot be presumed in this case.  See Hamilton, 458 F. Supp. 2d at 1093 (prejudice is not established where the nature of the news coverage was factual and not inflammatory and the bulk of the publicity occurred months before jury selection began); Casey v. Moore, 386 F.3d 896, 910 (9th Cir. 2004) (whether a jury was biased is a question of fact and trial court's finding on this question is entitled to a presumption of correctness); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554 (1976) (pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial); accord McVeigh, 153 F.3d at 1181 (noting that presumed prejudice is "rarely invoked and only in extreme situations").  Nor has Petitioner provided any authority that selection for portrayal on *America's Most Wanted* is alone a basis to presume prejudice.

In the rare case that prejudice is presumed, there will have been a "'barrage of inflammatory publicity immediately prior to trial,' . . . amounting to a 'huge . . . wave of public passion.'" Patton v. Yount, 467 U.S. 1025, 1033 (1984) (quoting Murphy, 421 U.S. at 798 and Irvin, 366 U.S. at 728).  For the reasons stated, such was not the case here.

## 2.    Defense Strategy: The Empaneled Jury Was Acceptable to Counsel

Mr. Soria and Mr. Cater used a juror rating system that scored the jurors; they discussed the scoring for each individual juror.  (EH RT at 52:18-53:5.)  The criteria used by counsel in scoring

jurors included consideration of how much negative impact was elicited for those jurors who saw *America's Most Wanted* (EH RT at 55:5-17) and other forms of pretrial publicity (EH RT at 55:20-56:11), and whether the juror was believable (EH RT at 57:7-9).

Additionally, the rating system reflected whether, and the extent to which, a juror's initially low score was rehabilitated by beliefs that would support selection of a sentence of life without parole, jurors he referred to as being "pro-life", resulting in a higher juror score.  (EH RT at 67:9-21.)  A juror's rating could change over time, from juror questionnaire through voir dire.  (EH RT at 123:13-24.)

Defense counsel considered each juror as a whole package. (EH RT at 57:18-21.)  A juror was dismissed where the rating system dictated.  (EH RT at 59:20-25.)

Mr. Soria stated that he challenged jurors for cause, for having seen *America's Most Wanted*, in order to preserve the issue on appeal.  (EH RT at 50:17-21.)  The trial judge denied some of these for-cause challenges.  (See e.g., EH RT at 51:8-11.)  Defense counsel unsuccessfully challenged for cause six of the twelve seated jurors (jurors Robert Bowles, Dale Campbell, Julie Hanson, Patricia Hinson, Jeannine Lee, and Michael Vaughn).  (See ECF No. 276 at 33-34 & n.17.)

Mr. Soria stated that he left on the panel jurors who had seen *America's Most Wanted* because he felt evidence of guilt was overwhelming.  (See EH RT at 13:4.)  He was more concerned with avoiding jurors whose beliefs would support selection of a death sentence, jurors he referred to as being "pro-death penalty" (EH RT at 13:10-11) and picking pro-life jurors (EH RT at 17:12, 81:16-18).  Mr. Soria, who was lead counsel at the time, states that he and Mr. Cater were in agreement on this primary goal of selecting a pro-life jury, which he states was difficult in Kern County at that time.  (EH RT at 49:1-13.)  Though Mr. Cater testified at the evidentiary hearing that he felt the major objective was to get jurors empaneled who had not seen *America's Most Wanted* (EH RT at 154:2-9), he agreed that getting a pro-life jury was a primary consideration.  (EH RT at 184: 11-15.)

Mr. Soria was responsible for filing the change of venue motion.  (EH RT at 151:1-7.)  He stated that it did not occur to him to renew the motion (EH RT at 11:23-24, 12) to keep off jurors who had seen the *America's Most Wanted* program (EH Ex. 16, ¶ 8; EH RT at 86-89); that he was satisfied with the jury empaneled; and that any contrary statements in his 2008 declaration were prior to

refreshing his recollection for the 2013 evidentiary hearing.  (EH RT at 33, 49-60, 85, 105:11-107:3, 185-89.)  Mr. Soria testified that he did not see the need to use preemptory challenges simply because he had challenged for cause (EH RT at 26: 9-17, 69:19-70:7), and he was concerned whom he might get if he dismissed any of the finally empaneled jurors.  (EH RT at 77:4-6.)  Mr. Soria could not recall any disagreement with Mr. Cater that the finally empaneled jury was acceptable to the defense.  (EH RT at 81:8-11.)

Mr. Cater stated that he was not happy with the jury they passed on, and that he had expected the prosecution to continue with challenges.  (EH RT at 189:16-23.)  However, Mr. Cater conceded that he consulted with Mr. Soria regarding the selection of jurors and had no major disagreements with Mr. Soria as to the jury chosen.  (EH RT at 190:10-12.)  Mr. Cater also conceded that a potential juror's awareness of the case was not "an absolute death knell"; that if the juror appeared impartial even though having viewed the *America's Most Wanted* program and was "very good" on the death penalty, the juror would not have warranted a peremptory challenge.  (EH RT at 154.)  He also agreed that saving a defendant's life in a capital case was the primary consideration.  (EH RT at 184.)

The Court finds and concludes that Petitioner has not impeached defense counsel's juror selection methodology.  Defense counsel, in addition to the effect of pretrial publicity, considered potential jurors' feelings about the death penalty and Petitioner not testifying and the prosecution witnesses.  (See e.g., EH RT at 13, 17, 29, 37, 48, 54-55, 154, 184-85; EH Ex.'s. 1r at TC000843, TC000230; 2a at TC001225; 2c at TC001226, TC000244; 2e at TC001224; 2f at TC001221; 2g at TC001227, Q19; 2i at TC001220; 5d at TC000244; 5l at TC000900, TC000437; 5r at TC000893, TC000251; and 6b at TC000243.)  To this end, although juror Barnes was familiar with the case from sources other than *America's Most Wanted,* defense counsel favored his views on the death penalty (EH RT at 61-63, 66-67) because juror Barnes believed that imposition of the death penalty should be used "only . . . as a last resort if the crime demands it."  (EH Ex. 2a at Q20; EH RT at 61.)

Similarly, juror Bowles's exposure to *America's Most Wanted* was minimal and, more importantly, he was offended by the show because it suggested Petitioner was guilty of the crimes charged.  (EH RT at 25, 55; EH Ex. 2b at TC001219, 13971401.)  Juror Hanson gave a credible assurance of impartiality during voir dire and remembered little about the show despite her earlier

questionnaire response that she thought Petitioner was probably guilty based on the show.  (EH RT at 25, 64-66; EH Ex. 2d at 1092-1100.)  Defense counsel retained juror Hinson, despite having made a pro forma challenge for cause based on the show, because she did not remember the show, believed it would be difficult to vote for death, and her overall rating was middling, a three.  (EH RT at 27, 63-64; EH Ex. 2e at TC001224.)  Juror Lee "absolutely" could put aside what she had learned from *America's Most Wanted*, had not read any other news, and hated to see the death penalty used.  (EH RT at 55-56; EH Ex. 2g at TC001227, Q19-20, 240-247.)  Juror Lee believed that defense attorneys had "tough job[s]" and that both the guilty and innocent deserved representation.  (EH RT at 56; EH Ex. 2g at Q13.)  Juror Goff was subjected to a pro forma "for cause" challenge based on his having seen the *America's Most Wanted* program, to preserve the issue for appeal, but Mr. Goff was retained as a pro-life sentence  juror favorable to the defense    (RT at 1427-1441.)

Petitioner makes much of defense counsel allowing juror Vaughn to remain in the final twelve jurors.  (See EH RT at 85:20-89:11.)  Petitioner argued that the score defense counsel had given Vaughn warranted removal.  Petitioner argued that Vaughn's juror questionnaire suggested that he was pro-death penalty, had been exposed to pretrial publicity, and felt Petitioner was guilty.  However, defense counsel Soria responded that juror Vaughn's score was middling, not low, (EH RT at 104:16-17), and that he saw things in juror Vaughn's background (e.g., drug use; military service in Viet Nam) that made him a favorable juror for the defense.  (EH RT at 127-29.)  Co-counsel Cater was uncertain whether Vaughn's overall rating favored the defense or the prosecution.  (EH RT at 174:16-19.)  He scored juror Vaughn as middling on death penalty.  (EH RT at 178:14-16.)  Mr. Cater also testified at the evidentiary hearing that juror Vaughn's belief the crime involved Petitioner fighting with a friend, (EH RT at 176:11-13) favored the defense theory of voluntary manslaughter or imperfect self-defense.

The evidence developed at the May 14, 2013 hearing suggests that as a matter of jury selection strategy, defense counsel viewed pretrial publicity as important, but not controlling, as long as the juror gave credible assurances of impartiality and offered other benefits for Petitioner toward the overarching goal of avoiding a death sentence.  This was not an unreasonable strategy given that Kern County juries were "very pro-prosecution" regarding guilt in the 1980's, (EH RT at 49-50), with one-third to one-half of Kern County jurors then favoring the death penalty.  (Id. at 110.)

Furthermore, the Court finds Mr. Soria's testimony at the evidentiary hearing was forthcoming and corroborated by defense jury selection notes. He adequately addressed why his 2008 declaration (see EH Ex. 16) failed to explain the reasons he did not renew the venue motion – because he had not received and reviewed relevant case materials prior to making the statements therein – and that he had reviewed such materials prior to his testimony at the hearing. (EH RT at 8-9, 11, 33-40, 107.)

It does not appear unreasonable that, on the facts of this case, defense counsel would have a primary strategic goal of selecting pro-life jurors, and a secondary strategic goal of selecting jurors who had not seen the *America's Most Wanted* broadcast. See Duff-Smith v. Collins, 973 F.2d 1175, 1183 (5th Cir. 1992) (strategic choice not to pursue change of venue motion proper where counsel could have been satisfied with the panel as constituted after voir dire). Petitioner has not made a sufficient evidentiary showing that the defense strategy was objectively unreasonable. Nor is the Court convinced by Petitioner's contention that the above-described jury selection strategy was simply an excuse for counsel's insufficient investigation. (See, e.g., EH RT at 13, 48-50, 167-72.) That contention fails for reasons discussed *ante* and in claim W, *post*.

At bottom, Petitioner has not demonstrated that the defense in mitigation, including life experience and social history, was insufficiently developed prior to voir dire so as to preclude defense counsel's use of their asserted juror scoring methodology. Cf. Chateloin v. Singletary, 89 F.3d 749, 753 (11th Cir. 1996) (effective assistance found where counsel had no recollection of whether he waived jury trial to avoid death penalty, but testified that he believed that to be a reasonable tactic and had experience to support that opinion).

Furthermore, defense counsel's consistent "for cause" challenges of jurors who had seen the *America's Most Wanted* program, (see EH RT, at 50:13-19; 181:16-20; EH Ex.'s. 1a at 562; 1f at 1435; 1k at 1507; 1o at 1235; 1r at 868; 2b at 1402; 2c at 1012; 2d at 1100; 2e at 1120; 2g at 245; 2l at 384-87; 4c at 729; 5d at 987; 5h at 436; 5u at 1172-73; 5w at 1185; 5bb at 766; 6a at 955-56; 6d at 619; 6e at 1057; 6f at 1141; 6h at 1162; 6i at 1177; 6j at 290; 6k at 1299; 6m at 452; 6n at 847; 7b at 1372; RT at 465; EH RT at 50:17-51:22, 101:15-21, 120-122, 181-186), could have reasonably been seen as a means to preserve the issue on appeal without risking use of peremptory challenges in a way that impaired final say on the jury selected. See Jeffrey G. Adachi et al., Cal. Criminal Law Procedure and

Practice § 15.26 (2013 CEB); see also id. at § 15.17 ("it is unlikely that a trial judge who may have just denied a challenge to a juror for cause based on prejudice stemming from publicity will grant a motion to change venue a short time later."). Especially so here, given that the same jury sat for the guilt and penalty phases. (See EH RT at 22:7-10.)

### 3.     Futility of Renewed Motion to Change Venue

The Court finds that the trial court's statements and rulings during voir dire, as well as the testimony of counsel Cater and Soria, reasonably demonstrated that a renewed change of venue motion likely would have been denied.

#### a.     State Law Requirements

Defense counsel could not renew a change of venue motion until facts were disclosed during voir dire supporting the claim that a fair trial could not be had in Kern County because of pretrial publicity. People v. Coleman, 48 Cal. 3d 112, 133, 136 (1989); Odle v. Superior Court, 32 Cal. 3d 932, 943-44 (1982); People v. Wallace, 6 Cal. 2d 759, 764 (1936); see also EH Ex. 24 at 50.

Even then, counsel had to demonstrate that other efforts besides a venue change had been insufficient to protect his client's right to an impartial jury, by: (1) challenging for cause every juror who had been exposed to pretrial publicity; (2) exercising a peremptory challenge against every juror who had been so exposed; and (3) moving to strike the jury panel. Coleman, 48 Cal. 3d at 136; Odle, 32 Cal. 3d at 943; see also People v. Bittaker, 48 Cal. 3d 1046, 1087-88 (1989), overruled on other grounds by People v. Black, 58 Cal.4th 912 (2014) (to preserve claim of improper denial of cause challenge, defendant must use peremptory challenge against juror, exhaust peremptory challenges or justify failure to do so, and state dissatisfaction with jury selected).

#### b.     Trial Court Disinclined to Grant Relief

Petitioner faults defense counsel for not renewing the venue motion. He argues that under state law, the venue change was required given the reasonable likelihood a fair trial could not be had, the small community size and the nature of the crime. Corona v. Superior Court, 24 Cal. App. 3d 872, 883-84 (1972); Martinez, 29 Cal. 3d at 583-85 (1981).

Petitioner also faults counsel for not seeking a "blanket for cause" ruling excluding all jurors who had been exposed to the *America's Most Wanted* program. (ECF No. 178 at 59: 16-19.) He points

to the trial judge's statement that:

> [H]e wanted to determine first of all how many prospective run-ins we get who actually have seen this video [*America's Most Wanted*] and... see what their reaction is. [T]hat if there were] general [prejudicial] reactions... [he] might be inclined to give a blanket for cause.

(Id.; see also 11/1/90 RT at 50.)

Petitioner argues these omissions were not part of any reasonable litigation strategy or intentional abandonment of the venue motion.

### 1) *Venue Change Motion*

Counsel could reasonably have believed that a renewed venue change motion would have been denied given the facts of this case.  Mr. Soria, though acknowledging the importance of making motions and objections in the trial court in order to preserve issues for appellate review (EH RT at 50, 101-03, 109), testified at the evidentiary hearing that he believed the venue motion, if renewed, would have been denied.  (EH RT at 32-33; 46; 81:3-7; 109:25-110:3; 114, 153:15-17.)  Likewise, Mr. Cater testified that it was unlikely such a motion would have been granted.  (EH RT at 194-95.)

At the evidentiary hearing, Mr. Soria testified that he felt the motion to change venue was "not good" because less than 50% of the jurors were aware of the *American's Most Wanted* program.  (EH RT at 32:25-33:4.)  Co-counsel Cater testified at the evidentiary hearing that, although he believed the venue motion had merit given the level of publicity and uniqueness of the *America's Most Wanted* program, (EH RT at 151:17-21), he had never brought a venue motion himself and that he had never seen one granted in Kern County.  (EH RT at 179:2-12.)

Defense counsel acknowledged that, according to their survey, the number of Kern County residents who had heard of his case was small compared to other cases where venue motions had been granted, (11/1/90 RT at 23), and conceded that the nature and extent of the news coverage would not have warranted a change of venue absent the reenactment of the crime on *America's Most Wanted*. (11/1/90 RT at 23.)  Moreover, voir dire could reasonably have suggested that the passage of time between significant media coverage and the trial limited the effect of pretrial publicity.  (See, e.g., EH Ex.'s. 1c at 1460:7-10; 2c at 1005-06; 6f at 1135-36.)

Mr. Soria stated that he did not regret commissioning the survey or filing the venue motion,

because he believed the then-unique nature of *America's Most Wanted* warranted the filing of the motion. (EH RT at 46, 114, 176, 180.) But he nonetheless believed his chances of getting the motion granted were "nonexistent." (Id. at 109:25-110:3.)

Mr. Cater testified that there was no strategic reason for not renewing the motion, (EH RT at 153:6-8), that he and Mr. Soria simply overlooked doing so, (EH RT at 194:2-3), and that it was "a mistake" not to get a final ruling on the motion. (EH RT at 153:18-21.) However, Mr. Cater goes on to concede that the trial court likely would not have granted the venue motion. (EH RT at 153:15-17.) He believed that the trial judge would have invited them to renew the motion had the judge been inclined to grant it. (Id. at 194-95.)

Defense counsel acknowledge that they did not use all their peremptory challenges, (EH RT at 19:21-23; 187:5-14), exercising only four of the available twenty peremptory challenges, (RT at 1633-38), effectively precluding any change of venue. (EH RT at 69:19-70:7.) However, Mr. Soria was an experienced capital defense attorney, (EH RT at 37-39), who, prior to the venue change motion, had consulted with jury experts in a separate action regarding the requirements for a successful venue change motion. (EH RT at 45-47.) Furthermore, neither Mr. Soria nor Mr. Cater had seen a venue motion granted in Kern County. (EH RT at 44, 179.) Mr. Soria stated that he was aware of a venue motion with 70% media saturation that was nonetheless denied in Kern County. (EH RT at 44:20-45:3.) This suggests a basis for deference to counsel's decision not to renew the motion given Strickland's presumption of competent assistance. Stewart v. Secretary, Dep't of Corrections, 476 F.3d 1193, 1209 n.25 (11th Cir. 2007) (noting that counsel's experience strengthens the presumption of reasonable assistance).

Defense counsel could reasonably have concluded that the trial court would have denied a renewed change of venue motion. (See EH RT at 51, 182-83.)

### 2)      *"Blanket For Cause" Ruling*

Counsel could reasonably have believed the trial court would not grant a "blanket for cause" ruling relating to *America's Most Wanted* because that court actively rehabilitated certain of these jurors. The trial court granted defense cause challenges for jurors who not only remembered pretrial publicity about the case but who also could not set aside their beliefs about Petitioner's guilt because of

1   this publicity.  (See, e.g., EH Ex.'s. 6a at 955-56; 6c at 1604; 6d at 619; 6e at 1062-63; 6h at 1161-62;

2   6i at 1177; 6j at 280-90; 6k at 1296-99; 6n at 844-47.)  The trial court also denied many other cause

3   challenges based on exposure to pretrial publicity because the jurors either remembered very little

4   about the case or could set aside what they had learned, and they had provided credible assurances that

5   they could put aside any initial beliefs about Petitioner's guilt.  (See e.g., EH RT at 182; EH Ex.'s. 1a at

6   563; 1f at 1435-40; 1k at 1498-1507; 1o at 1228-35; 1r at 859-68; 2b at 1402-03; 2c at 1005-13; 2d at

7   1098-1100; 2e at 1111-20; 2g at 243-45; 2l at 373-78, 384-87; 4c at 724-30; 5d at 976-91; 5h at 433-38;

8   5u at 1162-74; 5w at 1178-90; 5bb at 761-66; RT at 459-66.)

9        Here, the trial court excused nine jurors based on exposure to pretrial publicity.  On the other

10  hand, it denied nineteen cause challenges on the same basis because none of these jurors "had such

11  fixed opinions that they could not judge impartially the guilt of the defendant."  See Yount, 467 U.S. at

12  1035.  Six of these potential jurors who saw the *America's Most Wanted* program or believed they may

13  have seen it were actually selected as jurors, over defense challenges for cause, based on credible

14  assurances of impartiality.  (RT at 243-45 re Marie Lee; RT at 1111-20 re Patricia Hinson; RT at 362-

15  87 re Michael Vaughn; RT at 1005-14 re Dale Campbell; RT at 1092-1102 re Julie Hanson; RT at

16  1393-1403 re Robert Bowles.)  Similarly, juror Gilbert Barnes as selected as a juror even though he

17  was exposed to print and television coverage (RT at 90-106) and stated during voir dire that he thought

18  Petitioner was guilty based thereon.  The trial court's resolution of these questions is entitled to

19  deference.  Yount, 467 U.S. at 1038 (deference accorded to trial judge's determination where based on

20  voir dire and juror demeanor).

21       Defense counsel could reasonably have concluded that the trial court would not have entertained

22  a blanket challenge for cause.  (See EH Ex. 24 at 50.)

23       **4.    No Prejudicially Deficient Conduct by Defense Counsel**

24       Petitioner argues that defense counsel Soria was deficient by not renewing the venue motion

25  and by being pre-occupied with the prospect of a job change and the press of the noted concurrent

26  capital case, People v. Holt, E.D. Cal. Case No. 1:97-cv-6210-AWI, and did not adequately prepare for

27  voir dire, the venue change, or the penalty phase.

28       It was not unreasonable for defense counsel to adopt the strategy discussed above for selecting

39

the jury, and to forego renewal of the venue motion by placing priority in avoiding a death sentence over the effect of pretrial publicity.  (EH RT at 48-49.)  The joint decision of defense counsel to select a favorable jury regarding penalty selection was a reasonable strategic alternative to exhausting all of Petitioner's peremptory challenges, which could have resulted in losing favorable jurors and still not obtaining a change of venue.  Given Mr. Soria's almost ten years' experience as a criminal defense attorney at the time, his experience as counsel in fifteen prior murder cases and three prior capital cases, (EH RT at 37-47), Strickland's presumption of competent assistance is persuasive.  See Stewart, 476 F.3d at 1209 (noting that counsel's experience strengthens the presumption of reasonable assistance).

In rejecting Petitioner's ineffective assistance of counsel claim on direct appeal, the California Supreme Court observed:

> Counsel's failure to renew the change of venue motion did not result from ignorance or inadvertence and reflected a reasonable trial strategy. [Citation] The impact of the pretrial publicity generally and the *America's Most Wanted* episodes in particular was a critical focus of the voir dire. Although many prospective jurors had been exposed to some pretrial publicity, including the segment reenacting the killings, for the most part few recalled the specifics or had formed a resolute impression of [Petitioner's] guilt. In particular, those who eventually sat on the jury all gave assurances they would decide the case based solely on the courtroom evidence. [Citation] In light of these responses, counsel could well have recognized the effect of the publicity had not been as substantial as feared, especially after an 11-month interim. Thus, renewed effort to seek a change of venue would be futile since the trial court had conditioned any change in its tentative ruling on a determination the television coverage had impaired the ability to assemble an impartial jury. In addition, the reenactment was relevant only to the guilt phase portion of the trial. With guilt virtually a foregone conclusion, counsel's concern may at that point have turned to the penalty phase, which was substantially insulated from the effect of pretrial publicity. [Citation] Given the possibility of a valid trial tactic, we reject this claim of ineffective assistance. [Citation]

Bolin, 18 Cal. 4th at 314.

The above noted record on evidentiary hearing suggests that defense counsel employed this strategy in jury selection.  While defense counsel believed that the effect of the pretrial publicity upon potential jurors was an important consideration in selecting a jury, it appears that counsel considered avoiding a death sentence to be of paramount importance to Petitioner.  Moreover, jurors "who are least willing and likely to vote death are more apt to be good jurors on the question of guilt." (EH Ex. 15 at A-20.)

Defense counsel could reasonably have found that given the strength of the evidence against

Petitioner and the knowledge that Kern County jurors were generally supportive of the death penalty, jurors' thoughts about the death penalty were more important than mere exposure to pretrial publicity or even significant exposure to pretrial publicity if the juror gave credible assurances of impartiality and offered other benefits for Petitioner.  Mr. Soria's experience with Kern County juries for 10 years had demonstrated that such juries were "very pro-prosecution." (EH RT at 49-50.)  Moreover, at that time, one-third to one-half of Kern County jurors were in favor of the death penalty.  (Id. at 110.)

Defense counsel also considered whether potential jurors wanted Petitioner to testify to prove his innocence, their likely reactions to the prosecution witnesses including the surviving victim, Jim Wilson, and juror rehabilitation during voir dire.  (EH RT at 13, 17, 29-30, 37, 48, 54-55, 154, 184-85; see also EH Ex.'s. 1a at 563; 1f at 1435-40; 1k at 1498-1507; 1o at 1228-35; 1r at 859-68; 2b at 1402-03; 2c at 1005-13; 2d at 1098-1100; 2e at 1111-20; 2g at 243-45; 2l at 373-78, 384-87; 4c at 724-30; 5d at 976-91; 5h at 433-38; 5u at 1162-74; 5w at 1178-90; 5bb at 761-66; RT at 459-66.)  For example, juror Barnes was familiar with the case from media exposure, yet defense counsel liked his views on the death penalty (EH RT at 61-67) because juror Barnes believed that imposition of the death penalty should be used "only. . . as a last resort if the crime demands it."  (EH Ex. 2a at Q20; EH RT at 61.)

Similarly, juror Bowles saw, but was offended by the *America's Most Wanted* program. (EH RT at 25, 55; EH Ex. 2b at TC001219, 1397.)  Juror Hanson, who stated in her juror questionnaire that she thought Petitioner was probably guilty based on the *America's Most Wanted* program, later gave assurance of impartiality during voir dire, saying she remembered little of the show.  (EH RT at 25, 64-66; EH Ex. 2d at 1092-94, 1097-1102.)  Defense counsel retained juror Hinson, despite having made a pro forma challenge for cause based on the program, because she did not remember the show, believed it would be difficult to vote for death, and her overall rating was a three.  (EH RT at 27, 51, 59, 63-64; EH Ex. 2e at TC001224.)  Juror Lee "absolutely" could put aside what she had learned from *America's Most Wanted*, had not read any other news, and hated to see the death penalty used.  (EH RT at 55-56; EH Ex. 2g at TC001227, Q19-20, 240-43.)

While perhaps not as important as significant exposure to publicity or views on the death penalty, defense counsel also weighed other juror characteristics in deciding whether to exercise peremptory challenges against jurors who either had limited exposure to publicity or who had provided

credible assurances of impartiality.  (EH RT at 125-26.)  Counsel relied upon their instincts and considered each juror independently in deciding which jurors to select.  (Id. at 57, 59-60, 66-67, 185.) For example, though one potential juror, Mr. Newberry, had seen the *American's Most Wanted* program and felt Petitioner was probably guilty, defense counsel's notes reflect both counsel and Petitioner liked Mr. Newberry.  (EH Ex. 4c at Q1.)  Similarly, a juror's prior experience with inmates or drugs was considered by defense counsel, (see EH Ex.'s. 1d at TC000436, TC000868; 2b at Q13; 5bb at TC000227), as was prior military service in Vietnam, (EH Ex. 2l at Q5, Q13).

Though counsel Cater could not recall the meaning of the defense notes on juror Vaughn, (EH RT at 173-76), he "was pleased to see" that Vaughn's knowledge of the case gained from the *America's Most Wanted* program was consistent with their "theory of defense."  (EH RT at 176.)  Defense counsel also considered juror Lee's belief that defense attorneys had "tough job[s]" and that both the guilty and innocent deserved representation.  (EH RT at 56; EH Ex. 2g at Q13.)

Mr. Soria, at the evidentiary hearing went on to explain that he did not exhaust all his peremptory challenges because he liked the jurors he had on the panel.  (EH RT at 60.)  Had he used all of his peremptory challenges, he would not have known the final composition of the jury, especially in a case such as this where counsel was unaware which jurors would be called to replace jurors who had been excused on a peremptory challenge.  (Id. at 70.)

Additionally, the noted defense strategy for juror selection was independently supported by trial counsel's handwritten notes taken during jury selection, (see, e.g., EH Ex.'s 1a-7i.), regarding decisions about particular jurors.  (See, e.g., EH RT at 16, 122-23, 186.)  As noted, Mr. Soria explained why his 2008 declaration (see EH Ex. 16) failed to clearly set out the defense jury selection and venue strategy, i.e., that he had not reviewed any of these materials prior to making the statements in his 2008 declaration but had reviewed them prior to his testimony at the evidentiary hearing.  (EH RT at 8-9, 11, 33-34, 36, 39-40, 95-96, 107.)

Petitioner also claims counsel was deficient for not seeking a ruling on the venue motion in order to preserve the issue for appeal.  He argues the professional norms embodied in the *ABA Guidelines* provide for preservation of appeal issues.  (See ECF No. 178 at 62:24-63:2; *ABA Guideline* 11.7.3.)  However, Petitioner has not demonstrated *ABA Guidelines* create a duty counsel was bound to

follow.  See e.g., Bobby v. Van Hook, 558 U.S. 4, 8-9 (2009) (*ABA Guidelines* have been viewed as essentially guides that inform reasonable attorney conduct, but not "inexorable commands").  Even if *ABA Guidelines* could be viewed as required conduct, counsel could reasonably have decided that an appeal of the venue issue would have lacked merit for the reasons discussed above.  Additionally, counsel's noted juror selection strategy, going to trial with a jury with whom they were satisfied, could reasonably be seen as outweighing considerations of appeal preservation.

The facts developed at the evidentiary hearing suggest that it was not unreasonable for the California Supreme Court to reject claimed ineffective assistance of counsel relating to the motion to change venue.  Defense counsel was not required to make a futile and potentially counterproductive renewal of the change of venue motion, even in a capital case.  See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (counsel not incompetent for failing to file meritless suppression motion).  Nor was it prejudicial because there was no reasonable probability the motion to change venue, if renewed, would have been granted.  Finally, even if there was a violation of state law as Petitioner contends, see Coleman, 48 Cal. 3d at 136, such is not alone a sufficient basis for federal habeas relief.  Pulley v. Harris, 465 U.S. 37, 41 (1984).

### 5.   Conclusions Regarding Limited Evidentiary Hearing – Claim C2

For the reasons stated, Petitioner has failed to demonstrate that counsel was deficient by failing to renew the change of venue motion and that, but for counsel's unprofessional errors, venue in this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

Claim C2 is denied.

## C.   Ineffective Assistance of Counsel at the Penalty Phase

Petitioner, at the evidentiary hearing, attempted to develop facts relating to Mr. Soria's allegedly inadequate penalty phase preparation and conduct.  However, such matters are outside the scope of the evidentiary hearing granted by the Court.  (ECF Nos. 261 at 54:12-15, 276 at 53:4-7.) Moreover, for claims like these, that are adjudicated on the merits in state court, a petitioner can only rely on the record that was before the state court to satisfy the requirements of § 2254(d).  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Pinholster, 563 U.S. at 181.  Here, evidentiary development of allegations relating to IAC at the penalty phase is precluded because Petitioner has not satisfied the §

2254(d) gateway for reasons stated in claim W, *post.*

Even if the Court could consider the purported evidentiary proffer at the evidentiary hearing, no prima facie claim has been stated. Mr. Soria, at the evidentiary hearing, initially testified he took no steps, prior to November 1990, to prepare for the penalty phase. (EH RT at 23:23-24:7.) He stated that he was somewhat pre-occupied with the prospect of taking a job with the Monterey Public Defender, (Id. at 21:11-15), and with the demands of acting as petitioner's counsel in Holt through May 1990. (Id. at 30:24-31:11.) However, Mr. Soria later testified that he was in fact preparing for both the guilt and penalty phases in this action prior to trial, during the period July-November 1990. (Id. at 68:15-69:15.)

Mr. Cater, who came in as second chair in late July, testified at the evidentiary hearing that no sufficient penalty defense had been prepared by Mr. Soria. (Id. at 161:14-19, 163:8-22, 166:17-19, 167:12-16, 169:19-21.) Mr. Cater testified that Mr. Soria and his investigator, Bruce Binns, provided little, if anything, relating to their penalty phase preparation. (Id. at 148:9-12.) But later in his testimony, Mr. Cater conceded that he did receive Mr. Soria's penalty file, including research and discovery, though stating that these files did not contain much information. (Id. at 159:15-21.)

For the reasons stated above and in claim W, *post*, Petitioner was not and is not entitled to evidentiary development of claimed ineffective assistance of defense counsel at the penalty phase.

## VII. REVIEW OF RECORD CLAIMS

A.      **Claims Relating to Pretrial Issues**

1.      **Review of Claim A**

Petitioner alleges the trial court erred in denying Mr. Soria's July 1990 pretrial motion to withdraw from the case, despite Mr. Soria's lack of interest and preparation and his valid reasons to withdraw, forcing Petitioner to proceed to trial with an unwilling, incompetent, disloyal and ineffective attorney.

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court. The California Supreme Court ruled that, to the extent Petitioner's claim alleged trial-court error, the claim was procedurally barred because this claim could have been, but was not, raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In

re Dixon, 41 Cal. 2d at 759].)   The California Supreme Court also summarily rejected Petitioner's

claim on the merits in a decision unaccompanied by explanation.  (Id.)

### a.   Clearly Established Law

Trial court error violates due process where it renders the resulting criminal trial fundamentally

unfair.  Chambers v. Mississippi, 410 U.S. 284, 294, 303 (1973).

The standard for ineffective assistance of counsel is set forth at in claim C2, *ante*.

### b.   Analysis of Claim A

Petitioner alleges that the trial court abused its discretion by refusing to appoint new lead

counsel unless Mr. Soria could quickly find replacement lead counsel agreeable to keeping the

previously set October 22, 1990 trial date.  (7/18/90 RT at 3-4.)  Mr. Soria was unable to do so, but he

agreed to go forward with Mr. Cater as second counsel.  (7/30/90 RT at 9-11.)

A breakdown in the attorney-client relationship can result in a denial of the right to effective

assistance of counsel.   Frazer v. United States, 18 F.3d 778, 782-83, 785 (9th Cir. 1994); see also

Brown v. Craven, 424 F.2d. 1166, 1169-70 (9th Cir. 1970) (trial court's failure to conduct inquiry into

irreconcilable conflict arising from the client's refusal to communicate or cooperate with counsel

resulted in denial of effective assistance of counsel); Schell v. Witek, 218 F.3d 1017, 1026, (9th Cir.

2000) (citing Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991)) (the overarching constitutional

question is whether the attorney-client conflict has become so great that "it resulted in a total lack of

communication or other significant impediment that resulted in turn in an attorney-client relationship

that fell short of that required by the Sixth Amendment").

Here, the record reflects that, on July 18, 1990, the trial court heard Soria's motion to

withdraw as counsel. Soria argued that he had been seeking other employment, (7/18/90 In Camera

Hearing RT 14 at 3-4, 11), and that sufficient time remained for new counsel to get up to speed.

(7/18/90 In Camera Hearing RT at 4-5, 10-11.)   The trial court denied Soria's request without

prejudice and stated that it would reconsider Soria's motion on the following conditions: (1) that

Soria provided the court with the names of two attorneys who were willing to work together and

represent Petitioner "within the next week"; (2) the attorneys would be ready to begin trial on

October 22, 1990, "or very shortly thereafter"; and (3) Petitioner had met with the two attorneys and

felt "comfortable" with them representing him. (7/18/90 RT at 12; see also 7/18/90 RT at 3.)  Both Mr. Soria and Petitioner agreed that the court's denial of the motion to withdraw and the conditions on reconsideration of the motion were "fair."  (7/18/90 RT at 12.)

On July 30, 1990, Mr. Soria indicated his willingness to continue handling Petitioner's case and that he had found a co-counsel, Mr. Cater, to assist him. (7/18/90 RT at 9.)   The trial court then appointed Mr. Cater as co-counsel.  (Id. at 9-10.)

Petitioner cites to the *ABA Guidelines* and argues that the trial court "unreasonably applied" the Sixth Amendment duty of investigation in a capital case because its ruling would not have allowed a new counsel sufficient time to prepare for trial.  (ECF No. 178 at 17-18.)    But even if a failure to abide by the *ABA Guidelines* could establish ineffectiveness of counsel, the trial court was not provided any reason to believe that Mr. Soria was not abiding by them, (see claim I, *post*), or that any newly appointed counsel could not abide by them.

Mr. Soria informed the court that he brought the motion when he did because "there would be a significant amount of time for new counsel to come in" and he had "done enough investigation that [he] could bring [new] counsel up to speed" before trial. (7/18/90 In Camera Hearing RT at 4-5.)  Moreover, even if the trial court's ruling could have conflicted with the *ABA Guidelines* regarding the amount of preparation time needed for a newly appointed counsel, the issue was never before the trial court because Mr. Soria chose to remain on the case.  (7/18/90 RT at 9.)

Mr. Soria also had indicated that he was "on the middle of the fence" about withdrawing in any event and agreed with the court's assessment that he was primarily making the motion to withdraw because he did not currently have a second counsel, which he felt was necessary to presenting the case effectively. (7/18/90 In Camera Hearing RT at 7-8, 10-11.)  Mr. Soria then indicated that another counsel, Mr. Cater, had expressed interest, and the court indicated he would do "an excellent job." (7/18/90 In Camera Hearing RT at 13.)

To the extent Petitioner complains that Mr. Soria subsequently performed deficiently alleged in claims B2, C2, D, G2, H2, I1-I17, J, W1-W9 and Y, these claims all fail for the reasons stated, *post*.

Petitioner also argues by inference that the trial court abused its discretion in denying Mr. Soria's motion to withdraw given that court's subsequent grant of Petitioner's Marsden motion

following the guilt phase.  In granting the <u>Marsden</u> motion, the trial court removed Mr. Soria due to a complete breakdown in the attorney-client relationship to the point of conflict of interest (RT at 2271-96), appointing Mr. Cater to be lead counsel for the penalty phase.  (CT at 544-45; RT at 2298-2301.) However, the trial court cannot be found to have abused its discretion in denying the motion to withdraw based upon events that occurred after ruling on that motion.  (<u>See</u> ECF No. 178 at 14-18.) Mr. Soria's performance at trial is irrelevant when determining the propriety of the trial court's pre-trial ruling on the motion to withdraw.

Similarly unavailing is Petitioner's claim that the trial court erred in subsequently denying Mr. Cater's post-sentencing motion for appointment of independent counsel.  At that time, the trial court "did not see anything wrong with [Mr. Soria's] representation and [did not think] by any stretch of the imagination that any more favorable determination would have occurred."  (2/25/91 RT at 16-17.)  This Court agrees, for reasons discussed in claim W, *post*.

A fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Strickland</u>, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d).

Claim A is denied.

## 2.   <u>Review of Claims B1 & B2</u>

Petitioner next claims ineffective assistance by defense counsel's preparation and submission of a jury questionnaire that contained prejudicial information and induced the jurors to prejudge the question of his guilt or innocence, and he claims that the trial court erred in using the questionnaire. (ECF No. 113 at 14-15.)

Petitioner raised both claims in his petition for writ of habeas corpus in the California Supreme Court.  (CSC Pet. Habeas Corpus at 25-28, 51-53.)   The California Supreme Court ruled that

Petitioner's first claim was procedurally barred because the claim could have been, but was not raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 & In re Dixon, 41 Cal. 2d at 759].) The California Supreme Court also summarily rejected both of Petitioner's claims on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

### a. Clearly Established Law

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin, 366 U.S. at 722; see also Skilling, 561 U.S. at 377-78. In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (citing Adams v. Texas, 448 U.S. 38, 45 (1980)). Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." Morgan v. Illinois, 504 U.S. 719, 728 (1992). Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause. Id. at 733; Ross v. Oklahoma, 487 U.S. 81, 85 (1988).

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan, 504 U.S. at 729. "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" Ristaino v. Ross, 424 U.S. 589, 594 (1976) (quoting Connors v. United States, 158 U.S. 408, 413 (1895)). "[T]he trial court retains great latitude in deciding what questions should be asked on voir dire." Mu'Min, 500 U.S. at 424. No hard-and-fast formula dictates the necessary depth or breadth of voir dire, see United States v. Wood, 299 U.S. 123, 145–146 (1936), and "[t]he Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." Morgan, 504 U.S. at 729. A trial court's failure to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." Mu'Min, 500 U.S. at 426.

"[T]he trial court retains great latitude in deciding what questions should be asked on voir dire." Id. at 424. A trial court's failure to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." Id. at 426.

Two specific inquires of voir dire are constitutionally compelled: inquiries into racial prejudice against a defendant charged with a violent crime against a person of a different racial group, id. at 424; and, in a capital case, inquiries into a juror's views on capital punishment. Morgan, 504 U.S. at 730-32.

The standard for ineffective assistance of counsel is set out in claim C2, *ante*. 299 U.S. 123

### b.  Analysis of Claims B1 & B2

Petitioner alleges that the questionnaire, prepared and submitted by defense counsel (SHCP Ex. 1; 11/1/90 Supp. RT at 35-36), prejudicially informed potential jurors of outside evidence, that he had been the subject of *America's Most Wanted*, leading jurors to prejudge his guilt, biasing them against him.  (See, e.g., RT 92-93; 364-378; 1482-83; 1488-89.)  He complains counsel was ineffective in unnecessarily exposing jurors to the information about the *America's Most Wanted* broadcast and that doing so may have caused jurors to form conclusions not based upon the admitted evidence.  See Taylor v. Kentucky, 436 U.S. 478, 485 (1978) (jury to reach their conclusion solely from the legal evidence adduced); Brecht, 507 U.S. at 637.

The questionnaire informed potential jurors that *America's Most Wanted* had created and aired a detailed re-enactment of the crime and that local stations had referenced, promoted and aired the episode.  (See SHCP Ex. 1, Question 71.)  The questionnaire asked potential jurors to state, based upon what they had seen, heard or read about the case, whether they would say that Petitioner was "definitely guilty, probably guilty, definitely not guilty or probably not guilty."  (SHCP Ex. 1, Questions 71 C, 73.)

The Court finds these claims unpersuasive.  As an initial matter, the trial court has broad discretion in the manner in which it conducts voir dire.  Ristaino, 424 U.S. at 594; Mu'Min, 500 U.S. at 424.  There is no constitutional right to a written questionnaire or that certain questions be included or omitted.  When a defendant challenges voir dire procedures, the issue is whether a particular question rendered the trial fundamentally unfair.  See Mu'Min, 500 U.S. at 425-266.  Equally so where the case has appeared on *American's Most Wanted*, such a "[a] searching voir dire of the prospective jurors is the primary tool to determine if the impact of the publicity rises to th[e] level of actual prejudice." Jin Sig Choi v. Warren, No. CIV. 12-3473 KM, 2015 WL 4042016, at *17 (D.N.J. June 30, 2015).

The California Supreme Court, for reasons discussed in claim C2, *ante*, could reasonably have determined that the trial court's need to gauge potential prejudice relating to *America's Most Wanted*

supported the specific questions regarding *America's Most Wanted*.   Rather than inviting unfair prejudgment of guilt, the questionnaire reasonably could be seen as exposing it.   "The Fourteenth Amendment guarantees each criminal defendant the right to a trial by an impartial jury free of outside influences.  See Sheppard, 384 U.S. at 362.  Even if some potential jurors' view of Petitioner's guilt or innocence was impacted by the questionnaire, (see e.g., RT at 1489-91 where the trial court appears to acknowledge as much), where responses demonstrated bias the Petitioner was able to mount a for cause challenge.  (See e.g., RT at 452 [juror Thompson], RT at 619-20 [juror Crawford], RT at 1497, 1510 [juror Clifford].)

At voir dire, the court must examine the jurors' statements "to determine whether a community-wide sentiment exists against the defendant [citation] . . . [n]egative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality.  Foley v. Parker, 488 F.3d 377, 387 (6th Cir. 2007).   Petitioner has not demonstrated the questionnaire was improper under clearly established law.  "[N]either th[e] court nor the parties should be precluded from asking 'case-specific' questions to attempt to discover a potential juror's bias based on facts that are or are likely to be at issue in this case."   U.S. v. Johnson, 366 F. Supp.2d 822, 849 (N.D. Iowa 2005).  Similarly, the Court rejects Petitioner's argument under Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986), that the questionnaire introduced the jury to prejudicial extrinsic evidence.  Bayramoglu is distinguishable to the extent that case involved clear juror misconduct during deliberations, researching possible criminal penalties and providing the results to other jurors.  Here, the allegedly prejudicial outside information was provided to the venire pool pretrial and was reasonably necessary to ferret out jurors who might be biased upon learning of evidence to be admitted at trial.   Even if Bayramoglu were factually on point, that court's determination the juror misconduct was harmless because the offending juror was removed and the other jurors were told to disregard the outside evidence would suggest harmless error here as well.  Potential jurors whose bias was shown by the questionnaire were removed for cause; the petite jury was instructed to consider only the admitted evidence.

It follows that counsel was not ineffective by drafting and submitting the questionnaire.  As

noted, in addition to broadcast media, numerous articles about the crime also appeared in the local newspaper, the *Bakersfield Californian*. (EH Ex. 53.) Given the facts of this case, a fair trial necessitated gauging the jurors' exposure to media coverage and its impact. As Respondent notes, counsel had "full authority to manage the conduct of the trial." Taylor v. Illinois, 484 U.S. 400, 417-18 (1988); New York v. Hill, 528 U.S. 110, 114-15 (2000). Petitioner was "bound" by the acts of his counsel and, "[a]bsent a demonstration of ineffectiveness, counsel's word on such matters is the last." Hill, 528 U.S. at 115; Allum v. Twomey, 484 F.2d 740, 745 (9th Cir. 1973) ("assuming the lawyer's competence, the client must accept the consequences of his trial strategy").

Even if counsel was deficient regarding the questionnaire, Petitioner has not demonstrated prejudice. The state supreme court could reasonably have determined the information in the questionnaire did not add to or conflict with evidence admitted at trial in any material way. Moreover, all jurors who had been exposed to pretrial publicity agreed they would follow instructions and deliberate based solely on the admitted evidence. (RT at 2182-2218; ECF No. 194 at 32:1-7 citing RT at 1005-07, 1011-12 [juror Campbell], 1111-15 [juror Hinson], 1142, 1145 [juror Lauer], 94, 100-03 [juror Barnes], 365-66, 375, 377-78 [juror Vaughn], 1397-98 [juror Bowles], 238, 240, 244-45 [juror Lee], 1092-94, 1097-1100 [juror Hanson], and 1422-23, 1426 [juror Medina].) The state supreme court could reasonably have concluded there was no reasonable probability of a more favorable outcome had the questionnaire not been used.

Finally, Petitioner's re-argument relating to actual and presumed prejudice is unpersuasive for reasons discussed in claim C2, *ante*, summarized as follows. The Court previously denied on the merits Petitioner's allegation of actual prejudice (i.e., "actual partiality or hostility that could not be laid aside." See Harris, 885 F.2d at 1363; ECF No. 261 at 54:12-15; ECF No. 276, at 53:4-7.) This was not a case where prejudice is presumed, i.e., where there was a "barrage of inflammatory publicity immediately prior to trial,' . . . amounting to a 'huge . . . wave of public passion." Yount, 467 U.S. 1025, 1033 (1984) (quoting Murphy, 421 U.S. at 798 and Irvin, 366 U.S. at 728).

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the

proceeding would have been different, <u>Strickland</u>, 466 U.S. at 687-98. It follows that there was no trial court error in that regard.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. <u>See</u> 28 U.S.C. § 2254(d).

Claims B1 and B2 are denied.

### 3. Review of Claim D

In this claim, Petitioner alleges that defense counsel was ineffective during voir dire of each of the twelve emplaned jurors regarding whether the jurors were willing to consider mitigating factors at the sentence selection phase. Petitioner also claims that the trial court compounded the error by failing to explain the mitigating factors to be considered at the penalty phase.

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court (CSC Pet. Habeas Corpus at 35-51), which the California Supreme Court rejected on the merits. (CSC Order Den. Pet. Habeas Corpus.)

#### a. Clearly Established Law

The legal standard for ineffective assistance of counsel is set out in claim C2, *ante*.

#### b. Analysis of Claim D

Petitioner claims that defense counsel conducted ineffective voir dire regarding "whether the jurors were willing to consider mitigating factors" and that "[t]he trial court compounded that error by limiting its explanation of factors to consider at the penalty phase to the circumstances of the crime as opposed to mitigating factors." (ECF No. 113 at ¶ 164.)

Petitioner alleges that defense counsel's voir dire was deficient regarding "the nature of mitigation" and the statutory mitigation factors so that the jurors could answer whether they were willing to consider mitigating factors during their sentence deliberations. (ECF No. 113 at ¶ 165; <u>see also</u> RT at 90-106 re Gilbert Barnes; RT at 389-97 re Connie Pauley; RT at 236-50 re Marie Lee; RT at 361-87 re Michael Vaughn; RT at 1111-23 re Patricia Hinson; RT at 1144-47 re Beverly Lauer; RT at 1088-91 re Ralph Lopes; RT at 1009-14 re Dale Campbell; RT at 1096-1102 re Julie Hanson; RT at

1352-62 re Steven Parkison; RT at 1399-1404 re Robert Bowles; RT at 1424-27 re John Medina.)

The Court is not persuaded that defense counsel acts ineffectively at voir dire by not requesting that potential jurors be instructed about the nature of statutory mitigation.  As noted, only two specific inquires of voir dire are constitutionally compelled: inquiries into racial prejudice against a defendant charged with a violent crime against a person of a different racial group, Ristaino, 424 U.S. at 595; and, in a capital case, inquiries into a juror's views on capital punishment.  Morgan, 504 U.S. at 730-732. Since the Supreme Court has not decided the issue raised by Petitioner, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent.  See Carey, 549 U.S. at 76.

Moreover, defense counsel could have had tactical reasons for not asking questions about mitigation in the abstract.  Knowing that there may not have been anything significant to present in mitigation or that what was available may not ultimately materialize, counsel may have sought to avoid potential prejudice caused by discussion of mitigating factors not later presented at the penalty phase. "[W]hen counsel focuses on some issues [and excludes] others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  Jacobs v. Horn, 395 F.3d 92, 118 (3d Cir. 2005) (citing Yarborough v. Gentry, 540 U.S. 1, 8 (2003)); cf. People v. Lucas, 12 Cal. 4th 415, 482-84 (1995) (rejecting defendant's claim that he needed a new penalty jury to avoid potential prejudice caused by court's voir dire statements that defense would present evidence in mitigation at penalty trial).

Even had defense counsel sought to question prospective jurors regarding "the nature of mitigation," the trial court could have properly denied such requests or sustained objections to such questions.  People v. Sanders, 11 Cal. 4th 475, 539 (1995) (the scope of questions to be asked at voir dire is a matter for the court's discretion); see also 11/1/90 RT at 37-45 (court notes limitations in voir dire set by Proposition 115 and desire not to unnecessarily prolong voir dire, allowing use of juror questionnaire).  In short, defense counsel was not required to question the venire about potential mitigation evidence in order to be constitutionally effective.  See Hale v. Gibson, 227 F.3d 1298, 1317-18 (10th Cir. 2000) (no ineffectiveness for failure to voir dire about defense strategy); Paradis v. Arave, 954 F.2d 1483, 1491 (9th Cir. 1992), vacated on other grounds, 507 U.S. 1026 (1993) (no

ineffectiveness for failure to voir dire about possible defense).

Petitioner also alleges that the trial court failed to explain the mitigating factors to be considered at the penalty phase and (along with the prosecutor) referred to the Penal Code § 190.3 factors as "guidelines" (see claim U1, post), "clearly vitiat[ing] any narrowing of the jury's discretion in determining what penalty to render."  (ECF No. 113 at 47:9-11.)  However, the trial court is not required to instruct the jurors at voir dire.  The jury was properly instructed at the penalty phase.  Prior to commencing their deliberations, the jurors were instructed with CALJIC No. 8.85 and specifically instructed that they "shall consider all of the evidence," including any mitigating factors found applicable (RT at 2605-07; see also claim U, post); they were provided instructions explaining what mitigating factors were (RT at 2615); and they were told how they should be weighed.  (RT at 2615-16.) Jurors are presumed to follow the court's instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000); United States v. Olano, 507 U.S. 725, 740 (1993); Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997); United States v. Brady, 579 F.2d 1121, 1127 (9th Cir. 1978).  Petitioner's suggestion the jury's impartiality was undermined by the alleged error (see ECF No. 178 at 66:5-6) could reasonably be seen as only speculative.

Petitioner's allegation that the trial court "limit[ed] its explanation of factors to consider at the penalty phase to the circumstances of the crime as opposed to mitigating factors", (see ECF No. 113 at 37:16-17), does not demonstrate constitutional error.  It does not appear that the court's comments were meant to be an exhaustive list of the penalty factors and the law.  Instead, it appears that court's comments were meant to give the prospective jurors "a general idea of the nature of the proceeding." People v. Livaditis, 2 Cal. 4th 759, 781 (1992).  If the jury somehow misunderstood this, "the penalty phase instructions ultimately given obviated any prejudice." People v. Wright, 52 Cal. 3d 367, 414 (1990) (disapproved on other grounds by People v. Wright, 49 Cal.4th 405, 459 (2010)).

Furthermore, Petitioner does not allege that the trial court failed to inquire into the noted constitutionally compelled areas of voir dire.  Ristaino, 424 U.S. at 595; Morgan, 504 U.S. at 730-732. Since the Supreme Court has not decided the issue raised by Petitioner, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent.  See Carey, 549 U.S. at 76.

Finally, Petitioner cannot demonstrate any prejudice on this claim.  Even if counsel had asked the mitigation questions he claims should have been asked, it is unknown what the jurors' answers would have been, what rulings the trial court would have made on cause challenges subsequently made, and how the jury makeup would have changed, if at all.  White v. Luebbers, 307 F.3d 722, 728 (8th Cir. 2002).  Furthermore, "it is exceedingly unlikely that directing the venire's attention to the potential mitigating evidence would either have disposed the jury that was selected to lenity or have altered the composition of the jury in a direction favorable to him." Lear v. Cowan, 220 F.3d 825, 829 (7th  Cir. 2000).  More importantly, prior to trial, each of the jurors assured the court that he or she could be fair and impartial.  Bolin, 18 Cal. 4th at 314, 316; see Leavitt v. Arave, 383 F.3d 809, 826-27 (9th Cir. 2004) (giving weight to jurors' assurances of impartiality); Quintero-Barraza, 78 F.3d at 1350 & n.5 (trial court's conclusion regarding "juror impartiality" is a "factual issue" given "special deference" under AEDPA).

A fair-minded jurist could have found that Petitioner failed to establish defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 687-98.

For the reasons above, this Court also agrees with the California Supreme Court that there was no reasonable likelihood that Petitioner did not receive a fair trial despite the limited voir dire regarding Penal Code § 190.3 mitigation factors.

Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim D is denied.

**4.    Review of Claim E**

In this claim, Petitioner alleges that the trial court erred by failing to excuse five prospective jurors, who were ultimately placed on the panel, four of whom were challenged for cause, and he alleges ineffective assistance by  counsel's failure to dismiss these jurors by peremptory challenge.

Petitioner presented this same claim to the California Supreme Court on direct appeal.  (AOB at

26-34.)  The California Supreme Court held that Petitioner's claim had not been preserved for appeal based on the well-settled rule in California that "exhaustion of peremptory challenges is a condition precedent to an appeal based on the composition of the jury."  Bolin, 18 Cal. 4th at 315, (citing Ross, 487 U.S. at 90).  That Court stated:

> Defendant's right to a fair and impartial jury is not compromised as long [as] he could have secured the juror's removal through the exercise of a peremptory challenge.  Accordingly, California courts hold that the defendant must exercise his peremptory challenges to remove prospective jurors who should have been excluded for cause, and that to complain on appeal of the composition of the jury, the defendant must have exhausted those challenges. [Citation] Defendant did not do so; he may not now claim error.

Bolin, 18 Cal. 4th at 315.  The California Supreme Court also rejected Petitioner's related ineffective assistance claim as follows:

> [W]e also reject defendant's passing suggestion that defense counsel rendered ineffective assistance in failing to utilize all available peremptory challenges. "[T]he decision whether to accept a jury as constituted is obviously tactical, and nothing on the appellate record demonstrates counsel's tactical choice here was either unreasonable or prejudicial." [Citation] We have reviewed the voir dire of the jurors in question. Whether or not they had been exposed to any pretrial publicity, including viewing *America's Most Wanted*, each gave credible assurances he or she would decide the case based only on what transpired in the courtroom.

Id. at 316.

### a.   Clearly Established Law

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin, 366 U.S. 717, 722 (1961); see also Skilling, 561 U.S. at 377-78. In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  Wainwright, 469 U.S. at 424 (quoting Adams, 448 U.S. at 45).  Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." Morgan, 504 U.S. at 728.  Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause.  Id. at 733; Ross, 487 U.S. at 85.

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to

1    identify unqualified jurors." <u>Morgan</u>, 504 U.S. at 729. "Voir dire 'is conducted under the

2    supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" <u>Ristaino</u>,

3    424 U.S. at 594 (<u>quoting</u> <u>Connors</u>, 158 U.S. at 413). "[T]he trial court retains great latitude in

4    deciding what questions should be asked on voir dire." <u>Mu'Min</u>, 500 U.S. at 424. "No hard-and-fast

5    formula dictates the necessary depth or breadth of voir dire," <u>Wood</u>, 299 U.S. at 145–146, and "[t]he

6    Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an

7    impartial jury." <u>Morgan</u>, 504 U.S. at 729. A trial court's failure to ask certain questions does not

8    violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." <u>Mu'Min</u>, 500

9    U.S. at 426.

10   The ineffective assistance standard is set out in claim C2, *ante*.

11   **b.   <u>Analysis of Claim E</u>**

12   Petitioner alleges that these jurors were biased due to media coverage. Juror Barnes stated he

13   "definitely" believed Petitioner was guilty based on newspaper and television coverage. (RT at 90-

14   93.) However, Mr. Barnes later stated he was did not "know" whether Petitioner was guilty (RT at

15   93-94) and stated he could decide the case based on what he heard in the courtroom. (<u>Id.</u>) Petitioner

16   also alleges that juror Barnes was pre-disposed toward the death penalty. (ECF No. 113 at 48:28-

17   49:13.) Juror Barnes stated that he would have no doubt about the death penalty for very violent

18   crime consistent with the perpetrator's past record. (RT at 104.)

19   Juror Vaughn saw the *America's Most Wanted* broadcast and based on it felt Petitioner was

20   "probably guilty" (RT at 364-65), but not necessarily so. (RT at 378.) Petitioner notes that Juror

21   Vaughn also failed to disclose on his questionnaire a prior arrest for possession of marijuana. (RT at

22   381-83.)

23   Juror Bowles had seen the *America's Most Wanted* program. (RT at 1396.)

24   Juror Lee may have seen the *America's Most Wanted* program. (RT at 238-39.)

25   Juror Hanson saw the *America's Most Wanted* program and remembered some general

26   information about the crime. (RT at 1092-1100.)

27   Petitioner argues that, notwithstanding the above showing of "bias," the trial court denied

28   defense counsel's for-cause challenges against jurors Lee, Vaughn, Hanson and Bowles. (<u>See</u> RT at

245 (Lee); RT at 378-79 (Vaughn); RT at 1100 (Hanson); RT at 1402 (Bowles.)

This claim fails.  Petitioner does not cite to established authority that a trial court violates due process in not excusing a juror for cause even when the defendant is able to but fails to exercise a peremptory challenge.  In <u>Ross</u>, the Supreme Court found no due process violation where the state had a rule requiring the defendant to exhaust all peremptory challenges before complaining of an allegedly erroneous denial of a cause challenge.  487 U.S. at 90.  Accordingly, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent.  <u>See</u> Carey, 549 U.S. at 76.

Additionally, the California Supreme Court could reasonably have determined that Petitioner failed to show that these jurors were other than impartial.  (<u>See</u> claim C2, *ante*.) Petitioner's argument that juror Barnes was predisposed to the death penalty is not sufficiently supported in the evidentiary record.  A potential juror's view regarding the death penalty may not be the basis of a for-cause challenge unless those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  <u>Wainwright</u>, 469 U.S. at 424 (<u>quoting</u> <u>Adams</u>, 448 U.S. at 45).

The record demonstrates that each of the five jurors referenced by Petitioner assured the trial court that she/he could be fair and impartial.  Juror Barnes assured the court and counsel that he could decide the case on the facts presented in court, not in the media (RT at 92-103) and that he could presume Petitioner's innocence at the start of trial (<u>id.</u>); Juror Vaughn likewise assured the court and counsel that he accepted the presumption of innocence (RT at 365-84) and that he could be fair despite prior knowledge of the case (<u>id.</u>); Juror Bowles told the court that he had not seen enough of the *America's Most Wanted* program's reenactment of the crime "to really remember what it was about" (RT at 1397), that he had no opinion one way or the other about Petitioner's guilt or innocence (<u>id.</u>), and that he could be a fair and impartial juror in this case (RT at 1398); Juror Lee  "[v]aguely" remembered the case from television (RT at 238), but she assured the court and counsel she absolutely could put aside whatever prior knowledge of the case she had and decide the case on the evidence presented in the courtroom (RT at 240-46); and Juror Hanson recalled some of the details of the charged crimes from the *America's Most Wanted* program (RT at 1092-1102) but assured the

1    court she could put that information out of her mind and decide the case on the evidence presented in

2    court.  (Id.)

3          Petitioner contends the trial court gave too much weight to these jurors' statements that they

4    could follow the law.  (ECF No. 178 at 58:18-59:7.)  However, for the reasons discussed above, the

5    state supreme court could reasonably have found that Petitioner "presented no evidence that any of

6    the jurors that convicted and sentenced him were unable or unwilling to properly perform their

7    duties."  United States v. Padilla-Mendoza, 157 F.3d 730, 734 (9th Cir. 1998).  "[A]n impartial jury

8    consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'"

9    Lockhart v. McCree, 476 U.S. 162, 178 (1986) (quoting Wainwright, 469 U.S. at 423).  Each of the

10   above five jurors stated that their prior knowledge of the case would not affect their sitting as fair and

11   impartial jurors.  The California Supreme Court could reasonably have found that the trial court's

12   denial of Petitioner's for-cause challenges as to these jurors was not an abuse of its discretion causing

13   an unfair trial.

14         Even if the trial court had erred, the California Supreme Court could reasonably have found

15   the error to be harmless.  The overarching issue was whether the jury that sat for the trial was

16   impartial.  See Poland v. Stewart, 169 F.3d 573, 583 (9th Cir. 1999) (holding trial court's denial of

17   challenges for cause did not violate Sixth Amendment where no prejudice shown).  Here, Petitioner

18   has not demonstrated on the evidentiary record that the empaneled jury was other than impartial.

19   (See claim C2, ante.)

20         Petitioner's additional allegation, albeit un-argued, that defense counsel was ineffective for

21   failing to make peremptory challenges against these five allegedly biased jurors fails for the reasons

22   stated above, as well as those discussed in claim F, post.  Accordingly, a fair-minded jurist could have

23   found that Petitioner failed to establish trial court error, or that he was denied a fair trial, or that

24   defense counsel's performance fell below an objective standard of reasonableness and that, but for

25   counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland,

26   466 U.S. at 687-98.

27         It does not appear that the state supreme court's rejection of the claim was contrary to, or an

28   unreasonable application of, clearly established federal law, as determined by the Supreme Court, or

that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim E is denied.[6]

### 5.   Review of Claim F

Petitioner alleges in this claim that defense counsel was ineffective by failing to challenge the empaneled jurors for cause or by available peremptory challenges.

The California Supreme Court considered and rejected this same claim on the merits on direct appeal, noting that:

> "'[T]he decision whether to accept a jury as constituted is obviously tactical, and nothing on the appellate record demonstrates counsel's tactical choice here was either unreasonable or prejudicial.' [Citation] We have reviewed the voir dire of the jurors in question. Whether or not they had been exposed to any pretrial publicity, including viewing *America's Most Wanted*, each gave credible assurances he or she would decide the case based only on what transpired in the courtroom."

Bolin, 18 Cal. 4th at 316.

### a.   Clearly Established Law

The standard for ineffective assistance of counsel is set out in claim C2, *ante*.

### b.   Analysis of Claim F

Petitioner faults defense counsel for failing to challenge and remove Jurors Barnes, Vaughn, Bowles, Hanson, and Lee.  (ECF No. 178 at 70-72.)

Petitioner re-argues that the empaneled jury was tainted with prejudicial publicity; that juror Barnes had prejudged guilt and the penalty; and that at least juror Vaughn had prejudged guilt.  He argues that defense counsel acknowledged as much when making for-cause challenges against jurors Lee, Vaughn, Hanson and Bowles, who had seen the *America's Most Wanted* program.  (See RT at 245 (Lee); RT at 378-79 (Vaughn); RT at 1100 (Hanson); RT at 1402 (Bowles.)  Petitioner also claims defense counsel was ineffective by failing to exercise available peremptory challenges against these five jurors.

However, the evidentiary record suggests defense counsel may have had tactical reasons to

---

[6] Here, Respondent contends this claim is not cognizable because it creates and retroactively applies a "new rule" of constitutional law under Teague v. Lane, 489 U.S. 288 (1989).  Respondent advances this argument as to numerous other claims as well.  Unless otherwise noted, the Court declines to address Respondent's Teague arguments where the claim lacks merit.

keep all of the noted jurors.  Juror Barnes had some reservations about the death penalty (RT at 97-98, 104) and had not seen the reenactment of the charged crimes on the *America's Most Wanted* program (RT at 92), the latter possibly being the reason defense counsel did not challenge juror Barnes for cause (see claim E, *ante*).

Juror Vaughn admitted in his questionnaire that at one time he had a "problem" with marijuana, and he admitted during voir dire that he had used marijuana for "probably four or five years."  (RT at 371.)  Juror Vaughn also admitted that he had been arrested once for marijuana and ultimately had the charge reduced from a felony to a misdemeanor.  (RT at 381-83.)  Since Petitioner was charged with a marijuana offense, counsel could have tactically believed that having juror Vaughn, who himself had used marijuana and who had been convicted of a crime, would be sympathetic to Petitioner in some respects.

As to juror Bowles, he specifically stated that he doesn't "agree" with *America's Most Wanted* (RT at 1396) because "everybody has their day in court and if a person has not been convicted or proven guilty, I don't feel they should be shown on that program . . . . [¶] They, now, people, the general public, oh, he is guilty because it's shown on TV. He is guilty. I don't agree with that." (RT at 1397:19-26.)  Mr. Soria lodged a pro forma challenge based on the *America's Most Wanted* program. (RT at 1402:14-15.)  However, Mr. Soria otherwise passed juror Bowles for cause. (RT at 1402:14-15.)  This could suggest that apart from building the appeal record regarding the *America's Most Wanted* program, Mr. Soria found juror Bowles to be unbiased.

Juror Lee indicated that she "absolutely" does not believe everything in the newspaper and views television as "entertainment" rather than a source of news.  (RT at 237:16-21.)  She expressed some uncertainty about imposing the death penalty (RT at 242:9-21) and held a job as a union steward (RT at 243:9-13), something the defense could have found favorable.  In any event, she assured the court that she "absolutely" could put her prior minimal knowledge about the case aside and decide it on the evidence presented in court.  (RT at 240, 242-45.)

Juror Hanson remembered little about the case from *America's Most Wanted*, assuming what she knew even pertained to Petitioner's case and she had not mistaken it for something else.  (RT at 1092-94, 1097-99.)  Furthermore, defense counsel could have felt that juror Hanson's former career

1  with the welfare department and the fact that she was presently unemployed were favorable to the

2  defense.   (RT at 1095:8-15.)   Juror Hanson also had taken many courses in psychology and

3  psychiatry in preparation for becoming a counselor.   (RT at 1101:16-25.)   Since Petitioner was

4  considering whether to offer psychiatric evidence, he may have viewed juror Hanson as someone who

5  would favorably view such evidence.

6      This Court is not persuaded by the claim.  Petitioner has not made an evidentiary showing that

7  undermines the California Supreme Court's conclusion that defense counsel's failure to use

8  peremptory challenges could have been a reasonable tactical decision.  <u>Davis v. Woodford</u>, 333 F.3d

9  982, 995-96 (9th Cir. 2003), <u>amended</u> <u>and</u> <u>superseded</u> 384 F.3d 628, 643 (9th Cir. 2004) (no

10  ineffectiveness in failing to use peremptory challenges where jurors' statements did not demonstrate

11  actual or implied bias; each said they could "follow the judge's instructions and decide the case

12  impartially"); <u>Quintero-Barraza</u>, 78 F.3d at 1349-50 (where juror stated it would be "difficult" for

13  him to be impartial because he believed persons to be guilty until proven innocent, no ineffectiveness

14  in failing to strike juror because decision was manifestly tactical and due respect was paid to juror's

15  oath); <u>Denham v. Deeds</u>, 954 F.2d 1501, 1505 (9th Cir. 1992) (where juror stated that defendant may

16  have told her about the charged crime while she waited on them at work, no ineffectiveness to fail to

17  challenge her because she said she could be fair and where decision could be tactical).

18      Nor has Petitioner shown that the California Supreme Court incorrectly concluded that

19  Petitioner failed to demonstrate any prejudice from the decision of counsel not to object to these

20  jurors.  <u>Bolin</u>, 18 Cal. 4th at 316 ("nothing on the appellate record demonstrates counsel's tactical

21  choice here was either unreasonable or prejudicial").   Prior to trial, each of the jurors assured the

22  court that he or she could be fair and impartial.   <u>Id.</u> at 314, 316; <u>see</u> <u>Leavitt</u>, 383 F.3d at 826-27

23  (giving weight to jurors' assurances of impartiality).  As explained in claim E, *ante*, all five of these

24  jurors provided what could reasonably be viewed as credible assurances that each could decide the

25  case on the evidence presented in court.

26      For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish

27  that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

28  an objective standard of reasonableness and that but for counsel's unprofessional errors the result of

1   the proceeding would have been different.  Strickland, 466 U.S. at 687-98.

2        It does not appear that the state supreme court's rejection of the claim was contrary to, or an

3   unreasonable application of, clearly established federal law, as determined by the Supreme Court, or

4   that the state court's ruling was based on an unreasonable determination of the facts in light of the

5   evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

6        Claim F is denied.

7        **6.      Review of Claims G, G1 & G2**

8        Petitioner, in these claims, cites to People v. Wheeler, 22 Cal. 3d 258 (1978), and Batson v.

9   Kentucky, 476 U.S. 79 (1986), and alleges that the prosecution improperly used racially

10  discriminatory peremptory challenges to excuse prospective jurors with Hispanic surnames.

11  Specifically, he points to potential jurors Nancy Burciaga (RT at 1632:19-20), Dina Romero (RT at

12  1635:22-23), and Arthur Cordova (RT at 1636:19-20).  He faults both the trial court and counsel for

13  failing to make a Wheeler/Batson objection.  (ECF No. 113 at 52-54; ECF No. 178 at 72-80.)

14  Petitioner also contends that the California Supreme Court did not adjudicate the merits of his

15  constitutional allegations.  (Id.)  All this, he claims, violated his Sixth Amendment right to a jury

16  drawn from a representative cross-section of the community and his Fourteenth Amendment right to

17  equal protection.  (Id.)

18       Petitioner presented these same allegations to the California Supreme Court on direct appeal.

19  That court held Petitioner's failure to make a Wheeler motion waived alleged prosecutorial misconduct

20  and trial court error.  Bolin, 18 Cal. 4th at 316-17.  The California Supreme Court also denied on the

21  merits the allegation that trial counsel was ineffective by failing to preserve the Wheeler issue.  Bolin,

22  18 Cal. 4th at 317.

23       Respondent counters that the claims are procedurally defaulted, waived by counsel's failure to

24  object—an independent and adequate state ground.  Petitioner replies that any waiver and default was

25  caused by the ineffective assistance of his trial counsel, citing Martinez v. Ryan, 132 S. Ct. 1309, 1317

26  (2012) (an attorney's errors during direct appeal may provide cause to excuse a procedural default).

27       The Court will review the merits of the unadjudicated allegations de novo, see Pirtle, 313 F.3d

28  at 1167-68 & n.4; Coleman, 501 U.S. at 732-35, without determining whether the state procedural

1   default is adequate and independent to bar relief in federal court.  See Franklin, 290 F.3d at 1232

2   (courts empowered to reach the merits if on their face clearly not meritorious despite asserted

3   procedural bar); Loggins, 654 F.3d at 1215 (relief may be denied on the merits where petition is clearly

4   not meritorious despite asserted procedural bar).

5       As to the adjudicated ineffective assistance allegations, these are reviewed deferentially under

6   AEDPA.  See Williams, 133 S. Ct. at 1094-96.

7       The three claims are analyzed separately below.

8              **a.       Review of Claim G – Prosecutorial Misconduct**

9       Petitioner alleges that the noted three potential jurors were improperly removed by the

10  prosecution's discriminatory peremptory challenges.

11                  *1)       Clearly Established Law*

12       To constitute a due process violation, the prosecutorial misconduct must be "of sufficient

13  significance to result in the denial of the defendant's right to a fair trial."  Greer v. Miller, 483 U.S.

14  756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  "Before a federal court

15  may overturn a conviction resulting from a state trial . . . it must be established not merely that the

16  [State's action] is undesirable, erroneous, or even universally condemned, but that it violated some

17  right which was guaranteed to the defendant by the Fourteenth Amendment."  Smith v. Phillips, 455

18  U.S. 209, 221 (1982) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).

19       Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.

20  Greer, 483 U.S. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The

21  court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged

22  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim

23  of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an

24  unfair trial to the accused."  Phillips, 455 U.S. at 219.  "Improper argument does not, per se, violate a

25  defendant's constitutional rights."  Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting

26  Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993)).  Furthermore, the Supreme Court has stated:

27          [A]rguments of counsel generally carry less weight with a jury than do instructions from the
            court. The former are usually billed in advance to the jury as matters of argument, not
28          evidence, . . . , and are likely viewed as the statements of advocates; the latter, we have often

64

recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

Boyde v. California, 494 U.S. 370, 384-85 (1990).

If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht.  See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.").

### 2)    *Analysis of Claim G*

The California Supreme Court reviewed this claim on direct appeal and held that Petitioner's failure to make a Wheeler motion waived the claim.  Bolin, 18 Cal. 4th at 316-17.

The Sixth Amendment guarantees trial by a jury drawn from a representative cross-section of the community.  Batson, 476 U.S. at 96-98.  The Equal Protection Clause prohibits a prosecutor from using peremptory challenges to exclude potential jurors solely on account of their race, e.g., on the assumption that black jurors as a group are unable to impartially consider the case against a black defendant.  Id. at 79.

Under Batson and its state corollary, Wheeler, in order to contest the discriminatory use of peremptory challenges by the prosecution, a defendant must establish a prima facie case of discrimination by showing circumstances indicating that the exclusion of jurors was based on their race.  Batson, 476 U.S. at 1723; Wheeler, 22 Cal. 3d at 281.  These circumstances include but are not limited to a pattern of striking members of a certain racial group, or voir dire questions that reveal the prosecutor's intent to strike solely for racial reasons.  Id.  Once a defendant puts forth a prima facie case, the prosecutor must come forward with "clear and reasonably specific" neutral explanations for the peremptory strikes.  Id.

In Purkett v. Elem, 514 U.S. 765, 767 (1995), the Supreme Court provided a three-step Batson analysis: (1) the opponent of the peremptory challenge makes a prima facie showing of racial discrimination, (2) the burden of proof then shifts to the proponent of the strike to present a race-

neutral explanation, noting that unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral, and (3) the court then determines whether the opponent of the strike has proved purposeful discrimination.  In 1991, the Supreme Court decided Powers v. Ohio, 499 U.S. 400, 402 (1991), which expanded the Batson rule to cases where, as here, the petitioner and excluded jurors are not of the same ethnicity.

In considering a Batson objection or ruling, all of the circumstances that bear upon the issue of racial animosity must be consulted.  Snyder v. Louisiana, 552 U.S. 472, 478 (2008) (citing Miller-El v. Dretke, 545 U.S. 231, 239 (2005)).  In the Ninth Circuit, the first prong under Batson, the prima facie showing of racial discrimination, is accorded deferential review in a habeas proceeding.  Tolbert v. Page, 182 F.3d 677, 682 (9th Cir. 1999).

Because there was no Wheeler/Batson objection at trial the reasons for the prosecution challenge of these three potential jurors are not express in the state record.  See Dias v. Sky Chefs, Inc., 948 F.2d 532, 534 (9th Cir. 1991) (Batson objections "must occur as soon as possible, preferably before the jury is sworn.").  Petitioner relies upon an inference of racial discrimination arising from his allegations that, of thirteen Hispanic potential jurors in the original pool of 158 (AOB at 36), nine were removed for hardship or cause, (ECF No. 178 at 52-53), and the three noted above were removed by prosecution peremptory challenge, leaving one Hispanic, juror Medina, seated on the jury.  (Id.)  He cites to Williams v. Runnels, 432 F.3d 1102, 1107 (9th Cir. 2006), in arguing that this statistical disparity is sufficient to raise an inference of purposeful discrimination.  (See ECF No. 178 at 74.)

As the California Supreme Court noted, excuse for financial hardship is not alone a basis for a Wheeler challenge.  See Bolin, 18 Cal. 4th at 316, n.3.  Petitioner claims a statistical inference of discrimination, that though Hispanics comprised only a small percentage of the venire pool surviving hardship (i.e., 4 Hispanics in the 149 member venire pool), 75% of Hispanics (i.e., 3 of 4) were subject of peremptory challenge.  Petitioner argues these circumstances suggest purposeful racial discrimination.  See Windham v. Merkle, 163 F.3d 1092, 1099 (1998) ("to establish a prima facie case of purposeful racial discrimination, a defendant must interpose an objection on the ground that the prosecutor has exercised peremptory challenges against prospective jurors because of their race

[and] defendant must articulate facts and other relevant circumstances that raise an inference that the prosecutor exercised peremptory challenges to exclude the veniremen from the petit jury on account of their race.").

Respondent counters that the claim is waived by defense counsel's failure to object. Petitioner replies that any waiver was caused by the ineffective assistance of counsel.

Here, Petitioner relies upon only the alleged Hispanic surnames of the challenged jurors to support an inference of discrimination.  However, Petitioner does not demonstrate, other than through counsel's surmise, that the challenged jurors Burciaga, Romero and Cordova had Hispanic surnames and were Hispanic.  Cf. Williams, 432 F.3d at 1107  (petitioner, an African-American, made a prima facie statistical disparity showing under Batson where prosecution excused three of four African-Americans from a 59 member jury pool).

Petitioner also fails to show that anything in these jurors' questionnaires and voir dire signaled purposeful racial motivation.  See e.g., U.S. v. Esparsen, 930 F.2d 1461, 1465-67 (10th Cir. 1991) (no discriminatory peremptory challenge where racial identity of venire members with Hispanic surnames was uncertain and nothing during voir dire suggested a racial motivation); cf. People v. Trevino, 39 Cal. 3d 667, 684-86 (1985), disapproved on other grounds, People v. Johnson, 47 Cal. 3d. 1194, 1216-21 (1989) (prima facie Wheeler claim to exclude Hispanics stated where prosecution challenged individuals based solely on Spanish surnames where Hispanics comprised 30% of the total population of the county).

Moreover, that an alleged Hispanic, Mr. Medina, was not challenged and remained a sitting juror, suggests an absence of discriminatory selection.  See Esparsen, 930 F.2d at 1468 (presence on the final jury of a member of the excluded cognizable group is relevant to a Batson challenge when the prosecution had an opportunity to strike the juror).

A California Court of Appeal has held that "the exclusion of disproportionate numbers of minority jurors per se" does not automatically establish a prima facie case of discrimination under Wheeler.  People v. Allen, 212 Cal. App. 3d 306, 316 (1989).  Furthermore, "[a] prima facie case of group bias requiring prosecutorial explanation arises only if from all the circumstances of the case the trial court finds a strong likelihood that the persons were being challenged because of their group

association rather than specific bias." Carrera v. Ayers, 699 F.3d 1104, 1109 (9th Cir. 2012).

Here, the evidentiary record also suggests non-discriminatory reasons for these peremptory challenges. Potential juror Burciaga expressed a pro-life stance during voir dire, (see RT at 1461-67), and questioned her ability to impose a death sentence in this case. (Id.) Petitioner appears to concede that juror Burciaga was challenged due to her position on the death penalty. (See claim H, *post*; ECF No. 113 at 54-55.)

Potential juror Romero suggested during voir dire that previously her husband was the subject of child support proceedings brought by the district attorney's office. (RT at 317-18.) Similarly, during voir dire, potential juror Cordova suggested possible dissatisfaction with law enforcement relating to criminal proceedings against family members, (RT at 160-61), that his prior service as a juror in a murder case had been "very stressful" (RT at 167:25-27), and that he questioned whether the death penalty was fairly applied (RT at 166-75).

Petitioner also alleges in passing that he was denied the opportunity to develop facts supporting this claim. (See ECF No. 178 at 76 n.71.) But he has shown neither the requisite (28 U.S.C. § 2254(e)(2)(A)(ii)) diligence, i.e., facts that could not have been previously discovered by diligent counsel, nor the requisite purposeful discrimination against these jurors by the prosecution. Any suggestion that counsel was deficient by failing to make a Wheeler/Batson objection is insufficient to support this claim given the possibility counsel was reasonably motivated by trial tactics a discussed in claim G2, *post*. Furthermore, Petitioner has not otherwise shown on the record that he was denied factual development of this claim. See Dias, 948 F.2d 532, 535 (9th Cir. 1991) ("No case requires a trial court to address *sua sponte* [an unadvanced Wheeler objection], an issue that neither this court nor the Supreme Court has decided. Trials are still adversary proceedings in which counsel may not lay traps for a trial judge and then expect relief from an appellate court.").

In sum, the California Supreme Court could reasonably have found the record devoid of facts showing how race was involved in the instant peremptory challenges and supporting an inference that the prosecutor exercised the challenges on account of race. See Carrera, 699 F.3d at 1110 (six peremptory strikes of Hispanic-surnamed venirepersons not sufficient to show Wheeler bias where obvious non-discriminatory reasons for striking and two Hispanic-surnamed persons seated on the

jury); cf. Johnson, 125 S. Ct. at 2418 (inference of discriminatory statistical disparity found where African-American petitioner being tried for murdering his Caucasian girlfriend's daughter objected to prosecutor's challenge of all three African-American's on the jury panel).

For the reasons stated, this claim does not demonstrate constitutional error.  Moreover, Respondent would be prejudiced by consideration of an untimely Wheeler objection when Respondent did not have the opportunity to contemporaneously respond during voir dire.  See Dias, 948 F.2d at 535.

Claim G is denied.

### b.      Review of Claim G1 – Trial Court Error on Batson/Wheeler Claim

Petitioner alleges that the trial court erred in not *sua sponte* initiating a Wheeler/Batson objection to the prosecution's use of peremptory challenges against the three potential jurors.

The California Supreme Court reviewed this claim on direct appeal and, as with the above claim, held that Petitioner's failure to make a Wheeler motion waived the claim.  Bolin, 18 Cal. 4th at 316-17.

### 1)      Clearly Established Law

The standard for trial court error is set out in claim A.

### 2)      Analysis of Claim G1

Petitioner alleges that the trial court had a *sua sponte* duty to raise the Wheeler/Batson issue because of the prosecution's blatant use of peremptory challenges on racial grounds and that failure to do so "had a substantial and injurious effect or influence in determining the jury's verdict." (ECF No. 113 at 53:14-15); Brecht, 507 U.S. at 637.  He claims this violated his Sixth Amendment right to a jury drawn from a representative cross-section of the community and his Fourteenth Amendment right to equal protection.

The initial burden of mounting a Batson challenge is on the aggrieved party.  See Purkett, 514 U.S. at 767.  Petitioner has not cited authority that the trial court had a *sua sponte* obligation to question the prosecution's challenges.  On review, the California Supreme Court found no such obligation.  Bolin, 18 Cal. 4th at 316-17 (citing Wheeler, 22 Cal. 3d at 280); see also Dias, 948 F.2d 532, 535 (9th Cir. 1991) ("It is too late to claim on appeal that the trial court erred when counsel

never asked the judge to do anything."). Even if such an obligation were found to exist, the prosecution's challenges to jurors Burciaga, Romero and Cordova were not constitutionally infirm for the reasons stated above.

For the reasons stated, this claim does not demonstrate constitutional error. Moreover, Respondent would be prejudiced by consideration of an untimely Wheeler objection when Respondent did not have the opportunity to contemporaneously respond during voir dire. See Dias, 948 F.2d at 535.

Claim G1 is denied.

### c.    Review of Claim G2 – Ineffective Assistance on Wheeler/Batson Claim

Petitioner contends that trial counsel was ineffective by not lodging a Wheeler/Batson objection to the above noted peremptory challenges.

The California Supreme Court reviewed this claim on direct appeal and found it to be without merit. Bolin, 18 Cal. 4th at 317.

### 1)    Clearly Established Law

The standard for ineffective assistance of counsel is set out in claim C2, *ante*.

### 2)    Analysis of Claim G2

The California Supreme Court denied these allegations, finding:

> On this record, we are unable to determine the reason counsel did not make a timely challenge. He may have perceived the prosecutor could adequately rebut the charge, or he himself may have been dissatisfied with the individuals excused. Since the decision may well have been "an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. [Citation]"

Id.

The Court, considering the discussion in claims G and G1, *ante*, finds this determination is not unreasonable. Judicial scrutiny of counsel's performance is highly deferential and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." Strickland, 466 U.S. at 689. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of

70

possible reasons [defense] counsel may have had for proceeding as they did." Pinholster, 563 U.S. at 196.

"The proper measure of attorney performance remains simple reasonableness under prevailing professional norms." Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688). The California Supreme Court could reasonably have found that Petitioner failed to demonstrate the prosecution's challenge of these three jurors was for reasons of race, and that defense counsel could have reasonably refrained from raising a futile Wheeler/Batson objection.

A fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that there was a reasonable probability Petitioner would have prevailed on a Wheeler challenge had it been raised by counsel. Mitcham v. Davis, 103 F. Supp. 3d 1091, 1108, citing Carrera, 699 F.3d at 1108; Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim G2 is denied.

### 7.    Review of Claims H, H1 & H2

Petitioner, in these claims, alleges prosecutorial misconduct and ineffective assistance relating to exclusion of nine potential jurors with reservations about the death penalty, denying him rights to equal protection, an impartial jury drawn from a cross-section of the community, and a reliable determination of guilt and sentence, violating his rights under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

The prosecutorial misconduct claim was raised on direct appeal and denied on the merits. Bolin, 18 Cal. 4th at 317.

The ineffective assistance claim, failing to object to the prosecutor's use of peremptory challenges to exclude potential jurors with reservations about the death penalty, (ECF No. 113 at 57-58; ECF No. 178 at 82), also was raised on direct appeal and denied on the merits. Bolin, 18 Cal. 4th

at 317.

Petitioner alleges that these claims were not adjudicated by the state court.  (ECF No.  113 at 57:11-12.)  This is incorrect, as the California Supreme Court rejected these allegations on the merits. See Bolin, 18 Cal. 4th at 317.

These claims are analyzed separately below.

### a.    Review of Claims H, H1

#### 1)    Clearly Established Law

The legal standard for prosecutorial misconduct is set out in claim G, *ante*.

The legal standard for ineffective assistance is set out in claim C2, *ante*.

#### 2)    Analysis of Claims H and H1

In claims H and H1, Petitioner alleges that the prosecution used at least nine of fourteen peremptory challenges exercised to exclude potential jurors who, while voicing some concern of sentencing someone to death, nonetheless stated they could vote for death in an appropriate case. (ECF No. 113 at 54-57); (juror Fuson, RT at 1316-22); (juror Burciaga, RT at 1461-65); (juror Goff, RT at 1427-40); (juror Lewis, RT at 1501-07); (juror O'Neal, RT at 734-35); (juror Lucas, RT at 542-48); (juror Hatfield, RT at 661-64); (juror Sprague, RT at 814, 818-20); (juror Holder, RT at 1413-15).

Petitioner cites Witherspoon v. Illinois, 391 U.S. 510, 522-23 (1967), as authority that the prosecution improperly used peremptory challenges to exclude jurors solely because of reservations about the death penalty.  He claims this denied him an impartial jury and "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

In rejecting this claim on direct appeal, the California Supreme Court stated:

Relying primarily on Witherspoon v. Illinois (1968) 391 U.S. 510 and Wainwright v. Witt (1985) 469 U.S. 412, defendant contends the prosecutor violated various constitutional rights by using peremptory challenges to excuse prospective jurors who expressed scruples about imposing the death penalty. Witherspoon and Witt set forth the standard for determining whether the trial court properly excused prospective jurors for cause based on their attitudes toward capital punishment. [Citation] With respect to peremptory challenges, this court has consistently held such excusals do not implicate any constitutional guaranty. [Citation] Defendant offers no persuasive reason to reexamine that determination. Consequently, counsel was not ineffective for failing to make an objection.

Bolin, 18 Cal. 4th at 317.

This Court agrees that Petitioner's reliance upon Witherspoon, and also Gray v. Mississippi, 481 U.S. 648 (1987), is misplaced given their facts. Those cases involved prosecution for-cause challenges of potential jurors who expressed general objections to or scruples about the death penalty. As noted in claim E, ante, "[t]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin, 366 U.S. at 722; see also Skilling, 561 U.S. at 377-78. In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright, 469 U.S. at 424 (quoting Adams, 448 U.S. at 45). Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." Morgan, 504 U.S. at 728.

The California Supreme Court held that, because the prosecutor's exercise of peremptory challenges to excuse jurors with scruples about the death penalty does not implicate any constitutional guaranty, defense counsel was not ineffective for failing to make a futile objection. Bolin, 18 Cal. 4th at 317. Failure to object is not ineffectiveness where an objection would have lacked merit. United States v. Aguon, 851 F.2d 1158, 1172 (9th Cir. 1988), overruled on other grounds by Evans v. United States, 504 U.S. 255 (1992).

"The Supreme Court has never questioned the propriety, under the Constitution, of using peremptory challenges to remove from the jury persons likely to support the defendant's position" on capital punishment. Gosier v. Welborn, 175 F.3d 504, 510 (7th Cir. 1999). It follows that the California Supreme Court's conclusion was neither an unreasonable application of, nor contrary to, Supreme Court law. Carey, 549 U.S. at 76.

A criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Uttecht v. Brown, 551 U.S. 1, 9 (2007); cf. Wainwright, 469 U.S. at 424 (exclusion for cause is proper where a juror's views on capital punishment would impair the performance of his duties). Petitioner concedes that none of the jurors about whom he complains was excluded for cause. (ECF No. 113 at 54:12-19;

1   ECF No. 178 at 80:22-81:2.)   Furthermore, peremptory challenges are not of constitutional

2   dimension.  Ross, 487 U.S. at 88; Gray, 481 U.S. at 663.  The California Supreme Court on direct

3   appeal stated that:

4       "[W]ith respect to peremptory challenges, this court has consistently held such excusals do
        not implicate any constitutional guaranty."

5

6   Bolin, 18 Cal. 4th at 317.  The Supreme Court has upheld use of peremptory challenges that do not

7   discriminate on a constitutionally suspect basis.  See e.g., Holland v. Illinois, 493 U.S. 474, 478 (1990)

8   (rejecting argument that "a prosecutor's use of peremptory challenges to eliminate a distinctive group

9   in the community deprives the defendant of a Sixth Amendment right to the 'fair possibility' of a

10  representative jury").

11      Respondent suggests, and this Court agrees that the California Supreme Court reasonably

12  could have determined these nine peremptory challenges were not related to the potential jurors'

13  reservations over the death penalty.  Prospective juror Lucas's son had a drug related arrest (RT at

14  539-40); prospective juror Hatfield had a DUI (RT at 656-58); prospective juror Sprague had been

15  federally indicted and prosecuted, but not convicted (RT at 810-13); and prospective juror O'Neal

16  was an ex-felon who had served time in prison for burglary and robbery (RT at 731-33).  As to the

17  other five challenges, Petitioner's speculation alone that a challenge was exercised because of the

18  prospective juror's reservations about the death penalty is not a basis for a constitutional violation.

19      For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish

20  that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

21  an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of

22  the proceeding would have been different

23      Accordingly, it does not appear that the state supreme court's rejection of these claims was

24  contrary to, or an unreasonable application of, clearly established federal law, as determined by the

25  Supreme Court, or that the state court's ruling was based on an unreasonable determination of the

26  facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

27      Claims H and H1 are denied.

28          **b.      Review of Claim H2**

74

In claim H2, Petitioner alleges defense counsel's ineffective assistance by failing to object to the prosecution's noted selection of an allegedly pro-death penalty jury. Petitioner alleges that there was no tactical reason for counsel's failure to object.

### 1)     *Clearly Established Law*

The legal standard for ineffective assistance of counsel is set out in claim C2, *ante*.

### 2)     *Analysis of Claim H2*

This claim fails for the same reasons discussed in claims H and H1, *ante*. A fair-minded jurist could have found that Petitioner has not demonstrated the prosecution's use of peremptory challenges was constitutionally infirm, or that he was denied a fair trial. Defense counsel's failure to object, where objection would be futile, was not objectively unreasonable. See Aguon, 851 F.2d at 1172; Strickland, 466 U.S., at 687-698. Additionally, Petitioner has not demonstrated that but for counsel's performance there is a reasonable probability of a more favorable result. Strickland, 466 U.S. at 687-98. For the reasons discussed in claim E, *ante*, he has not demonstrated on the evidentiary record that the empaneled jury was other than impartial.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim H2 is denied.

## B.     **Claims Relating to Guilt Phase**

### 1.     **Review of Claim I**

This claim consists of seventeen subclaims alleging ineffective assistance at the guilt phase, resulting in a complete breakdown of the adversarial process, denying Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

The California Supreme Court considered and rejected ineffective assistance of counsel claims at the guilt phase on direct appeal, noting generally that:

> Defendant alleges numerous instances of ineffective assistance of counsel. To prevail on such claims, he must establish not only deficient performance, i.e., representation below an

objective standard of reasonableness, but also resultant prejudice. [Citation] Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts. [Citation]  To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation ...." [Citation]  Finally, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citation]

Bolin, 18 Cal. 4th at 333-35.

The seventeen subclaims are addressed separately below

### a.    Clearly Established Law

The legal standard for ineffective assistance of counsel is set out in claim C2, *ante*.

### b.    Review of Claim I1

In this claim, Petitioner alleges defense counsel's cumulative failure to adequately investigate, prepare for or present the guilt phase as alleged in claims I2-I17 amounts to ineffective assistance of counsel.

This claim was raised and denied on direct appeal.

Petitioner also raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily rejected on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner cites to claim A and alleges that lead counsel Soria and initial second counsel Peterson did little work on this case prior to appointment of Mr. Cater as replacement second counsel in July 1990.  (ECF No. 113 at 58-62; ECF No. 178 at 92-94.)  Petitioner argues that Mr. Soria, who was engaged in another capital trial for the initial four months of his appointment in this case, did not do a complete guilt phase investigation.   He complains that Mr. Soria used an incompetent investigator, Bruce Binns Investigations; that Mr. Soria did not have a trial strategy; that Mr. Soria did not consult necessary experts; that Mr. Soria did not test forensic evidence; and that Mr. Soria nonetheless did not request a continuance of trial.

Petitioner also alleges that when Mr. Cater was appointed, Mr. Soria told him the investigation for both phases of trial was virtually completed, even though that was not true, and that

Cater had no reason to believe otherwise.  (SHCP Ex. 47; 2/25/91 RT at 11-12.)  As a result, Petitioner alleges that Mr. Cater ended up cross-examining witnesses without investigative materials to rely upon.

The California Supreme Court could reasonably have denied this claim as lacking support in the evidentiary record.  Claim A, to the extent re-alleged here, fails for the reasons stated therein, *ante*.  As noted by the California Supreme Court, conclusory allegations of failure to investigate are insufficient to raise a cognizable claim of ineffective assistance of counsel.  Bolin, 18 Cal. 4th at 332-34; see also Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory suggestions that counsel provided ineffective assistance "fall far short of stating a valid claim of constitutional violation"); United States v. Taylor, 802 F.2d 1108, 1119 (9th Cir. 1986) (petitioner's "vague and speculative assertions" failed to satisfy his burden under Strickland).

Petitioner's only specific allegations refer to investigator Binns, (ECF No. 113 at 59-61), whom he describes as drunk and ineffective during pretrial witness interviews.  (Id.; SHCP Ex. 4; SHCP Ex. 5; 2/25/91 RT at 11.)

The California Supreme Court rejected this claim for the following reasons:

> Without elaboration, defendant asserts the investigator employed on his case must have been inadequate because counsel's performance was so deficient, also noting the investigator admitted stealing money from defendant. These assertions are entirely too vague and conclusory to demonstrate any lack of competence on the part of either.  Absent such a demonstration, we will not speculate defendant received ineffective assistance.

Bolin, 18 Cal. 4th at 334.  The California Supreme Court's rejection of this claim was not unreasonable.  As noted by that court, defense counsel had "few viable options" because "[w]ith two eyewitnesses to the killing, the defendant's state of mind and intent were the only issues open to question. The forensic evidence bearing on those elements was straightforward, to the point, and not susceptible to much controversy. The guilt phase was matter-of-fact in tenor, and the penalty phase was presented and argued without inflammatory rhetoric or vilification."  Id. at 313.  That court went on to describe the evidence against Petitioner as "overwhelming."  Id. at 334.

Petitioner points to the *ABA Guidelines*, which require a thorough capital case defense investigation, in support his ineffective assistance of counsel claims.  (ECF No. 178 at 83-85.)  But

the *ABA Guidelines* are "only guides." <u>Strickland</u>, 466 U.S. at 688; <u>Jeffries</u>, 5 F.3d at 1198 (ABA

Standards serve only as a 'guide' for determining whether an attorney's performance is adequate").   It

follows that a failure to follow the *ABA Guidelines* "does not necessarily make out a denial of the

Sixth Amendment guarantee of assistance of counsel." <u>Nix v. Whiteside</u>, 475 U.S. 157, 165 (1986).

This Court "need not determine the actual explanation for defense counsel's strategic choices,

so long as his [choices] fall[] within the range of reasonable representation." <u>Morris v. State of</u>

<u>California</u>, 966 F.2d 448, 456 (9th Cir. 1991).   "The mere criticism of trial tactics is insufficient to

establish ineffectiveness or prejudice."   <u>United States v. Ferreira-Alameda</u>, 815 F.2d 1251, 1254 (9th

Cir. 1986).   Here, counsel's primary defense theory, to avoid a death sentence by showing the

Huffstuttler and Mincy killings were not first degree murder, could be seen as reasonably furthered

by the guilt phase investigation and presentation.

Counsel, individually or through investigator Binns, inspected the physical crime scene and

viewed crime scene photos (<u>see</u> claims I8-I9, *post*); reviewed police reports and eye witness

statements of Ramirez and Wilson (<u>see</u> claims I2-I3, *post*); reviewed the report of criminologist

Laskowski (<u>see</u> claims I8-I9); interviewed witnesses Ms. Ward and Ms. Islas (<u>see</u> claims I4-I5, *post*);

interviewed Petitioner's daughter Paula and attempted to contact her common law husband, Jerry

Halfacre and reviewed Petitioner's threatening letter to Halfacre and Detective Williamson's

interview of Halfacre (<u>see</u> claim I6, *post*); contacted or attempted to contact potential witnesses Mr.

Daser, Mr. Jones, Mr. Williams and Mr. (Brent) Wilson and reviewed related police reports (<u>see</u>

claim I7, *post*); contacted Dr. Markman and investigated mental state defenses (<u>see</u> claim I10, *post*);

traveled to the Los Angeles area to identify and interview potential witnesses and obtained Detective

Nikkel's report regarding Covina California potential witnesses including Ms. Hooten (<u>see</u> claim K,

*post*); and traveled to Chicago, Illinois to identify and interview potential witnesses among

Petitioner's extended family (<u>see</u> claim W1, *post*; SHCP Ex. 47, 1/7/91 <u>Marsden</u> RT at 2304-11).

These efforts were to garner evidence that Petitioner acted in the heat of passion or by self-

defense, including evidence that Petitioner feared Huffstuttler; that Petitioner's mental state precluded

premeditation; that Petitioner and Huffstuttler were scuffling at the time Huffstuttler was shot; that

circumstances under which Petitioner shot Huffstuttler carried over to his shooting Mincy and

Wilson; that Petitioner may have been stabbed during the scuffle; and that one or more unidentified parties may have been involved in the murders.

To the extent Petitioner bases this claim on claims I2 through I17 (see ECF No. 178 at 93), for the reasons set forth in those claims, post, Petitioner fails to demonstrate any singular errors for this Court to aggregate.  Thompson v. Calderon, 86 F.3d 1509, 1521 (9th Cir. 1996), amended by 109 F.3d 1358, 1369 (9th Cir. 1997), rev'd, 120 F.3d 1045 (en banc), opinion reinstated, Calderon v. Thompson, 523 U.S. 538, 566 (1998) ("finding no prejudice from the errors considered separately, we also find no cumulative prejudice"); see also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (holding that there was no reason to reverse for cumulative error because there was no violation of federal rights in the guilt phase).

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different.  Strickland, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim I1 is denied.

### c.    Review of Claim I2

Petitioner alleges multiple failures by counsel to investigate and present evidence to impeach witness Eloy Ramirez, who was present during the crime and fled the scene with Petitioner to the home of Ramirez's girlfriend, Patricia Islas, where they spent the night following the murders.

The state supreme court rejected this claim on direct appeal, stating that:

> Defendant contends counsel's investigation and review of discovery were inadequate because he failed to interview Patricia Islas or to anticipate her testimony about statements made by Ramirez. At trial, counsel made a hearsay objection to this testimony and also complained the statements had not been disclosed on discovery. In response, the prosecutor noted they were contained in a police report. On that basis,

defendant asserts counsel's review and preparation must have been deficient. The record reflects, however, that the "discovery" objection was predicated on a lack of detail in the report regarding Ramirez's statements, implying counsel had in fact reviewed what was provided. The record also suggests a defense investigator contacted Islas prior to trial. More importantly, even if he did not, defendant fails to establish additional investigation would have produced exculpatory or impeachment evidence.

Petitioner raised this claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily rejected on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus).

Mr. Ramirez, a friend of Petitioner's who is apparently blind in one eye and drinks heavily, was present at the crime scene when Petitioner shot and killed both victims.  Bolin, 18 Cal. 4th at 310. Ramirez, who was arrested by Kern County Sheriff for the homicides (SHCP Ex. 13), testified to what he saw and heard of the events surrounding the killings.  (Id.; RT at 1919-62.)  Petitioner faults counsel on several fronts.

### 1)	Ramirez's Statement to Law Enforcement

Petitioner first asserts that defense counsel failed to investigate the circumstances surrounding Ramirez's statement to the police and/or to investigate any mental and physical conditions that would have affected Ramirez's ability to perceive, recall, or testify about the events as an eye witness.  (ECF No. 113 at 63-67.)  More specifically, Petitioner asserts that defense counsel failed to interview Joseph Gutierrez, Ramirez's attorney, about Ramirez's condition at the time of Ramirez's interview with the police or any promises made in exchange for his statement.  (Id.)  Petitioner claims Gutierrez would have provided information showing that Ramirez was strongly motivated to exculpate himself and could have led to evidence of law enforcement inducement, and that the failure to interview him prevented any effective challenge of the testimony of Ramirez and Deputy Williamson.  (Id.)

Petitioner also faults counsel for failure to interview Kern County Sheriff's Deputies Nickel and Williamson, who interviewed Ramirez after his arrest.  (Id.)

Though the declaration of Mr. Gutierrez indicates that defense counsel did not contact him regarding Ramirez's "statement or the circumstances under which it was given" (SHCP Ex. 7 at 2), ex parte motions for funds filed by counsel indicate that the defense team made an unsuccessful attempt to contact Gutierrez on April 9, 1990 (SHCP Ex. 69A, 4/17/90 Binn's Invoice, at 9) and that

the defense team contacted Gutierrez on July 30, 1990, and drafted a letter to him on July 31, 1990. (SHCP Ex. 69B, 8/28/90 Binn's Invoice, at EMF Billing Statement at 1.)  Nothing suggests that the defense team spoke to Gutierrez about anything other than Ramirez.

Documentary evidence indicates that Petitioner's counsel investigated Ramirez and prepared for his testimony. (See SHCP Ex. 69A, Binn's 3/13/90 Invoice, at 2 [reviewed Ramirez's taped statement]; SHCP Ex. 69A, 6/6/90 EMF Billing Statement at 2 [reviewed reports for information on Ramirez]; 6/6/90 EMF Billing Statement at 5 and 8/28/90 EMF Billing Statement at 2 [contacted Paula Bolin regarding Ramirez]; 7/18/90 EMF Billing Statement at 3 and 8/28/90 EMF Billing Statement at 1 [prepared letter to Paula Bolin regarding Ramirez]; 8/28/90 EMF Billing Statement at 2-3 [attempted to locate Ramirez]; 8/28/90 EMF Billing Statement at 3 and 10/16/90 Billing Statement at 3 [contacted Frank Jones regarding Ramirez].)

Additionally, as discussed in claim K1, *post*, defense counsel was already aware of the only inducement made to Ramirez, i.e., that if he was uninvolved in the murders, he would be released without charges being filed.  (RT at 1861.)  Deputy Williamson testified at trial:

> We felt that Mr. Ramirez knew a lot more than what he was telling us, because he wasn't telling us anything, and that basically if by [sic] were able to determine that he was involved, we would file charges; if we were able to determine that he was not involved, we would not file charges. But there was no promises other than we were trying to conduct an investigation.

(Id.)  The California Supreme Court could reasonably have found that attorney Gutierrez allowed Ramirez to talk with authorities because Ramirez was uninvolved in the crime.  (Id.; see SHCP Ex. 13, Supplemental Report of Senior Deputy Nikkel dated 9/7/89.)  Gutierrez admits "[i]t appeared to me at the time that the deputies did not really feel [Ramirez] was involved, but had arrested him solely to obtain his cooperation." (SHCP Ex. 7, ¶ 4.)

Petitioner has not demonstrated on the evidentiary record that further interviewing of Ramirez, Gutierrez, or Deputies Nickel or Williamson, other than that already done by counsel, would have provided any new helpful or useful information.  The defense team was in possession of Ramirez's taped statement and the deputies' reports (see SHCP Ex. 69A, Binns' 3/13/90 Invoice, at 2; SHCP Ex. 13; RT at 1850-55, 1935-38), and Petitioner has failed to set forth what additional information would have been obtained had the defense team personally interviewed Deputies Nickel

and Williamson.

Moreover, Gutierrez had an attorney-client privilege with Ramirez which, absent waiver, would have prevented him from discussing any privileged information with Petitioner's counsel. (See, e.g., RT at 1937; SHCP Ex. 7 at 3.)  Since counsel were well-informed regarding the nature of the testimony to be presented by these individuals, and Petitioner presents only conjecture about alleged inducements which might be discovered had further investigation been done, his claim of ineffective assistance fails.  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001); LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998) (defense counsel need not personally conduct interviews where he had transcripts of prosecution interviews).

Nor has Petitioner argued or established prejudice from any defense counsel failure to conduct further interviews.  The "inducement" as noted above was presented during trial and argued during counsel's closing argument.  (RT at 1861, 1962, 2163, 2170-71.)

Given the noted substantial evidence against Petitioner, (see claims O, R, S, *post*), any additional inducements which might have been uncovered likely would not have resulted in a different outcome.  Bragg, 242 F.3d at 1088.  Ramirez was not the only witness to the crime.  Wilson also saw and heard Petitioner arguing with Huffstuttler before Petitioner killed Huffstuttler and Mincy, and then tried to kill him (Wilson).  Bolin, 18 Cal. 4th at 310; RT at 1739-43, 1765-71. Wilson's testimony corroborated Ramirez's testimony in many important respects.  Bolin, 18 Cal. 4th at 310-311.  Likewise, Ramirez corroborated the significant events to which Wilson testified.  (RT at 1922-25, 1950-58.)  Ramirez's testimony regarding various forensic aspects of the case, e.g., that Huffstuttler immediately fell to the ground after being shot only to be fired upon again and that Petitioner made the scene look like a drug deal gone bad, also was confirmed by other testimony and photographic and physical evidence.  (See RT at 1792-96, 1806-10, 1818-24, 1834-36, 1843-55, 1928-34, 1945-58, 1969-71, 1978-2013, 2015, 2017.)   Additionally, Patricia Islas, Ramirez's girlfriend, to whom Ramirez first spoke about the murders, testified to Ramirez's statements to her, which were consistent with his testimony at trial and to the above detectives.  (RT at 1969-73.)

*2)   Ramirez's Physical and Mental Condition at the Time of the Crime*

Petitioner faults defense counsel' for failing to investigate Ramirez's physical and mental

condition at the time of the crime.  (ECF No. 113 at 65-67.)  Petitioner claims that this would have led to discovery of various facts about Ramirez's vision and drug and alcohol use, (id.; RT 1912-19; SHCP Ex. 8), demonstrating that he was an incompetent and/or not credible witness.

Petitioner states Ramirez was an alcoholic (SHCP Ex. 3 at ¶ 7-8, Ex. 11 ¶ 25, Ex. 12 at ¶ 10-11) who had been drinking at the time of the crime and who may have had pre-existing memory and perception issues from a car accident the year before the crime.  (SHCP Ex. 9 at ¶ 28.)

However, the record reflects that defense counsel was aware of, and presented to the jury, evidence of Ramirez's vision problem.  (SHCP Ex. 13 at 6; RT at 1834-35, 1912-13.)  Similarly, defense counsel was aware that Ramirez had been drinking just prior to his arrest. (SHCP Ex. 13 at 3.)  Evidence of Ramirez's alleged alcoholism and drinking the day of the murders was presented to the jury.  (RT at 1726, 1850-51, 1917-19, 1942.)

Ramirez testified that, prior to the shooting, he had been drinking beer, (RT at 1918; see also RT at 1918, 1942), and that he felt the effects of the beer and was "feeling good."  (RT at 1918-19.) Deputy Williamson further testified that Ramirez had obviously been drinking when he was arrested shortly after the murders and was "an alcoholic type."  (RT at 1850:25-28.)

When counsel asked Ramirez if he got drunk the day after the murders, Ramirez testified that he did not remember.  (RT at 1962.)  The jury was presented with additional evidence that Ramirez had difficulty remembering events.  (RT at 1914, 1918, 1925, 1931, 1938-42, 1944, 1948-49, 1951, 1953, 1960; see also SHCP Ex. 13 at 2.)  Any failure to present cumulative evidence of Ramirez's alcoholism or inebriated status on the day of the murders could not have been prejudicial.

The record reflects that the jury also considered other evidence potentially impeaching Ramirez's testimony.  (See RT at 1850-1861 [inducements]; RT at 1956 [spontaneous denial of participation in the crimes]; RT at 1957 [admitted nervousness].)  Here, again, the failure to present cumulative evidence would not be prejudicial.

### 3)   *Impeachment with Inconsistent Statements*

Petitioner faults defense counsel for failing to present at the December 1990 trial Ramirez's inconsistent tape recorded statements given to Kern County Sheriff's deputies on September 6, 1989, several days after the crime, and at the March 1990 preliminary hearing.  (ECF No. 113 at 67-70.)

Petitioner claims that defense counsel did not develop Ramirez's alleged inconsistent statements whether Petitioner was surprised by the arrival of Huffstuttler and the victims at the cabin, i.e., Ramirez initially stated Huffstuffler told him and Bolin that Huffstuttler was going to stay with the victims for a couple days but this information was not adduced at trial (see SHCP Ex. 13 at 3-4; RT at 1944), thereby missing an opportunity to support the heat of passion defense.  However, Ramirez did testify at trial that, though he was unsure what was said between Petitioner and the victims at the bar (RT at 1944), and that Petitioner was cordial in greeting the group at the cabin (RT at 1733-34), Petitioner nonetheless told Huffstuttler upon the latter's arrival at the cabin that "bringing his friends up there" was a "no no" (RT at 1950).

Petitioner claims that defense counsel did not develop Ramirez's inconsistent statements whether he saw Huffstuttler and the other victims go down to the marijuana field, i.e., Ramirez initially stated he did not see where the victims went upon arriving at the cabin, but at trial he stated the victims went down to the marijuana patch.  (CT at 23-24, 36-39; RT 1922, 1949-52; see also SHCP Ex. 13 at 14, 16; CT at 23, 38-39, 41.)  However, there is no material inconsistency in this regard.  Ramirez's statement that he was unsure whether he could see victims Mincy and Wilson at the time Huffstuttler was shot is not inconsistent with his subsequent statements that Mincy and Wilson went to the marijuana field.  (Id.)

Petitioner claims that counsel did not develop Ramirez's inconsistent statements regarding what Huffstuttler said and did just prior to being shot, i.e., prior to and at trial Ramirez stated he heard Huffstuttler say something to Petitioner like "what are you going to do, shoot me?" or "shoot me then" or "why don't you shoot me" and raised his hands in the air (RT at 1922; CT at 25-26; SHCP Ex. 13 at 4, 6; see ECF No. 113 at 68), but at a point during his pretrial interview with Officer Nikkel the following colloquy took place:

Question: When [Petitioner] went in the house to get the gun, did he say he was gonna get the gun?
Answer: Um-hmm.  No …(?)

Question: Did he say anything?
Answer: No

Questions: To [Huffstuttler]?
Answer: (Unintelligible)

Question: And [Huffstutterl] said, "What are you gonna do, shoot me?"
Answer: I didn't really know.  I didn't hear him … nothing.

Question: He didn't say anything?  He didn't say yes to [Huffstutter] or anything?
Answer: No.

(SHCP Ex. 13 at 16.)   However, Ramirez's noted answer to Nikkel's question appears ambiguous when taken in the context of Nikkel's questions about whether Petitioner said anything prior to shooting Huffstuttler.   Ramirez may have been confused and his statement that he did not "hear … nothing" was meant to be a response to Nikkel's questions whether Petitioner said anything.   Even if the response referred to Huffstuttler, it is incomplete and uncertain as to what Ramirez meant to say.

Because Ramirez's noted statements to authorities prior to and at trial were not necessarily inconsistent there was nothing for defense counsel to impeach Ramirez with at trial.  (RT at 1922-23; CT 25-26; SHCP Ex. 13 at 4-6, 16.)

Petitioner claims that counsel did not develop Ramirez's inconsistent statements regarding whether Ramirez knew where Petitioner kept the rifle used in the crime, i.e., prior to trial Ramirez denied knowing where Petitioner kept the rifle (CT at 49; SHCP Ex. 13 at 5), but at trial Ramirez testified that Petitioner kept the rifle at his bedside (RT at 1955-56).  However, Ramirez's pretrial statements reflected that he did not know where the rifle came from immediately prior to the shooting (CT at 49) but that he previously had seen the rifle "in the cabin" (id.) and that he thought the rifle was kept "either in the lounge, or in – inside the house."  (SHCP Ex. 13 at 5.)

Here again, the state supreme court could reasonably have found no inconsistency.  Ramirez's initial statement that he did not know where the rifle was on the day before the shooting is not inconsistent with his later statement that Petitioner kept the rifle at his bedside.   (Id.)   Ramirez's testimony regarding where the gun was also helped Petitioner because it supported Rebecca Ward's testimony that the guns were kept there only to kill rattlesnakes.   (RT at 1668.)   It also supported Petitioner's alternate defense that Ramirez knew where the gun was and could describe it because Ramirez actually participated in the murders.   (RT at 1955, 2167.)

Petitioner claims that counsel did not develop Ramirez's allegedly inconsistent statements regarding whether he saw Petitioner break bottles of hot sauce to make the scene look like a "bad

dope deal", i.e., that Ramirez did not mention the bottles during his testimony at preliminary hearing (CT 31) or early in his interview with detective Nikkel (SHCP Ex. 13 at 7), but later in his interview with Nikkel stated that Petitioner broke bottles (id. at 16) and at trial Ramirez testified that Petitioner "broke bottles and poured stuff on them." (RT at 1929.) However, these statements are not necessarily inconsistent. Any conflict between Ramirez's testimony and his pretrial statements in this subject area was speculative, partly because different questions were asked at different times. The California Supreme Court reasonably could have found no material conflict. Where a witness is thoroughly examined, failure to impeach with minor inconsistencies between preliminary hearing and trial testimony does not establish ineffectiveness because "the decision to not use everything is preeminently a tactical decision best made by counsel." Jaiceris, 290 F. Supp. 2d at 1082.

Petitioner argues that Ramirez gave conflicting testimony regarding whether Petitioner had gone in the cabin immediately before shooting Huffstuttler. Ramirez testified prior to trial that while Petitioner and Huffstuffler were arguing Petitioner went into the cabin and came out and he (Ramirez) then heard a shot. (SHCP Ex. 13 at 4; CT 19, 25, 41; RT 1923, 1950-52.) Ramirez initially confirmed this at trial, testifying that "[Petitioner] walked in, came back out and shot [Huffstuttler]." (RT at 1950:16.) But then Ramirez responded to a question whether Petitioner went into the cabin before shooting Huffstuttler by stating "I don't remember." (RT 1952:2-4.) The California Supreme Court could reasonably have concluded counsel's failure to follow-up on this inconsistency to be a matter of trial tactics. As noted, prior to and at trial Ramirez testified that Petitioner went into and came out of the cabin prior to shooting Huffstutter. His statement that he could not remember could be seen as transient and not necessarily inconsistent with his prior statements. Moreover, counsel could have determined that exploring the inconsistency might have led to further testimony contrary to the defense theory that the killing of Huffstuttler occurred in the cabin during an argument and was manslaughter, not murder. (ECF No. 113 at 79.) The mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice. Ferreira-Alameda, 815 F.2d at 1254.

Petitioner argues that Ramirez gave conflicting testimony regarding his statement that Huffstuttler had his "hands raised up out from his side" just prior to being shot, i.e., prior to trial

Ramirez stated that Huffstuttler had his hands raised prior to being shot (SHCP Ex. 13 at 6), but did not so testify at trial (see RT at 1922-23, 1950-52).  Trial tactics were seemingly implicated here as well.  If Petitioner wanted to emphasize Ramirez's intoxication, poor vision and memory, getting Ramirez to describe specific movements might not have been helpful to the defense, especially given the absence of evidence that Huffstuttler ever had any weapons that day or fought Petitioner.  (See RT at 1689-90, 1707, 1731, 1740-43, 1747, 1922-24, 1930, 1950-52, 1958.)  Further, the California Supreme Court could reasonably have concluded that defense counsel was in a better position by simply arguing that Huffstuttler might have made threatening gestures, supporting their heat of passion defense, than allowing Ramirez to clarify that Huffstuttler did not do so.

Finally, an additional explanation for any alleged inconsistency regarding recorded statements made on September 6, 1989 (SHCP Ex. 13 at 1), is that the batteries in the tape recorder ran down during the interview and only a portion of the September 6, 1989 interview was taped.  This could suggest that untaped portions of the interview might have resolved apparent inconsistencies.

### 4)      Impeachment with Prior Misdemeanor Convictions

Petitioner contends that his counsel rendered deficient performance by failing to impeach Ramirez with prior misdemeanor convictions for theft (1965 and 1967) and for resisting, delaying, or obstructing an officer (1973), convictions defense counsel presumptively knew about.  (ECF No. 113 at 70; SHCP Ex. 14.)

Here, again, trial tactics could reasonably have dictated counsel not pursue impeachment given the nature of these offenses, their age, and potential difficulties in garnering supporting evidence and witnesses to prove these crimes.  People v. Wheeler, 4 Cal. 4th 284, 297-301 (1992) (misdemeanor conviction is inadmissible hearsay).

### 5)      No Prejudice

Petitioner claims that had Ramirez been impeached with the noted evidence in this claim, the jury might have discounted Ramirez's testimony which was key to the prosecution's theory that the killing of Huffstuttler was first degree murder; and instead credited statements of the other eye witness, Mt. Wilson, which Petitioner  contends support the defense theory of voluntary manslaughter arising from a scuffle between Petitioner and Huffstuttler or Petitioner protecting himself upon being

threatened by Huffstuffler.

Even if counsel was deficient as alleged, for the reasons discussed above and those discussed in claim I3, *post*, the California Supreme Court could reasonably have found no <u>Strickland</u> prejudice arising from claim I2. Moreover, defense counsel questioned Ramirez about the circumstances under which he gave his statement to the police, his awareness of Petitioner's marijuana venture, his alcohol consumption on the day of the crimes, his poor memory of and inability to perceive the details of the crimes, and his apparent lack of participation in the crimes. (RT at 1935-62.) The jury was able to consider this information. Petitioner has not demonstrated prejudice under claim I2 by counsel's failure to further investigate and present evidence impeaching eye witness Ramirez. <u>See</u> <u>e.g.</u>, <u>Burger v. Kemp</u>, 483 U.S. 776, 795 (1987) (failure to pursue fruitless investigation not unreasonable).

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different. <u>Strickland</u>, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. <u>See</u> 28 U.S.C. § 2254(d).

Claim I2 is denied.

### d.    <u>Review of Claim I3</u>

Petitioner faults counsel's failure to impeach victim witness Wilson regarding his alleged inconsistent statements about the shooting of Huffstuttler. (ECF No. 113 at 71-74.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which the California Supreme Court summarily rejected on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner claims that Wilson's trial testimony was inconsistent with his pretrial statements on the issue of whether Huffstuttler was shot in the cabin. Petitioner argues that in his pretrial statements Wilson told authorities that Petitioner and Huffstuttler entered the cabin, but later testified

that it sounded as if one or both entered the cabin, but that he could not see the cabin.  (SHCP Ex. 6 at 7, 31; RT 1740-42; RT 1764-69; RT 1809.)

Petitioner claims prejudice in that impeachment on this issue would have called into question Ramirez's credibility, and supported Petitioner's argument for manslaughter, creating a reasonable likelihood of a totally different outcome.

The Court is not persuaded by this claim.  Wilson's pretrial statements were not inconsistent with, but rather could be seen as clarifying of, his subsequent testimony. Wilson stated at the preliminary hearing and at trial that he could not see the entrance to the cabin.  Deputy Layman, who had written in his police report that "Wilson said [Huffstuttler] and [Petitioner] went into the residence," clarified during his trial testimony that Wilson had told him that he could not see the front of the cabin.  (RT at 1809-10.)

Moreover, even though Wilson testified at trial that he did not hear scuffling, (RT at 1767-68), but had told Kern County Deputy Layman that he had (RT at 1809-10), the state supreme court could reasonably have found no inconsistency.  The term "scuffle" could refer to a verbal argument as suggested during the prosecution's closing argument.  (RT 2154-55.)  Wilson's testimony at trial was consistent with an ongoing argument of some sort between Petitioner and Huffstuttler.  (RT at 1767-68.)  Deputy Layman might have used "scuffle" to describe the argument, whether verbal or physical.

Accordingly, the state supreme court could reasonably have determined that Wilson's statements on this matter were substantially consistent and that impeachment would not have been successful.  In that Wilson's statements were not clearly inconsistent, defense counsel was not necessarily deficient for failing to impeach on these points.  Given Wilson's consistent testimony that he could not see the cabin, Wilson could have explained any alleged inconsistencies between what Deputy Layman had reported and what Wilson had told him.  Defense counsel could have determined that the alleged inconsistencies were explainable based on the circumstances in the record and thus not a basis for impeachment.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome

of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

Therefore, the California Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim I3 is denied.

**e.**     **Review of Claim I4**

In this claim, Petitioner alleges defense counsel was ineffective by failing to investigate or challenge the testimony of Rebecca Ward, victim Huffstuttler's girlfriend, who had previously lived at the cabin but was not present during the murders.  (ECF No. 113 at 74-75.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court (SHCP at 113-15), which was summarily denied on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner alleges that defense counsel failed to interview Ward and impeach her regarding how she and others were involved in the marijuana operation, and regarding prior threats of violence by Huffstuttler against Petitioner and Huffstuttler's financial interest in the marijuana operation.  He claims these failures by defense counsel were not tactical because her testimony damaged Petitioner's manslaughter defense.

Ward testified regarding the weapons kept at the cabin.  (RT at 1660-69, 2143.)  She also testified regarding Petitioner's partnership with Huffstuttler in the marijuana growing operation.  (RT at 1660-69, 2142-43.)  Petitioner claims the prosecutor argued that Petitioner had a financial motive for killing Huffstuttler, undermining the defense manslaughter theory.

Petitioner claims that defense counsel should have asked Ward on cross-examination whether she had a financial interest in the marijuana farm or whether she used marijuana or any other drugs. But even if Petitioner could demonstrate the relevance of such questions, the California Supreme Court reasonably could have found it unlikely Ward would take the stand and inculpate herself in this fashion.  That court could also have found trial tactics in play.  Should Ward have responded negatively to such questions, it could have bolstered her credibility.  Defense counsel had

investigated Ward and presumptively aware that she had admitted knowledge of the marijuana crop and helped to water it on occasion, (RT at 1664), but stated that the marijuana venture was between Petitioner and Huffstuttler.  (RT at 1667; SHCP, Ex. 18b, 9/7/89 Nikkel Supp. Report at 13.)

Petitioner also claims that defense counsel failed to investigate and to interview Ward prior to the trial, thereby missing crucial information.  However, the record belies these allegations.  (See SHCP Ex. 69B, 10/16/90 EMF Billing Statement at 3 [contacted Ward in Pineville Oregon]; see also 3/20/90 EMF Billing Statement at 5 [contacted Barbara Ward regarding Rebecca Ward]; 4/26/90 EMF Billing Statement at 4 [searched court files for information regarding Ward]; 6/6/90 EMF Billing Statement at 2 [reviewed discovery regarding Ward]; 8/28/90 EMF Billing Statement at 6 [attempted to locate and serve subpoena on Ward]; 10/16/90 EMF Billing Statement at 2-3, 5 [attempted to locate Ward, attempted to contact Ward's ex-husband, spoke with bar owner regarding Ward].)

Even if counsel should have done more to obtain information from Ward prior to trial, nothing supports Petitioner's theory that Ward would have provided information favorable to the defense. Petitioner cites to the declaration of Paula Bolin and claims that Ward might have been able to provide information that Jerry Halfacre had a financial interest in the marijuana plantation.  (See SHCP Ex. 9 at ¶ 10.)  But nowhere in Paula Bolin's declaration does she indicate Ward or her boyfriend, Huffstuttler, was aware of any alleged financial interest of Halfacre.  (Id.)  Petitioner has not demonstrated that defense counsel reasonably could have expected to get this information from Ward.

Petitioner suggests that Ward could have provided information helpful to a self-defense theory relating to an alleged fight between Petitioner and Huffstuttler that occurred shortly before the shootings.  It appears that, when authorities interviewed Ward shortly after the shootings, she referenced a confrontation of some sort between Petitioner and Huffstuttler:

> [Ward] said one time, when [Ward, Petitioner, and Huffstuttler] were at the cabin, [Huffstuttler] had gone out to get their pillows out of the van. She said when [Huffstuttler] closed the door to the van, he slammed it. She said that [Petitioner] came into the bedroom where they were at and stuck the .45 into [Huffstuttler's] mouth, telling him that he should not slam the door to his van. She said she and two (2) other people, who were friends of [Petitioner's], named Sandra and Dennis, from Covina,

pulled [Petitioner] off of [Huffstuttler].

(SHCP, Ex. 18b, 9/7/89 Nikkel Supp. Report at 13.)

However, the California Supreme Court could reasonably have determined that defense counsel may have been tactically motivated in not further investigating Ward's knowledge of this confrontation. The jury was unlikely to believe that Petitioner feared Huffstuttler as a result of this incident, (SHCP Ex. 15 at ¶ 8), but was more likely to focus on Petitioner's violent temper and display of the weapon. Sondra Hooten, who apparently witnessed the fight, does not mention Ward was present during the fight, (SHCP Ex. 15 at ¶ 7-8), suggesting a basis to discount such testimony by Ward. Additionally, it appears that Ward was a minor witness given the testimony of Ramirez and Wilson, eyewitnesses to the shooting of Huffstuttler.

Relying upon a remark from the prosecutor's closing argument (RT at 2142-43), Petitioner also asserts that his counsel was ineffective because they failed to question Ward about her drug use, which was allegedly apparent during her testimony. The Court finds the allegation unavailing. During closing argument, the prosecutor made the following statement about Ward: "Becky probably uses drugs. We don't have any evidence of that other than what you could see on the witness stand, and I think you could all see that she was not all there." (RT at 2142-43.) However, the California Supreme Court could reasonably have found that the prosecutor's statement was not evidence that Ward was intoxicated when testifying, but rather a reference to how drug use had affected Ward and her credibility as a witness: her demeanor, appearance, and ability to communicate and recall.

Petitioner does not cite to any evidence supporting the contention that Ward was intoxicated while testifying. Even if Ward's demeanor did suggest obvious intoxication, defense counsel might have made a tactical decision to not question her on the subject, reserving this "obvious" information about her demeanor for argument, only to have the prosecutor mention it first.

Even if counsel did unreasonably fail to investigate or challenge Ward's testimony, Petitioner has not demonstrated prejudice. Any further information from Ward about the alleged confrontation between Petitioner and Huffstuttler could be seen as duplicative of Ms. Hooten's testimony regarding that confrontation. See e.g., Foster v. Delo, 39 F.3d 873, 880 (8th Cir. 1994) (no ineffectiveness for failure to investigate minor witness whose testimony was consistent with other witnesses).

1   Additionally, the substantial evidence cited by the prosecution in closing could reasonably have

2   supported the prosecution theory that Petitioner had murdered Huffstuttler, not due to fear of

3   Huffstuttler or self-defense, but because Huffstuttler had brought strangers to the marijuana farm.

4   (RT at 2154:11-14.)

5        For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish

6   that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

7   an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome

8   of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

9        It does not appear that the California Supreme Court's rejection of the claim was contrary to,

10  or an unreasonable application of, clearly established federal law, as determined by the Supreme

11  Court, or that the state court's ruling was based on an unreasonable determination of the facts in light

12  of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

13       Claim I4 is denied.

14         **f.**      **Review of Claim I5**

15       In this claim, Petitioner alleges defense counsel was ineffective by failing to adequately

16  investigate or impeach the testimony of Patricia Islas, Ramirez's girlfriend, who gave testimony

17  corroborating that of Ramirez.  (ECF No. 113 at 75-76.)

18       Petitioner raised this same claim in his petition for writ of habeas corpus in the California

19  Supreme Court, and in his direct appeal, both of which were denied on the merits.  (CSC Order Den.

20  Pet. Habeas Corpus; Bolin, 18 Cal. 4th at 333.)

21       Petitioner alleges that counsel or defense investigator Binns "attempted to question Islas prior

22  to trial without success."  (ECF No. 113 at 75-76.)  Petitioner concludes this interview was

23  unsuccessful because investigator Binns was incompetent.  (ECF No. 113 at 76.)  Petitioner also

24  alleges that Islas was a heavy drinker and drug user (id.; SHCP Ex's 3, 11, 12) whose competency

25  and credibility could have been challenged on such basis.  He claims her testimony supported that of

26  Ramirez and was prejudicial, and that impeaching her would have significantly supported his

27  voluntary manslaughter defense.

28       The California Supreme Court considered and rejected this claim on direct appeal, noting that:

Defendant contends counsel's investigation and review of discovery were inadequate because he failed to interview Patricia Islas or to anticipate her testimony about statements made by Ramirez. At trial, counsel made a hearsay objection to this testimony and also complained the statements had not been disclosed on discovery. In response, the prosecutor noted they were contained in a police report. On that basis, defendant asserts counsel's review and preparation must have been deficient. The record reflects, however, that the "discovery" objection was predicated on a lack of detail in the report regarding Ramirez's statements, implying counsel had in fact reviewed what was provided. The record also suggests a defense investigator contacted Islas prior to trial. More importantly, even if he did not, defendant fails to establish additional investigation would have produced exculpatory or impeachment evidence.

Bolin, 18 Cal. 4th at 333.

The record reflects that Islas did speak to a member of the defense team, but it appears that she did not speak about the events she testified to at trial.  (RT at 1972-73; SHCP Ex. 69B, 6/6/90 EMF Billing Statement at 2, 4; Bolin, 18 Cal. 4th at 333.)  Petitioner does not state what favorable or exculpatory facts Islas would have provided had she been interviewed.  Petitioner suggests, but points to no evidence that Islas would have told counsel that she abused drugs and "thus might not have accurately recalled the events to which she testified."  (ECF No. 113 at 76.)  See U.S. v. Schaflander, 743 F.2d 714, 721 (1984) (claim of failure to interview witness rejected because the defendant did "not produce[] affidavits or sworn statements from . . . the witness[] or from counsel.").

Petitioner cites to declarations from Joyce Sophie Balsamico (SHCP Ex. 3 at 2) stating that "I also knew Eloy's girlfriend, Pat Islas. Pat drank a lot, too"; and from Richard Brogden (SHCP Ex. 11 at 7-8) stating that Islas was a "very heavy drinker" and "did a lot of drugs.  Pat used marijuana, cocaine, and various narcotics"; and from Richard Balsamico (SHCP Ex. 12 at 2-3) stating that Islas was a "drinker."

However, none of these declarations suggests Islas was abusing drugs or alcohol at or near the time period that she testified, or that she had difficulty remembering things.  Her interview with Detective Nikkel, which was available to defense counsel (SHCP Ex 18b, 9/7/89 Nikkel Supp. Report at 7-8), and her testimony at trial (RT at 1963-73) suggest that Islas had no trouble remembering details about the relevant information she knew about the crime.  Moreover, one of Petitioner's exhibits corroborates Islas's testimony that Petitioner went to her house the day after the murders. (SHCP Ex. 15 at 3.)

Petitioner cannot show prejudice relating to this claim. Islas's testimony was minor given the eyewitness testimony of Ramirez and Wilson, and corroborated only in general terms Ramirez's testimony that Petitioner had murdered Huffstuttler because he had brought strangers to his marijuana farm. (RT at 1963-73.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different. Strickland, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim I5 is denied.

### g.      Review of Claim I6

Petitioner claims that defense counsel did not investigate Jerry Halfacre, who had been living with Petitioner's daughter, Paula Bolin, was the father of Paula's child, Ashley, and who provided a threatening letter he received from Petitioner to authorities, through his probation officer Georgia O'Connor, that was used by the prosecution in aggravation as alleged in claim R, post. (ECF No. 113 at 76-77.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner faults counsel's failure to interview Halfacre about various matters, claiming that, if they had done so, they "would have learned that Halfacre was an active partner in the marijuana venture himself and perhaps in the crime itself" as suggested by Paula Bolin. (ECF No. 113 at 77:12-14; see also SHCP Ex. 9 at ¶ 10-12; SHCP Ex. 16.)

The record is uncertain regarding whether counsel interviewed Halfacre. It appears that defense investigators contacted Halfacre (SHCP Ex. 18b, 4/26/90 EMF Billing Statement at 4, 7), and

later attempted further contact with him.  (6/6/90 EMF Billing Statement at 4.)  Petitioner has not demonstrated that counsel failed to interview Halfacre.  See e.g., Schaflander, 743 F.2d at 721 (without the necessary factual showing, defendant's allegations remain mere conclusory statements.)

Counsel could reasonably have discounted Paula Bolin's sworn and unsworn statements that Halfacre had a business interest in the marijuana farm (SHCP Ex. 9 at ¶¶ 10-11) as well as her suggestion that Halfacre may have been at the cabin on the day of the shooting because "the day of the shooting [she] was not with Jerry [Halfacre]" (SHCP Ex. 9 at ¶ 12).  Significantly, Paula was a self-acknowledged drug user who was then estranged from Halfacre.  (RT at 2490-93; SHCP Ex. 9 at 1-5; SHCP Ex. 16 at 2.)

Counsel apparently were aware of the contents of Deputy Williamson's September 7, 1989 interview of Halfacre.  (See SHCP Ex. 18b, 3/20/90 EMF Billing Statement at 6 indicating that defense counsel investigator reviewed the tape.)  Deputy Williamson also testified at trial as to details of this interview.  (RT at 1836-37.)  For instance, counsel was presumably aware that Halfacre, through his probation officer, assisted police in locating Petitioner's van, used to flee the scene of the crime.  Halfacre also turned over to authorities the threatening letter written to him by Petitioner which was used in the penalty phase.  (RT at 1868, 2442-44; SHCP Ex. 18b at 8-10; SHCP Ex. 6 at 33-35; Bolin, 18 Cal. 4th at 336 & n.11.)  Although Halfacre did not testify at trial, this information came in through the testimony of other witnesses.  (RT at 1836-37, 1867-68, 2442-44.)

Halfacre was on probation around the time of trial.  (RT at 1866.)  It is likely that he would not have admitted any of these allegations for fear of facing a probation violation.  Paula's conjecture that Halfacre might have been involved in the crimes reasonably could be accorded little if any weight.  The weight of evidence was to the contrary.  In his interview with law enforcement, Halfacre stated that he had not been up to the cabin where the murders had occurred in about nine months. (SHCP Ex. 18b, 9/7/89 Halfacre Interview at 5.)

Given the foregoing and Halfacre's seemingly poor relationship with his former common law wife, Petitioner's daughter Paula, counsel could have determined that they had enough information about Halfacre and that additional information would not have been helpful to their theory of defense. (See e.g., SHCP Ex. 6 at 33-35); United States v. Farr, 297 F.3d 651, 658 (7th Cir. 2002) (counsel "is

not obligated to . . . personally investigate every conceivable lead"). Moreover, Halfacre indicated in his interview with police that he did not "want to be involved," (SHCP Ex. 18b 9/7/89 interview with Jerry Halfacre, at 6), suggesting he would not have cooperated with defense counsel. Given the likelihood that Halfacre would have provided only unfavorable information, counsel could have made a reasonable tactical decision not to pursue an interview of Halfacre.

Additionally, Petitioner cannot show prejudice relating to this claim. Even if Petitioner could have shown that Halfacre had an interest in the marijuana farm, it likely would not have impacted the verdict. The prosecution did not argue that Petitioner's motive for killing Huffstuttler was to avoid profit sharing, but that rather the motive was Huffstuttler's showing the marijuana to the victims, (RT at 2152-54), as otherwise apparent in the record. (See e.g., RT at 2492-93, 2578.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability of a different outcome. Strickland, 466 U.S., at 687-98.

It does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim I6 is denied.

## h.   Review of Claim I7

Petitioner claims defense counsel did not investigate or interview other possible guilt phase witnesses who may have been involved in the crime. (ECF No. 113 at 77-79.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner argues that defense counsel did not investigate or interview other possible guilt phase witnesses, friends of Petitioner, who may have been involved in the crime, specifically Mark Daser, Frank Jones, Ulysses Williams, and Brent Wilson.

### 1)     Mark Daser

Petitioner claims that he described the crime and how he acted in self-defense to Daser, telling him that Huffstuttler had pulled a knife on him and stabbed him before Petitioner shot him.  (ECF No. 113 at 78; SHCP Ex. 4.)  Petitioner alleges that he also showed fresh wounds to Daser.  (Id.)

The record reflects that Daser was contacted by the defense team.  (SHCP Ex. 4 at ¶ 19; SHCP Ex. 69B, 4/26/90 EMF Billing Statement at 9; 8/28/90 EMF Billing Statement at 2.)  Counsel was also aware of Daser's statement to local law enforcement.  (SHCP Ex. 18b, Supplemental Report of Deputy Williamson dated 1/29/90.)  Defense counsel clearly considered calling Daser as a witness but made a reasonable tactical decision not to, determining it would be "counterproductive" given the opinion of Dr. Markman regarding the scars:

> [A]nd we felt if Dr. [Markman] after two hours of talking to [Petitioner] and seeing him and felt that [the scars] went the wrong way, that that would look like fabricated evidence, and that was my opinion.

(RT at 2289.)  The record reflects that counsel contacted "Dr. Markowitz (sic)," who interviewed Petitioner and inspected the wounds.  (RT at 2288-89.)  Petitioner alleges that Dr. Markowitz was actually Dr. Ronald Markman, the psychiatrist who evaluated Petitioner for trial competency. (ECF No. 113 at 111 n.22.)  As noted, Dr. Markman advised defense counsel that the wounds "went the wrong way" (RT at 2289) i.e., appeared self-inflicted rather than inflicted by Huffstuttler as Petitioner suggested.  (SHCP Ex. 20 at 3.)  Petitioner's subsequent argument that Dr. Markman was unqualified to opine on the nature of the scars appears unsupported in the record.  See e.g., Affinito v. Hendricks, 366 F.3d 252, 258-59 (3d Cir. 2004) (where defendant has failed to show that the expert selected is unqualified, selection of expert is a matter of strategy and tactics).

Furthermore, the prosecutor argued at closing that no witness saw Huffstuttler with a knife and no blood was on the knife found at the crime scene.  (RT at 2175-76.)  Witness Ramirez suggested that Petitioner went to see Daser to get a "solid alibi."  (SHCP Ex. 13 at 9.)  Significantly, witness Wilson did not testify as to any limp or injury to Petitioner following the shooting of Huffstuttler.  (RT at 1770-71.)

Defense counsel also considered Daser's statements regarding what Petitioner had told him about the alleged knife fight to be inadmissible hearsay.  (RT at 2289.)  Furthermore Daser's

credibility was likely in issue.  Mr. Daser was "one of [Petitioner's] closest friends" (SHCP Ex. 4 at 1) and the knife fight statements, helpful to Petitioner, were contrary to the noted testimony of the witnesses present during the crimes, and unsupported by Daser's own statements to Deputy Williamson shortly after the crimes.  (SHCP Ex. 18b, 1/29/90 Williamson Supp. Report at 2.)

Given the foregoing, it is unlikely that Petitioner could have suffered prejudice from his counsel's failure to further investigate Daser and present his testimony about the knife fight.  The California Supreme Court could reasonably have determined that defense counsel made a tactical choice not to further investigate the knife fight scenario and call Daser about the knife wounds.

### 2)  Frank Jones

Petitioner next argues that defense counsel failed to interview Jones, another friend of Petitioner who allegedly saw him after the crime and before he fled California for Chicago.  (ECF No. 113 at 78:2-4.)  He claims that Jones had knowledge of Halfacre's involvement in the marijuana farm and could have provided impeachment about Ramirez.  (ECF No. 113 at 78:9-11.)  However, Petitioner does not specify the nature of Halfacre's involvement nor of Jones' knowledge thereof.  In any event, as explained in claim I6, *ante*, even if Halfacre had also been Petitioner's partner in the marijuana venture, Halfacre's involvement was not relevant to the "voluntary manslaughter" defense theory.

Moreover, the record reflects that Jones was contacted by the defense team; he was interviewed numerous times both in person and over the telephone.  (SHCP Ex. 69B, 3/20/90 EMF Billing Statement at 5; 6/6/90 EMF Billing Statement at 4; 8/28/90 EMF Billing Statement at 3; see also SHCP Ex. 24 at 11.)  Defense counsel also had a police report concerning an interview of Jones. (SHCP Ex. 6 at 32-33.)

Petitioner does not specify what impeachment information Jones had about Ramirez. Ramirez's taped interview with Deputy Nikkel indicates that Jones could have corroborated Ramirez in much the same way that Islas did. (SHCP Ex. 13 at 10-12.)  "Speculation that [a] missing witness[] would have been helpful. . . . is insufficient to carry the burden of a habeas corpus petitioner." Johnson v. Alabama, 256 F.3d 1156, 1187 (11th Cir. 2001) (quoting Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985)).  Petitioner does not explain what other information Jones had that would

1   have assisted the defense.  Jaiceris, 290 F. Supp. 2d at 1081-82 (finding no ineffectiveness or

2   prejudice for counsel's failure to call various witnesses where the "[p]etitioner's explanation is

3   incoherent as to who they were, where they could be found, and what they could testify to, and lacks

4   any indication that he informed his counsel any more clearly about them than he did the court.").

5        Given the foregoing, it is unlikely that Petitioner could have suffered prejudice from his

6   counsel's failure to further investigate Jones and present his testimony regarding Halfacre and

7   Ramirez.  The California Supreme Court could reasonably have determined that defense counsel

8   made a tactical choice not to further investigate these allegations.

9                            *3)*    ***Ulysses Williams***

10        Petitioner argues that defense counsel were ineffective in their investigation of Ulysses

11  Williams, a Kern County Sheriff's Department narcotics officer who "might have been involved in

12  the crime."  (ECF No. 113 at 78; see also RT at 2279-80.)

13        It appears that defense counsel was aware of Petitioner's belated contention that Williams was

14  involved in the crime and tried to locate Williams without success.  (RT at 2288.)

15        Petitioner does not state what information Williams might have provided and how he was

16  prejudiced without it.  As noted, "speculation that [a] missing witness[] would have been helpful. . . .

17  is insufficient to carry the burden of a habeas corpus petitioner."  Johnson, 256 F.3d at 1186-87.

18  Petitioner does not explain how information Williams had would have assisted the defense.  See

19  Jaiceris, 290 F. Supp. 2d at 1081-82.

20        Given the foregoing, it is unlikely that Petitioner could have suffered prejudice from his

21  counsel's failure to further investigate Williams and present his testimony regarding the shootings.

22  The California Supreme Court could reasonably have determined that defense counsel made a tactical

23  choice not to further investigate these allegations.

24                            *4)*    ***Brent Wilson***

25        Petitioner argues that defense counsel was deficient for failing to locate or interview Brent

26  Wilson, a man allegedly mentioned in police reports obtained by trial counsel as being near the crime

27  scene and arrested for "suspicious activities."  (ECF No. 113 at 78.)

28        The record indicates that defense counsel attempted to locate and interview Wilson based on

information in discovery provided by Kern County law enforcement, but was unsuccessful.  (See SHCP Ex. 69B 10/16/90 EMF Billing Statement at 6; 2/8/91 EMF Billing Statement at 1-2; 10/16/90 EMF Billing Statement at 2.)  Petitioner suggests trial counsel was deficient in this regard, but does not point to facts showing counsel's efforts were unreasonable, or what evidence, if any, Brent Wilson could or would have provided about the murders.

Given the foregoing, it is unlikely that Petitioner could have suffered prejudice from his counsel's failure to further investigate Brent Wilson and present his testimony regarding the crimes.  The California Supreme Court could reasonably have determined that defense counsel made a tactical choice not to further investigate these allegations.

### 5)    *Conclusions*

Accordingly, the California Supreme Court was not unreasonable in finding that defense counsel was not deficient in foregoing further investigation of Daser, Jones, Williams and Brent Wilson.  Petitioner was not prejudiced by defense counsel's doing so.  For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S., at 687-98.

In sum, it does not appear that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim I7 is denied.

### i.    **Review of Claims I8 and I9**

Petitioner in these next claims alleges that defense counsel, apart from visiting the crime scene, did not conduct any significant forensic investigation; failed to consult any forensic expert in order to show the shooting of Huffstuttler was in the heat of passion or self-defense, and that Mincy was not running away from the shooter when he was shot; and failed to challenge the qualifications of and inadequately cross-examined criminologist Gregory Laskowski regarding the Huffstuttler and

Mincy shootings.  (ECF No. 113 at 79-83.)   He supports this argument with the habeas declaration of criminologist Peter Barnett.  (See SHCP Ex. 17.)

Petitioner raised these same claims in his petition for writ of habeas corpus in the California Supreme Court, which were summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

### 1)      *Crime Scene Photographs*

Petitioner claims generally that defense counsel failed to obtain a complete set of crime scene photographs taken by the Kern County Sheriff's Department during the post-crime investigation. (ECF No. 113 at 79.)  He claims this was crucial because, by the time counsel was appointed, the crime scene had been altered by the weather, the media, and vandalism, and might have yielded evidence that the shootings occurred at different times and with different weapons, suggesting more than one shooter was involved.  (ECF No. 113 at 82.)

However, Petitioner does not demonstrate, by citation to facts in the record, that the defense had less than all of the crime scene photographs taken by the Kern County Sheriff's Department.  Nor does he explain or make a proffer as to what photographs were missing and how they might have supported his defense.

The state supreme court reasonably could have rejected Petitioner's unsupported suggestion that unspecified crime scene photographs might have helped the defense in unspecified ways.  See e.g., Wacht v. Cardwell, 604 F.2d 1245, 1247 (9th Cir. 1979) (petitioner must demonstrate entitlement to habeas relief through specific allegations that "state facts that point to a 'real possibility of constitutional error'").

### 2)      *Failure to Consult a Forensic Expert*

Petitioner faults defense counsel for failure to consult with a forensic expert.

The state supreme court denied this claim on direct appeal, stating that:

> Defendant faults counsel's . . .  failure to call defense experts to counter the ballistics and blood-spatter evidence presented by the prosecution.) ... Defendant identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses [or examination of defense experts] and that would have produced a more favorable result at trial. [¶] ... Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations] We cannot evaluate

alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation." [Citation]  Whether to call certain witnesses is also a matter of trial tactics, unless the decision results from unreasonable failure to investigate. [Citation] The record does not establish defense experts would have provided exculpatory evidence if called, and we decline to speculate in that regard as well.

Bolin, 18 Cal. 4th at 333-35.

Petitioner claims that "[a] qualified forensic expert would have cast significant doubt on the prosecution's reconstruction of the crime, that Huffstuttler was shot outside the cabin where he was found and that Mincy was shot while running from the shooter [SHCP Ex.'s 17, 18; RT at 2054-59], and would have provided evidence to support the defense theory that the killing of Vance Huffstuttler occurred in the cabin during an argument, and was manslaughter, not murder." (ECF No. 113 at 79.)

*Mr. Huffstuttler*

Petitioner, pointing to the declaration of his habeas criminalist, Mr. Barnett, faults defense counsel for failing to retain a forensic expert who could have testified that the prosecution's forensic case supporting first degree murder was insubstantial and inconclusive.  (ECF No. 113 at 81:22-24.) Barnett concludes Huffstuttler may have been shot once during an argument with Petitioner inside the cabin, and then dragged outside over the dirt and later shot three more times with the intent to show a "drug deal that had gone bad."  (ECF No. 113 at 81:16-21; SHCP Ex. 17.)

Barnett notes that Huffstuffler was wearing only socks which had no dirt on them, but only hot sauce (ECF No. 113 at ¶ 324; SHCP Ex. 17); the dirt found on Huffstuttler's pants and shirt suggests he was dragged to where he was found (id.); the trajectory of the bullets suggests three of the four shots were fired from the same angle causing Barnett to conclude that one shot was fired while Huffstuttler was standing in the cabin and three were fired after he had fallen to the ground (id.);  the .45 caliber bullet and pistol found near Huffstuttler's body were not linked to the murders by ballistics analysis or fingerprints (id.); and the crime scene photographs suggest two sets of footprints around HuffStuttler's body (id.).

However, the state supreme court could reasonably have concluded that Barnett provides only minimal support for a manslaughter defense.  Firstly, Barnett's conclusion of two different bullet trajectories is not inconsistent with that of prosecution criminologist Laskowski; Barnett in fact

1   concedes that Huffstuttler may have been shot once while standing and then three times while on the

2   ground as the prosecution argued.  (See SHCP Ex. 17 at 6-7, Ex. 18 at 1-3.)

3       According to Barnett, the gunshot trajectory suggest Huffstuttler could have been shot during an

4   argument in the cabin and then dragged outside where he was found.  But this seems speculative.

5   Barnett ignores the trial testimony of eyewitnesses Ramirez and Wilson supporting the prosecution case

6   that the shooting occurred outside the cabin and that Huffstuttler, when shot, was not fighting with or

7   threatening Petitioner.  (See claims I2 and I3, *ante*.)  Significantly, Petitioner has not pointed to facts in

8   the record suggesting Huffstuttler's blood was found in the cabin.  Petitioner chose not to testify.

9       Barnett appears to provide little if any support for the alternative defense theory that Petitioner

10  acted out of self-defense when he shot Huffstuttler.  (See ECF No. 113 at 80-81.)  Nothing in the record

11  before the state supreme court suggests that Huffstuttler attacked Petitioner or that Huffstuttler

12  possessed any weapons.  (See RT at 1689-90, 1707, 1731, 1740-43, 1747, 1922-24, 1930, 1950-52,

13  1958.)

14      The state supreme court could reasonably have determined that the noted evidence of bullet

15  trajectory and stains on Huffstuttler's clothing were consistent with the prosecution theory that

16  Petitioner attempted to make the murder look like a drug deal gone bad by shooting into Huffstuttler's

17  body while it was on the ground and changing the scene to make it appear a scuffle had taken place.

18  (See SHCP Ex. 13 at 7, 16; Ex. 17 at 4-6.)  Moreover, there apparently were no drag marks at the

19  murder scene.  As Respondent notes, there was testimony at trial that the dirt stains could have been

20  caused when Huffstuttler fell to the ground after being shot.  (ECF No. 194, at 169:10-13, citing RT at

21  1923-24, 1958, 2061); Bolin, 18 Cal. 4th at 310.

22      Petitioner's observation that the Laskowski's report suggests the rifle connected to Petitioner

23  may not have been the weapon that killed Huffstuttler (see SHCP Ex. 18) is not inconsistent with the

24  prosecution theory that Petitioner used the rifle to shoot Huffstuttler after the latter was on the ground

25  and not moving.  (RT at 1928.)   Nor is it inconsistent with the trajectory evidence noted by Bennett.

26  (See SHCP Ex. 17 at 4-9.)

27      Barnett notes the two sets of footprints around Huffstuttler's body could suggest more than one

28  shooter.  (SHCP Ex. 17 at 4-5, 9.)  However, the jury was already aware of the multiple shoeprints

found at the scene by the evidence presented at trial.  (RT at 1829-30, 1848-49.)    The evidentiary record before the state court demonstrated that a total of five people were at the scene, the three victims, Ramirez and Petitioner.  The presence of more than one person at the scene of Huffstuttler's murder does not necessarily suggest multiple shooters were involved.  Barnett does not dispute that "[t]he absence of complete documentation" regarding the shoe impressions made "the paths of the various individuals present during the incident impossible to reconstruct." (SHCP Ex. 17 at 5.)

Barnett does not suggest Petitioner was not the shooter; nor does he opine that there was more than one shooter.  (See Id. at 9.)  The jury heard Laskowski's testimony that he could not positively link the .45-caliber bullet and .45-caliber pistol found at the crime scene (RT at 2048-49), and that there were no fingerprints found on the .45 pistol.  (Id.)  Barnett himself concludes that there was "little significance" to the failure to recover "useable latent fingerprints" from the .45-caliber pistol.  (SHCP Ex. 17 at 4.)  The jury had before it evidence that Petitioner removed prints from the gun.  (RT at 1930, 1958-59.)  Counsel did argue, albeit unsuccessfully, a possible multiple shooter theory for the jury to consider.  (See e.g., RT at 2164, 2167-69.)

Accordingly, the state supreme court could have concluded there was no reasonable probability of a more favorable result even with additional forensic analysis of the crime scene regarding the Huffstuttler shooting.   That court could reasonably have discounted Barnett's testimony as not adding anything of more than minor probative value.  See Ainsworth v. Calderon, 138 F.3d 787, 792-93 (9th Cir. 1998) (finding no ineffectiveness because proffered defense expert affidavits "are consistent with and add no new evidence to the evidence that was already before the jury.").

For the reasons stated, the state supreme court could reasonably have found that defense counsel was not ineffective regarding forensic investigation of the Huffstuttler shooting.  "Counsel for the defense is not required to present expert testimony on all possible defenses in a case."  Hall v. Sumner, 512 F. Supp. 1014, 1021 (1981).

*Mr. Mincy*

Petitioner faults counsel for not challenging Laskowski's conclusion, based in part upon blood splatter and bullet trajectory analysis, that Mincy was shot while running, dropped to the ground, and was shot again (SHCP Ex. 18; RT at 2050-59), a conclusion the prosecution used in arguing the killing

of Mincy was first degree murder.  Petitioner points to Barnett's conclusion that Mincy was not involved in a struggle because the body shows no abrasions or lacerations; and that Mincy was shot where he was found because no blood stains were found in the area leading up to where Mincy's body was found.  (SHCP Ex. 17 at 7.)  However, Barnett's conclusions could be seen as conflicted and based on conjecture.

Barnett states that bullet trajectory analysis suggests one of the shots occurred when Mincy was in some position other than his final resting position and that multiple shots occurred when Mincy was on the ground in his final resting position.  (Id.)  Yet Barnett seems to contradict himself by stating that "[b]lood smears and spatters on Mincy's body all appear consistent with [the] victim being in essentially the position where found when all of the gunshot wounds occurred."  (Id. at 8.)

Barnett states that blood splatter near Mincy's body "seems unlikely to have resulted from the position in which the body was found" and that "blood splatter on the trucks (sic) and on the right thigh could all have originated from Mincy when he was scrambling around after having been shot in the arm."  (Id.)  Barnett concludes that the blood splatter could have occurred when Mincy "mov[ed] his [wounded] arm around in a rapid manner while in a position near the rock . . . ."  (Id.)

But Petitioner ignores that Barnett's findings could be seen as supportive of Laskowski's conclusion that Mincy was initially shot in the back and the right arm while erect and running and then shot again when on the ground.  (SHCP Ex. 18 at 4-5; RT at 2050-59.)  Moreover, Barnett fails to arrive at any conclusion based on his noted findings.  (SHCP Ex. 17 at 9.)

The state supreme court could have concluded there was no reasonable probability of a more favorable result even with additional forensic analysis of the crime scene regarding the Mincy shooting.  That court could reasonably have discounted Barnett's testimony as not adding anything of more than minor probative value.  See Ainsworth, 138 F.3d at 792-93 (finding no ineffectiveness because proffered defense expert affidavits "are consistent with and add no new evidence to the evidence that was already before the jury.").

For the reasons stated, the state supreme court could reasonably have found that defense counsel was not ineffective regarding forensic investigation of the Huffstuttler shooting.  "Counsel for the defense is not required to present expert testimony on all possible defenses in a case."  Hall,

512 F. Supp. at 1021.

### 3)     *Failure to Challenge Criminologist Laskowski's Qualifications*

Petitioner faults counsel for failing to cross-examine prosecution criminologist Laskowski regarding Laskowski's alleged lack of knowledge, skill, education, experience and training in the analysis of blood splatter evidence  (ECF No. 113 at 83-87), claiming that Laskowski did not qualify as a blood splatter expert under state law.  (Id.)

The California Supreme Court rejected Petitioner's challenge of Laskowski's qualifications as an expert, observing that:

Utilizing photographs of the crime scene, Criminalist Laskowski testified regarding the various positions of Mincy's and Huffstuttler's bodies when they were shot. Based on blood spatters and drips depicted in the photos, he indicated one shot was to Mincy's body while in a "fetal-like" position on its left side; as to the others, his body was in a vertical position. Laskowski also concluded Mincy "was moving at a relatively rapid pace" after being initially wounded. With respect to Huffstuttler, he determined that for several shots the body was prone and not moving. Defendant now contends this evidence was inadmissible because the witness was not qualified to render an expert opinion [Citation] and because he did not personally investigate the crime scene.

. . .

[A]ny objection would have been properly overruled. Evidence Code section 720 provides that a person may testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him," [Citation] which "may be shown by any otherwise admissible evidence, including his own testimony." [Citation] The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation] "'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.'" [Citation]

The record establishes Laskowski was fully qualified to testify based on his educational background in biochemistry and serology and his training as a criminalist for 13 years, including attending and giving seminars in blood-spatter analysis and crime scene investigation. He had also testified as an expert witness on numerous prior occasions. Given his expertise, Laskowski's testimony was not cumulative. Utilizing his knowledge of blood spatters and drips, he was better able to describe the particulars of what occurred during the shooting of Huffstuttler and Mincy than any photographic depiction of their bodies. For example, he concluded from the spatter evidence that Mincy was moving around after he was first shot and before he fell into a fetal position, where he was shot one more time. He also explained that the large pool of blood around Huffstuttler's body indicated he was prone and not moving when he received the final shots. As discussed in other contexts, this evidence was relevant to the issues of intent and premeditation and deliberation. The photographs Laskowski referred to adequately

illustrated his testimony; therefore, the fact he did not personally examine the crime scene was a matter of evidentiary weight. Since his testimony was admissible on all grounds, counsel had no basis for objecting.

Bolin, 18 Cal. 4th at 321-22; see also RT at 2040-43.

The record reflects that Laskowski, a thirteen-year employee of the Kern County Regional Criminalistics Laboratory, testified that he attended seminars "essentially having to do with . . . blood splatter analysis" (RT at 2041-42) and that he had given "papers and lectures at these same type of seminars." (RT at 2042.)  Petitioner cites to People v. Hogan, 31 Cal. 3d 815, 852 (1982), disapproved on other grounds by People v. Cooper, 53 Cal. 3d 771, 836 (1991) (the qualifications of an expert must be related to the particular subject upon which he is giving expert testimony).  He argues that this testimony is ambiguous and that Laskowski may have received minimal or no blood splatter training and given few if any papers and lectures.  (See ECF No. 113 at 85 n.17.)  He argues that Laskowski did not clearly testify as to the topics upon which he had given seminars.

However, the following colloquy between the prosecutor and Laskowski at trial suggests otherwise:

Q What are the nature of those seminars that you have attended?

A They are all essentially having to do with the field of criminalistics and the varied disciplines in criminalistics that would include hair and fiber examination, shoe track, tire track analysis, firearms and tool mark analysis, blood spatter analysis, crime scene investigation, collection and preservation of physical evidence and arson and explosive analysis.

Q And you yourself, Mr. Laskowski, have also given papers and lectures at these same types of seminars, have you not?

A That is correct.

(RT at 2041-42.)

Laskowski testified that he had qualified as an expert in blood spatter analysis on "several hundred occasions." (RT at 2042.)  Petitioner's speculation that Laskowski's training "may have" encompassed only "a ten or fifteen minute lecture" on blood spatter evidence, or that Laskowski "could have attended a seminar where [blood spatter analysis] was supposed to have been addressed, but never was" (ECF No. 113 at 85) is not sufficient to demonstrate that the state supreme court's

finding based on evidence in the record was objectively unreasonable.   See 28 U.S.C. § 2254(d)(2)(e)(1).   Nor is it necessarily probative of the issue that Petitioner can conceive of alternatives to the conclusions drawn by Laskowski.  (ECF No. 178 at 109:19-110:4.)

Respondent points out that defense counsel Soria was familiar with Laskowski's qualifications, both from discovery in this matter and from work on other cases.  (See EH Ex. 69B at 10/16/90 EMF Billing Statement at 3); see also Berryman v. Ayers, No. 95-CV-05309-AWI, 2007 WL 1991049, at **3, 5-7 (E.D. Cal. July 10, 2007) [a prior capital case in which Soria was counsel and Laskowski testified].)  Soria could reasonably have believed that Laskowski, a thirteen-year criminalist with Kern County who had qualified as an expert hundreds of times (RT at 2041-42), was sufficiently qualified to testify regarding blood-spatter and tactically chose not to question him further because doing so would only stress his qualifications to the jury.  This being the case, counsel could reasonably have determined the better argument was to suggest to the jury that little weight should be accorded Laskowski's allegedly unqualified opinions.   See e.g., RT at 2064 [counsel highlights Laskowski's disagreement with defense forensic pathologist and that unlike the pathologist, Laskowski was not "a doctor"].)

Defense counsel also may have made a tactical decision not to object to Laskowski's testimony, reserving objection for the gruesome photographs upon which Laskowski relied in forming his opinions, photographs which defense counsel viewed as cumulative, inflammatory and prejudicial.  (See RT at 2084-85.)  The extent and nature of cross-examination is a matter of trial tactics entrusted to the judgment of defense counsel.  Dows v. Wood, 211 F.3d, 480, 487 (9th Cir. 2003); United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985).  Decisions about cross examination "are given great deference and must . . . meet only objectively reasonable standards."  Dows, 211 F.3d at 487.  Even if a witness could have been subjected to more vigorous examination, no prejudice lies where evidence of guilt is strong.  Murtishaw v. Woodford, 255 F.3d 926, 953 (9th Cir. 2001).  Furthermore, failure to object -- such as to a witness's expertise -- is not ineffectiveness where an objection would have lacked merit.  Aguon, 851 F.2d at 1172.

Petitioner citation to Hogan (see ECF. 113 at 84-85; Doc. 178 at 138-40) in support of the argument Laskowski was unqualified is of no assistance on these facts.  In Hogan, the California

1   Supreme Court found the prosecution's otherwise qualified criminalist to be unqualified in blood

2   splatter because he admitted he had no formal education or training in this area.  31 Cal. 3d at 852-53.

3   But here Laskowski's qualifications included "attending and giving seminars in blood-spatter

4   analysis."  Id. at 322.  As discussed above, Laskowski's qualifications were supported by the record.

5   (RT at 2040-43.)

6         Petitioner claims that Laskowski was unqualified as a pathologist because the prosecution's

7   pathologist, Dr. Holloway, disagreed with Laskowski's interpretation of gunshot wounds, i.e., the

8   number of Huffstuttler's gunshot wounds which demonstrated a "shoring" or "buttress" effect."

9   (ECF No. 113 at 86:14-16; RT at 2065.)  Dr. Holloway found possible buttress effect with only one

10  of Huffstuttler's wounds (SHCP Ex. 19 at 5.)  Laskowski, in his September 10, 1990 report, noted Dr.

11  Holloway's finding.  (SHCP Ex. 18 at 3.)  In his subsequent trial testimony, Laskowski stated his

12  opinion that at least three of Huffstuttler's wounds showed buttress effect (RT at 2064), consistent

13  with the prosecution theory that Huffstuttler was shot three times while on the ground.  (RT at 2065.)

14  However, the California Supreme Court reasonably could have discounted any such difference of

15  opinion as mere disagreement among experts which alone does not demonstrate that one expert is

16  unqualified.  See e.g., Toler v. Troutt, 2015 WL 1408490 at *9 (W.D. Okla., Feb. 20, 2015) (medical

17  difference of opinion not actionable under the Eighth Amendment).

18        Petitioner also claims in passing that counsel Soria must have been ineffective in cross-

19  examining Laskowski because co-counsel Cater stepped in to lodge an objection (see ECF No. 113 at

20  83 [citing RT at 2072].)  The California Supreme Court could reasonably have found this claim

21  speculative, or a reflective of trial tactics.  Petitioner has not shown how and why an objection by co-

22  counsel necessarily rises to the level of prejudicial deficient performance under Strickland.

23        Additionally, Petitioner has not demonstrated prejudice.  Laskowski seems properly qualified

24  as an expert and had been qualified by courts as such on several hundred prior occasions.  The failure

25  to cross-examine him on this basis could not have been prejudicial.  (See claim N, post; see also

26  Lochart v. Fretwell, 506 U.S. 364, 374 (1992) (counsel's failure to make a meritless objection is not

27  prejudicial under Strickland).  Petitioner's argument that without Laskowski's testimony there would

28  have been no sufficient forensic evidence showing Petitioner's intent, premeditation, and planning

(ECF No. 178 at 143-44; Respondent's Brief on Appeal at 126), is unavailing for reasons stated by the California Supreme Court, as follows (see also claim O, *post*):

> [Petitioner] correctly notes the killings took place within a few minutes of the victims' arrival at his cabin. What occurred within those few minutes, however, is particularly telling with respect to his state of mind. According to both Wilson and Eloy Ramirez, [Petitioner] began arguing with Huffstuttler when Mincy and Wilson were shown the marijuana plants. [Petitioner] continued berating Huffstuttler as the two walked back toward the cabin. [Petitioner] went inside, retrieved a revolver, and shot Huffstuttler at close range. He proceeded back across the creek and confronted Wilson and Mincy. After apologizing that he had "nothing against" them, he opened fire. As a wounded Wilson fled the scene, he heard Mincy plead for his life. More shots were fired. [Petitioner] returned to Huffstuttler and fired several rifle rounds into his motionless body. The autopsy report indicated at least three shots were inflicted before he died, although according to Ramirez he did not move after the first shot. After the shootings, [Petitioner] told Ramirez he was going to make the scene look like a bad dope deal had occurred and scattered marijuana, broke bottles, and poured chili sauce around Huffstuttler's body. None of the victims were armed; nor did they engage in any provocative conduct. From this evidence, a reasonable trier of fact could infer [Petitioner] had a motive for the killings, both to punish Huffstuttler for revealing the marijuana operation to strangers and to protect his crop from theft or exposure to law enforcement. He also may have wanted to eliminate Mincy and Wilson as witnesses to the Huffstuttler shooting. In conjunction with these possible motives, the manner of killing supports a finding of premeditation and deliberation. Both victims died of multiple gunshot wounds, several of which would have been fatal individually. While [Petitioner] fired some shots at Mincy as he was attempting to flee, at least one shot entered his body as he lay in a fetal position. This forensic evidence indicates [Petitioner] did not want merely to wound either victim; he wanted to make certain they died. The trial testimony also suggests rapid but purposeful planning activity once [Petitioner] realized the potential consequences of his partner's carelessness. While chastising Huffstuttler, he walked back to the cabin where he got a gun. Rather than seek reconciliation, he shot Huffstuttler without warning. He then shot Mincy and Wilson and made good his escape after attempting to conceal his own involvement in the crimes. Viewing the record in its entirety, we find sufficient evidence to support the jury's finding of first degree murder. [Citation] [Petitioner]'s argument simply asks this court to reweigh the facts.

Bolin, 18 Cal. 4th at 331-33.

The state supreme court's prejudice analysis also noted that:

> [Petitioner] identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution [expert] witnesses . . . and that would have produced a more favorable result at trial. [¶] ... Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations] We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated

speculation." [Citation]

Bolin, 18 Cal. 4th at 333-35.  Apart from Laskowski's testimony, the noted evidence against Petitioner that was before the state court was substantial.  (See claims O, R and S.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of these claims was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claims I8 and I9 are denied.

###       j.      Review of Claim I10

In this claim, Petitioner alleges that defense counsel did not conduct an adequate investigation into Petitioner's mental health.  (ECF No. 113 at 87-94.)

This claim was presented on state habeas corpus and summarily rejected on the merits without explanation by the California Supreme Court.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner alleges that defense counsel was ineffective by not conducting a sufficient social, life and mental health investigation, which led to an inadequate mental defense evaluation.  As a result, defense forensic psychiatrist, Dr. Markman, who conducted a single, brief pre-trial evaluation of Petitioner, based his report on insufficient life and social history, insufficient background and insufficient investigative information.  (See SHCP Ex. 20.)  Petitioner also points to the circa 2000 habeas declarations of his experts, Drs. Khazanov and Matthews (see SHCP Ex.'s 10, 22), who opined that Dr. Markman's diagnosis was not sufficiently supported in the evidence and professional protocols.

Petitioner relies upon Drs. Khazanov and Matthews in complaining that Dr. Markman's September 22, 1990 pre-trial competency evaluation failed to address Petitioner's serious head injuries including brain damage; neuropsychological impairment affecting his ability to assist in his defense;

1    extended exposure to neurotoxins; chronic alcohol abuse; military career including combat in Vietnam;

2    and a life of significant trauma, abuse and stress, (SHCP Ex.'s 10 and 22), each of which could have

3    negated malice aforethought and supported his manslaughter defense.

4         According to Dr. Markman's November 20, 1990 assessment letter:

5    Mental status examination revealed [Petitioner] to be fully oriented in all spheres, alert,
     cooperative, and above normal intelligence with an excellent fund of knowledge.
6    Responses were relevant and coherent, memory and concentration were not impaired
     and affect was appropriate, though detached. There was no evidence of a major mental
7    disorder, thought disorder or psychosis, judgment was not impaired and insight into his
     status was adequate. He was able to provide a coherent narration of his version of the
8    events of September 2, 1990 and their sequeiae.

9    In broad terms and without reviewing the specifics of the events, [Petitioner] emphasizes
     that he acted in self-defense. He goes into great detail about the circumstances and
10   attributes everything to a "dope deal that went bad," a series of events when "someone
     comes walking into the cabin with a .44 caliber gun in his waistband." He reports that he
11   acted offensively only after "Vance [one of the victims] cut me across my legs." (He
     demonstrated scars on both anterior thighs, the left higher than the right.)
12

13   [¶ . . . ¶]

14   There is no history of previous psychiatric treatment or hospitalization. He does admit to
     poly-drug abuse "years ago–you name it," to include intravenous heroin and cocaine.
15   There is also an extended history of daily alcohol use.

16   [¶ . . . ¶]

17   In summation, [Petitioner] demonstrates no current evidence of a major mental disorder.
18   Treatment, hospitalization or medication on a mandatory basis is not indicated and the
     prognosis for change remains guarded. His psychiatric status exhibits long-term
19   behavioral patterns, difficult to alter or treat. His story narration is not a function of
     fantasy, but rather a presentation based on self-protective grounds. If fabricated, he is
20   fully aware that he is doing so.

21   He is clearly competent to stand trial within the meaning of Section 1368, P.C. He is
22   fully oriented, aware of the nature and the purpose of the proceedings pending and can
     cooperate rationally in presenting a defense. There is no data to support an insanity plea
23   under M'Naughten criteria. Furthermore, I find no evidence that would point to
     diminished actuality for the crime of murder.
24

25

26   (SHCP Ex. 20 at 1-3.)  Dr. Markman's letter to counsel specifically stated that his opinion would not

27   support an insanity or diminished capacity defense.  (Id. at 3.)

28         The California Supreme Court was not unreasonable in finding that defense counsel

appropriately retained the services of an expert and investigated whether to present evidence supporting a mental defense. That expert, Dr. Markman, reviewed Kern County Sheriff reports, "past records and probation reports," the preliminary hearing transcript, and the coroner's report. (SHCP Ex. 20.) He also personally examined Petitioner and consulted with counsel. (ECF No. 113 at 87:21-88:4; SHCP Ex. 20.) Nothing in Dr. Markman's report appears to suggest that further mental defense investigation or examination was necessary or warranted. Petitioner argues in isolation that additional investigation and testing should have been done, but does not support this argument with the evidentiary record then before the state court. That a subsequently retained expert such as Dr. Matthews suggests a more comprehensive mental examination and neuropsychological assessment could have been done (ECF No. 113 at 89:6-90:14; SHCP Ex. 22) is not evidence such reasonably should have been done, or that facts otherwise related by Petitioner to counsel or known to counsel reasonably warranted further investigation or examination.

Here, defense counsel could reasonably have made a tactical choice not to conduct further investigation, in reliance upon the qualified expert's opinion that there was no basis to support such a mental defense. Because that choice was not unreasonable, counsel's assistance was not ineffective. See Harris v. Vasquez, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."); see also Williams v. Woodford, 384 F.3d 567, 611 (9th Cir. 2004) (holding counsel's decision not to investigate mental defense further was reasonable in light of conclusions of mental health experts).

The decision not to call Dr. Markman as a witness also could have been a matter of tactics. See Strickland, 466 U.S. at 690-91; see also Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) (observing that "few decisions draw so heavily on professional judgment as whether or not to proffer a witness at trial"). For the reasons stated, Dr. Markman's testimony likely would have supported the charges, not a mental defense to them. "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." Richter, 562 U.S. at 106-08 (quoting Strickland, 466 U.S. at 689); see also Williams, 529 U.S. at 415 (defense counsel conducted a reasonable investigation into Petitioner's troubling background and unique personal circumstances and developed a coherent and organized strategy, proffered evidence, and

1    presented a case for mitigation); Wiggins, 539 U.S. at 521 (citing Strickland, 466 U.S. at 688) ("the

2    proper measure of attorney performance remains simply reasonableness under prevailing professional

3    norms.").  As the Supreme Court noted in Van Hook,

4        This is not a case in which the defendant's attorney [] failed to act while potentially
         powerful mitigating evidence stared [him] in the face [Citation] or would have been
5        apparent from documents any reasonable attorney would have obtained, [Citation].  It is
6        instead a case, like Strickland itself, in which defense counsel's "decision not to seek
         more" mitigating evidence from the defendant's background "than was already in hand"
7        fell "well within the range of professionally reasonable judgments."

8    558 U.S. at 11-12 (quoting Strickland, 466 U.S. at 699).

9        Petitioner also claims that in 1989 and 1990, he suffered from substance abuse, trauma-

10   induced stress disorder, impairment of brain function, and organic brain damage, citing to his decade-

11   later neuropsychological evaluation by Dr. Khazanov (SHCP Ex. 10, at ¶ 41), and assessment by Dr.

12   Matthews (SHCP  Ex. 22 at 42), who concluded that:

13       [T]o a reasonable degree of medical certainty that the shooting of Vance Huffstuttler
14       was "the result of trigger responses to perceived dangers to [Petitioner] himself."
         Petitioner's exaggerated perceptions and reactions were the result of "[Petitioner's]
15       many deficits, his organic brain damage, the stress he was under at the time of the crime
         and his ingestion of alcohol and cocaine.
16

17   (ECF No. 178 at 355-56.)

18       The Court is unconvinced by this claim.  The California Supreme Court could reasonably have

19   found unpersuasive these mental defense allegations based on evaluations made ten years after Dr.

20   Markman's evaluation, allegations that were contradicted by a record which included substantial

21   evidence that Petitioner functioned and communicated at a high level and assisted in his own defense.

22   (See claim O, post; 7/18/90 RT at 5-14 [re Petitioner's participation in hearing on motion to withdraw];

23   12/13/90 RT at 2270-72, 2275-76, 2278-87, 2295 [re Petitioner's participation in Marsden hearing].)

24   There was testimony that Petitioner shot Mincy several times when he was lying in a creek bed curled

25   in the fetal position and begging for his life, (RT at 1741, 1743, 1792, 2054-58), and that Petitioner

26   removed the wires from Wilson's car to ensure that he bled to death before finding help.  (RT at 1738,

27   1863-64, 1929, 1957, 1959, 1961, 1975.)

28       Petitioner's cited authority, Jacobs, 395 F.3d at 102-04 does not suggest otherwise.  See e.g.,

115

Boyde v. Brown, 404 F.3d 1159, 1168-69 (9th Cir. 2004), amended by 421 F.3d 1154 (9th Cir. 2005) (holding that if new mental health evidence, obtained after the trial, were sufficient to establish the petitioner's innocence, the petitioner could "always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion").

The Court finds similarly unpersuasive Petitioner's argument that *ABA Guidelines* and related commentary and unspecific general practices required that counsel further investigate and present life history and mental health defenses on the facts of this case. Petitioner has not demonstrated that the *ABA Guidelines* require further investigation where counsel makes a reasonable tactical decision based on the available information. See Williams, 384 F.3d at 611 (holding counsel's decision not to investigate mental defense further was reasonable in light of conclusions of mental health experts). Counsel is entitled to rely on the expert consulted, and the consultation may support a limitation on further investigation. See Moran v. Godinez, 57 F.3d 690, 699-700 (9th Cir. 1994). Allowing "battles of psychiatric opinions during successive collateral challenges to a death sentence would place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas process." Harris, 949 F.2d at 1518.

Petitioner claims that defense counsel was deficient in choosing Dr. Markman because his expertise was in serial killers and he was known to advocate tougher sentencing in order to keep society safe. (SHCP Ex. 21.) Yet nothing in the evidentiary record suggests Dr. Markman was unqualified, or that counsel's selection was objectively unreasonable given the facts of this case. Dr. Markman was apparently well-known in the field of forensic psychiatry and had been retained as a mental health expert in other criminal cases, including other murder cases, by both the prosecution and defense. (Id.) Furthermore, Dr. Markman had both law and medical degrees and, like Petitioner, Dr. Markman had served in the armed forces. (Id.) Moreover, selection of experts is generally at counsel's discretion. See Ake v. Oklahoma, 470 U.S. 68, 84-85 (1985) (counsel under no obligation to seek out an expert that would render an opinion, or to use tests, that he now figures would have better withstood the prosecutor's cross-examination).

Even if defense counsel's investigation and presentation of mental defenses was deficient, the state supreme court could reasonably have found unaffected the jury's imposition of the death

penalty, given the noted substantial evidence against Petitioner.  (See claim O, *post*.)

For these reasons, Petitioner has failed to overcome the strong presumption that counsel made decisions in the exercise of professional judgment.  Strickland, 466 U.S. at 690.  Even if defense counsel had discovered this evidence and still chose to proceed with his strategy as opposed to the strategy Petitioner now advocates, a fair-minded jurist could conclude that counsel's decision was reasonable.  "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  Richter, 562 U.S. at 107.  "[T]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  Yarborough, 541 U.S. at 8.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim I10 is denied.

### k.   **Review of Claim I11**

In this next claim, Petitioner alleges that defense counsel was ineffective by failing to object to introduction of evidence of weapons unrelated to the crimes, i.e., a shotgun and suspected, albeit unloaded pipe bombs, all found at the murder scene.  (ECF No. 113 at 94-96.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which the California Supreme Court summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner claims the shotgun introduced into evidence at trial, (RT at 1823-30; 1903), and testimony regarding the pipe bombs given at trial (RT at 1863, 1885, 1887-90), was irrelevant and prejudicial under state law and deficient and prejudicial under Strickland depriving him of rights

1   under the Sixth Amendment.  However, the state supreme court was not unreasonable in rejecting this

2   claim.

3       Petitioner has not demonstrated this evidence was admitted in violation of state evidentiary

4   requirements.  In this case, the prosecution had the burden of proving that Petitioner was knowingly

5   cultivating marijuana, one of the charged offenses.  (RT at 2212.)  The state supreme court could

6   reasonably have found the presence of a shotgun and suspected pipe bombs near the marijuana patch

7   was relevant to this issue and therefore admissible under California law and that counsel's failure to

8   object was not deficient performance.  There was testimony at trial that these types of weapons are

9   often found on property where illicit substances are being cultivated.  (RT at 1885.)  In particular,

10  evidence of pipe bombs on the property assisted the prosecution in meeting that burden because Kern

11  County Sheriff's Sergeant Glen Johnson specifically testified, without objection, that he often finds

12  bombs in illicit cultivation areas (RT at 1885-86) and that the pipes quickly could have been loaded to

13  explode using gunpowder and a car battery located nearby.  (RT at 1862-65, 1884-90.)

14      These weapons also could be seen as relevant to the parties' respective theories regarding the

15  shootings.  The weapons could support the prosecution's theory that Petitioner's motive for the

16  murders was to protect his marijuana crop.  (See ECF No. 113 at 96.)

17      The shotgun, which was recovered from under the mattress in the bedroom (RT at 1825),

18  could have supported the Petitioner's defense theory that he was afraid of Huffstuttler and acted in

19  self-defense.  (See e.g., ECF No. 113 at 79-83.)

20      Even if the evidence was errantly admitted, Petitioner has not demonstrated that the error rose

21  to the level of a constitutional violation.  Petitioner may not raise an issue of state law as a basis for

22  habeas relief.  "[F]ederal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers,

23  497 U.S. 764, 780 (1990); see also Pulley, 465 U.S. at 41.  This evidence was not highlighted by the

24  prosecution, (RT at 1824, 1885, 1888, 2030); it was not mentioned in the prosecution's closing

25  argument (RT at 2142-2144).  Federal courts may not interfere with a state evidentiary ruling unless

26  the evidence was so prejudicial that its admission violated fundamental due process and the right to a

27  fair trial.  Jeffries, 5 F.3d at 1192; Butcher v. Marquez, 758 F.2d 373, 378 (9th Cir. 1985).  Such was

28  not the case here.

Furthermore, defense counsel successfully objected to portions of the testimony meant to link marijuana cultivation and pipe bombs, obviating any need for curative instruction in that regard. (RT at 1888; see also ECF No. 113 at 96.) The jury was properly instructed to disregard the testimony. (RT at 2184.) Defense counsel could reasonably have determined not to call further attention these matters for the reasons stated and to avoid giving the jury additional harmful detail. In any event, the noted evidence otherwise against Petitioner was substantial. (See claims O, R and S, *post*.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different. Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim I11 is denied.

## l.    Review of Claim I12

Petitioner alleges in this claim that defense counsel was ineffective by not objecting to admission of irrelevant, cumulative, gruesome color photographs, depicting the deceased victims at the crime scene, and two autopsy photographs, denying him due process and a fair and reliable penalty determination. (ECF No. 113 at 96-98.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Additionally this claim was raised to, and rejected by the California Supreme Court on direct appeal. Bolin, 18 Cal. 4th at 318-19.

Petitioner complains that the prosecution was allowed to introduce thirteen gruesome and inflammatory photographs, eleven color photographs of Mincy and Huffstuttler as they were found at the crime scene, and two autopsy photographs. Prior to trial, defense counsel objected to all thirteen

1  photographs.  (CT at 214-24.)  The trial court deferred ruling.  (11/1/90 RT at 28-30).  At trial,

2  defense counsel objected only to four of the photographs, and then only on state law grounds.  (RT at

3  2083-88; Bolin, 18 Cal. 4th 319, n.4.)  A total of eleven photographs were admitted into evidence.

4  (People's Ex.'s. 3-4, 10, 17, 35, 40, 42-44, 72-73; RT at 2079-88.)  Petitioner claims all of these

5  photographs were prejudicial and cumulative and that consistent with *ABA Guidelines*, should have

6  been objected to and excluded under state law as more prejudicial than probative.  He claims that

7  admission of these photographs caused the penalty trial to be fundamentally unfair, that there was no

8  tactical reason not to object to these photographs, and that had these photographs not been admitted,

9  there is a reasonable probability Petitioner would not have suffered a capital conviction.  (RT at 2083-

10  84.)

11      A due process claim can be stated where graphic photos of victims make the trial

12  fundamentally unfair.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  Photographs that

13  are relevant to the crime charged are generally admissible.  See Villafuerte v. Lewis, 75 F.3d 1330,

14  1343 (1996).  Under California law, "photographs which disclose the manner in which the victim was

15  wounded are relevant on the issues of malice and aggravation of the crime and the penalty."  People

16  v. Thompson, 50 Cal. 3d 134, 182 (1990).

17      The California Supreme Court considered and rejected Petitioner's allegations on direct

18  appeal, noting that:

19      Over defense objection, the trial court admitted into evidence three photographs of
20      Mincy's body, which Criminalist Gregory Laskowski utilized to illustrate his testimony
        about blood spatters and drips found at the crime scene.  Defendant renews his
21      contention these photos were cumulative and more prejudicial than probative due to
        their "gruesome" nature. [Citation]
22
        The admission of photographs of a murder victim lies within the sound discretion of the
23      trial court, exercise of which will not be disturbed on appeal absent a showing of abuse,
        i.e., that their probative value is clearly outweighed by their prejudicial effect. [Citation]
24      In overruling the objection, the court here characterized the evidence as "highly
        relevant" because Laskowski used all three pictures to explain how he concluded from
25      the blood spatters and drips that Mincy had been in motion when defendant fired some
        of the shots.  In the court's view, "it certainly goes to the issue of intent and
26      premeditation and planning ...."  These conclusions reflect a proper exercise of the
        court's discretion. Since identity was not at issue, defendant's state of mind was critical
27      to the charge of first degree murder [Citation], and firing at a fleeing victim reasonably
28      reflects an intention to kill. [Citation] Moreover, even though the pictures served to

120

corroborate a testimonial witness, they were not cumulative since the photographic evidence could assist the jury in understanding and evaluating that testimony. [Citation] Indeed, Laskowski's testimony may have made little sense without appropriate illustration. We have examined the exhibits and also do not find them unduly gruesome.

Bolin, 18 Cal. 4th at 318-19.

For these reasons, the state supreme court could reasonably have found that Petitioner was not prejudiced by introduction of the photos or failure of defense counsel to further object to them.  The photographs could be relevant and probative of the charges and their elements, including intent to kill, aggravation and penalty.

Significantly, Laskowski relied upon People's Exhibits 42 through 44, 72, and 73 to support his testimony and conclusions that Huffstuttler was shot and died where he was found and that he was shot after he was no longer moving.  (RT at 2055-65.)  The other photographs were not close-ups and not particularly bloody or gruesome and were reasonably probative of the manner of death and the crime scene and the victims in relation to it.  (RT at 1661-62, 1671, 1683, 1732, 1790-92, 1817, 1946-47.)

Defense counsel could reasonably have recognized the probative value of these photographs (see, e.g., RT at 2083), which the trial court found "highly relevant" (RT at 2084), and, as a matter of tactics, determined that it would have been pointless to argue for their exclusion.

Petitioner also faults defense counsel for objecting to the photographs at trial on only state evidentiary grounds.  Petitioner argues that counsel should have also objected on federal constitutional grounds.  (ECF No. 113 at 97.)  However, the "admissibility of evidence in a state trial is matter of state law," which is binding on the federal court unless there is a due process violation.  Clark, 16 F.3d at 963-64.  Only if no permissible inferences can be drawn from admitted evidence will due process be violated.  Jammal, 926 F.2d at 920; cf. Estelle, 502 U.S. at 67 (Ninth Circuit erroneously "relied in part on its conclusion that the [prior injury] evidence was 'incorrectly admitted . . . pursuant to California law' in ruling that McGuire's due process rights were violated by admission of the evidence.").

Here, the California Supreme Court also could reasonably have found that the Petitioner did not show prejudice relating to admission of the photographs.  Even without these photographs, it is not reasonably probable the jury would have returned a sentence less than death given the substantial evidence against Petitioner.  (See claims O, R and S, post.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different. Strickland, 466 U.S. at 687-98.

It follows that the state supreme court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim I12 is denied.

**m.    Review of Claim I13**

In this claim, Petitioner alleges defense counsel was ineffective because of irregularities and improprieties that occurred during the jury's view of the crime scene and related locations. (ECF No. 113 at 98-100.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which the California Supreme Court summarily denied on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Related allegations were also raised and rejected on direct appeal. Bolin, 18 Cal. 4th at 323-26.

Petitioner faults defense counsel for agreeing to the jury view, and for not objecting "to the taking of testimony during the jury view, the absence of [Petitioner] while testimony was being taken, the admission of evidence when the entire jury was not present, and/or media coverage of the view." (ECF No. 113 at 98; see also claims L1-L4, post.)

The California Supreme Court, on direct appeal, stated that:

At the prosecutor's request and with the express agreement of the defense, the jury was taken to defendant's cabin to view the scene of the crimes accompanied by the court, counsel, a court stenographer, and Sheriff's Deputies Layman and Williamson, who acted as bailiffs . . .

When the jury arrived at the scene, the court indicated "we are not going to take any testimony at this time." The jurors were then permitted to walk around the area, including where the marijuana plants had been growing, but were admonished not to

discuss the case. After the jurors had looked around for an unspecified time, the court inquired, "Do any of you have any questions?" One juror asked for the location of the trailer where Huffstuttler had lived, which defense counsel indicated. Thereafter, on inquiry primarily from the court, Layman and Williamson, who had originally investigated the crime scene, pointed out the location of Wilson's truck, Huffstuttler's body, a woodpile, and the main road into the cabin area, all of which had been testified to in court. Williamson also described the foliage as taller at the time of the investigation, obscuring the view of the marijuana plants from the cabin. . . .

In putting certain questions to the 'shower,' the trial judge intended to clarify and expedite the proceedings; as to any other alleged irregularity at the scene of the view ..., there can be no contention on appeal that there was error, for the silence of the defendant's counsel in those circumstances constitutes a waiver. [Citations]

[T]he trial court conducted the jury view in full conformance with the provisions of [Penal Code] section 1119, which expressly provides that when the court determines a jury view of the scene is proper, the place or property must be shown to them by a person appointed by the court for that purpose .... For more than a century, courts have consistently applied this interpretation, implicitly recognizing that the admonition that "no person ... speak or communicate with the jury" (§ 1119) is plainly directed to insulating the jury from extraneous contact and potential tampering. [Citations]

In this case, Layman and Williamson investigated the crime scene; the trial court therefore reasonably designated them as "showers" to explain how the actual physical conditions related to their trial testimony. The record establishes that their involvement was limited to that end, i.e., "showing" the jury what their words had described and the photographs had depicted. [Citations] Given the court's broad discretion in these matters, we find no abuse in having the deputies respond to specific questions rather than proceeding in some other manner. [Citation] Williamson's statement that the foliage differed in height from the time of the crime was also proper "to account for any change in [the] condition between [its] state as shown by the evidence and [its] appearance at the time the jury inspected [it]." [Citation]

We also find no violation of defendant's constitutional rights by virtue of his absence during the view. Prior to the excursion, defendant expressly waived his presence and acknowledged he did so voluntarily. The record reflects that before making this decision he had discussed the matter with counsel. We have repeatedly rejected the argument that the Sixth Amendment confrontation clause of the United States Constitution or the due process clause of the California Constitution (art. I, § 15) prevents a criminal defendant from waiving the right of presence at a critical stage of a capital trial. [Citation] We have no reason to reconsider that conclusion, particularly when no additional testimony was taken in conjunction with the view. [Citation]

We also find no prejudicial error with respect to defendant's statutory rights. In *People v. Jackson* (1996) 13 Cal. 4th 1164, 1211, this court held "that a capital defendant may not voluntarily waive his right to be present during the proceedings listed in section 977, including those portions of the trial in which evidence is taken [before the trier of fact] ...." [Citation] Although a jury view is not among the designated proceedings in section

977, we have long held that "in so viewing the premises the jury was receiving evidence" even if nontestimonial. [Citation] Thus, it comes within the purview of section 977. Nevertheless, in this case it is not reasonably probable that a more favorable result would have been reached had defendant, in addition to his counsel, been present. [Citation] On this record, we find "no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant's trial interests would be better served by *not* attending the jury view." [Citation]

Bolin, 18 Cal. 4th at 323-26.

Petitioner complains that, under California law, the jury view should not have taken place at all because it was uncertain whether and the extent to which, in the months intervening between the crime and the jury view, the crime scene had been altered by *America's Most Wanted*, the media, weather and seasonal changes, defense investigator Bruce Binns, and vandals.  See People v. Pompa, 192 Cal. 412, 421 (1923) (trial court is to consider changed physical conditions in making decision whether to allow a jury view of crime scene).  He claims that there had been "many significant changes" to the crime scene: potential evidence trampled, plastic marijuana leaves strewn about, the cabin ransacked, items removed from the scene, bullet holes from Binns's target practice, and changed vegetation and lighting conditions.  (See ECF No. 178 at 127:24-25.)

It was not unreasonable for defense counsel to believe that the crime scene viewing would assist the jury (11/1/90 RT at 46-48) and support Petitioner's defense. (RT at 2164, 2168.)  Petitioner's primary theories of voluntary manslaughter and self-defense related in part to claimed inconsistencies in eye-witness testimony.  These inconsistencies implicated consideration of the crime scene layout including location, topography and visual obstructions, improvements, and the location of forensic evidence discussed in court.  Furthermore, defense counsel was present to represent Petitioner during the entire jury viewing.

Counsel apparently had tactical reasons not to object to the jury view.  Petitioner, having waived his presence at the jury view, avoided potentially prejudicing the jury by seeing Petitioner in full restraints.  Bolin, 18 Cal. 4th at 325-26; (RT at 1776-79.)  Counsel apparently believed the crime scene view might cause the jury to discredit the testimony of prosecution witnesses.  A court "need not determine the actual explanation for defense counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation."  Morris, 966 F.2d at 456; see also Pop v.

1   Yarborough, 354 F. Supp. 2d 1132, 1144 n.11 (C.D. Cal. 2005).

2       Beyond tactical reasons not to object to the jury view, the record clearly demonstrates that

3   defense counsel believed that viewing the scene of the shootings would assist the jury.  (See, e.g.,

4   11/1/90 RT at 46-48.)  As to the condition of the crime scene, the jurors were aware of the passage of

5   time and seasonal change and presumably took that into account.  (See e.g., RT at 1788-89, 1929-30.)

6   Moreover, the jury was aware from voir dire and trial proceedings that the case and the crime scene had

7   received publicity and would continue to receive publicity.  Significantly, the jury was aware the

8   America's Most Wanted program was staged at the crime scene, possibly altering it.

9       Petitioner has not demonstrated that the jury view violated state law.  The California Supreme

10  Court could reasonably have determined that no additional testimony was taken as such during the jury

11  view.  Furthermore, the Supreme Court has confirmed that "showing," which is what actually occurred

12  at the jury's view of the crime scene (see claim L, post) is historically based and does not offend due

13  process.  Snyder v. Massachusetts, 291 U.S. 97, 110-11 (1934) (overruled in part on other grounds by

14  Malloy v. Hogan, 378 U.S. 1, 16 (1964) ("statements to the jury pointing out the specific objects to be

15  noted have been a traditional accompaniment of a view for about two centuries, if not longer.  The

16  Fourteenth Amendment has not displaced the procedure of the ages.").  Even if Petitioner had

17  demonstrated a violation of California law regarding the jury view, as noted a federal habeas court may

18  not examine questions of state law; it "is limited to deciding whether a conviction violated the

19  Constitution, laws, or treaties of the United States."  Estelle, 502 U.S. at 67-68.

20      The state court could reasonably have determined that Petitioner's presence during the jury

21  view was unnecessary.  Due process does not require a defendant be present during a jury view of a

22  crime scene "when presence would be useless, or the benefit but a shadow."  Kentucky v. Stincer, 482

23  U.S. 730, 745 (1987) (quoting Snyder, 291 U.S. at 106-07); see also Rice v. Wood, 77 F.3d 1138, 1140

24  n.2 (9th Cir. 1996) (there is a strong presumption that any errors are subject to harmless error analysis if

25  defendant had counsel and was tried by an impartial adjudicator).   Petitioner has not made a showing

26  that his presence at the crime scene was necessary - defense counsel was present throughout the

27  viewing.  Petitioner's waiver of attendance at the jury view suggests as much.  (11/1/90 RT at 46-48).

28      Petitioner argues, but does not support in the record, that the presence of the media at the jury

125

view was unavoidable and affected the jurors' view of the crime scene.  (ECF No. 113 at 100.)  His conclusion that media presence detracted from the "remoteness of the scene," presumably because they were able to travel there with all their equipment, (id.) is similarly unsupported.  Moreover, the court also specifically told the jury about the possible media presence at the jury view and that "they are ordered not to talk, and you are ordered not to talk to them." (RT at 1892-93, 1976-77).  The court also admonished the jury numerous times to avoid any and all contact with the media.  (RT at 25, 228, 235, 249, 326, 1642-43, 1892-93, 1976-77, 2090.)  Jurors are presumed to follow the court's instructions.  Therefore, an objection to the presence of the media at the jury view on such a basis would have lacked merit.

As to juror Barnes's request to drive separately to the jury view, Petitioner does not demonstrate a basis for objection.  He does not cite to facts in the record showing how and why allowing juror Barnes to drive separately impacted his defense.  Furthermore, in light of the amount of miles juror Barnes already had to drive each day just to get to court, and the additional miles he would have to drive to go to the courthouse before seeing the crime scene, it was unlikely the court would have sustained any objection.  (RT at 2033-34, 2089-90.)  The state court also could reasonably have found that, had juror Barnes traveled with the other jurors, it is not reasonably probable that the result of Petitioner's proceeding would have been different.

Petitioner complains the jury improperly viewed the Sand Canyon Store without juror Barnes. The jurors were told they would drive past the Sand Canyon Store, but not stop and inspect it, without juror Barnes.  (RT at 2121.)  However, the record is unclear whether the jury did in fact drive past it or receive any information about the Sand Canyon Store, without juror Barnes present.  Even if they had, Petitioner has not demonstrated that the trial testimony of eyewitnesses Ramirez and Wilson was dependent upon or related to the location and structure of the Sand Canyon Store or that the Sand Canyon Store had some material relationship to other locations and events described in the trial testimony.  Again, Petitioner, at all times during the jury view, was represented by defense counsel.

Moreover, all jurors, including juror Barnes, saw photographs of the Sand Canyon Store.  (RT at 1724-25; CT at 390.)  Even if juror Barnes was absent from an exterior viewing of it, the California Supreme Court could reasonably have found this had only a minor, if any, impact on the jury's

1    determinations. See e.g., Olano, 62 F.3d at 1188 (finding no error where juror missed an afternoon

2    of testimony but reviewed a written transcript of what he missed; cf. Tanner v. United States, 483

3    U.S. 107, 126 (1987) (jurors falling asleep during testimony are not incompetent).   Petitioner

4    speculates that the credibility of witnesses Ramirez and Wilson could have been impugned to the

5    extent their testimony describing the Store varied from what the jurors saw when driving past it.  (See

6    claim L3, infra.)  But Petitioner does not point to any facts showing such inconsistency or related

7    credibility issues.

8         For all the reasons stated above and in claim L, post, the California Supreme Court could have

9    reasonably concluded that no prejudicial errors occurred in the jury's view of the crime scene.

10   Petitioner could not have been prejudiced by any actions of counsel in this regard.   A fair-minded

11   jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent

12   alleged, that defense counsel's performance fell below an objective standard of reasonableness and

13   that, but for counsel's unprofessional errors, the outcome of this proceeding would have been

14   different.  Strickland, 466 U.S. at 687-98.

15         It follows that the state supreme court's rejection of the claim was not contrary to, or an

16   unreasonable application of, clearly established federal law, nor based on an unreasonable

17   determination of the facts in light of the evidence presented in the state court proceeding.  See 28

18   U.S.C. § 2254(d).

19         Claim I13 is denied.

20          **n.**     **Review of Claim I14**

21         In this next claim, Petitioner alleges defense counsel did not notice and object to the trial

22   court's misreading of guilt phase instructions, omitting elements, misstating the law, and failing to

23   instruct the jury on its function, as alleged in claims P1, P2, P3, P6, P7, P8, and P9, post.  (ECF No.

24   113 at 100-01.)

25         Petitioner raised this claim in his petition for writ of habeas corpus in the California Supreme

26   Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas

27   Corpus.)

28         Petitioner complains that defense counsel failed to object to the trial court's misreading of

1    CALJIC 2.22, 3.31.5, 8.20, 8.30, 8.67, 8.80, 17.40, or  17.41 as discussed in claims P1, P2, P3, P6,

2    P7, P8 and P9, *post*.  (ECF No. 113 at 101:1-4.)  He claims that even though these instructions had

3    been agreed to by counsel and the trial court (RT at 2097, 2100-03, 2107), defense counsel failed to

4    catch instances where the court's oral instructions added to or omitted from the written instructions.

5            In this case, the trial court provided the jury with copies of the correctly worded instructions,

6    which the jury had during deliberations.  Moreover, for the reasons set forth in claims P1, P2, P3, P6,

7    P7, P8, and P9, *post*, even if defense counsel's performance was deficient, it is not reasonably

8    probable that the jury verdict would have been affected by it.  As discussed in those claims, in light of

9    the jury instructions as a whole, it is also not reasonably probable that the jury misunderstood the

10   burden of proof as to any element of the case, particularly premeditation and deliberation as it related

11   to counts I, II, and III.

12           Defense counsel is not ineffective by failing to make meritless objections.  <u>Aguon</u>, 851 F.2d at

13   1172.  These alleged errors, singly and cumulatively, are not persuasive.  <u>Calderon</u>, 523 U.S. at 566

14   ("finding no prejudice from the errors considered separately, we also find no cumulative prejudice");

15   <u>see also Rupe</u>, 93 F.3d at 1445 (holding that there was no reason to reverse for cumulative error

16   because there was no violation of federal rights in the guilt phase).

17            For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish

18   that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

19   an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome

20   of this proceeding would have been different.  <u>Strickland</u>, 466 U.S., at 687-98.

21           It follows that the California Supreme Court's rejection of the claim was not  contrary to, or

22   an unreasonable application of, clearly established federal law, nor based on an unreasonable

23   determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28

24   U.S.C. § 2254(d).

25           Claim I14 is denied.

26           **o.      Review of Claim I15**

27           In this next claim, Petitioner alleges defense counsel was ineffective by failing to request the

28   use of "not guilty" in place of "innocent," as the former term is used in CALJIC Nos. 1.00

128

("Respective Duties of Judge and Jury"), 2.51 ("Motive"), and 2.52 ("Flight After Crime"), as more specifically alleged in claim P5, *post*.  (ECF No. 113 at 101-02.)

Petitioner raised this claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner complains that the trial court's use of "innocent" instead of "not guilty" misled the jury regarding the prosecution's burden of proving guilt beyond a reasonable doubt, depriving Petitioner of his rights to due process and trial by jury.

Respondent argues, correctly, that at the time of trial, the instructions given were the standard instructions on the issues as approved by the California Supreme Court.  See People v. Wade, 39 Cal. App. 4th 1487, 1491-92 (1995) (determining that use of "innocent" instead of "not guilty" did not mislead the jury regarding the prosecution's burden of proof).

For this reason and those explained in claim P5, *post*, defense counsel was not ineffective in failing to object to the noted instructions.  Pelmer v. White, 877 F.2d 1518, 1522 (11th Cir. 1989) (holding assistance not ineffective where counsel failed to object to instructions approved by state appellate court).  Nor was Petitioner prejudiced by counsel's failure to request instructions deviating from the standardized approved CALJIC instructions at the time of his trial.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It follows that the California Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim I15 is denied.

## p.    Review of Claim I16

Petitioner claims defense counsel was ineffective by failing to make adequate objections to

the trial court's reading of CALJIC 2.06 and 2.52, regarding consciousness of guilt.  (ECF No. 113 at 102-103; Bolin, 18 Cal. 4th at 326-27.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Additionally, the California Supreme Court considered and rejected these allegations on direct appeal.  Bolin, 18 Cal. 4th 297, 326-27.

Petitioner complains that use of these instructions was not supported by the evidence and improperly suggested his alleged conduct was an admission of guilt.  He alleges that counsel Soria, who objected to CALJIC 2.52 but not CALJIC 2.06, did not state adequate grounds for objecting to these instructions and "admitted" facts that were in dispute when discussing instruction 2.06 with the trial court and the district attorney (RT at 2096), as more specifically alleged in claims P4 and P5, post.  He claims there was no tactical advantage in doing so and that he was prejudiced both by waiver of objection and because there is a reasonable probability the jury's determination would have been different absent the instructions.

The trial court gave these instructions as follows:

CALJIC No. 2.06 (5th ed. 1988) - "If you find that a defendant attempted to suppress evidence against himself in any manner such as by destroying evidence or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and its significance, if any, are matters for your consideration."

CALJIC No. 2.52 (5th ed. 1988) - "The flight of a person immediately after the commission of a crime or after being accused of a crime is not sufficient in itself to establish guilt, but it is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding the question of his guilt or his innocence. [¶] The weight to be given such a circumstance is entirely up to the jury."

(CT at 440, 450.)

The California Supreme Court, in rejecting these allegations, stated that:

At the time the court discussed jury instructions, defense counsel agreed the evidence supported CALJIC No. 2.06 and did not object to the court's proposed wording. Any claim of error is therefore waived. [Citation] Regardless, no error occurred. Sufficient

evidence supported the instruction in light of Ramirez's testimony defendant attempted to make the murder scene "look like a bad dope deal" by breaking bottles, scattering loose marijuana, and shooting the body several more times with a rifle after the initial revolver shot. Defendant wiped his fingerprints off the handgun, put the weapon in Huffstutler's hand, placed a knife near the body, and poured chili sauce around it. He then fled south before leaving the state for Chicago. Along the way he threw away some wires he had taken to disable Wilson's truck.

CALJIC Nos. 2.06 and 2.52 do not impermissibly emphasize noncriminal activity as "consciousness of guilt." On the contrary, these instructions "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations] Moreover, section 1127c requires a flight instruction when the prosecution relies on such conduct as tending to show guilt.

As in past decisions, we find no merit in the contention the instructions improperly allow the jury to draw inferences about defendant's state of mind and equate evidence of suppression or concealment with a confession. "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." [Citation]  For cognate reasons they do not violate the proscription of *Griffin v. California* (1965) 380 U.S. 609, 615 against referring to the defendant's exercise of his Fifth Amendment right not to testify as evidence of guilt. The instructions in no respect implicated defendant's failure to testify or directed the jury to draw negative inferences from it.

Bolin, 18 Cal. 4th at 326-27.

The Court finds Petitioners allegations to be unpersuasive.  (See also claims P4 and P5, *post*.) As reasoned by the state supreme court, these instructions appear to unequivocally state that the conduct described therein is not sufficient to prove guilt, but instead that it "may be considered."  The California Supreme Court could reasonably have found that these instructions did not improperly reduce the prosecution's burden of proof.  See County Court of Ulster County v. Allen, 442 U.S. 140, 167 (1979) (prosecution may rely on all the evidence in the record to meet the reasonable doubt

standard where the state presumption is permissive rather than mandatory).

The trial record supported giving these instructions.  See Bolin, 18 Cal. 4th at 327.  The crime scene was remote and secluded.  (RT at 1731, 1760-61.)  Petitioner told Huffstuttler, just prior to shooting him, that it was a "no-no" to bring people to see the marijuana farm.  (RT at 1739, 1922, 1950.)  Petitioner also told Huffstuttler that he did not know Mincy and Wilson and could not understand Huffstuttler's reasons for bringing them to see the marijuana plants. (RT at 1739-40.)  Immediately after shooting Huffstuttler, Petitioner approached Mincy and Wilson with a gun, told them that he had nothing against them, and then shot them.  (RT at 1741.)  Petitioner re-arranged the crime scene to make it look like a failed drug transaction and fled to Los Angeles and then Chicago.  Bolin, 18 Cal. 4th at 331-33.  Counsel did not admit disputed facts precluding these instructions.  (See RT at 2096.)  This Court finds no basis to discount these facts in the record.  See e.g., Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254 (e)(1).

At the time of trial, these instructions were the standard instructions on these issues, approved by the California Supreme Court.  See People v. Crandell, 46 Cal. 3d 833, 871 (1988) (abrogated on other grounds by People v. Crayton, 28 Cal. 4th 346, 364-65; see also Pelmer, 877 F.2d at 1522 (holding assistance not ineffective where counsel failed to object to instructions approved by state appellate court).  Here, the state supreme court could reasonably have found defense counsel not to be ineffective by failing to object to these instructions given the evidence in the record supporting their use.

Additionally, to the extent Petitioner argues that the language of the instructions violated his constitutional rights, the Ninth Circuit has upheld the use of a very similar consciousness of guilt instruction.  See United States v. Perkins, 937 F.2d 1397, 1401-02 & n.2 (9th Cir. 1991).  As long as the instruction does not convey that inconsistent statements constitute evidence of guilt, but merely that the jury may consider them as indicating a consciousness of guilt, the instruction does not violate constitutional rights.  See Id.  CALJIC No. 2.06 and 2.52 are not constitutionally infirm under this standard.  Bolin, 18 Cal. 4th at 327.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It follows that the state supreme court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim I16 is denied.

### q.    Review of Claim I17

In this final claim, Petitioner alleges counsel Soria was ineffective by making an incoherent guilt phase closing argument that was too short, misstated the law and his defense theories and conceded Petitioner's guilt for criminal behavior without his consent.  (ECF No. 113 at 103-109; RT at 2162-69.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

The California Supreme Court also considered and rejected on direct appeal Petitioner's allegation that his counsel was ineffective for admitting his culpability during guilt phase closing argument.  Bolin, 18 Cal. 4th at 334-35.

### 1)    *Abbreviated Closing*

Petitioner alleges that Soria, without consulting co-counsel or Petitioner, delivered a shorter and less detailed version of his originally prepared closing argument.  Petitioner alleges Soria did this in order to force the prosecutor to give her final summation prior to the lunch break, i.e., without extra time for her to prepare over the lunch break.  Petitioner alternatively argues that Mr. Soria shortened the closing argument as a practical joke on the prosecutor.  (ECF No. 113 at 103; RT at 2178.)

Petitioner alleges the failure to give a sufficient closing was especially prejudicial because the defense presented no evidence during the guilt phase.

The state supreme court reasonably could have found these arguments to be mere conjecture,

133

1  lacking support in the evidentiary record.  To the extent the closing argument was of short duration,

2  Petitioner failed to show that "a longer or more passionate closing argument would have resulted in

3  an alternative" verdict.  Griffin v. Delo, 33 F.3d 895, 903 (1994).

4  　　　　The California Supreme Court could reasonably have found that "defense counsel had few

5  viable options, but made reasonable efforts to negate first degree murder despite considerable factual

6  impediments."  Bolin, 18 Cal. 4th at 313, 334-35.  The record reasonably supports this determination,

7  as discussed below.

8  　　　　　　　　　　　　**2)**　　　***Conceding Guilt***

9  　　　　Petitioner alleges that Soria, without Petitioner's consent, conceded guilt as to some of the

10  charges, (ECF No. 113 at 103-05, 108), as follows:

11  　　　　Good morning, ladies and gentlemen. There is no doubt that the events that happened on
Labor Day weekend with my client has some liability for, some responsibility for. We

12  are not going to say not guilty on all counts. That is just not what happened. But you
have to assess the responsibility. You have to determine from the facts and the law that

13  the Court gives you what his responsibility is, and I think the facts to some extent are not

14  as clear as the prosecutor presented to you.

15  　　　　Certainly on Count 4, the count of cultivation of marijuana, the defense will simply ask
you to review the evidence, apply the law the Court gives to you and render a verdict.

16  We will not present any argument on that.

17
　　　　With regards to what happened in the creek bed, certainly [Petitioner] is responsible for

18  some of it. Once again, you have to decide the liability based on the law the Court gives
you and you have to determine from the facts and that's interesting because you have

19  two parallel stories where they intersect at some point, but you have two storytellers.

20  (RT at 2162.)

21  　　　　Petitioner also alleges that Mr. Soria went on to vouch for the credibility of victim witness Jim

22  Wilson:

23  　　　　Let's take up the negative thing regarding Jim Wilson.  If he is lying, why is he lying?  I
think looking at the evidence the only thing he is probably lying about is what he knew

24  or didn't know about the marijuana going up the hill or when or when he didn't see it.  I
don't think he is lying about being shot.  There is physical evidence he got shot, and I

25  don't think his evidence is unreliable regarding what he heard Mr. Mincy say or what he

26  observed.

27  (RT at 2163.)

28  　　　　Petitioner faults Soria for breaching his duty of loyalty by essentially conceding guilt as to the

three shootings and marijuana cultivation without Petitioner's consent, citing United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir. 1991) (attorney who informs the jury that there is no reasonable doubt about factual issues in dispute fails to act as adversary to prosecution).  Particularly prejudicial, he claims, was the concession that Wilson heard Mincy begging Petitioner not to shoot.  According to Petitioner, Soria ended up advocating for the prosecution, not the defense.  He cites in this regard United States v. Cronic, 466 U.S. 648, 659, 666 (1984) (complete failure to subject prosecution case to meaningful adversarial testing denies sixth amendment rights).

The California Supreme Court considered and rejected the allegation that Soria was ineffective by acknowledging some culpability during closing, stating that:

> Defendant asserts defense counsel was ineffective for acknowledging some culpability on defendant's part in closing argument: "There is no doubt that the events that happened on Labor Day weekend with my client has some liability for [sic], some responsibility for. We are not going to say not guilty on all counts. That is just not what happened."
>
> We find no incompetence in these remarks. Given the overwhelming evidence of defendant's guilt, including the testimony of two eyewitnesses, the concession appears to be a reasonable trial tactic by which counsel could urge the jury to return verdicts on the lesser included offenses of second degree murder or voluntary manslaughter. Since counsel could also reasonably anticipate having to conduct a penalty phase, it also allowed him to preserve his credibility in arguing mitigation. [Citation] In resolving these claims, "we must 'assess counsel's overall performance throughout the case' [citation], evaluating it 'from counsel's perspective at the time of the alleged error and in light of all the circumstances. [Citations] Moreover, when read in context, the argument in no respect reflects a breakdown of the adversarial process. [Citation] Counsel noted discrepancies between the testimony of Wilson and Ramirez, suggested the jury could infer Ramirez was more involved in the crimes than claimed, and pointed to other evidence defendant was guilty of less than first degree murder. The multiple-murder special circumstance would be triggered even if the jury found only one of the killings was first degree murder (§ 190.2, subd. (a)(3)); therefore, counsel reasonably focused his guilt phase argument on reducing that possibility. Conceding some measure of culpability was a valid tactical choice under these restrictive circumstances.

Bolin, 18 Cal. 4th at 334-35.

This Court finds that, based on the evidentiary record, the state supreme court could reasonably have found the noted conduct to be tactically motivated and consistent with the defense strategy of arguing for manslaughter in order to avoid death sentence eligibility.  Petitioner had certain liability for the crimes and only limited evidence in defense.  (RT at 2162-69.)  Defense counsel argued that

135

Petitioner was less than fully culpable for the crimes, variously focusing on Ramirez and the inference he might have been involved in the Huffstuttler shooting, (RT at 2166-69), and heat of passion and imperfect self-defense theories.

Regarding the shooting of Mincy, in the absence of direct evidence of heat of passion or self-defense, counsel could and did reasonably argue that Petitioner was still acting under heat of passion from the Huffstuttler shooting when he shot and killed Mincy, in an attempt to reduce Petitioner's culpability for that offense.  (RT at 2175.)  On the facts of this case, the California Supreme Court reasonably could have found such a tactical decision to admit some liability, even in the absence of consent by the accused, not to be ineffective assistance.  See Florida v. Nixon, 543 U.S. 175, 190-91 (2004) (counsel in capital case where guilt is clear may reasonably focus on penalty phase).

It was not unreasonable for the California Supreme Court to discount Petitioner's contention that Soria's noted tactic was not based upon an adequate investigation.  The guilt phase investigation was constitutionally sufficient for the reasons discussed in claims I1-I16, ante. The same can be said of the penalty phase investigation (see claim W, post), even if it was incomplete at the time of the guilt phase.  Significantly, Petitioner has not provided any declaration of counsel relating to trial tactics or the absence of tactics, in these regards.

Unsuccessful trial strategies are not alone ineffective assistance.  Sloan v. Delo, 54 F.3d 1371, 1384 (8th Cir. 1995) ("Although the [defense] closing apparently was not persuasive, a strategy need not be successful to be reasonable.").  "The mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice." Ferreira-Alameda, 815 F.2d at 1254.

### 3)   *Misstating Law and Defense Theories*

Petitioner alleges that Soria's abbreviated closing statement, to the extent it was intelligible, included the following prejudicial misstatements of law regarding the elements of voluntary manslaughter (Pen. Code § 192) and second degree murder (Pen. Code § 189):

> Now, [Petitioner] is part of the scuffle, is part of an argument, heat of passion, unreasonable self-defense and if you find that acceptable regarding the initial shooting of Vance Huffstuttler, you don't believe that he shot him a second time, he is only guilty of voluntary manslaughter which isn't intentional killing, but it is not without malice aforethought, it is not without premeditation, it is not with intent. It is basically a homicide we can't excuse, but there is an excuse.

(RT at 2169.)

The California Supreme Court summarily rejected this allegation on the merits without explanation.  (See CSC Order Den. Pet. Habeas Corpus.)

Petitioner argues the deficient closing had its genesis in a breakdown in the adversarial process, resulting in an actual conflict of interest adversely affecting Soria's performance and giving rise to a presumption of prejudice.  Petitioner contends that the trial court acknowledged as much when, following the guilt phase, it found irreconcilable differences between Soria and Petitioner and removed Soria from the case. Furthermore, even if prejudice is not presumed, Petitioner claims it is reasonably probable that a more favorable result would have obtained had Soria presented a competent closing argument.

Petitioner also argues that Soria's closing argument confused defense theories: a heat of passion or unreasonable self-defense theory in which Petitioner shot Huffstuttler, and an alternative theory under which Ramirez fired the shots that killed Huffstuttler.  (RT at 2163-69.)  However, Soria's strategy of presenting alternate theories need not be seen as unreasonable given that Ramirez's participation in Huffstuttler's death was not established by any direct evidence.  Even if the jury had chosen to believe such theory without evidence, Ramirez's participation would not have exculpated Petitioner, but simply made him an accomplice to it.  That these strategies were not ultimately successful does not make them unreasonable.  Sloan, 54 F.3d at 1384.

The jury was aware of the primary defense theory that the killings were not first degree murder, even if this theory was misstated during Soria's closing.  (See e.g., RT at 2166-67.)  The jury would have understood that Soria's closing focused on Petitioner's reduced culpability and responsibility for the killings.

Furthermore, as the Respondent notes, Soria told the jury that the court would be providing instructions regarding heat of passion and self-defense, and suggested that the jury should listen to and consider the instructions carefully along with the evidence in reaching its verdict.  (RT at 2166.)  The court did provide those instructions as well as instructions regarding intent for murder and manslaughter (RT at 2195-2211), and also told the jury that it should follow the court's instructions over the arguments of counsel if they conflicted.  (RT at 2182-83.)  The jury is presumed to have

followed these instructions.

Given the weight of the noted evidence against Petitioner, the California Supreme Court reasonably could have found that Petitioner did not show prejudice relative to this claim. See U.S. v. Johnson-Wilder, 29 F.3d 1100, 1105 (7th Cir. 1994) (where evidence of guilt is "very substantial . . . there is no reason to conclude that a defense free of the alleged errors would have brought about a different result.")

While "[t]he right to effective assistance extends to closing arguments," Gentry, 540 U.S. at 5 (citing Bell, 535 U.S. at 701-02, and Herring v. New York, 422 U.S. 853, 865 (1975)), "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate strategy at that stage." Id. at 5-6. Judicial review of defense counsel's closing argument "is therefore highly deferential - and doubly deferential when it is conducted through the lens of federal habeas." Id. at 6. The arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. Boyde, 494 U.S. at 384-85.

Finally, Petitioner's suggestion that prejudice should be presumed based on actual conflict of interest arising from a breakdown in the attorney-client relationship fails for reasons discussed in claims J and W1, *post*.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different. Strickland, 466 U.S. at 687-98.

It follows that the California Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim I17 is denied.

## 2.    Review of Claim J

Petitioner next claims that Soria's divided loyalties caused Petitioner to distrust him, resulting

1   in a breakdown of the relationship and an actual conflict of interest, denying Petitioner effective

2   representation and due process under the Fifth, Sixth and Fourteenth Amendments.  (ECF No. 113 at

3   109-112.)

4       Petitioner raised this same claim in his petition for writ of habeas corpus in the California

5   Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred

6   because this claim could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet.

7   Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The

8   California Supreme Court also summarily rejected Petitioner's habeas claim on the merits without

9   explanation.  (CSC Order Den. Pet. Habeas Corpus.)

10         **a.**    **Clearly Established Law**

11       The Sixth Amendment provides that a criminal defendant shall have the right to "the

12   Assistance of Counsel for his defense."  As a general matter, a defendant alleging a Sixth

13   Amendment violation must demonstrate "a reasonable probability that, but for counsel's

14   unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S.

15   at 694.

16       However, an exception exists for cases in which counsel actively represents conflicting

17   interests.  Mickens v. Taylor, 535 U.S. 162, 166 (2002); Cuyler, 446 U.S. at 345-50.  In such a case,

18   prejudice is presumed.  Id.  However, Petitioner must establish that "an actual conflict of interest

19   actually affected the adequacy of [defense counsel's] representation."

20         **b.**    **Analysis of Claim J**

21       Petitioner alleges Soria's desire to withdraw to seek other employment caused a loss of

22   loyalty to and inadequate representation of Petitioner and a breakdown in the attorney-client

23   relationship resulting in an actual conflict of interest.  (ECF No. 113 at 109-112; claim I17; see RT at

24   2268, 2271-96.)  Petitioner also alleges Soria had a personal conflict because, the evening before a

25   crucial point in the guilt phase, Soria was out celebrating a new job offer.  (ECF No. 113 at 110.)

26         *1)*    *Actual Conflict of Interest*

27       Petitioner alleges Soria had an actual conflict of interest.  As previously discussed, following

28   the guilt phase, the trial court considered ex parte Petitioner's Marsden motion including his

1   complaints about Soria's guilt phase performance.  That court found that:

2
3
> [A]s as result of the disagreement between Mr. Soria and [Petitioner] there has been a complete breakdown in that relationship to the point that I don't think they are talking to each other

4   (RT at 2298:19-22.)  As a result, on December 14, 1990, the trial court appointed Cater to take over for

5   the penalty phase.  However, the trial court did not make a finding that Mr. Soria had an actual, or any,

6   conflict of interest.  Instead the trial court found a breakdown in communication and "estrangement,"

7   pointing to Petitioner's stated refusal to accept a visit from Mr. Soria.  (RT at 2298-99); Bolin, 18 Cal.

8   4th at 347.

9   Petitioner supports his actual conflict claim by pointing to Soria's decision not to present

10  evidence relating to his leg wounds.  As discussed more fully in claim I7, *ante*, petitioner contends

11  scars on his legs were incurred while he defended himself during the Huffstuttler shooting.  But Soria

12  was aware Dr. Markman had examined the scars and opined they were self-inflicted.  (RT at 2289.)

13  Soria's concern this evidence appeared fabricated and based upon inadmissible and uncorroborated

14  hearsay suggests his decision not to present it was a matter of trial strategy rather than a result of an

15  "actual conflict" with petitioner.  (See 12/13/90 RT at 2288-89; claim I7, *ante*.)

16  Counsel Soria was entitled to make tactical decisions, "even in the face of his client's

17  incomprehension or even explicit disapproval." Schell, 218 F.3d at 1017, 1026 and n.8.  Soria

18  explained his reasons for not informing Petitioner of this tactical decision.  (12/13/90 RT at 2289.)  A

19  conflict of interest is not created every time an attorney responds to an accusation from a client for to

20  do so would create in the client a unilateral power to create a conflict by expressing dissatisfaction.

21  United States v. Moree, 220 F.3d 65, 71 (2d Cir. 2000).

22  Petitioner cannot create a conflict of interest predicated solely on his expressed dissatisfaction

23  with counsel.  United States v. John Doe #1, 272 F.3d 116, 126 (2d Cir. 2001).  At the time of Soria's

24  request to withdraw, the record reflects that Petitioner wanted Soria to represent him.  (7/18/90 RT at

25  10-12); see Garcia v. Bunnell 33 F.3d 1193, 1198 (9th Cir. 1994) (no actual conflict where record

26  discloses no active representation of competing interest).

27  Any re-allegation of ineffective assistance, discussed in claim I, fails for the reasons stated

28  therein.

### 2) *Personal Conflict of Interest*

A conflict of interest claim cannot be based on an alleged conflict between the client's interests and the lawyer's personal interests.  <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1184 (2005) (finding that the <u>Cuyler</u> line of cases is limited to conflicts involving joint representation).  <u>Earp</u> specifically noted the case upon which Petitioner relies, <u>Mannhalt v. Reed</u>, 847 F.2d 576, 580 (9th Cir. 1988), and found argument relying on it to be futile under AEDPA.  <u>Id.</u> at 1183 n.23.

The California Supreme Court could reasonably have found that Soria did not suffer from a personal conflict of interest and perform deficiently by virtue thereof.

### 3) *Prejudice – Actual Conflict*

Petitioner argues that no showing of prejudice is required because Soria had an actual conflict of interest.  <u>Cuyler</u>, 446 U.S. at 348.  He claims that the trial court found as much.  However, petitioner's argument for the less stringent standard of <u>Cuyler</u> (regarding presumed prejudice in cases of actual conflict of interest) is unavailing.  (<u>See</u> ECF No. 113 at 109); <u>Cuyler</u>, 446 U.S. at 348-49. "Until a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."  <u>Cuyler</u>, 446 U.S. at 350. Petitioner has not made such a showing, for the reasons stated.

### 4) *Prejudice – Personal Conflict*

Petitioner's claim that counsel's personal conflict of interest violated his Sixth Amendment right to the assistance of counsel is governed by <u>Strickland</u>.  <u>See</u> <u>Mickens</u>, 535 U.S. at 174-75 (explaining that clearly established Supreme Court precedent does not permit application of a prejudice standard less stringent than <u>Strickland</u> unless the alleged conflict results from joint representation, a situation which involves both a high probability of prejudice and inherent difficulty in proving that prejudice).

Petitioner has not shown a reasonable probability the outcome of his trial would have been different if counsel had taken some action that was not taken because of the alleged personal conflict of interest.  <u>See</u> <u>Bolin,</u> 18 Cal. 4th at 347; <u>United States v. Perry</u>, 857 F.2d 1346, 1350-51 (9th Cir. 1988) ("mere possibility of an actual conflict of interest created by service of a grand jury subpoena upon a target's counsel is insufficient to disturb a conviction" absent proof of actual prejudice).

Petitioner also contends that the breakdown in his attorney client relationship mandated a mistrial.  (ECF No. 113 at 109.)  For the reasons stated, the California Supreme Court reasonably could have found otherwise.  Furthermore, the record does not demonstrate that Petitioner moved for a new trial or that he was dissatisfaction with Cater's continuing representation.  (12/13/90 Marsden RT at 2292, 2295-99.)

### 5)   Conclusions

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel had an actual conflict of interest, Cuyler, 446 U.S. at 348, or that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It follows that the California Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim J is denied.

## 3.   Review of Claim K

Petitioner next claims that during discovery, the prosecution withheld from the defense certain material exculpatory evidence discussed below.  (ECF No. 113 at 112-17.)

Petitioner raised this claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

### a.   Clearly Established Law

#### 1)   Brady

The Supreme Court held that if the state fails to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S 83 (1963), the conviction cannot stand if there is a reasonable probability that the evidence, considered cumulatively, would have produced a different result at trial. Kyles v. Whitley, 514 U.S. 419, 434 (1995).  If a habeas petitioner establishes the "reasonable

probability" of a different result, the error cannot subsequently be found harmless.  Id. at 436.  In Brady, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  Brady, 373 U.S. at 87.

There are three components to a Brady violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued.  Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281–82 (1999).  "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Strickler, 527 U.S. at 280 (quoting Bagley, 473 U.S. at 682).  "[T]here is never a real Brady violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Id. at 281.

### 2)      *Due Process*

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly, 416 U.S. at 643.  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  Greer, 483 U.S. at 765 (quoting Bagley, 473 U.S. at 667).

Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.  See Greer, 485 U.S. at 765-66; Weitzenhoff, 35 F.3d at 1291.  A court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused."  Phillips, 455 U.S. at 219.  "Improper argument does not, per se, violate a defendant's constitutional rights."  Thompson, 74 F.3d at 1576 (quoting Jeffries, 5 F.3d at 1191).

### b.      Analysis of Claim K

### 1)      *Inducements to Ramirez*

Petitioner alleges that the prosecution withheld evidence that charges pending against prosecution witness Ramirez were dropped in exchange for his testimony against Petitioner.  (ECF No. 113 at 113.)  Petitioner claims this information had significant impeachment value for reasons discussed in claim I2, *ante*, and that withholding it had a substantial and injurious effect in determining the jury's verdict.  Brecht, 507 U.S. 619 (1993).

Petitioner argues that there must have been such an agreement because Ramirez's attorney, Gutierrez, declared that he would not have advised Ramirez to speak to the authorities if he (Gutierrez) did not believe that Ramirez would be released as a result.  (SHCP Ex. 7 at 2.)  He argues that even a tacit agreement must be disclosed.  United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986) (facts which imply an agreement regarding material evidence must be disclosed).

However, the record could reasonably suggest that the alleged incentive was the promise by law enforcement that if Ramirez was uninvolved in the crime then he would be released upon giving a statement to authorities, and that this incentive was disclosed to the defense.  (See RT at 1850-61, 1934-38.)  Petitioner's proffer of the Gutierrez declaration is not evidence otherwise.  The inference which Petitioner draws from the Gutierrez declaration is not supported by facts stated in that declaration.

The California Supreme Court could reasonably have found such allegations to be unsupported in the evidentiary record.  Surmise alone is not sufficient to show entitlement to habeas relief under § 2254(d).

### 2) *Inducements to Halfacre*

Petitioner alleges that the prosecution withheld evidence that its witness, Jerry Halfacre, received inducements from the prosecution to provide information used at the penalty phase.  This allegation is briefly discussed here because Petitioner includes it in his guilt phase claims.  (See ECF No. 113 at 113:24-114:18.)  However, this allegation relates primarily to the penalty phase and is discussed at length in claim R, *post*.

As noted, Halfacre had been living with Petitioner's daughter, Paula Bolin, and was the father of Paula's child, Ashley.  Halfacre gave his probation officer Georgia O'Connor a threatening letter he had received from Petitioner.  As discussed more specifically in claim R, *post*, in the letter

1   Petitioner threatened, among other things, to have Halfacre "permanently removed from the face of
2   this Earth." (RT at 2390-93, 2442-43); <u>Bolin</u>, 18 Cal. 4th at 336 n.11.

3       The letter was used by the prosecution at Petitioner's penalty trial as aggravating evidence of
4   "criminal activity which involved the use or attempted use of force or violence or the express or
5   implied threat to use force or violence" pursuant to Pen. Code § 190.3(b).  (ECF No. 113 at 113:27-
6   28.)  At that time, Halfacre was on probation for vehicular manslaughter.  Petitioner alleges Halfacre
7   was released from probation and allowed to leave the state in exchange for giving his probation
8   officer the letter.  (<u>See</u> ECF No. 113 at 114:4-5; RT at 2442-43.)  Petitioner alleges the prosecution's
9   failure to disclose this inducement prevented him challenging admission of the letter on grounds it did
10  not satisfy the elements of a threat under Penal Code § 422.  That is, Halfacre turned the letter over to
11  authorities not because of he was in fear of immediate harm, but solely to receive concessions from
12  the prosecution.  Petitioner alleges this prosecutorial wrongdoing had a substantial and injurious
13  effect in determining the jury's verdict.  <u>Brecht</u>, 507 U.S. at 637.

14      Petitioner states that Penal Code § 422 provided in pertinent part:

15      Any person who willfully threatens to commit a crime which will result in death or great
16  bodily injury to another person, with the specific intent that the statement is to be taken
    as a threat, even if there is no intent of actually carrying it out, which, on its face and
17  under the circumstances in which it is made, is so unequivocal, unconditional,
    immediate, and specific as to convey to the person threatened, a gravity of purpose and
18  an immediate prospect of execution of the threat, and thereby causes that person
    reasonably to be in sustained fear for his or her own safety or for his or her immediate
19  family's safety, shall be punished by imprisonment in the county jail not to exceed one
    year, or by imprisonment in the state prison.
20

21  (ECF No. 113 at 154:18-23); <u>see also</u> <u>Bolin</u>, 18 Cal. 4th at 337.

22      The state supreme court was not unreasonable in denying this allegation.  Preliminarily, the
23  alleged inducement does not appear to be <u>Brady</u> information because it was not exculpating of
24  Petitioner and could not have impeached or impugned the credibility of Halfacre because Halfacre did
25  not testify at Petitioner's trial.  (RT at 1867-69, 2442-44; SHCP Ex. 6 at 34.)

26      Petitioner has not demonstrated the undisclosed inducement denied him a fair trial.  He does
27  not deny that he wrote the letter.  He does not support with facts in the record his allegation the letter
28  was provided by Halfacre in exchange for Halfacre's release from probation and travel restrictions.

That allegation could be seen as merely speculative.   See Mayle v. Felix, 545 U.S. 644, 655 (2005) "[P]etition[er] is expected to state facts that point to a real possibility of constitutional error.").

Finally, for the reasons discussed in claim R1, *post*, the state court could reasonably have concluded that the letter threatened force or violence within § 422, placing Halfacre in sustained fear that Petitioner would follow-through on the threats in the letter; and that the letter was not otherwise improperly admitted at Petitioner's penalty phase.

In any event, Petitioner has not demonstrated prejudice.   The California Supreme Court, reviewing the admissibility of the letter on direct appeal, stated that:

> Although some of the language in the letter is menacing, it also reflects [Petitioner's] concern for his daughter's and granddaughter's well-being, a point stressed by the defense in mitigation. Moreover, the nature and circumstances of the threats would not necessarily provoke serious concern, especially considering [Petitioner] was incarcerated and would at least have to make outside arrangements to effect them. Halfacre waited four months before giving the letter to his probation officer, during which time apparently nothing had happened.

> More importantly, the letter paled compared to other aggravating evidence, which the prosecutor focused on in closing argument. In particular, the guilt phase testimony revealed [Petitioner] as a calculating and callous individual, willing to kill defenseless victims, including his friend and partner Huffstuttler, in cold blood to protect his drug enterprise. In addition, the assault with great bodily injury against Matthew Spencer and attempted manslaughter against Kenneth Ross confirmed [Petitioner's] pattern of resorting to violence in dealing with problems. Given this history, it is unlikely the jury accorded the letter much, if any, weight in fixing the penalty at death.

Bolin, 18 Cal. 4th at 340-41.   This Court finds that California Supreme Court's conclusions to be reasonable, especially given the noted substantial evidence against Petitioner.   (See claims O, R, and S, *post*.)

### 3)   *Police Contacts with Wilson*

Petitioner alleges that the prosecution withheld information regarding the disposition of Wilson's truck and further communications between him and authorities or the prosecution.  (ECF No. 113 at 114-16.)  Petitioner points to Wilson's testimony at trial that at some later date he returned to the property to retrieve his truck, (RT at 1738), and infers that Wilson must have been escorted by law enforcement to the crime scene to obtain his truck and that law enforcement must have documented these events.  (ECF No. 113 at 114-15.)

146

However, Petitioner knew from Wilson's above noted testimony that Wilson picked up the truck. It appears that Petitioner had enough information to obtain this evidence, if it existed, on his own. See Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006) (finding no Brady error since the petitioner knew of the existence of medical records and "his counsel could have sought the documents through discovery."). Petitioner does not demonstrate that the government had a duty to turn it over to him. Accordingly, the California Supreme Court could reasonably have found no Brady error.

Petitioner's further allegation that there must have been an inducement because Wilson's trial testimony was more consistent with witness Ramirez than had been Wilson's pretrial statements, (see claim I3, *ante*), is similarly unpersuasive. Petitioner does not point to anything in the evidentiary record showing that Wilson had any contact with law enforcement during this time in the nature of an inducement or otherwise.

Even if there was such a withholding of information, the California Supreme Court could reasonably have found it harmless. Nothing in the record suggests that any information relating to Mr. Wilson's retrieval of his truck would have resulted in a different outcome. The jury was already aware that Wilson had returned to the crime scene from his own testimony. (RT at 1738.) The state court could reasonably have found the result of proceedings would not have been different absent the alleged Brady error. Brecht, 507 U.S. at 637.

### *4)    Police Interviews Regarding Threats by Huffstuttler against Petitioner*

Petitioner alleges that the prosecution withheld evidence that, a week before the shootings, Petitioner had assaulted Huffstuttler and placed the barrel of a gun in Huffstuttler's mouth (see CT at 225-26; RT at 2363-70), in response to which Huffstuttler threatened violence against Petitioner, causing Petitioner to fear Huffstuttler. (SHCP Ex. 15.) Specifically, Petitioner alleges that the prosecution withheld law enforcement interviews with Petitioner's friends and neighbors in Los Angeles County, including Sondra Hooten and her boyfriend Dennis Dademasch, who apparently witnessed the alleged confrontation and consequent threats while guests at the cabin. (ECF No. 113 at 116-17.) Petitioner claims this undisclosed evidence would have supported a defense of unreasonable or imperfect self-defense, and that withholding it had a substantial and injurious effect

1    in determining the jury's verdict.

2         The record suggests that defense counsel had discovery on the incident in question; defense

3    counsel Cater apparently admitted as much.   (See RT at 2363-65; see also SHCP Ex. 69B 6/6/90

4    EMF Billing Statement at 2.)   For example, as discussed in claim I4, *ante*, Deputy Nikkel's report

5    clearly includes his interview with Huffstuttler's girlfriend, Ms. Ward, about this confrontation of

6    sorts between Petitioner and Huffstuttler, as follows:

> [Ward] said one time, when [Ward, Petitioner, and Huffstuttler] were at the cabin,
> [Huffstuttler] had gone out to get their pillows out of the van. She said when
> [Huffstuttler] closed the door to the van, he slammed it. She said that [Petitioner] came
> into the bedroom where they were at and stuck the .45 into [Huffstuttler's] mouth,
> telling him that he should not slam the door to his van. She said she and two (2) other
> people, who were friends of [Petitioner's], named Sandra and Dennis, from Covina,
> pulled [Petitioner] off of [Huffstuttler].

12   (SHCP, Ex. 18b, 9/7/89 Nikkel Supp. Report at 13.)

13        Petitioner has not shown the existence of additional law enforcement interviews with

14   Petitioner's friends and neighbors in Los Angeles County.   The declaration of Sondra Hooten

15   included with his habeas proffer does not suggest that at the time of trial she had talked to authorities

16   or the prosecution team about the alleged confrontation.   (See SHCP Ex. 15 at 2-3.)   Absent from

17   Petitioner's habeas proffer is any declaration from Mr. Dademasch.

18        Since Petitioner had the police report concerning this incident, it appears that there could be

19   no Brady error.

20        The California Supreme Court could reasonably have found that Petitioner, who at the time of

21   trial was in possession of Detective Nikkel's report concerning the alleged confrontation, had enough

22   information to obtain this evidence on his own, had there actually been any evidence to obtain.   See

23   Raley, 470 F.3d at 804.   Defense counsel could have interviewed these individuals.   Counsel

24   apparently did contact Ms. Ward and could have spoken to her about the incident.   (SHCP Ex. 69B

25   10/16/90 EMF Billing Statement at 3.)

26        Additionally, even if the prosecutor should have turned over evidence of these alleged

27   interviews, Petitioner has failed to show prejudice.   See Kyles, 514 U.S. at 433-34.   Petitioner's

28   habeas proffer of Ms. Hooten declaration referring to this incident does not suggest that Huffstuttler

acted violently toward or threatened violence upon Petitioner. Furthermore, the noted evidence against Petitioner was substantial. (See claims O, R and S, *post*.)

It follows that the state supreme court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim K is denied.

### 4. Review of Claim L

Petitioner next claims his rights were violated by the jury's view of the crime scene. He asserts four subclaims which are addressed separately below. He claims cumulative error.

#### a. Claim L1

Petitioner alleges that he did not waive his right to be present at the jury view, or to the taking of testimony during the view, or to the viewing of the Sand Canyon Store by less than all jurors. (ECF No. 113 at 120-23.) He claims a denial of due process and the right to confront witnesses against him. (Id.)

Petitioner raised this same claim on direct appeal. The California Supreme Court held that Petitioner's state and federal constitutional rights had not been violated because he had expressly waived his right to be present at the jury view of the crime scene. Bolin, 18 Cal. 4th at 325. That court also found that the trial court had not committed prejudicial error under state law. Id.

Petitioner also raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which the California Supreme Court summarily denied on the merits without explanation (CSC Order Den. Pet. Habeas Corpus) as well as on procedural grounds (because the claim was repetitive of a claim that had been raised and rejected on direct appeal). (CSC Order Den. Pet. Habeas Corpus, citing In re Harris, 5 Cal. 4th at 824-29; In re Waltreus, 62 Cal. 2d at 225.)

#### 1) Clearly Established Law

A defendant has a federal due process right to be present at court proceedings if his presence has a reasonably substantial relation to his ability to defend himself. United States v. Gagnon, 470 U.S. 522, 526 (1985). A waiver is ordinarily an intentional relinquishment or abandonment of a

known right or privilege.  <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).

### 2) *Analysis of Claim L1*

Petitioner alleges that he did not knowingly waive being present at the jury view because he did not anticipate that during the jury view, Kern County Sheriff's Department deputies Layman and Williamson, both of whom had previously been sworn in the case, would answer questions from the jury about issues such as the relative location of Huffstuttler's body and Wilson's truck and whether and the extent to which vegetation obscured views of portions of the crime scene, (RT at 1892-93; 2120-22), matters only he (Petitioner) could challenge.  He complains that the jurors may have understood the deputies to be continuing their prior testimony even though the deputies were not then under oath.

Petitioner also complains that, unbeknownst to him, Penal Code § 977 precluded waiver of presence at a proceeding where evidence is taken and requires a written waiver, not provided here.

Petitioner alleges that the information provided by the deputies during the crime scene view was relevant to his voluntary manslaughter defense and that at least to this extent his absence was not harmless beyond a reasonable doubt, <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967), and had a substantial and injurious effect on the jury's verdict (<u>see</u> <u>Brecht</u>, 507 U.S. at 637).

The record reflects that, on December 10, 1990, prior to the conclusion of the guilt phase evidence, pursuant to the agreement of the prosecutor and defense counsel (11/1/90 RT 46-48), the jurors were taken to view the crime scene.  (RT at 2119-22.)  Defense counsel believed that it would be helpful to the jury and "agreed that the jury really needed to see the scene." (11/1/90 RT at 47-48.)

After Soria advised the trial court that Petitioner wished to waive attending the crime scene view (11/1/90 RT at 48), the following colloquy occurred:

MR. SORIA: Yes, your Honor, in order to facilitate the trip up on Monday, I believe my client will waive his presence to going up the mountain.

THE COURT: Yes, we had really kind of assumed he would.  But, Mr. Bolin, would you waive your presence there, I take it?

DEFENDANT BOLIN: Yes, sir.

THE COURT: All right, and nobody has threatened you in order to get you to do this, have they?

DEFENDANT BOLIN: No, sir.

THE COURT: All right, are you satisfied with the waiver, Mrs. Ryals?

MRS. RYALS: Yes, your Honor.

(RT at 1893; <u>see also</u> CT at 380.)

Petitioner did not attend the jury view on December 10, 1990.  (RT at 2119.)

The California Supreme Court reviewed and rejected these same allegations, finding that:

We also find no violation of defendant's constitutional rights by virtue of his absence during the view. Prior to the excursion, [Petitioner] expressly waived his presence and acknowledged he did so voluntarily. The record reflects that before making this decision he had discussed the matter with counsel. We have repeatedly rejected the argument that the Sixth Amendment confrontation clause of the United States Constitution or the due process clause of the California Constitution prevents a criminal defendant from waiving the right of presence at a critical stage of a capital trial. [Citation] We have no reason to reconsider that conclusion, particularly when no additional testimony was taken in conjunction with the view.

We also find no prejudicial error with respect to defendant's statutory rights. In *People v. Jackson* (1996) 13 Cal. 4th 1164, 1211, this court held "that a capital defendant may not voluntarily waive his right to be present during the proceedings listed in section 977, including those portions of the trial in which evidence is taken [before the trier of fact] ...." [Citation] Although a jury view is not among the designated proceedings in section 977, we have long held that "in so viewing the premises the jury was receiving evidence" even if nontestimonial. [Citation] Thus, it comes within the purview of section 977. Nevertheless, in this case it is not reasonably probable that a more favorable result would have been reached had defendant, in addition to his counsel, been present. [Citation] On this record, we find "no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant's trial interests would be better served by *not* attending the jury view." [Citation]

<u>Bolin</u>, 18 Cal. 4th at 325.

As noted, that court also concluded that no additional testimony was taken in conjunction with the jury view:

In this case, Layman and Williamson investigated the crime scene; the trial court therefore reasonably designated them as "showers" to explain how the actual physical conditions related to their trial testimony. The record establishes that their involvement was limited to that end, i.e., "showing" the jury what their words had described and the photographs had depicted. Given the court's broad discretion in these matters, we find no abuse in having the deputies respond to specific questions rather than proceeding in

151

1  some other manner. Williamson's statement that the foliage differed in height from the
2  time of the crime was also proper "to account for any change in [the] condition between
   [its] state as shown by the evidence and [its] appearance at the time the jury inspected
3  [it]."

4  Id. at 324-25.

5       The Court finds this claim to be unpersuasive.  Petitioner has not demonstrated a clearly
6  established federal right to be present at a jury view of a crime scene.  See Snyder, 291 U.S. at 117-18
7  (due process does not require the defendant's presence at a jury view of the crime scene); see also
8  Moore v. Campbell, 344 F.3d 1313, 1323 (11th Cir. 2003) ("the issue of whether a defendant must be
9  present at all times in a capital trial has not yet been settled by the Supreme Court").  Mr. Soria stated
10 that he had talked with Petitioner about the importance of viewing the scene.  (11/1/90 RT at 48.)
11 Having waived his presence, Petitioner did not attend the jury view of the scene. (RT at 1893, 2119; CT
12 at 380.)

13      Nor has Petitioner demonstrated that his presence at the jury view would have contributed to
14 the fairness of the proceeding, even where the "showers" then "point[ed] out particular features of the
15 scene and [] request[ed] the jury to observe them."  Snyder, 291 U.S. at 110-11; see also Monroe v.
16 Kuhlman, 433 F.3d 236, 245-47 (2d Cir. 2006) (attorney's absence from jury view harmless error
17 even though defendant could have learned something from observing what jury focused upon).

18      A defendant has a right to be present "whenever his presence has a relation, reasonably
19 substantial, to the fullness of his opportunity to defend against the charge."  Stincer, 482 U.S. at 745
20 (quoting Snyder, 291 U.S. at 105-06).  However, he need not be present "when presence would be
21 useless, or the benefit but a shadow."  Id. (quoting Snyder, 291 U.S. at 106-07); see Rice, 77 F.3d at
22 1140 n.2 (listing cases finding right to presence not violated).  The state supreme court could
23 reasonably have found this to be such a case.

24      Once at the crime scene, the jurors were allowed to "look through the property" and to "walk
25 down [to the marijuana area", which they had previously seen in crime scene photographs.  (RT at
26 1119.)  The jurors were then allowed to ask questions, initially of the court and trial counsel and then
27 of deputies Layman and Williamson as "showers."  The deputies variously spoke to the location of
28 Wilson's truck; the location and angle of Huffstuttler's body; the location of the gun relative to

1   Huffstuttler's body; the location of the main road; and the height of the surrounding vegetation and

2   line of sight to the marijuana area at the time of the crime.  (RT at 2120-22.)  Detective Williamson

3   stated that the crime scene was "intact" other than the wintertime foliage.  (Id.)

4        The jurors, without juror Barnes, may have driven past the Sand Canyon store, where the

5   victim met up with Petitioner prior to the shootings.  (Id.)  It appears the jurors were familiar with the

6   crime scene through the photographs admitted into evidence and readily able to discern how the

7   photographs might have differed from their view of the crime scene including the noted statements at

8   the crime scene.  Petitioner's suggestion that his presence was required to provide further clarity in

9   these regards lacks factual support.  Moreover, defense counsel was present at the jury view and

10  apparently did not object to the noted statements or seek correction of the transcript of the jury's

11  viewing.

12       Petitioner's state law claim is not a basis for federal habeas relief.  See Estelle, 502 U.S. at 67-

13  68.  Under California law, a defendant shall be personally present at other proceedings involving the

14  taking of all evidence, unless he signs a written waiver.  Cal. Const., art. I, § 15; Pen. Code §§ 977(b),

15  1043(a); People v. Johnson, 6 Cal. 4th 1, 17 (1993), abrogated on other grounds by People v. Rogers,

16  39 Cal. 4th 826, 879 (2006).  But a defendant's "absence from various court proceedings, even

17  without waiver, may be declared non-prejudicial in situations where his presence does not bear a

18  reasonably substantial relation to the fullness of his opportunity to defend against the charge."

19  Johnson, 6 Cal. 4th at 18 (citing People v. Garrison, 47 Cal. 3d 746, 782 (1989)) (quoting People v.

20  Bloyd, 43 Cal. 3d 333, 359-60 (1987)).

21       Even if the Court were to assume the state law gave rise to a protectable federal right,

22  Petitioner has not demonstrated prejudice.

23       It was not unreasonable for the California Supreme Court to determine that "on this record,

24  we find no sound basis to question the contemporaneous judgment of defense counsel, with which

25  defendant then agreed, that defendant's trial interests would be better served by *not* attending the jury

26  view."  Bolin, 18 Cal. 4th at 325.

27       It follows that the state supreme court's rejection of the claim was not contrary to, or an

28  unreasonable application of, clearly established federal law, nor based on an unreasonable

1  determination of the facts in light of the evidence presented in the state court proceeding.  See 28

2  U.S.C. § 2254(d).

3      Claim L1 is denied.

4    **b.    Claim L2**

5      Petitioner claims that the manner in which the jury viewed the crime scene violated Penal

6  Code § 1119 ("§ 1119") (ECF No. 113 at 123-25), which in turn denied Petitioner state-created due

7  process and fair trial rights under the Fifth and Fourteenth Amendments.  (ECF No. 113 at 125:1-2.)

8      Petitioner raised this same claim on direct appeal, which the California Supreme Court

9  rejected based on counsel's failure "to object to any aspect of the jury view."  Bolin, 18 Cal. 4th at

10  323.  In the alternative, the California Supreme Court found that the trial court did not abuse its

11  discretion by having "the deputies respond to specific questions[.]" Id. at 325.

12      Petitioner also raised this same claim on state habeas corpus, which the California Supreme

13  Court summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

14    *1)    Clearly Established Law*

15      The due process standard is set out in claim L1, *ante.*

16    *2)    Analysis of Claim L2*

17      Petitioner alleges the jury received communications not authorized under § 1119, violating

18  state created federal due process and fair trial rights.  Hicks v. Oklahoma, 447 U.S. 343, 346 (1979)

19  (a criminal jury may deprive defendant of liberty only to the extent determined by the jury in the

20  exercise of its statutory discretion).

21      Section 1119 provides in pertinent part:

22      When, in the opinion of the court, it is proper that the jury should view the place in
       which the offense is charged to have been committed, or in which any other material fact
23      occurred, or any personal property which has been referred to in the evidence and cannot
       conveniently be brought into the courtroom, it may order the jury to be conducted in a
24      body, in the custody of the sheriff or marshal . . . to the place, or to the property, which
       must be shown to them by a person appointed by the court for that purpose; and the
25      officer must be sworn to suffer no person to speak or communicate with the jury, nor to
       do so himself or herself, on any subject connected with the trial. . . ."
26

27  Bolin, 18 Cal. 4th at 323 n.5.

28      The California Supreme Court reviewed and rejected this claim, by stating:

154

[T]he trial court conducted the jury view in full conformance with the provisions of section 1119, which expressly provides that when the court determines a jury view of the scene is proper, the place or property "must be shown to them by a person appointed by the court for that purpose ...." Originally, in <u>People v. Green</u> (1878) 53 Cal. 60, 61, this court construed the statute to preclude any person, even on direction of the trial court, from speaking to the jury on any subject connected with the trial. In <u>People v. Bush</u> (1887) 71 Cal. 602, 606, however, this rigid construction was rejected as illogical and inconsistent with the statutory language: "[W]e cannot conceive how [the shower] could have shown the jury the ... places which they were sent to view in any other way [than pointing out and naming such places], under the statute." [Citation] For more than a century, courts have consistently applied this interpretation, implicitly recognizing that the admonition that "no person ... speak or communicate with the jury" (§ 1119) is plainly directed to insulating the jury from extraneous contact and potential tampering. [Citations]

At the same time, the broad discretion conferred by the statute authorizes the trial court to conduct the view as appropriate to the circumstances. For example, in <u>People v. Pompa</u>, <u>supra</u>, 192 Cal. 412, we rejected the defendant's claim of error that the view was not, as originally directed by the court, strictly limited to an inspection of the premises. [Citation] Although considerable testimony was taken and evidence received by the jury, "the record expressly disclose[d] that during the entire proceedings ... the court in its completeness, including the judge, the clerk, the bailiff, the reporter, the interpreter, the jury, the defendant, and the respective counsel was at all times present, the only element absent being the walls and fittings of the courtroom wherein the court is usually convened." [Citation] Since "the forms of law governing the trial of causes" was otherwise observed, we declined to hold this "absence of formality" had compromised the proceedings. [Citation]

In this case, Layman and Williamson investigated the crime scene; the trial court therefore reasonably designated them as "showers" to explain how the actual physical conditions related to their trial testimony. The record establishes that their involvement was limited to that end, i.e., "showing" the jury what their words had described and the photographs had depicted. [Citations] Given the court's broad discretion in these matters, we find no abuse in having the deputies respond to specific questions rather than proceeding in some other manner. [Citation] Williamson's statement that the foliage differed in height from the time of the crime was also proper "to account for any change in [the] condition between [its] state as shown by the evidence and [its] appearance at the time the jury inspected [it]." [Citation]

We also find no prejudicial error with respect to defendant's statutory rights. [Citation] [I]n this case it is not reasonably probable that a more favorable result would have been reached had defendant, in addition to his counsel, been present. [Citation] On this record, we find "no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant's trial interests would be better served by *not* attending the jury view." [Citation]

<u>Bolin</u>, 18 Cal. 4th at 324-325.

Petitioner has not convinced the Court that the comments of deputies Layman and Williamson, while showing the jury the crime scene, violated § 1119, denying him federal rights.  As noted, the California Supreme Court, in rejecting this claim, broadly construed § 1119 to allow the appointed showers "to explain how the actual physical conditions related to their trial testimony."  Id. at 324-25.  Because "their involvement was limited to that end," id. at 325, and § 1119's provision against communicating with the jury has been recognized by the California Supreme Court as directed to insulating the jury from "extraneous contact and potential tampering," id. at 324, citing People v. Tarm Poi, 86 Cal. 225 (1890), the California Supreme Court could reasonably have determined that no abuse of discretion or violation of the statute occurred.

Petitioner has not cited any applicable clearly established Supreme Court laws.  Accordingly, the state supreme court's decision is not contrary to or an unreasonable application of United States Supreme Court precedent.  Carey, 549 U.S. at 76.

Furthermore, to the extent Petitioner's argument raises an issue of state law his claim is not a basis for habeas relief.  (ECF No. 113 at 123-25.)  "[F]ederal habeas corpus relief does not lie for errors of state law." Lewis, 497 U.S. at 780.  A federal habeas court may not examine questions of state law; it "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 67-68.

As with claim L1, *ante*, even if the Court were to assume the state law gave rise to a protectable federal right, Petitioner has not demonstrated prejudice.  Petitioner concedes "the requirements of Penal Code § 1119 have not been strictly construed by the California courts . . . ." (ECF No. 178 at 158:1-2.)  He complains of a lack of courtroom decorum and that the court clerk was not present.  Yet he does not explain with reference to the record how this, or the comments of the "showers," prejudicially impacted him.

In sum, the California Supreme Court could reasonably find that Petitioner did not make a showing of why and how the manner in which the jury view was conducted denied him a fair trial.  This Court agrees with the state supreme court that, "[o]n this record, we find no sound basis to question the contemporaneous judgment of defense counsel, with which defendant then agreed, that defendant's trial interests would be better served by not attending the jury view." Bolin, 18 Cal. 4th

at 325.

It follows that the state supreme court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim L2 is denied.

**c.   Claim L3**

In this next claim, Petitioner alleges that the viewing of the Sand Canyon Store by only 11 of the 12 jurors violated Penal Code § 1119, that he did not waive this violation, and that the violation denied him a fair jury trial and due process under state and federal law.  (ECF No. 113 at 125-28.)

Petitioner raised this same claim on habeas corpus in the California Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

*1)      Clearly Established Law*

The due process standard is set out in claim L1, *ante*.

*2)      Analysis of Claim L3*

Petitioner alleges that the jury, as a body, did not view the Sand Canyon Store, the location where Petitioner and Ramirez met the victims on the day of the shootings.  (RT at 2121.)  Petitioner states that he did not anticipate this alleged structural error and did not knowingly waive his rights regarding it.  (RT at 1892-93.)

As noted, juror Barnes, with the agreement of the parties and the trial court, was allowed to drive home from the crime scene view separately from the other jurors.  (RT at 2121.)  After juror Barnes departed, the remaining jurors were told they would drive past the Sand Canyon Store.  (Id.)

Petitioner argues that once Barnes left, the jury was no longer constituted as a jury, such that any action taken by the partial jury denied him fair trial and due process under Article I § 16 of the

157

California Constitution and the Fifth, Sixth and Fourteenth Amendments. <u>Hicks</u>, 447 U.S. at 346. He argues the eleven jurors received additional information relevant to testimony of witnesses Ramirez and Wilson outside his presence, i.e., effectively conducting the jury trial without the full jury. He alleges this created structural error, exempt from harmless error review, and highly prejudicial under <u>Brecht</u>.

This claim fails. Preliminarily, the record is unclear whether juror Barnes and/or the remaining 11 jurors actually drove past and saw the Sand Canyon Store. Equally uncertain is whether deputies Layman and Williamson commented on the Store during the jury view. In short, Petitioner makes no showing that during the jury view, any juror received information about the Store that was relevant to the testimony of Ramirez and Wilson. The California Supreme Court would not have been unreasonable in determining that speculation alone is not a basis for error.

Similarly, any violation of § 1119 could be seen as speculative. Even if juror Barnes was absent from a jury viewing of the San Canyon Store, the state supreme court could reasonably find such a state law violation did not result in a fundamentally unfair trial violating Petitioner's constitutional rights. Petitioner argues that because Ramirez and Wilson described the Sand Canyon Store in their testimony, their credibility would have been impacted by any inconsistencies between their description of the Sand Canyon Store and what the jury saw when viewing the Store. But Petitioner does not point to any facts in his proffer suggesting such inconsistencies existed, much less reflected upon witness credibility. This argument could be seen as speculative.

Petitioner's citation to <u>Hicks</u> in support of the argument that § 1119 supports a state created due process right is unavailing. <u>Hick's</u> does not so hold. Petitioner does not demonstrate that the state legislature intended this result, or that courts have interpreted § 1119 in this fashion.

Petitioner's waiving attendance at the scene view did not run afoul of due process protections for reasons discussed in claim L1, *ante*. Moreover, it appears that defense counsel was present during the jury view and did not object in relation to any viewing of the Sand Canyon Store. (RT at 2121.)

Finally, Petitioner has not established any prejudice related to this allegation. Petitioner has not demonstrated that the trial testimony of eyewitnesses Ramirez and Wilson was dependent upon or related to the location and structure of the Sand Canyon Store or that the Sand Canyon Store had

some material relationship to other locations and events described in the trial testimony.  Moreover, all the jurors had seen photographs of the Sand Canyon Store.  (RT at 1724-25; CT at 390).  Even if juror Barnes was absent from a viewing of the Store,  the California Supreme Court could reasonably have found this had only a minor, if any, impact on the jury's determinations, for the reasons stated. See e.g.,  Olano, 62 F.3d at 1188 (finding no error where juror missed an afternoon of testimony but reviewed a written transcript of what he missed).

In sum, Petitioner makes no showing that during the jury view, any juror received information about the Store that was relevant to the testimony of Ramirez and Wilson, or that any absence of juror Barnes from a jury viewing of the San Canyon Store resulted in a fundamentally unfair trial violating Petitioner's constitutional rights.

It follows that the state supreme court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim L3 is denied.

### d.   **Claim L4**

In this final claim, Petitioner complains that the trial court did not take steps to reduce the intrusive effect of press coverage during the jury view, denying Petitioner due process and a fair jury trial under the Fifth, Sixth, and Fourteenth Amendments.  (ECF No. 113 at 128-30.)

Petitioner raised this same claim on habeas corpus in the California Supreme Court.  (CSC Pet. Habeas Corpus at 197-200.)  The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected the claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

#### 1)    *Clearly Established Law*

The standard for due process is set out in claim L1, *ante*.

#### 2)    *Analysis of Claim L4*

159

Petitioner argues that the jury view was tainted by excessive media involvement, denying fairness and integrity of the proceedings.

The trial court, prior to the jury view, warned jurors that the press would be "tailing" them up the mountain to the crime scene.  (RT at 1892-93.)  Petitioner claims that the media presence at the jury view denied "judicial serenity and calm," Estes, 381 U.S. at 536, and changed the jury's perception of the crime scene and how it relates to the testimony at trial.  (ECF No. 113 at 129.)  This, he claims, had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637.

But the state court could reasonably have found these allegations, relating to media at the jury view and how the media might have influence matters there, to be speculative and without merit.  Petitioner seizes upon two comments the trial court made prior to the trip to the crime scene.  (ECF No. 113 at 128-29.)  The court first stated: "[w]e will be tailed by a television crew who will be filming again."  (RT at 1892.)  Later, the court commented:

> [T]his trip Monday has gotten a little more complicated and publicized than I might wish, and I cannot close down these highways, at least I don't think that's within my power, and there are going to be television stations following us up and down and around, so I just have to warn you about that. Avoid contact with them, and I am sure that we will make some security arrangements for you but there's going to be more than one television crew, I think, tailing us, so to speak, up the mountain. [Citation]  The trial court also told jurors that the media "are ordered not to talk [to you], and you are ordered not to talk to them.

(RT at 1976-77.)

Notwithstanding these comments, nothing in the record reasonably suggests that media was in fact present at the jury view.  It follows that Petitioner's suggestion the presence of the media "would have dramatically altered the jury's perceptions" of the crime scene, and his ruminations regarding how media might have impacted the jury view, e.g., detracting from the sense of remoteness and creating background noise, are all unavailing absent any showing the media was present for the viewing.  (ECF No. 113 at 129.)  Petitioner was given the opportunity to obtain discovery regarding this claim.  (ECF No. 174 at 11.)  Nonetheless, the claim remains unsupported in the record.

Even if the media was present for the jury's view of the crime scene, the state supreme court

1   could reasonably have concluded there was no prejudice.  Nothing in the record suggests media

2   activity that impacted or altered the jury's view of the crime scene.  The court referenced security

3   arrangements for the trip which could have ameliorated distraction the media might otherwise

4   present.  (RT at 1893, 1976-77.)  Moreover, the trial court admonished the jury numerous times to

5   avoid any and all contact with the media.  (RT at 25, 228, 235, 249, 326, 1642-43, 1892-93, 1976-77,

6   2090.)  Jurors are presumed to follow the court's instructions.  Olano, 507 U.S. at 740.

7           It follows that the California Supreme Court's rejection of the claim was not contrary to, or an

8   unreasonable application of, clearly established federal law, nor based on an unreasonable

9   determination of the facts in light of the evidence presented in the state court proceeding.  See 28

10  U.S.C. § 2254(d).

11          Claim L4 is denied.

12          **5.      Review of Claim M**

13          Petitioner, in his next claim, alleges trial court error by admitting cumulative, irrelevant, and

14  gruesome crime scene and autopsy photographs, discussed in claim I12, *ante*, which he alleged were

15  unduly prejudicial and violated Petitioner's state law rights and rights under the Fifth, Eighth and

16  Fourteenth Amendments.  (ECF No. 113 at 130-32.)

17          Petitioner presented these same allegations to the California Supreme Court on direct appeal.

18  The California Supreme Court held that Petitioner's failure to object on federal constitutional grounds

19  in the trial court waived the claim.  Bolin, 18 Cal. 4th at 319.  The California Supreme Court also

20  held that Petitioner's failure to object to the admission of photographs other than People's Exhibits

21  42, 43, and 44 waived any state law objection to the remaining photographs.  Id. at 319 n.4.

22          Petitioner raised this same claim on habeas corpus in the California Supreme Court.  (CSC

23  Pet. Habeas Corpus at 148-150.)  That court summarily rejected the claim on the merits without

24  explanation.  (CSC Order Den. Pet. Habeas Corpus.)

25          **a.      Clearly Established Law**

26          As noted, a due process claim can be stated where graphic photos of victims make the trial

27  fundamentally unfair.  Jammal, 926 F.2d at 919.  However, photos that are relevant to the crime

28  charged and elements thereof are admissible.  See Villafuerte, 75 F.3d at 1343.

Under California law, "photographs which disclose the manner in which the victim was wounded are relevant on the issues of malice and aggravation of the crime and the penalty." Thompson, 50 Cal. 3d at 182.  But otherwise relevant evidence will be precluded if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Evid. Code §§ 350, 352; People v. Cardenas, 31 Cal. 3d 897, 903-04 (1982).

### b.    Analysis of Claim M

Petitioner revisits the photographs which were the subject of ineffective assistance of counsel claim I12, *ante*, but this time alleging trial court error in allowing the prosecution to introduce the color photographs of Mincy and Huffstuttler at the crime scene and during autopsy.  (People's Ex.'s. 3, 4, 10, 17, 35, 40, 42, 43, 44, 72, and 73; see RT at 2079-80, 2083-85, 2088; ECF No 113 at 130:20-24; CT at 391.)  These photographs were used by prosecution criminalist Laskowski to support his allegedly improper blood splatter testimony.   (See e.g., RT at 2084.)   Petitioner claims the photographs had a substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637.

This claim fails for the same reasons discussed in claim I12, summarized below.

The state supreme court could reasonably have found the photographs corroborative of the trial testimony and forensic evidence; relevant to expert testimony; probative for sentence selection; and not unnecessarily inflammatory or gruesome.   These photographs clearly relate to the circumstances of the murders and the identities of the victims.  These photographs could reasonably inform as to state(s) of mind of the perpetrator(s) and thus have probative value regarding charges and elements including intent to kill, aggravation and penalty.  Photographs that are relevant to the crime charged are admissible.   See Villafuerte 75 F.3d at 1343; Thompson, 50 Cal. 3d at 182 ("[P]hotographs which disclose the manner in which the victim was wounded are relevant on the issues of malice and aggravation of the crime and the penalty.").

Significantly, criminologist Laskowski relied upon People's Exhibits 42 through 44, 72, and 73 to support his testimony and conclusions that Huffstuttler was shot and died where he was found and that he was shot after he was no longer moving.  (RT at 2055-65.)  The other photographs were not

close-ups and not particularly bloody or gruesome and were reasonably probative of the manner of death and the crime scene and the victims in relation thereto.  (RT at 1661-62, 1671, 1683, 1732, 1790-92, 1817, 1946-47.)

Petitioner argues that the photographs were cumulative of and offered little beyond the testimony of those who saw what was depicted.  However, he does not point to facts in his proffer showing the photographs lacked all probative value and permissible inference and were unduly prejudicial and that their admission prevented Petitioner from having a fair trial.  It appears that the photographs informed the expert testimony of criminologist Laskowski (see People's Ex.'s 42-44, 72-73), and might have been of value to the jury in understanding and evaluating the credibility of this and other testimony.  See Batchelor v. Cupp, 693 F.2d 859, 865 (9th Cir. 1982) ("[A]dmission of photographs lies largely within the discretion of the trial court, whose ruling will not be disturbed . . . unless the admission of the photographs rendered the trial fundamentally unfair").  Some of the photos were wide area shots of the crime scene, not focusing on the bodies, which reasonably could have provided useful context to the testimony of the eyewitnesses.  (See People's Ex.'s 17, 35, 40.)

Even without the photographs, it is not reasonably probable the jury would have returned a more favorable verdict.  Petitioner argues the jurors were likely to accord more weight to the photographs than deserved because the jurors were unused to seeing such photos.  But the noted evidence against Petitioner including the circumstances surrounding the murders and their aftermath was substantial.  (See claims O, R and S, post.)  As the California Supreme Court observed: "[w]ith two eyewitnesses to the killing, the defendant's state of mind and intent were the only issues open to question.  The forensic evidence bearing on those elements was straightforward, to the point, and not susceptible to much controversy."  Bolin, 18 Cal. 4th at 313.

Petitioner's argument that admission of the photos was unduly prejudicial and violated state law, citing Pen. Code §§ 350, 352, cannot alone be a basis for federal habeas relief.  Lewis, 497 U.S. at 780; see also Pulley, 465 U.S. at 41.

For the reasons stated, admission of the photographs of the victims did not cause Petitioner's trial to be fundamentally unfair.  Jammal, 926 F.2d at 919.  This Court does not find that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly

established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim M is denied.

### 6.      Review of Claim N

In this next claim, Petitioner alleges trial court error by allowing criminologist Laskowski to testify as an "expert" regarding blood splatter evidence and by admitting his irrelevant, cumulative and prejudicial testimony relating to blood splatter causing Petitioner's trial to be unfair.  (ECF No. 113 at 132:14-134:-1.)

Petitioner presented this claim to the California Supreme Court on direct appeal.   The California Supreme Court held that Petitioner's claim was waived because he failed to object contemporaneously to Laskowski's testimony on the grounds urged on appeal.  Bolin, 18 Cal. 4th at 319.

Petitioner raised this same claim on habeas corpus in the California Supreme Court. (CSC Pet. Habeas Corpus at 126-133.)   The California Supreme Court summarily rejected the claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

### a.      Clearly Established Law

The standard for trial court error is set out at claim A.

### b.      Analysis of Claim N

This claim is related to claims I8 and I9, denied *ante*, wherein Petitioner raised failure to challenge Laskowski's qualifications to opine on blood splatter evidence in the context of claimed ineffective assistance of counsel.

Laskowski testified regarding analysis of bullets removed from the victims and the patterns of blood spatters and drips on and near the victims.  (RT at 2053-63.)  Laskowski did so having never visited the crime scene, relying instead on crime scene photographs.  (RT at 2053-63.)

Petitioner alleges that Laskowski was not qualified to give expert testimony as to blood splatter evidence.  He alleges the testimony was not probative, but inflammatory, and so prejudicial as to violate Petitioner's federal due process rights.   He faults the trial court for allowing the

1   testimony and defense counsel for failing to challenge Laskowski's qualifications as a blood splatter

2   expert.  (ECF No. 113 at 132-34.)

3       Petitioner also alleges that California Supreme Court did not adjudicate the federal claims,

4   instead disposing of these allegations on state law procedural grounds given trial counsel's failure to

5   contemporaneously object to Laskowski's testimony.  (ECF No. 113 at 133:22-26); see also Bolin, 18

6   Cal. 4th at 319.

7       However, the record reflects that the California Supreme Court on direct appeal did review

8   these same allegations, as a federal constitutional violation (ineffective assistance of counsel), and

9   denied them.  See Bolin, 19 Cal. 4th at 321-22; see also claims I8-I9, ante.  Thus the summary denial

10  does not alone rest on an unadjudicated procedural denial of these allegations.  See e.g., Kernan v.

11  Hinojosa, No. 15-833, 2016 WL 2842454, at *2 (U.S. May 16, 2016) (strong evidence can refute

12  presumption that a later decision rejecting claim did so on the basis of an earlier reasoned opinion

13  imposing a procedural default).

14      In rejecting Petitioner's related ineffective assistance of counsel claim based on failure to

15  challenge Laskowski's qualifications, the state supreme court observed that:

16

17      Utilizing photographs of the crime scene, Criminalist Laskowski testified regarding the
        various positions of Mincy's and Huffstuttler's bodies when they were shot. Based on
18      blood spatters and drips depicted in the photos, he indicated one shot was to Mincy's
        body while in a "fetal-like" position on its left side; as to the others, his body was in a
19      vertical position. Laskowski also concluded Mincy "was moving at a relatively rapid
        pace" after being initially wounded. With respect to Huffstuttler, he determined that for
20      several shots the body was prone and not moving. Defendant now contends this
        evidence was inadmissible because the witness was not qualified to render an expert
21      opinion (Evid. Code, § 720) and because he did not personally investigate the crime
        scene. He further asserts it should have been excluded pursuant to Evidence Code
22      section 352. Since he failed to make these objections at trial, the issue is waived.
        [Citation]

23      …

24      Evidence Code section 720 provides that a person may testify as an expert "if he has
        special knowledge, skill, experience, training, or education sufficient to qualify him,"
25      [Citation] which "may be shown by any otherwise admissible evidence, including his
        own testimony." [Citation] The trial court's determination of whether a witness qualifies
26      as an expert is a matter of discretion and will not be disturbed absent a showing of
        manifest abuse. [Citation] "Where a witness has disclosed sufficient knowledge of the
27      subject to entitle his opinion to go to the jury, the question of the degree of his
        knowledge goes more to the weight of the evidence than its admissibility." [Citation]

28      The record establishes Laskowski was fully qualified to testify based on his educational

background in biochemistry and serology and his training as a criminalist for 13 years, including attending and giving seminars in blood-spatter analysis and crime scene investigation. He had also testified as an expert witness on numerous prior occasions. Given his expertise, Laskowski's testimony was not cumulative. Utilizing his knowledge of blood spatters and drips, he was better able to describe the particulars of what occurred during the shooting of Huffstuttler and Mincy than any photographic depiction of their bodies. For example, he concluded from the spatter evidence that Mincy was moving around after he was first shot and before he fell into a fetal position, where he was shot one more time. He also explained that the large pool of blood around Huffstuttler's body indicated he was prone and not moving when he received the final shots. As discussed in other contexts, this evidence was relevant to the issues of intent and premeditation and deliberation. The photographs Laskowski referred to adequately illustrated his testimony; therefore, the fact he did not personally examine the crime scene was a matter of evidentiary weight. Since his testimony was admissible on all grounds, counsel had no basis for objecting.

Bolin, 18 Cal. 4th at 321-22.

This Court, for purposes of this claim, finds that the California Supreme Court's conclusion that Laskowski was "fully qualified" as an expert in blood spatter analysis, Bolin, 18 Cal. 4th at 321-22, was not unreasonable given the facts on record and inference therefrom, as more fully discussed in claims I8 and I9, *ante*.  Laskowski's testimony regarding the forensic evidence and photographs was probative of the charged offenses and neither cumulative nor more prejudicial than probative. See claims I8, I9 and M, *ante*, and O, *post*.  The state court could reasonably have found his testimony instructive on matters of intent, premeditation, deliberation, and self-defense, as explained in claims I8, I9, M and O.  Federal courts may not interfere with a state evidentiary ruling unless the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial.  Jeffries, 5 F.3d at 1192; Butcher, 758 F.2d at 378.  Only if no permissible inferences can be drawn from admitted evidence will due process be violated. Jammal, 926 F.2d at 920.  This is not such a case, for the reasons stated.

Even without Laskowski's testimony, the California Supreme Court could have found no reasonable probability and likelihood that the result of the proceeding would have changed.  The noted evidence of Petitioner's guilt was substantial. (See claims O, R and S, *post*.)  Laskowski's testimony was not the only evidentiary support for Petitioner's intent, premeditation, and planning. See Bolin, 18 Cal. 4th at 331-33.  As the California Supreme Court observed: "[w]ith two eyewitnesses to the killing, the defendant's state of mind and intent were the only issues open to question.  The forensic evidence bearing on those elements was straightforward, to the point, and not

susceptible to much controversy." Id. at 313.

For the reasons stated, the California Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim N is denied.

### 7.    Review of Claim O

Petitioner claims the evidence presented at trial was insufficient to prove beyond a reasonable doubt all the elements of first-degree murder, denying him due process and a fair jury trial.  (ECF No. 113 at 134-36.)

Petitioner raised this same claim on direct appeal.  The California Supreme Court denied the claim on the merits.  Bolin, 18 Cal. 4th at 331-33.

### a.    Clearly Established Law

Then applicable California law provided, "[m]urder is the unlawful killing of a human being . . . with malice aforethought."  Pen. Code § 187, subd. (a).  "[A]ll murder which is perpetrated . . . by any kind of willful, deliberate, and premeditated killing . . . is murder of the first degree."  Pen. Code § 189; see People v. Berryman, 6 Cal. 4th 1048, 1085 (1993), overruled on other grounds, People v. Hill, 17 Cal. 4th 800, 822-23 (1998).  Premeditation and deliberation are generally established by proof of (1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing.  People v. Anderson, 70 Cal. 2d 15, 26-27 (1968).  The California Supreme Court "sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."  Id. at 27.

A federal habeas court reviews challenges to the sufficiency of the evidence by determining whether in "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Lewis, 497 U.S. at 781.  "A reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously."  McDaniel v. Brown, 558 U.S. 120, 131 (2010).

Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with reference to substantive requirements as defined by state law. Jackson v. Virginia, 443 U.S. 307, 324 n.16 (1979). In cases where the evidence is unclear or would support conflicting inferences, the federal court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." Id. at 326. To prevail here, Petitioner must show "that the prosecution's case against him "was so lacking that the trial court should have entered a judgment of acquittal." McDaniel, 558 U.S. at 131.

AEDPA adds another layer of deference over the already deferential Jackson standard. Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the Jackson standard when reviewing the petitioner's claim. See, e.g., Juan H. v. Allen, 408 F.3d 1262, 1275 n.12 (9th Cir. 2005); Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997) (recognizing that "unreasonable application" standard applies to insufficient evidence claim). "Expressed more fully, this means a reviewing court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." McDaniel, 558 U.S. at 133.

### b.    Analysis of Claim O

Petitioner alleges the evidence presented was insufficient to prove that he acted with deliberation and premeditation. (ECF No. 113 at 134); Anderson, 70 Cal. 2d at 26-27. He re-argues his voluntary manslaughter theory, namely, that the Huffstuttler shooting resulted from a sudden argument with Petitioner (ECF No. 113 at 135:1-4) caused by Huffstuttler bringing Mincy and Wilson to the cabin and showing them the marijuana field (RT at 1729-42, 1755, 1764-65). Petitioner goes on to assert that he then immediately shot Mincy and Wilson (RT at 1741), not because he planned to, but by reacting on impulse to a perceived threat from Huffstuttler and because they were uninvited intruders. (ECF No. 113 at 135:13-17.)

Petitioner points out that Wilson initially told authorities he heard a scuffle before shots were fired (RT at 1809-10), though by the time of trial he was unable to remember a scuffle. (RT at 1770.) Petitioner also points out that the prosecution expert identified dust on Huffstuttler's clothing which

1  Petitioner contends is consistent with a struggle having occurred prior to the gunshots.  (RT at 2071.)

2         Petitioner contends that this claim was not adjudicated by the state court because that court

3  did not address the constitutional issues presented.   (ECF No. 135 at 135:24-25.)   This Court

4  disagrees for the reasons that follow.

5         The California Supreme Court considered and rejected these allegations on direct appeal,

6  noting that:

7         Defendant contends the evidence of first degree murder was insufficient to establish a
       preconceived design or careful thought or reflection. [Citation] In particular, he argues
8      that he could not have formed the requisite state of mind because the unexpected arrival
       of Mincy and Wilson immediately precipitated both the argument with Huffstuttler
9      about the strangers' observations of the marijuana plants and the shootings.

10        In assessing the sufficiency of the evidence, we review the entire record in the light most
       favorable to the judgment to determine whether it discloses evidence that is reasonable,
11     credible, and of solid value such that a reasonable trier of fact could find the defendant
       guilty beyond a reasonable doubt. [Citations] Reversal on this ground is unwarranted
12     unless it appears "that upon no hypothesis whatever is there sufficient substantial
       evidence to support [the conviction]." [Citation] In People v. Anderson, supra, 70 Cal.
13     2d at pages 26-27, we identified three categories of evidence relevant to resolving the
       issue of premeditation and deliberation: planning activity, motive, and manner of killing.
14     However, as later explained in People v. Pride (1992) 3 Cal. 4th 195, 247: "Anderson
       does not require that these factors be present in some special combination or that they be
15     accorded a particular weight, nor is the list exhaustive. Anderson was simply intended to
       guide an appellate court's assessment whether the evidence supports an inference that
16     the killing occurred as the result of preexisting reflection rather than unconsidered or
       rash impulse. [Citation]" Thus, while premeditation and deliberation must result from "
17     'careful thought and weighing of considerations' " (70 Cal. 2d at p. 27), we continue to
       apply the principle that "[t]he process of premeditation and deliberation does not require
18     any extended period of time. 'The true test is not the duration of time as much as it is the
       extent of the reflection. Thoughts may follow each other with great rapidity and cold,
19     calculated judgment may be arrived at quickly ....' [Citations]"

20        Defendant correctly notes the killings took place within a few minutes of the victims'
       arrival at his cabin. What occurred within those few minutes, however, is particularly
21     telling with respect to his state of mind. According to both Wilson and Eloy Ramirez,
       defendant began arguing with Huffstuttler when Mincy and Wilson were shown the
22     marijuana plants. Defendant continued berating Huffstuttler as the two walked back
       toward the cabin. Defendant went inside, retrieved a revolver, and shot Huffstuttler at
23     close range. He proceeded back across the creek and confronted Wilson and Mincy.
       After apologizing that he had "nothing against" them, he opened fire. As a wounded
24     Wilson fled the scene, he heard Mincy plead for his life. More shots were fired.
       Defendant returned to Huffstuttler and fired several rifle rounds into his motionless
25     body. The autopsy report indicated at least three shots were inflicted before he died,
       although according to Ramirez he did not move after the first shot. After the shootings,
26     defendant told Ramirez he was going to make the scene look like a bad dope deal had
       occurred and scattered marijuana, broke bottles, and poured chili sauce around
27     Huffstuttler's body. None of the victims were armed; nor did they engage in any
       provocative conduct.

28
          From this evidence, a reasonable trier of fact could infer defendant had a motive for the

killings, both to punish Huffstuttler for revealing the marijuana operation to strangers and to protect his crop from theft or exposure to law enforcement. He also may have wanted to eliminate Mincy and Wilson as witnesses to the Huffstuttler shooting. In conjunction with these possible motives, the manner of killing supports a finding of premeditation and deliberation. Both victims died of multiple gunshot wounds, several of which would have been fatal individually. While defendant fired some shots at Mincy as he was attempting to flee, at least one shot entered his body as he lay in a fetal position. This forensic evidence indicates defendant did not want merely to wound either victim; he wanted to make certain they died. The trial testimony also suggests rapid but purposeful planning activity once defendant realized the potential consequences of his partner's carelessness. While chastising Huffstuttler, he walked back to the cabin where he got a gun. Rather than seek a reconciliation, he shot Huffstuttler without warning. He then shot Mincy and Wilson and made good his escape after attempting to conceal his own involvement in the crimes. Viewing the record in its entirety, we find sufficient evidence to support the jury's finding of first degree murder. [Citation]  Defendant's argument simply asks this court to reweigh the facts.

Bolin, 18 Cal. 4th at 331-33.  Petitioner argues the facts demonstrate that he had insufficient time to plan the killings, and that he had no prior relationship with any of the victims that would suggest a motive for the killings.  (ECF No. 178 at 177:14-178:5, citing the Anderson factors.)  The Court disagrees for the reasons stated by the California Supreme Court.  The trial record suggests Petitioner was motivated to kill Huffstuttler for bringing strangers to the marijuana field, followed by some amount of time to retrieve a gun, return and take Huffstuttler down to the ground with a single shot. Petitioner then pursued Mincy, apologized for what he was about to do, and shot him dead while Mincy begged to live.  Petitioner's conduct after the shootings could reasonably inform the manner in which he killed his victims.  See People v. Perez, 2 Cal.4th 1117, 1128 (1992).  Petitioner searched for Wilson after he escaped wounded into to the forest; when he could not find him, Petitioner commented to Ramirez that Wilson would bleed to death before he got off the hill.  (RT at 1928-29.) Apparently to ensure this, Petitioner disabled Wilson's truck, removing wires and discarding them during his flight to Los Angeles.  (RT at 1738, 1863-64, 1929, 1957, 1959, 1961, 1975.)  Petitioner altered the crime scene and then fled.  All these facts reasonably suggest Petitioner was motivated to, planned to and purposefully obtained a gun and shot Huffstuttler and Mincy in order to kill them. These facts do not suggest the victims threatened to physically harm Petitioner.

A rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt based on the noted evidence in the record.  The state supreme court's denial of these claims was not contrary to, or an unreasonable application of, clearly established federal law, or based

170

1   on an unreasonable determination of the facts in light of the evidence presented in the state court

2   proceeding.  See 28 U.S.C. § 2254(d).

3       For the stated reasons, the California Supreme Court reasonably rejected Petitioner's

4   constitutional challenge to the sufficiency of the evidence.  See 28 U.S.C. § 2254(d).

5       Claim O is denied.

6       **8.    Review of Claim P**

7       Petitioner next claims instructional error, in 10 subclaims, which he alleges individually,

8   cumulatively, and in combination with defense counsel's deficient guilt phase closing argument (see

9   claim I17, *ante*), confused the elements of first degree murder, second degree murder, and voluntary

10  manslaughter, and denied him due process and a fair jury trial.  (ECF No. 113 at 136-52.)   Each

11  subclaim is discussed separately below.

12      **a.    Clearly Established Law**

13      Initially, the Court notes that any error in the state court's determination of whether state law

14  supported an instruction in this case cannot form the basis for federal habeas relief.  Estelle, 502 U.S.

15  at 71 (1991) (citing Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983)) ("[T]he Due Process

16  Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state

17  evidentiary rules").  "Failure to give [a jury] instruction which might be proper as a matter of state

18  law, by itself, does not merit federal habeas relief."  Menendez v. Terhune, 422 F.3d 1012, 1029 (9th

19  Cir. 2005) (quoting Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985)).

20      The Supreme Court has stated instead that a claim that a court violated a petitioner's due

21  process rights by omitting an instruction requires a showing that the error "so infected the entire trial

22  that the resulting conviction violate[d] due process."  Henderson v. Kibbe, 431 U.S. 145, 154 (1977)

23  (quoting Cupp, 414 U.S. at 147).  The burden on Petitioner is especially heavy "where . . . the alleged

24  error involves the failure to give an instruction."  Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006).

25      Even if constitutional instructional error has occurred, the federal court must still determine

26  whether Petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious

27  effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  A "substantial and

28  injurious effect" means a "reasonable probability" that the jury would have arrived at a different

171

verdict had the instruction been given.  Clark, 450 F.3d at 916.

### b.   Review of Claim P1

Petitioner alleges that the trial court's failure to instruct with CALJIC No. 3.31 allowed the jury to convict him of two counts of premeditated first-degree murder without finding a joint concurrence of an act and specific intent.  (ECF No. 113 at 136-39; ECF No. 178 at 215.)

Petitioner raised this claim in his petition for writ of habeas corpus filed in the California Supreme Court.  The California Supreme Court found that Petitioner's claim was procedurally barred because it could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily denied the claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner argues the trial court had a *sua sponte* duty to instruct on concurrent act and intent where specific intent crimes, such as murder, were charged.  (ECF No. 113 at 137:8-10); see People v. Alvarez, 14 Cal. 4th 155, 220 (1996).  He claims the trial court should have given CALJIC 3.31, which requires that for murder there be a concurrence of act and intent, and states in pertinent part:

> In the crime(s) and allegation(s) charged in Counts [ ] of the information, and [or] which [is a] [are] lesser crime[s] thereto], [namely ___,], there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the [crime(s)] [or] [allegation(s)] to which it relates [is not committed] [or] [is not true]. [The specific intent required is included in the definition[s] of the [crime[s]] [or] [allegation[s]] set forth elsewhere in these instructions.]

Petitioner claims that, instead, the trial court gave CALJIC 3.31.5, which is to be read for crimes in which a specific mental state is an element of the crime, as follows:

> In each of the crimes charged in Counts one and two and in the lesser included crimes of 2nd degree murder and voluntary manslaughter there must exist a certain mental state in the mind of the perpetrator and unless that mental state exists the crime to which it relates is not committed . . . .

(RT at 2195-96.)  He claims instruction 3.31.5 does not require concurrent act and intent and because of that is intended to be read in addition to instruction 3.31 where the charged crime involves act and intent.  (ECF No. 113 at 137:19-24.)  Petitioner claims that, because of this error, the jury was never instructed that intent to kill had to be concurrent with the act of shooting the victims.  As a result, he

claims, the jury may have believed it could find the requisite mental states from actions that occurred after the crimes.  (ECF No. 113 at 139:1-4.)

Petitioner also argues that the government failed to carry its burden of showing this instructional error was harmless beyond a reasonable doubt, <u>Chapman</u>, 386 U.S. at 23, and denied him due process, a fair trial, and a reliable adjudication of the charges under <u>Brecht</u>, violating the Fifth, Sixth, Eighth and Fourteenth Amendments.   <u>In re Winship</u>, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Respondent concedes the trial court did not instruct with CALJIC No. 3.31 (which explains the requirement of a joint concurrence of intent and act) in relation to counts I and II, but argues that other instructions substantially covered the same principle.  (ECF No. 194 at 209:1-3.)

The California Supreme Court, on direct appeal, considered claimed instructional error for CALJIC 3.31.5, 8.30, 8.40 and 8.43, regarding mental state for lesser included offenses, and found the instructions correctly stated the law and were not likely to confuse the jury when considered in context and in relation to each other.  <u>Bolin</u>, 18 Cal. 4th at 328-29.

The Court finds this claim to be unpersuasive.   The record reflects that the trial court instructed the jury on the essential elements of murder (RT at 2197; CT at 458-59; CALJIC No. 8.10), on the intent required for first degree murder under the theory of willful, deliberate, and premeditated killing (RT at 2198; CT at 463; CALJIC No. 8.20), and on the sufficiency of circumstantial evidence to prove specific intent or mental state (RT at 2196-97; CT at 472; CALJIC No. 2.02).

Furthermore, the trial court instructed that jury with CALJIC No. 3.31.5 as follows:

In each of the crimes charged in Counts 1 and 2 and in the lesser included crimes of second-degree murder and voluntary manslaughter as to counts 1 and 2, there must exist a certain mental state in the mind of the perpetrator, and unless that mental state exists, the crime to which it relates is not committed.

The mental state required or the mental states required are included in the definition of the crimes charged, which I will read to you later. *The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of that particular act, but you may not find the defendant guilty of the offenses charged in Counts 1, 2, and 3 [. . .] unless the proved circumstances which are not only, first of all, consistent with the theory that the defendant had the required specific intent or mental state but, secondly, cannot be reconciled with any other*

1      *rational conclusion.*

2   (RT at 2195-96, emphasis added.)

3          The trial court also instructed the jury with CALJIC No. 8.20 (ECF No. 113 at 139:12-19),

4   stating that:

5          All murder which is perpetrated by any kind of willful, deliberate and premeditated
           killing with express malice aforethought is murder of the first degree. [¶] The word
6          "willful," as used in this instruction, means intentional. [¶]

7          The word "deliberate" means formed or arrived at or determined upon as a result of
           careful thought and weighing of considerations for and against the proposed course of
8          action. The word "premeditated" means considered beforehand. [¶]

9

10         The significance of an omitted instruction is evaluated by a comparison of the omitted

11  instruction with the instructions that were given.  Murtishaw, 255 F.3d at 971 (citing Henderson, 431

12  U.S. at 156).

13         Here, the instructions given, in particular CALJIC Nos. 3.31.5 and 8.20 (see also claim P2, *post*)

14  expressed to the jury that the killing must be committed with the requisite mental state, i.e.,

15  intentionally, willfully and with premeditation, in order to be first degree murder.   The noted

16  instructions given specifically referenced the "specific intent or mental state with which an act is done."

17  (RT at 2196.)  The jury would have understood that there must be joint union of such intent and the act

18  of murder in order to find Petitioner guilty of first degree murder.  The jury would not reasonably have

19  understood this instruction to consider only Petitioner's mental state formed after the killings.  See e.g.,

20  Alvarez, 14 Cal. 4th  at 219-20 (holding that the omission of CALJIC No. 3.31 with regard to the

21  charge of murder did not require reversal because the murder instructions "substantially covered" the

22  concept of concurrence of act and specific intent); People v. Rodrigues, 8 Cal. 4th 1060, 1142-43

23  (1994) (holding that the court's instructions as a whole properly guided the jury's consideration of the

24  evidence because CALJIC No. 8.20 "adequately expressed the need for joint operation of act and intent

25  on that theory") (citing People v. Kozel, 133 Cal. App. 3d 507, 522 (1982)); see also   People v.

26  Benjamin, 52 Cal. App. 3d 63, 84-85 (1975).

27         The state supreme court could reasonably have found that the noted instructions given

28  adequately express the requirement for a joint concurrence of requisite intent and act with regard to first

174

degree murder.

Petitioner may believe that CALJIC No. 3.31 would have communicated the relevant principle to the jury better. However, "[t]he availability of a better instruction is not a ground for reversal" under federal law. United States v. Ward, 914 F.2d 1340, 1344 (9th Cir. 1990).

Additionally, to the extent that Petitioner complains of a state law violation, this Court must defer to the ruling by the California Supreme Court. Therefore, the issue before this Court is whether any violation of state law occurred that rose to the level of a deprivation of a right guaranteed by the federal Constitution. For the reasons stated, it did not.

It follows that the California Supreme Court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim P1 is denied.

### c.    Review of Claim P2

In this next claim, Petitioner alleges that the trial court prejudicially misspoke when instructing the jury on the definition of first degree murder. (ECF No. 113 at 139-40.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court. (CSC Pet. Habeas Corpus at 206-08.) The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not, raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].) That court also summarily denied the claim on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner contends that the trial court read the word "reflex" instead of the word "reflection," when instructing with CALJIC No. 8.20 (ECF No. 113 at 139:12-19), specifically as follows:

> All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word "willful," as used in this instruction, means intentional. [¶]
>
> The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand. [¶]

175

If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing **reflex** and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶]

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill.

(RT at 2198-2200.) Petitioner argues this error prejudiced his defense. He claims the jury could have convicted him of first degree murder even though he may have acted without malice aforethought. He contends this instructional error was prejudicially erroneous not merely ambiguous, Boyde, 494 U.S. at 378-80, and had a substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637.

Respondent concedes that the Reporter's Transcript indicates the trial court misspoke by stating the word "reflex," instead of "reflection," when reading CALJIC No. 8.20 to the jury. (ECF No. 194 at 213:19-21; RT at 2198-2200.)

The Court finds this claim unavailing. The record reflects that the trial court also provided the jury the instructions in written form, which correctly used the word "reflection" rather than "reflex." (CT at 412, 463.) Furthermore, the jury was instructed that "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action," and that premeditated means "considered beforehand." (RT at 2198.)

Properly considering the jury instructions as a whole, the trial court's misstatement was unlikely to mislead the jury into believing, as Petitioner suggests, that they could convict him of premeditated murder based on a "reflexive" urge to kill (ECF No. 178 at 187). See United States v. Marin-Cuevas, 147 F.3d 889, 893 (9th Cir. 1998) (considering whether the jury instructions "*taken as a whole*" were misleading or represented a statement inadequate to guide the jury's deliberations"

176

(quoting Stoker v. United States, 587 F.2d 438, 440 (9th Cir. 1978)) (emphasis in original).

In light of the definitions provided to the jury and the instruction as a whole, the California Supreme Court reasonably could have found that no reasonable juror would give the instructions the meaning that Petitioner proposes, rather than the obvious meaning stated in the written form. People v. Crittenden, 9 Cal. 4th 83, 138 (1994) (inadvertent misreading of instruction not error where no reasonable juror would have given the instruction the meaning asserted by defendant). It is not reasonably likely that the jury would have misunderstood the instruction in this context. See Boyde, 494 U.S. at 380; United States v. Ancheta, 38 F.3d 1114, 1117 (9th Cir. 1994) (misreading of a single phrase in the conspiracy instruction not plain error where corrected in the written instructions provided to the jury).

Petitioner's argument that the Ninth Circuit requires precedence be given to the oral instructions, citing People of Territory of Guam v. Marquez, 963 F.2d 1311, 1314-15 (9th Cir. 1992), is likewise misplaced. Marquez stands for the proposition that "all jury instructions must be read aloud to the jury in the presence of counsel and the defendant." 963 F.2d at 1314-15. The trial court in Marquez failed entirely to instruct the jury orally on any elements of the crimes charged and the definitions of the terms used in a description of the charges, providing only written instructions, such that the reviewing court could not tell from the record whether each juror was aware of the elements. Id. at 1315-16. The Marquez court found the refusal of the trial court to read the elements of the alleged offense to be structural error that precluded harmless error analysis. Id.

Here, the trial court did not refuse to read the elements of the charged offense, but rather non-prejudicially misspoke in doing so. Nor is Marquez clearly established law of the Supreme Court. Casey, 386 F.3d at 907. Petitioner's cited California v. Roy, 519 U.S. 2, 7 (1996), wherein that court applied harmless error analysis in reviewing instructional error omitting the intent element from the definition of the crime, is not authority that the error in this case was structural, or more than harmless.

The California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of United States Supreme Court law, or based upon an unreasonable determination of the facts.

For the reasons stated, claim P2 is denied.

### d.    Review of Claim P3

In this claim, Petitioner alleges that the trial court prejudicially misspoke when instructing the jury on the premeditation element of attempted murder (ECF No. 113 at 140-42), denying him due process and a fair jury trial, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments.

Petitioner raised this claim in his petition for writ of habeas corpus in the California Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner alleges that the trial court read the word "events" in place of the word "reflection," when instructing with CALJIC No. 8.67. (ECF No. 141:1-4.)  Specifically, the trial court instructed the jury as follows:

> It is also alleged in Count 3 that the crime attempted was willful, deliberate, and premeditated murder. If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true. [¶] "Willful" means intentional." Deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. "Premeditated" means considered beforehand. [¶] If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is attempt to commit willful, deliberate, and premeditated murder. [¶]

> The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, but rather the extent of the **events.** A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation. [¶]To constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being. [¶] The People have the burden of proving the truth of this

allegation. If you have a reasonable doubt that it is true, you must find it to be not true.

(RT at 2208-10) (emphasis added.)

Petitioner alleges that this error "instructed the jury to rely on the extent of Petitioner's actions or other events prior to the shootings, rather than the extent of any thought taken before [the shootings]," precluding the jury from considering the requirement for deliberation.  (ECF No. 113 at 141:5-8); see Roy, 519 U.S. at 7 ([prejudicial instructional error mis-describing element violates constitution).

Petitioner alleges this instruction was not provided to the jury in writing, (ECF No. 178 at 181:6-17; CT 412-30), and that in any event the incorrect oral instruction must be given precedence. Marquez, 963 F.2d at 1314-15.

Petitioner alleges this instruction was prejudicially erroneous, Boyde, 494 U.S. at 378-80, was not harmless beyond a reasonable doubt, id., and had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637.

Respondent does not dispute that the trial court read the word "events" in place of the word "reflection," when reading CALJIC No. 8.67.  (RT at 2209.)  However, Respondent contends, and the record demonstrates that the trial court also provided the jury the instructions in written form, which correctly used the word "reflection," rather than "events." (CT at 412, 486.)  Moreover, it appears that the jury was properly instructed that the crime of attempted murder must be committed with the requisite mental state, i.e., willfully, deliberately and with premeditation.  (CALJIC No. 8.67; RT at 2208-10.)  Specifically, the instruction given provided that, in order to find Petitioner guilty of the crime, the jury must find "that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation[.]"  (RT at 2209.)

The state supreme court, viewing the jury instructions as a whole, could have found no reasonable likelihood that the jury's finding of willful, deliberate and premeditated attempted murder was based on "the events" surrounding the shooting of Mr. Wilson, rather than the extent of Petitioner's reflection.  This is because the instructions given, viewed in toto, appear to clearly

1   require that the jury find Petitioner committed the act with this state of mind in order to find the

2   special allegation true.  See Marin-Cuevas, 147 F.3d at 893 (stating the test for error is whether the

3   jury instructions "taken as a whole were misleading or represented a statement inadequate to guide

4   the jury's deliberations").  It is not reasonably likely that the jury would have misunderstood the

5   instruction given the plain language of the instructional charge in its entirety.  See Boyde, 494 U.S.

6   at 380; see Ancheta, 38 F.3d at 1117 (misreading of a single phrase in the conspiracy instruction not

7   plain error where corrected in the written instructions provided to the jury).  Petitioner's citation to

8   Roy is not authority otherwise, for the reasons stated, *ante*.

9        As was the case above, Petitioner's reliance upon Marquez in support of this claim is

10  misplaced.  The trial court in this action did not refuse to read the elements of the charged offense.

11       For the reasons stated, the California Supreme Court could reasonably conclude the jury was

12  not misled by the attempted murder instructional error.

13       The California Supreme Court's rejection of this claim was not contrary to, or an

14  unreasonable application of, United States Supreme Court law, or based upon an unreasonable

15  determination of the facts.

16       Claim P3 is denied.

17       **e.    Review of Claim P4**

18       Petitioner alleges the trial court erred in giving duplicative, unnecessary and prejudicial

19  instructions, partially over defense objection, regarding both consciousness of guilt by suppression of

20  evidence (CALJIC 2.06) and flight from the crime scene (CALJIC 2.52).  (ECF No. 113 at 142-44.)

21       Petitioner first raised this claim on direct appeal.  The California Supreme Court found that

22  Petitioner had forfeited his right to object to any claim relating to CALJIC No. 2.06 by failing to

23  object below, and in fact agreeing that the evidence supported giving the instruction.  Bolin, 18 Cal.

24  4th at 326-27 (citing People v. Jackson, 13 Cal. 4th 1164, 1223 (1996)).  The California Supreme

25  Court also rejected the entire claim on the merits.  Id.

26       Petitioner revisits allegations in claim I16 (ineffective assistance), alleging that the trial court

27  erred by giving CALJIC 2.06 (regarding consideration of suppression of evidence against defendant

28  as showing consciousness of guilt) and CALJIC 2.52 (regarding consideration of flight after

commission of a crime as showing consciousness of guilt).  (RT at 2172-92; CT at 440, 450.)

Petitioner claims giving these instructions "effectively circumvented" the requirement that jurors find deliberation and premeditation, Penal Code § 189, by "providing duplicitous jury instructions which unduly emphasized noncriminal actions allegedly taken by [Petitioner] after the shootings as the basis for using consciousness of guilt in place of a finding of deliberation and premeditation."  (ECF No. 113 at 143:12-15.)

Petitioner claims these instructions may have drawn the jury's attention from the premeditation and deliberation elements, denying him due process and a fair trial under the Brecht standard.

Petitioner also states that this claim was not adjudicated by the state court because that court did not address the constitutional issues.  (ECF No. 135 at 144:8-9.)  The Court disagrees, for the reasons stated below.

On direct appeal, the California Supreme Court considered whether the consciousness of guilt instructions prejudicially emphasized "noncriminal conduct occurring after the shootings" and concluded they did not, as follows:

> CALJIC Nos. 2.06 and 2.52 do not impermissibly emphasize noncriminal activity as "consciousness of guilt." On the contrary, these instructions "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations] Moreover, section 1127(c) requires a flight instruction when the prosecution relies on such conduct as tending to show guilt.
>
> As in past decisions, we find no merit in the contention the instructions improperly allow the jury to draw inferences about defendant's state of mind and equate evidence of suppression or concealment with a confession. "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." [Citation] For cognate reasons they do not violate the proscription of Griffin v. California (1965) 380 U.S. 609, 615, against referring to the defendant's exercise of his Fifth Amendment right not to testify

1    as evidence of guilt. The instructions in no respect implicated defendant's failure to
2    testify or directed the jury to draw negative inferences from it.

3    Bolin, 18 Cal. 4th at 326-27.

4           The Court finds this claim unpersuasive for the reasons stated above and those discussed in

5    claim I16, *ante.* These instructions appear to unequivocally state that the conduct described therein is

6    not sufficient to prove guilt, but instead that it "may be considered."  The California Supreme Court

7    could reasonably have found that these instructions did not improperly reduce the prosecution's burden

8    of proof.  See Allen, 442 U.S. at 167 (prosecution may rely on all the evidence in the record to meet the

9    reasonable doubt standard where the state presumption is permissive rather than mandatory).

10          Furthermore, the California Supreme Court found these instructions appropriately supported by

11   the trial record:

12          [S]ufficient evidence supported the instruction in light of Ramirez's testimony defendant
            attempted to make the murder scene "look like a bad dope deal" by breaking bottles,
13          scattering loose marijuana, and shooting the body several more times with a rifle after
            the initial revolver shot. Defendant wiped his fingerprints off the handgun, put the
14          weapon in Huffstuttler's hand, placed a knife near the body, and poured chili sauce
            around it.  He then fled south before leaving the state for Chicago. Along the way he
15          threw away some wires he had taken to disable Wilson's truck.

16   Bolin, 18 Cal. 4th at 327.  This Court finds no basis to depart from these factual determinations, which

17   are  to be "presumed correct absent clear and convincing evidence to the contrary."  Miller-El, 537 U.S.

18   at 340; 28 U.S.C. § 2254 (e)(1).  The crime was remote and secluded.  (RT at 1731, 1760-61.)

19   Petitioner told Huffstuttler, just prior to shooting him, that it was a "no-no" to bring people to see the

20   marijuana plantation. (RT at 1739, 1922, 1950.) Petitioner also told Vance that he did not know Mincy

21   and Wilson and could not understand Huffstuttler's reasons for bringing them to see the marijuana

22   plants.  (RT at 1739-40.)  Immediately after shooting Huffstuttler, Petitioner approached Mincy and

23   Wilson with a gun, told them that he had nothing against them, and then shot them.  (RT at 1741.)

24          Accordingly, this Court finds that the California Supreme Court could reasonably conclude that

25   sufficient evidence was presented to justify giving instructions regarding consciousness of guilt and

26   flight.

27          The California Supreme Court's rejection of this claim was not contrary to or an unreasonable

28   application of, United States Supreme Court law, or based upon an unreasonable determination of the

182

facts.

Claim P4 is denied.

### f.    Review of Claim P5

Petitioner's next claim alleges that the trial court erred by instructing the jury with CALJIC 1.00 (Respective Duties of Judge and Jury), CALJIC 2.51 (Motive), and CALJIC 2.52 (Flight After Crime), which directed the jury to decide between "guilt and innocence," rather than between "guilty and not guilty." (ECF No. 113 at 144-45.) He claims this error lowered the prosecution's burden to prove guilt beyond a reasonable doubt, depriving Petitioner of his Fifth, Sixth, and Fourteenth Amendment rights to a jury trial, due process, and a reliable penalty determination. (Id.; ECF No. 178 at 195-98.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court. The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].) The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner alleges that the jury's obligation is to find whether there is sufficient evidence to support a guilty verdict, and that use of an "innocence" standard impermissibly relieves the prosecution of the burden to prove guilt and places the burden on Petitioner to prove innocence. (ECF No. 113 at 144:24-25); Mullaney v. Wilbur, 421 U.S. 684, 704 (1975) (due process requires that prosecution prove beyond a reasonable doubt the absence of heat of passion when the issue is presented in a homicide case). Petitioner points to the trial court's reading of CALJIC Nos. 1.00, 2.51, and 2.52 referring to "innocent" or "innocence", as follows:

CALJIC No. 1.00, discussing the respective duties of the judge and the jury, included, as given, in its final paragraph:

> You must not be influenced by pity for a defendant or by prejudice against him. You must not be biased against the defendant because he was arrested for this offense, because he was charged with certain crimes, or because he was brought here to stand trial. None of these circumstances is evidence of his guilty [sic], and you must not infer or speculate from any or all of them that he is more likely to be guilty than innocent.

1  (RT at 2183.)

2      CALJIC No. 2.51, instructing on motive, as given, provided:

3      Motive is not an element of the crimes charged and it does not have to be shown.

4      However, you may consider motive or lack of motive as a circumstance in this case.
   Presence of motive may tend to establish guilt and absence of motive may tend to
5  establish innocence. You will, therefore, give its presence or absence, as the case may
   be, the weight to which you find it to be entitled.

6

7  (RT at 2191.)

8      CALJIC No. 2.52, instructing on flight, as given, provided:

9      The flight of a person immediately after the commission of a crime or after being
   accused of a crime is not sufficient in itself to establish guilt, but it is a fact which, if
10 proved, may be considered by you in light of all the other proved facts in deciding the
   question of his guilt or his innocence.

11

12 (RT at 2191-92.)

13     Petitioner contends it was not enough that subsequent instructions may have correctly stated

14 the law because the jurors' deliberative process had been "inescapably tainted" by the "notion that

15 they had to find [Petitioner] innocent of the offenses to return a verdict of not guilty."  (ECF No. 113

16 at 145:2-6.)

17     Petitioner contends that requiring the jury to decide between "guilty" and "innocence" had a

18 substantial and injurious effect or influence on the jury's determination of a verdict, Brecht, 507 U.S.

19 at 637, denying him due process and a fair jury trial.

20     The Court is not persuaded by this claim.  The record shows that the trial court instructed the

21 jury with CALJIC No. 1.01, requiring that the jury consider the instructions as a whole.  (RT at 2183-

22 84.)  A reasonable juror would have understood that any reference to guilt or innocence in these

23 instructions was to be considered in light of CALJIC No. 2.90, instructing the jury that it must use the

24 proof-beyond-a-reasonable-doubt standard in its determination of guilt.  (RT at 2195.)

25     Also, as Respondent points out, the trial court also made several references to reasonable

26 doubt.  It did so when instructing on: (1) sufficiency of circumstantial evidence (CALJIC No. 2.01;

27 RT at 2186-87), (2) reliance on the state of the evidence (CALJIC No. 2.61; RT at 2192), (3) murder

28 and manslaughter distinguished (CALJIC No. 8.50; RT at 2204), (4) reasonable doubt as to whether a

murder was of the first or second degree (CALJIC No. 8.71; RT at 2205), (5) reasonable doubt as to whether killing was murder or manslaughter (CALJIC No. 8.72; RT at 2205), (6) special circumstances (CALJIC No. 8.80; RT at 2206), (7) willful, deliberate, and premeditated attempted murder (CALJIC No. 8.67; RT at 2210), (8) use of a firearm (CALJIC No. 17.19; RT at 2213), and (9) implied acquittal before conviction of a lesser included or lesser related offense (CALJIC No. 17.10; RT at 2214).  (See ECF No. 194 at 224.)

The Court finds that the California Supreme Court could reasonably have determined that CALJIC Nos. 1.00, 2.51, and 2.52, considered in conjunction with the entire set of instructions, including CALJIC No. 2.90, sufficiently made the jury was aware that it must apply the beyond-a-reasonable-doubt standard of proof.  (See RT at 2183, 2191-92; CT at 432-33, 449-50.)

"Although the Constitution does not require jury instructions to contain any specific language, the instructions must convey both that a defendant is presumed innocent until proven guilty and that he may only be convicted upon a showing of proof beyond a reasonable doubt." Gibson v. Ortiz, 387 F.3d 812, 820 (9th Cir. 2004), overruled on other grounds by Byrd v. Lewis, 566 F.3d 855, 866 (9th Cir. 2009).  "Any jury instruction that reduces the level of proof necessary for the Government to carry its burden is plainly inconsistent with the constitutionally rooted presumption of innocence." Id.  "Any challenged instruction must be considered in light of the full set of jury instructions and the trial record as a whole." Id. at 821.

Here, for the reasons stated, the use of the noted instructions could not reasonably have resulted in the violation of any constitutional right.

The California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, United States Supreme Court law, or based upon an unreasonable determination of the facts.

Claim P5 is denied.

### g.   Review of Claim P6

In this claim Petitioner alleges that the trial court misread CALJIC 2.22, the instruction on weighing conflicting testimony.  (ECF No. 113 at 145-47.)

Petitioner first raised this claim in his petition for writ of habeas corpus in the California

Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner alleges that the trial court prejudicially misspoke when instructing with CALJIC No. 2.22, regarding the weight to be given to conflicting testimony.  The Reporter's Transcript indicates that the court instructed the jury with CALJIC No. 2.22, as follows:

> Now, you are not bound to decide an issue of fact in accordance with the testimony of [~~a number of~~] witnesses which does not convince you as against the testimony of a lesser number or some other evidence which appeals to your mind with more convincing force. [¶] You may not disregard the testimony of the greater number of witnesses merely from caprice or whim or prejudice or from a desire to favor one side as against the other. [¶] You must not decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides **[because]** [t]he final test is not in the relative [**number of witnesses but in the**] convincing force of the evidence.

(RT at 2190-91 [material omitted by the court is striked-through, bolded and bracketed; material added by the trial court is bolded and bracketed].)

Petitioner argues this instruction, as read, suggested jurors should not resolve conflicting testimony by focusing on the convincing force of evidence but rather on matters outside the evidentiary record, and allowed the jurors to disregard one witness's credible testimony in favor of testimony from two witnesses lacking in credibility, the opposite of what the instruction was intended to convey.  He contends this was especially prejudicial given the pretrial publicity from the *America's Most Wanted* program and what he believes was the substantially conflicting testimony from the two eyewitnesses, Ramirez (who testified the shooting occurred outside the cabin and that Wilson and Mincy were on their way to the cabin) (RT at 1923, 1952), and Wilson (who testified he originally thought that the shooting occurred inside the cabin and that he was in the creek bed at the time).  (RT at 1768-69.)  He suggests a properly instructed jury would have found Wilson more credible.  (ECF No. 113 at 147:8-11.)  He claims the instructional error was prejudicial because Wilson's testimony supported Petitioner's "heat of passion" defense.  (ECF No. 113 at 147:14-17.)

Petitioner also claims this instruction was not provided to the jury in writing.  However, the

record reflects that the trial court provided the jury the instruction in written form.  The copy of CALJIC No. 2.22 provided to the jury during deliberations was worded correctly and properly set forth the jury's duty in weighing conflicting testimony.  (CT at 412, 447.)

The trial court also clearly instructed the jury that it must:

> [D]ecide all of the questions of fact in this case from the evidence received in this trial and not from any other source. That means that you must not make any independent investigation of the fact or the law or consider or discuss facts as to which there is no evidence.

(RT at 2184-85.)  The California Supreme Court, upon consideration of this instruction, could have determined there is no reasonable likelihood that the jury based its decision on sources outside of evidence presented at trial simply because the trial court omitted the phrase "number of" when instructing with CALJIC No. 2.22.

CALJIC No. 2.22, as read to the jury, plainly told the jury that it "is not bound to decide an issue of fact in accordance with the testimony of witnesses which does not convince you as against the testimony of a lesser number or some other evidence which appeals to your mind with more convincing force." (RT at 2190.)  In light of this instruction, there is no reasonable likelihood that the jury would have disregarded the credible testimony of one witness in favor of the less-credible testimony of two other witnesses.

The Court also finds that, viewing the jury instructions as a whole, there is no reasonable likelihood that the jury would have been confused or misled into believing, as Petitioner suggests, that they could find him guilty of the premeditated attempted murder based on information presented outside of the trial, or by incorrectly weighing witness testimony.  Given the instructions as a whole, a reasonable juror would give the instructions the obvious meaning stated in the written form. Crittenden, 9 Cal. 4th at 13; see also Marin-Cuevas, 147 F.3d at 893 (stating the test for error is whether the jury instructions "*taken as a whole* were misleading or represented a statement inadequate to guide the jury's deliberations" (emphasis in original)).  It is not reasonably likely that the jury would have misunderstood the instruction in this context. As was the case above, the Court finds that Petitioner's cited case of Roy, 519 U.S. at 7, is not authority otherwise.

Additionally, any possible misunderstanding that could have resulted from the court's

1   misstatement was harmless because the written instructions given to the jury provided the correctly
2   worded instruction.  See Ancheta, 38 F.3d at 1117.

3       The California Supreme Court's rejection of this claim was not contrary to, or an
4   unreasonable application of, United States Supreme Court law, or based upon an unreasonable
5   determination of the facts.

6       Claim P6 is denied.

7       **h.    Review of Claim P7**

8       Petitioner next alleges that the trial court misread the instruction on the special circumstance
9   of multiple murder, CALJIC 8.80, denying Petitioner due process and reliable sentencing, violating
10   the Sixth, Eighth and Fourteenth Amendments.  (ECF No. 113 at 148-49.)

11       On direct appeal, Petitioner claimed that CALJIC No. 8.80 did not define "reasonable doubt."
12   The California Supreme Court held that the trial court's instruction with CALJIC No. 8.80 correctly
13   stated the law and that Petitioner waived the issue on appeal based on his defense counsel's failure to
14   request clarification or amplification of the instruction.  Bolin, 18 Cal. 4th at 327-28 (citing People v.
15   Arias, 13 Cal. 4th 92, 171 (1996)); People v. Byrnes, 30 Cal. 206, 208 (1866)).   The California
16   Supreme Court also rejected Petitioner's claim on the merits.  Id. at 328.

17       Petitioner raised that claim a second time in his petition for writ of habeas corpus in the
18   California Supreme Court and added the allegations in this claim.   The California Supreme Court
19   ruled the habeas claim was procedurally barred because it could have been, but was not raised on
20   direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In
21   re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected the habeas
22   claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

23       Petitioner argues that the trial court's reading of CALJIC No. 8.80 was incomprehensible, did
24   not define "reasonable doubt," and did not inform the jurors that they must find the special
25   circumstance to be true beyond a reasonable doubt by unanimous finding.  (ECF No. 113 at 148:14-
26   18.)

27       At the time of trial, CALJIC 8.80 read as follows:

28       If you have a reasonable doubt as to whether a special circumstance is true, you must

188

find it to be not true . . . In order to find a special circumstance alleged in the case to be true or untrue, you must agree unanimously.

CALJIC 8.80 (1989 Revision)

Petitioner claims the trial court read CALJIC 8.80 as follows:

If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be **unreasonable**. In order to find the special circumstance alleged in the case to be true or untrue, **it has unanimously**.

 (RT at 2206, emphasis added.)

Petitioner claims that the jury was not instructed that the special circumstance finding had to be beyond a reasonable doubt, Santosky v. Kramer, 455 U.S. 745, 755 (1982); In re Winship, 397 U.S. 358, 361 (1970), and had to be unanimous, People v. Collins, 17 Cal. 3d 687, 693 (1976). He claims this resulted in structural error, Boyde, 490 U.S. at 380, and an unreliable death finding and death sentence. Ford v. Wainwright, 477 U.S. 399, 414 (1986). Petitioner also claims this instruction as not provided to the jury in writing. (CT at 412-30.)

Here, the record reflects that the trial court read the word "unreasonable," instead of the phrase "not true," when reading CALJIC No. 8.80, as follows:

Now, if you find the defendant in this case guilty of murder of the first degree, you must then determine if the following circumstance is true or not true. That special circumstance is multiple murder. The People have the burden of proving the truth of that special circumstance.

If you have a reasonable doubt as to whether or not a special circumstance is true, then you must find it to be **unreasonable.** In order to find the special circumstance alleged in this case to be true or untrue, it has to be unanimous. You will state your special finding as to whether the special circumstance is or is not true on the form that will be handed to you at the end of these instructions.

(RT at 2206-2207) (emphasis added); see also CSC Order dated 9/24/97.

The California Supreme Court rejected on direct appeal the allegation that the jury was not sufficiently instructed that it must find the special circumstance to be true beyond a reasonable doubt, and on the definition of reasonable doubt, stating that:

Shortly before giving the special circumstance instruction, the court had already charged the jury that the defendant is presumed innocent and that the prosecution has the burden of proving guilt beyond a reasonable doubt. It then delineated the applicable standard:

"Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial. The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole. In [People v. Burgener, 41 Cal. 3d 505 (1986)], the court had not defined reasonable doubt in conjunction with the instruction on express malice but had given the definition elsewhere. Hence, the instruction was not defective. Given the entirety of the charge to the jury, it is clear that there is no reasonable possibility that the jury could have been misled as to the appropriate standard for their special finding on express malice. The instructions taken as a whole indicate that the prosecution's burden of proof throughout was proof beyond a reasonable doubt. We reach a similar conclusion on this record.

Bolin, 18 Cal. 4th at 328.

On this basis, the California Supreme Court could reasonably have found any error was no more than harmless.  See Neder v. United States, 527 U.S. 1, 8 (1999) ("most constitutional errors can be harmless") (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991)).  Any error by failing to instruct the jury specifically that it must find the special circumstance unanimously true beyond a reasonable doubt appears similar to a jury instruction that omits an element of an offense, which is subject to harmless error analysis.  See Neder, 527 U.S. at 10.

The jury was correctly instructed on reasonable doubt before the special circumstance instruction was given.  Bolin, 18 Cal. 4th at 328.  A reasonable juror would have understood from the trial judge's instruction that the multiple murder special circumstance could not be found unless, based on the evidence presented at trial, all jurors unanimously believed the special circumstance was true beyond a reasonable doubt.   (RT at 2206-2207.)   The jurors were given the CALJIC No. 8.80 special circumstance form referred to by the judge in his instructions (id.) upon which to render its true or not true finding on the special circumstance.  (See CT at 537.)  Furthermore, the jury was polled following the penalty verdict and revealed that its decision was unanimous.  (RT at 2620.)  Given this record, it does not reasonably appear that the jury could have been misled as to the appropriate standards for finding the special circumstance to be true.

190

Additionally, the trial court did provide the jury with the correctly worded instruction in written form.  (CT at 412, 481-82.)  The trial court also read to the jury similar instructions regarding true or not true findings as to willful, deliberate, and premeditated attempted murder (CALJIC No. 8.67; RT at 2210), and personal use of a firearm (CALJIC No. 17.19; RT at 2213).

Petitioner does not make an evidentiary showing of any trial court misstatement related to the unanimity requirement.  (CT at 481; RT at 2206; CSC Order dated 9/24/97.)  It appears that the California Supreme Court corrected the language "it has unanimously" by replacing it with "it has to be unanimous."  (See CSC Order dated September 24, 1997.)

The entire charge to the jury was clear that it had to make a true or not true finding, not an "unreasonable" finding, on the special circumstance.  Cupp, 414 U.S. at 146-47.  Furthermore, a true finding on the special circumstance of multiple murder followed from the jury's verdicts of guilt on both of Petitioner's first degree murder counts.  (CT at 533, 535, 537.)

The California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, United States Supreme Court law, or based upon an unreasonable determination of the facts.

Claim P7 is denied.

### i.  Review of Claim P8

Petitioner next alleges that the trial court misread CALJIC 17.40, errantly instructing the jury to discuss the evidence with individuals other than their fellow jurors.  (ECF No. 113 at 149-50.)

Petitioner first raised this claim in his petition for writ of habeas corpus in the California Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner alleges that the trial court's misreading invited each juror to discuss the evidence, not with "the other jurors" but rather with "your colleagues."  (RT at 2216; CT at 506.)

At the time of trial, CALJIC 17.40, entitled "Individual Opinion Required – Duty to

Deliberate," read as follows:

> Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with **the other jurors**.

CALJIC 17.40 (1989 Revision, emphasis added)

Petitioner claims the trial court read CALJIC 17.40 as follows:

> Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions **with your colleagues**.

(RT at 2216, emphasis added.)

Petitioner argues that, because of this error, the jurors may not have based their verdict "solely on the evidence before them in a fair and unbiased manner" (ECF No. 113 at 150:3-4), denying him due process, violating the Fifth, Sixth and Fourteenth Amendments. He claims the error had a substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637.

This claim fails. When considered in context, it is clear that the jurors' "colleagues" were limited to the other jurors. The instruction itself provided that each of them had to decide the case for themselves after discussing the evidence and instructions. (RT at 2216.) Because individuals other than jurors were not present for all of the evidence and instructions, the jurors would not have understood the court to be instructing them to discuss the case outside of the jury room.

Additionally, as Respondent notes, other instructions clarified that the jury alone was able to render a verdict. The jury was instructed:

> You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. [¶] You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, that you must not on your own visit the scene, conduct experiments, or consult reference works or persons for additional information. [¶] You must not discuss this case with any other person except a fellow juror, and you must not discuss the case with a fellow juror until the case is submitted to you for your decision and only when all jurors are present in the jury room.

(ECF No. 194 at 234:2-6; see CT at 436; RT at 2184-85, 2215-17; CALJIC No. 1.03.) Furthermore, at the end of the jury instructions, the court swore the bailiff using these words:

> You do solemnly swear that you will take charge of this jury and take them to some private and convenient place where they may deliberate upon a verdict, and suffer no person or persons to communicate with them, nor do so yourself except to ask them if

192

they have agreed upon a verdict, or by order of the Court, and you will return them to this courtroom when they have agreed upon a verdict or by order of the Court, so help you God?

(RT at 2218-19.)

To the extent Petitioner also claims that the correction version of CALJIC 17.40 was not provided to the jury in writing, the record suggests otherwise.  (CT at 412, 506.)  But in any event, the claim fails because, for the reasons stated above, it was clear from the entire charge to the jury that it was not to speak with anyone other than fellow jurors during the deliberations.  Cupp, 414 U.S. at 146-47.

The California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, United States Supreme Court law, or based upon an unreasonable determination of the facts.

Claim P8 is denied.

### j.      Review of Claim P9

Petitioner next alleges that the trial court misread CALJIC 17.41 (How Jurors Should Approach Their Task) so as to omit the instruction that they be "impartial" jurors.  (ECF No. 113 at 150-51.)

Petitioner first raised this claim in his petition for writ of habeas corpus in the California Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred because the claim could have been, but was not raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

At the time of trial, CALJIC 17.41, entitled "How Jurors Should Approach Their Task" read as follows:

> The attitude and conduct of jurors at all times are very important.  It is rarely helpful for a juror at the beginning of deliberation to express an emphatic opinion on the case or to announce a determination to stand for a certain verdict.  When one does that at the outset, a sense of pride may be aroused, and one may hesitate to change a position even if shown it is wrong.  Remember that you are not partisans or advocate in this matter. You are **impartial** judges of the facts.

CALJIC 17.40 (1989 Revision, emphasis added.)

193

Petitioner claims the trial court read CALJIC 17.40 as follows, leaving out the strikethrough word:

> The attitude and conduct of jurors at all times are very important.  It is rarely helpful for a juror at the beginning of deliberation to express an emphatic opinion on the case or to announce a determination to stand for a certain verdict.  When one does that at the outset, a sense of pride may be aroused, and one may hesitate to change a position even if shown it is wrong.  Remember that you are not partisans or advocate in this matter.  You are ~~impartial~~ judges of the facts.

(RT at 2217, emphasis added.)

Petitioner argues that this error deprived him of a fair trial and of due process and caused him prejudice under Brecht, i.e., the error had a substantial and injurious effect or influence in determining the jury's verdict.  See Irvin, 366 U.S. at 722 ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."); see also Skilling, 561 U.S. at 377-78.

Respondent concedes the error (ECF No. 194 at 289:16-19), but notes that the trial court did charge the jury to "keep in mind that you are not partisans and you are not advocates, you are judges." (RT at 2217.)

The California Supreme Court could reasonably have determined that the entire charge of the jury instructions adequately apprised the jurors of their duty to be impartial and unbiased in their deliberations.  The jurors were instructed with CALJIC No. 1.00 which told them that they "must accept and follow the law . . . whether or not [they] agree with the law," and that in reaching their verdict they must not be influenced by pity, prejudice, sentiment, conjecture, sympathy, passion, public opinion or public feeling.  (CT at 432; RT at 2182-83.)

Furthermore, the jury was instructed with CALJIC No. 2.22, which informed them that they "may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other."  (ECF No. 194 at 289:23-26; see also CT at 447; RT at 2190-91.)

Respondent correctly notes that the jurors were repeatedly advised their determination was to be based upon reasonable interpretations of the evidence, only the evidence, and not on any sort of bias.  (ECF No. 194 at 235:26-236:4, citing CT at 427 [CALJIC No. 2.02]; CT at 436 [CALJIC No. 1.03]; CT at 438-39 [CALJIC No. 2.01]; CT at 447 [CALJIC No. 2.22]; CT at 451 [CALJIC No.

2.60]; CT at 472 [CALJIC No. 2.02]; CT at 504 [CALJIC No. 17.30]; CT at 505 [CALJIC No. 17.31]; CT at 506 [CALJIC No. 17.40].)

Petitioner also claims this instruction was not provided to the jury in writing. (CT at 412-30.) But here again the record shows the jury was provided with a written copy of CALJIC No. 17.41 during its deliberations, which included the word "impartial" that was omitted by the trial court's reading of the instruction. (CT at 412, 507.)

For all the reasons stated, the California Supreme Court could have reasonably determined that it was clear from the entire charge to the jury that jurors understood they had a duty to be impartial. Cupp, 414 U.S. at 146-47.

The California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, United States Supreme Court law, or based upon an unreasonable determination of the facts.

Claim P9 is denied.

### k.    Review of Claim P10

In this final claim, Petitioner claims that cumulative instructional error arising from claims P1 through P9 *ante*, left the jury with insufficient guidance to render a fair and accurate guilt determination, (ECF No. 113 at 151-152) denying him a fair jury trial and due process under the Sixth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court. The California Supreme Court ruled that Petitioner's claim was procedurally barred because this claim could have been, but was not raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].) The California Supreme Court also summarily rejected Petitioner's claim on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner cites to claims P1-P9, alleging that "the jury was not properly instructed on the mental states for first degree murder or attempted murder, the concurrence of act and mental state or specific intent for murder, how to judge conflicting testimony, or even how to comport themselves as jurors." (ECF No. 113 at 151:17-20.) He claims the cumulative effect of this error was to deny him a

1    fair trial and due process, prejudice under <u>Brecht</u>.

2           "The Supreme Court has clearly established that the combined effect of multiple trial errors

3    may give rise to a due process violation if it renders a trial fundamentally unfair, even where each

4    error considered individually would not require reversal." <u>Parle v. Runnels</u>, 505 F.3d 922, 928 (9th

5    Cir. 2007) (<u>citing</u> <u>Donnelly</u>, 416 U.S. at 643).

6           Although individual errors looked at separately may not rise to the level of reversible error,

7    their cumulative effect may nevertheless be so prejudicial as to require reversal. <u>United States v.</u>

8    <u>Necoechea</u>, 986 F.2d 1273, 1282 (9th Cir. 1993). However, the fact that errors have been committed

9    during a trial does not mean that reversal is required. "[W]hile a defendant is entitled to a fair trial;

10   [she] is not entitled to a perfect trial, for there are no perfect trials." <u>United States v. Payne</u>, 944 F.2d

11   1458, 1477 (9th Cir. 1991).

12          Here, for the reasons stated above, claims P1-P9 are insubstantial whether considered singly

13   or cumulatively. <u>See</u> <u>United States v. Karterman</u>, 60 F.3d 576, 580 (9th Cir. 1995) ("[b]ecause each

14   error is, at best, marginal, we cannot conclude that their cumulative effect was 'so prejudicial' to

15   [defendant] that reversal is warranted."); <u>see also</u> <u>Rupe</u>, 93 F.3d at 1445; <u>Detrich v. Ryan</u>, 740 F.3d

16   1237, 1273 (9th Cir. 2013). "Cumulative error analysis applies where there are two or more actual

17   errors. It does not apply . . . to the cumulative effect of non-errors." <u>Moore v. Gibson</u>, 195 F.3d

18   1152, 1175 (10th Cir. 1999) (<u>quoting</u> Castro v. Ward, 138 F.3d 810, 832 (10th Cir. 1998)).

19          This Court does not find that the California Supreme Court's rejection of the claim was

20   contrary to, or an unreasonable application of, clearly established federal law, as determined by the

21   Supreme Court, or that the state court's ruling was based on an unreasonable determination of the

22   facts in light of the evidence presented in the state court proceeding. <u>See</u> 28 U.S.C. § 2254(d).

23          Claim P10 is denied.

24          **9.      Review of Claim Q**

25          Petitioner, in his next claim, alleges that cumulative error during the guilt phase denied him

26   due process, an impartial jury, effective assistance of counsel, and a reliable determination of guilt

27   and sentence, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (ECF

28   No. 113 at 152-53.)

Petitioner raised this same claim on direct appeal and in his petition for writ of habeas corpus in the California Supreme Court, which that court denied on the merits. Bolin, 18 Cal. 4th at 335; (CSC Order Den. Pet. Habeas Corpus).

Petitioner alleges that the cumulative effect of guilt phase errors denied him fundamental fairness at trial and prejudiced the jury's determination of their verdict under the Brecht standard. Lincoln v. Sunn, 807 F.2d 805, 814, n.6 (9th Cir. 1987); Odle v. Calderon, 65 F. Supp. 2d 1065, 1076-77 (1999).

As noted, "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." Parle, 505 F.3d at 928 (citing Donnelly, 416 U.S. at 643). Although individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal. Necoechea, 986 F.2d at 1282.

The California Supreme Court considered and rejected this claim on direct appeal, noting that:

[D]efendant contends that even if harmless individually, the cumulative effect of the trial errors mandates reversal. Because we have rejected all of his claims, we perforce reject this contention as well.

Bolin, 18 Cal. 4th at 335

Likewise, for the reasons stated, *ante*, this Court has found no guilt phase constitutional errors. There is nothing to accumulate to a level of reversible error. Petitioner was "entitled to a fair trial but not a perfect one, for there are no perfect trials." McDonough Power Equipment v. Greenwood, 464 U.S. 548, 553 (1984) (quoting Brown v. United States, 411 U.S. 223, 231-232 (1973)).

Even if there were guilt phase error, Petitioner has failed to demonstrate prejudicial error, whether individually or in sum. The Court's analysis of guilt phase claims, *ante*, determines no reasonable likelihood of a more favorable result, for the reasons stated and given the noted substantial evidence against Petitioner. (See claim O, *ante*; claims R and S, *post*.)

Accordingly, the Court does not find that the state supreme court's rejection of the claim was

1    contrary to, or an unreasonable application of, clearly established federal law, as determined by the

2    Supreme Court, or that the state court's ruling was based on an unreasonable determination of the

3    facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

4         Claim Q is denied.

**C.    Claims Relating to Penalty Phase**

**1.     Review of Claim R**

         In this next claim, Petitioner alleges that, over defense objection, the trial court allowed the

prosecution to admit as Pen. Code § 190.3(b) aggravating evidence (i.e., evidence of uncharged

"criminal activity which involved the express or implied threat to use force or violence"), Petitioner's

June 25, 1990 letter in which he appears to threaten Jerry Halfacre.  (See RT at 2442-54.)  Petitioner

claims this was error because the letter did not satisfy the elements of a "threat" under Penal Code §

422 and did not place Halfacre in fear of immediate harm.

         The letter read as follows:

Jerry 6/25/90

Well I finally heard from Paula [defendant's daughter and mother of Halfacre's child]
and what I heard from her I'm not to[o] pleased with. I heard her side of things w[h]ich
are real different from what you had to say. I'm only going to say this one time so you
better make sure you understand. If you ever[] touch my daughter again, I'll have you
permanently removed from the face of this Earth. You better thank your lucky stars
you['re] Ashley's father or you[']d already have your fucking legs broke.

I found out what happen[e]d to most of the money from the van, and I also found out
you got 1500 for the truck not 1300 like you said. I'm still going to find out how much
you got for the Buick and if it's 1¢ over 1000 you can kiss your ass good by[e]. I also
found out it was running like a top and the burnt valves was a bunch of bull shit, just like
I thought in the first place. You sounded a little shak[]y over the phone and gave
yourself away.

I told you a long time ago don't play fucking games with me. You're playing with the
wrong person asshole. I've made a couple of phone calls to San Pedro to some friends of
mine and the[y're] not to[o] happy with your fucking game playing with other people's
money and especially you hitting Paula.

What I want done and it better be done. Everything that's mine or hers tools, clothes,
books, gun, TV, VCR, I don't fucking care if it's a bobby pin, you better give it to Paula.
I want all my shit given to her and I mean every fucking thing. You have a week to do it
or I make another phone call. I hope you get the fucking message. Your game playing is
eventually going to get you in more than a poo butt game player can handle.
1 week asshole. "And keep playing your game with [my granddaughter] and see what
happens.

Petitioner concedes the jury was instructed (albeit deficiently, see claim R4) on the elements of California Penal Code § 422.  (See ECF No. 113 at 213:7-8; CT 643.)  Section 422 provides in pertinent part that:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.

(See ECF No. 113 at ¶ 586; see also Bolin, 18 Cal. 4th at 337.)

Petitioner alleges this error by the trial court denied him free speech, due process, and a fair sentence determination, violating his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.  (ECF No. 113 at 154-62.)

Petitioner raises multiple subclaims which are addressed separately below.

Petitioner raised certain of these allegations on direct appeal, and raised the claim in his state petition for writ of habeas corpus.  On direct appeal, the California Supreme Court rejected the allegations, holding that a threat under Penal Code § 422 need not be unconditional, Bolin, 18 Cal. 4th at 336-41, and that Petitioner suffered no prejudice based on the introduction of the letter at the penalty phase.  Id. at 340-41.

The California Supreme Court ruled that Petitioner's state habeas claim was procedurally barred because certain of the allegations could have been, but were not, raised on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also summarily rejected Petitioner's habeas claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

### a.    Clearly Established Law

A state law error that renders the trial fundamentally unfair violates the Due Process Clause. Chambers, 410 U.S. at 298, 302-03; Hicks, 447 U.S. at 346 (due process protects defendant from

arbitrary deprivation of expectations under state law).

Under California law, otherwise relevant evidence is precluded if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."   Evid. Code §§ 350, 352; Cardenas, 31 Cal. 3d at 903-04.

### b.   Factual Background

During the penalty phase, the prosecution introduced in aggravation Petitioner's June 25, 1990 letter to Jerry Halfacre, the common-law husband of Petitioner's daughter, Paula, and father of their child, Ashley.  (RT at 1836, 1867, 2442-45.)  Halfacre had given the letter to his former probation officer, Ms. Lancia O'Connor, on October 12, 1990.  (RT at 2442-44, 2455); Bolin, 18 Cal. 4th at 336 n.11.

As noted, in the letter, Petitioner appears to threaten Halfacre never to touch his daughter again or Petitioner would have him "permanently removed from the face of this Earth."  Petitioner also threatened to kill Halfacre if Petitioner found out that Halfacre had lied to Petitioner about a Buick that Halfacre had sold.  Petitioner warned Halfacre that he had made phone calls to friends outside of prison about Halfacre's behavior, implying that these friends would carry out Petitioner's threats.  Finally, Petitioner ordered Halfacre to deliver all of Petitioner's and Paula's belongings to Paula within one week or Halfacre would be killed.  See Bolin, 18 Cal. 4th at 336 n.11.

Defense counsel objected to introduction of the letter on various grounds, all overruled by the trial court, (RT at 2390-93, 2453-54), which then instructed the jury on the elements of Penal Code § 422.  (See CT at 643.)

### c.   Analysis of Claim R1

In this claim, Petitioner alleges that the Halfacre letter as introduced was more prejudicial than probative under California Evidence Code §§ 350, 352.  He also claims the letter as introduced did not satisfy the elements of a "threat" under California Penal Code § 422. Petitioner's arguments are analyzed separately below.

#### 1)   *Sustained Fear*

Petitioner argues that Halfacre may not have actually received the letter, and that if he did it

did not place him in sustained fear.  He points out that Halfacre waited four months before giving the letter to his probation officer.  (RT at 2443-44; ECF No. 113 at 157); <u>see</u> <u>Bolin</u>, 18 Cal. 4th at 340.  He points out that Halfacre did not testify, about his state of mind regarding the letter or otherwise.

However, the Court finds that the California Supreme Court could reasonably have drawn inference from the record that Halfacre received the letter and feared that Petitioner would follow through on the threats in it.  The envelope which contained the letter was introduced into evidence and indicates that the letter was addressed to Halfacre and was postmarked.  (People's Ex. 1; RT at 2443-54.)

The threats appear to be serious, angry, and immediate.  The letter could be seen as threatening on its face.  The prospect that Halfacre might be killed by Petitioner's friends on the outside was reasonably apparent.  <u>Bolin</u>, 18 Cal. 4th at 336 n.11.

Petitioner has not demonstrated otherwise.  Given Halfacre's relationship with Paula (RT at 2490-91), it was reasonable to conclude that Halfacre knew of the allegations that Petitioner had acted violently in the past and was wanted by the police for murder.  (RT at 1867-68.)

### 2)      *Unconditional and Immediate*

Petitioner argues that, at the time the letter was sent, he was incarcerated and unable to execute any immediate action on the alleged threats.  (ECF No. 113 at 155:4-5); <u>see</u> <u>People v. Stanfield</u>, 32 Cal. App. 4th 1152, 1157 (1995).  He also argues that his alleged threats were "conditional" and that his "goal was plainly to persuade Mr. Halfacre to behave himself, not to create a circumstance under which he could harm Mr. Halfacre." (ECF No. 178 at 217.)

However, the California Supreme Court considered and rejected these arguments on direct appeal, noting that:

> [T]he reference to an "unconditional" threat in section 422 is not absolute. As the court in <u>People v. Stanfield</u> noted, "By definition, extortion punishes conditional threats, specifically those in which the victim complies with the mandated condition. [Citations] Likewise, many threats involved in assault cases are conditional. A conditional threat can be punished as an assault, when the condition imposed must be performed immediately, the intent is to immediately enforce performance by violence and defendant places himself in a position to do so and proceeds as far as is then necessary. [Citation] It is clear, then, that the <u>Kelner</u> court's use of the word 'unconditional' was not meant to prohibit prosecution of all threats involving an 'if' clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying

201

a gravity of purpose and imminent prospect of execution." As the court commented in U.S. v. Schneider (7th Cir. 1990) 910 F.2d 1569, 1570: "Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats."

Moreover, imposing an "unconditional" requirement ignores the statutory qualification that the threat must be "*so ... unconditional ... as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution . . . .*" (§ 422, italics added.) "The use of the word 'so' indicates that unequivocally, unconditionally, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim." "If the fact that a threat is conditioned on something occurring renders it not a true threat, there would have been no need to include in the statement the word 'so.'" This provision "implies that there are different degrees of unconditionally. A threat which may appear conditional on its face can be unconditional under the circumstances. . . . [¶] Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution." Accordingly, we reject defendant's threshold contention that the letter was inadmissible because it contained only conditional threats.

Bolin, 18 Cal. 4th at 339-40; see also Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 372 (9th Cir. 1996) (finding that "any person could reasonably consider the statement 'If you don't give me this schedule change, I'm going to shoot you,' made by an angry teenager, to be . . . unequivocal and specific enough to convey a true threat of physical violence").

The California Supreme Court reasonably determined that these threats taken together were "unequivocal, unconditional, immediate, and specific." That court's analysis is not contrary to the holding of the Supreme Court in Watts v. United States, 394 U.S. 705, 708 (1969) (holding that statement "If they ever make me carry a rifle, the first man I want to get in my sights is L.B.J." was hyperbolic speech, not a true threat), post.

The California Supreme Court reasonably could have found these threats to be non-illusory. The only unmet condition to the threatened conduct was Petitioner's awareness that certain events had occurred, i.e., whether Petitioner found out about Halfacre selling his Buick for more than $1,000 or touching his daughter, Paula. Bolin, 18 Cal. 4th at 336 n.11. Specifically, regarding the threat relating to the possibility that Halfacre sold Petitioner's Buick for more than the $1000 amount Halfacre said he got for it, that amount had already been determined and Halfacre was aware of it

since the sale had already taken place.  Regarding the threat relating to the possibility Halfacre might touch Petitioner's daughter Paula and granddaughter Ashley, it is unreasonable to assume that Halfacre would never again have contact with his former girlfriend and their daughter.    Halfacre would know whether the conditional events had occurred and he could reasonably anticipate that Petitioner would find out from Paula that they had occurred.  If so, Petitioner stated that he would "make another phone call to his friends," apparently to make good on his threats.  (Id.)

### 3) *Exaggerated*

Petitioner argues the alleged threat was exaggerated, (ECF No. 113 at 155:4-28), and did not convey a gravity of purpose and an immediate prospect of execution.  Stanfield, 32 Cal. App. 4th at 1157; Watts, 394 U.S. at 705.  He argues that the letter could not be a threat because "[t]he statements were plainly hyperbolic" (ECF No. 178 at 217:24) in that "touch my daughter" really meant "harm my daughter." (ECF No. 178 at 218:1-3.)  He claims Petitioner was merely advising Halfacre not to commit criminal acts of domestic violence, child abuse, or theft.  He argues that he was incarcerated and not in a position to make good on the alleged threats.    However,  the  threatened  actions  and events triggering them were sufficiently clearly and angry.  Petitioner states in the letter that Halfacre would  already  have  had  his  "fucking  legs  broke"  if  he  were  not  the  father  of  Petitioner's granddaughter and that he "can kiss [his] ass goodby[e]" if he sold the Buick for any amount over $1,000.  Bolin, 18 Cal. 4th at 336 n.11.  Petitioner's reference to friends in San Pedro who could carry out his threats suggests they could be carried out.  Id.; see also Allen v. Woodford, 395 F.3d 979, 987, 1009 (9th Cir. 2005) (incarceration is not a deterrent to directing crime outside the institution).

The California Supreme Court could reasonably have found the statements in the letter not simply rhetorical as petitioner contends.

### 4) *No Foundation or Probative Value*

Petitioner argues that Halfacre did not testify, and that the prosecution presented no evidence showing if, when and how Halfacre received the letter, or that the letter caused Halfacre to fear Petitioner.  Because of this, Petitioner claims the letter was admitted without evidentiary foundation and lacked probative value.    The Court is unpersuaded.  Probation officer O'Connor testified that she received the letter from Halfacre on October 12, 1990, a few months after it was mailed to

1   Halfacre. (RT at 2442-46; see also RT at 2453:21 [the prosecutor argued at trial: "I think the evidence

2   has shown that Jerry Halfacre gave the letter to his probation officer. If he didn't receive the letter, he

3   couldn't have had it[.]"].)   Moreover, Evidence Code § 641 provides: "A letter correctly addressed

4   and properly mailed is presumed to have been received in the ordinary course of mail."   The envelope

5   which contained the letter was introduced into evidence and indicates that the letter was addressed to

6   Halfacre and was postmarked. (People's Ex. 1; RT at 2443-54.)

7                                    *5)        No True Threat or Prejudice*

8           Petitioner argues that Penal Code § 422 is based on wording taken from United States v.

9   Kelner, which "defined true threats as only those which according to their language and context

10  conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale

11  of protected [speech]."   534 F.2d 1020, 1026-27 (2d Cir. 1976); (see also ECF No. 113 at 154:25-28,

12  citing Stanfield, 32 Cal. App. 4th at 1160).   Applying these standards, Petitioner argues that the

13  Halfacre letter contained only conditional language which did not satisfy the elements of a true threat

14  under Penal Code § 422. (ECF No. 113 at 154-58.)

15          As discussed in claim R4, *post*, the California Supreme Court, in denying this claim on direct

16  appeal, did not definitively rule whether the letter constituted a threat for purposes of § 422, due to

17  instructional error.   See Bolin, 18 Cal. 4th at 340 n.13.   However, for the reasons stated and for

18  purposes of this claim, that court could reasonably have found that introduction of the letter was not

19  improper under § 422 as set out above and § 190.3(b).

20          Petitioner also argues introduction of the letter was inflammatory and prejudicial under

21  Brecht, and denied him due process and a fair jury determination.   Hicks, 447 U.S. at 346; Hamilton,

22  458 F. Supp.2d at 1090 (citing Brecht, 507 U.S. at 637).   He argues the letter was significantly

23  prejudicial because it suggested to the jury that Petitioner posed a risk of future dangerousness.

24          But even if the trial court erred in admitting the letter, the California Supreme Court

25  reasonably determined in claim R4, *post*, that such error did not substantially impact the jury's verdict

26  or deny him a fair sentencing determination.   The aggravating evidence, including the circumstances

27  of the charged crimes and prior violent activity, was substantial.   (See claims O, *ante*; claim S, *post.)*

28          In this regard, the California Supreme Court concluded that:

[T]he letter paled compared to other aggravating evidence, which the prosecutor focused on in closing argument. In particular, the guilt phase testimony revealed [Petitioner] as a calculating and callous individual, willing to kill defenseless victims, including his friend and partner Huffstuttler, in cold blood to protect his drug enterprise. In addition, the assault with great bodily injury against Matthew Spencer and attempted manslaughter against Kenneth Ross confirmed [Petitioner's] pattern of resorting to violence in dealing with problems. Given this history, it is unlikely the jury accorded the letter much, if any, weight in fixing the penalty at death.

Bolin, 18 Cal. 4th at 341.  This Court agrees.

The letter also had some mitigating value.  (Id.; see also claim R4.)  To the extent the letter might have suggested future dangerousness, Halfacre's apparent lack of concerned for his safety, having waited four months before giving his probation officer the letter, appears to be mitigating.  (Id.) Moreover, the letter demonstrated Petitioner's concern for his family, as noted by the defense.  Bolin, 18 Cal. 4th at 340; (RT at 2492-93; 2578-91).  The California Supreme Court could reasonably have discounted as conjecture, Petitioner's argument that the Halfacre letter, suggesting a propensity for violence, negatively impacted the jury's assessment of mitigating testimony by defense witnesses.

Additionally, to the extent this claim raises solely issues of state law, it is no basis for federal habeas relief.  (See ECF No. 113 at 154-58 [arguing that the letter did not satisfy the elements of § 422]; ECF No. 113 at 157 [arguing that admission of letter violates Evid. Code §§ 350, 352].)  As noted, "federal habeas corpus relief does not lie for errors of state law." Lewis, 497 U.S. at 780; see also Pulley, 465 U.S. at 41.

Accordingly, this Court does not find that the California Supreme Court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim R1 is denied.

### d.   Analysis of Claim R2

Petitioner's next claim alleges that applying the § 422 factors to show the letter was a criminal threat and aggravating at the penalty phase, improperly served to criminalize constitutionally protected speech, violating the First and Fourteenth Amendments.  (ECF No. 113 at 158-60.)

Petitioner argues that only "true threats" may be punished without violating the First Amendment, Kelner, 534 F.2d at 1026, and that the Halfacre letter did not contain any true threat. This, he claims, was evident in Halfacre's delay in providing the letter to authorities, and the slim likelihood that the conditions of the threats would be satisfied, and even then that Petitioner would be able to make good on the threatened action.

The California Supreme Court considered this claim on habeas review and denied it as procedurally barred because the claim could have been, but was not, raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus, citing In re Harris, 5 Cal. 4th at 825 n.3; In re Dixon, 41 Cal. 2d at 759.)  The California Supreme Court also summarily denied the claim on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

"In general, threats are not protected by the First Amendment." Lovell, 90 F.3d at 371 (citing Watts, 394 U.S. at 705).  Only "true threats" may be punished without offending the First Amendment.  The California Supreme Court could reasonably have found that Petitioner's threats were not "constitutionally protected speech." See Watts, 394 U.S. at 707-08. "A 'true' threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the [F]irst [A]mendment." United States v. Orozco-Santillan, 903 F.2d 1262, 1265-66 (9th Cir. 1990), overruled in part on other grounds by United States v. Keyser, 704 F.3d 631 (9th Cir. 2012).

"Alleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." Id.; Lovell, 90 F.3d at 372; accord Kelner, 534 F.2d at 1027 ("So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific . . . as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied").

"[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself."  United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970).  "[A]s expansive as the [F]irst [A]mendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving of no [F]irst [A]mendment protection." Shackelford v. Shirley, 948 F.2d 935, 938 (5th Cir. 1991) (denying

habeas relief to inmate convicted under telephone harassment statute).  "A threat to break a person's knees . . . is a statement of intention rather than an idea or opinion and is not part of the marketplace of ideas."  United States v. Velasquez, 772 F.2d 1348, 1357 (7th Cir. 1985).

The California Supreme Court considered and rejected Petitioner's contention that the letter was inadmissible because it contained only conditional threats, Bolin, 18 Cal. 4th at 340, finding that "[a] seemingly conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution."  Id.  Petitioner contends the evidentiary record does not demonstrate the contingencies in the letter, which he characterizes as criminal acts by Halfacre, were "highly likely to occur."

It was not unreasonable for the state court to determine the contingencies in question were "highly likely to occur," because, as mentioned, the contingency regarding the Buick did in fact occur and it was reasonable to conclude Halfacre would have future contact with his child and the mother of his child.  It is not dispositive for First Amendment purposes that Halfacre did not act immediately upon receiving the threat.  See Lovell, 90 F.3d at 372 (fact that victim "chose not to seek help instantly is not dispositive").  For reasons discussed in claim R1, ante, the California Supreme Court could reasonably have determined that Petitioner's threats were not protected speech.

Accordingly, this Court does not find that the state supreme court's rejection of these allegations was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim R2 is denied.

e.      **Analysis of Claim R3**

Petitioner next alleges that the California Supreme Court, on direct appeal, unforeseeably and for the first time interpreted § 422 as applying to "conditional" threats, and then retroactively applied this new interpretation to uphold Petitioner's sentence.  He argues that this unforeseeable judicial enlargement of a criminal statute, applied retroactively, violated due process under the Fifth and Fourteenth Amendments to the U.S. Constitution.  (ECF No. 113 at 160); cf. Bouie v. City of

1   Columbia, 378 U.S. 347, 354-55 (1964) (due process implicated when an unforeseeable state-court

2   construction of a criminal statute is applied retroactively).

3          Petitioner raised this same claim in a petition for writ of habeas corpus to the California

4   Supreme Court, which denied it as procedurally barred because it could have been, but was not raised

5   on direct appeal.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3; In

6   re Dixon, 41 Cal. 2d at 759].)

7          The California Supreme Court also summarily rejected the habeas claim on the merits without

8   explanation.  (CSC Order Den. Pet. Habeas Corpus.)

9          Petitioner argues that, under Bouie's fair warning rationale, the test is whether a petitioner

10  could reasonably determine that his conduct violated the law:

> This circuit has in the past held that retroactive application of an interpretation of state
> law is not prohibited per se; however, "[s]uch a decision may violate due process if the
> court's interpretation of a criminal statute enlarges its scope to cover behavior not
> previously considered to be unlawful." Camitsch v. Risley, 705 F.2d 351, 355 (9th Cir.
> 1983); see also United States v. Walsh, 770 F.2d 1490, 1492 (9th Cir. 1985) ("radical
> and unforeseen departure from prior law").

15  McSherry v. Block, 880 F.2d 1049, 1053 n.4 (9th Cir. 1989).  He argues that, in 1990, when he wrote

16  the letter to Halfacre, prior judicial interpretation all precluded conviction for a conditional threat.

17  (ECF No. 178 at 223:6-8.)

18         Respondent counters that the California Supreme Court's interpretation of § 422 had been

19  uncertain on this issue and was still evolving in 1990 when Petitioner wrote the Halfacre letter.  At

20  that time, according to Respondent, the California Supreme Court had not interpreted the language in

21  Penal Code § 422.  Respondent points out that the authority on which Petitioner relies, People v.

22  Brown, 20 Cal. App. 4th 1251 (1993), post-dates his letter, and that in any event it was not

23  unforeseeable that a conditional threat might be found to violate Penal Code § 422.  See United States

24  v. Burnom, 27 F.3d 283, 284-85 (7th Cir. 1994) (holding Bouie does not apply "to the resolution of

25  uncertainty that marks any evolving legal system"); cf., Moore v. Wyrick, 766 F.2d 1253, 1257 (8th

26  Cir. 1985) (significant change in state law which, if applied retroactively, would materially expand

27  defendant's criminal liability cannot be applied retroactively).

28         Petitioner concedes that "intermediate appellate courts of California had been divided on the

question."  (ECF No. 178 at 216, n.142); see e.g., People v. Brooks, 26 Cal. App. 4th  142, 145

(1994) ("if you testify, I'll kill you" found sufficient to support conviction under Penal Code § 422);

Brown, 20 Cal. App. 4th at 1251 ("if you call the police, I'll kill you" found insufficient to support

conviction under § 422).

The California Supreme Court, in its review of this claim noted that the language of Penal

Code § 422 was "adopt[ed] almost verbatim language from United States v. Kelner" which in turn

relied upon Watts.  That court stated:

> In Kelner, the defendant, a member of the Jewish Defense League, had been convicted
> under a federal statute for threatening to assassinate Palestinian leader Yasser Arafat,
> who was to be in New York for a meeting at the United Nations. Kelner argued that
> without proof he specifically intended to carry out the threat, his statement was political
> hyperbole protected by the First Amendment rather than a punishable true threat.
> [Citation]
>
> The reviewing court disagreed and concluded threats are punishable consonant with
> constitutional protections "when the following criteria are satisfied. So long as the threat
> on its face and in the circumstances in which it is made is so unequivocal, unconditional,
> immediate and specific as to the person threatened, as to convey a gravity of purpose
> and imminent prospect of execution, the statute may properly be applied." [Citation]  In
> formulating this rationale, the Kelner court drew on the analysis in Watts v. United
> States (1969) 394 U.S. 705 [ ], in which the United States Supreme Court reversed a
> conviction for threatening the President of the United States. Defendant Watts had
> stated, in a small discussion group during a political rally, "And now I have already
> received my draft classification as 1-A and I have got to report for my physical this
> Monday coming. I am not going. If they ever make me carry a rifle the first man I want
> to get in my sights is L.B.J." [Citation] Both Watts and the crowd laughed after the
> statement was made.  [Citation] The Supreme Court determined that taken in context,
> and considering the conditional nature of the threat and the reaction of the listeners, the
> only possible conclusion was that the statement was not a punishable true threat, but
> political hyperbole privileged under the First Amendment. [Citation]
>
> As the Kelner court understood this analysis, the Supreme Court was not adopting a
> bright line test based on the use of conditional language but simply illustrating the
> general principle that punishable true threats must express an intention of being carried
> out. [Citation] "In effect, the Court was stating that threats punishable consistently with
> the First Amendment were only those which according to their language and context
> conveyed a gravity of purpose and likelihood of execution so as to constitute speech
> beyond the pale of protected [attacks on government and political officials]." [Citation]
> Accordingly, "[t]he purpose and effect of the Watts constitutionally-limited definition of
> the term 'threat' is to insure that only unequivocal, unconditional and specific
> expressions of intention immediately to inflict injury may be punished – only such
> threats, in short, as are of the same nature as those threats which are . . . 'properly
> punished every day under statutes prohibiting extortion, blackmail and assault. . . .'"

1    [Citation]

2    Bolin, 18 Cal. 4th at 338-39.

3        The California Supreme Court, consistent with its noted analysis, could reasonably have

4    determined that "the reference to an 'unconditional' threat in section 422 is not absolute." Bolin, 18

5    Cal. 4th at 339. That court also could reasonably have found Petitioner's letter to be truly threatening

6    notwithstanding any involved contingency. The conditions stated in Petitioner's letters reasonably

7    could be seen as coated with threatening language. See Id. at 336, n.11. "Bouie applies only to

8    unpredictable shifts in the law, not to the resolution of uncertainty that marks any evolving legal

9    system." Burnom, 27 F.3d at 284-85. The California Supreme Court's analysis and conclusions

10   relating to § 422 could reasonably fall within the latter. See e.g., United States v. Herrera, 584 F.2d

11   1137, 1149 (2d Cir. 1978) (due process requires only that "the law give sufficient warnings that men

12   may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential

13   defendant into a false sense of security, giving him no reason even to suspect that his conduct might

14   be within its scope").

15       Accordingly, this Court does not find that the state supreme court's rejection of the claim was

16   contrary to, or an unreasonable application of, clearly established federal law, as determined by the

17   Supreme Court, or that the state court's ruling was based on an unreasonable determination of the

18   facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

19       Claim R3 is denied.

20           **f.    Analysis of Claim R4**

21       Petitioner's final claim alleges that the trial court erred by failing to instruct the jury

22   accurately and completely on the elements of a § 422 criminal threat regarding the Halfacre letter that

23   was introduced as aggravating evidence at the penalty phase. Petitioner alleges this error denied him

24   due process and a fair trial and sentence. (ECF No. 113 at ¶¶ 611-618.)

25       Petitioner raised this claim in a petition for writ of habeas corpus to the California Supreme

26   Court, which denied it as procedurally barred because it could have been, but was not raised on direct

27   appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3; In re Dixon,

28   41 Cal. 2d at 759].) The California Supreme Court also summarily rejected Petitioner's habeas claim

210

on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

The record reflects that at the penalty phase, the jury was instructed that evidence had been introduced to show Petitioner had committed various criminal acts, including writing a threatening letter to Halfacre.  (RT at 2608; CT at 634, 643.)  They were instructed that: "[b]efore a juror may consider any of such criminal acts as an aggravating circumstance in this case, the jury must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal acts." (CT at 634.)  They were also instructed regarding the concurrence of act and specific intent for criminal threats.  (RT at 2611-13; CT at 641.)

As to the § 422 criminal threat, the jury was instructed that:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person with the specific intent that the statement is to be taken as a threat, which causes that person reasonably to sustain fear for his own safety, is guilty of a violation of Penal Code Section 422.
>
> In order to prove such crime, each of the following elements must be proved:
>
> One, a person made a threat to commit a crime which, if carried out, would result in death or great bodily injury to another person.
>
> Two, such threat is made with the specific intent the statement was to be taken as a threat.
>
> Three, that such threat caused another person to fear for his own or his family's personal safety.
>
> It is not necessary that the defendant have the intent to carry out the threats.

(RT at 2613; CT at 643.)

Petitioner alleges that the trial court also should have instructed the jury that a § 422 "threat" must be "on its face and under the circumstances in which it is made, so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat."  See CALJIC 9.94.

The California Supreme Court agreed with Petitioner when it reviewed this allegation on direct appeal.  See Bolin, 18 Cal.4th at 340 n.13.  However, that court found such instructional error harmless, see Bolin, 18 Cal. 4th at 340 n.13, stating that:

1

2

3

4

5

6

7

    Alternatively, defendant argues that the letter still does not meet the statutory definition because the threat lacked immediacy and Halfacre did not testify he feared for his safety. We need not definitively resolve these contentions. Even if the trial court should have excluded the letter, we find no reasonable possibility the error affected the verdict. [Citation] Although some of the language in the letter is menacing, it also reflects defendant's concern for his daughter's and granddaughter's well-being, a point stressed by the defense in mitigation. Moreover, the nature and circumstances of the threats would not necessarily provoke serious concern, especially considering defendant was incarcerated and would at the least have to make outside arrangements to effect them. Halfacre waited four months before giving the letter to his probation officer, during which time apparently nothing had happened.

8

Bolin, 18 Cal. 4th at 340.

9

10

11

12

13

14

15

16

17

    The California Supreme Court was not unreasonable in this regard.  Though as noted, the jury may have been given incomplete instructions on the elements the aggravating criminal threat (id. at 340 n.13), the state supreme court was not unreasonable in finding the error harmless for reasons stated in the discussed of claim R1, ante, summarized as follows.  The aggravating evidence, including the circumstances of the charged crimes and prior violent activity, was substantial. (See claims O, ante; claim S, post.)  Halfacre's months long delay in taking any action on the letter could reasonably suggest Petitioner did not pose a future danger.  The letter could be mitigating to the extent it suggested violence was not imminent and that Petitioner was motivated by his desire to protect his family.  See e.g., Bolin, 18 Cal. 4th at 340; (RT at 2492-93; 2578-91).  The state supreme court noted that:

18

19

20

21

22

23

    [T]he letter paled compared to other aggravating evidence, which the prosecutor focused on in closing argument. In particular, the guilt phase testimony revealed [Petitioner] as a calculating and callous individual, willing to kill defenseless victims, including his friend and partner Huffstuttler, in cold blood to protect his drug enterprise. In addition, the assault with great bodily injury against Matthew Spencer and attempted manslaughter against Kenneth Ross confirmed [Petitioner's] pattern of resorting to violence in dealing with problems. Given this history, it is unlikely the jury accorded the letter much, if any, weight in fixing the penalty at death.

24

Bolin, 18 Cal. 4th at 341.

25

26

27

28

    Equally unavailing is Petitioner's re-argument (see claim R1, ante) that admission of the letter "altered the credibility analysis regarding [Petitioner's aggravating] assaults on Matthew Spencer and Kenny Ross" and that without the "prejudicial character evidence" of the letter "the jury would likely have given greater consideration to the defense's mitigating evidence regarding those [other

aggravating] incidents." (ECF No. 178 at 229: 7-14.) Such re-argument appears nothing more than speculation. The noted evidence in aggravation was substantial apart from the letter. Additionally, for the same reasons, neither Petitioner's trial counsel (for failing to object on this ground in the trial court) nor his appellate counsel (for failing to raise this ground on appeal) was ineffective. (ECF No. 113 at 161 n.45 [re claim W8, *post*]; Id. *at* 235-36 [re claim DD, *post*].)

It is not enough for habeas relief that "[an] instruction was allegedly incorrect under state law." Estelle, 502 U.S. at 71-72. "In the absence of a federal constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law." Mitchell v. Goldsmith, 878 F.2d 319, 324 (9th Cir. 1989). For the reasons stated above and those discussed in claims R1-R3, Petitioner has not demonstrated the state instructional error as to § 422 denied him a fair sentence determination. See e.g., Hamilton, 458 F. Supp. 2d at 1090 ("The limited scope of federal habeas review does not warrant relief unless trial errors had a 'substantial and injurious effect or influence in determining the jury's verdict' and deprived [the petitioner] of a fair trial in violation of his right to due process.").

Accordingly, this Court does not find that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim R4 is denied.

**2.** **Review of Claim S**

Petitioner, in his next claim, alleges that the jury erroneously was allowed to consider in aggravation evidence of prior unadjudicated criminal activity, denying him equal protection, due process, a fair jury trial, a reliable sentence, and freedom from cruel and unusual punishment, violating his rights under the Fifth, Eighth and Fourteenth Amendments. (ECF No. 113 at 162-164.) Petitioner made this same claim on direct appeal to the California Supreme Court, which was denied on the merits. Bolin, 18 Cal. 4th at 335-36.

**a.** **Clearly Established Law**

A state law error that renders the trial fundamentally unfair violates the Due Process Clause.

1  Chambers, 410 U.S. at 298, 302-03; Hicks, 447 U.S. at 346 (due process protects defendant from
2  arbitrary deprivation of expectations under state law).

3      In a capital case, evidence of unadjudicated criminal conduct may constitute an aggravating
4  circumstance and be admissible at sentencing.  See Campbell v. Kincheloe, 829 F.2d 1453, 1461 (9th
5  Cir. 1987) (holding unadjudicated criminal conduct may be introduced to support the aggravating
6  factor of probable future violence).

7                  **b.      Analysis of Claim S**

8      Petitioner complains that the jury was allowed to consider, as aggravating, unconvicted
9  criminal conduct in the form of his 1979 assault on Matthew Spencer (RT at 2371-2385, 2412-43; CT
10  at 634) and his 1990 threatening letter to Halfacre (RT at 2442-54; CT 634).  He argues he was never
11  convicted, prosecuted, or charged with these events and that the jury's consideration of them fell
12  below the heightened reliability requirement for capital sentencing.  See Woodson v. North Carolina,
13  428 U.S. 280, 305 (1976);  California v. Ramos, 463 U.S. 992, 998-99 (1983).

14     He also complains that the penalty jury, having just convicted him of capital murder, was
15  biased against him; that the jury was not instructed that the presumption of innocence applied to
16  unadjudicated criminal activity; that the jury was not instructed that they must unanimously find these
17  allegations true beyond a reasonable doubt and make their findings in writing; and that the limitations
18  period had run on the assault charge.

19     All of these alleged infirmities, he claims, had a substantial and injurious effect or influence
20  on the jury's verdict under Brecht.

21     Preliminarily, the Court rejects Petitioner's allegations that the foregoing constitutional errors
22  were not adjudicated by the state court.  Rather, the California Supreme Court adjudicated these
23  allegations by considered and rejected them on direct appeal, as follows:

24         Defendant makes several claims regarding the jury's consideration of unadjudicated
           criminal activity as a circumstance in aggravation. (§ 190.3, factor (b).) He
25         acknowledges this court has previously upheld the use of such evidence at the penalty
           phase. [Citation] He argues, however, that he was denied his constitutional right to an
26         impartial fact finder and reliable penalty determination because the same jury that
           decided his guilt could not be expected to evaluate this evidence without bias or
27         prejudice. We have considered and rejected this argument in People v. Balderas, [ ], and
           find no reason to reconsider our conclusions. We have also previously determined that
28

                                        214

the use of factor (b) evidence does not run afoul of the statute of limitations. [Citation] Nor was the jury required unanimously to agree defendant committed the alleged crimes. [Citation]

On this record, we find no error by virtue of the trial court's failure to repeat the "presumption of innocence" instruction given prior to guilt phase deliberations. At the beginning of the penalty phase, the court expressly alerted the jury that "[m]ost of the rules that I gave you before ... will apply to this case." Nothing in the court's subsequent penalty instructions suggested the jury should disregard the earlier admonition that a criminal defendant is presumed innocent; and a reasonable juror would assume it continued to apply. [Citation]

Bolin, 18 Cal. 4th at 335-36.

That court's determination in these regards was not unreasonable.  Petitioner has not demonstrated clearly established authority from the United States Supreme Court holding that a jury may not consider prior unadjudicated criminal activity during the penalty phase of a capital case.  See Sharp v. Texas, 488 U.S. 872 (1988) (Marshall J, dissenting) ("I would grant the petition to resolve the question whether the Eighth and Fourteenth Amendments preclude the introduction of evidence of unadjudicated criminal conduct at the sentencing phase of a capital case."); Miranda v. California, 486 U.S. 1038 (1988) (same); see Spencer v. Texas, 385 U.S. 554, 563-564 (1967) (approving limited use of other crimes evidence for purposes other than propensity).  Given the Supreme Court has not decided the issue, the California Supreme Court's above decision could not be contrary to or an unreasonable application of United States Supreme Court precedent.  Carey, 549 U.S. at 76.

Furthermore, the United States Supreme Court has upheld the constitutionality of California's death penalty law, including § 190.3(b), which permits evidence of prior criminal activity involving violence or threats of violence.  California v. Brown, 479 U.S. 538, 543 (1987); see also Tuilaepa v. California, 512 U.S. 967, 975-80 (1994).  California's death penalty statute expressly provides that a capital defendant's prior violent conduct is relevant to the penalty determination.

Petitioner's allegation that because he had been previously convicted of only one felony (the attempted voluntary manslaughter on Ross), the instruction on aggravating unadjudicated criminal activity unduly emphasized this evidence as an aggravating factor, was rejected by the state supreme court.  That court reasonably was "unpersuaded the jury was likely to interpret the court's direction in this manner."  Bolin, 18 Cal. 4th at 341.  This Court agrees.  The allegation appears no more than

speculation and was reasonably rejected.

California law also calls for a single jury to determine both guilt and penalty.  People v. Balderas, 41 Cal. 3d 144, 205 (1985).  Petitioner cites no United States Supreme Court authority for his contention that presenting evidence of his prior uncharged offenses to the same jury that found him guilty of first degree murder with special circumstances denies him an impartial fact finder. (ECF No. 113 at 163.)

Petitioner does not cite any authority for his claim that, in the penalty phase of a capital trial, the prosecution should be barred from presenting evidence of offenses that might be barred from actual prosecution by a statute of limitations.  (Id. at 164.)  The California Supreme Court could reasonably find that that penalty phase use of evidence of prior violent crime did not make the verdict unfair or unreliable.  See Bolin, 18 Cal. 4th at 335 ("[T]he use of [§ 190.3] factor (b) evidence does not run afoul of the statute of limitations.").

Petitioner's argument, that his rights were violated by the absence of a requirement that the jurors unanimously agree in writing beyond a reasonable doubt that an allegation of criminal activity is true, (ECF No. 113 at 163), also is unavailing.  The California Supreme Court reasonably rejected these allegations, stating "[w]e have long held the Constitution does not mandate such a finding." Bolin, 18 Cal. 4th at 341.  Petitioner was not being tried for the aggravating conduct adduced at the penalty phase.  The safeguards he seeks were unnecessary.  See e.g., Williams v. Vasquez, 817 F. Supp. 1443, 1471 (E.D. Cal. 1993) (holding lack of jury instruction enumerating elements of offenses or standard of proof which must be met before jury can consider those offenses does not render unconstitutionally vague California's aggravating factor allowing jury to weigh unadjudicated criminal conduct).

For the reasons stated, this Court does not find that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim S is denied.

**3.      Review of Claim T**

In his next claim, Petitioner alleges the lack of a unanimous jury finding beyond a reasonable doubt that the prior criminal activity discussed in claim S, *ante*, was true, denied him equal protection, presumption of innocence, due process, a reliable and fair penalty determination, a unanimous jury, and subjected him to cruel and unusual punishment, violating his rights under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution.  (ECF No. 113 at 164-66.)

The California Supreme Court considered this same claim on direct appeal and rejected it on the merits.  Bolin, 18 Cal. 4th at 335-36, 341.

### a.      Clearly Established Law

The applicable legal standards are set out in claim S, *ante*.

### b.      Analysis of Claim T

Petitioner argues that the absence of a unanimity requirement denied him a presumption of innocence, available in the non-capital context, resulting in an unfair trial and unreliable sentence determination.  Hicks, 447 U.S. at 346.

Petitioner finds fault with the following instruction given the jury:

> Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts, to wit: assault with a deadly weapon and writing a threatening letter which involved the express or implied use of force or violence or the threat of force or violence.

> Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, the jury must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal acts.

> A juror may not consider any evidence of any other criminal acts as an aggravating circumstance.

> It is not necessary for all the jurors to agree.  If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation.  If a juror is not so convinced, then that juror must not consider that evidence for any purpose.

(RT at 2608; see also CT at 634.)  Petitioner claims that, "in light of the importance of the [evidence of prior unadjudicated criminal activity] to the prosecution's case in aggravation," the errors alleged in this claim are prejudicial under Brecht.

Petitioner also alleges that the foregoing constitutional arguments were not adjudicated by the

1    state court.  The Court disagrees, and finds the claim unpersuasive for the reasons stated in claim S,

2    *ante*, and as follows.

3        Petitioner does not identify any clearly established authority from the United States Supreme

4    Court holding that a jury must unanimously find Petitioner's prior unadjudicated criminal activity to

5    be true in order to consider it as a factor in aggravation during the penalty phase of a capital case.  See

6    Cummings v. Polk, 475 F.3d 230, 238 (2007) (recognizing that the United States Supreme Court has

7    not resolved this issue and thus, under AEDPA, claim must be denied).  Additionally, an issue solely

8    of state law is not a basis for habeas relief.  Estelle, 502 U.S. at 67-68.

9        As noted, Petitioner was not being tried for the unadjudicated conduct offered at the penalty

10   phase.  Thus the unanimity safeguard was unnecessary.  Aggravating circumstances are not separate

11   penalties but are standards to guide the making of the choice between death and life imprisonment.

12   People v. Raley, 2 Cal. 4th 870, 910 (1992).  A factor set forth in Penal Code § 190.3 does not require

13   a "yes" or "no" answer to a specific question, but points the sentencer to the subject matter which

14   guides the choice between the two punishments.  Tuilaepa, 512 U.S. at 975.

15       The United States Supreme Court has made clear that "the constitutional prohibition on

16   arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing

17   'scheme that permits the jury to exercise *unbridled discretion* in determining whether the death

18   penalty should be imposed after it has found that the defendant is a member of the class made eligible

19   for that penalty by statute.'" Ramos, 463 U.S. at 1008 n.22, (quoting Zant v. Stephens, 462 U.S. 862,

20   875 (1983)).

21       Petitioner's citation to Apprendi v. New Jersey, 530 U.S. 466 (2000), (see ECF No. 178 at

22   239:2-3) does not support this claim.  Apprendi, which requires that any fact that increases the

23   penalty for a crime beyond the prescribed statutory maximum, must be submitted to a jury and proved

24   beyond a reasonable doubt, is not contravened by California's death penalty scheme.  This is because

25   once a California jury convicts of first degree murder with a special circumstance "the defendant

26   stands convicted of an offense whose maximum penalty is death." People v. Ochoa, 26 Cal. 4th 398,

27   454 (2001),abrogated on other grounds as stated in People v. Prieto, 30 Cal. 4th 226, 263 n.14 (2003).

28       Petitioner's reliance upon cases involving the requirement of a unanimous verdict for a

1  criminal conviction (i.e., not for finding a factor in aggravation - see ECF No. 178 at 236-38) is

2  misplaced, for the reasons stated.

3     Accordingly, this Court does not find that the state supreme court's rejection of the claim was

4  contrary to, or an unreasonable application of, clearly established federal law, as determined by the

5  Supreme Court, or that the state court's ruling was based on an unreasonable determination of the

6  facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

7     Claim T is denied.

8     **4.     Review of Claim U**

9     Petitioner alleges, in seven subclaims, that the trial court committed multiple instructional

10  errors at the penalty phase, "by refusing several entirely appropriate and necessary instructions

11  offered by the defense, and by failing to inform the jury of the scope of their task and adequately

12  guide their discretion, thereby failing to guarantee that the charge as a whole adequately guided the

13  jury's discretion in determining whether [Petitioner] should live or die."  (ECF No. 113 at 166:11-

14  13.)

15     The clearly established law applicable to the subclaims is set out below.  The subclaims are

16  reviewed separately.

17     **a.     Clearly Established Law**

18     A challenge to jury instructions does not generally state a federal constitutional claim.  Rather,

19  in order to warrant federal habeas relief, a challenged jury instruction "cannot be merely undesirable,

20  erroneous, or even universally condemned, but must violate some due process right guaranteed by the

21  [F]ourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (1988) (quoting Cupp, 414 U.S. at

22  146).  Petitioner must demonstrate the instructional error infected the entire trial as to render it unfair.

23  Dunckhurst v. Deeds, 859 F.2d 110, 114 (1988); see also Estelle, 502 U.S. at 72 (quoting Cupp, 414

24  U.S. at 147).  If an error is found, then the court must also determine that the error had "a substantial

25  and injurious effect or influence in determining the jury's verdict before granting relief in habeas

26  proceedings."  Brecht, 507 U.S. at 637.

27     In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but

28  rather in the context of the overall charge.  Spivey v. Rocha, 194 F.3d 971, 976 (9th Cir. 1999).

"[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.  Additionally, a reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would, with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." Johnson, 509 U.S. at 368.  Lastly, federal courts presume that juries follow instructions, including cautionary instructions.  Weeks, 528 U.S. at 234; Olano, 507 U.S. at 740.

### b.      Analysis of Claim U1

Petitioner alleges that, beginning in voir dire and continuing through instructions at the penalty phase, the trial court erroneously told the jury that the penalty phase instructions, in their entirety, were simply "guidelines" (see RT at 242, 368, 395, 1009, 1091, 1114, 1117, 1354, 1399, 1419, 1906, 2394), and that the penalty decision would be entirely within the juror's discretion.  (ECF No. 113 at 166-71.)

Petitioner complains that the trial judge characterized the determination of the death penalty as "just a balancing, not beyond a reasonable doubt" (see, e.g., RT at 1122:25-28), thereby failing to limit the jurors' discretion by objective standards, Gregg v. Georgia, 428 U.S. 153, 189 (1976), denying Petitioner due process, Estelle, 502 U.S. 62 (1991), and a fair and reliable sentence determination, Tuilaepa, 512 U.S at 973.

Specifically, Petitioner complains this violated his Fifth Amendment right not to testify and his Eighth and Fourteenth Amendment rights to have the jury consider all mitigating evidence, Eddings v. Oklahoma, 455 U.S. 104, 115 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978), and to have each element of aggravating prior criminal conduct established beyond a reasonable doubt.

The California Supreme Court considered this claim on petition for writ of habeas corpus and rejected it as procedurally barred because it could have been, but was not raised on direct appeal. (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3 and In re Dixon, 41 Cal. 2d at 759].)   That court also summarily denied the habeas claim on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

This claim fails.  The California Supreme Court could reasonably have determined that the

instructions given in this case, when considered as a whole, "adequately performed the constitutional function of guiding the jury's discretion in sentencing." <u>Bolin</u>, 18 Cal. 4th at 343. The jury was specifically instructed that it "shall" consider the mitigating factors it found applicable (RT at 2605-07), what the mitigating factors were (RT at 2615; CT 631-32), and how they should be weighed (RT at 2615). The jurors were specifically instructed that aggravating and mitigating factors were not simply to be counted. (RT at 2615; CT at 647.)

Petitioner argues the errors alleged above may have led the jury to consider less than all the mitigating evidence. But for the reasons stated below, the California Supreme Court could reasonably have found that the jury was fully instructed on the factors to consider when determining the appropriate penalty for Petitioner. (RT at 2605-07.)

The jury was instructed with CALJIC 2.60 relating to Petitioner's decision not to testify (CT at 646) and CALJIC 8.85 relating to the statutory factors they must consider at the penalty phase (CT at 631-32). The trial court directed the jurors that, "[y]ou must accept and follow the law as I give it to you, whether or not you agree with the law." (RT at 2604.) That court also instructed the jury that most of the guilt phase rules applied to the penalty phase, (RT at 2394), and that they should be guided by the applicable factors of aggravating and mitigating circumstances as instructed (CT at 647-48, CALJIC 8.88).

As noted, when evaluating the effect of an instruction on the jury, courts must follow "the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." <u>Boyde</u>, 494 U.S. at 378; <u>Middleton v. McNeil</u>, 541 U.S. 433, 435-36 (2004) (finding that an erroneous instruction was cured by the spillover effect of correct instruction on the law elsewhere).

The California Supreme Court generally reviewed instructional error claims on direct appeal and reasonably rejected any suggestion that a proper interpretation of California's death penalty law required the jury to be instructed in the manner requested by Petitioner. <u>Bolin</u>, 18 Cal. 4th at 341-345. It is unlikely that the jury would have interpreted the trial court's brief comments earlier in the trial as authorization to wholly ignore the guilt phase instructions when determining the appropriate penalty. (RT at 2603-16.) It follows that Petitioner has not demonstrated instructional errors that had

1   a substantial and injurious effect or influence in determining the jury's verdict under <u>Brecht</u>.  <u>See also</u>

2   claim D, *ante*.

3          Accordingly, this Court does not find that the state supreme court's rejection of the claim was

4   contrary to, or an unreasonable application of, clearly established federal law, as determined by the

5   Supreme Court, or that the state court's ruling was based on an unreasonable determination of the

6   facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d).

7          Claim U1 is denied.

8          **c.      Analysis of Claim U2**

9          Petitioner next alleges that the trial court erred by not reading CALJIC No. 8.84.1 ("Duty of

10  Jury – Penalty Proceeding") regarding the penalty phase duty of the jury.  Specifically he claims the

11  jury was not instructed to "[d]isregard all other instructions given to you in other phases of this trial"

12  and that it must "neither be influenced by bias nor prejudice against the defendant, nor swayed by

13  public opinion or public feelings [and that] you will consider all of the evidence, follow the law,

14  exercise your discretion conscientiously, and reach a verdict."  (ECF No. 113 at 171:19-28.)

15         This, he contends, may have left the jury confused as to whether it could consider sympathy,

16  pity, compassion or mercy in the penalty phase.  (RT at 2394); <u>People v. Babbitt</u>, 45 Cal. 3d 660, 718

17  n.26 (1988) (<u>as modified</u> <u>on</u> <u>denial</u> <u>of</u> <u>reh'g</u> (Aug. 25, 1988) (trial courts should expressly inform the

18  jury at the penalty phase which instructions previously given continue to apply).

19         Petitioner also alleges that at the penalty phase, the jury did not consider the consequences

20  their verdict and their individual sense of morality, because they were not instructed to disregard the

21  guilt phase instruction requiring them to return a "just" verdict, "regardless of the consequences."

22  (CT at 432-33; CALJIC 1.00.)

23         Petitioner raised the same claim in his petition for writ of habeas corpus in the California

24  Supreme Court, (CSC Pet. Habeas Corpus at 246-50), which that court found to be procedurally

25  barred because the claim could have been, but was not, raised on direct appeal.  (CSC Order Den. Pet.

26  Habeas Corpus [citing <u>In re Harris</u>, 5 Cal. 4th at 825 n.3; <u>In re Dixon</u>, 41 Cal. 2d at 759].)

27         The California Supreme Court also summarily rejected the claim on the merits without

28  explanation.  (CSC Order Den. Pet. Habeas Corpus.)

CALJIC No. 8.84.1 ("Duty of Jury – Penalty Proceeding") (1989 New), provides in full:

You will now be instructed as to all of the law that applies to the penalty phase of this trial.

You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial.

You must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings. Both the People and the Defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict.

(ECF No. 178 at 244:20-45-4.)

Respondent concedes that the trial court did not give CALJIC 8.84.1 (ECF No. 194 at 284:17-18), but argues that the California Supreme Court could reasonably have found that the jury was sufficiently instructed, through the other instructions given, with all the requirements contained in CALJIC 8.84.1. This Court agrees.

Petitioner cites to Babbitt and argues that CALJIC 8.84.1 was to be used at the penalty phase in lieu of CALJIC 1.00 due to the latter's lack of clarity as to applicability of guilt phase instructions at the penalty phase. 45 Cal. 3d 660, 717-18 & n.26. The Babbitt court stated that:

[W]e upheld the 1978 death penalty statute against a challenge that it withdraws constitutionally compelled sentencing discretion from the jury. [Citation] To forestall any possible confusion we directed trial courts in the future to instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in Brown.

Babbitt, 45 Cal. 3d at 714.

Here, the state supreme court could reasonably have concluded that the jury was instructed as to their penalty phase responsibilities and the scope of their sentencing discretion. The jury was given the factors to consider in determining the penalty. (CT at 631-32; RT at 2605-07; CALJIC No. 8.85.) They were instructed not to consider "for any reason whatsoever the deterrer or non-deterrent effect on [sic] the death penalty or the monetary cost to the State of California of execution or maintaining a prisoner for life." (RT at 2614; CT at 644; see also Defendant's Proposed Instruction No. 15, CT at 644.) They were instructed they "must conscientiously consider and weigh the

1   evidence and apply the law" and must return a verdict that is "just and reasonable." (RT at 2604; CT

2   at 628-29; Defendant's Proposed Jury Instruction No. 1.00.) They were instructed (at the guilt phase)

3   not to be swayed by public opinion or prejudice. Id. They were instructed "to assume that if you

4   sentence [Petitioner] to death, he will be executed in the gas chamber." (RT at 2614; CT at 645;

5   Defendant's Proposed Instruction No. 4, CT at 645.) They were instructed to disregard conflicting

6   guilt phase instructions. (RT at 2607; CT at 632; CALJIC No. 8.85.)

7        The state supreme court could reasonably have determined that the jury was bound to the

8   principles embodied in CALJIC 8.84.1 and that "the jury could not have been misled about its sole

9   responsibility to determine on its individualized weighing discretion, whether death was

10  appropriate." Babbitt, 45 Cal. 3d at 718. Here again, jurors are presumed to follow the instructions

11  as given and in their entirety and to use the appropriate factors when making their penalty

12  determination. Middleton, 541 U.S. at 435-36 (not reasonably likely jury misunderstood

13  requirements of charged offense when all the instructions are considered in their entity). Petitioner

14  has not demonstrated that the court's failure to give CALJIC 8.84.1 was instructional error that made

15  his trial unfair.

16       To the extent Petitioner argues ineffective assistance of trial and appellate counsel in

17  connection with this alleged instructional error, as more specifically discussed in his claims W8 and

18  DD, such allegations fail for the reasons stated above and in claims W8 and DD, *post*.

19       Petitioner's related argument that he was prejudiced by the alleged extensive misleading and

20  negative pretrial publicity in this case, and by the prosecution's improper penalty phase closing

21  argument that the jury should consider public sentiment in reaching their verdict, (see RT at 2574),

22  fails for reasons discussed in claim V, *post*. Petitioner has not demonstrated federal constitutional

23  error, Estelle, 502 U.S. at 67, and cannot show prejudice under Brecht.

24       Accordingly, this Court does not find that the California Supreme Court's rejection of the

25  claim was contrary to, or an unreasonable application of, clearly established federal law, as

26  determined by the Supreme Court, or that the state court's ruling was based on an unreasonable

27  determination of the facts in light of the evidence presented in the state court proceeding. See 28

28  U.S.C. § 2254(d).

1    Claim U2 is denied.

2         **d.    Analysis of Claim U3**

3         Petitioner next alleges the trial court erred by failing to distinguish between aggravating and

4    mitigating circumstances in the penalty phase instructions, denying him due process and a reliable

5    penalty determination, violating his rights under the Fifth, Eighth and Fourteenth Amendments.

6    (ECF No. 113 at 174-75.)

7         Specifically, Petitioner alleges that the trial court's use of CALJIC 8.85 (CT at 631-32), which

8    lists the Penal Code § 190.3 aggravating and mitigating factors without distinguishing which are

9    aggravating and which are mitigating, allowed the jury to give mitigating factors aggravating weight,

10   and to consider the absence of statutory mitigating factors as aggravating factors.

11        Petitioner also alleges that the state court did not adjudicate his constitutional arguments in

12   this claim.  The Court disagrees, and denies the claim for the following reasons.

13        The California Supreme Court reviewed these allegations on direct appeal and adjudicated

14   them by denying the allegations on the merits, stating that:

15        Defendant asserts the trial court violated various constitutional rights by failing to
16        delineate which statutory factors were aggravating and which were mitigating. We
          have consistently rejected this argument. "[T]he aggravating or mitigating nature of [the
17        section 190.3] factors should be self-evident to any reasonable person within the context
          of each particular case." [Citation] Here, the court explained that an aggravating factor
18        was anything connected with the crime "which increases its guilt or enormity or adds to
          the injurious consequences ...." By contrast, a mitigating factor was any "extenuating
19        circumstance" short of justification or excuse. Nothing in these commonly understood
          definitions supports defendant's assertions that the jury could have considered section
20        190.3, factor (d) (extreme mental or emotional disturbance), factor (g) (acting under the
          substantial domination of another), or factor (h) (impairment due to mental defect or
21        intoxication) as aggravating, particularly since there was no evidence of such
          circumstances. Moreover, in closing argument both the prosecutor and defense counsel
22        identified which factors could be considered aggravating and which mitigating.

23
          We are also unpersuaded that language instructing the jury to determine "whether or
24        not" section 190.3, factors (d) through (h) and (j) existed caused any confusion in this
          regard. [Citation] This reference simply complemented the court's generic instruction
25        that the jury's function was to "decide what the facts are from the evidence received in
          the trial ...." Furthermore, in the final analysis "the constitutional prohibition on arbitrary
26        and capricious capital sentencing determinations is not violated by a capital sentencing
          'scheme that permits the jury to exercise unbridled discretion in determining whether the
27        death penalty should be imposed after it has found that the defendant is a member of the
          class made eligible for that penalty by statute." [Citation]
28

225

Bolin, 18 Cal. 4th at 341-42.

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. 586 at 604; Eddings, 455 U.S. at 113-114 (adopting rule in Lockett). "The standard against which we assess whether jury instructions satisfy the rule of Lockett and Eddings was set forth in Boyde, 494 U.S. 370 (1990)." Johnson v. Texas, 509 U.S. 350, 367-68 (1993). In Boyde, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" 494 U.S. at 377 (quoting Franklin v. Lynaugh, 487 U.S. 164, 181 (1988)).

In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" Johnson, 509 U.S. at 367 (quoting Boyde, 494 U.S. at 380). "[W]e do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a commonsense understanding of the instructions in the light of all that has taken place at the trial." Id. at 368 (quoting Boyde, 494 U.S. at 381). Further, a single instruction "may not be judged in artificial isolation, but must be considered in light of the instructions as a whole and the entire trial record." Estelle, 502 U.S. at 72.

The failure to identify whether factors are aggravating or mitigating is not contrary to or an unreasonable application of Supreme Court authority. In Pulley, the Supreme Court reviewed California's sentencing system, including the manner in which the jury considered relevant factors in deciding the penalty. 465 U.S. at 51. The Supreme Court noted that the 1977 death penalty law (like the 1978 law applicable in this case) did not identify or separate the aggravating or mitigating factors. Id. at 53 n.14. The Court found California's death penalty law to be constitutional. Id. at 51 ("Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977

California statute is not of that sort."). <u>Pulley</u> was clearly established authority at the time

Petitioner's conviction became final on March 8, 1999.

In <u>Tuilaepa</u>, the Supreme Court revisited California's death penalty sentencing scheme. The Supreme Court rejected the argument that California's "single list of factors" was unconstitutional. The Court stated:

> This argument, too, is foreclosed by our cases. A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision. In <u>California v. Ramos</u>, for example, we upheld an instruction informing the jury that the Governor had the power to commute life sentences and stated that "the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem." [Citation] Likewise, in <u>Proffitt v. Florida</u>, we upheld the Florida capital sentencing scheme even though "the various factors to be considered by the sentencing authorities [did] not have numerical weights assigned to them." [Citation] In <u>Gregg</u>, moreover, we "approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." [Citation] We also rejected an objection "to the wide scope of evidence and argument" allowed at sentencing hearings. [Citation] In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. [Citation] "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." [Citation] Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." [Citations] In contravention of those cases, petitioners' argument would force the States to adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors. The States are not required to conduct the capital sentencing process in that fashion. [Citation]

<u>Tuilaepa</u>, 512 U.S. at 979-80.

Here, at the penalty phase, the jury was instructed with CALJIC No. 8.85, which sets forth the factors the jury should consider in determining penalty:

> In determining which penalty is to be imposed on this defendant, you shall consider all of the evidence which has been received during any part of the trial in this case. You shall consider, take into account and be guided by the following factors, *if applicable....*

(CT at 631; RT at 2605.) The court then read the several factors under headings A through J, (informing the jury of the statutory factors from Penal Code § 190.3(a) through (i) and (k)), but did not expressly inform them which factors were relevant solely as mitigating factors. (CT at 631-32;

227

1    RT at 2605-07.)   However, the trial court did instruct the jury that it could consider any other

2    circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the

3    crime and any sympathetic or other aspect of the defendant's character or record that the defendant

4    offers as a basis for a sentence less than death, whether or not related to the offense for which he is on

5    trial; and that it must disregard any instruction given in the guilt or innocence phase which conflicted

6    with the foregoing instruction.  (RT at 2607; CT at 632.)

7         There is no clearly established authority from the United States Supreme Court holding that a

8    jury must be instructed in a particular manner.  The Eighth Amendment does not require that a jury be

9    instructed on particular statutory mitigating factors.  Buchanan v. Angelone, 522 U.S. 269, 275-77

10   (1998).  Accordingly, since the Supreme Court has not decided the issue, the state supreme court's

11   decision could not be contrary to or an unreasonable application of United States Supreme Court

12   precedent.  Carey, 549 U.S. 76.

13        Petitioner has made no evidentiary showing that the instructions given in this case in any way

14   foreclosed the jury from considering any relevant mitigating evidence.  The Supreme Court has

15   examined the language in California's jury instruction on mitigation multiple times, and upheld it

16   against constitutional challenges every time.  See Ayers v. Belmontes, 549 U.S. 7, 24 (2006); Brown

17   v. Payton, 544 U.S. 133, 142 (2005); Boyde, 494 U.S. 370, 386.

18        Even if there were instructional error by failing to distinguish between aggravating and

19   mitigating circumstances, the California Supreme Court could reasonably have found no "substantial

20   and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 638.  The jury

21   was instructed that:

22        An aggravating factor is any fact, condition or event in the commission of a crime which
          increases its guilt or enormity or adds to the injurious consequences which is above and
23        beyond the elements of the crime itself.

24        The mitigating circumstance is any fact, condition or event which if such does not
          constitute a justification or excuse for the crime in question but may be considered as an
25        extenuating circumstance in determining the appropriateness of the death penalty.

26   RT at 2615.   The state supreme court reasonably found that these definitions used commonly

27   understood terms.  Bolin, 18 Cal. 4th at 341-42.  Moreover, Petitioner has not demonstrated on the

28   evidentiary record that the jury gave mitigating factors aggravating weight or considered the absence of

statutory mitigating factors to be aggravating.  Bolin, 18 Cal. 4th at 341-42.  Though Petitioner argues that "[i]t is reasonably likely that the jury applied CALJIC No. 8.85 in a manner inconsistent with the Constitution" (ECF No. 178 at 251:5-6), he fails to demonstrate on the evidentiary record that any juror was precluded from considering any aspect of a defendant's character or record and any of the circumstances of the offense to be mitigating.

In any event, it seems unlikely the jury would have held such an erroneous belief.  The jury was instructed that it could consider any non-statutory extenuating, sympathetic, or other basis for a sentence less than death, whether or not related to the conviction, and that the jury must disregard any instruction given in the guilt or innocence phase which conflicted with the foregoing instruction.  (RT at 2607; CT at 632.)

There also appear additional reasons that the state supreme court could have found no prejudicial error.  Both sides, in their respective closing arguments, identified those factors which could be aggravating and those which could be considered mitigating.  See RT at 2573-2601; see also Bolin, 18 Cal.4th at 341.  The noted circumstances of the instant capital murders and evidence of adjudicated and unadjudicated past criminal acts also suggest substantial aggravating evidence.  (See claims O, R and S, ante; RT at 2605-14; CALJIC Nos. 8.85, 8.86, 8.87, CT at 631-33.)

For the reason stated by the California Supreme Court as well as those discussed above, the Court finds it unlikely that the jurors improperly and prejudicially applied CALJIC 8.85 as a result of the alleged failure to distinguish between aggravating and mitigating factors.  Moreover, an error solely of state law is not a basis for federal habeas relief.

Accordingly, this Court does not find that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim U3 is denied.

**e.**     **Analysis of Claim U4**

Petitioner next alleges that, at the penalty phase, the trial court failed to instruct on the definition of "reasonable doubt" applicable to aggravating criminal acts, denying him due process

1   under the Fifth and Fourteenth Amendments.  (ECF No. 113 at 175-76.)

2       Petitioner made this same claim on direct appeal, which the California Supreme Court

3   considered and rejected on the merits.  Bolin, 18 Cal. 4th at 342.  He alleges the state court did not

4   fully adjudicate the claim.

5       However, the California Supreme Court considered and rejected the claim, stating that:

6       During penalty phase instruction, the trial court did not repeat the definition of
        reasonable doubt given at the guilt phase. Defendant contends this omission violated

7       various constitutional rights because the term is not commonly understood outside the
        law. We find no error. At the beginning of the penalty phase, the court expressly alerted

8       the jury that "[m]ost of the rules that I gave you before ... will apply to this case."
        Nothing in the court's subsequent instructions suggested the jury should disregard the

9       earlier definition; a reasonable juror would assume it continued to apply.

10

11  Bolin, 18 Cal. 4th at 342.

12      As noted, during the penalty phase, the prosecution presented aggravating evidence of

13  Petitioner's prior felony conviction for attempted voluntary manslaughter and his two prior

14  unadjudicated criminal acts of assault and writing a threatening letter.  The jury was instructed at the

15  penalty phase that it "must first be satisfied beyond a reasonable doubt" that Petitioner was convicted

16  of or committed these criminal acts before they could be considered aggravating circumstances.  (CT

17  at 633-34; RT at 2607-08; CALJIC Nos. 8.86, 8.87.)

18      Petitioner concedes that the jury was instructed on the definition of "reasonable doubt" at the

19  guilt phase, (CT at 457), but complains that jury was not re-instructed on this definition at the penalty

20  phase. (RT at 2607; CT at 633.)  He alleges that penalty phase instructions implied that the guilt

21  definition did not apply at penalty phase.  (RT at 2603-04; CT at 628.)  He claims this error left the jury

22  "unguided in their determination as to whether or not to accept the evidence presented by the

23  prosecution in aggravation," (RT at 2603-08; CT at 628-34), which substantially and injuriously

24  affected the jury's verdict under Brecht.

25      The Court is unpersuaded.  The trial court's admonition at the beginning of the penalty phase

26  instructions, that it would now "tell [the jury] about the law which applies to this phase of the trial",

27  (see RT at 2603; CT at 628) was not followed by any penalty phase instruction that the jury disregard

28  the definition of reasonable doubt (CALJIC No. 2.90) that had been given to them during the guilt

phase.  (CT at 457; RT at 2195.)  Instead, as noted by the state supreme court on direct appeal, the jury was instructed that "most of the rules that I gave you before . . . will apply to [the penalty phase]."  RT at 2394; see also Bolin, 18 Cal. 4th at 342.  The instructions are considered in their totality.  Estelle, 502 U.S. at 72.  The jurors were presumed to follow the instructions given by the trial court.  Weeks, 528 U.S. at 234.

Petitioner has not demonstrated the jury was instructed to disregard the CALJIC No. 2.90 instruction.  Nor has he demonstrated clearly established law required the trial court to re-read the reasonable doubt definition.  See Sanders, 11 Cal. 4th at 561 (the court at the penalty phase is not required to re-read guilt phase instructions when the latter were not limited to use at the guilt phase and when no penalty phase instructions contradict the guilt phase instructions).

The Court finds that the California Supreme Court could reasonably determine it unlikely that a failure to re-instruct with CALJIC No. 2.90 at the penalty phase confused the jury such that they were left unguided in determining whether to accept aggravating evidence.  The inference otherwise argued by Petitioner does not find sufficient support in the record.

Accordingly, this Court does not find that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim U4 is denied.

### f.    Analysis of Claim U5

Petitioner next alleges that the then-effective California death penalty statute suffered from constitutional infirmities, which are reviewed separately below.  (ECF No. 113 at 176-78.)

### 1)    Failure to Minimize Risk of Arbitrary Penalty

Petitioner cites to Furman v. Georgia, 408 U.S. 238, 313 (1972), and complains that his death sentence was imposed arbitrarily and capriciously because jury instructions at the penalty phase did not provide "a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not," exposing Petitioner to cruel and unusual punishment and denying him due process in violation of the Fifth and Eighth Amendments.  (ECF No. 113 at 176:20-

21.)

The California Supreme Court considered and rejected these allegations on direct appeal, stating that:

> In sum, our capital sentencing scheme does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. [Citation] Nor does the felony-murder rule falter in this regard.   [Citation] The statutory categories have not been construed in an unduly expansive manner. [Citation]  The breadth of the prosecutor's discretion in choosing to seek the death penalty does not render it unconstitutional. [Citation]  The jury need not make express findings with respect to circumstances in aggravation [Citation], or find beyond a reasonable doubt that death is the appropriate penalty [citation].

Bolin, 18 Cal. 4th at 345-46.

Supreme Court cases have established that a state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Kansas v. Marsh, 548 U.S. 163, 173-74 (2006).  If the "state system satisfies these requirements," then the "state enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Id. (citing Franklin, 487 U.S. at 179 and Zant, 462 U.S. at 87576, n.13.)

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder.  Sawyer v. Whitley, 505 U.S. 333, 342 (1992).  A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors." Id.; see also Gregg, 428 U.S. at 196-97.

In California, a defendant may be sentenced to death for first degree murder if the trier of fact finds the defendant guilty and also finds true one or more of the special circumstances listed in Penal Code § 190.2.  As relevant here, one of the circumstances is: "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree."  Penal Code § 190.2(a)(3).  There is no question that this sentencing scheme satisfies clearly established constitutional requirements.  First, the subclass of defendants eligible for the death penalty is rationally narrowed to those who have committed multiple murders.  Tuilaepa, 512 U.S. at 969-73.  The multiple murder special circumstance sufficiently guides the sentencer and is not unconstitutionally vague.  See Godfrey

v. Georgia, 446 U.S. 420, 428 (1980) (the sentencer's discretion must be guided by "clear and objective standards.").

In California v. Ramos, the United States Supreme Court stated that "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious.  463 U.S. at 1008-09.  At the selection stage, an individualized determination includes consideration of the character and record of the defendant, the circumstances of the crime, and an assessment of the defendant's culpability. Tuilaepa, 512 U.S. at 972-73.  However, the jury "need not be instructed how to weigh any particular fact in the capital sentencing decision."  Id. at 979.

Here, the Court finds that the California Supreme Court could reasonably have determined that California's death penalty scheme then in effect did not fail to genuinely narrow the class of murderers eligible for the death penalty.  California's scheme, which narrows the class of death-eligible offenders to less than the definition of first degree murder and permits consideration of all mitigating evidence, has been approved by the United States Supreme Court, Tuilaepa, 512 U.S. at 972-79; Harris, 465 U.S. at 38, and this Court, Ben-Sholom v. Woodford, E.D. Cal. Case No. CV-F-93-5531, ECF. No. 421 at 122, 124-25.

### 2)   *Vagueness Regarding Sentence Determination*

Petitioner complains of vagueness in the trial court's instruction, CALJIC 8.88, that in order to "return a judgment of death, each of you must be persuaded that the aggravating evidence and/or circumstances is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."  (ECF No. 113 at 177:2-11; RT at 2616; CT at 648); see also Woodson, 428 U.S. at 305.  He contends the trial court failed to inform the jury that it must find death to be the "appropriate" penalty and not just "warranted."  (ECF No. 113 at 177:12-17.)

The California Supreme Court considered and rejected these allegations on the merits on direct appeal, stating that:

> In explaining the nature of the penalty phase deliberative process, the trial court instructed: "To return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors, that it

warrants death instead of life without parole." Defendant now argues the "so substantial" and "warrants" phrasing is impermissibly vague and does not adequately guide the decision to impose death. As in the past, we find no constitutional infirmity. [Citation] Prior to this instruction, the [trial] court explained, "In the weighing of aggravating and mitigating circumstances, it does not mean a mere mechanical counting of the factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." Assessed in this context, the "so substantial" instruction "clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty. [Citations]"

Bolin, 18 Cal. 4th at 342-43.

That court went on to find that, "considered as a whole," the instructions were "sufficient to guide the jury's deliberative process and inform the jurors they must find death is the 'appropriate' penalty if that [is] their verdict." Id. at 343.

Prior to the instant instruction, the trial court instructed the jury that "[i]n weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (RT at 2616; CT at 647-48.)  That court also instructed the jury on the meaning of a mitigating circumstance, noting that such a circumstance may be used "in determining the appropriateness of the death penalty." (RT at 2615; CT at 647.)  Defense counsel informed the jury that it would be deciding what is the "appropriate penalty."  (RT at 2467, 2584, 2596.)

Upon consideration of the entire charge to the jury and related argument, it is unlikely the alleged vagueness prevented consideration of constitutionally relevant evidence in sentence determination.  Boyde, 494 U.S. at 380.  As noted, a reviewing court approaches the instructions in the same way that the jury would, with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." Johnson, 509 U.S. at 368.  It can be presumed that the jury followed the instructions, including the cautionary instructions. Weeks, 528 U.S. at 234.

Even if there was constitutional error, Petitioner has not demonstrated error under Brecht, i.e., that there is a reasonably likelihood the jury improperly applied the allegedly ambiguous terms in

234

1  determining their verdict, for the reasons stated and given the noted substantial evidence against

2  Petitioner.  (See claims O, R and S, ante; cf., Calderon v. Coleman, 525 U.S. 141, 145 (1998)

3  (inaccurate sentence commutation instruction was Brecht error).

### 3)    *Aggravation, Sympathy and Mercy*

4  

5      Petitioner complains that the trial court, upon rejecting defendant's proffered Instruction No.

6  9, failed to instruct the jurors that they could return a life without parole sentence even where the

7  aggravating circumstances substantially outweigh the mitigating circumstances (ECF No. 113 at 177)

8  (citing Gregg, 428 U.S. at 199), and that they could consider other mitigating factors, such as

9  sympathy and mercy.

10     The California Supreme Court considered and rejected these allegations on the merits on

11  direct appeal, stating that:

12  
13      Defendant contends the trial court erroneously refused instructions informing the jurors
       in various terms that sympathy, pity, compassion, and mercy were factors in deciding
14      the appropriate sentence. We find no error. "We have repeatedly held that a jury told it
       may sympathetically consider all mitigating evidence need not also be expressly
15      instructed it may exercise 'mercy.'" [Citations] Here, the trial court gave the standard
       instruction to take into account "any other circumstance which extenuates the gravity of
16      the crime even though it is not a legal excuse for the crime and any sympathetic or other
       aspect of the defendant's character or record that the defendant offers as a basis for a
17      sentence less than death, whether or not related to the offense for which he is on trial."
       The court also told the jury "to assign whatever moral or sympathetic value you deem
18      appropriate to each and all of the various factors you are permitted to consider." No
       additional instruction was required.
19  

20  Bolin, 18 Cal. 4th at 343-44.

21     As noted, in reviewing penalty phase instructions, the test is "whether there is a reasonable

22  likelihood that the jury has applied the challenged instruction in a way that prevents the consideration

23  of constitutionally relevant evidence." Boyde, 494 U.S. at 380.  Further, a single instruction "may not

24  be judged in artificial isolation," but must be considered in light of the instructions as a whole and the

25  entire trial record. Estelle, 502 U.S. at 72.

26     Here, the state court could reasonably have found that the jury was not precluded from

27  considering constitutionally relevant mitigating and sympathetic evidence during their sentence

28  deliberations.  The Supreme Court has never required a sentencing court to instruct a jury on how to

weigh and balance factors in aggravation and mitigation.  In Tuilaepa, the Supreme Court stated, "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  512 U.S. at 979.  "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment."  Id. (quoting Ramos, 463 U.S. at 1008.)

In Marsh, the Supreme Court stated:

In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. *"[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.*"

548 U.S. at 175 (quoting Franklin, 487 U.S. at 179).  Here, in explaining the factors the jury was to consider in reaching its decision, the trial court specifically instructed the jury that it could consider:

[A]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.

(RT at 2607; CT at 632.)  The trial court also told jurors that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." (RT at 2615; CT at 647.)   The prosecutor also noted that the jury could and should consider sympathy for the defendant in determining the appropriate penalty.  (RT at 2396, 2579, 2581.)

There is no clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner.  Accordingly, since the Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent.  Carey, 549 U.S. at 76.

To the extent Petitioner alleges the jury may have applied the instruction in a manner contrary to state law (see ECF No. 113 at 177: 23-24 ["state law provides that jurors may sentence a defendant to life without parole even where the aggravating circumstances substantially outweigh the mitigating

circumstances"]), this allegation is not alone a basis for federal habeas relief.  Pulley, 465 U.S. at 41.

Accordingly, the state supreme court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Nor was the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim U5 is denied.

### g.  Analysis of Claim U6

Petitioner next claims that the trial court erroneously refused certain of his proposed penalty phase instructions which were designed to guide jury discretion in sentence selection, denying him due process and a fair penalty phase determination.  (ECF No. 113 at 178-86.)

The California Supreme Court considered and rejected the allegation relating to Petitioner's proposed Instruction No. 9 on direct appeal. He also raised all these same allegations in his petition for writ of habeas corpus in the California Supreme Court.  That court found Petitioner's habeas claims were procedurally barred because these claims could have been, but were not, raised on direct appeal, or were repetitive of such claims.  (CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3; In re Dixon, 41 Cal. 2d at 759].)  The California Supreme Court also rejected the habeas claims on the merits.  (CSC Order Den. Pet. Habeas Corpus); Bolin, 18 Cal. 4th at 343.

Petitioner alleges that the trial court erroneously determined that CALJIC 8.88 was "good enough," rejecting his proposed penalty phase instructions number 2, 9-14, and 19-21, all of which were allegedly designed to inform the jury that they should consider only instructions given at the penalty phase; that they could consider non-statutory mitigating factors; that "unlike in the guilt phase of the case, sympathy, mercy and compassion, or any other mitigating factors, are appropriate considerations for a penalty determination"; that they could return for life without parole even if aggravating circumstances outweigh mitigating circumstances; and that doubt is to be resolved in favor of life without parole.  (ECF No. 113 at 178-81; RT at 2549-50; CT at 651, 652, 655, 656, 657, 658, 659, 660, 663, 665.)  He also alleges that the trial court did not inform the jury that weighing of aggravating and mitigating factors was not to be done mechanically and that death was to be imposed only if it was the appropriate penalty.

237

However, the Court finds that the California Supreme Court could have reasonably rejected this claim for the reasons stated in claims U1-U5, *ante*.  The trial court separately instructed the jury on the requirement that it follow the penalty instructions and stated rules of law, such that Petitioner's proposed Instruction No. 2 (CT at 663) could reasonably be seen as unnecessary.  (RT at 2607; CT at 632; CALJIC No. 8.85.)

Petitioner acknowledges that the jury was instructed that it could consider "any sympathetic or other aspect of the defendant's character or record" to support a life sentence (CALJIC 8.85) and that it was free to assign whatever "moral or sympathetic value" was "appropriate" to the various factors it was "permitted to consider."  (CALJIC 8.88; ECF No. 113 at 183:22-25.)

Petitioner's proposed instructions could have reasonably been seen as unnecessary given the overall charge to the jury regarding its exercise of sentencing discretion as discussed in claims U1-U5, *ante*.  Spivey, 194 F.3d at 976.  The trial court could properly reject a petitioner's proposed jury instruction if other instructions adequately cover the issues about which the defense is concerned.  United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996); United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979) ("there is no right to have the instruction phrased in the precise terms requested by defendant").

Additionally, Petitioner's proposed instruction that jurors could not return a verdict of death unless they were persuaded beyond a reasonable doubt that it was the appropriate penalty, (ECF No. 113 at 184-85), was reasonably rejected.  See, e.g., Williams v. Calderon, 52 F.3d 1465, 1485 (1995) (failure to require a specific finding that death is the appropriate penalty beyond a reasonable doubt does not render California's death penalty statute unconstitutional); accord People v. Webb, 6 Cal. 4th 494, 536 (1993).

Under California law "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror."  People v. Samayoa, 15 Cal. 4th 795, 853 (1997); see also Walton v. Arizona, 497 U.S. 639, 651 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584, 589 (2002) (a defendant may constitutionally be required to establish by a preponderance of the evidence the existence of mitigating circumstances, a conclusion manifestly inconsistent with

Petitioner's assertion that the Constitution requires the jury to determine beyond a reasonable doubt that death is the appropriate penalty).  Petitioner's cited People v. Cancino is not authority otherwise because here, for the reasons stated, the jury was adequately instructed as to its sentencing discretion. 10 Cal. 2d 223, 230 (1937).

The California Supreme Court considered and rejected on direct appeal, alleged instructional error relating to Petitioner's proposed Instruction No. 9, noting that:

> [T]he instructions adequately performed the constitutional function of guiding the jury's discretion in sentencing.  [Citation] In this case, the court gave similar instructions that told the jury "it could return a death verdict only if aggravating circumstances predominated and death is the appropriate verdict.
>
> Here, the trial court gave the standard instruction to take into account "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The court also told the jury "to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." No additional instruction was required.

Bolin, 18 Cal. 4th at 343-44.

That court could reasonably have found that the standard penalty phase instructions given in this case, CALJIC Nos. 8.85, 8.86, 8.87, and 8.88, adequately guided the jury's sentencing discretion and determination.  (RT at 2605-08, 2614-16; CT at 631-34, 647-48.)  As the California Supreme Court stated on direct appeal:

> [I]n the final analysis "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute.' [Citation]"

Bolin, 18 Cal. 4th at 342 (quoting Ramos, 463 U.S. at 1009 n.22).

"The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence."  Blystone v. Pennsylvania, 494 U.S. 299, 307 (1990); Boyde, 494 U.S. at 377.  Here, the jury was specifically instructed to consider, in reaching their decision regarding the appropriate penalty, "any sympathetic or other aspect of the defendant's

character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (RT at 2607.) The instructions given by the trial court could reasonably be seen as satisfying the Blystone and Boyde standards. A mere state law instructional error, if there were one, is not a basis for federal habeas relief. Dunckhurst, 859 F.2d at 114 ("a state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.").

Additionally, the court's instruction to the jury about not "mechanical[ly] counting" the aggravating and mitigating factors (RT at 2615; CT at 647) adequately informed the jury that it could base a life sentence on the existence of only one factor in mitigation.

Accordingly, the state supreme court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim U6 is denied.

### h.     Review of Claim U7

Petitioner claims cumulative penalty phase instructional error as alleged in claims U1-U6 rendered the court's charge to the jury insufficient as a whole to provide guidance necessary for a fair and reliable sentencing determination. (ECF No. 113 at 186-87.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which that court summarily rejected on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner re-argues claims U1-U6 and claims cumulative effect of these errors caused substantial prejudice in the jury's determination of the verdict under Brecht.

"The Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." Parle, 505 F.3d at 928 (citing Donnelly, 416 U.S. at 643). However, the fact that errors have been committed during a trial does not mean that reversal is required. "[W]hile a defendant is entitled to a fair trial, [he] is not entitled to a perfect

1  trial, for there are no perfect trials."  Payne, 944 F.2d at 1477; U.S. v. De Cruz, 82 F.3d 856, 868 (9th
2  Cir. 1996).

3      Here, for the reasons stated above in claims U1 through U6, the California Supreme Court
4  could reasonably have found that there was no penalty phase instructional error, individually or
5  cumulatively.

6      Accordingly, the California Supreme Court could reasonably have found that Petitioner failed
7  to establish that rejection of claim U and all its subclaims was contrary to, or an unreasonable
8  application of, clearly established federal law, or an or an unreasonable determination of the facts in
9  light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

10     Claim U7 is denied.

11     **5.    Review of Claim V**

12     Petitioner next claims prosecutorial misconduct during penalty phase closing argument,
13  denying him a fair trial, due process and fair and reliable penalty determination in violation of the
14  Fifth, Sixth and Fourteenth Amendments.  (ECF No. 113 at 187-90.)

15     Petitioner raised this same claim in his petition for writ of habeas corpus in the California
16  Supreme Court.  The California Supreme Court ruled that Petitioner's claim was procedurally barred
17  because this claim could have been, but was not raised on direct appeal. (CSC Order Den. Pet.
18  Habeas Corpus [citing In re Harris, 5 Cal. 4th at 825 n.3; In re Dixon, 41 Cal. 2d at 759].)

19     The California Supreme Court also summarily rejected Petitioner's habeas claim on the merits
20  without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

21     **a.    Clearly Established Law**

22     The standard of review for claims of prosecutorial misconduct is a "narrow one of due
23  process"; the federal habeas court must determine whether the alleged instances of misconduct "so
24  infected the trial with unfairness as to make the resulting conviction a denial of due process."
25  Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643); see also Greer, 483 U.S. at 765; Tan v.
26  Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).

27     To constitute a denial of due process, the prosecutorial misconduct must be of sufficient
28  significance to result in the denial of the defendant's right to a fair trial.  Greer, 483 U.S. at 765

(quoting Bagley, 473 U.S. at 676); see also United States v. Agurs, 427 U.S. 97, 98 (1976); Smith, 455 U.S. at 221 (ordinary trial errors by a prosecutor do not suffice; the misconduct must be egregious enough to deny the defendant a fair trial). The remarks complained of, in order to constitute a denial of due process, must be of such a quality that they prevent a fair sentencing hearing. Nichols v. Scott, 69 F.3d 1255, 1278 (5th Cir. 1997). A petitioner is entitled to relief in this context only where the constitutional violations exerted a "substantial and injurious" effect on the judgment. Brecht, 507 U.S. at 620; Fields v. Woodford, 309 F.3d 1095, 1109 (9th Cir. 2002) (stating the Ninth Circuit applies Brecht if misconduct of constitutional dimension is established), amended 315 F.3d 1062 (9th Cir. 2002).

b. **Analysis of Claim V**

Petitioner alleges the penalty phase was unfair because the prosecutor's closing improperly argued matters outside the evidence, improperly stated her own personal opinion of the credibility of witnesses, misstated the law regarding the role of sympathy, and urged jurors to impose the moral judgments of the community rather than their individual moral judgments. The specific instances of alleged misconduct are discussed separately.

*1)* *Public Sentiment*

Petitioner alleges the prosecutor improperly encouraged the jury to consider public sentiment about petitioner and the death penalty during her closing argument, as follows:

> You must determine whether or not Paul Clarence Bolin, twice a killer, should be given the death penalty or should live out his natural life in prison. As jurors in this phase, you will be required to bring into play all of your individual and all of your collective consciousness, all of your sense of duty, all of your values, your morals, your ethics, your individual and your collective experiences in life, your personal values and also your value of what the community expects of you because you, as a member of this jury, are representatives of the community.

(RT at 2574; see also ECF No. 113 at 188:10-16.)

> Paul Bolin has crossed the line which society draws. He has to now accept the proper punishment for what he has done. When you came into this courtroom, you did not know that this is what your responsibility would be, it is a heavy responsibility. I am glad it is not mine, but I appreciate the fact that each of you has listened and each of you has paid attention, and I would like for you, as representatives of society, to draw the line that society draws and say to this man, "Paul Clarence Bolin, you have stepped over

that line and now you must suffer the same fate as those people that you saw to cut their life off" and give this man the ultimate punishment, that punishment which I believe the evidence shows that he deserves, that is death.

(RT at 2582; see also ECF No. 113 at 188:10-16.)

However, these comments do not reasonably suggest the jury consider matters not in the record, or that they deviate from the instructions to be given by the trial court.  The California Supreme Court could reasonably have determined the prosecutor's noted comments simply argued the crimes and aggravating factors already in the record and were not unfair.  For example, the prosecutor specifically told the jury: "I would like you to consider your verdict rationally, with rational thoughts from all the evidence and not from emotion." (RT at 2582.)  The prosecutor also asked the jurors to consider future dangerousness and the protection of society in general in determining whether Petitioner should spend his life in prison or be put to death for his crimes.  (RT at 2577.)  Significantly, these comments were consistent with the prosecution theme that Petitioner resolves conflict with violence.  (RT at 2578-79); see Runnels, 413 F.3d at 1115 (the presence of a relevant theory in argument will place the argument outside those prohibited as based solely on appeals to passion and prejudice).

### 2) *Matters Not In Evidence*

Petitioner alleges that the prosecutor argued matters not in evidence when she asked jurors to consider Petitioner's character and influence upon others:

Consider the fact that there are two people no longer alive because this man wanted to protect 300 lousy marijuana plants. And when you are thinking about his protection of his 300 marijuana plants, think about the people from Chicago and the help that this man, they thought, was giving to their youngsters, their teen-age children and *think about what happens to those marijuana plants of Mr. Bolin when they are grown and sold on the streets in Los Angeles; think about who they are sold to and think about what kind of role model this man would be making for those teen-agers in Chicago.*

(RT at 2581.)  Petitioner claims there was no evidence of any intended or actual sale of marijuana. However, the state supreme court could reasonably have found that this argument was relevant to evidence presented regarding the marijuana farm - that at the time of the shootings the plants were not yet ready to harvest and sell (RT at 1879-80) - that Petitioner had not yet found a buyer (RT at 1669); and to rebut evidence presented by the defense relating to Petitioner helping his young relatives in

243

Chicago during his flight from authorities.  Moreover, any such prejudice was likely ameliorated by the defense theory that the shootings were not motivated to save Petitioner's marijuana business.  (RT at 2587); see Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998) (a defense attorney's argument may minimize any potential prejudice from inappropriate prosecution argument).

### 3)    Personal Opinion

Petitioner alleges that the prosecutor, during closing argument, improperly expressed her opinion that Mary Bolin did not testify truthfully and credibly about her father's involvement in the aggravating Spencer assault event.  As discussed in more detail in clam W6, post, Mary, testified that the event occurred when she was 12 years old. (See RT at 2469, 2483.)  She testified that Spencer was partying at her house, smoking pot and sniffing paint, when he put his hands down her pants and tried to pull her top down.  (See RT at 2470-71.)  She testified that Petitioner, upset after Mary told him what had happened, arrived and ran towards Spencer and ordered Spencer to leave, and that Spencer then exited through the backyard where Petitioner's friend, Richard Balsamico, began beating him with a stick.  (See RT at 2412-72.)  Mary testified that she did not see Petitioner hit Spencer.  (See RT at 2473.)

On cross-examination, Mary told the prosecutor she did not remember the police coming to her house or talking to the police.  (See RT at 2480-81.)  She was then impeached with Deputy Gutierrez's police report of the Spencer incident in which Mary failed to provide the information to which she testified, noted above.  (See RT at 2479-83.)

During closing, the prosecutor argued as follows with regard to that testimony:

> Now, one of Paul Bolin's daughters took the witness stand and told you a story which did not go along with the police report and, of course, when she was questioned about it, she couldn't remember whether or not she told that to the police. When shown the police report, she couldn't remember anything, but I am sure that she loves her father, and I am sure that she thought she could help him by misrepresenting or perhaps just forgetting what actually happened.

(RT at 2578.)

> Again, a daughter came in and told a story which simply was not true but, then, again, this girl loves her father. A poor father is better than no father at all, so she would come in and tell a story that was entirely different than that which was told to the police or that [other witnesses] told, but just remember this man was convicted of this crime. . . .

244

(RT at 2579.)

However, as Respondent notes, the prosecutor was free to argue relative credibility and lack of truthfulness based upon reasonable inference raised by admitted evidence. See Duckett v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995); United States v. Sarno, 73 F.3d 1470, 1496-1497 (9th Cir. 1995).  Here Petitioner acknowledges that Mary's testimony was contradicted by another witness.  (ECF No. 113 at 189:13-16.)  It was not unreasonable for the state court to find that the prosecutor's argument was properly related to Mary's credibility.  The prosecutor also told jurors that they should be guided by their own feeling regarding the evidence, not counsel's argument. (RT at 2574-75.)   The court's instructions emphasized this principle. (CT at 628-29; RT at 2604; Def.'s Proposed Instr. No. 1, CT at 628.)

At closing, a prosecutor is allowed wide latitude to argue reasonable inferences from the evidence, including casting a witness's testimony as lies or fabrication.  See Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert, 182 F.3d at 685.  It follows that Petitioner's further citation to Turner v. Louisiana for the proposition that the prosecutor's conduct was unfair because it was not based on the admitted evidence, see 379 U.S. 466, 472-73 (1965), is unavailing.  Ms. Ryals's comments could reasonably be seen as inference from noted evidence in the record.

Petitioner's allegation that federal law precludes the prosecutor's offering her personal opinion of issues of guilt and credibility, citing to United States v. Potter, 616 F.2d 384, 392 (9th Cir. 1979) and United States v. Davis, 564 F.2d 840, 866 (9th Cir. 1977), also is unavailing.  The Potter court acknowledged the impropriety of the prosecutor interposing his own opinion and commentary on factual matters not in evidence, and found any prejudice neutralized by the court's instruction that argument is not evidence.  Potter, 616 F.2d at 392.  The Davis court likewise acknowledged the limits of personal opinion where not based on evidence in the record.  Davis, 564 F.2d at 846.  Here, the prosecutor's comments could be seen as proper given the conflicting testimony, and any error could be seen as harmless given the jury instruction the argument was not to be taken as evidence.

### 4)   *Ethical Norms*

Similarly, Petitioner's allegation that the prosecutor's noted comments violated ethical norms

is unpersuasive.  Even if the prosecutor's argument could be seen as unethical, Petitioner has not demonstrated it was contrary to clearly established Federal law.

### 5)   *Sympathy*

Petitioner alleges that the prosecutor, in closing argument, improperly stated that sympathy should be limited to Petitioner's culpability for the crimes, and contradicted the language of California Penal Code § 190.3(j), by telling the jurors that:

> Mr. Cater and Mr. Bolin put on evidence of that factor which you can also consider called sympathy. That is anything which lessens the culpability of this man for these crimes. You can consider anything that makes this less serious, that mitigates his act and he put on the family and he put on friends, and he put on people who had known Mr. Bolin.

(ECF No. 113 at 189:23-26, citing RT at 2579:23-26.)  The jury was instructed with CALJIC 190.3(j) which allows the jury to consider:

> Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.

(CT at 632; RT at 2607.)

Petitioner contends the prosecutor's comment misled the jury as to what they could properly consider in determining their penalty verdict.  However, the state supreme court could reasonably have found otherwise.  The prosecutor neither argued against sympathy for Petitioner and his family, (RT at 2581), nor in favor of sympathy for the victims.  (RT at 2575.)   Instead the prosecutor urged the jury to consider the circumstances of crimes admitted into evidence.  (RT at 2575.)   Petitioner's reliance upon Penry v. Lynaugh is misplaced because in that case, unlike this case, the jury was not instructed that it could consider and give effect to mitigating evidence.  492 U.S. 302, 320 (1989) (abrogated by Atkins v. Virgina, 536 U.S. 304, 321 (2002)).

Nor do the other allegations in claim U demonstrate that the jury was improperly instructed regarding mitigating considerations of sympathy, for reasons stated in the discussion of that claim. Furthermore, the trial court instructed the jury that sympathy could be considered in determining the sentence.  (RT at 2607, 2615; CALJIC Nos. 8.85, 8.88.)

*6)      Prejudice*

Even if the prosecutor's comments were improper, there was no more than harmless error under <u>Brecht</u>.  The prosecutor told the jurors that it was their feelings about the evidence and factors in aggravation that mattered, not her own.  (RT at 2574-75.)  The trial court properly instructed the jury on this point.  (CT at 628-29; RT at 2604.)  The prosecutor stated that the jury's deliberations should be based upon  the evidence.  (RT at 2574.)  The trial court instructed the jury that the argument of counsel was not evidence.  (RT at 2573.)  The trial court also instructed the jury to follow its instructions if anything said by the lawyers contradicted the instructions.  (RT at 2604.) Jurors are presumed to follow instructions.  <u>Boyde</u>, 494 U.S. at 381-85.  <u>See</u> <u>Potter</u>, 616 F.2d 384, 392 (9th Cir. 1979) (prosecutor's closing contained some improprieties albeit not purposeful or flagrant or requiring reversal); <u>Furman v. Wood</u>, 190 F.3d 1002, 1006-07 (9th Cir. 1999) (rejecting habeas claim where, although some of prosecutor's arguments were improper, jury was told comments were not evidence, and evidence against defendant was substantial).

For all the reasons stated, the state supreme court could reasonably have found this claim unavailing.  A jury generally accords less weight to the arguments of counsel than to the instructions it is given.  <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 898 (9th Cir. 1996) (<u>citing Boyde</u>, 494 U.S. at 384) (jurors generally accord less weight to arguments of counsel than the court's instructions and such arguments must be viewed in the context of all argument and the instructions); <u>see also</u> <u>Darden</u>, 477 U.S. at 182 (claim of prosecutorial misconduct rejected where the prosecutor's comments "did not manipulate or misstate the evidence, nor . . . implicate other specific rights of the accused, such as the right to counsel or to remain silent").

A fair-minded jurist could therefore reasonably conclude that Petitioner failed to establish rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d).

Claim V is denied.

**6.     <u>Review of Claim W</u>**

Petitioner next alleges multiple subclaims asserting ineffective assistance of counsel during

the penalty phase, resulting in a complete breakdown of the adversarial process, denying Petitioner due process, a fair trial, and a reliable verdict, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (ECF No. 113 at 190-219.)  Petitioner also asserts ineffective assistance by state appellate counsel, Richard Gilman.  These subclaims are reviewed separately.

### a.    Clearly Established Law

The applicable legal standard for ineffectiveness of counsel is set forth out in claim C2, *ante*. The basic requirements of <u>Strickland</u> apply with equal force in the penalty phase.  Thus, Petitioner must show that counsel's actions fell below an objective standard of reasonableness, and that the alleged errors resulted in prejudice.  <u>Strickland</u>, 466 U.S. at 687-98.  In the context of the penalty phase, just as in the guilt phase, the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"  <u>Wiggins</u>, 539 U.S. at 521 (quoting <u>Strickland</u>, 466 U.S. at 688).

In the penalty phase, defense counsel has an "obligation to conduct a thorough investigation of the defendant's background," <u>Williams</u>, 529 U.S. at 396, and defense counsel has a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings.  <u>Wiggins</u>, 539 U.S. at 521-23.  Counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances."  <u>Williams</u>, 529 U.S. at 415.

Nonetheless, the Supreme Court has recognized that the duty to investigate does not require defense counsel "to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  <u>Rompilla v. Beard</u>, 545 U.S. 374, 382-83 (2005) (citing <u>Wiggins</u>, 539 U.S. at 525) (further investigation is excusable where counsel has evidence suggesting it would be fruitless); <u>Strickland</u>, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help").  As the <u>Strickland</u> court stated:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

248

unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.

"In assessing counsel's investigation, the court must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms," Strickland, 466 U.S. at 688, which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." Id. at 689.

Further, the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigative decisions are reasonable depends critically on such information. Strickland, 466 U.S. at 691.

In order to demonstrate prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693-94. To assess that probability, the reviewing court must consider the totality of the available mitigation evidence and reweigh it against the evidence in aggravation. Porter v. McCollum, 558 U.S. 30, 41 (2009) (citing Williams, 529 U.S. at 397-398). The court must consider whether the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing. Rompilla, 545 U.S. at 393 (quoting Strickland, 466 U.S. at 694).

### b.    Analysis of Claim W1

Petitioner claims generally that counsel Soria and his investigator Binns were lax and inefficient in their trial investigation and preparation and did not provide reports to, or communicate with co-counsel Cater following Cater's appointment as lead counsel. (ECF No. 113 at 193-94; RT at 2273-74.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which summarily rejected it on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

### 1)      Withheld and Inaccurate Information

Petitioner alleges that investigator Binns did not conduct an effective investigation and provided misinformation regarding his investigation of Petitioner's relatives.  (See SHCP Ex. 47.) Petitioner suggests that Binns did not share the small amount of information he gleaned during his investigation, placing Soria in breach of his ethical obligations as predecessor counsel.  (See 1/7/91 RT at 2304-11.)

Petitioner alleges that Soria and Binns did not provide Cater with complete and accurate information, (id.; ECF No. 113 at 193), and that the "failure of Soria and Binns to turn over all information regarding the status and results of the penalty investigation forced Cater to start the investigation from scratch [and] to waste a significant portion of the short time that he had in reduplicating work already accomplished by Binns."  (ECF No. 113 at 193:27-194:3.)

Petitioner also alleges that Soria failed to advise Cater of the evidence the prosecutor intended to use in aggravation, matters the prosecutor had spoken to Soria about "at great length."  (RT at 2391.)

The California Supreme Court reviewed certain of these allegations in the context of denial of Cater's new trial motion, and determined that:

> With respect to Cater's concern about the adequacy of penalty phase investigation, the record contains no colorable claim that it was in fact deficient. At best, he offered only speculation based on hearsay reports, and defendant added nothing to substantiate the allegation.

Bolin, 18 Cal. 4th at 347.

This Court finds that, on the record before it, the California Supreme Court could reasonably have found Soria and Binns were not deficient in their investigation and did not withhold information from Cater.  Binns did engage in penalty phase investigation, locating and interviewing witnesses including Petitioner's friends and family members in Covina and Chicago.  (See SHCP Ex. 47, 1/7/91 Marsden RT at 2304-11.)  Binns did turn over his written files to Cater (id.; see also SHCP at 91) and did respond to Cater's questions about the files (Id.).  The California Supreme Court could reasonably have found no deficient investigation or inaccurate information was provided, even though Binns may have worked independently and largely provided oral reports of his investigative activities.  (Id.)

Cater stated that his manner of investigating the penalty phase "differ[ed] greatly" from that used by Soria and Binns.  (CT at 548.)  However, this could reflect a matter of trial tactics.  Nor was it unreasonable for the California Supreme Court to conclude that Cater's generalized complaint, that Binns's reports were incomplete and certain of the information provided by Soria and Binns was inaccurate, (see SHCP Ex. 47, 1/7/91 Marsden RT at 2304-11), was speculative.  Similarly, Petitioner points to scant support in the record for Cater's allegation that Binns and Soria withheld information.

Petitioner himself stated in his petition for writ of habeas corpus filed in the California Supreme Court that:

> Trial counsel's files were not properly maintained, making it difficult to establish precisely what steps were taken, and when, by counsel. Nonetheless, Soria claims to have turned over all trial materials to Cater, when Cater took over the penalty phase. Soria's investigator, Bruce Binns claims to have turned over all records maintained by him to either Soria or Cater. Thus, the files obtained by appellate counsel from Cater appear to be the complete record of trial preparation in this case.

(SHCP at 91.)

### 2)      *Failure to Communicate*

Petitioner also asserts that Soria and Cater failed to communicate effectively about the prosecution's intended case in aggravation.  See e.g., Bean v. Calderon, 163 F.3d 1073, 1078 (9th Cir. 1998) (deficient development of mitigating evidence related to confusion between co-counsel as to respective duties constituted ineffective assistance).  Petitioner points to a portion of the record in which the prosecutor suggested she had spoken with Soria about the prosecutor's intent to call Huffstuttler's girlfriend, Ms. Ward, as a witness during the penalty phase, and suggested Soria never passed this information along to Cater.  (ECF No. 113 at 194; RT at 2363-64, 2391.)

However, it appears the prosecutor had also served Cater with notice regarding her intent to call Ward as a witness in support of an aggravating factor.  (RT at 2363-64.)  In fact, the prosecution provided adequate notice of that information, and Cater acknowledged that he had received discovery regarding it.  (See claim K, *ante*.)

Petitioner also complains that Soria did not tell Cater of the prosecution's intent to introduce the letter to Halfacre, and that Cater was unaware of this fact until "three days before the penalty phase." (ECF No. 113 at 194.)  But the record demonstrates that the prosecutor gave the required

notice of such to both Cater and Soria.  (See RT at 2391.)  The trial court overruled Cater's objection to admitting the letter on such notice grounds, finding "[the prosecutor] did give notice and did ask for an exemplar." (Id.)   Additionally, the California Supreme Court reviewed the claim and determined that proper notice had been provided.  Bolin, 18 Cal. 4th at 336-37.

Petitioner fails to show that any of the alleged errors gave rise to deficient performance resulting in prejudice under the Strickland standard.  Cater apparently was able to talk to all of the necessary witnesses and contends that he was able to and did conduct a more thorough investigation than had Soria and Binns.  (See SHCP Ex. 47 at 2305-10.)  Petitioner fails to demonstrate that he was prejudiced by any alleged failure to communicate accurately, through role confusion, see Bean, 163 F.3d at 1078, or otherwise.

### 3)   Appellate Counsel

Petitioner alleges that his appellate counsel was ineffective by failing to review a copy of the Reporter's Transcript from the January 7, 1991 Marsden hearing (see SHCP Ex. 47; ECF No. 113 at 191 n.52), and failed to include the transcript in the state certified record.  But these claims are unsupported in the record.  It appears that the transcript was before the state habeas court.  (See SHCP Ex. 47.)  Accordingly, no prejudice is apparent.

### 4)   Conclusions

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S., at 687-98.

A fair-minded jurist could therefore reasonably conclude that Petitioner failed to establish rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim W1 is denied.

### c.   Analysis of Claim W2

Petitioner alleges that Cater, upon his appointment as penalty phase counsel, was ineffective

by requesting only a two-week continuance to allow completion of the penalty phase investigation, when he knew or should have known that a life history investigation had not been done and that more time was required. (ECF No. 113 at 194-95.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which that court summarily rejected on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

Petitioner complains counsel Cater was ineffective by failing to investigate, prepare and present an adequate penalty phase defense. Cater had advised the trial court of his dissatisfaction with the previous investigation and opined that his investigator had obtained more satisfactory results. (See SHCP Ex. 47 at 2305-07). As noted, Cater indicated to the court that his investigation into the penalty phase "differ[ed]" from Soria's. (CT at 548.) Yet Cater requested only the additional two-week continuance to prepare for the penalty phase.

The record reflects that the trial court initially granted defense counsel three weeks to prepare for the penalty phase. (See RT at 2297-98.) At the Marsden hearing on January 7, 1991, Cater requested and was granted an additional two-week continuance. (See SHCP Ex. 47; RT at 2312-13.) During the Marsden hearing, Cater explained to the trial court what had been done and what remained to be done within the requested additional time. (See SHCP Ex. 47 at 2304-11.) At that point, Cater stated to the court his belief that the requested further continuance would be sufficient "because we have got an excellent head start, Mr. Roger Ruby has practically closed down his office working full time for me right now to gather this together." (Id. at 2310.)

Petitioner concedes that Cater and his investigator, Roger Ruby, spent the five weeks following Cater's December 14, 1990 appointment, investigating and preparing the penalty phase defense. (See ECF No. 113 at 194-95.) Yet Petitioner argues that, because of the extent of the aggravating incidents, this was still not enough time to follow-up on mitigating life history facts including childhood abuse and neglect that caused Petitioner to live on the streets as a minor; work history including apparent occupational exposure to toxic solvents; prison records; and possible mental state defenses. (See RT 2504; SHCP Ex. 24; RT at 2307-08.) Petitioner contends that this failure to conduct additional investigation was unreasonable. He notes Cater presented a penalty

phase defense that lasted only a little over two hours, (see CT at 588-589), and presented no evidence regarding Petitioner's mental status, childhood abuse and trauma, exposure to neurotoxic chemicals, physical injuries, substance abuse, or military service.

However, it was not unreasonable for the California Supreme Court to determine that Cater's performance at the penalty phase was not deficient for reasons discussed in claims W1 *ante* and W3, through W10 *post*.  Petitioner's reliance on <u>Bean</u> is unpersuasive because <u>Bean</u> appears factually distinguishable.  163 F.3d at 1078.  Counsel in <u>Bean</u>, due to role confusion, did no penalty phase work until after the guilt phase was completed.  <u>Id.</u>  Here, defense counsel did conduct penalty phase investigation in the months before trial without any semblance of role confusion.  (See claim C2, *ante*.)  Cater's expressed dissatisfaction with the efforts of Soria and Binns did not appear to arise from role confusion or a failure by Soria and Binns to initiate the pretrial investigation.

As noted, Cater apparently was able to talk to all of the witnesses he felt necessary, and that he was able to do a more thorough investigation in his estimation than the investigation previously undertaken.  (See SHCP Ex. 47 at 2305-10.)  It does not appear that Cater requested or required any continuance beyond the five weeks previously granted.

Petitioner's cited <u>Daniels v. Woodford</u> in support of his argument that external constraints necessitated further continuance is unavailing because Petitioner has not demonstrated on the evidentiary record the existence of any external constraints.  428 F.3d at 1206 (counsel's deficient investigation resulted in part from court's refusal to grant a continuance and problems getting state funding).  In fact, the record suggests the opposite.  Cater requested, and trial court granted, additional funding to support further investigation during the two continuances to prepare for the penalty phase.  (See SHCP Ex. 47.)  Cater represented that he thought two weeks would be sufficient.  (<u>Id.</u> at 2310.)  Counsel's actions could be seen as strategic rather than the result of external constraints.

Petitioner also relies upon <u>Jackson v. Calderon</u>, 211 F.3d 1148 (9th Cir. 2000), in support of his argument that Cater did not spend sufficient time preparing for the penalty phase.  But <u>Jackson</u> too is distinguishable because there defense counsel, based on the belief trial would not reach the penalty phase, spent about 2 hours preparing for it by interviewing two witnesses and reviewing

defendant's juvenile and military records.  Id. at 1162.  Here, Cater acted as co-counsel during the guilt phase, and when the trial court appointed him to be lead counsel for the penalty phase, that court provided additional funding for another investigator and five weeks of additional time to further investigate and prepare.  As discussed in claims W1 and W3-W10, counsel Cater and his investigator Ruby marshaled mitigating evidence including through interviews with numerous of petitioner's family and friends in California and Chicago, and otherwise by investigating family, social, military and medical and mental health background information and the aggravating evidence of the prosecution.

Based on the record, the state supreme court could reasonably have determined that Cater's decision to proceed to the penalty phase without requesting an additional continuance and funding was based on informed professional judgment following a reasonably adequate investigation.

A fair-minded jurist could have reasonably have determined that, based on the evidence, a longer continuance would not have resulted in a more favorable disposition for Petitioner, for the reasons stated and given the substantial evidence presented against Petitioner at the penalty phase. (See claims O, R and S, *ante*.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of this proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim W2 is denied.

### d.   Analysis of Claim W3

Petitioner next alleges that defense counsel Cater did not adequately interview and prepare penalty phase witnesses Mary Bolin and Paula Bolin.  (ECF No. 113 at 195-96.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California

Supreme Court, which the California Supreme Court summarily rejected on the merits without explanation. (CSC Order Den. Pet. Habeas Corpus.)

### 1)       Pretrial Interview and Preparation

Mary Bolin was the sole defense witness regarding the Spencer and Ross incidents in aggravation. (See RT at 2468-2477.) Mary also testified that Petitioner had been a good father to her. (RT at 2477-80.)

Mary's sister, Paula, testified that Petitioner had suffered a personal tragedy (the death of a beloved girlfriend) shortly before the capital crimes, and that he had lived at the remote cabin, the site of the murders, for close to a year after his girlfriend's death. (See RT at 2494-95.)

Petitioner faults Cater for allowing his investigator, Ruby, to conduct the pre-testimony interviews and preparation with Mary and Paula for direct and cross-examination, rather than doing so personally. Petitioner contends this made their testimony less compelling than it could have been given the mitigating information referenced in their respective habeas declarations given ten years later. (See RT at 2477-2480, 2490-95; SHCP Ex.'s 5, 9.)

Petitioner also claims that the first time Mary ever spoke to Cater was on the witness stand. (See EH Ex. 5, p. 9.) Likewise, Paula did not discuss her testimony with defense counsel before she took the stand. (See EH Ex. 9, p. 15.) Petitioner claims this lack of preparation allowed these witnesses to be unnecessarily impeached (see RT at 2479-83), constituting ineffective assistance. See Douglas v. Woodford, 316 F.3d 1079, 1088 (9th Cir. 2003) (it is imperative in penalty phase that all relevant mitigation information be unearthed).

The California Supreme Court could reasonably have denied this claim. Neither Mary nor Paula recalled speaking directly to Cater before their testimony. (See SHCP Ex. 5 at 9; SHCP Ex. 9 at 15.) Nonetheless, Ruby interviewed these witnesses prior to trial, prepared a written report, and may have spoken with Cater about these interviews. Cater presumptively knew what mitigating information these witnesses had to offer. (See SHCP Ex.'s. 5, 9, 24.) Cater could reasonably have believed that other tasks were more important than interviewing these witnesses personally given information already learned from Mr. Ruby.

The record demonstrates that both Mary and Paula likely knew the general nature of their

1   expected testimony at Petitioner's trial given the facts covered in Ruby's interview with them.  (See
2   e.g., RT at 2478-79, 2495; SHCP Ex.'s 5 at 8, 9 at 14, 24 at 8-10.)  Each knew their father was facing
3   the death penalty and neither wanted him to be sentenced to death.  (See RT at 2478-79, 2495.)

4          Petitioner's attempt to support his argument with citation to Douglas, Bloom v. Calderon, 132
5   F.3d 1267 (9th Cir. 1997), and Hovey v. Ayers, 458 F.3d 892 (9th Cir. 2006), is unavailing because
6   each case is distinguishable.  (See ECF No. 178 at 277-78.)  Douglas is a pre-AEDPA case, thus on
7   review AEDPA deference was not given to the state court's finding of no error.  316 F.3d at 1085.
8   Moreover, in Douglas, "Douglas's wife assert[ed] that she did not even know she would be testifying
9   until the night before the penalty phase began."  Id. at 1087.  Here, Petitioner's daughters were
10  interviewed multiple times and given information regarding the nature of their testimony in the weeks
11  before trial.

12         The Bloom and Hovey courts considered the failure of counsel to prepare expert witnesses
13  who were not given important documents and background materials regarding the defendants,
14  seriously impairing the credibility and testimony of critical mitigation witnesses.  See Bloom, 132
15  F.3d at 1277; Hovey, 458 F.3d at 930.  Here, Petitioner's daughters had lived with him and were
16  generally aware of his background.  (See SHCP Ex.'s 5 and 9.)  Furthermore, both were presented as
17  lay witnesses.

18         Petitioner also alleges that Cater failed to elicit from Mary and Paula certain details in
19  mitigation relating to Petitioner's mental state, his family background, the effects of his experiences
20  in Vietnam, his chronic physical pain, his many good deeds and the death of his girlfriend shortly
21  before the capital crimes.  (ECF No. 178 at 297-98.)  However, it appears that neither Mary nor Paula
22  could testify to Petitioner's mental state near the time of the shootings, not only because they were
23  without sufficient knowledge or expertise, but because each stated that they had seen him only
24  occasionally in the months leading up to the murders.  (See SHCP Ex.'s 5 at 6, 9 at 14.)

25         Testimony regarding Petitioner's alleged good deeds was presented through other witnesses.
26  (RT at 2508-09, 2515-19, 2523-24.)  There was other testimony that Petitioner housed neighborhood
27  teenagers and took in and provided for those in need of a home.  (RT at 2402, 2469-70, 2473, 2486-
28  89, 2567.)

It seems unlikely Mary and Paula could have provided any significant mitigating testimony relating to Petitioner's childhood and family life because Petitioner refused to discuss such matters with them.  (See SHCP Ex. 9 at 8.)  The record otherwise reflected Petitioner's troubled home and life as a youth, (see RT 2503-04); his enlistment in the Navy, (see RT at 2505); and his positive influence on his children and others.  (See RT 2502-29.)  As noted, Paula did testify about the death of Petitioner's girlfriend.  (See RT at 2494-95.)

Petitioner claims that Cater's failure to prepare Mary to testify resulted in her impeachment regarding the Spencer assault.  As discussed more fully in claim W6, post, Petitioner's unadjudicated 1979 assault upon Spencer, witnessed by Mary, was offered in aggravation at the penalty phase.  (See ECF No. 113 at 200-03.)  Mary testified that Spencer was partying at her house and put his hands down her pants and tried to pull her top down.  (See Id. at 2470-71.)  She testified that Petitioner, upset after Mary told him what had happened, arrived and ran towards Spencer and ordered him to leave and that Spencer exited through the backyard where Richard Balsamico began beating him with a stick.  (See RT at 2412-72.)  Mary testified that she did not see Petitioner hit Spencer.  (See RT at 2473.)  However on cross-examination, Mary told the prosecutor she did not remember the police coming to her house or talking to the police.  (See RT at 2480-81.)  She was then impeached with the police report of Deputy Gutierrez regarding the Spencer incident in which Mary failed to state the events to which she testified.  (See RT at 2479-83.)

However, Cater was presumably aware of Mary's involvement in the Spencer assault from the police report and from her interview with investigator Ruby.  (See SHCP Ex. 24 at 9.)  Cater may have chosen, as a matter of trial tactics, not to have Mary re-read the police report from the Spencer assault prior to her testimony because: (1) she had told police at the time that she had not seen anything (see RT at 2480-83, 2578; SHCP  Ex. 27 at 6-7) and (2) Cater could reasonably have believed that the jury would find her more credible if she simply indicated that she did not remember certain events rather than if she had prepared her testimony by reviewing the police report and the statements of others.

Along the same lines, Cater may have decided for tactical reasons to avoid in depth questioning of Paula and Mary at trial about the Ross and Spencer incidents.  Mary, at the time of the

258

1   Spencer assault, apparently had declined to provide police with the information to which she testified.

2   (RT at 2480-83, 2578.)

3          Nothing in the record suggests that Paula was present for the Ross shooting (Ross Police

4   Reports), or that Paula had been untruthful to police (RT at 2496-97), or that Paula may have been

5   using drugs at the time of trial.  (SHCP Ex. 9 at 1).

6          Defense counsel reasonably could have concluded that further questioning Mary and Paula

7   about these issues might have served only to emphasize the aggravating circumstances, rather than

8   elicit information helpful to the defense.

9          The California Supreme Court could reasonably have concluded that Cater was not ineffective

10  by failing to interview and prepare these witnesses personally.

11                            *2)*       ***Prejudice***

12         Even if counsel was deficient as alleged, the state supreme court could reasonably have

13  concluded there was no prejudice.

14         Petititioner makes no evidentiary showing that had counsel Cater personally interviewed Mary

15  and Paula, he would have discovered more favorable evidence for use at the penalty phase trial.  Mary

16  and Paula were each interviewed by investigator Ruby.   Yet neither apparently provided the

17  information about the aggravating events that is contained in their respective habeas declarations of a

18  decade later.  (See SHCP Ex.'s. 5, 9, 24.)  Moreover, as discussed in claim W7, *post*, defense counsel

19  did present some of the information included in their declarations, and that which was not presented

20  could reasonably be seen as essentially cumulative.

21         As to Mary's impeachment regarding the Spencer incident, i.e., that Mary, at the time of the

22  Spencer assault, apparently had declined to provide police with the information to which she testified

23  at trial (RT at 2480-83, 2578), mitigation is apparent in the record.  Mary testified that she was only

24  thirteen at the time of the incident. (RT at 2483.)   She also may not have talked to police because she

25  was scared (RT at 2482), given her youth and having just been the victim of an alleged sexual assault

26  (RT at 2471).

27         For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish

28  that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different.  <u>Strickland</u>, 466 U.S. at 687-98.

For the reasons stated, it does not appear that the state supreme court's rejection of the claim claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d).

Claim W3 is denied.

   e.   **Analysis of Claim W4**

Petitioner next alleges ineffective assistance by defense counsel's failure to investigate and present evidence concerning the letter to Jerry Halfacre.  (ECF No. 113 at 195-98.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court (<u>see</u> SHCP at 280-82), which that court summarily rejected on the merits without explanation.  (<u>See</u> CSC Order Den. Pet. Habeas Corpus).

The prosecution introduced the letter written by Petitioner to Halfacre at the penalty phase trial.  (<u>See</u> RT at 2443.)  Though Halfacre did not testify at the penalty phase, his probation officer did, stating that Halfacre gave her the letter on October 12, 1990.  (<u>Id.</u>)  The letter and its contents are discussed in detail in claim R, *ante*.

Petitioner alleges that there were additional pages of that letter, subsequently obtained by Petitioner's daughter Paula as described in her unsworn statement, which allegedly implicate Halfacre in the capital murders and Petitioner's marijuana farm.  (<u>See</u> ECF No. 113 at 197; SHCP Ex.'s 9, 16, 25.)

Petitioner also faults defense counsel for not interviewing Halfacre or his Probation Officer, Ms. O'Connor, regarding the surrounding circumstances including any inducement or benefit Halfacre might have received.  (<u>See</u> ECF No. 113 at 196; <u>see also</u> claims R1-R4.)  Petitioner alleges that in exchange for providing the letter to authorities, Halfacre was released from probation and allowed to leave the state.

Strategic decisions based upon investigation conducted by counsel are accorded deference:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91. "The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be." Soffar v. Dretke, 368 F.3d 441, 473 (2004).   In determining whether counsel made reasonable tactical decisions about certain evidence, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable. Wiggins, 539 U.S. at 523.

Here, for reasons discussed in claims I6 and K, ante, Petitioner has failed to demonstrate both that counsel failed to investigate these circumstances and, even if he did, that his failure to do so was prejudicial.  Even assuming that the missing pages of the letter, allegedly obtained by Paula, could establish that Halfacre turned over the letter out of fear he would be arrested, nothing in the record suggests counsel, or Halfacre for that matter, were aware of the alleged missing pages.

Petitioner suggests that Cater obtained the missing pages of the letter sometime after the guilt phase, (see ECF No. 113 at 197), but has not offered Cater's declaration in this regard.  If Petitioner is correct that Cater had the letter, he does not show that Cater failed to consider it.  Significantly, nothing in the noted testimony about the shootings suggests that Halfacre was involved. A defense attorney is not obligated to track down each and every possible witness or to personally investigate every conceivable lead.  An ineffective assistance of counsel claim cannot rest upon counsel's alleged failure to engage in a scavenger hunt for potentially exculpatory information with no detailed instruction on what this information may be or where it might be found.  Farr, 297 F.3d at 658.

As more fully discussed in claim K, ante, Petitioner has not demonstrated that Halfacre provided the letter in exchange for his release from probation and travel restrictions.  The state supreme court could reasonably have determined that Halfacre received no undisclosed benefits in exchange for his providing the letter to his probation officer.

261

Additionally, for reasons discussed in claims R and I6, *ante*, any alleged failure to investigate or present this evidence was not prejudicial.  The state supreme court could reasonably have found that the missing page(s) of the letter could not have been used to "defeat[ ] any argument that [Halfacre] was in fear of [Petitioner's] threats" and thus prevent admission of the Halfacre letter under Penal Code § 422.  (See ECF No. 113 at 197.)

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim W4 is denied.

**f.      Analysis of Claim W5**

Petitioner next claims that defense counsel did not adequately investigate and present evidence concerning Petitioner's prior serious felony conviction for attempted voluntary manslaughter of Kenneth Ross.  (See ECF No. 113 at 198-200.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which the California Supreme Court summarily rejected on the merits without explanation.  (See CSC Order Den. Pet. Habeas Corpus.)

Petitioner, then the legal guardian of Nyla Olsen, alleges that the shooting of Ross, then Nyla's boyfriend, occurred following an argument between Ross and Olsen at Petitioner's residence.  (See RT at 2400-10.)  Ross eventually walked back to Petitioner's house to ask him what Olson had told him. (See RT at 2400, 2408.)  Petitioner allegedly came out the front door and shot Ross once in the chest with an M-1 .30 caliber carbine rifle (see RT at 2400-02, 2563) and began to beat Ross all over his upper body with his rifle.  (RT at 2401.)  Ross was taken to the hospital by paramedics and

1   stayed there off-and-on for about a month while being treated for a torn liver, punctured diaphragm

2   and lung, and broken rib.  (RT at 2403.)

3       Mary, then 15 years old, was a witness to the shooting and testified that Ross was crazed,

4   drunk, slapping Nyla around and that Ross appeared to have had something in his hand and gestured

5   toward Petitioner prior to being shot.  (See RT at 2473-76.)  Olsen, who had married Ross by the time

6   of trial, gave testimony that partially contradicted Mary's testimony.  (See RT at 2555-72.)

7       Petitioner faults Cater for not cross-examining Olsen about contradictory testimony she gave

8   at the preliminary hearing in the Ross matter (Testimony of Nyla Olsen, Preliminary Hearing

9   Transcript, People v. Bolin, Los Angeles County Municipal Court No. A527608, SHCP Ex. 26), in

10  order to show that Petitioner acted out of fear of Ross.  This omission, Petitioner argues, allowed the

11  prosecutor to use Olsen's testimony to support the prosecutor's statement to the jury that "[a]gain, a

12  daughter [Mary] came in [and] told a story which simply was not true but, then, again, this girl loves

13  her father."  (See RT at 2579.)

14      Petitioner faults defense counsel for allowing Mary to testify regarding the Ross incident.  He

15  claims this created an inconsistent role for Mary, in that her testimony regarding the Ross incident

16  undermined Petitioner's mitigation case because her credibility as a fact witness was compromised by

17  her desire to assist her father, whom she loved.  Petitioner claims further investigation would have

18  turned up a witness to the event, Richard Brogden, who knew Ross and would have testified that,

19  immediately before the shooting, he had told Petitioner that Ross carried a gun.  (See ECF No. 113, at

20  199:21-200:8; SHCP Ex. 11.)

21      Petitioner faults defense counsel for not retaining a mental health expert to evaluate penalty

22  phase issues and arrive at explanations for the shooting of Ross which might have become apparent to

23  counter the prosecution's argument that Petitioner "is a violent man who uses violence to solve

24  problems."  (See RT at 2579.)

25      However, the California Supreme Court could reasonably have determined that defense

26  counsel was not ineffective in any of these regards.  Olsen testified at the preliminary hearing that she

27  had been crying and screaming while she and Ross were outside arguing.  (See SHCP Ex. 26 at 50-

28  51.)  At the penalty phase trial, she stated that she had argued with Ross outside, but she was never

1   asked if she was crying during that time.  (<u>See</u> RT at 2563-73.)  Also, at both the preliminary hearing

2   and the penalty phase trial, Olsen confirmed Mary's testimony that Ross may have grabbed Mary and

3   pushed her aside.  (<u>See</u> SHCP Ex. 26 at 49-50; RT at 2572.)  There was no apparent material

4   inconsistency in these regards.

5          As to Olsen's testimony that there might have been a fight between Petitioner and Ross, Olsen

6   never testified that the fight was anything more than verbal, or that Ross had a weapon.  (<u>See</u> SHCP

7   Ex. 26.)  Instead, Olsen testified at the preliminary hearing that Ross had told Petitioner only "that he

8   wanted to talk to him," not that he threatened him.  (<u>See</u> SHCP Ex. 26 at 48.)

9          Defense counsel reasonably could have made a tactical decision not to focus on this testimony

10  because it was minor and likely aggravating, and that attacking Olsen's credibility based on her

11  marriage to Ross was a more promising strategy.  As noted in claim I2, *ante*, impeachment tactics are

12  a matter of trial strategy.  <u>Ferreira-Alameda</u>, 815 F.2d at 1254; <u>Jaiceris,</u> 290 F. Supp. 2d at 1080-82.

13  Similarly, the extent and nature of cross-examination is also a matter of trial tactics entrusted to the

14  judgment of counsel.  <u>Dow</u>, 211 F.3d at 487.

15         Petitioner's claim that allowing Mary to testify regarding the Ross incident created an

16  inconsistent role for Mary is likewise not compelling.  Mary was a witness to the Ross shooting and

17  provided some mitigating evidence regarding the shooting.  Even assuming that this allegation has

18  been exhausted (Respondent argues otherwise, <u>see</u> ECF No. 194 at 334:21-24), any potentially

19  "inconsistent role[]" created for Mary by allowing her to testify regarding both aspects of the case,

20  likely was not prejudicial since Mary's testimony in both areas provided some mitigating evidence

21  for Petitioner.  Significantly, Petitioner does not explain how and why impeaching Mary's credibility

22  regarding the Ross shooting necessarily resulted in "her ability to generate mercy [being] greatly

23  reduced."  (<u>See</u> ECF No. 178 at 283.)

24         Regarding defense counsel's failure to investigate potential witness Richard Brogden's

25  information about the Ross shooting, counsel reasonably could have determined that Brogden's

26  testimony would have been of questionable value.  Brogden did not testify at the trial or the

27  preliminary hearing in the Ross case.  (<u>See</u> CSC Informal Response Ex. H.)  Nor was he questioned

28  by the police in that case.  (<u>See</u> SHCP Ex. 11 at 6-7; <u>see also</u> SHCP Ex. 18b.)

Even had Brogden testified, it is not reasonably probable that the result of Petitioner's proceeding would have been more favorable.  Brogden apparently did not see Petitioner shoot Ross or witness any altercation, other than verbal, between them.  (See SHCP Ex. 11 at 6-7.)  Though Brogden states in his declaration that he told Petitioner that Ross owned a gun, he also states that he had no idea whether Ross had it with him the day that Petitioner shot Ross.  (See SHCP Ex. 11 at 6-7.)

Defense counsel also reasonably could have found that aspects of Brogden's testimony would have been unfavorable.  Brogden states in his declaration that Petitioner "snaps" when he gets angry, that "once he snaps, all bets are off," and that he (Brogden) tells his friends to "get the hell out of Dodge . . . [w]hen [Petitioner] gets to the 'snapping' point."  (See SHCP Ex. 11 at 1, 5-6.)  Testimony along these lines would have supported the prosecution theme that Petitioner used violence to resolve problems.

Petitioner also faults defense counsel's failure to present mental health evidence to mitigate Petitioner's actions in the Ross shooting.  Yet Petitioner apparently did not offer any mental health evidence or defense at his earlier trial in the Ross matter.  Nor does it appear that Petitioner's own mental health experts opine that he was acting under a mental disorder at the time of the assault against Ross.  (See SHCP Ex.'s 10, 22.)

For the reasons stated, the California Supreme Court could reasonably have found that Petitioner was not prejudiced by counsel's alleged failure to investigate or present evidence regarding the Ross shooting and that counsel rendered constitutionally effective assistance at trial in this regard.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability outcome of the proceeding would have been different.  Strickland, 466 U.S., at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

265

Claim W5 is denied.

###### g.   Analysis of Claim W6

Petitioner next alleges that defense counsel did not adequately investigate and present evidence concerning his unadjudicated 1979 assault upon Spencer offered in aggravation at the penalty phase.  (See ECF No. 113 at 200-03.)   Petitioner raised same allegations regarding the Spencer assault in his petition for writ of habeas corpus in the California Supreme Court (see SHCP at 287-90), which that court summarily rejected on the merits without explanation.  (See CSC Order Den. Pet. Habeas Corpus.)

The prosecutor presented the testimony of Spencer during the penalty phase.  (See RT at 2411-29)  Spencer testified that in 1979, he was Petitioner's 23-year-old neighbor.  He had gone to Petitioner's house at the invitation of "Becky," who was renting a room there.  Petitioner's daughters were present, as was an individual named Brian Martinez.  (See RT at 2413-30.)

Spencer testified that the door flew open and Petitioner came in and swung a tree limb at him; Spencer ran out the back while "Rick" began beating him with a stick; Petitioner then hit Spencer in the head with a pipe.  (See RT 2374-77.)  Spencer was treated for abrasions and required eight stitches.  (See RT at 2425-26.)

Mary, then about 12 years old (see RT at 2469, 2483), testified that Spencer and Brian Martinez were partying at her house, smoking pot and sniffing paint, when Spencer put his hands down her pants and tried to pull her top down.  (See RT at 2470-71.)  She testified that Petitioner, upset after Mary told him what had happened, arrived and ran towards Spencer and ordered Spencer and Martinez to leave, and that Spencer then exited through the backyard where Richard (Rick) Balsamico, who disliked Spencer, began beating him with a stick.  (See RT at 2412-72.)  Mary testified that she did not see Petitioner hit Spencer.  (See RT at 2473.)

On cross-examination, Mary told the prosecutor she did not remember the police coming to her house or talking to the police.  (See RT at 2480-81.)  She was then impeached with the police report of Deputy Gutierrez regarding the Spencer incident in which Mary failed to provide the information to which she testified.  (See RT at 2479-83.)

Petitioner faults counsel for not preparing Mary for the cross-examination (see SHCP Ex. 5)

and for not rehabilitating Mary thereafter. (See SHCP Ex. 27.) He complains defense counsel did not attempt to rebut the prosecutor's suggestion that Mary was lying to protect her father. (See RT at 2578.) He also complains that counsel did not present testimony from Balsamico, who would have stated that Spencer was drunk, armed with a knife and that it was Balsamico, not Petitioner, who beat Spencer. (See SHCP Ex. 12.)

The Court is not persuaded. The California Supreme Court could reasonably have found defense counsel's questioning of Mary about the Spencer assault was tactically motivated to avoid further harm to her testimony. Spencer testified that he had not been using drugs or alcohol that day and did not believe any of the teenagers at Petitioner's house were either. (See RT at 2417-25; see also SHCP Ex. 27.) He testified that he was not carrying any weapons, did not make any threats or moves toward Petitioner, and never spoke to Petitioner during the assault. (See RT at 2416, 2423, 2425.)

On cross-examination, Mary admitted that she did not tell the police any of this information to which she testified. (See RT at 2480.) She did not remember the police ever coming to talk to her or refusing to talk to them (see RT at 2480-81), or that the others were using drugs or alcohol that evening. (See RT at 2480-82.) However, she admitted that she may have told the police that she did not see anything because she was scared. (See RT at 2482.) She also admitted that she did not remember the incident very well. (See RT at 2480.) On redirect examination, counsel confirmed that Mary was only thirteen at the time of the incident. (See RT at 2483.)

Petitioner does not suggest how Mary's testimony could have been rehabilitated given the foregoing. It appears that, notwithstanding her denial, Mary gave statements to the police at the time of the incident. (See SHCP Ex.'s 5, 27.) The California Supreme Court could have found it reasonable for defense counsel not to pursue any significant rehabilitation attempt, but to move on to other defense matters.

As for Petitioner's assertion that his counsel failed to prepare Mary for her testimony resulting in her effective impeachment (see ECF No. 113 at 202; ECF No. 178 at 316), the state supreme court could reasonably have found the assertion refuted for reasons discussed in claim W3, *ante*. Similarly, Petitioner's complaint that Mary was placed in an inconsistent role by being asked to testify about the

Spencer and Ross incidents and to plead for mercy (ECF No. 178 at 316), fails for the same reasons discussed in claim W5, *ante*.

Petitioner also faults defense counsel for not presenting the testimony of his friend, Balsamico, (see ECF No. 113 at 202-03), who appears to claim responsibility for the assault on Spencer and who states that he would have testified on Petitioner's behalf had he been asked.  (See SHCP Ex. 12 at 3, 5-6.)  However, counsel could reasonably have found such testimony suspect. Balsamico's statement to the police at the time of the Spencer incident was that Petitioner was involved in a physical fight with Spencer, in which Balsamico joined in aid of Petitioner.  (See SHCP Ex. 27 at 6.)  Petitioner himself admitted that he was involved in the fight and struck either Spencer or Martinez.  (See Id. at 5.)

Balsamico's habeas declaration, provided ten years after the shootings, also appears inconsistent with Mary's testimony and interview about the assault.  (See RT at 2469-73; SHCP Ex. 12 at 3-4.)  Counsel, for tactical reasons, may have chosen not to present such testimony that could have been readily impeached.  See, e.g., Denham, 954 F.2d at 1505-06 (defense counsel not ineffective where decision not to call witness based on inconsistencies in witness's testimony).

Petitioner also complains that defense counsel should have presented the testimony of a mental health expert to attempt to explain Petitioner's behavior in the Spencer assault. This claim, which appears to be unexhausted, in any event lacks merit.  Not even Petitioner's mental health experts opine the existence of a mental defense to his assault against Spencer.  (See SHCP Ex.'s. 10, 22.)  Moreover, counsel could have chosen not to present a mental defense, if one existed, because the Spencer assault was remote in time (ten years prior to the instant capital murders) and suggested some mitigating evidence (action by Petitioner protecting his daughter from a perceived sexual assault).

Additionally, Petitioner has not demonstrated prejudice. Mary was rehabilitated somewhat following her impeachment, by her testimony that she was only thirteen at the time of the Spencer incident, (see RT at 2483), and may not have talked to police because she was scared, (see RT at 2482), and having been the victim of an attempted sexual assault.  (See RT at 2471.)  Thus tactical explanations may have existed for not pursuing Balsamico's testimony.

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim W6 is denied.

### h.    Analysis of Claim W7

Petitioner next presents multiple allegations that defense counsel was ineffective in the investigation, preparation, and presentation of the case in mitigation, denying the jury a fair and accurate profile of him, in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights. (See ECF No. 113 at 203-18.)

Petitioner raised these allegations to the California Supreme Court on direct appeal, which that court rejected, noting that:

> Although several family members and friends presented mitigating testimony as to his background and character, defendant contends his counsel rendered ineffective assistance at the penalty phase in failing to submit additional evidence regarding his childhood, including alleged abuse, his mental health, his military service and injuries, and his employment history. We find none of this evidence of record. Accordingly, "without engaging in speculation, we cannot infer anything about its existence, availability, or probative force, or the probable consequences of its use at trial." Defendant has thus failed to establish either incompetence or prejudice.

Bolin, 18 Cal. 4th at 345.

Petitioner also raised these allegations in his petition for writ of habeas corpus in the California Supreme Court, which summarily rejected the claim on the merits without explanation. (See CSC Order Den. Pet. Habeas Corpus).

### 1)    Petitioner's Background and Life History

Petitioner claims that counsel was ineffective for failing to adequately investigate his

background and family history, and by not conducting a social history or life history evaluation, as required by the *ABA Guidelines*.  (See ECF No. 113 at 203-218; SHCP Ex. 47 1/7/91 Marsden Hearing RT at 2309); see also *ABA Guidelines*, §§ 11.4.1, 11.8.3.F(1).)  Petitioner argues that further investigation would have revealed: a history of child abuse, head injuries, and neglect; a history of exposure to neurotoxins, back injury and substance abuse; his mental health issues related to his six months of service in the Vietnam War; his long history of polysubstance abuse; his alleged ingestion of multiple narcotics on the day of the shootings; and his character for hard work and generosity. (See ECF No. 113 at 203:13-18.)

The California Supreme Court was not unreasonable in rejecting these allegations.  Mr. Cater's investigator, Mr. Ruby, discovered much information about Petitioner's background, despite the fact that Petitioner apparently was unwilling to discuss his childhood and was not particularly forthcoming with details about his background in general.  (See SHCP Ex. 9 at 8 [Paula Bolin's declaration indicating that Petitioner refused to discuss his childhood, his family, or her mother]; SHCP Ex. 20 at 2 [interview with Dr. Markman during which Petitioner refused to discuss his family background]; see also February 25, 1991, Probation Officer's Report and Recommendation at 3, 16 [indicating that Petitioner refused to discuss his background or family history].)

Petitioner claims the "full story" of his abuse and neglect was never told.  (See ECF No. 113 at 205:20-21.)  However, the record reflects details of Petitioner's broken home and life on the street as a youth, (see RT at 2503-04); his enlistment in the Navy as a teen, (see RT at 2505); his positive influence on his kids and others (see RT 2502-29); and that he was a model inmate during his earlier incarceration relating to the Ross incident (see RT at 2498-2500; SHCP Ex. 24).

Capital defense counsel has "a duty to make reasonable investigations or to make reasonable decisions that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Strickland, 466 U.S. at 691; see also Babbitt v. Calderon, 151 F.3d 1170, 1173 (1998) (a lawyer may make a reasonable decision that a particular investigation is unnecessary).  The relevant inquiry is not what counsel could have pursued but whether the choices counsel made were reasonable.  Siripongs v. Calderon, 133 F.3d 732, 736 (9th

270

Cir. 1998).

Mr. Cater relied upon interviews with and statements from friends and family; materials related to Petitioner's prior convictions; materials related to the current offense; portions of Petitioner's trial testimony; and information related to his medical care, military service, employment, and education.  (See, e.g., SHCP Ex 20, 24.)  These are all sources similar to those relied upon ten years later by Petitioner's habeas expert, Dr. Matthews.  (See SHCP Ex.'s. 22, 24, 29, 31, 32.)

Mr. Cater also spoke with Petitioner and questioned him about his background, including his employment history and military service, as well as his relationships with family and friends.  (See SHCP Ex. 47, 1/7/91 Marsden RT at 2308-09.)  Cater's investigator, Mr. Ruby, interviewed Petitioner's daughters Mary and Paula, his stepdaughter Pamela Castillo, Petitioner's sisters Francis and Rosemary, and other relatives, including Gary Monto, Marilyn Perez, Trina Perez, Florence Monto, Betty Monto, Jermiah Monto and Sylvester Monto.  (See SHCP Ex. 24 at 1-5.)  Ruby interviewed David Alexander, Petitioner's probation officer in Oklahoma (see SHCP Ex. 24 at 1), and a family friend named Mrs. Myrick, who agreed to testify on his behalf.  (See Id. at 11-12.)

It appears that Ruby interviewed these witnesses prior to the penalty phase trial, prepared a written report and spoke with Cater about his interviews.  (See SHCP Ex. 24.)  It also appears that Cater spoke to Ruby about Paula and Mary Bolin and that Cater likely knew what mitigating information these witnesses had to offer.  (See SHCP Ex.'s. 5, 9, 24.)

Based on this investigation, Cater could reasonably have determined which witnesses would provide the most effective presentation given the mitigation theory that Petitioner had positive attributes and could adjust well to prison.  Even if defense counsel did not review and present evidence from Petitioner's prison file showing he would function well in a life without parole setting, (see ECF No. 113 at 212-13), such likely would have been cumulative of the above noted life history, and unlikely to affect the result of proceedings given the noted substantial aggravating evidence.  (See claims O, R and S, ante.)

Significantly, Petitioner did not provide a declaration from either Ruby or Cater regarding the extent to which they discussed noted interviews and witnesses and trial tactics.  Petitioner does not specifically identify any school, employment, medical or psychiatric records that Ruby or Cater could

have sought or introduced in 1990 that would have provided additional information in support of a mitigating factor.

Petitioner also argues that Soria and Cater did not communicate sufficiently with each other and relied on incomplete military, prison, and life history records. However, these allegations fail for reasons discussed in claim W1, *ante*.

The California Supreme Court could reasonably have found defense counsel's penalty phase investigation was not deficient in the above regards, for the reasons stated. See e.g., Hamilton, 458 F. Supp. 2d at 1134 (defense interviewed the available witnesses, and no better available witness about petitioner's background and social history other than his mother was uncovered).

### 2)    *Medical and Mental Health History*

Petitioner claims counsel failed to investigate, develop and present mitigating medical and mental health evidence. (See ECF No. 113 at 203:4-8.) He faults counsel for failing to provide competency examiner, Dr. Markman, with sufficient information about Petitioner's family and life history; for failing to request that Dr. Markman evaluate potential issues in mitigation; and for failing to consult with other qualified experts regarding potential issues in mitigation. (See ECF No, 113 at 203-18.)

Petitioner claims that these shortcomings left his history of exposure to neurotoxins and organic brain damage undeveloped and unpresented. (See ECF No. 113 at 203:18-23; SHCP Ex.'s. 10, 20, 22.)

Petitioner claims counsel's deficiencies impaired his defense theory that the cumulative effect of medical and mental health factors, coupled with alcohol and cocaine ingestion prior to the crime, caused him to perceive a great threat from the actions of Huffstuttler and triggered a strong self-defense reaction at the time of the crimes. (See ECF No. 113 at 215:21-28; SHCP Ex. 22.)

The record reflects that Dr. Markman, during his trial competency (psychiatric) evaluation, asked Petitioner about his family history. Dr. Markman related his findings to counsel in a letter. (See SHCP Ex. 20 at 2.) Petitioner told Dr. Markman that his parents divorced when he was nine years old; that he was shuttled among different living situations; that he completed the tenth grade, performing poorly in school; and that he had been married and divorced three times. (Id.) Dr.

1   Markman noted that Petitioner refused to provide any further information regarding his family

2   background.  (Id.)  Petitioner claimed polysubstance abuse "years ago" and an extended history of

3   using alcohol daily.  (Id.)

4       Petitioner told Dr. Markman that the shootings related to an exchange of marijuana for

5   cocaine and that he had ingested a substantial amount of alcohol and smoked cocaine prior to the

6   shootings.  (Id.)  However, Petitioner "repeatedly maintained that he knowingly acted in self-defense

7   and that another individual, as yet unidentified, may have been responsible for some of the deaths."

8   (Id.)  Dr. Markman noted that Petitioner had a successful nine-year history of military service in the

9   Navy and also that he had been discharged because of a back injury.  (Id.)

10      Here, the state supreme court was not unreasonable in concluding counsel was not deficient

11  regarding development and presentation of medical and mental health mitigating information.  Dr.

12  Markman's report, though generated with a view toward trial competency, did not reasonably suggest

13  the need to investigate potentially mitigating medical and mental health defenses.  Dr. Markman

14  apparently did not identify matters warranting further investigation, concluding that Petitioner

15  "demonstrates no current evidence of a major mental disorder."  (SHCP Ex. 20 at 1-3.)  Nor are the

16  facts of this case suggestive of the need for such further investigation.   Petitioner's noted seemingly

17  purposeful and goal oriented statements and actions just prior to, during and after the capital murders

18  do not suggest uninvestigated potentially mitigating medical or mental state defenses.  Counsel is not

19  put to further investigation where reasonable initial investigation suggests such would not bear fruit.

20  See Hensley v. Crist, 67 F.3d 181, 186 (9th Cir. 1995).

21      Even though Petitioner may not have been forthcoming with useful information regarding his

22  medical and mental health background, by speaking with friends and family Ruby and Cater

23  discovered and presumably considered aspects of Petitioner's violent family background; that he had

24  lived on the streets from a young age; that he served in the Navy for nine years; that he served in the

25  Vietnam War in 1972; that he was discharged from the Navy a year later because of a back injury;

26  that he had behaved well while on parole and while incarcerated in Chino; and that he claimed to

27  have had a long history of substance abuse, including ingestion of alcohol and cocaine on the night of

28  the shootings (although this latter claim appears rebutted by other facts in the record).  (See SHCP

Ex.'s. 9, 20.)

Regarding alleged exposure to toxic substances, the California Supreme Court reasonably could have found that defense counsel might not have been on notice of such and that Petitioner's work as a machinist and a pipefitter in the Navy may have exposed him to toxic solvents.

Petitioner asserts that,

> [L]ay witnesses also had a wealth of information about Mr. Bolin's exposure to toxic chemicals, and their apparent effects. See, e.g., Exhibits 4 (Declaration of Mark Daser), 9 (Declaration of Paula Bolin), 11 (Declaration of Richard Brogden). Counsel made no efforts to locate such witnesses, nor to identify work and military records which would document the exposure.

(See ECF No. 178 at 293:12-18.)  But Petitioner does not suggest that any of the noted witnesses saw in Petitioner signs of harmful toxics exposure, or were qualified to offer an opinion regarding toxic chemicals.  Here again, the record seemingly contradicts any suggestion that Petitioner was impaired when he committed the capital crimes or while he was in custody.  Ramirez described how Petitioner had wiped his prints off the gun, put the gun into Huffstuttler's hand, put marijuana near the body, staged the scene to look like a "drug deal gone bad," and pulled the wires from Wilson's car to prevent its use should Wilson return, thus ensuring that Wilson would bleed to death before getting help.  (See SHCP Ex. 13 at 4-7, 15-17; RT 1738, 1863-64, 1928-29, 1957, 1959, 1961, 1975.)

Additionally, for the reasons noted above and in claim I10, *ante*, the California Supreme Court could have reasonably discounted evidence relating to exposure to toxins.  As stated, after examining Petitioner and inquiring into his employment and service with the Navy, Dr. Markman concluded that Petitioner "demonstrates no current evidence of a major mental disorder." (See SHCP Ex. 20 at 1-3.)  Petitioner's taking flight from the crime scene to the Los Angeles area and then Chicago, and his apparent self-serving statements to Dr. Markman, all suggested that he was mentally capable, as did his pursuit of heat of passion and imperfect self-defense theories.  (See Id. at 1-2.)

In Hensley, the Ninth Circuit recognized that a petitioner must show that counsel was somehow put on notice to investigate a particular matter. 67 F.3d at 186; see also Langford v. Day, 110 F.3d 1380, 1387 (9th Cir. 1997) (citing Strickland, 466 U.S. at 691) (the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or

actions."); Dyer v. Calderon, 113 F.3d 927, 941 (9th Cir. 1997), vacated on other grounds, 151 F.3d 970 (9th Cir. 1998) (petitioner never told attorney that he smoked PCP, and doctors were also unaware, so no need to investigate despite current declarations).  Here, it does not appear that either Petitioner or any other witness discussed prior exposure to toxic substances, or that Petitioner behaved as if he suffered from brain damage or had any noticeable cognitive deficits.

### 3)  History of Substance Abuse

Petitioner claims that he was prejudiced by defense counsel's failure to investigate his long history of substance and alcohol abuse even though counsel was aware and could have introduced evidence through Dr. Markman and/or Petitioner.  (ECF No. 178 at 294-95; SHCP Ex. 20 at 1-3.)

However, defense counsel could reasonably have decided to omit this evidence for fear it might not be viewed as mitigating by the jury.  See Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir. 1994) ("precedents show that many lawyers justifiably fear introducing evidence of alcohol and drug use"); see also White v. Singletary, 972 F.2d 1218, 1225-26 (11th Cir. 1992) ("counsel's strategy not to dwell on the intoxication issue" was tactical and reasonable).

Defense counsel may have felt that introducing a long history of substance abuse would have contradicted the other evidence presented in mitigation, namely that Petitioner was devoted to his family, had worked hard throughout his life to support his family, and that he had adjusted well to prison life.  Furthermore, counsel also may have felt that evidence of substance abuse would have supported the defense theory that Petitioner shot the victims because his drug operation had been exposed.  In such regards, the record could reasonably support a determination that defense counsel was aware of Petitioner's substance abuse and did not present this evidence for tactical reasons.  If so, it appears unlikely that any further investigation would have changed counsel's decision not to present this type of evidence during the penalty phase.

Petitioner argues that the investigation in his case was similar to investigations which the Ninth Circuit had previously found to be deficient.  He cites to the cases of Correll v. Ryan, 465 F.3d 1006 (9th Cir. 2006), amended by Correll v. Ryan, 539 F.3d 938, (9th Cir. 2008); Boyde, 404 F.3d 1159 amended by 421 F.3d 1154;  Frierson v. Woodford, 463 F.3d 982 (9th Cir. 2006);  and Karis v. Calderon, 283 F.3d 1117, 1133 (9th Cir. 2002).  However, each of these cases is distinguishable.

In Correll, a pre-AEDPA case subject to de novo review, defense counsel met only briefly with defendant between the trial and penalty phase, almost completely failed to investigate available mitigation evidence, and put on no affirmative penalty defense.  539 F.3d at 943-44.  In Boyde, defense counsel failed to investigate mitigating childhood abuse, and failed to introduce the evidence his limited investigated did uncover.  404 F.3d at 1176.  In Frierson, defense counsel was on notice of, but failed to investigate and present mitigating evidence of extensive drug history, childhood abuse and head trauma, mental impairment and brain damage.  463 F.3d at 992-96.  In Karis, defense counsel failed to investigate and present significant mitigation evidence; the defense mitigation presentation took only 48 minutes and omitted evidence of childhood poverty and abuse.  283 F.3d at 1133-41.

By contrast, in this case, investigator Ruby contacted numerous mitigation witnesses, including family and friends suggested by Petitioner, for additional information regarding his background, with noted positive results.  (See SHCP Ex.'s. 5, 9, 24.)  Moreover, the only evidence that Petitioner may have suffered drug and alcohol intoxication at the time of the capital murders was his possibly self-serving statement to Dr. Markman.  (See SHCP Ex. 20 at 1-3.)  Ramirez testified that he and Petitioner left the bar together and were at the cabin less than an hour before the victims arrived.  (See RT at 1947.)  In all the statements made to the police and during trial, Ramirez did not mention anything about Petitioner smoking cocaine prior to the shootings, or for that matter drinking alcohol at the cabin the day of the shootings.  Additionally, Petitioner's noted conduct during and after the shootings reasonably suggests the absence of alcohol and drug intoxication.

### 4)   *Lay Witnesses*

Petitioner complains defense counsel did not elicit from lay witnesses and present all possible information regarding circumstances in mitigation.  (ECF No. 113 at 201-11.)

Petitioner argues that the mitigation defense was "meager" (see ECF No. 178 at 298:4); that defense counsel was ineffective by "fail[ing] to elicit testimony from the witnesses which would have provided the jury with insight into [Petitioner's] troubled childhood, his history of substance abuse, and his mental and emotional problems."  (Id. at 298:9-12.)  He claims this missed the opportunity to develop a "comprehensive mitigation picture."  Ainsworth v. Woodford, 268 F.3d 868, 874 (9th Cir.

2001) (defense counsel ineffective for failing to adequately investigate, develop and present readily available substantial mitigating evidence).

However, the defense presented numerous mitigation witnesses during the penalty phase, including several family members, who testified that: (1) Petitioner supported and took custody of his two daughters who had been abandoned by his first wife; (2) Petitioner served in Vietnam in the Navy; (3) Petitioner financially supported and provided a home for his step-daughter after her biological mother (Petitioner's ex-wife) abandoned her; (4) Petitioner opened his home to other young people who needed his help and provided them with food and shelter; (5) Petitioner protected his daughters and other people who lived with him; (6) Petitioner was a "model inmate" when imprisoned in Chino for the attempted voluntary manslaughter of Ross; (7) Petitioner moved up to the secluded cabin after his fiancée Rhonda died in a car crash; (8) Petitioner had a difficult childhood and suffered the hatred of his biological father and his stepfather; (9) Petitioner was forced to live on the streets starting at about nine years of age for the greater part of his childhood; and (10) Petitioner fixed up the house where he was staying in Chicago, was generous and helpful, and established close ties with his family in Chicago after the capital murders.  (See RT at 2402-2528.)

Petitioner also faults defense counsel for emphasizing his positive conduct with family members while he was a fugitive, rather than on developing mitigation from Petitioner's life history and experience.  Petitioner claims this strategy was not based on any sufficient investigation. However, the California Supreme Court reasonably could have found defense tactics developed through the mitigation investigation influenced counsel's actions relative to lay witnesses.  Counsel sought to portray the Petitioner as a person with positive qualities who had the potential to rehabilitate and to adjust to life in prison.  Counsel here, unlike counsel in Ainsworth, did investigate and consider Petitioner's background and mental state, including witness interviews and examination of personal history records, and presented the noted evidence relating to his troubled childhood, substance abuse history, military and employment history, and prior incarceration.  A more comprehensive background presentation reasonably might have opened the door to evidence of aggravating criminal activities, Petitioner's violent temper and use of violence, and his attempts to avoid responsibility for his violence.

To the extent Petitioner relies on pre-AEDPA cases noted *ante* (<u>Summerlin</u>, <u>Bean</u>, <u>Jackson</u>, <u>Ainsworth</u>, and <u>Douglas</u>), his reliance is misplaced.  <u>Bean</u> and <u>Jackson</u> are unavailing for reasons discussed in claims W1 and W2, *ante*.  <u>Summerlin</u>, <u>Ainsworth</u> and <u>Douglas</u> found counsel therein ineffective where there was no or only insubstantial investigation and presentation of available mitigation evidence, in contrast to the noted efforts of defense counsel in this case.

### 5)   *Mental State Defenses*

Petitioner complains defense counsel did not consult or retain an expert to develop mental deficits and defenses.  (ECF No. 113 at 203:11-12, 211-18.)  He claims, and Respondent concedes (ECF No. 194 at 353:27), that the competency evaluation of Dr. Markman was not necessarily meant to evaluate mental illness for the purpose of presenting mitigation evidence.  (ECF No. 178 at 300.)

Petitioner relies upon declarations of his habeas experts, Drs. Khazanov and Matthews, provided ten years after the capital crimes, suggesting the existence of brain impairment predating the crimes and that the crimes were triggered by a traumatic stress reaction and alcohol and cocaine ingestion.  (<u>See</u> SHCP Ex.'s 10, 22.)

The Ninth Circuit has held that a defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client facts that the experts do not request."  <u>Wallace v. Stewart</u>, 184 F.3d 1112, 1116 (9th Cir. 1999); <u>see also</u> <u>Caro v. Woodford</u>, 280 F.3d 1254, 1254 (9th Cir. 2002) (counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health).  But defense counsel only has a duty to investigate a defendant's mental state "if there is evidence to suggest that the defendant is impaired," <u>Douglas</u>, 316 F.3d at 1085, and counsel has notice of the mental impairment.  <u>Caro</u>, 280 F.3d at 1254.  Petitioner was evaluated by a qualified forensic psychiatrist, Dr. Markman, prior to trial.  Dr. Markman determined that Petitioner was competent to stand trial.  Dr. Markman also determined that Petitioner did not suffer from mental disorders, (SHCP Ex. 20 at 1-3), based on an examination that:

> [R]evealed [Petitioner] to be fully oriented in all spheres, alert, cooperative, and above normal intelligence with an excellent fund of knowledge. Dr. Markman found that Petitioner's responses to be relevant and coherent and his memory and concentration were unimpaired and his affect was appropriate, though detached. There was no evidence of a major mental disorder, thought disorder or psychosis, judgment was not

1   impaired and insight into his status was adequate.  He was able to provide a coherent

2   narration of his version of the events of September 2, 1990 and their sequelae.

3   (SHCP Ex. 22, at 58.)

4       Petitioner argues that his habeas expert, Dr. Matthews, determined that the shooting of Mr.

5   Huffstuttler was likely the result of an exaggerated response to perceived dangers, that is:

6       [T]o a reasonable degree of medical certainty that the shooting of Vance Huffstuttler
7       was the result of trigger responses to perceived dangers to [Petitioner] himself.
        Petitioner's exaggerated perceptions and reactions were the result of [Petitioner's] many
8       deficits, his organic brain damage, the stress he was under at the time of the crime and
        his ingestion of alcohol and cocaine.
9

10  (Id.)  Even if this was the case, the California Supreme Court could reasonably have found that

11  Petitioner's noted subsequent acts of walking down to the creek bed and shooting Mincy multiple

12  times while the latter was curled on the ground begging for his life, wounding Wilson and searching

13  for him following his escape, changing the scene of the murders to make it look like drug deal gone

14  bad, disabling Wilson's truck and leaving him on the mountain to bleed to death, and then fleeing to

15  the Los Angeles area and ultimately Chicago, all suggested mental state defenses were unavailable.

16  As noted, the only evidence that Petitioner was under the influence of intoxicants was his statement to

17  Dr. Markman.  (See SHCP Ex. 20 at 1-3.)  Ramirez did not mention it.  Petitioner's close friend,

18  Daser, stated that Petitioner drank only on the weekend and that Petitioner was not a binge drinker.

19  (See SHCP Ex. 4 at 1, 4.)  Petitioner's daughter, Mary, agreed with this assessment.  (See SHCP Ex.

20  5 at 10.)

21      Nor does Dr. Matthews's mental evaluation, conducted over a decade after the capital

22  murders, change the fact that shortly before trial, Dr. Markman, a qualified psychiatrist, evaluated

23  Petitioner and concluded that he showed no signs of suffering from any "major mental disorder,

24  thought disorder or psychosis" and furthermore that his judgment did not appear to be impaired.

25  (SHCP Ex. 20.)  Dr. Markman took into consideration Petitioner's claimed daily use of alcohol and

26  claimed long history of substance abuse.  (Id. at 2-3.)  Dr. Markman diagnosed Petitioner with

27  polysubstance abuse and a personality disorder with paranoid, explosive, and antisocial features. (Id.

28  at 3.)  The fact that Dr. Matthews, ten years hence, may have disagreed with Dr. Markman does alone

1  render Dr. Markman's opinions incorrect.  See e.g., Boyde, 404 F.3d at 1168-69 (holding that if new

2  mental health evidence, obtained after the trial, were sufficient to establish the petitioner's innocence,

3  the petitioner could "always provide a showing of factual innocence by hiring psychiatric experts

4  who would reach a favorable conclusion").

5  　　The California Supreme Court could reasonably have determined that Dr. Matthews's belief

6  that Petitioner "may" have experienced neuropsychological damage in utero because his father may

7  have beaten his mother, or because his mother may have worked at a metal plating shop (see SHCP

8  Ex. 22 at 42-43), amounts to surmise and nothing more.  The same can be said about the suggestion

9  of Petitioner's expert, Dr. Khazanov, that Petitioner suffered post-partum closed head injuries.  (See

10  SHCP Ex. 10 at 11.)  Dr. Khazanov apparently based this conclusion only upon her assumption that

11  Petitioner suffered a closed head injury when his father threw him against a wall, (see SHCP Ex. 10

12  at ¶ 31-34), given head scars of undetermined origin.  (Id.)

13  　　Dr. Khazanov's statement that Petitioner may have suffered organic brain deficits secondary

14  to the effects of long-term military and workplace exposure to toxic substances (see SHCP Ex. 10 at

15  ¶¶ 35-40) likewise could reasonably be seen as speculative, notwithstanding declarations from

16  Petitioner's former coworkers purportedly vouching for their own exposure to toxic substances.  (See

17  SHCP Ex.'s 4, 11.)  Petitioner was found to be healthy when he received a physical examination in

18  1981.  (See SHCP Ex. 41.)  Petitioner certified at that time that he did not suffer from eye trouble

19  (pain, burning, itching, etc.), headaches or throbbing temples, depression, excess worry, or trouble

20  sleeping, illness or injury from chemical exposure, or dizziness or fainting spells.  (Id.)  Again, the

21  noted level of functioning suggested by the record, both in the military (see e.g., SHCP Ex. 33) and

22  during and after the capital murders (see SHCP Ex. 13), belies a claim of brain damage.

23  　　Petitioner's claim that Dr. Markman failed to identify his "organic brain damage" and that

24  counsel should have consulted and retained other experts in this regard (ECF No. 178 at 303) could

25  reasonably be viewed as unsupported in the record that was before the state court.  Defense counsel

26  provided Dr. Markman with access to Petitioner to conduct an evaluation, along with Petitioner's

27  prior police reports, the reports related to the capital crimes, and his prior probation reports (which

28  presumably detailed much of his employment and life history).  (See SHCP Ex. 20 at 1.)  It is

reasonable to conclude that defense counsel could not have known that Dr. Markman would require any other information absent his request or further relevant information from Petitioner.  Hendricks, 70 F.3d at 1038 (expert must provide guidance regarding information that may be helpful).

Nor does the record necessarily suggest that defense counsel was reasonably on notice of a toxic substances defense.  Counsel has no duty to pursue neurological experts when a qualified forensic psychiatrist does not indicate that such testing is implicated, Walls v. Bowersox, 151 F.3d 827, 835 (8th Cir. 1998), or when there is no indication of brain damage, Wright v. Angelone, 151 F.3d 151, 163 (4th Cir. 1998).  Defense counsel is entitled to and can rely on the report of an expert who is consulted.  Babbitt, 151 F.3d at 1174 (counsel has no duty to contact other experts when he reasonably thought those consulted were well-qualified and no duty to ensure the trustworthiness of an expert's conclusions).

For the reasons stated, the California Supreme Court could have found it unlikely that Petitioner was prejudiced by counsel's decision not to call Dr. Markman or another mental health expert as a witness.  Doing so also might have opened the door to aggravating testimony relating to his violent outbursts, alleged substance abuse and his denials of responsibility for his actions including the self-inflicted wounds.  (See e.g., SHCP Ex. 20 at 1-3); Harris, 949 F.2d at 1525 (counsel not ineffective by choosing not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion). Moreover, the noted evidence in aggravation at the penalty phase was substantial.  (See claims O, R and S, ante.)

Accordingly, the California Supreme Court could reasonably have found that alleged mental state defenses would not have been sufficient to undermine confidence in the trial outcome.  See U.S. v. Lewis, 786 F.2d 1278, 1283 (5th Cir. 1986).

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an

1    unreasonable application of, clearly established federal law, as determined by the Supreme Court, or

2    that the state court's ruling was based on an unreasonable determination of the facts in light of the

3    evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

4    Claim W7 is denied.

5    **i.    Analysis of Claim W8**

6    Petitioner's next claim alleges defense counsel was ineffective by not objecting to the penalty

7    phase instructional errors alleged in claims R4 and U1-U5, *ante*, denying him a fair trial and reliable

8    sentence determination, violating the Sixth and Eighth Amendments.  (ECF No. 113 at 218.)

9    Petitioner raised this same claim in his petition for writ of habeas corpus in the California

10   Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den.

11   Pet. Habeas Corpus.)

12   The California Supreme Court also considered and denied certain of these allegations on the

13   merits on direct appeal.  See Bolin, 18 Cal. 4th at 341-45.

14   Petitioner argues that, had defense counsel objected to these instructional errors, they would

15   have been corrected, (ECF No. 113 at 218:15), and that it is reasonably probable the result of his

16   proceeding would have been more favorable.  (Id. at 218:18-19.)

17   The Court disagrees.  This claim fails for the reasons set forth in Claim R4 and Claims U1

18   through U5, *ante*.  There is no cumulative error because there is no individual error.  Parle, 505 F.3d

19   at 928 (citing Donnelly, 416 U.S. at 643).

20   For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish

21   that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below

22   an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a

23   reasonable probability the outcome of the proceeding would have been different.  Strickland, 466

24   U.S. at 687-98.

25   It does not appear that the state supreme court's rejection of the claim was contrary to, or an

26   unreasonable application of, clearly established federal law, as determined by the Supreme Court, or

27   that the state court's ruling was based on an unreasonable determination of the facts in light of the

28   evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim W8 is denied.

### j.    Analysis of Claim W9

Petitioner's final claim alleges that counsel was ineffective by not objecting to the improper comments made by the prosecutor during her penalty phase closing argument, discussed in claim V, *ante* and summarized below, denying him a fair trial and reliable penalty determination, violating his rights under the Sixth and Fourteenth Amendments.  (ECF No. 113 at 218-19.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily rejected on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)  Petitioner argues that defense counsel's failure to object to the prosecutor's improper closing comments that the jury should consider public sentiment; matters outside the record; sympathy only to the extent of Petitioner's culpability; and the prosecutor's personal opinion regarding the truthfulness and credibility of defense witness Mary Bolin -  all misled the jury as to those factors they could properly consider at the penalty phase, impermissibly increasing the likelihood of a death sentence.  (ECF No. 113 at 218:24-26.)

But this claim fails for the reasons stated in claim V, *ante*.  Furthermore, "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during opening statement and closing argument is within the 'wide range' of permissible professional legal conduct."  Necoechea, 986 F.2d at 1281 (citing Strickland, 466 U.S. at 689) (finding no ineffectiveness for failure to object to the prosecutor's argument).

There is no cumulative error because there is no individual error.  Parle, 505 F.3d at 928 (citing Donnelly, 416 U.S. at  643).

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different.  Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an

unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Claim W9 is denied.

### 7.     Review of Claims X and Y

In these next two claims, Petitioner alleges that following the penalty phase, the trial court erred in denying his request for appointment of separate counsel for the purpose of filing a new trial motion based on ineffective assistance of counsel.  (ECF No. 113 at 219-26; SHCP Ex. 47.)  He also alleges that Cater was ineffective for not filing a new trial motion and not renewing his request for separate counsel.  (Id.)  Petitioner claims these errors denied him the right to counsel, due process, and a reliable sentence determination, violating his rights under the Fifth, Sixth and Fourteenth Amendments.  (Id.)

Petitioner raised these same claims on direct appeal, which the California Supreme Court denied on the merits.  Bolin, 18 Cal. 4th at 346-47.  Petitioner also raised these claims in his petition for writ of habeas corpus in the California Supreme Court.  The California Supreme Court ruled that Petitioner's habeas claims were procedurally barred because they were repetitive of claims that had been raised and rejected on direct appeal. (See CSC Order Den. Pet. Habeas Corpus [citing In re Harris, 5 Cal. 4th at 824-29; In re Waltreus, 62 Cal. 2d at 225].)  The California Supreme Court also summarily denied the habeas claims on the merits without explanation.  (See CSC Order Den. Pet. Habeas Corpus.)

### a.     Legal Standards

A state law error that renders the trial fundamentally unfair in violation of the federal Constitution violates due process.  See Chambers, 410 U.S. at 298, 302-03 (due process protects defendant from arbitrary deprivation of expectations under state law).

The standard for ineffective assistance is set out in claim C2, *ante*.

### b.     Analysis of Claims X and Y

As grounds for new trial, Petitioner re-argues presumed prejudice arising from counsel Soria's alleged actual conflict of interest including the noted deficiencies relating to investigator Binns,

Soria's failure to ensure guilt phase witnesses were personally interviewed, and the complete breakdown of the relationship between Soria and Petitioner.  (See claims A, J, *ante*.)

### 1)   Independent Counsel

Petitioner claims that the trial court erred in denying his motion for appointment of separate counsel.  (See ECF No. 113 at 219.)

However, the California Supreme Court could have found the trial court's denial of independent counsel to be reasonable in the absence of predicate ineffective assistance.  Soria was not ineffective or conflicted for reasons discussed in claims A and J, *ante*.  The trial court noted that it denied the request for independent counsel because it "did not see anything wrong with Mr. Soria's representation, and . . . [no] more favorable determination would have occurred."  (2/25/91 RT at 16-17.)  The trial court found no colorable claim for independent counsel, and suggested habeas corpus was appropriate to pursue ineffective assistance claims.  (2/25/91 RT at 17.)

The California Supreme Court also considered and rejected these allegations, stating that:

> Following the penalty verdict, Defense Attorney William Cater requested the court appoint new counsel for the purpose of making a new trial motion that might involve issues of ineffective assistance at trial. In camera, Cater indicated he thought the investigation for both the guilt and penalty phases had been deficient due to inadequacies on the part of the investigative agency retained by prior trial counsel, Charles Soria. Because Cater had represented defendant at both the guilt and penalty phases, he felt it was inappropriate for him to argue ineffective assistance in the context of a new trial motion. Defendant did not express dissatisfaction with Cater during any of the proceedings. Relying on the standard set forth in *People v. Stewart* [Citation], the court denied the request because the defense did not present a "colorable claim" the assistance of another attorney was necessary for the new trial motion. [Citation] In the court's view, Soria's representation was adequate, "and I certainly don't think by any stretch of the imagination that any more favorable determination would have occurred."

Bolin, 18 Cal. 4th at 346.

This Court finds that the California Supreme Court also could reasonably have determined Cater was not prevented, by conflict of interest or otherwise from arguing Soria's ineffectiveness.  Cater and Soria were each appointed independently.  The record does not suggest any conflict of interest that might have prevented Cater from arguing ineffective assistance of counsel against Soria, at least to the extent based on matters unknown to Cater during the trial.  See Strickland, 466 U.S. at 690 (counsel's performance is to be viewed as of the time of counsel's conduct).  In fact, the record

reflects Cater's claimed ignorance of certain of the guilt phase issues allegedly mishandled by Soria. (See e.g., SHCP Ex. 47, 1/7/91 Marsden RT at 2304-11).  Successive representation alone does not demonstrate a conflict of interest.  See, e.g., Whiting v. Burt, 395 F.3d 602, 619 (6th Cir. 2005) ("the rather common occurrence of trial counsel [filing a direct appeal based on ineffective assistance of counsel] does not create any obvious prejudice.").

It seems that the trial court had sufficient opportunity to consider the reasons for a claim of ineffectiveness, having conducted two hearings on that issue.  (See 12/13/90 Marsden hearing; 2/25/91 In Camera hearing.)  The trial court found no basis for further evidentiary development of these issues.  (See 12/13/90 Marsden Hearing RT at 2291-99; 2/25/91 RT at 7, 16-17.)  The trial court found defense counsel's performance during the guilt and penalty phases not ineffective.  (Id.)

In rejecting these allegations on direct appeal, the California Supreme Court stated:

> At the *Marsden* hearing, defendant had asserted that the shootings were the responsibility of several other individuals possibly in confederacy with Mincy and Wilson to steal his marijuana and that he himself had been wounded in the incident. Although he had given Soria names and addresses of some of the alleged assailants as well as names and addresses of persons to whom he had shown his wounds after he left Kern County, Soria failed to call any of them to testify at trial. Defendant also complained discussions he had with Soria had become known to the prosecutor possibly through some breach of confidentiality on the part of the defense investigator. Soria responded that he had investigated or attempted to investigate the witnesses provided by defendant, with inconclusive results. In particular, medical information indicated defendant's wounds were inconsistent with his description of the events. Soria also did not think the investigator had been the source of any leaks. He acknowledged, however, that he and defendant were in conflict. The court found no substance to defendant's complaints, but nevertheless determined a breakdown in the attorney-client relationship jeopardized defendant's right to a fair trial and therefore relieved Soria.

> On this record, we find no abuse of discretion in the trial court's refusal to appoint new counsel to prepare and present a new trial motion. The court originally concluded, and later reiterated, that Soria's representation was not inadequate. Because it was able to observe his trial performance, we defer to that assessment absent contrary evidence. With respect to Cater's concern about the adequacy of penalty phase investigation, the record contains no colorable claim that it was in fact deficient. At best, he offered only speculation based on hearsay reports, and [Petitioner] added nothing to substantiate the allegation. Accordingly, the trial court properly declined to replace Cater for a new trial motion. The court also properly refused to appoint additional counsel for that purpose. As we have noted before, no authority supports the appointment of "simultaneous and independent, but potentially rival, attorneys to represent defendant."

Bolin, 18 Cal. 4th at 347.

In light of this Court's denial of all the record claims, *ante*, the noted conclusions of the California Supreme Court regarding denial of independent counsel were not unreasonable.  See also Jackson v. Ylst, 921 F.2d 882, 887-88 (9th Cir. 1990) (requiring a trial court to appoint substitute counsel whenever a defendant seeks a new trial on the basis of counsel's incompetence is unsupported by case law and would be a "new rule" under Teague).

The record does not demonstrate that the trial court's denial of independent counsel substantially and adversely affected his right to counsel, fair trial and a reliable sentence, or that had the trial court granted Petitioner a new trial, it is reasonable to believe that he would have obtained a more favorable outcome.  The noted evidence supporting Petitioner's guilt and death sentence determination was substantial.  (See e.g., claims O, R and S, *ante*.)

### 2)   New Trial Motion

Petitioner faults Cater for not filing a motion for a new trial following the penalty phase and prior to imposition of sentence and claims his failure to do so was itself ineffective assistance.  (ECF No. 113 at 224.)  He speculates that Cater could have supported a motion for new trial by proffering then available facts, outside the trial record, included in the state habeas proffer.  (See ECF No. 113 at 224-26.)  These facts, according to Petitioner, would have shown the failure of Soria and Binns to investigate guilt and penalty phase issues; along with the evidence that appropriate investigation would have yielded including the missing pages of the Halfacre letter (see SHCP Ex.'s 9, 16, 25), statements from Balsamico that it was he, not Petitioner, who assaulted Spencer (see SHCP Ex.'s 12, 46), and statements from individuals including Sandra Hooten regarding the confrontation between Huffstuttler and Petitioner shortly before the murders.  (See SHCP Ex. 28.)

However, the state supreme court could have concluded it was not reasonably probable that such extra-record facts, (see ECF No. 113 at 224-26), even if then available and admissible evidence, would have altered the outcome of Petitioner's trial.  For the reasons stated in the record claims, *ante*, the California Supreme Court reasonably found lacking the claims relating to investigator Binns's incompetence; unspecified mitigating information from family members in Chicago; statements of Paula regarding the alleged missing pages from the Halfacre letter; statements of Balsamico regarding the Spencer assault; and unspecified mitigating information from Petitioner's friends in Los Angeles.

At bottom, Petitioner has not demonstrated a reasonable probability that an evidentiary proffer insufficient to warrant habeas relief would have resulted in granting a new trial. Even if a new trial motion had been granted, Petitioner has not demonstrated a likelihood of a more favorable result for the reasons stated in claims I1 through I17 and W1 through W9. Furthermore, the noted evidence against Petitioner was substantial. (See claims O, R and S, *ante*.)

### 3)   Conclusions

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial; that defense counsel's performance fell below an objective standard of reasonableness; and that absent counsel's unprofessional errors there was a reasonable probability the outcome of the proceeding would have been different. Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of claim X and Y was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claims X and Y are denied.

### 8.   Review of Claim Z

Petitioner next claims that the determination of his death sentence was unreliable due to the individual and cumulative ineffectiveness of counsel during the penalty phase as alleged in claims R, S, T, U, V, and W, *ante*, violating his rights under the Eighth Amendment to the U.S. constitution. (See ECF No. 113 at 226-27.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which that court summarily denied on the merits without explanation. (See CSC Order Den. Pet. Habeas Corpus.)

Petitioner argues that the above noted penalty phase errors prevented the jury from considering exculpatory and mitigating evidence during their sentence selection deliberations, rendering their verdict unreliable. (ECF No. 113 at 226:17-227:11.) He claims this denied him the jury's reasoned moral response to all mitigating evidence relevant to his background, character and the circumstances of the crime. (Id.)

The Court finds that this claim fails for the reasons discussed in claims R, S, T, U, V and W, *ante*.  As discussed in those claims, Petitioner has not demonstrated that the jury was precluded from considering mitigating evidence, so as to come within <u>Eddings</u>.  455 U.S. 104 (1982).  Moreover, there is no cumulative error because there is no individual error.  <u>Parle</u>, 505 F.3d at 928 (<u>citing</u> <u>Donnelly</u>, 416 U.S. at 643).

For the reasons stated, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged, that defense counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different.  <u>Strickland</u>, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d).

Claim Z is denied.

**9.    Review of Claim AA**

Petitioner next claims that the cumulative effect of the above noted guilt, special circumstance, and penalty phase errors denied him a fair trial and rendered his conviction and sentence unreliable, violating his rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments.  (ECF No. 113 at 227:14-27.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

The Court finds that this claim fails because all the foregoing record claims *ante*, fail for the reasons stated.  There can be no cumulative error because there is no individual error.  <u>Parle</u>, 505 F.3d at 928, <u>citing</u> <u>Donnelly</u>, 416 U.S. at 643.  As noted, Petitioner was "entitled to a fair trial but not a perfect one, for there are no perfect trials."  <u>McDonough Power Equipment</u>, 464 U.S. at 553 (<u>quoting</u> <u>Brown</u>, 411 U.S. at 231-32).

It does not appear that the state supreme court's rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim AA is denied.

**10.   Review of Claim BB**

Petitioner next alleges multiple subclaims asserting that California's then-effective death penalty scheme was unconstitutional, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.   (ECF No. 113 at 228-30.)   These subclaims are considered separately below.

**a.   Clearly Established Law**

As noted, Supreme Court cases have established that a state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Marsh, 548 U.S. at 173-74.   If the "state system satisfies these requirements," then the "State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Id. (citing Franklin, 487 U.S. at 179, and Zant, 462 U.S. at 875–876 n.13).

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder.   Sawyer, 505 U.S. at 342.   A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors." Id.; see also Gregg, 428 U.S. at 196-97.

**b.   Review of Claim BB1**

Petitioner alleges that California's death penalty scheme "fails to account for differing degrees of culpability attendant to different types of murder, enhancing the possibility that a death sentence will be imposed arbitrarily, without regard for the blameworthiness of the particular defendant or the acts at issue."   (ECF No. 113 at 228:5-8.)

Petitioner raised these same allegations in his petition for writ of habeas corpus in the

California Supreme Court, which that court summarily denied on the merits without explanation. (See CSC Order Den. Pet. Habeas Corpus.)  That court also generally denied these allegations on direct appeal.  See Bolin, 18 Cal. 4th at 345-46.

Petitioner alleges that California's death penalty scheme then in effect was unconstitutional because it was unpredictable, failing to genuinely narrow the class of murders eligible for the death penalty.  He cites to a separate California capital case, People v. Sanchez, No. S007780, in which "counsel analyzed published opinions in murder appeals over a period of five years, and demonstrated that 93% of defendants convicted of first degree murder in California committed their offenses under circumstances creating death-eligibility."  (ECF No. 113 at 228:9-19.)  This, he claims, demonstrates that "the California sentencing scheme does not provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not."  Id.; Furman, 408 U.S. 238.  He argues that, to be constitutional, the death penalty "must be reserved for those killings which society views as the most grievous . . . affronts to humanity."  Id.; Zant, 462 U.S. at 877 n.15.

Here, the California Supreme Court considered and denied Petitioner's claim regarding the narrowing effect of its death penalty statute.  Bolin, 18 Cal. 4th at 345.  That court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Nor was the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

The Court finds that this claim fails for the reasons stated in claim U5.  California's death penalty scheme, which narrows the class of death eligible offenders to less than the definition of first degree murder and permits consideration of all mitigating evidence, has been approved by the United States Supreme Court, Tuilaepa, 512 U.S. at 972-79; Harris, 465 U.S. at 38, and this Court, see Ben-Sholom, E.D. Cal. Case No. CV-F-93-5531, ECF. No. 421 at 122, 124-25.

Claim BB1 is denied.

c.    **Review of Claim BB2**

Petitioner next complains that under the California death penalty scheme then in effect "an

291

1    individual prosecutor had complete discretion to determine: 1) whether to charge a special

2    circumstance; and 2) whether to seek the death penalty in a case in which one or more special

3    circumstances are charged." (ECF No. 113 at 228-29.)

4        Petitioner raised this same claim in his petition for writ of habeas corpus in the California

5    Supreme Court, which that court summarily denied on the merits without explanation. (See CSC

6    Order Den. Pet. Habeas Corpus.) These allegations relating to prosecutor's discretion to seek the

7    death penalty were also denied on direct appeal. See Bolin, 18 Cal. 4th at 345.

8        Petitioner complains of "unbounded discretion" in the prosecution that creates a "substantial

9    risk of arbitrariness" because offenders with similar characteristics may or may not be chosen as

10   candidates for the death penalty depending on the individual prosecutor, or because the prosecutor

11   may rely on impermissible characteristics such race and economic status. (ECF No. 113 at 229:3-9.)

12   He claims this unconstitutionally expanded death penalty eligibility under Penal Code § 190.2.

13   Petitioner relies in large part on Bush v. Gore, 531 U.S. 98 (2000), a voting rights case, to support his

14   claim that California's death penalty law should be struck down because of a lack of statewide

15   uniform standards as to when a prosecutor should seek the death penalty, analogizing the fundamental

16   right to vote to the fundamental right to life. (See ECF No. 178 at 356.)

17       However, in McCleskey v. Kemp, the Supreme Court held that the mere existence of

18   prosecutorial discretion over charging decisions does not render a capital punishment scheme

19   unconstitutional. 481 U.S. 279 (1987). Prosecutorial discretion "is essential to the criminal justice

20   process," and does not violate the federal Constitution. Id. at 297. Instead, the Constitution forbids

21   only "purposeful discrimination" in the exercise of prosecutorial discretion, id. at 292-93, and in

22   order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally

23   clear proof before we would infer that the discretion has been abused." Id. at 297. That California's

24   statutory scheme gives the prosecutor discretion does not alone violate the Constitution. See Gregg,

25   428 U.S. at 225.

26       Petitioner has not demonstrated that Bush v. Gore is authority otherwise, and courts have held

27   that it is not. See Coleman v. Quarterman, 456 F.3d 537, 542 (5th Cir. 2006) (finding Bush v. Gore

28   inapplicable in context of criminal procedure); Black v. Bell, 181 F. Supp. 2d 832, 879 (M.D. Tenn.

2001) (<u>Bush v. Gore</u> is not authority that unbridled prosecutorial discretion is unconstitutional).  The claim that California's death penalty scheme is unconstitutional by virtue of prosecutorial discretion is foreclosed by precedent.  <u>See</u> <u>United States v. Mitchell</u>, 502 F.3d 931, 982, (9th Cir. 2007).

The California Supreme Court reviewed these allegations and arrived at the same conclusion, "[t]hat the breadth of the prosecutor's discretion in choosing to seek the death penalty does not render it unconstitutional."  <u>Bolin</u>, 18 Cal. 4th at 345.  That court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  Nor was the state court's ruling based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d).

Claim BB2 is denied.

###    d.    Review of Claim BB3

Petitioner next claims that the then effective California death penalty statute "fails to meet the minimum standards necessary to assure rational and consistent application of the death penalty", denying him due process, equal protection and a reliable and fair penalty determination, violating the Fifth, Eighth and Fourteenth Amendments.  (ECF No. 113 at 229:20-25.)

Petitioner raised this same claim on direct appeal, which the California Supreme Court denied on the merits.  <u>Bolin</u>, 18 Cal. 4th at 345-46.

Petitioner alleges that the death penalty statute is infirm because it does not require the jury to make written findings or require the jury's selection of a death sentence be based on the reasonable doubt standard.  (ECF No. 113 at 229-30.)  He points out that the Georgia death penalty scheme upheld in <u>Gregg</u> required written findings beyond a reasonable doubt of the aggravating circumstances.  428 U.S. at 165, 196-97.

This claim is unpersuasive.  The Constitution does not require written findings by the jury regarding imposition of the death penalty.  <u>See</u> <u>Walton</u>, 497 U.S. at 647-48; <u>Williams</u>, 52 F.3d at 1484-85.

Additionally, "[t]he United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed."  <u>Harris</u>, 692 F.2d at 1195.  All that is constitutionally required is an "adequate basis for appellate review."  <u>Id.</u>

The California death penalty scheme provides for the trial court's express reasons for its findings when ruling on the automatic motion for modification and this provides the "adequate basis" for appellate review.  Id.; see People v. Diaz, 3 Cal. 4th 495, 571-573 (1992).  Petitioner does not demonstrate that clearly established Supreme Court precedent requires more.  See Williams, 52 F.3d at 1484 (California's statute "ensures meaningful appellate review") (citing Brown, 479 U.S. at 543).

Petitioner's citation to Ring, 536 U.S. 584, and Apprendi, 530 U.S. 466 (see ECF No. 178 at 359-60), does not suggest otherwise.  Apprendi, which requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, id. at 490, is not implicated by California's death penalty scheme.  As discussed previously, this is because once a California jury convicts of first degree murder with a special circumstance "the defendant stands convicted of an offense whose maximum penalty is death."  Ochoa, 26 Cal. 4th at 454; see also Prieto, 30 Cal. 4th at 263 & n.14.

Ring is inapposite for the same reasons Apprendi is inapplicable.  Ring invalidated Arizona's capital sentencing scheme because death could be imposed only after the judge, sitting as sentencer without a jury, found at least one specifically enumerated aggravating factor to be true.  530 U.S. at 588-89.  Because death was not the maximum penalty that could be imposed based solely on the jury's conviction of first degree murder, the aggravating factors in Arizona "operate as the 'functional equivalent of an element of a greater offense.'"  Id. at 609.

Petitioner's citation to Cunningham v. California, 549 U.S. 270 (2007), for the proposition that the capital sentence determination must be by the jury and beyond a reasonable doubt, also fails to persuade the Court.  (See ECF No. 178 at 361.)  The Apprendi error in that case arose from trial court findings of fact in a determinate sentencing law case that served to increase the criminal penalty beyond the statutory maximum; such findings must be made by the jury beyond a reasonable doubt.  Cunningham, 549 U.S. at 288-89.  As discussed above, this is not the case here.

Petitioner also claims the constitutional arguments in this claim were not adjudicated by the state supreme court.  (ECF No. 113 at 15-16.)  However, the California Supreme Court adjudicated these allegations by rejecting them on direct appeal on the merits, stating that:

The jury need not make express findings with respect to circumstances in aggravation

1  [Citation], or find beyond a reasonable doubt that death is the appropriate penalty
2  [Citation].

3  Bolin, 18 Cal. 4th at 345-46.

4      For the reasons stated, that court's rejection of this claim was not contrary to, or an
5  unreasonable application of, clearly established federal law, as determined by the Supreme Court.
6  Nor was the state court's ruling based on an unreasonable determination of the facts in light of the
7  evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

8      Claim BB3 is denied.

9      **11.**   **Review of Claim DD**

10      Petitioner next claims ineffective assistance of appellate counsel by failing to raise, on direct
11  appeal, all of the claims asserted in his federal proceeding, causing the California Supreme Court to
12  reject claims B1, J, L1-L4, P1-P3, P5-P10, Q, R1-R4, U1, U2, U6, U7, V, X. Y, Z, AA, BB1-BB2
13  and FF as improperly presented on habeas corpus, violating his rights to due process and meaningful
14  appellate review under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (ECF No. 113 at 235-
15  36; cf., ECF No. 178 at 365 [citing same claims plus claim A but minus claims L1 and L2].)

16      Petitioner raised this same claim in his petition for writ of habeas corpus in the California
17  Supreme Court), which the California Supreme Court summarily denied on the merits without
18  explanation.  (CSC Order Den. Pet. Habeas Corpus.)

19      **a.**   **Clearly Established Law**

20      The Strickland standard (see claim C2 *ante*) applies to appellate counsel.  Smith v. Robbins,
21  528 U.S. 259, 285 (2002).  However, appellate counsel has no constitutional obligation to raise every
22  non-frivolous issue, even if requested by the appellant.  Jones v. Barnes, 463 U.S. 745, 751 (1983)
23  (holding that an attorney need not advance every colorable argument on appeal).

24      The Supreme Court has recognized that "since time beyond memory" experienced advocates
25  "have emphasized the importance of winnowing out weaker arguments on appeal and focusing on
26  one central issue if possible, or at most on a few key issues." Id. at 751-52; cf. Banks v. Reynolds, 54
27  F.3d 1508, 1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" - an issue obvious from the
28  record which would have resulted in reversal - is ineffective).

The appropriate inquiry is not whether raising a particular issue on appeal would have been frivolous, but whether raising it would have led to a reasonable probability of reversal.  Miller v. Keeney, 882 F.2d 1428, 1435 (9th Cir. 1989).  Where a petitioner had only a remote chance of obtaining reversal based upon an issue, neither of the Strickland prongs is satisfied.  Id.

### b.   Analysis of Claim DD

Petitioner alleges that his appointed appellate counsel, Mr. Gilman, was ineffective by failing to appropriately raise the noted claims on direct appeal, causing the California Supreme Court to deny the claims on habeas review pursuant to In re Dixon, 41 Cal. 2d 756 (1953).  (ECF No. 113 at 235:21-236:11.)  He claims prejudice to the extent this Court sustains Respondent's Dixon defense to these claims.  (Id.)

Petitioner alleges the constitutional arguments in this claim were not adjudicated by the state court.  (See ECF No. 113 at 236:6-7.)  However, the state supreme court denied this habeas claim for ineffective assistance of appellate counsel claim on the merits.  (CSC Order Den. Pet. Habeas Corpus.) This claim denial is sufficient as an adjudication of the claim.  See Williams, 133 S. Ct. at 1094-96.

The record reflects that appellate counsel filed a 181-page opening brief raising 21 issues of law with numerous sub-issues.  (See Appellant's Opening Brief lodged June 11, 1999.)  Appellate counsel also filed a reply brief (see Appellant's Reply Brief lodged June 11, 1999) and a petition for rehearing (see Appellant's Petition for Rehearing lodged June 11, 1999).  The appeal was disposed of by the noted lengthy merits opinion by the California Supreme Court.  Bolin, 18 Cal. 4th 297.

Petitioner asserts for the first time in his brief in support of the amended petition that his appellate counsel failed to raise claim A (relating to whether the trial court improperly denied Soria's pretrial motion to withdraw) on direct appeal.  (See ECF No. 178 at 365 n.249.)  This allegation is not included in the amended petition and appears to be unexhausted.  Even if this allegation were properly before this Court, it fails for the reasons discussed in claim A, ante.

Petitioner concedes that claims L1 and L2, not raised in the state opening brief on appeal, were raised in a supplemental appeal brief and that Petitioner was not prejudiced by this method of presentation.  (See ECF No. 178 at 365 n.249.)  Claim Q (cumulative error in the guilt phase), was raised by appellate counsel on appeal and no deficiency is apparent as to this claim.  (See Appellant's

Opening Brief lodged June 11, 1999.)

Furthermore, the Court finds this claim fails because all the noted claims, having been adjudicated in state court, are denied on the merits under the § 2254(d) standard for reasons stated, *ante*. Even if appellate counsel was deficient as alleged, Petitioner has not demonstrated prejudice.

Petitioner also claims that appellate counsel "failed to prepare transcript notes, failed to perfect the record on appeal, failed to timely communicate with federal counsel, abandoned his client when the State threatened to set an execution date, and failed to fulfill his obligations as appointed counsel in a capital case." (ECF No. 113 at 235-36.) However, Petitioner has not made a showing on the evidentiary record that appellate counsel did not do so. Nor has Petitioner demonstrated prejudiced in these regards, for the reasons stated.

Accordingly, a fair-minded jurist could have found that Petitioner failed to establish that he was denied a fair trial, or to the extent alleged that appellate counsel's performance fell below an objective standard of reasonableness and that but for counsel's unprofessional errors there is a reasonable probability the outcome of the proceeding would have been different. Strickland, 466 U.S. at 687-98.

It does not appear that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

Claim DD is denied.

**12.    Review of Claim EE**

Petitioner' next alleges that to execute him following his lengthy confinement pursuant to his February 25, 1991 conviction and sentence of death, which became final on March 8, 1999, would be cruel and unusual punishment, violating the Fifth, Sixth, Eighth, and Fourteenth Amendments and international law. (ECF No. 113 at 236-37.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which that court summarily denied on the merits without explanation. (See CSC Order Den. Pet. Habeas Corpus.)

Petitioner argues that to execute him after such a lengthy incarceration is cruel and unusual punishment and subjects him to double jeopardy of multiple ex post facto punishments not accurately described at the penalty determination.  He cites to People v. Ochoa and argues that delay in determining whether a death sentence is valid may, if prolonged, have the effect of increasing the penalty imposed for the commission of capital crimes.  26 Cal. 4th at 463.

Petitioner claims that he has been confined in a "concentration camp" of the condemned (ECF No. 178 at 389:14) causing him psychological injuries and damages.  He analogizes incarceration pending state review of the validity of his death sentence to "pretrial detention," apparently arguing for the more favorable conditions of confinement to which the latter are entitled.  (ECF No. 178 at 416:21-22.)

However, Petitioner does not cite any clearly established authority from the United States Supreme Court addressing a prolonged detention claim.  See Allen v. Ornoski, 435 F.3d 946, 958-59 (9th Cir. 2006) ("[t]he Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment. . . . Allen cannot credibly claim that there is any clearly established law, as determined by the Supreme Court, which would support this . . . claim"); accord Lackey v. Texas, 514 U.S. 1045 (1995); Knight v. Florida, 528 U.S. 990 (1999).  In McKenzie v. Day, the Ninth Circuit rejected such a Lackey claim involving a twenty-year delay, stating that "[a] defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights."  57 F.3d 1461, 1466 (9th Cir. 1995).

The court in Ochoa concluded that "execution notwithstanding the delay associated with defendant's appeals was not unconstitutional and furthered both the deterrent and retributive functions; and that shielding defendant from execution solely on this basis would frustrate these two penological purposes."  26 Cal. 4th at 464.

For the reasons stated, the California Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  Since the U.S. Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent.  Carey, 549 U.S. 76; see also White v. Johnson, 79 F.3d 432, 439 (5th Cir. 1996) ("White has benefitted from [the] careful and

meticulous [review] process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights.").

It reasonably appears that the duration of Petitioner's appeal, as well as his collateral review proceedings, "is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." Johns v. Bowersox, 203 F.3d 538, 547 (8th Cir. 2000) (quoting Chambers v. Bowersox, 157 F.3d at 570).

Petitioner's further allegation that execution after prolonged incarceration violates international human rights law and jus cogens theories (citing Pratt v. Attorney General for Jamaica, 4 All. E.R. 769 (Privy Council) 1993; Soering v. United Kingdom, 11 E.H.R.R. 439, ¶ 111 [Euro. Ct. of Human Rights]; International Covenant on Civil and Political Rights ("ICCPR"), article 7; Torture Convention, articles 1 and 16; and the American Convention on Human Rights, article 5), fails for the reasons discussed in claim FF, *post*.

Additionally, Petitioner concedes that the ICCPR and the Torture Convention are not self-executing, and that the ICCPR does not create a private cause of action, (*see* ECF No. 178 at 401-02 n.266), suggesting he may lack standing to raise claims thereunder.

Claim EE is denied.

**13.    Review of Claim FF**

Petitioner's final claim is that the individual and cumulative errors alleged in all the above claims denied him a fair trial and reliable sentence under various international laws, covenants, and declarations.  (ECF No. 113 at 237-38.)  He cites to the Universal Declaration of Human Rights, the ICCPR article 6, the American Declaration of the Rights and Duties of Man (American Declaration) articles 1, 26, and customary international law.  (ECF No. 178 at 429:25-431:15.)

Petitioner raised this same claim in his petition for writ of habeas corpus in the California Supreme Court, which was summarily denied on the merits without explanation.  (CSC Order Den. Pet. Habeas Corpus.)

Petitioner's essential argument appears to be that imposition and execution of a death sentence for what he characterizes as "a single-victim felony murder, against a defendant who did not inflict the injuries resulting in death" violates customary international law and article 6, section 2, of the

1  ICCPR, which limits the death penalty to only "the most serious crimes."  (ECF No. 113 at 238: 8-
2  11.)

3      He argues that "the United States is bound by customary international law, as informed by
4  such instruments as the ICCPR and the American Declaration," and that these international laws are
5  instructive in Eighth Amendment cruel and unusual punishment analysis.  (ECF No. 178 at 431:5-6)
6  (citing Roper v. Simmons, 543 U.S. 551, 575 (2005)).

7      He points out that the Ninth Circuit has looked to the Universal Declaration as an exposition
8  of customary international law, Martinez v. City of Los Angeles, 141 F.3d 1373, 1383-84 (9th Cir.
9  1998), and that the American Declaration is comparable to the Universal Declaration.  Alejandre v.
10  Republic of Cuba, 996 F. Supp. 1239, 1252 n.11 (S.D. Fla. 1997).

11      The Court is unconvinced by this claim.  On March 8, 1999, when Petitioner's conviction
12  became final, no clearly established Supreme Court law held that capital punishment was illegal in
13  the United States based on international law.  It appears that challenges to imposition of the death
14  penalty based on international law have regularly been rejected.  See e.g., Buell v. Mitchell, 274 F.3d
15  337, 370-76 (6th Cir. 2001) (rejecting challenge to death sentence based international laws such as
16  the American Declaration, the ICCPR, and customary international law norms); Brewer v. Hall, 378
17  F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law
18  relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot
19  be contrary to or an unreasonable application of clearly established federal law.")

20      This Court finds that the California Supreme Court could reasonably have determined that
21  Petitioner may not rely on the Universal Declaration of Human Rights and the American Declaration
22  as freestanding authority.  Though 28 U.S.C. § 2254(a) limits the scope of these proceedings to
23  alleged violations of the Constitution, laws, and treaties of the United States, the Universal
24  Declaration of Human Rights is not a law or treaty within the meaning of 28 U.S.C. § 2254(a) -  it
25  "does not of its own force impose obligations as a matter of international law."  Sosa v. Alvarez-
26  Machain, 542 U.S. 692, 734 (2004); see Siderman de Blake v. Argentina, 965 F.2d 699, 715 (9th Cir.
27  1992) (international law rests on consent of states).  Similarly, the American Declaration is not a
28  treaty.  See Jamison v. Collins, 100 F. Supp. 2d 647, 767 (S.D. Ohio 2000) (international law does

1    not preclude the state of Ohio from establishing and carrying out a capital punishment scheme).

2    Petitioner concedes that the Universal Declaration and the American Declaration are not treaties.

3    (See ECF No. 178 at 430:25-431:2.)

4           Furthermore, Petitioner has not demonstrated standing on this claim and thus cannot invoke

5    the jurisdiction of international law in this proceeding.  The principles of international law apply to

6    disputes between sovereign governments and not between individuals.  Hanoch Tel-Oren v. Libyan

7    Arab Republic, 517 F. Supp. 542, 545-47 (D.D.C. 1981).  Petitioner suggests no basis for the Court to

8    find that the international law he cites is self-executing and provides an individual right of action.

9    See Dreyfus v. Von Finck, 534 F.2d 24, 30 (2d Cir. 1976) (disavowed in part by Filartiga v. Pena-

10   Irala, 630 F.2d 876, 884) (2d Cir. 1980) (it is only when a treaty is self-executing, when it prescribes

11   rules by which private rights may be determined, that it may be relied upon for the enforcement of

12   such rights).  The ICCPR is not self-executing.  Sosa, 542 U.S. at 734-35; Jamison, 100 F. Supp. 2d at

13   766.

14          To the extent Petitioner argues that the noted international law is at least instructive as to

15   interpretation of the Eighth Amendment, Roper, 543 U.S. at 575, nothing in his argument suggests an

16   available basis for federal habeas relief for him, a convicted multiple first degree murderer.  Even if

17   Petitioner had standing to argue international law, the United States ratified the ICCPR subject to

18   reservation of the right to impose capital punishment subject only constitutional constraints.  See 138

19   Cong. Rec. S-4781-01, S4783 (1992).

20          Petitioner does not demonstrate that the other international law and custom to which he cites

21   precludes capital punishment in his case.  Accordingly, the California Supreme Court's rejection of this

22   claim was not contrary to or an unreasonable application of Supreme Court precedent.  Petitioner is not

23   entitled to relief.

24          Claim FF is denied.

25          **VIII. FURTHER EVIDENTIARY HEARING AND RECORD EXPANSION**

26          The Court reserved ruling on Petitioner's December 22, 2008 motion for record expansion and

27   evidentiary hearing relating to claims A, B2,  D, F, G, I, J, K, W, Y, BB, DD, and EE of the amended

28   petition.  (ECF Nos. 214, 271.)

Petitioner, in post-hearing briefing, argues that "Mr. Soria's testimony on claim C2, insofar as it manifests the comprehensive and wide-ranging inadequacy of his representation of [Petitioner], bolsters [Petitioner's] argument that he is entitled to an evidentiary hearing on his other claims of ineffective assistance [i.e., claims B2, D, F, G2, I, W and Y] should relief not be granted on claim C2." (ECF No. 343 at 16 n.10.)

However, the Court shall deny further record expansion and evidentiary hearing.  The record claims that were adjudicated in state court do not survive 28 U.S.C. § 2254(d) analysis for reasons discussed above.  "[R]eview under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits."  Pinholster, 563 U.S. at 181; accord Stokely v. Ryan, 659 F.3d 802, 809 (9th Cir. 2011).  Any attempted "relitigation" is "bar[red]," Richter, 562 U.S. at 98, no matter what semantics Petitioner employs to avoid being "limited to the record that was before the state court that adjudicated the claim on the merits," Pinholster, 563 U.S. at 181.  To this extent, new evidence in federal court simply cannot assist Petitioner.  Id. at 185.

The record claims that were not adjudicated in state court, reviewed by the Court de novo, do not survive 28 U.S. C. § 2254(e)(2) analysis for the reasons discussed above.  These claims are not entitled to record expansion  and evidentiary hearing.  28 U.S.C. § 2254(e)(2)(A)(B).

Accordingly, Petitioner's December 22, 2008 request for further record expansion and evidentiary hearing as to claims A, B2,  D, F, G, I, J, K, W, Y, BB, DD, and EE of the amended petition (ECF No. 214), shall be denied.

## IX. CERTIFICATE OF APPEALABILITY

Because this is a final order adverse to the Petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability ("COA").  Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  See 28 U.S.C. § 2253(c).

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller–El, 537 U.S. at 335-36 (2003).  The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides as follows:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Court may issue a COA only "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; accord Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that, with respect to the following claims, reasonable jurists could disagree with the Court's resolution or conclude that the issues presented are adequate to deserve encouragement to proceed further:

1. Claim C2: whether trial counsel was ineffective for failing to renew the change of venue motion following voir dire of the jury.

2. Claim I13: whether trial counsel was ineffective because of irregularities and improprieties that occurred during the jury's view of the crime scene and related locations.

3. Claim L (L1-L4): whether the jury view of the crime scene violated Petitioner's state and federal rights.

4. Claim W2: whether trial counsel was ineffective by failing to move for a further continuance at the penalty phase.

Therefore, a certificate of appealability is granted as these claims.

As to the remaining claims and further requests for record expansion and evidentiary hearing, the Court concludes that reasonable jurists would not find the Court's determination that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby declines to issue a COA as to the remaining claims and further requests for record expansion and evidentiary hearing.

## X. ORDER

Accordingly, for the reasons stated, it is HEREBY ORDERED that:

1. The allegation of ineffective assistance of appellate counsel for failure to raise on appeal claim A is DISMISSED without prejudice as unexhausted,

2. Claim C2 is DENIED following limited evidentiary hearing,

3. Further record expansion and evidentiary hearing for claims A, B2, D, F, G, I, J, K, W, Y, BB, DD, and EE are DENIED,

4. Record based claims A, B, and D through FF, are DENIED,

5. The Amended Petition for Writ of Habeas Corpus (ECF No. 113) is DENIED,

6. A COA is ISSUED as to the Court's resolution of claims C2, I13, L (L1-L4), and W2, and DECLINED as to the remaining claims and further requests for record expansion and evidentiary hearing,

7. Any and all scheduled dates are VACATED, and

///

///

///

///

8.   The Clerk of the Court is directed to substitute RON DAVIS, Warden of San Quentin State Prison, as the Respondent warden in this action, and to enter judgment accordingly.

IT IS SO ORDERED.

Dated:   **June 9, 2016**                           **/s/ Lawrence J. O'Neill**
                                                     UNITED STATES CHIEF DISTRICT JUDGE